**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ARTISAN AND TRUCKERS CASUALTY
COMPANY,

                Plaintiff,

    v.

BUKHARA TRANS, INC.

           Defendants.

No.    1:23-cv-4439

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff, the Artisan and Truckers Casualty Company ("Progressive") by and through its counsel, Sudekum, Cassidy & Shulruff, Chtd. for its Complaint for Declaratory Relief pursuant to 28 U.S.C. §2201 and Rule 57 of the Rules of Federal Civil Procedure against Bukhara Trans, Inc. ("Bukhara") states the following:

### INTRODUCTION

1.    This is an action for declaratory judgment pursuant to 28 U.S.C. §2201 and Rule 57 of the Rules of Federal Civil Procedure based on the complete diversity of citizenship of the parties as provided in 28 U.S.C. § 1332.

2.    This action arises from damage to cargo that was not refrigerated when Bukhara was contractually required to do so. Progressive seeks a declaration that it is not required to either defend or indemnify its insured, Bukhara in an action brough by the cargo broker who engaged Bukhara to transport the damaged cargo that is the subject of this litigation.

## PARTIES AND NON-PARTIES

3.     Plaintiff, Progressive is an Ohio corporation with its principal place of business in the State of Ohio. At all relevant times, Progressive was and is authorized to issue policies of insurance in the State of Illinois.

4.     At all times relevant, Progressive issued a policy of insurance to Bukhara that included a Motor Truck Cargo Liability Endorsement Form Z434 IL (02/19) and the Refrigeration Breakdown Coverage Endorsement (Form Z440 (0610) ("the policy"). (**Exhibit 1**).

5.     Defendant, Bukhara, is an Illinois Corporation with its principal place of business in Illinois, located at 1400 Light Road, Apt. 103, Oswego, Illinois. At all times relevant Bukhara was a motor vehicle carrier engaged in the transportation of freight in various states including Illinois and Arkansas.

6.     H.C. Schmieding Produce Company, LLC, ("Schmieding") is a non-party to this lawsuit. On information and belief, Schmieding is a Florida limited liability company doing business in Arkansas. As is set forth more fully below, at all times relevant, Schmieding worked as a cargo broker and engaged Bukhara to transport the damaged cargo that is the subject of this litigation.

7.     Sysco Corporation ("Sysco") is a non-party to this lawsuit. On information and belief, Sysco is an American multinational corporation involved in marketing and distributing food products.

## JURISDICTION AND VENUE

8.     At all times material hereto, Bukhara acted by and through its agents, employees, servants, workmen, and/or ostensible agents engaged within the course and scope of their employment.

9.     Jurisdiction is proper in the federal district courts because this is an action based on complete diversity of citizenship pursuant to 28 U.S.C. § 1332 and the amount of controversy exceeds $75,000.

10.     Venue is proper in the Federal District Court for the Northern District of Illinois, Eastern Division because Bukhara has its principal place of business at 1400 Light Road, Apt. 103, Oswego, Illinois.

## FACTUAL BACKGROUND

11.     On or about October 11, 2022, pursuant to the Carrier Agreement (**Exhibit 2**), the Carrier Load Tender Reference Number LD134110 (**Exhibit 3**), and a Bill of Lading Order # 4-264146 (**Exhibit 4**), Bukhara picked up a load of cargo ("the cargo") at a Sysco facility in Houston, Texas to be delivered to a Sysco facility in Knoxville, Tennessee.

12.     The cargo consisted of 32,277 pounds of frozen whole cranberries.

13.     At the time it took possession of the cargo, Bukhara inspected it and found it to be in good condition. (Exhibit 4, Bill of Lading with driver's signature).

14.     The Carrier Load Tender required the trailer used to transport the load to be precooled to 0 degrees. (Exhibit 3).

15.     The Bill of Lading required the temperature to be maintained at 0 degrees. (Ex.4).

16.     The Bill of Lading also noted the cargo consisted of perishable product and proper temperature must be maintained. (Exhibit 4).

17.     Bukhara took possession of the cargo and placed it in a dry trailer, with no refrigeration capabilities.

18.     Upon arrival at the Sysco facility in Houston, Texas, on October 12, 2022, the product surface temperature of the product comprising the cargo was between 23 and 50 degrees.

3

19.     The temperature critical limit of the product comprising the load was 15 degrees. (See **Exhibit 5**, Temperature Analysis).

20.     The Carrier Agreement required Bukhara to transport the load in accordance with the food safety and security instructions. (Exhibit 2).

21.     The Carrier Agreement also stated Bukhara represented and warranted all equipment used to transport food shipments will be equipped with refrigeration units. (Exhibit 2).

22.     The driver's signature on the Bill of Lading verified the product was in good condition at the time of loading into the Bukhara trailer. (Exhibit 4).

23.     On October 12, 2022, when Bukhara made delivery of the cargo to the Sysco facility in Knoxville, Tennessee, the pulp temperature of the product comprising the cargo ranged from 29 to 46 degrees.

24.     The high temperatures referred to min ¶ 17 above, were noted on the Bill of Lading. (See Exhibit 3).

25.     Due to the high temperatures, Sysco deemed the contents of the cargo to be unsafe and rejected the cargo.

26.     On October 12, 2022, upon making delivery of the now damaged cargo, Bukhara was notified that either the broker, Schmieding, or the shipper, Sysco, would be making a claim ("the claim").

27.     Bukhara did not accept liability for damaging the cargo.

28.     On January 10, 2023, Schmieding, as the broker, filed suit against Bukhara in the United States District Court for the Western District of Arkansas, Fayetteville Division in the matter entitled, *H.C. Schmieding, v. Bukhara Trans., Inc.,* Case No 5:23-cv-05011-TLB seeking to recover damages in the amount of $113,277.64. ("the Schmieding lawsuit"). (**Exhibit 6**).

29. The Schmieding lawsuit seeks to recover damages in the amount of $113,277.64 from Bukhara.

30. On May 11, 2023, Progressive declined to provide coverage to Bukhara for the claim.

**APPLICABLE TERMS OF THE POLICY**

31. The policy provides, in pertinent part, as follows:

**Form 6912 (02/19)**

**COMMERCIAL AUTO POLICY**

**GENERAL DEFINITIONS**

The words and phrases below, whether in the singular, plural or possessive, have the following specific meanings when appearing in boldface type in this policy, and in endorsements issued in connection with this policy, unless specifically modified.

1. "**Accident**" means a sudden, unexpected and unintended event, or a continuous or repeated exposure to that event, that causes **bodily injury** or **property damage**.

\*\*\*

15. "**Property damage**" means physical damage to, destruction of, or loss of use of, tangible property.

\*\*\*

**PART 1-LIABILITY TO OTHERS**

**INSURING AGREEMENT-LIABILITY TO OTHERS**

Subject to the Limits of Liability, if **you** pay the premium for liability coverage for the **insured auto** involved, **we** will pay damages, other than punitive or exemplary damages, for **bodily injury**, **property damage**, and **covered pollution cost or expense** for which an **insured** becomes legally responsible because of an accident arising out of the ownership, maintenance or use of that **insured auto**. However, we will only pay for the covered pollution cost or expense if the same **accident** also caused **bodily injury** or **property damage** to which this insurance applies.

5

**We** will settle or defend, at **our** option, any claim or lawsuit for damages covered by this Part I. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the Limit of Liability for this coverage has been exhausted by payment or judgments or settlements.

\*\*\*

**EXCLUSIONS-PLEASE READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE FOR AN ACCIDENT OR LOSS WILL NOT BE AFFORDED UNDER THIS PART-I LIABILITY TO OTHERS.**

Coverage under this Part I, include **our** duty to defend, does not apply to:

1.  **Expected or Intended Injury**
    **Bodily injury** or **property damage** either expected by or caused intentionally by or at the direction of any **insured**.

\*\*\*

**Form Z434 IL (02/19)**

**MOTOR TRUCK CARGO LEGAL LIBILITY
COVERAGE ENDORSEMENT**

Except as specifically modified by this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with you that the insurance provided under your Commercial Auto Policy is modified as follows:

**INSURING AGREEMENT-LOSS TO COVERED PROPERTY**

Subject to the Limit of Liability, if you pay the premium for this Motor Truck Cargo Legal Liability Coverage, **we** will pay for the direct physical **loss** to **covered property** that **you** are legally liable to pay as a **trucker** under a written: bill of lading, tariff document, rate confirmation sheet, shipping receipt, or contract of carriage. For this coverage to apply, the **covered property** must, at the time of loss, be in your exclusive physical custody and control:

1.  while **in due course of transit** in, on, or attached to an **insured auto**; or
2.  during **loading or unloading**.

Coverage applies for **loss** to **covered property** only if the loss is caused by a **covered peril**. For **covered property** that is **your** property, **our** payment is not contingent upon **your** liability.

**We** have the option to settle or defend any claim or lawsuit for damages covered by this endorsement. However, **we** have no duty to defend **you** against any lawsuit to which this insurance does not apply. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the limit of liability for this **covered property** coverage has been exhausted by payment of judgments or settlements.

*****

## ADDITIONAL DEFINITIONS

The following additional define apply only to Motor Truck Cargo Legal Liability Coverage, as set forth in this endorsement, and any endorsements thereto that solely pertain to this coverage, whenever the defined term appears therein in boldface type, whether in the singular, plural, or possessive:

2.    "**Covered peril**" means any external risks of direct physical **loss** to **covered property** or **business equipment**, except for those listed in a. through m. below as Excluded Perils.

**Excluded Perils**: Please read the following list of excluded perils carefully. Coverage will not be afforded under this Motor Truck Cargo Legal Liability Coverage endorsement for these types of perils. **We** will not pay for any **losses** to **covered property** or business equipment caused by, resulting in or from, or arising out of these excluded peris regardless of any other cause or even that contributes  concurrently or in any sequence to the **loss**.

d.    **Inherent Vice**
      Deterioration; wear and tear; obsolescence; hidden or latent defect; gradual decay fungus; mildew; mold; rot; rust; insects; vermin; change in flavor; or any quality; fault, or weakness in the **covered property** or **business equipment** that caused it to damage or destroy itself.

g.    **Wetness, Breakdown, Temperature, Humidity**
      (i)    Mechanical or electrical breakdown or failure including breakdown or failure of a refrigeration unit or its associate component parts, or heating equipment installed in a cargo component; or

7

    (ii)    Wetness, humidity, dampness, dryness, or changes in or extremes of temperature unless it results from damage to an **insured auto**.

However, this Excluded Peril does not apply to **loss** caused by a fire or explosion if such fire or explosion would be covered under this endorsement.

m.    **Corrosion, Contamination**
**We** will not pay for corrosion, contamination, marring or scratching to any **covered property** or **business equipment** unless it results from damage to an **insured auto**.

\*\*\*

**Form Z440 (06/10)**

### REFRIGERATION BREAKDOWN COVERAGE ENDORSEMENT

This endorsement modifies the Motor Truck Cargo Legal Liability Coverage endorsement. Except as specifically modified by this Refrigeration Breakdown Coverage endorsement, all provisions of the Motor Truck Cargo Legal Liability Coverage endorsement apply.

**We** agree with **you** that the insurance provided under **your** Motor Truck Cargo Legal Liability Coverage endorsement is modified as follows:

### INSURING AGREEMENT

The following is added to the Insuring Agreement:

Subject to the Limit of Liability, if **you** pay the premium for the Refrigeration Breakdown Coverage endorsement, **we** will pay for **your** legal liability for direct physical **loss** to **covered property**, caused by spoilage or change in temperature, resulting directly from the sudden and accidental breakdown of refrigeration or heating units on an **insured auto**.

\*\*\*

### ADDITIONAL DEFINITIONS

Under the definition of "**covered peril**", Excluded Peril "g." is deleted and replaced by:

g.    **Breakdown, Temperature, Humidity**
    (i)    Humidity, dampness, dryness, or changes in or extremes of temperature, other than such **loss** caused by the sudden and

8

accidental breakdown of refrigeration or heating units on the **insured auto**; or

(ii)   Mechanical or electrical breakdown or failure, other than the sudden and accidental breakdown of refrigeration or heating units on the **insured auto**. However, this Excluded Peril does not apply to **loss** caused by a fire or explosion if such fire or explosion would be covered under this endorsement.

**\*\*\***

**EXCLUSIONS**

The following exclusions are added:

Coverage under this Refrigeration Breakdown Coverage endorsement will not apply for **loss** caused by, resulting from, or arising out of breakdown of the refrigeration or heating unit due to any of the following, regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**:

1.   Failure to provide adequate fuel supply;

2.   Failure to maintain crankcase oil or refrigerant level within the manufacturer's specifications;

3.   Intentional destruction or damage to automatic temperature control units by an employee; or

4.   Failure to maintain the calibration of the refrigeration or heating unit and/or failure to maintain the refrigeration or heating unit within the manufacturer's specifications.

**\*\*\***

**REQUEST FOR DECLARATION**

32.   No coverage is afforded under the policy for the claim for the following reasons:

A.   The damage to the cargo was not an "accident" as that term is defined by and used in the policy;

B.   The damage to the cargo was "expected or intended…property damage" as that phrase is defined by and used in the policy;

C.   The damage to the cargo is due to the deterioration, wear and tear, gradual decay, fungus, mold, change in flavor, quality, fault, or weakness of the cargo that causes it to damage or destroy itself within the meaning of the "Inherent Vice" exclusion of the Motor

Truck Cargo Legal Liability Coverage endorsement (Form Z434 IL (02/19);

D. The damage to the cargo was the result of "changes in … temperature" within the meaning of the Wetness, Breakdown, Temperature Humidity exclusion of the Motor Truck Cargo Legal Liability Coverage endorsement (Form Z434 IL (02/19);

E. The damage to the cargo was the result of "corrosion" and/or "contamination" within the meaning of the Corrosion, Contamination exclusion of the Motor Truck Cargo Legal Liability Coverage endorsement (Form Z434 IL (02/19); and

F. The damage to the cargo is not within the Breakdown, Temperature Humidity "covered peril" of the Refrigeration Breakdown Coverage Endorsement (Form Z440 (06/10).

33. As the damage to the cargo arose out of Bukhara's failure to transport the load in accordance with the food safety and security instructions and lack of a refrigeration unit, Progressive's Commercial Auto Policy excludes coverage under the Policy for damages to the cargo alleged in the underlying Complaint.

34. For the foregoing reasons, the damage to the cargo is not covered by the policy and Progressive is not required to either defend or indemnify Bukhara for the allegations raised in the Schmieding lawsuit.

WHEREFORE, the Artisan and Truckers Casualty Company seeks a declaration pursuant to 28 U.S.C. §2201 and Rule 57 of the Rules of Federal Civil Procedure that it has neither a duty to defend or indemnify Bukhara Trans, Inc. in the lawsuit pending in Western District of Arkansas, Fayetteville Division entitled *H.C. Schmieding, v. Bukhara Trans., Inc*., Case No 5:23-cv-05011-TLB, and for such other relief this Court deems just and appropriate.

Respectfully submitted,
SUDEKUM, CASSIDY & SHULRUFF, CHTD.

By:  /s/: *Frederick J. Sudekum, III*
One of the Attorneys for Plaintiff

10

Frederick J. Sudekum, III (ARDC No. 6182381)
Mark A. Mitchell (ARDC No. 6344127)
SUDEKUM, CASSIDY & SHULRUFF, CHTD.
20 North Clark Street, Suite 2450
Chicago, IL 60602
Telephone (312) 803-6250
E-mail fjs@scslegal.com; mm@scslegal.com

# Exhibit 1



May 19, 2023
Policy Number: 945885810-001
Claim Number: 22-8735713


Artisan and Truckers Casualty Company


I certify that each of the following is true regarding the attached records, to the best of my knowledge and belief:

1. I am an employee familiar with the manner and process in which these records are created and maintained by virtue of my duties and responsibilities;

2. The records were made at or near the time of the occurrences of the matters set forth by, or from information transmitted by, people with knowledge of those matters;

3. The records were kept in the course of regularly conducted business activity; and

4. It was the regular practice of the business activity to make the record.


*Jennifer Castell*

Jennifer Castell

COLONIAL INS SERVICE
3845 HOLCOMB BRIDGE R
NORCROSS, GA 30092

**PROGRESSIVE**®
COMMERCIAL

Named insured

Bukhara Trans Inc
1400 LIGHT RD. APT 103
OSWEGO, IL 60543

**Policy number: 945885810**

Underwritten by:
Artisan and Truckers Casualty Co
October 13, 2022
Policy Period: Jan 26, 2022 - Jan 26, 2023
Page 1 of 5

**agent.progressive.com**
**Online Service**
Make payments, check billing activity, print
policy documents, update your policy or
check the status of a claim.

**1-678-257-2450**
**COLONIAL INS SERVICE**
Contact your agent for personalized service.

**1-800-444-4487**
For customer service if your agent is
unavailable or to report a claim.

# Commercial Auto
# Insurance Coverage Summary
## This is your Declarations Page
## Your coverage has changed

Your coverage began on January 26, 2022 at 12:01 a.m. This policy expires on January 26, 2023 at 12:01 a.m.

This coverage summary replaces your prior one. Your insurance policy and any policy endorsements contain a full explanation of your coverage. The policy limits shown for an auto may not be combined with the limits for the same coverage on another auto, unless the policy contract allows the stacking of limits. The policy contract is form 6912 (02/19). The contract is modified by forms 2852IL (02/19), Z433IL (04/08), 2371 (06/10), Z434IL (02/19), Z440 (06/10), MCS90 (99/99), 1198 (07/16), 4717 (02/19), 4852IL (02/19), 4881IL (02/19) and Z228 (01/11).

The named insured organization type is a corporation.

Artisan and Truckers Casualty Co is a stock company (NYSE:PGR).
PO Box 94739 Cleveland, OH 44101.

## Policy changes effective October 11, 2022

| | |
|---|---|
| Changes processed on: | October 12, 2022 9:21 a.m. |
| Premium change: | $11,418.00 |
| Changes: | Walid Saleh has been removed from the policy.<br>Mudawi Omer has been removed from the policy. |

The changes shown above will not be effective prior to the time the changes were requested.

0002 Continued

## Outline of coverage

### Auto coverage part

| Description | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $139,279 |
| Bodily Injury and Property Damage Liability | $1,000,000 combined single limit | | |
| Uninsured Motorist | $1,000,000 combined single limit | | 469 |
| Underinsured Motorist | $1,000,000 combined single limit | | 413 |
| Medical Payments | Rejected | | -- |
| Trailer Interchange | $60,000 | $1,000 | 24,369 |
| **Subtotal policy premium** | | | **$164,530** |

### Commercial General Liability coverage part

| Description | Limits | Premium |
|---|---|---|
| Limited General Liability - Trucking Operations | $1,000,000/$2,000,000 | $1,561 |
| Each Occurrence | $1,000,000 | |
| General Aggregate | $2,000,000 | |
| Products/Completed Operations Aggregate | $2,000,000 | included |
| Personal and Advertising Injury | $1,000,000/any one person or organization | included |
| Damage to Premises Rented to You | $100,000/any one premises | included |
| Medical Expense | $5,000/any one person | included |
| **Subtotal policy premium** | | **$1,561** |

### Motor Truck Cargo coverage part

| Description | Limits | Deductible | Premium |
|---|---|---|---|
| Motor Truck Cargo | $100,000 | $1,000 | $22,001 |
| Refrigeration Breakdown | included in Motor Truck Cargo Limit | $2,500 | included |
| **Subtotal policy premium** | | | **$22,001** |
| Additional Insured Fee | | | 60 |
| **Total 12 month policy premium and fees** | | | **$188,152** |

## Rated drivers

1. Jude Fanfan
2. Fakhriddin Avezov
3. Sylvain Lecler
4. Wisbens Alfred
5. Jumadurdy Glychdurdyyev
6. Loveson Louis
7. Nicolas Compas
8. Myratdurdy Rejepov

## Rated commodities

1. CANNED GOODS
2. FOOD (FROZEN/NOT SEAFOOD)
3. MEATS / DRESSED POULTRY
4. VEGETABLES

Policy number: 945885810
Bukhara Trans Inc
Page 3  of 5

## Auto coverage schedule

1. **2021 FREIGHTLINER CASCADIA 126**
VIN: **3AKJHHDR2MSMU3501**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: Truck Tractor

| | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| Liability Premium | $19248 | $67 | $59 | **$19,374** |

2. **2030 Non-owned Attached Trailer** **
VIN: **None**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: 20

| | Liability Premium | Auto Total |
|---|---|---|
| Liability Premium | $649 | **$649** |

3. **2030 Non-owned Attached Trailer** **
VIN: **None**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: 20

| | Liability Premium | Auto Total |
|---|---|---|
| Liability Premium | $649 | **$649** |

4. **2030 Non-owned Attached Trailer** **
VIN: **None**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: 20

| | Liability Premium | Auto Total |
|---|---|---|
| Liability Premium | $649 | **$649** |

5. **2022 FREIGHTLINER CASCADIA 126**
VIN: **3AKJHHDR6NSNK4356**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: Truck Tractor

| | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| Liability Premium | $19248 | $67 | $59 | **$19,374** |

6. **2030 Non-owned Attached Trailer** **
VIN: **None**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: 20

| | Liability Premium | Auto Total |
|---|---|---|
| Liability Premium | $649 | **$649** |

7. **2022 FREIGHTLINER CASCADIA 126**
VIN: **3AKJHHDR4NSNK4341**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: Truck Tractor

| | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| Liability Premium | $19248 | $67 | $59 | **$19,374** |

0004 Continued

8. **2022 FREIGHTLINER CASCADIA 126**
VIN: **3AKJHHDR3NSNK4363** Garaging Zip Code: 60543 Radius: More than 500 miles
Personal use: N Body type: Truck Tractor

| Liability Premium | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| | $19248 | $67 | $59 | **$19,374** |

9. **2022 FREIGHTLINER CASCADIA 126**
VIN: **3AKJHHDR2NSNK4354** Garaging Zip Code: 60543 Radius: More than 500 miles
Personal use: N Body type: Truck Tractor

| Liability Premium | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| | $19248 | $67 | $59 | **$19,374** |

10. **2022 FREIGHTLINER CASCADIA 126**
VIN: **3AKJHHDRXNSNK4361** Garaging Zip Code: 60543 Radius: More than 500 miles
Personal use: N Body type: Truck Tractor

| Liability Premium | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| | $19248 | $67 | $59 | **$19,374** |

11. **2030 Non-owned Attached Trailer \*\***
VIN: **None** Garaging Zip Code: 60543 Radius: More than 500 miles
Personal use: N Body type: 20

| Liability Premium | Liability Premium | Auto Total |
|---|---|---|
| | $649 | **$649** |

12. **2030 Non-owned Attached Trailer \*\***
VIN: **None** Garaging Zip Code: 60543 Radius: More than 500 miles
Personal use: N Body type: 20

| Liability Premium | Liability Premium | Auto Total |
|---|---|---|
| | $649 | **$649** |

13. **2023 FREIGHTLINER CASCADIA 126**
VIN: **3AKJHHDR8PSUH1741** Garaging Zip Code: 60543 Radius: More than 500 miles
Personal use: N Body type: Truck Tractor

| Liability Premium | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| | $19248 | $67 | $59 | **$19,374** |

14. **2030 Non-owned Attached Trailer \*\***
VIN: **None** Garaging Zip Code: 60543 Radius: More than 500 miles
Personal use: N Body type: 20

| Liability Premium | Liability Premium | Auto Total |
|---|---|---|
| | $649 | **$649** |

\*\*Non-Owned trailer but only while attached to a listed power unit specifically described on the declarations page.

## Premium discount

| Policy | |
|---|---|
| 945885810 | Electronic Funds Transfer |

Policy number: 945885810
Bukhara Trans Inc
Page 5 of 5

## Additional Insured information

1.    Additional Insured          Alliance Shippers Inc
15515 S 70th Court
Orland Park, IL 60462

2.    Additional Insured          BEST BAY LOGISTICS INC
13831 Slover Ave
Fontana, CA 92337

3.    Additional Insured          Reliable Transportation Solution
PO BOX 507
Amelia, OH 45102

Form 6489 IL (08/17)



Progressive
P.O. Box 94739
Cleveland, OH 44101

November 11, 2021
Policy number: 945885810

Bukhara Trans Inc
1400 Light Rd. Apt 103
Oswego, IL 60543

Enclosed is the  MCS90.

Please retain this copy for your records.

If this endorsement subjects the Company to public liability for negligence in the insured's operation, maintenance or use of motor vehicles, you are required to inform us of all vehicles that are commercially owned or operated by the insured and to list them on your policy. Please review the current policy declaration page and inform us promptly of any additional vehicles that need to be listed. If you acquire (or acquire the services of) any additional commercially owned or operated vehicles in the future, you must promptly notify us of each such additional vehicle. Failure to promptly inform us of, and list, all current and future commercially owned or operated vehicles may result in the cancellation or nonrenewal of this policy, or in a premium increase.

Thank you,
Commercial Auto
Permit Issuance and Verification
1-800-444-4487

Form COVERLTR (06/04)

0007

**Please note, the expiration date as stated on this form relates to the process for renewing the Information Collection Request for this form with the Office of Management and Budget. This requirement to collect information as requested on this form does not expire. For questions, please contact the Office of Registration and Safety Information, Registration, Licensing, and Insurance Division.**

A Federal Agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a current valid OMB Control Number. The OMB Control Number for this information collection is 2126-0008. Public reporting for this information collection is estimated to be approximately 2 minutes per response, including the time for reviewing instructions, gathering the data needed, and completing and reviewing the collection of information. All responses to this collection of information are mandatory. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Information Collection Clearance Officer, Federal Motor Carrier Safety Administration, MC-RRA, Washington, D.C. 20590.

**U.S. Department
of Transportation**
Federal Motor Carrier
Safety Administration

OMB No: 2126-0008
Expiration: 05/31/2024
Form MCS-90 Revised 06/03/2021

USDOT Number: 3546628       Date Received:_____

## FORM MCS-90
### ENDORSEMENT FOR MOTOR CARRIER POLICIES OF INSURANCE FOR PUBLIC LIABILITY UNDER SECTIONS 29 AND 30 OF THE MOTOR CARRIER ACT OF 1980

Issued to Bukhara Trans Inc

(Motor Carrier name)

of 1400 Light Rd. Apt 103 Oswego, IL 60543

(Motor Carrier state or province)

Dated at 09:56 AM on this 11th day of November, 2021
Amending Policy Number: CA 945885810 Effective Date: 12/17/2021
Name of Insurance Company: Artisan and Truckers Casualty Co

Countersigned by: _____

Authorized company representative

The policy to which this endorsement is attached provides primary or excess insurance, as indicated for the limits shown (check only one):

[X] This insurance is primary and the company shall not be liable for amounts in excess of $750,000 for each accident.

[ ] This insurance is excess and the company shall not be liable for amounts in excess of $_____ for each accident in excess of the underlying limit of $_____ for each accident.

Whenever required by the Federal Motor Carrier Safety Administration (FMCSA), the company agrees to furnish the FMCSA a duplicate of said policy and all its endorsements. The company also agrees, upon telephone request by an authorized representative of the FMCSA, to verify that the policy is in force as of a particular date. The telephone number to call is: 1-800-444-4487.

Cancellation of this endorsement may be effected by the company of the insured by giving (1) thirty-five (35) days notice in writing to the other party (said 35 days notice to commence from the date the notice is mailed, proof of mailing shall be sufficient proof of notice), and (2) if the insured is subject to the FMCSA's registration requirements under 49 U.S.C. 13901, by providing thirty (30) days notice to the FMCSA (said 30 days notice to commence from the date the notice is received by the FMCSA at its office in Washington, D.C.).

**Filings must be transmitted online via the Internet at http://www.fmcsa.dot.gov/urs**

## DEFINITIONS AS USED IN THIS ENDORSEMENT

**ACCIDENT** includes continuous or repeated exposure to conditions or which results in bodily injury, property damage, or environmental damage which the insured neither expected nor intended.

**MOTOR VEHICLE** means a land vehicle, machine, truck, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway for transporting property, or any combination thereof.

**BODILY INJURY** means injury to the body, sickness, or disease to any person, including death resulting from any of these.

**PROPERTY DAMAGE** means damage to or loss of use of tangible property.

**ENVIRONMENTAL RESTORATION** means restitution for the loss, damage, or destruction of natural resources arising out of the accidental discharge, dispersal, release or escape into or upon the land, atmosphere, watercourse, or body of water, of any commodity transported by a motor carrier. This shall include the cost of removal and the cost of necessary measures taken to minimize or mitigate damage to human health, the natural environment, fish, shellfish, and wildlife.

**PUBLIC LIABILITY** means liability for bodily injury, property damage, and environmental restoration.

0008 Continued

The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Motor Carrier Safety Administration (FMCSA).

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon,

or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

It is further understood and agreed that, upon failure of the company to pay any final judgment recovered against the insured as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the company to compel such payment.

The limits of the company's liability for the amounts prescribed in this endorsement apply separately to each accident and any payment under the policy because of anyone accident shall not operate to reduce the liability of the company for the payment of final judgments resulting from any other accident.

## SCHEDULE OF LIMITS - PUBLIC LIABILITY

| Type of Carriage | Commodity Transported | January 1, 1985 |
|---|---|---|
| **(1)** For-hire (in interstate or foreign commerce, with a gross vehicle weight rating of 10,000 or more pounds). | Property (nonhazardous) | $750,000 |
| **(2)** For-hire and Private (in interstate, foreign, or intrastate commerce, with a gross vehicle weight rating of 10,000 or more pounds). | Hazardous substances, as defined in 49 CFR 171.8, transported in cargo tanks, portable tanks, or hopper-type vehicles with capacities in excess of 3,500 water gallons; or in bulk Division 1.1, 1.2, and 1.3 materials, Division 2.3, Hazard Zone A, or Division 6.1, Packing Group I, Hazard Zone A material; in bulk Division 2.1 or 2.2; or highway route controlled quantities of a Class 7 material, as defined in 49 CFR 173.403. | $5,000,000 |
| **(3)** For-hire and Private (in interstate or foreign commerce, in any quantity; or in intrastate commerce, in bulk only; with a gross vehicle weight rating of 10,000 or more pounds). | Oil listed in 49 CFR 172.101; hazardous waste, hazardous materials, and hazardous substances defined in 49 CFR 171.8 and listed in 49 CFR 172.101, but not mentioned in (2) above or (4) below. | $1,000,000 |
| **(4)** For-hire and Private (In interstate or foreign commerce, with a gross vehicle weight rating of less than 10,000 pounds). | Any quantity of Division 1.1, 1.2 or 1.3 material; any quantity of a Division 2.3, Hazard Zone A, or Division 6.1, Packing Group I, Hazard Zone A material; or highway route controlled quantities of a Class 7 material as defined in 49 CFR 173.403. | $5,000,000 |

* The schedule of limits shown does not provide coverage. The limits shown in the schedule are for information purposes only.

COLONIAL INS SERVICE
3845 HOLCOMB BRIDGE R
NORCROSS, GA 30092



**Policy number:  945885810**

Underwritten by:
Artisan and Truckers Casualty Co
Insured:
Bukhara Trans Inc
July 12, 2022
Policy Period: Jan 26, 2022 - Jan 26, 2023

Bukhara Trans Inc
1400 LIGHT RD. APT 103
OSWEGO, IL 60543

**Mailing Address**

Artisan and Truckers Casualty Co
PO Box 94739
Cleveland, OH 44101

# Additional insured endorsement

**1-800-444-4487**

For customer service, 24 hours a day,
7 days a week

## Name of Person or Organization

Reliable Transportation Solution
PO BOX 507
Amelia, OH 45102

This endorsement modifies insurance provided under the commercial auto policy and any endorsements thereto affording liability coverage.

The person or organization named above is an **insured** with respect to such liability coverage as is afforded by the policy, but this insurance applies to said **insured** only as a person liable for the conduct of another **insured** and then only to the extent of that liability. **We** also agree with **you** that insurance provided by this endorsement will be primary for any power unit specifically described on the **Declarations Page** and showing liability coverage.

### Limit of Liability

| | |
|---|---|
| **Bodily Injury** | Not applicable |
| **Property Damage** | Not applicable |
| **Combined Liability** | $1,000,000 each **accident** |

### All other terms, limits and provisions of this policy remain unchanged.

This endorsement applies to Policy Number: 945885810

Issued to (Name of Insured): Bukhara Trans Inc

Effective date of endorsement: July 9, 2022          Policy expiration date: January 26, 2023

Form 1198 (07/16)

COLONIAL INS SERVICE
3845 HOLCOMB BRIDGE R
NORCROSS, GA 30092


*COMMERCIAL*

**Policy number:  945885810**

Underwritten by:
Artisan and Truckers Casualty Co
Insured:
Bukhara Trans Inc
June 24, 2022
Policy Period: Jan 26, 2022 - Jan 26, 2023

BEST BAY LOGISTICS INC
13831 SLOVER AVE
FONTANA, CA 92337

**Mailing Address**
Artisan and Truckers Casualty Co
PO Box 94739
Cleveland, OH 44101

# Additional insured endorsement

**1-800-444-4487**
For customer service, 24 hours a day,
7 days a week

## Name of Person or Organization

BEST BAY LOGISTICS INC
13831 Slover Ave
Fontana, CA 92337

This endorsement modifies insurance provided under the commercial auto policy and any endorsements thereto affording liability coverage.

The person or organization named above is an **insured** with respect to such liability coverage as is afforded by the policy, but this insurance applies to said **insured** only as a person liable for the conduct of another **insured** and then only to the extent of that liability. **We** also agree with **you** that insurance provided by this endorsement will be primary for any power unit specifically described on the **Declarations Page** and showing liability coverage.

### Limit of Liability

| | |
|---|---|
| **Bodily Injury** | Not applicable |
| **Property Damage** | Not applicable |
| **Combined Liability** | $1,000,000 each **accident** |

### All other terms, limits and provisions of this policy remain unchanged.

This endorsement applies to Policy Number: 945885810
Issued to (Name of Insured): Bukhara Trans Inc

Effective date of endorsement: June 23, 2022          Policy expiration date: January 26, 2023

Form 1198 (07/16)

0011

COLONIAL INS SERVICE
3845 HOLCOMB BRIDGE R
NORCROSS, GA 30092



**Policy number: 945885810**

Underwritten by:
Artisan and Truckers Casualty Co
Insured:
Bukhara Trans Inc
June 22, 2022
Policy Period: Jan 26, 2022 - Jan 26, 2023

Alliance Shippers Inc
15515 S 70TH COURT
ORLAND PARK, IL 60462

**Mailing Address**

Artisan and Truckers Casualty Co
PO Box 94739
Cleveland, OH 44101

# Additional insured endorsement

**1-800-444-4487**

For customer service, 24 hours a day,
7 days a week

## Name of Person or Organization

Alliance Shippers Inc
15515 S 70th Court
Orland Park, IL 60462

This endorsement modifies insurance provided under the commercial auto policy and any endorsements thereto affording liability coverage.

The person or organization named above is an **insured** with respect to such liability coverage as is afforded by the policy, but this insurance applies to said **insured** only as a person liable for the conduct of another **insured** and then only to the extent of that liability. **We** also agree with **you** that insurance provided by this endorsement will be primary for any power unit specifically described on the **Declarations Page** and showing liability coverage.

### Limit of Liability

| | |
|---|---|
| **Bodily Injury** | Not applicable |
| **Property Damage** | Not applicable |
| **Combined Liability** | $1,000,000 each **accident** |

### All other terms, limits and provisions of this policy remain unchanged.

This endorsement applies to Policy Number: 945885810
Issued to (Name of Insured): Bukhara Trans Inc

Effective date of endorsement: June 21, 2022          Policy expiration date: January 26, 2023

Form 1198 (07/16)

0012

Form Z434 IL (02/19)

## MOTOR TRUCK CARGO LEGAL LIABILITY
## COVERAGE ENDORSEMENT

Except as specifically modified by this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### INSURING AGREEMENT—LOSS TO COVERED PROPERTY

Subject to the Limit of Liability, if **you** pay the premium for this Motor Truck Cargo Legal Liability Coverage, **we** will pay for the direct physical **loss** to **covered property** that **you** are legally liable to pay as a **trucker** under a written: bill of lading, tariff document, rate confirmation sheet, shipping receipt, or contract of carriage. For this coverage to apply, the **covered property** must, at the time of **loss**, be in **your** exclusive physical custody and control:

1. while **in due course of transit** in, on, or attached to an **insured auto**; or
2. during **loading or unloading**.

Coverage applies for **loss** to **covered property** only if the **loss** is caused by a **covered peril**. For **covered property** that is **your** property, **our** payment is not contingent upon **your** liability.

**We** have the option to settle or defend any claim or lawsuit for damages covered by this endorsement. However, **we** have no duty to defend **you** against any lawsuit to which this insurance does not apply. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the limit of liability for this **covered property** coverage has been exhausted by payment of judgments or settlements.

### INSURING AGREEMENT—LOSS TO BUSINESS EQUIPMENT

Subject to the Limit of Liability, if **you** pay the premium for this Motor Truck Cargo Legal Liability Coverage, **we** will pay for the direct physical **loss** to **business equipment**. For this coverage to apply, the **business equipment** must, at the time of **loss**, be in **your** exclusive physical custody and control. Coverage applies for **loss** to **business equipment** only if the **loss** is caused by a **covered peril**.

**We** have the option to settle or defend any claim or lawsuit for damages covered by this endorsement. However, **we** have no duty to defend **you** against any lawsuit to which this insurance does not apply. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the limit of liability for **business equipment** coverage has been exhausted by payment of judgments or settlements.

### ADDITIONAL DEFINITIONS

The following additional definitions apply only to Motor Truck Cargo Legal Liability Coverage, as set forth in this endorsement, and any endorsements thereto that solely pertain to this coverage, whenever the defined term appears therein in boldface type, whether in the singular, plural, or possessive:

1. "**Business equipment**" means computer and related computer hardware, used exclusively in the management of **your**

1

0013

business, that **you** own or that is leased or loaned to **you**. **Business equipment** does not include computer, cell phone, smart phone, or any other electronic equipment, used or intended to be used for personal non-business use.

2.  "**Covered peril**" means any external risks of direct physical **loss** to **covered property** or **business equipment**, except for those listed in a. through m. below as Excluded Perils.

    **Excluded Perils:** Please read the following list of excluded perils carefully. Coverage will not be afforded under this Motor Truck Cargo Legal Liability Coverage endorsement for these types of perils. **We** will not pay for any **losses** to **covered property** or **business equipment** caused by, resulting in or from, or arising out of these excluded perils regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**.

    a.  **Civil Authority**

        Order of any civil authority, including seizure, confiscation, destruction, or quarantine of property. However, **we** will pay for **loss** or damage caused by or resulting from acts of destruction ordered by any governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this endorsement.

    b.  **Nuclear Hazard, Pollutants**

        (i)   Any weapon employing atomic fission or fusion; or

        (ii)  Nuclear reaction or radiation, or radioactive contamination from any other cause. But **we** will pay for direct **loss** caused by resulting fire if the fire would be covered under this endorsement.

        (iii) The release, discharge, seepage, migration, dispersal, or escape of **pollutants**, unless the release, discharge, seepage, migration, dispersal, or escape is caused by a **specified peril**.

    c.  **War, Civil Commotion**

        (i)   **War**, including undeclared or civil war;

        (ii)  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or agents;

        (iii) Insurrection, rebellion, revolution, usurped power, or action taken by a governmental authority to hinder or defend against any of these; or

        (iv)  Strikers, locked-out workmen, or persons taking part in labor disturbances or riots, or civil commotions.

    d.  **Inherent Vice**

        Deterioration; wear and tear; obsolescence; hidden or latent defect; gradual decay; fungus; mildew; mold; rot; rust; insects; vermin; change in flavor; or any quality, fault, or weakness in the **covered property** or **business equipment** that causes it to damage or destroy itself.

    e.  **Criminal, Fraudulent, or Dishonest Acts**

        Criminal, fraudulent, dishonest, or illegal acts alone or in collusion with another, whether or not such acts occurred during regular hours of employment, by:

        (i)   **you**;

        (ii)  **your** partners, officers, directors, trustees, or joint ventures;

        (iii) others to whom **you**, **your** partners, officers, directors, trustees, or joint ventures entrust the property;

        (iv)  others who have an interest in the property; or

        (v)   the employees or agents of any party specified in (i) through (iv) above.

        This Excluded Peril does not apply to acts of destruction by **your** employees, but **we** will not pay for theft by employees.

0014

f. **Consequential Loss**

Loss of use, loss of market, loss of market value, or delay; or any other remote or consequential loss, other than direct physical **loss**, to **covered property** or **business equipment**.

g. **Wetness**, **Breakdown, Temperature, Humidity**

(i) Mechanical or electrical breakdown or failure including breakdown or failure of a refrigeration unit or its associate component parts, or heating equipment installed in a cargo component; or

(ii) Wetness, humidity, dampness, dryness, or changes in or extremes of temperature unless it results from damage to an **insured auto**.

However, this Excluded Peril does not apply to **loss** caused by a fire or explosion if such fire or explosion would be covered under this endorsement.

h. **Voluntary Parting, Nondelivery, Mysterious Disappearance**

(i) Voluntary parting with title to, or possession of, the property due to fraudulent scheme, trick, or false pretense;

(ii) Nondelivery or misdelivery; or

(iii) Mysterious or unexplained disappearance; shortage of any property upon taking inventory; or theft of a part of the contents of any shipping package.

i. **Fines, Penalties, and Costs**

Any costs, fines, punitive damages, assessments, attorney fees, court costs, or other penalties that **you** are required or liable to pay as a result of **your** violation of any law or regulation, or as a result of the violation of any law or regulation relating to any delay in the payment, denial, or settlement of any claim.

j. **Pre-existing Damage**

**We** will not pay for pre-existing damage to any **covered property** or **business equipment**.

With respect to auto haulers, **we** will not pay for pre-existing damage to vehicles being transported by the **insured**. For coverage to apply, the **insured** auto hauler must provide to **us** a signed inspection document attesting to the condition of **covered property** before loading.

k. **Installation Operations**

**Your** operation as rigger, hoister, erector, installer, or dismantler.

l. **Business Equipment Damage**

**We** will not pay for the following damage to **business equipment**:

(i) Wear and tear, any quality in the equipment that causes it to damage or destroy itself, hidden or latent defect, or gradual deterioration;

(ii) Structural, mechanical, or electrical failure or breakdown; or

(iii) Damage caused by maintenance or a software upgrade or download.

m. **Corrosion, Contamination**

**We** will not pay for corrosion, contamination, marring or scratching to any **covered property** or **business equipment** unless it results from damage to an **insured auto**.

3. "**Covered property**" means lawful goods and merchandise of others, except for the items listed in a. through j. below as Excluded Properties. **Covered property** includes **goods and merchandise** owned by **you** while loaded for shipment in or on an **insured auto**, whether or not shipped under a bill of lading or shipping receipt. When used in this endorsement, **goods and**

3

**merchandise** means products destined for market and/or sale. **Covered property** does not include any equipment **you** own that is being transported between work sites. **Covered property** also does not include **autos you** lease, hire, rent, or borrow.

**Excluded Properties:** Please read the following list of excluded properties carefully. Coverage will not be afforded under this Motor Truck Cargo Legal Liability Coverage endorsement for **loss** to these types of properties**.**

a. **Art, Jewelry, Metals, Money, Papers**

Objects of art, including paintings and statuary; jewelry, precious or semi-precious stones; precious or semi-precious metals or alloys; money and securities of any kind, including monies collected or not collected under a C.O.D., bill of lading, or shipping receipt; food stamps, lottery tickets, notes, money orders, traveler's checks, accounts, bills, deeds, or other evidences of debt; valuable papers of any kind, including passports, manuscripts, mechanical drawings, and blueprints.

b. **Contraband**

Contraband or property in the course of illegal transportation or trade.

c. **Live Animals**

Live animals, birds, or fish, including cattle or poultry, unless death results or is made necessary within 24 hours by a **specified peril**; or unless they escape or stray from the scene of **loss** and cannot be located, but only if the escape or straying is caused by a **specified peril**. **We** do not cover **your** liability for reduction in the market value or downgrading of live animals, birds, or fish due to minor injuries, scrapes, and bruises.

d. **Other Carrier**

Any property while in the physical custody of any other carrier.

e. **Property Not Under Bill of Lading**

Any property for which no bill of lading, tariff document, rate confirmation sheet, shipping receipt, or contract of carriage has been issued, or which is carried gratuitously or without charge. This exclusion does not include poultry cages owned by the shipper while being utilized in the transportation of **covered property**.

f. **Storage**

Any property in or on an **insured auto** after it has remained at any location for more than 72 hours. This includes locations **you** own or use. This exclusion does not apply to delays in transportation outside of **your** control due to severe weather, as long as transport resumes as soon as the weather emergency has ended.

g. **Transporting Vehicles and Equipment**

Any transporting vehicle or conveyance, including its equipment such as tarpaulins and fittings, chains, binders, and intermodal shipping containers, unless specified on a bill of lading.

h. **Explosive or Radioactive Material**

Explosives, ammunition, fireworks, or radioactive material.

i. **Pharmaceuticals, Tobacco, Marijuana Products, Alcohol**

Prescription pharmaceuticals, tobacco products, marijuana products, or alcoholic beverages, other than beer or wine.

j. **Mobile/Modular Homes and Buildings**

**Mobile/Modular homes and buildings** whether carried on or attached to the **insured auto**.

4. "**Earned freight charges**" means freight charges from the point of departure to the point of **loss**.

5. "**In due course of transit**" means being shipped from the time **you** assume exclusive physical custody and control of the **covered property** for the purpose of the actual movement of **covered property** from the point of shipment bound for a specific destination and ending when one of the following first occurs:
   a. the **covered property** is accepted by, or on behalf of, the consignee at the intended destination;
   b. the **covered property** is accepted by, or on behalf of, the consignee at any intermediate point short of reaching the original intended destination;
   c. 72 hours after arrival at destination; or
   d. any other stop that exceeds 72 hours.
   **In due course of transit** includes ordinary and necessary stops, interruptions, delays, or transfers incidental to the route and method of shipment.

6. "**Insured auto**" means:
   a. Any **auto** specifically described on the **declarations page** that is not a **trailer**;
   b. An additional **auto** that is not a **trailer** on the date **you** become the owner if:
      (i) **you** acquire the **auto** during the policy period shown on the **declarations page**;
      (ii) **we** insure all **autos** owned by **you** that are used in **your** business;
      (iii) no other insurance policy provides coverage for that **auto**; and
      (iv) **you** tell **us** within 30 days after **you** acquire it that **you** want **us** to cover it;
   c. Any replacement **auto** that is not a **trailer** on the date **you** become the owner if:
      (i) **you** acquire the **auto** during the policy period shown on the **declarations page**;
      (ii) the **auto** that **you** acquire replaces one specifically described on the **declarations page** due to termination of **your** ownership of the replaced **auto** or due to mechanical breakdown of, deterioration of, or **loss** to the replaced **auto** that renders it permanently inoperable;
      (iii) no other insurance policy provides coverage for that **auto**; and
      (iv) **you** tell **us** within 30 days after **you** acquire it that **you** want **us** to cover it;
   d. A **trailer** designed primarily for travel on public roads, only when the **trailer** is attached to a power unit that is an **insured auto** or while it is **in due course of transit** by a power unit that is an **insured auto**; and
   e. Any **temporary substitute auto** that is not a **trailer**.

7. "**Loading or unloading**" means the direct physical process of hoisting, lifting, or moving **covered property**:
   a. onto an **insured auto** from the ground or loading docks adjacent to such **insured auto**; or
   b. off of an **insured auto** to the place where it is finally delivered.
   However, for auto haulers, **loading or unloading** means moving **covered property** onto or off of **your insured auto**, including moving a motor vehicle under its own power solely for the purpose of **loading or unloading** it from the **insured auto**, but no more than one road mile from the **insured auto**.

8. "**Mobile/Modular Homes and Buildings**" means prefabricated housing units and buildings, factory-built homes and buildings, mobile homes, and modular homes and buildings. The term does not include motor homes or travel trailers designed for use on public roads.

9. "**Pollutant**" is used in this endorsement as defined in the General Definitions section of **your** Commercial Auto Policy.

5

10. "**Specified peril**" means:

    a.  fire, lightning, or explosion;

    b.  smoke, but this cause of **loss** does not include smoke from exhaust fumes or gases of the transporting vehicle, agricultural smudging, or industrial operations;

    c.  windstorm or hail, but this cause of **loss** does not include **loss** caused by or resulting from:

       (i)  heat, cold, or change in or extremes of temperature; or

      (ii)  ice (other than hail), snow, or sleet, whether driven by wind or not;

    d.  collision, overturn, or derailment of a transporting conveyance. With respect to live animals, birds, or fish, this cause of **loss** does not include **loss** caused by or resulting from the **insured auto** coming in contact with:

       (i)  the roadbed;

      (ii)  curbing;

      (iii)  rails or ties of railways; or

      (iv)  a stationary object while backing for **loading or unloading** purposes;

    e.  collapse of a bridge, wharf, dock, platform, or culvert;

    f.  stranding, sinking, burning, or collision on any ferry;

    g.  flood, meaning the rising of any natural body of water; and

    h.  theft, but excluding pilferage by **you** or **your** employees, anyone with a financial interest in the cargo or their employees, authorized representatives or anyone else entrusted with the cargo. Theft does not include **loss** caused by or resulting from:

       (i)  wrongful conversion; or

      (ii)  acceptance of counterfeit money, fraudulent post office or express money orders, or checks or promissory notes not paid upon presentation.

    With respect to live animals, birds, or fish, **we** will extend this theft coverage to pay for direct physical **loss** to live animals, birds, or fish caused by theft of:

       (i)  the entire load of live animals, birds, or fish; or

      (ii)  the **insured auto** in or on which the live animals, birds, or fish are loaded.

    However, this coverage extension does not apply to the loss of individual animals or less than the entire load of live animals, birds, or fish unless the entire **insured auto** is first stolen.

11. "**Trucker**" means any person, organization, or motor carrier engaged in the business of transporting property for hire.

## ADDITIONAL PAYMENTS

In addition to the applicable limit of liability:

1. **Earned Freight**

    **We** will pay **earned freight charges** that are due to **you** if **you** are unable to collect them from others because of a **loss** to **covered property** that is caused by a **covered peril**. The most **we** will pay under this additional coverage for all freight charges in any one **loss** is $10,000.

2. **Removal Expenses**

    a.  **We** will pay removal expenses incurred to remove debris of **covered property**, which results from a **loss** caused by a **covered peril** that occurs during the policy period. The term "debris" does not include **pollutants**.

    b.  **We** will also pay removal expenses incurred to extract **pollutants** from land or water, if the discharge, dispersal, migration, or release of the **pollutants** is caused by or results from **loss** to **covered property**, and if such **loss** is caused by a **covered peril** during the policy period.

    **We** do not pay for:

0018

(i) the cost of testing; evaluating; observing; or recording the existence, level, or effects of **pollutants**. However, **we** will pay the cost of testing that is necessary for the extraction of **pollutants** from land or water.

(ii) any damage to **your insured auto** from **pollutants**.

c. The most **we** will pay for all removal expenses described in a. or b. above arising out of any one **loss** is $25,000.

d. The expenses for removal of **covered property** debris and **pollutants** will be paid only if they are reported to **us** in writing within 180 days of the earlier of:

(i) the date of the direct physical **loss**; or

(ii) the end of the policy period.

3. **Expenses in Defense or Settlement of Claims**

**We** will pay, with respect to any claim **we** investigate or settle, or with respect to any lawsuit against any insured **we** defend:

a. all expenses **we** incur.

b. the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. However, **we** have no duty to purchase a bond in a principal amount exceeding **our** limit of liability, and **we** have no duty to apply for or furnish these bonds.

c. all reasonable expenses incurred by **you** at **our** request, including actual loss of earnings up to $250 per day because of time off from work.

d. all costs taxed against the insured in any lawsuit against the insured **we** defend.

e. interest accruing after entry of judgment on that part of the judgment that does not exceed **our** limit of liability for any lawsuit **we** defend. This does not apply if **we** have not been given notice of suit or the opportunity to defend an insured. **Our** payment, offer in writing, or deposit in court of that part of the judgment that does not exceed **our** limit of liability ends **our** duty to pay interest that accrues after the date of **our** payment, written offer, or deposit.

f. interest accruing before entry of judgment on that part of the judgment that does not exceed **our** limit of liability for any lawsuit **we** defend. **Our** offer to pay that part of the judgment that does not exceed **our** limit of liability ends **our** duty to pay interest that accrues after **our** offer.

4. **Sue and Labor**

a. **We** will pay the necessary expenses **you** incur to prevent further **loss** to **covered property** if that expense is incurred within a 12-hour period after the **covered peril** occurs.

b. If, in the event of an occurrence, it becomes necessary to move the **covered property** in order to avoid a **loss** to the **covered property**, **we** will pay the reasonable and necessary costs incurred by **you** to move the **covered property** away from the location of the occurrence.

c. The most **we** will pay for the aggregate of all expenses incurred under subparts a. and b. above is $7,500.

**LIMITS OF LIABILITY**

1. **Amount of Payment**

a. Subject to subsections 2., 3., and 4. below, in the event of a **loss** to **covered property**, **we** will pay the least of the following:

(i) **Your** legal liability for the direct physical **loss** to the **covered property**;

(ii) The declared value of the **covered property** shown in the bill of lading, tariff documents, rate confirmation sheet, shipping receipt, or contract of carriage;

(iii) For household goods, the amount specified in any advice of coverage, or other document evidencing an agreed valuation for property in transit;

(iv) The actual cost to the shipper to repair or replace the **covered property** with material of like kind and quality, not including any claim for diminution of value to the **covered property**; or

(v) The "Cargo" limit shown on the **declarations page**.

b. Regardless of the number of **insured autos** or **trailers** involved, insureds, premiums paid, policies issued by **us**, claims made, or lawsuits brought, the most **we** will pay for **loss** to **covered property** in any one occurrence is the limit of liability shown on the **declarations page** for "Cargo Liability" coverage.

c. With respect to **business equipment**, subject to subsections 2., 3., and 4. below, in the event of a **loss**, **we** will pay the lower of:

(i) the amount necessary to replace the **business equipment**; or

(ii) the amount necessary to repair the **business equipment**.

**We** will not pay the amount necessary to repair or replace **business equipment** unless the equipment has been, or is actually going to be, repaired or replaced. Subject to the limit of liability for this coverage, **we** will pay only the amount **you** are required to spend to repair or replace the **business equipment**.

The most **we** will pay for **loss** to **business equipment** in any one occurrence is the $5,000 limit of liability for this **business equipment** coverage.

2. **Deductible**

For each **loss** to **covered property** that qualifies for coverage under this endorsement, the deductible shown on the **declarations page** for this "Cargo Liability" coverage will be applied to reduce the **loss** payable on the **covered property**. A $250 deductible will apply to each **business equipment loss**. For each **loss** to **business equipment** that qualifies for coverage under this endorsement, the **business equipment** deductible will be applied to reduce the **loss** payable on the **business equipment**.

If there is other **loss** arising out of a single occurrence that applies under this endorsement, or under the associated Commercial Auto Policy, and/or any other endorsement attached thereto, only one deductible will be applied to the aggregate of all **loss** components. The highest deductible applicable to any single coverage implicated in the **loss** will apply.

If **we** pay for any part of a deductible in the settlement of any claim or lawsuit, **you** must reimburse **us** for the deductible or the portion thereof that **we** paid.

3. **Insurable Interest**

**We** will not cover more than **your** insurable interest in any **covered property** or **business equipment**.

4. **Sets or Parts**

a. Sets

The **loss** to an article that is part of a set will not be considered a **loss** to the entire set. Therefore, if there is a **loss** to **covered property** or **business equipment** that is part of a set, **we** at **our** option may choose to:

(a) repair or replace any part to restore the pair or set to its value before the **loss** or damage; or

(b) pay the difference between the value of the pair or set before and after the **loss** or damage.

b. Parts

If **loss** is to a part of **covered property** or **business equipment** that consists of several parts, **we** will pay for only the lost or damaged part.

**DUTIES IN CASE OF A LOSS**

The following additional duties apply under this Motor Truck Cargo Legal Liability Coverage endorsement:

1. **You** must take all reasonable steps to protect **covered property** and **business equipment** at the time of and after a **loss** to

8

0020

avoid further damage.

2. **You** must allow **us** to have all property involved in an **accident** or **loss** inspected and appraised before its repair or disposal.

3. **You** must give **us** a copy of the descriptions and schedules from all insurance policies applicable to the **covered property** or **business equipment**, whichever the case may be, that was destroyed or damaged.

4. **You** must send **us** a signed, sworn proof of loss containing all the information **we** request to settle the claim. **You** must do this within 60 days after **our** request. **We** will supply **you** with the necessary forms.

5. **You** must, as often as **we** reasonably require, submit, and so far as is within **your** power, cause all other persons interested in the **covered property** or **business equipment**, whichever the case may be, and members of their households and employees to submit, to examination under oath by any person **we** name, and, in connection with any claim made, to produce for examination all books of accounts, uniform bills of lading, shipping receipts, invoices, drivers' log books, and any other documents, at such reasonable time and place as **we** may designate, and permit extracts and copies thereof to be made.

6. Unless **we** give **our** permission, **you** may not dispose of the carcass(es) of animals, birds, or fish until **we** inspect or examine such carcass(es). However, this clause does not apply if such disposal is required by law or ordinance.

**GENERAL PROVISIONS**

1. When used in this endorsement, subsection 3—Other Insurance of the General Provisions section of **your** Commercial Auto Policy is deleted in its entirety and replaced by the following:

    a. **Other Insurance**
       (i) **You** may have other insurance subject to the same terms, conditions, and provisions as the insurance provided by this endorsement. If **you** do, **we** will pay **our** share of the covered **loss**. **Our** share is the proportion that the applicable limit of liability under this endorsement bears to the total of the limits of liability of all policies covering on the same basis.
       (ii) If there is other insurance covering the same **loss**, other than that described in paragraph (i) above, **we** will pay only for the amount of the covered **loss** in excess of the amount due from that other insurance, whether **you** can collect on it or not. However, **we** will not pay more than **our** applicable limit of liability.

    b. **Insurance Under Two or More Coverages**
       If two or more of this endorsement's coverages apply to the same **loss**, **we** will not pay more than the amount of the **loss** as determined under subsection 1—Amount of Payment in the Limits of Liability section of this endorsement, or the limit of liability applicable to the most specific coverage, whichever is less.

2. The following additional General Provisions apply to this Motor Truck Cargo Legal Liability Coverage endorsement:

    a. **Payment of Loss**
       (i) A covered **loss** will be payable 30 days after a satisfactory proof of loss is received or a final judgment award has been entered.

       **We** may make payment for a **loss** either to **you** or the owner of the property. **We** will not pay the owner more than their financial interest in the property. If **we** make a payment to the owner of the property, this shall be in full satisfaction of any claim by **you** for which such payment has been made.

0021

If a **loss** has been paid or made good by others, **we** will not be liable for any part of the **loss**. Payment for a **loss** is required only if **you** have fully complied with all the terms of this policy.

(ii) With respect to **covered property**, **we** have the following options:

    (a) pay the value of the **loss** as determined under subsection 1—Amount of Payment in the Limits of Liability section of this endorsement;

    (b) pay the cost of repairing or replacing the **covered property**;

    (c) rebuild, repair, or replace the **covered property** with property of like kind and quality, to the extent practicable, and within a reasonable time; or

    (d) take all or any part of the damaged property at an agreed value.

(iii) With respect to **business equipment**, **we** will pay the loss as determined under subsection 1—Amount of Payment in the Limits of Liability section of this endorsement.

b. **Abandonment**

**We** may keep all or part of the property at the agreed or appraised value, but **you** may not abandon any property to **us** without **our** written consent.

c. **Conformity with Statute**

When a condition of this coverage is in conflict with an applicable law, that condition is amended to conform to that law.

d. **Recovered Property**

If **you** or **we** recover any **covered property** or **business equipment** for which **we** have made payment under this policy, **you** or **we** will promptly notify the other of the recovery. At **your** option, the property will be returned to or retained by **you** or it will become **our** property. If **you** keep the property, **you** must return to **us** the amount **we** paid to **you** for the **covered property** or **business equipment**, whichever the case may be. **We** will pay recovery expenses and the expenses to repair the recovered **covered property** and **business equipment**, subject to the limit of liability.

If **we** have already paid **you** the **loss** amount at the time of any salvage or recovery, the amount **you** receive for the recovered **covered property** will accrue entirely to **our** benefit until **you** have paid any amounts owed to **us** as a result of the adjustment to the **loss** amount.

e. **Salvage**

Any recovery of salvage on a **loss** will accrue entirely to **our** benefit until the sum **we** paid has been replaced. If **our** benefit of salvage recovery exceeds the sum that **we** paid, **we** will return the difference to **you**, less any salvage recovery expenses.

f. **Policy Period and Territory**

Coverage under this endorsement applies only to **losses** that occur during the policy period shown on the **declarations page** and which occur within the United States or Canada.

g. **Coverage Required by Filings**

If **we** have filed a certificate of insurance on **your** behalf with any regulatory or governmental agency, and:

(i) **we** are required to pay any judgment entered against **you**; or

(ii) **we** agree to settle a claim or lawsuit;

arising out of a **loss** that is covered solely because of the existence of such certificate of insurance, **we** will be obligated to

pay no more than the minimum amount required by that agency or any applicable law. If any payment is based solely on the existence of such certificate, **you** must reimburse **us** in full for **our** payment, including legal fees and costs **we** incurred, whether the payment is made as a result of judgment or settlement.

h. **No Benefit to Bailee**

No person or organization other than **you**, having custody of **covered property** or **business equipment**, will benefit from this insurance.

i. **Transfer of Rights of Recovery Against Others to Us**

If any person or organization to or for whom **we** make payment under this endorsement has rights to recover damages from another, those rights are transferred to **us** to the extent of **our** payment. That person or organization must do everything necessary to secure **our** rights and must do nothing after **loss** to impair them. But **you** may waive **your** rights against another party in writing:

(i) Prior to a **loss** to the **covered property** or **business equipment**.

(ii) After a **loss** to the **covered property** or **business equipment**, but only if, at the time of **loss**, that party is one of the following:

    (a) someone insured by this insurance; or

    (b) a business firm:

        (1) owned or controlled by **you**; or

        (2) that owns or controls **you**.

j. **Legal Action Against Us**

No one may bring a legal action against **us** under this endorsement unless:

(i) there has been full compliance with all the terms of this policy; and

(ii) the action is brought within two years after **you** first have knowledge of the direct **loss** or damage.

k. **Premiums**

The first named insured shown on the **declarations page**:

(i) is responsible for the payment of all premiums; and

(ii) will be the payee for any return premiums **we** pay.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THIS POLICY REMAIN UNCHANGED.**

0023

## COMMERCIAL GENERAL LIABILITY ENDORSEMENT

Various provisions in this endorsement restrict coverage. Read the entire endorsement carefully to determine **your** rights, duties, and what is and is not covered.

**We** agree with **you** that the following coverage is added to your Commercial Auto Policy:

### ADDITIONAL DEFINITIONS USED IN THIS ENDORSEMENT

The following definitions are in addition to those found in the Commercial Auto Policy. Except as otherwise defined in this endorsement, terms appearing in boldface type, whether in the singular, plural or possessive, will have the following meanings.

1. "**Advertisement**" means a notice that is broadcast or published to the general public or specific market segments about **your** goods, products or services for the purpose of attracting customers or supporters. **Advertisement** includes material placed on the Internet or on similar electronic means of communication; however, regarding websites, only that part of a website that is about **your** goods, products or services for the purpose of attracting customers or supporters is considered an **advertisement**.

2. "**Coverage territory**" means:
   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;
   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or
   c. All other parts of the world if the injury or damage arises out of:
      (i)   Goods or products made or sold by **you** in the territory described in a. above;
      (ii)  The activities of a person whose home is in the territory described in a. above, but who is away for a short time on **your** business; or
      (iii) Personal and advertising injury offenses that take place through the Internet or similar electronic means of communication;

   provided that the **insured's** responsibility to pay damages is determined in a **suit** on the merits, in the territory described in a. above or in a settlement agreed to by **us**.

3. "**Executive officer**" means a person holding any of the officer positions created by **your** charter, constitution, by-laws or any other similar governing document.

4. "**Fungi**" means any type of form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

5. "**Hostile fire**" means a fire or explosion that is uncontrolled or breaks out from where it was intended to be.

6. "**Impaired property**" means tangible property, other than **your product** or **your work**, that cannot be used or is less useful than intended by its manufacturer or designer because:
   a. It incorporates **your product** or **your work** that is known or thought to be defective, deficient, inadequate or dangerous; or
   b. **You** have failed to fulfill the terms of a contract or agreement;
   if such property can be restored to use by:

1

    a. The repair, replacement, adjustment or removal of **your product** or **your work**; or
    b. **Your** fulfilling the terms of the contract or agreement.

7. "**Insured**" means:
    a. If **you** are designated in on the **Declarations Page** as:
        i.    An individual: **you** and **your** spouse, but only with respect to the conduct of a business of which **you** are the sole owner.
        ii.    A partnership or joint venture: **you**. **Your** members, partners, and their spouses, are also **insureds**, but only with respect to the conduct of **your** business.
        iii.    A limited liability company: **you**. **Your** members are also **insureds**, but only with respect to the conduct of **your** business. **Your** managers are **insureds**, but only with respect to their duties as **your** managers.
        iv.    An organization other than a partnership, joint venture or limited liability company: **you**. **Your** "executive officers" and directors are also **insureds**, but only with respect to their duties as **your** officers or directors. **Your** stockholders are also insureds, but only with respect to their liability as stockholders.
        v.    A trust: **you**. **Your** trustees are also insureds, but only with respect to their duties as trustees.
    b. Each of the following is also an **insured**:
        i.    **Your** volunteer workers, but only while performing duties related to the conduct of **your** business.
        ii.    **Your** employees, other than **your executive officers** (if **you** are an organization other than a partnership, joint venture or limited liability company) or **your** managers (if **you** are a limited liability company), but only for acts within the scope of their employment by **you** or while performing duties related to the conduct of **your** business.
        No employee or volunteer worker is an insured for:
          (1) **Bodily injury** or **personal and advertising injury**:
            (a) to **you**, to **your** partners or members (if **you** are a partnership or joint venture), to **your** members (if **you** are a limited liability company), to a co-employee while in the course of his or her employment or performing duties related to the conduct of **your** business, or to **your** other volunteer workers while performing duties related to the conduct of **your** business;
            (b) to the spouse, child, parent, brother, or sister of the co-employee or volunteer worker as a consequence of paragraph (1)(a) above;
            (c) for which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs (1)(a) or (b) above; or
            (d) arising out of his or her providing or failing to provide professional health care services.
          (2) **Property damage** to property:
            (a) owned, occupied, or used by,
            (b) rented to, in the care, custody, or control of, or over which physical control is being exercised for any purpose by
            **you**, any of **your** employees, volunteer workers, any partner or member (if **you** are a partnership or joint venture), or any member (if **you** are a limited liability company).
        iii.    Any person (other than **your** employee or volunteer worker), or any organization while acting as **your** real estate manager.

0025

    iv.    Any person or organization having proper temporary custody of your property if **you** die, but only:

        A.  with respect to liability arising out of the maintenance or use of that property; and

        B.  until **your** legal representative has been appointed.

    v.    **Your** legal representative if **you** die, but only with respect to duties as such. That representative will have all **your** rights and duties under this endorsement.

c.  Any organization **you** newly acquire or form, other than a partnership, joint venture or limited liability company, and over which **you** maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to the organization. However:

    i.    Coverage under this provision is afforded only until the 90th day after **you** acquire or form the organization or the end of the policy period, whichever is earlier;

    ii.    Coverage A does not apply to **bodily injury** or **property damage** that occurred before **you** acquired or formed the organization; and

    iii.   Coverage B does not apply to **personal and advertising injury** arising out of an offense committed before **you** acquired or formed the organization.

No person or organization is an **insured** with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

8.  "**Insured contract**" for purposes of this endorsement only, means:

a.  A contract for a lease of premises. However, any portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to **you** or temporarily occupied by **you** with permission of the owner is not an **insured contract**;

b.  A sidetrack agreement;

c.  Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d.  An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e.  An elevator maintenance agreement; and

f.  That part of any other contract or agreement pertaining to **your** business (including an indemnification of a municipality in connection with work performed for a municipality) under which **you** assume the tort liability of another party to pay for **bodily injury** or **property damage** to a third person or organization. Tort liability, as referred to in this provision, means a liability that would be imposed by law in the absence of any contract or agreement.

However, this paragraph f. does not include that part of any contract or agreement:

    (1)  That indemnifies a railroad for **bodily injury** or **property damage** arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

    (2)  That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

        (a)  Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

        (b)  Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

    (3)  Under which the **insured**, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the **insured's** rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

9. "**Loading or unloading**" means the handling of property:
   a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or **auto**;
   b. While it is in or on an aircraft, watercraft or **auto**; or
   c. While it is being moved from an aircraft, watercraft or **auto** to the place where it is finally delivered; however, **loading or unloading** does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or **auto**.

10. "**Occurrence**" means an **accident**, happening or event, including continuous or repeated exposure to substantially the same general harmful conditions.

11. "**Personal and advertising injury**" means injury, including consequential **bodily injury**, arising out of one or more of the following offenses:
    a. False arrest, detention or imprisonment;
    b. Malicious prosecution;
    c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
    d. Oral or written publication in any manner, including, but not limited to, e-mail, blogs, and other electronic publication, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
    e. Oral or written publication, in any manner including but not limited to e-mail, blogs, and other electronic publication, of material that violates a person's right of privacy;
    f. The use of another's advertising idea in **your advertisement**; or
    g. Infringing upon another's copyright, trademark, trade dress or slogan in **your advertisement**.

12. "**Product/completed operations hazard**":
    a. Includes all **bodily injury** and **property damage** occurring away from premises **you** own or rent and arising out of **your product** or **your work** except:
       (i) Injury or damage caused by products that are still in **your** physical possession; or
       (ii) Work that has not yet been completed or abandoned. **Your work** will be deemed completed at the earliest of the following times:
          (a) When all of the work called for in **your** contract has been completed;
          (b) When all of the work to be done at the job site has been completed if **your** contract calls for work at more than one job site; or
          (c) When that part of the work done at a particular job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
       Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.
    b. Does not include **bodily injury** or **property damage** arising out of:
       (i) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle, including an aircraft or watercraft, not owned or operated by **you**, and that condition was created by the **loading or unloading** of that vehicle by any **insured**;
       (ii) The existence of tools, uninstalled equipment, or abandoned or unused materials

13. "**Property damage**" for purposes of this endorsement only, means:

4

    a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **occurrence** that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

14. "**Silica**" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

15. "**Silica-related dust**" means a mixture or combination of silica and other dust or particles.

16. "**Suit**" means a civil proceeding involving allegations of damages because of **bodily injury**, **property damage** or **personal and advertising injury** to which this insurance applies. **Suit** includes but is not limited to:

    a. An arbitration proceeding in which such damages are claimed and to which the **insured** must submit or does submit with **our** consent; or

    b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the **insured** submits with **our** consent.

17. "**Your product**" means:

    a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

        (i)   **You**;

        (ii)  Others trading under **your** name; or

        (iii) A person or organization whose business or assets **you** have acquired: and

    b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**Your product** includes:

    a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your product**; and

    b. The providing of or failure to provide warnings or instructions.

**Your product** does not include vending machines or other property rented to or located for the use of others but not sold.

18. "**Your work**" means:

    a. Work or operations performed by **you** or on **your** behalf; and

    b. Materials, parts or equipment furnished in connection with such work or operations.

**Your work** includes:

5

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your work**; and

b. The providing of or failure to provide warnings or instructions.

**SECTION I – COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

a. **We** will pay those sums, OTHER THAN PUNITIVE OR EXEMPLARY DAMAGES, that the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** to which this insurance applies. **We** will have the right and duty to defend the **insured** against any **suit** seeking those damages. However, **we** will have no duty to defend the **insured** against any **suit** seeking damages for **bodily injury** or **property damage** to which this insurance does not apply. **We** may, at **our** discretion, investigate any **occurrence** and settle any claim or **suit** that may result. However:

(1) The amount **we** will pay for damages is limited as described in Section II – Limits Of Liability; and

(2) **Our** right and duty to defend ends when **we** have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A and B or medical expenses under Coverage C;

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b. This insurance applies to **bodily injury** and **property damage** only if:

(1) The **bodily injury** or **property damage** is caused by an **occurrence** that takes place in the **coverage territory**; and

(2) The **bodily injury** or **property damage** occurs during the policy period.

Any **bodily injury** or **property damage**, whether such **bodily injury** or **property damage** is known or unknown, that first occurred prior to the inception date of this policy (or the retroactive date of this policy, if any, whichever is earlier), or that is, or alleged to be, in the process of occurring at the inception date of this policy (or the retroactive date of this policy, if any, whichever is earlier), even if the **occurrence** continues during this policy period, will be deemed to have occurred prior to the policy period. Any **bodily injury** or **property damage**, whether known or unknown, which is in the process of settlement, adjustment or **suit** as of the inception date of this policy (or the retroactive date of this policy, if any, whichever is earlier) will also be deemed to have occurred prior to the policy period.

**Bodily injury** or **property damage** that first occurs during this policy period includes any continuation, change or resumption of that **bodily injury** or **property damage** after the end of this policy period.

c. Damages because of **bodily injury** or **property damage** include damages claimed by any person or organization for care, loss of services, or death resulting at any time from the **bodily injury**.

d. In the event that a claim or **suit** seeks damages, some of which are covered and others of which are not covered by this policy, the **insured** must agree to a reasonable allocation of the costs and fees of defense, and the **insured** will be responsible for payment of the costs and fees to defend the damages

or claims not covered by this policy.  This agreement shall be reached in writing, signed by the **insured** and **us**, prior to the date when a responsive pleading to the claim or **suit** is filed on behalf of the **insured**.  In the absence of such agreement, **our** duty to defend will apply only to those specific portions of the **suit** that are covered.

**EXCLUSIONS** - **READ THE FOLLOWING EXCLUSIONS CAREFULLY.  IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS ENDORSEMENT.**

Coverage under Coverage A does not apply to:

**a.  Expected or Intended Injury**

**Bodily injury** or **property damage** expected or intended from the standpoint of any **insured**.  This exclusion does not apply to **bodily injury** resulting from the use of reasonable force to protect persons or property.

**b.  Contractual Liability**

**Bodily injury** or **property damage** for which the **insured** is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:
(1)  That the **insured** would have in the absence of the contract or agreement; or
(2)  Assumed in a contract or agreement that is an **insured contract**, provided the **bodily injury** or **property damage** occurs subsequent to the execution of the contract or agreement.  Solely for the purposes of liability assumed in an **insured contract**, reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an **insured** are deemed to be damages because of **bodily injury** or **property damage**, provided:
   (i) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same **insured contract**; and
   (ii)  Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c.  Liquor Liability**

**Bodily injury** or **property damage** for which any **insured** may be held liable by reason of:
(1)  Causing or contributing to the intoxication of any person;
(2)  The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or
(3)  Any statute, ordinance or regulation relating to the sale, gift, distribution, selling, or use of alcoholic beverages.

This exclusion applies only if **you** are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d.  Workers' Compensation and Similar Laws**

7

Any obligation for which an **insured** or an insurer of that **insured**, even if one does not exist, may be held liable under workers' compensation, unemployment compensation, disability benefits law, or any similar law.

**e. Employer's Liability**

**Bodily injury** to:
(1)  An employee of any **insured** arising out of or within the course of:
    i.  that employee's employment by any **insured**; or
    ii. performing duties related to the conduct of any **insured's** business; or
(2)  The spouse, child, parent, brother or sister of that employee as a consequence of Paragraph a. above.

This exclusion applies:
(a)  Whether the **insured** may be liable as an employer or in any other capacity; and
(b)  To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the **insured** under an **insured contract**.

**f. Aircraft, Auto or Watercraft**

**Bodily injury** or **property damage** arising out of:
(1)  The ownership, maintenance, use, or entrustment to others of any aircraft, **auto** or watercraft owned or operated by or rented, leased or loaned to any **insured**; or
(2)  Any **auto you** do not own, lease, hire, rent or borrow that is used in connection with **your** business.
Use includes operation and **loading or unloading**.

This exclusion applies even if the claims against any **insured** allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that **insured**, if the **occurrence** which caused the **bodily injury** or **property damage** involved the ownership, maintenance, use or entrustment to others of any aircraft, **auto** or watercraft that is owned or operated by or rented or loaned to any **insured**.

This exclusion does not apply to:
(1)  A watercraft while ashore on premises **you** own or rent;
(2)  A watercraft **you** do not own that is:
    (a)  Less than 26 feet long; and
    (b)  Not being used to carry persons or property for a charge;
(3)  Parking an **auto** on, or on the ways next to, premises **you** own or rent, provided the **auto** is not owned by or rented or loaned to **you** or the **insured**;
(4)  Liability assumed under any **insured contract** for the ownership, maintenance or use of aircraft or watercraft; or
(5)  **Bodily injury** or **property damage** arising out of:
    (a)  The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of **mobile equipment** if it were not subject to a

8

compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

(b) the operation of any of the machinery or equipment listed in Paragraph B or C of the definition of **auto**.

**g. Mobile Equipment**

**Bodily injury** or **property damage** arising out of:

(1) The transportation of **mobile equipment** by an **auto** owned or operated by or rented or loaned to any **insured**; or

(2) The use of **mobile equipment** in, while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**h. Damage to Property**

**Property damage** to:

(1) Property **you** own, rent, or occupy, including any costs or expenses incurred by **you**, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises **you** sell, give away, or abandon, if the **property damage** arises out of any part of those premises;

(3) Property loaned to **you**;

(4) Personal property in the care, custody or control of the **insured**;

(5) That particular part of real property on which **you** or any contractors or subcontractors working directly or indirectly on **your** behalf are performing operations, if the **property damage** arises out of those operations; or

(6) That particular part of any property that must be restored, repaired, or replaced because **your work** was incorrectly performed on it.

Paragraphs (1), (3), and (4) of this exclusion do not apply to **property damage** (other than damage by fire) to premises, including the contents of such premises, rented to **you** for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To **You** as described in Section II – Limits of Insurance, subsection 6.

Paragraph (2) of this exclusion does not apply if the premises are **your work** and were never occupied, rented or held for rental by **you**.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to **property damage** included in the **products-completed operation hazard**.

**i. Damage to Your Product**

**Property damage** to **your product** arising out of it or any part of it.

9

**j. Damage to Your Work**

**Property damage** to **your work** arising out of it or any part of it and included in the **products/completed operations hazard**.

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on **your** behalf by a subcontractor.

**k. Damage to Impaired Property or Property Not Physically Injured**

**Property damage** to **impaired property** or property that has not been physically injured, arising out of:

(1)  A defect, deficiency, inadequacy or dangerous condition in **your product** or **your work**; or

(2)  A delay or failure by **you** or anyone acting on **your** behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to **your product** or **your work** after it has been put to its intended use.

**l. Recall of Products, Work or Impaired Property**

Damages claimed for any **loss**, cost or expense incurred by **you** or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1)  **Your product**;

(2)  **Your work**; or

(3)  **Impaired property**;

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**m. Personal and Advertising Injury**

**Bodily injury** arising out of **personal and advertising injury**.

**n. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

Exclusions c. through n. under this Coverage A do not apply to damage by fire to premises while rented to **you** or temporarily occupied by **you** with permission of the owner.  A separate limit of insurance applies to this coverage as described in Section II – Limits Of Insurance.

0033

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

1. **Insuring Agreement**
   a. **We** will pay those sums, OTHER THAN PUNITIVE OR EXEMPLARY DAMAGES, that the **insured** becomes legally obligated to pay as damages because of **personal and advertising injury** to which this insurance applies. **We** will have the right and duty to defend the **insured** against any **suit** seeking those damages. However, **we** will have no duty to defend the **insured** against any **suit** seeking damages for **personal and advertising injury** to which this insurance does not apply. **We** may, at **our** discretion, investigate any offense and settle any claim or **suit** that may result. However:
      (1) The amount **we** will pay for damages is limited as described in Section II – Limits Of Liability; and
      (2) **Our** right and duty to defend end when **we** have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A and B or medical expenses under Coverage C.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

   b. This insurance applies to **personal and advertising injury** caused by an offense arising out of **your** business but only if the offense was committed in the **coverage territory** during the policy period.

**EXCLUSIONS - READ THE FOLLOWING EXCLUSIONS CAREFULLY.  IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS ENDORSEMENT.**

Coverage under Coverage B does not apply to **personal and advertising injury**:

a. **Knowing Violation of Rights of Another**
   Caused by or at the direction of any **insured** with the knowledge that the act would violate the rights of another and would inflict **personal and advertising injury**.

b. **Material Published with Knowledge of Falsity**
   Arising out of oral or written publication of material, if published by or at the direction of the **insured** with knowledge of its falsity.

c. **Material Published Prior to Policy Period**
   Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

d. **Criminal Acts**
   Arising out of a criminal act committed by or at the direction of any **insured**.

e. **Contractual Liability**
   For any **loss** for which the **insured** has assumed liability in a contract or agreement.  This exclusion does not apply to liability for damages that the **insured** would have in the absence of the contract or agreement.

f. **Breach of Contract**

Arising out of a breach of contract, except an implied contract to use another's advertising idea in **your advertisement**.

**g. Quality or Performance of Goods – Failure to Conform to Statements**
Arising out of the failure of goods, products or services to conform to any statement of quality or performance made in **your advertisement**.

**h. Wrong Description of Prices**
Arising out of the wrong description of price of goods, products or services stated in **your advertisement**.

**i. Insureds in Media and Internet Type Businesses**
Committed by an **insured** whose business is:
(i)    Advertising, broadcasting, publishing or telecasting;
(ii)   Designing or determining content of websites for others; or
(iii)  An Internet search, access, content or service provider.
However, this exclusion does not apply to Paragraphs 11.a, 11.b and 11.c. of **personal and advertising injury** under the Additional Definitions Used In This Endorsement Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for **you** or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**j. Infringement of Copyright, Patent, Trademark or Trade Secret**
Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in **your advertisement**, of copyright, trade dress or slogan.

**k. Electronic Chatrooms or Bulletin Boards**
Arising out of an electronic chatroom or bulletin board the **insured** hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use of Another's Name or Product**
Arising out of the unauthorized use of another's name or product in **your** e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

## GENERAL POLICY EXCLUSIONS

**The following exclusions are applicable to both Coverage A and Coverage B.**

This endorsement provides no coverage for the following:

**a. Asbestos**

**Bodily injury**, **property damage** or **personal and advertising injury** arising out of, resulting from, caused by, or contributed to, either directly or indirectly, by:

0035

1. inhaling, ingesting, or prolonged physical exposure to asbestos or goods or products containing asbestos; or
2. the use of asbestos in constructing or manufacturing any good, product or structure; or
3. the removal of asbestos from any good, product or structure; or
4. the manufacture, transportation, storage or disposal of asbestos or goods or products containing asbestos;

This exclusion includes, but is not limited to, any cost for investigation, defense, abatement, mitigation, removal or disposal of asbestos or asbestos containing materials.

**b. Lead**

**Bodily injury**, **property damage** or **personal and advertising injury** arising out of, resulting from, caused by, or contributed to, either directly or indirectly, by lead or lead based products or any exposure or contamination of any person or property to such lead or lead based product. This exclusion includes but is not limited to any cost for abatement, mitigation, removal or disposal of paint, plumbing solder, pipes and fixtures or other items containing lead.

**c. Fungi or bacteria**

**Bodily injury**, **property damage** or **personal and advertising injury** which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any **fungi** or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

This coverage also does not apply to any **loss**, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, **fungi** or bacteria, by any **insured** or by any other person or entity.

This exclusion does not apply to any **fungi** or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**d. Silica or silica-related dust**

1. **Bodily injury**, **property damage**, or **personal and advertising injury** arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, **silica** or **silica-related dust**.

2. Any **loss**, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of **silica** or **silica-related dust**, by any **insured** or by any other person or entity.

**e. Employment-Related Practices Exclusion**

**Bodily injury** or **personal and advertising injury** to:

(1)   A person arising out of any:
1.   Refusal to employ that person;
2.   Termination of that person's employment; or
3.   Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2)   The spouse, child, parent, brother or sister of that person as a consequence of **bodily injury** to that person at whom any of the employment-related practices described in paragraphs 1, 2 or 3 above is directed.

This exclusion applies:

(a)   Whether the **insured** may be liable as an employer or in any other capacity; and
(b)   To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**f.  Assault and/or Battery Exclusion**

The coverage under this policy does not apply to any claim, **suit**, cost or expense arising out of assault and/or battery, or out of any act or omission in connection with the prevention or suppression of such acts, whether caused by or at the instigation or direction of any **insured** or **insured's** employees, patrons or any other person.

**g.  Sexual Abuse and/or Molestation Exclusion**

The coverages under this policy do not apply to **bodily injury**, **property damage** or **personal and advertising injury** arising out of

(1)   The actual or threatened abuse or molestation or licentious, immoral or sexual behavior whether or not intended to lead to, or culminating in any sexual act, of any person, whether caused by, or at the instigation of, or at the direction of, or omission by, any **insured**, his/her employees, or any other person; or
(2)   The actual or alleged transmission of any sexually transmitted disease.
Abuse includes, but is not limited to, negligent or intentional infliction of physical, emotional or psychological injury or harm.

This exclusion does not apply to the vicarious liability of the named insured for the acts or omissions of employees.

**h.  Firearms Exclusion**

This insurance does not apply to any claims, **suits**, accusations or charges or any **loss**, cost, or expense arising out of **bodily injury**, **property damage**, or **personal or advertising injury** arising out of the ownership, rental, maintenance, use or misuse of any firearms.

**l.  War**

**Bodily injury**, **property damage** or **personal or advertising injury** due to war, whether declared or undeclared, civil war, insurrection, rebellion, revolution, or to any act or condition incident to these.

14

**j. Pollution**

**Bodily injury, property damage,** or **personal or advertising injury** that would not have occurred in whole or part but for the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of **pollutants** at any time.

This includes any **loss**, cost, or expense arising out of any:

1. Request, demand, order, or statutory or regulatory requirement that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of **pollutants**; or
2. Claim or **suit** by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to, or assessing the effects of, "**pollutants**".

**s. Nuclear Energy Liability**

(1) **Bodily injury** or **property damage**:
   (a) With respect to which an **insured** under the policy is also an **insured** under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an **insured** under any such policy but for its termination upon exhaustion of its limit of liability; or
   (b) Resulting from the **hazardous properties** of **nuclear material** and with respect to which:
      1. any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or
      2. the **insured** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

(2) **Bodily injury** resulting from the **hazardous properties** of **nuclear material** and arising out of the operation of a **nuclear facility** by any person or organization.

(3) **Bodily injury** or **property damage** resulting from **hazardous properties** of **nuclear material**, if:
   (a) The **nuclear material**:
      1. is at any **nuclear facility** owned by, or operated by or on behalf of, an **insured**; or
      2. has been discharged or dispersed from any **nuclear facility** owned by, or operated by or on behalf of, an **insured**.
   (b) The **nuclear material** is contained in **spent fuel** or **waste** at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an **insured**; or
   (c) The **bodily injury** or **property damage** arises out of the furnishing by an **insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **nuclear facility**, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) only applies to **property damage** to such **nuclear facility** and any property threat.

(4) When used in this exclusion:
   (a) **Hazardous properties** includes radioactive, toxic or explosive properties.

    (b)   **Nuclear material** means **source material**, **special nuclear material**, or **by-product material**.

    (c)   **Source material**, **special nuclear material**, and **by-product material** have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

    (d)   **Spent fuel** means any fuel element or fuel component, solid, or liquid, which has been used or exposed to radiation in a **nuclear reactor**.

    (e)   **Waste** means any waste material:

        1.   containing **by-product material** other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its **source material** content; and

        2.   resulting from the operation by any person or organization of any **nuclear facility** included under the first two paragraphs of the definition of **nuclear facility**.

    (f)   **Nuclear facility** means:

        1.   Any **nuclear reactor**;

        2.   Any equipment or device designed or used for:

            a)   separating the isotopes of uranium or plutonium;

            b)   processing or utilizing **spent fuel**; or

            c)   handling, processing or packaging **waste**.

        3.   Any equipment or device used for the processing, fabricating or alloying of **special nuclear material** if at any time the total amount of such material in the custody of the **insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; or

        4.   any structure, basic, excavation, premises or place prepared or used for the storage or disposal of **waste**;

        and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

    (g)   **Nuclear reactor** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

    (h)   **Property damage** includes all forms of radioactive contamination of property.

## SUPPLEMENTARY PAYMENT – COVERAGES A AND B

1.  **We** will pay, with respect to any claim **we** investigate or settle, or any **suit** against an **insured we** defend:

    a.  All expenses **we** incur.

    b.  Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage under this policy applies. **We** do not have to furnish these bonds.

    c.  The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. **We** do not have to furnish these bonds.

    d.  All reasonable expenses incurred by the **insured** at **our** request to assist **us** in the investigation or defense of the claim or **suit**, including actual loss earnings up to $250 a day because of time off from work.

    e.  All cost taxed against the **insured** in the **suit**.

    f.  Prejudgment interest awarded against the **insured** on the part of the judgment **we** pay. If **we** make an offer to pay the applicable limit of insurance, **we** will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before **we** have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If **we** defend an **insured** against a **suit** and an indemnitee of the **insured** is also named as a party of the **suit**, **we** will defend that indemnitee if all of the following conditions are met:

a. The **suit** against the indemnitee seeks damages for which the **insured** has assumed the liability of the indemnitee in a contract or agreement that is an **insured contract**;

b. This insurance applies to such liability assumed by the **insured**;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the **insured** in the same **insured contract**;

d. The allegations in the **suit** and the information **we** know about the **occurrence** are such that no conflict appears to exist between the interests of the **insured** and the interests of the indemnitee;

e. The indemnitee and the **insured** ask **us** to conduct and control the defense of that indemnitee against such **suit** and agree that **we** can assign the same counsel to defend the **insured** and the indemnitee; and

f. The indemnitee:

   (1) Agrees in writing to:

      (a) Cooperate with **us** in the investigation, settlement or defense of the **suit**;

      (b) Immediately send **us** copies of any demands, notices, summonses or legal papers received in connection with the **suit**;

      (c) Notify any other insurer whose coverage is available to the indemnitee; and

      (d) Cooperate with **us** with respect to coordinating other applicable insurance available to the indemnitee; and

   (2) Provides **us** with written authorization to:

      (a) Obtain records and other information related to the **suit**; and

      (b) Conduct and control the defense of the indemnitee in such **suit**.

So long as the above conditions are met, attorneys' fees incurred by **us** in the defense of that indemnitee, necessary litigation expenses incurred by **us** and necessary litigation expenses incurred by the indemnitee at **our** request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for **bodily injury** and **property damage** and will not reduce the limits of insurance.

**Our** obligation to defend an **insured's** indemnitee and pay attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

a. **We** have used up the applicable limit of insurance in the payment of judgments or settlements; or

b. The conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

## COVERAGE C – MEDICAL PAYMENTS

1. **Insuring Agreement**

a. **We** will pay medical expenses as described below for **bodily injury** caused by an **accident**:

   (1) On premises **you** own or rent;

   (2) On ways next to premise **you** own or rent; or

0040

      (3)    Because of **your** operations;

Provided that:

      (1)    The **accident** takes place in the **coverage territory** and during the policy period;

      (2)    The expenses are incurred and reported to **us** within one year of the date of the **accident**; and

      (3)    The injured person submits to examination, at **our** expense, by physicians of **our** choice as often as **we** reasonably require.

  b.  **We** will make these payments regardless of fault.  These payments will not exceed the applicable limit of insurance.  **We** will pay reasonable expenses for:

      (1)    First aid administered at the time of an accident;

      (2)    Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

      (3)    Necessary ambulance, hospital, professional nursing and funeral services.

2.  **Exclusions**

  **We** will not pay expenses for **bodily injury**:

  **a. Any Insured**

    To any **insured.**

  **b. Hired Person**

    To a person hired to do work for or on behalf of any **insured** or a tenant of any **insured.**

  **c. Injury on Normally Occupied Premises**

    To a person injured on that part of premises **you** own or rent that the person normally occupies.

  **d. Workers Compensation and Similar Laws**

    To a person, whether or not an **employee** of any **insured**, if benefits for the **bodily injury** are payable or must be provided under a workers' compensation, disability benefits, or unemployment law or a similar law.

  **e. Athletic Activities**

    To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

  **f. Products-Completed Operations Hazard**

    Included within the **product-completed operations hazard**.

  **g. Coverage A Exclusions**

    To a person if the **bodily injury** would be excluded under Coverage A.

  **h. War**

    Due to war, whether or not declared, or any act or condition incident of war.  War includes civil war, insurrection, rebellion or revolution.

## SECTION II – LIMITS OF LIABILITY

1.  The Limits of Liability shown on the **Declarations Page** and the rules below fix the most **we** will pay regardless of the number of:

  a. **Insureds**;

b. Claims made or **suits** brought: or

c. Persons or organizations making claims or bringing **suits**.

2. The General Aggregate Limit is the most **we** will pay for the sum of:

a. Medical expenses under Coverage C;

b. Damages under Coverage A, except damages because of **bodily injury** or **property damage** included in the **products-completed operations hazard**; and

c. Damages under Coverage B.

3. The Product-Completed Operations Aggregate Limit is the most **we** will pay under Coverage A for damages because of **bodily injury** and **property damage** included in the **product-completed operations hazard**.

4. Subject to Paragraph 2. above, the Personal and Advertising Injury Limit is the most **we** will pay under Coverage B for the sum of all damages because of all **personal and advertising injury** sustained by any one person or organization.

5. Subject to Paragraph 2. or 3. above, whichever applies, the Each **Occurrence** Limit is the most **we** will pay for the sum of:

a. Damages under Coverage A; and

b. Medical expenses under Coverage C;

because of all **bodily injury** and **property damage** arising out of any one **occurrence**.

6. Subject to Paragraph 5. above, the Damage To Premises Rented To **You** Limit is the most **we** will pay under Coverage A for damages because of **property damage** to any one premises, while rented to **you**, or in the case of damage by fire, while rented to **you** or temporarily occupied by **you** with permission of the owner.

7. Subject to Paragraph 5. above, the Medical Expense Limit is the most **we** will pay under Coverage C for all medical expenses because of **bodily injury** sustained by any one person.

The Limits of Liability of this policy apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown on the **Declarations Page**, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Liability.

### SECTION III – COMMERCIAL GENERAL LIABILITY PROVISIONS AND CONDITIONS

The following provisions and conditions apply to this endorsement, and are in addition to the General Provisions of the Commercial Auto Policy, and to any schedules, endorsements, or modifications thereto:

1. **Legal Action Against Us**

No person or organization has a right under this endorsement:

(a) To join **us** as a party or otherwise bring **us** into a **suit** asking for damages from an **insured**; or

(b) To sue **us** on this endorsement unless all of its terms have been fully complied with.

A person or organization may sue **us** to recover on an agreed settlement or on a final judgment against an **insured**, but **we** will not be liable for damages that are not payable under the terms of this endorsement or that are in excess of the applicable limit of liability. An agreed settlement means a settlement and release of liability signed by **us**, the **insured** and the claimant or the claimant's legal representative.

2. **Other Insurance**

0042

If other valid and collectible insurance is available to the **insured** for a **loss we** cover under Coverages A and B of this policy, **our** obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when Paragraph b. below applies.  If this insurance is primary, **our** obligations are not affected unless any of the other insurance is also primary.  Then, **we** will share with all that other insurance by the method described in Paragraph c. below.

b. Excess Insurance

When this insurance applies, it is excess over:

(1) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for **your work**;

(b) That is Fire insurance for premises rented to **you** or temporarily occupied by **you** with permission of the owner;

(c) That is insurance purchased by **you** to cover **your** liability as a tenant for **property damage** to premises rented to **you** or temporarily occupied by **you** with permission of the owner; or

(d) If the **loss** arises out of the maintenance or use of an **auto**, aircraft or watercraft to the extent not subject to Exclusions m., n. or o. of Section I – Coverage A – Bodily Injury And Property Damage Liability.

(2) Any other primary insurance available to **you** covering liability for damages arising out of the premises or operations for which **you** have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, **we** will have no duty under Coverages A and B to defend the **insured** against any **suit** if any other insurer has a duty to defend the **insured** against that **suit**.  If no other insurer defends, **we** will undertake to do so, but **we** will be entitled to the **insured's** right against all those other insurers.

When this insurance is excess over other insurance, **we** will pay only **our** share of the amount of the **loss**, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the **loss** in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

**We** will share the remaining **loss**, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the **Declarations Page** of this policy.

c. Method of Sharing

If all of the other insurance permits contribution by equal shares, **we** will follow this method also.  Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the **loss** remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, **we** will contribute by limits.  Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

20

3. **Premium Audit**
   a. **We** will compute all premiums for this policy in accordance with **our** rules and rates.
   b. Premium shown in this policy as advance premium is a deposit premium only.  At the close of each audit period **we** will compute the earned premium for that period.  Audit premiums are due and payable on notice to the first Named Insured.  If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, **we** will return the excess to the first Named Insured.
   c. The first Named Insured must keep records of the information **we** need for premium computation, and send **us** copies at such times as **we** may request.

4. **Representations**
   By accepting this policy, **you** agree:
   a. The statements in the **Declarations Page** are accurate and complete;
   b. Those statements are based upon representation **you** made to **us**; and
   c. **We** have issued this policy in reliance upon **your** representations.

5. **Cancellation**
   **You** may cancel this policy by calling or writing **us**, and stating the future date that **you** wish the cancellation to be effective.

   **We** may cancel this policy by mailing a notice of cancellation to the named insured shown on the **Declarations Page** at the last known address appearing in **our** records.  If **we** cancel this policy during the first sixty (60) days of the initial policy period for any reason other than nonpayment of premium, notice of cancellation will be mailed at least thirty (30) days before the effective date of cancellation.  If **we** cancel this policy at any time due to nonpayment of premium, notice of cancellation will be mailed at least ten (10) days before the effective date of cancellation.  After this policy is in effect for more than sixty (60) days, or if this is a renewal or continuation policy, notice of cancellation will be mailed at least sixty (60) days before the effective date of cancellation.  **Our** notice of cancellation will state the reason(s) for cancellation.

   **We** may cancel this policy for any reason within the first sixty (60) days of the initial policy period.

   After this policy is in effect for more than sixty (60) days, or if this is a renewal or continuation policy, **we** may only cancel for one or more of the following reasons:
   1. **you** do not pay the required premium for this policy when due;
   2. this policy was obtained through a material misrepresentation;
   3. any insured has violated any of the terms and conditions of the policy;
   4. the risk originally accepted has measurably increased;
   5. certification to the Director of the loss of reinsurance by the insurer which provided coverage for **us** for all or a substantial part of the underlying risk insured; or
   6. a determination by the Director that the continuation of the policy could place **us** in violation of the insurance laws of this state.

0044

6. **When We Do Not Renew**
   If **we** decide not to renew this policy, **we** will mail or deliver to the first Named Insured shown in the **Declarations Page** written notice of the nonrenewal not less than 60 days before the expiration date.  If notice is mailed, proof of mailing will be sufficient proof of notice.

7. **Examination of Your Books and Records**
   **We** may examine and audit **your** books and records as they relate to this policy at any time during the policy period and up to three years afterward.

8. **Inspections and Surveys**
   **We** have the right but are not obligated to:
   a.  Make inspections and surveys at any time:
   b.  Give **you** reports on the conditions **we** find; and
   c.  Recommend changes.

   Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged.  **We** do not make safety inspections. **We** do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public.  **We** do not warrant that conditions:
   a.  Are safe or healthful; or
   b.  Comply with laws, regulation, codes or standard.

   This condition applies to **us** and to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

9. **Premiums**
   The first Named Insured shown on the **Declarations Page**
   a.  Is responsible for the payment of all premiums, and
   b.  Will be the payee for any return premiums **we** pay.

10. **Knowledge and Notice of Occurrence**
    It is agreed that knowledge of an **occurrence** or offense by an agent, servant or employee of the **insured** shall not constitute knowledge to the **insured** unless the corporate risk manager shall have received such notice.

    It is also agreed that if the **insured** reports an **occurrence** or offense to its workers' compensation carrier that develops into a liability claim, failure to report such **occurrence** or offense to **us** at the time of the **occurrence** or offense shall not be deemed in violation of Duties in the Event of **Occurrence**, Offense, Claim or **Suit**.

11. **Headings and Subheadings**
    The headings and subheadings in this policy and any endorsements or schedules hereto are included solely to aid the reader and do not affect the terms of this policy.

12. **Bankruptcy**
    **We** are not relieved of any obligation under this policy because of the bankruptcy or insolvency of an insured.

0045

Form Z433 IL (04/08)

0046

Form 2371 (06/10)

## **LIMITED GENERAL LIABILITY - TRUCKING OPERATIONS ENDORSEMENT**

This endorsement modifies insurance provided under the Commercial General Liability coverage form.

If **your declarations page** shows Limited General Liability, and this form number shows on the attachment line, then the Commercial General Liability coverage form is modified as follows:

### **GENERAL POLICY EXCLUSIONS**

### **The following exclusion is applicable to both Coverage A and Coverage B.**

This endorsement provides no coverage for the following:

12. **Other than Trucking Operations**

    **Bodily injury**, **property damage**, or **personal or advertising injury** arising out of any activity other than the insured's trucking operations or suffered by any person present at the **insured's** premises for reasons that, principally, are not related to the conduct of the **insured's** trucking operations. For purposes of this exclusion, the following are deemed to be other than trucking operations and are excluded:
    (i)   the use of the **insured's** property for any non-business purpose, such as, for example, a residence; or
    (ii)  the conduct of any business activity or the rendering of any professional service that is not a necessary part of the **insured's** trucking operations.

### **ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

0047

Form Z440 (06/10)

## REFRIGERATION BREAKDOWN COVERAGE **ENDORSEMENT**

This endorsement modifies the Motor Truck Cargo Legal Liability Coverage endorsement. Except as specifically modified by this Refrigeration Breakdown Coverage endorsement, all provisions of the Motor Truck Cargo Legal Liability Coverage endorsement apply.

**We** agree with **you** that the insurance provided under **your** Motor Truck Cargo Legal Liability Coverage endorsement is modified as follows:

**INSURING AGREEMENT**

The following is added to the Insuring Agreement:

Subject to the Limit of Liability, if **you** pay the premium for the Refrigeration Breakdown Coverage endorsement, **we** will pay for **your** legal liability for direct physical **loss** to **covered property**, caused by spoilage or change in temperature, resulting directly from the sudden and accidental breakdown of refrigeration or heating units on an **insured auto**.

**ADDITIONAL DEFINITIONS**

Under the definition of "**covered peril**", Excluded Peril "g." is deleted and replaced by:

g. **Breakdown, Temperature, Humidity**
   (i)  Humidity, dampness, dryness, or changes in or extremes of temper-ature, other than such **loss** caused by the sudden and accidental breakdown of refrigeration or heating units on the **insured auto**; or
   (ii) Mechanical or electrical breakdown or failure, other than the sudden and accidental breakdown of refrigeration or heating units on the **insured auto**. However, this Excluded Peril does not apply to **loss** caused by a fire or explosion if such fire or explosion would be covered under this endorsement.

**ADDITIONAL PAYMENTS**

0048

The following is added to the Additional Payments section:

5. **Additional Expense to Temporarily Store Covered Property**
   In addition to the applicable limit of liability for the Refrigeration Breakdown Coverage, **we** will pay any reasonable additional expenses that **you** incur to temporarily store **covered property** in a controlled-temperature environment in order to avoid or minimize **loss** to such property due to spoilage or change in temperature. Such temporary storage must be directly made necessary by the sudden and accidental breakdown of a refrigeration or heating unit of **your insured auto**. However, under this Additional Expense to Temporarily Store Covered Property coverage, **we** will not pay for:
   a. Expenses incurred to repair or replace the refrigeration or heating unit;
   b. Costs or penalties incurred for detention or delay of vehicles, **trailers**, or containers to which the refrigeration or heating unit is attached; or
   c. Additional lodging or meal expenses for the driver of the **insured auto** that exceed $150 per day or $300 total.
   The most **we** will pay with respect to any one occurrence under this Additional Expense to Temporarily Store Covered Property coverage is $2,500.

**LIMITS OF LIABILITY**

The following is added to subsection 2, Deductible:

For each **loss** that qualifies for coverage under the Refrigeration Breakdown Coverage endorsement, a deductible of $2,500 will be applied to reduce the **loss** payable with respect to the **covered property**.

**EXCLUSIONS**

The following exclusions are added:

Coverage under this Refrigeration Breakdown Coverage endorsement will not apply for **loss** caused by, resulting from, or arising out of breakdown of the refrigeration or heating unit due to any of the following, regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**:
1. Failure to provide adequate fuel supply;
2. Failure to maintain crankcase oil or refrigerant level within the manufacturer's specifications;
3. Intentional destruction or damage to automatic temperature control units by an employee; or
4. Failure to maintain the calibration of the refrigeration or heating unit and/or failure to maintain the refrigeration or heating unit within the manufacturer's

specifications.

**DUTIES IN CASE OF A LOSS**

The following are added to the Duties in Case of a Loss section:

7.  **You** must take all reasonable steps to protect **covered property** at the time of and after a **loss** to avoid further damage, including but not limited to storage of the cargo in a properly temperature controlled facility or alternate trailer;
8.  **You** must allow **us** access to the refrigeration or heating equipment prior to its repair unless a delay in repair would imperil the cargo;
9.  **You** must provide **us** access to all maintenance and repair records for the failed refrigeration or heating unit; and
10. **You** must allow **us** access to all records establishing the proper use of the equipment, including any and all electronic records or logs generated by the unit.

**GENERAL PROVISIONS**

The following is added to the General Provisions section:

I.  Refrigeration/Heating Equipment Maintenance.
    1.  **You**, or **your** employee, must check the refrigeration and heating equipment every 12 hours while it is being operated; and
    2.  At least once a month, **you** must:
        a.  Have the refrigeration and heating equipment inspected by a manufacturer-authorized representative, or other trained refrigeration specialist, which may include **you** or **your** employee;
        b.  Promptly perform the proper maintenance according to manufacturer's specifications;
        c.  Make any appropriate or necessary repairs; and
        d.  Keep and update written records with respect to item 1. and items 2.a. through 2.c. above. **You** must allow **us** to inspect these records as often as **we** may reasonably require. If **you** fail to maintain these records, coverage will be void under this endorsement.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE MOTOR TRUCK CARGO LEGAL LIABILITY COVERAGE ENDORSEMENT REMAIN UNCHANGED.**

1781 IL 0219

# ILLINOIS
## COMMERCIAL AUTO FORMS

**PLEASE READ YOUR POLICY AGREEMENT CAREFULLY.**
**Provisions of this Agreement and its endorsements restrict coverage. Be certain you understand all of the coverage terms, the exclusions, and your rights and duties.**

**All forms in the endorsement section do not automatically pertain to your policy.**
**Please refer to your declarations page for form numbers associated with your policy. Only those endorsements whose form numbers appear on your declarations page apply to your policy. All other parts of the policy that have not been modified by an endorsement will remain unchanged.**

**This booklet contains Form 6912 (02/19) and a section of optional endorsements.**



0051

Form 6912 (02/19)

## COMMERCIAL AUTO POLICY

---

## INDEX OF POLICY PROVISIONS

**PAGE**

**DUTIES IN THE EVENT OF AN ACCIDENT OR LOSS**. . . . . . . . . . . . . . . . . . . .1

**GENERAL DEFINITIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

**PART I—LIABILITY TO OTHERS**
Insuring Agreement—Liability To Others . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
Additional Definitions Used in This Part Only . . . . . . . . . . . . . . . . . . . . . . . .6
Additional Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
Out-Of-State Coverage Extension. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
Exclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
Limit of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

**PART II—DAMAGE TO YOUR AUTO**
Insuring Agreement—Collision Coverage . . . . . . . . . . . . . . . . . . . . . . . . . .15
Insuring Agreement—Comprehensive Coverage . . . . . . . . . . . . . . . . . . . .15
Insuring Agreement—Fire and Theft with Combined
   Additional Coverage (CAC) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
Additional Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
Additional Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
Additional Definitions Used in This Part Only . . . . . . . . . . . . . . . . . . . . . . .17
Exclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18
Limit of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
Deductible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21
Salvage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
No Benefit to Bailee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
Appraisal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
Payment of Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23
Loss Payee Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

**GENERAL PROVISIONS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

0053

**COMMERCIAL AUTO POLICY**

If **you** pay **your** premium when due, **we** will provide the insurance described in this policy.

## DUTIES IN THE EVENT OF AN ACCIDENT OR LOSS

For coverage to apply under this policy, **you** or the person seeking coverage must promptly report each **accident** or **loss** even if **you** or the person seeking coverage is not at fault. Refer to your policy documents for the claims phone number.

**You** or the person seeking coverage must also obtain and provide **us** the names and addresses of all persons involved in the **accident** or **loss**, the names and addresses of any witnesses, and the license plate numbers of the vehicles involved.

If **you** or the person seeking coverage cannot identify the owner or operator of a vehicle involved in the **accident**, or if theft or vandalism has occurred, **you** or the person seeking coverage must notify the police within 24 hours or as soon as practicable. However, for purposes of uninsured motorist coverage when the owner or operator of a vehicle involved in the accident cannot be identified, **you** or the person seeking coverage must notify the police no more than 30 days after the accident.

A person seeking coverage must:
1. cooperate with **us** in any matter concerning a claim or lawsuit;
2. provide any written proof of **loss we** may reasonably require;
3. allow **us** to take signed and recorded statements, including sworn statements and examinations under oath, which **we** may conduct outside the presence of **you**, a **relative**, or any person claiming coverage, and answer all reasonable questions **we** may ask as often as **we** may reasonably require;
4. promptly call **us** to notify **us** about any claim or lawsuit and send **us** any and all legal papers relating to any claim or lawsuit;
5. attend hearings and trials as **we** require;
6. submit to medical examinations at **our** expense by doctors **we** select as often as **we** may reasonably require;
7. authorize **us** to obtain medical and other records;
8. take reasonable steps after a **loss** to protect the **insured auto** from further **loss**. **We** will pay reasonable expenses incurred in providing that protection. If failure to provide such protection results in further loss, any additional damages will not be covered under this policy;
9. allow **us** to have access to an **insured auto** or other **auto** involved in an **accident** or **loss** and to have it inspected and appraised before its repair or disposal; and
10. authorize **us** access to **your** business or personal records as often as **we** may reasonably require.

0054

1

**GENERAL DEFINITIONS**

**The words and phrases below, whether in the singular, plural or possessive, have the following special meanings when appearing in boldface type in this policy, and in endorsements issued in connection with this policy, unless specifically modified.**

1. "**Accident**" means a sudden, unexpected and unintended event, or a continuous or repeated exposure to that event, that causes **bodily injury** or **property damage**.

2. "**Auto**" means a land motor vehicle or **trailer** designed for travel on public roads, or any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged. It does not include **mobile equipment**. Self-propelled vehicles with the following types of permanently attached equipment are **autos**, not **mobile equipment**:
   a. equipment designed and used primarily for:
      (i) snow removal;
      (ii) road maintenance, but not construction or resurfacing;
      (iii) street cleaning;
   b. cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and
   c. air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well-servicing equipment.

3. "**Bodily injury**" means bodily harm, sickness, or disease, including death that results from bodily harm, sickness, or disease.

4. "**Declarations**" or "**declarations page**" means the document prepared by **us** listing **your** policy information, which may include the types of coverage **you** have elected, the limit for each coverage, the cost for each coverage, the specifically described **autos** covered by this policy, and the types of coverage for each specifically described **auto**.

5. "**Employee**" includes a **leased worker** and a statutory employee. **Employee** does not include a **temporary worker**.

6. "**Insured auto**" or "**your insured auto**" means:
   a. Any **auto** specifically described on the **declarations page**; or
   b. An additional **auto** for Part I—Liability To Others and/or Part II—Damage To Your Auto on the date **you** become the owner if:
      (i) **you** acquire the **auto** during the policy period shown on the **declarations page**;

0055

2

(ii) **we** insure all **autos** owned by **you** that are used in **your** business;

(iii) no other insurance policy provides coverage for that **auto**; and

(iv) **you** tell **us** within 30 days after **you** acquire it that **you** want **us** to cover it for that coverage.

If **you** add any coverage, increase **your** limits, or make any other changes to this policy during the 30-day period after **you** acquire an additional **auto**, these changes to **your** policy will not become effective until after **you** ask **us** to add the coverage, increase **your** limits, or make such changes for the additional **auto**. **We** may charge premium for the additional **auto** from the date **you** acquire the **auto**.

With respect to Part I—Liability To Others, if **we** provide coverage for an additionally acquired **auto** in accordance with this paragraph b., **we** will provide the same coverage for such additional **auto** as **we** provide for any **auto** shown on the **declarations page**.

With respect to Part II—Damage To Your Auto, if **we** provide coverage for an **auto you** acquire in addition to any **auto** specifically described on the **declarations page**, and the additional **auto** is:

(i) a **private passenger auto**, **we** will provide the broadest coverage **we** provide for any **auto** shown on the **declarations page**; or

(ii) any **auto** other than a **private passenger auto**, and **you** have purchased Physical Damage coverage for at least one **auto** other than a **private passenger auto**, **we** will provide the broadest coverage for which the newly acquired **auto** is eligible.

c. Any replacement **auto** on the date **you** become the owner if:

(i) **you** acquire the **auto** during the policy period shown on the **declarations page**;

(ii) the **auto** that **you** acquire replaces one specifically described on the **declarations page** due to termination of **your** ownership of the replaced **auto** or due to mechanical breakdown of, deterioration of, or **loss** to the replaced **auto** that renders it permanently inoperable; and

(iii) no other insurance policy provides coverage for that **auto**.

If **we** provide coverage for a replacement **auto**, **we** will provide the same coverage for the replacement **auto** as **we** provide for the replaced **auto**. **We** will provide that coverage for a period of 30 days after **you** become the owner of such replacement **auto**. **We** will not provide any coverage after this 30-day period unless within this period **you** ask **us** to insure the replacement **auto**. If **you** add any coverage, increase **your** limits, or make any other changes to **your** policy during this 30-day period, these changes to **your** policy will not become effective until after **you** ask **us** to add the coverage, increase **your** limits, or make such changes.

0056

3

7. "**Insured contract**" means:
   a. A lease of premises;
   b. A sidetrack agreement;
   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;
   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;
   e. That part of any other contract or agreement pertaining to **your** business (including an indemnification of a municipality in connection with work performed for a municipality) under which **you** assume the tort liability that is vicariously imposed on another for **your** negligence or that of **your employees** or agents; or
   f. That part of any contract or agreement, entered into as part of **your** business, for the rental of an **insured auto**. However, such contract or agreement shall not be considered an **insured contract** to the extent that it obligates **you** or any of **your employees** to pay for **property damage** to any **auto** rented or leased to **you** or any of **your employees**.

   An "**insured contract**" does not include that part of any contract or agreement:
   1. That indemnifies a railroad for **bodily injury** or **property damage** arising out of construction or demolition operations within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass, or crossing; or
   2. That pertains to the loan, lease or rental of an **auto** to **you** or any of **your employees**, if the **auto** is loaned, leased or rented with a driver; or
   3. That holds a person or organization engaged in the business of transporting property by **auto** for hire harmless for **your** use of an **insured auto** over a route or territory that person or organization is authorized to serve by public authority.

8. "**Leased worker**" means a person leased to **you** by a labor leasing firm under an agreement between **you** and the labor leasing firm to perform duties related to the conduct of **your** business. **Leased worker** does not include a **temporary worker**.

9. "**Loss**" means sudden, direct and accidental loss or damage.

10. "**Mobile equipment**" means any of the following types of land vehicles, including, but not limited to, any attached machinery or equipment:
    a. Bulldozers, farm implements and machinery, forklifts, and other vehicles designed for use principally off public roads;
    b. Vehicles **you** use solely on premises **you** own or rent and on accesses to public roads from these premises, unless specifically described on the **declarations page** and not defined as **mobile equipment** under other parts of this definition;

0057

4

c. Any vehicle that travels on crawler treads, or that does not require licensing in the state in which **you** reside or **your** business is licensed;

d. Vehicles, whether self-propelled or not, used primarily to provide mobility to permanently attached:

   (i) Power cranes, shovels, loaders, diggers, or drills; or

   (ii) Road construction or resurfacing equipment, such as graders, scrapers or rollers.

e. Vehicles not described in Paragraphs a., b., c., or d. above that are not self-propelled and are used primarily to provide mobility to permanently attached equipment of the following types:

   (i) Air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well-servicing equipment; or

   (ii) Cherry pickers and similar devices used to raise or lower workers.

f. Vehicles not described in Paragraphs a., b., c., or d. above that are self-propelled and used primarily for purposes other than transportation of persons or cargo.

However, **mobile equipment** does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged.

11. "**Occupying**" means in, on, entering or exiting.

12. "**Personal vehicle sharing program**" means a system or process, operated by a business, organization, network, group, or individual, that facilitates the sharing of **private passenger autos** for use by individuals, businesses, or other entities.

13. "**Pollutants**" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

14. "**Private passenger auto**" means a land motor vehicle:

   a. of the private passenger, pickup body, or cargo van type;

   b. designed for operation principally upon public roads;

   c. with at least four wheels; and

   d. with a gross vehicle weight rating of 12,000 pounds or less, according to the manufacturer's specifications.

However, **private passenger auto** does not include step-vans, parcel delivery vans, or cargo cutaway vans or other vans with cabs separate from the cargo area.

15. "**Property damage**" means physical damage to, destruction of, or loss of use of, tangible property.

16. "**Relative**" means any person residing in the household in which the named insured resides who is related to the named insured by blood, marriage, or

0058

5

adoption, including a ward or foster child. This term only applies if the named insured is a natural person.

17. "**Temporary substitute auto**" means any **auto you** do not own while used with the permission of its owner as a temporary substitute for an **insured auto** that has been withdrawn from normal use due to breakdown, repair, servicing, loss or destruction. However, **temporary substitute auto** does not include any **auto** available for the regular or frequent use of **you**, a **relative**, or **your employees** unless that **auto** is insured under a separate policy of insurance that provides at least the minimum required limits of financial responsibility under the applicable state and federal laws.

18. "**Temporary worker**" means:
    a. a person who is furnished to **you** to substitute for a permanent **employee** on leave or to meet seasonal or short-term workload conditions; or
    b. a day laborer.

19. "**Trailer**" includes a semi-trailer and any piece of equipment used to convert a semi-trailer to a full trailer while it is attached to the semi-trailer.

20. "**We**", "**us**" and "**our**" mean the company providing this insurance as shown on the **declarations page**.

21. "**You**", "**your**" and "**yours**" refer to the named insured shown on the **declarations page**.

## **PART I—LIABILITY TO OTHERS**

### **INSURING AGREEMENT—LIABILITY TO OTHERS**

Subject to the Limits of Liability, if **you** pay the premium for liability coverage for the **insured auto** involved, **we** will pay damages, other than punitive or exemplary damages, for **bodily injury**, **property damage**, and **covered pollution cost or expense** for which an **insured** becomes legally responsible because of an **accident** arising out of the ownership, maintenance or use of that **insured auto**. However, **we** will only pay for the **covered pollution cost or expense** if the same **accident** also caused **bodily injury** or **property damage** to which this insurance applies.

**We** will settle or defend, at **our** option, any claim or lawsuit for damages covered by this Part I. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the Limit of Liability for this coverage has been exhausted by payment of judgments or settlements.

### **ADDITIONAL DEFINITIONS USED IN THIS PART ONLY**

A. When used in Part I—Liability To Others, **insured** means:
   1. **You** with respect to an **insured auto**.

0059

6

2. Any person while using, with **your** permission, and within the scope of that permission, an **insured auto you** own, hire, or borrow except:

    (a) Any person while he or she is working in a business of selling, leasing, repairing, parking, storing, servicing, delivering or testing **autos**, unless that business is **yours** and it was so represented in **your** application.

    (b) Any person while he or she is moving property to or from an **insured auto**, other than one of **your employees**, partners (if you are a partnership), members (if you are a limited liability company), or officers or directors (if you are a corporation).

    (c) The owner or anyone else from whom the **insured auto** is leased, hired, or borrowed. However, this exception does not apply if the **insured auto** is specifically described on the **declarations page**.

    (d) The employees or agents of an owner or anyone else from whom the **insured auto** is leased, hired or borrowed. However, this exception does not apply if the **insured auto** is specifically described on the **declarations page**.

For purposes of this subsection A.2., an **insured auto you** own includes any **auto** specifically described on the **declarations page**.

3. Any other person or organization, but only with respect to the legal liability of that person or organization for acts or omissions of any person otherwise covered under this Part I—Liability To Others. If **we** make a filing or submit a certificate of insurance on **your** behalf with a regulatory or governmental agency, the term "**insured**" as used in such filing or certificate, and in any related endorsement, refers only to the person or organization named on such filing, certificate or endorsement.

B. When used in Part I—Liability To Others, **insured auto** also includes:

1. **Trailers** designed primarily for travel on public roads, while connected to **your insured auto** that is a power unit;

2. **Mobile equipment** while being carried or towed by an **insured auto**;

3. Any **temporary substitute auto**; and

4. **Mobile equipment** that is:

    a. owned by **you**;

    b. leased, hired, or borrowed by **you** and **you** have purchased either "Hired Auto Coverage" or "Any Automobile Legal Liability Coverage" from **us**; or

    c. not owned, leased, hired, or borrowed by **you** and **you** have purchased either "Employer's Non-Ownership Liability Coverage" or "Any Automobile Legal Liability Coverage" from **us**.

However, **mobile equipment** meeting any of those three criteria will qualify only if at the time of **loss** it is being:

    a. used in **your** business;

    b. operated on a public highway; and

    c. operated in a state or province where it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law.

0060

7

C. When used in Part I—Liability To Others, "**covered pollution cost or expense**" means any cost or expense arising out of:
1. Any request, demand, order, or statutory or regulatory requirement; or
2. Any claim or suit by or on behalf of a governmental authority demanding that the **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of, **pollutants**.

**Covered pollution cost or expense** does not include any cost or expense arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of **pollutants**:
a. That are, or that are contained in any property that is:
   (i) Being transported or towed by, handled, or handled for movement into, onto, or from, the **insured auto**;
   (ii) Otherwise in the course of transit by or on behalf of the **insured**; or
   (iii) Being stored, disposed of, treated, or processed in or upon the **insured auto**;
b. Before the **pollutants** or any property in which the **pollutants** are contained are moved from the place where they are accepted by the **insured** for movement into or onto the **insured auto**; or
c. After the **pollutants** or any property in which the **pollutants** are contained are moved from the **insured auto** to the place where they are finally delivered, disposed of, or abandoned by the **insured**.

The above Paragraph a. of this definition does not apply to fuels, lubricants, fluids, exhaust gasses, or other similar **pollutants** that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the **insured auto** or its parts if:
(1) The **pollutants** escape, seep, migrate, or are discharged, dispersed or released directly from an **insured auto** part designed by its manufacturer to hold, store, receive or dispose of such **pollutants** and is a part that would be required for the customary operation of the **insured auto**; and
(2) The **bodily injury**, **property damage** or **covered pollution cost or expense** does not arise out of the operation of any equipment listed in Paragraphs b. and c. of the definition of **auto**.

The above Paragraphs b. and c. of this definition do not apply to **accidents** that occur away from premises owned by or rented to an **insured** with respect to **pollutants** not in or upon an **insured auto** if:
(1) The **pollutants** or any property in which the **pollutants** are contained are upset, overturned or damaged as a result of the maintenance or use of an **insured auto**; and
(2) The discharge, dispersal, release or escape of the **pollutants** is caused directly by such upset, overturn or damage.

0061

8

## ADDITIONAL PAYMENTS

In addition to **our** Limit of Liability, **we** will pay for an **insured**:

1. all expenses that **we** incur in the settlement of any claim or defense of any lawsuit;

2. interest accruing after entry of judgment on that part of the judgment that does not exceed **our** Limit of Liability. This payment does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured**. **Our** payment, offer in writing, or deposit in court of that part of the judgment which does not exceed **our** Limit of Liability ends **our** duty to pay interest which accrues after the date of **our** payment, written offer, or deposit;

3. the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in a principal amount exceeding **our** Limit of Liability, and **we** have no duty to apply for or furnish these bonds;

4. up to $2,000 for cost of bail bonds required because of an **accident we** cover. **We** have no duty to apply for or furnish these bonds;

5. reasonable expenses incurred by an **insured** at **our** request, including loss of earnings up to $250 a day; and

6. all court costs taxed against the **insured** in any "suit" against the **insured** we defend. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the **insured**.

### OUT-OF-STATE COVERAGE EXTENSION

If an **accident** to which this Part I applies occurs in any state, territory, or possession of the United States of America, Puerto Rico, or any province or territory of Canada, other than the state in which an **insured auto** is principally garaged, and the state, province, territory or possession has:
1. a financial responsibility or similar law requiring limits of liability for **bodily injury** or **property damage** higher than the limits shown on the **declarations page**, this policy will provide the higher limit; or
2. a compulsory insurance or similar law requiring a non-resident to maintain insurance whenever the non-resident uses an **auto** in that state, province, territory or possession, this policy will provide the greater of:
   a. the required minimum amounts and types of coverage; or
   b. the Limits of Liability under this policy.

This extension does not apply to the limit or limits specified by any law governing commercial carriers of passengers or property.

0062

9

**We** will not pay anyone more than once for the same elements of **loss** because of this extension.

**EXCLUSIONS—PLEASE READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE FOR AN ACCIDENT OR LOSS WILL NOT BE AFFORDED UNDER THIS PART I—LIABILITY TO OTHERS.**

Coverage under this Part I, including **our** duty to defend, does not apply to:

1. **Expected or Intended Injury**
   **Bodily injury** or **property damage** either expected by or caused intentionally by or at the direction of any **insured**.

2. **Contractual**
   Any liability assumed by an **insured** under any contract or agreement, unless the agreement is an **insured contract** that was executed prior to the occurrence of any **bodily injury** or **property damage**.

   However, this exclusion does not apply to liability for damages that an **insured** would have in the absence of the contract or agreement.

3. **Worker's Compensation**
   Any obligation for which an **insured** or an insurer of that **insured**, even if one does not exist, may be held liable under workers' compensation, unemployment compensation, disability benefits law, or any similar law.

4. **Nuclear Energy Liability**
   An **accident** for which any person is insured under nuclear energy liability insurance. This exclusion applies even if the limits of that insurance are exhausted.

5. **Employee Indemnification and Employer's Liability**
   **Bodily injury** to:
   a. An **employee** of any **insured** arising out of or within the course of:
      (i) That **employee's** employment by any **insured**; or
      (ii) Performing duties related to the conduct of any **insured's** business; or
   b. The spouse, child, parent, brother or sister of that **employee** as a consequence of Paragraph a. above.

   This exclusion applies:
   a. Whether the **insured** may be liable as an employer or in any other capacity; and
   b. To any obligation to share damages with or repay someone else who must pay damages because of the injury.

0063

10

But this exclusion does not apply to **bodily injury** to a domestic **employee** if benefits are neither paid nor required to be provided under any workers' compensation, disability benefits, or similar law, or to liability for **bodily injury** assumed by the **insured** under an **insured contract**. For the purposes of this policy, a domestic **employee** is a person engaged in household or domestic work performed principally in connection with a residence premises.

6. **Fellow Employee**
   **Bodily injury** to:
   a. a fellow **employee** of an **insured** injured while within the course of their employment or while performing duties related to the conduct of **your** business.
   b. the spouse, child, parent, brother, or sister of that fellow **employee** as a consequence of Paragraph a. above.

7. **Care, Custody or Control**
   **Property damage** to, towing or removal expense for, or **covered pollution cost or expense** involving, any property owned by, rented to, being transported by, used by, or in the care, custody or control of any **insured**, including any motor vehicle operated or being towed. But this exclusion does not apply to liability assumed under a sidetrack agreement.

8. **Movement of Property by Mechanical Device**
   **Bodily injury** or **property damage** resulting from or caused by the movement of property by a mechanical device, other than a hand truck, not attached to an **insured auto**.

9. **Handling of Property**
   **Bodily injury** or **property damage** resulting from or caused by the handling of property:
   a. before it is moved from the place where it is accepted by the **insured** for movement into or onto **your insured auto**; or
   b. after it has been moved from **your insured auto** to the place where it is finally delivered by the **insured**.

10. **Pollution**
    **Bodily injury** or **property damage** resulting from or caused by the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of any **pollutants**:
    a. That are, or that are contained in any property that is:
       (i) Being transported or towed by, handled, or handled for movement into, onto, or from, the **insured auto**;
       (ii) Otherwise in the course of transit by or on behalf of the **insured**; or
       (iii) Being stored, disposed of, treated, or processed in or upon the **insured auto**;

0064

b. Before the **pollutants** or any property in which the **pollutants** are contained are moved from the place where they are accepted by the **insured** for movement into or onto the **insured auto**; or

c. After the **pollutants** or any property in which the **pollutants** are contained are moved from the **insured auto** to the place where they are finally delivered, disposed of, or abandoned by the **insured**.

The above Paragraph a. of this exclusion does not apply to fuels, lubricants, fluids, exhaust gasses, or other similar **pollutants** that are needed for or result from the normal electrical, hydraulic, or mechanical functioning of the **insured auto** or its parts if:

(1) The **pollutants** escape, seep, migrate, or are discharged, dispersed, or released directly from an **insured auto** part designed by its manufacturer to hold, store, receive, or dispose of such **pollutants** and is a part that would be required for the customary operation of the **insured auto**; and

(2) The **bodily injury**, **property damage**, or **covered pollution cost or expense** does not arise out of the operation of any equipment listed in Paragraphs b. and c. of the definition of **auto**.

The above Paragraphs b. and c. of this exclusion do not apply to **accidents** that occur away from premises owned by or rented to an **insured** with respect to **pollutants** not in or upon an **insured auto** if:

(1) The **pollutants** or any property in which the **pollutants** are contained are upset, overturned, or damaged as a result of the maintenance or use of an **insured auto**; and

(2) The discharge, dispersal, seepage, migration, release, or escape of the **pollutants** is caused directly by such upset, overturn, or damage.

11. **Racing**
**Bodily injury** or **property damage** arising out of **you** or an **insured** participating in, or preparing for, a prearranged or organized racing, speed or demolition contest, stunting activity, or performance contest.

12. **War**
**Bodily injury** or **property damage** arising directly or indirectly out of:

a. War, including undeclared or civil war;

b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

13. **Operations**
**Bodily injury**, **property damage**, or **covered pollution cost or expense** arising out of the operation of:

a. any equipment listed in Paragraphs b. and c. of the definition of **auto**; or

0065

12

b. machinery or equipment that is on, attached to, or part of, a land vehicle that meets the definition of **mobile equipment**.

14. **Completed Operations**
**Bodily injury** or **property damage** arising out of, or caused by, **your** work after that work has been completed or abandoned.

For purposes of this exclusion, **your** work means:
a. Work or operations performed by **you** or on **your** behalf;
b. Materials, parts, or equipment furnished in connection with such work or operations; and
c. The delivery of liquids.

**Your** work includes warranties or representations made at any time with respect to the fitness, quality, durability, or performance of any of the items included in Paragraphs a., b., or c. above.

**Your** work will be deemed completed at the earliest of the following times:
a. When all of the work called for in **your** contract has been completed.
b. When all of the work to be done at a particular site has been completed if **your** contract calls for work at more than one site.
c. When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or sub-contractor working on the same project.
Work that may need service, maintenance, correction, repair, or replace-ment, but which is otherwise complete, will be treated as completed.

15. **Criminal Acts**
**Bodily injury** or **property damage** caused by, or reasonably expected to result from, a criminal act or omission of an **insured**. This exclusion applies regardless of whether that **insured** is actually charged with, or convicted of, a crime. For purposes of this exclusion, criminal acts or omissions do not include traffic violations.

16. **Vehicle Sharing—Private Passenger Autos**
**Bodily injury** or **property damage** arising out of the use of an **insured auto** that is a **private passenger auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of an **insured auto** by **you**.

**LIMIT OF LIABILITY**

**We** will pay no more than the Limit of Liability shown on the **declarations page** for this coverage for the **insured auto** involved in the **accident** regardless of:
1. the number of premiums paid;
2. the number of **insured autos** or trailers shown on the **declarations page**;

3. the number of policies issued by **us**;
4. the number of vehicles or **insureds** involved in an **accident**; or
5. the number of claims or lawsuits arising out of an **accident**;

subject to the following:

1. **Coverage Required by Filings**

   If **we** have filed a certificate of insurance on **your** behalf with any regulatory or governmental agency, and:
   (i) **we** are required to pay any judgment entered against **you**; or
   (ii) **we** agree to settle a claim or lawsuit;
   for **bodily injury**, **property damage**, or **covered pollution cost or expense** arising out of an **accident** or **loss** otherwise not covered under the terms of this policy solely because of such certificate of insurance, **we** will be obligated to pay no more than the minimum amount required by that agency or applicable law. If any payment is based solely on such certificate, **you** must reimburse **us** in full for **our** payment, including legal fees and costs **we** incurred, whether the payment is made as a result of judgment or settlement.

2. **Combined Bodily Injury and Property Damage Limits**

   Subject to the terms of Section 1 above, if **your declarations page** indicates that combined **bodily injury** and **property damage** limits apply for "each accident" or "combined single limit" applies, the most **we** will pay for the aggregate of all damages and **covered pollution cost or expense** combined, resulting from any one **accident**, is the combined liability insurance limit shown on the **declarations page** for the **insured auto** involved in the **accident**.

3. **Separate Bodily Injury Liability and Property Damage Liability Limits**

   Subject to the terms of Section 1 above, if **your declarations page** indicates that separate **bodily injury** liability and **property damage** liability limits apply:

   a. The "each person" **bodily injury** liability limit listed on the **declarations page** for the **insured auto** involved in the **accident** is the maximum **we** will pay for **bodily injury** sustained by any one person in any one **accident**, and that "each person" maximum limit will apply to the aggregate of claims made for such **bodily injury** and any and all claims derived from such **bodily injury**, including, but not limited to, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

   b. Subject to the **bodily injury** liability limit for "each person", the "each accident" **bodily injury** liability limit listed on the **declarations page** for the **insured auto** involved in the **accident** is the maximum **we** will pay for

0067

14

**bodily injury** sustained by two or more persons in any one **accident**, including all derivative claims which include, but are not limited to, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

c. The "each accident" **property damage** liability limit listed on the **declarations page** for the **insured auto** involved in the **accident** is the maximum **we** will pay for the aggregate of all **property damage** and **covered pollution cost or expense** combined, sustained in any one **accident**.

For the purpose of determining **our** Limit of Liability under Sections 1., 2., and 3. above, all **bodily injury**, **property damage**, and **covered pollution cost or expense**, resulting from continuous or repeated exposure to substantially the same event, shall be considered as resulting from one **accident**.

An **insured auto** and any **trailer** or **trailers** attached thereto shall be deemed to be one **auto** with respect to **our** Limit of Liability.

When coverage is afforded for an **accident** involving an **insured auto** that, at the time of loss:

a. is a **trailer** specifically described on the **declarations page**; and
b. is attached to any power unit that is not an **insured auto** specifically described on the **declarations page**;

the maximum amount we will pay will be limited to the lesser of an amount not to exceed the applicable compulsory or financial responsibility law limits of the state identified in **your** address as shown on the **declarations page** or the Limit of Liability shown on the **declarations page**.

Any amount payable under Part I—Liability To Others to or for an injured person will be reduced by any payment made to that person under any Uninsured Motorist Coverage, Underinsured Motorist Coverage, Personal Injury Protection Coverage, or Medical Payments Coverage provided by this policy.

## PART II—DAMAGE TO YOUR AUTO

### INSURING AGREEMENT—COLLISION COVERAGE

Subject to the Limits of Liability, if **you** pay the premium for Collision Coverage, **we** will pay for **loss** to **your insured auto** and its **permanently attached equipment** when it collides with another object or overturns.

### INSURING AGREEMENT—COMPREHENSIVE COVERAGE

Subject to the Limits of Liability, if **you** pay the premium for Comprehensive Coverage, **we** will pay for **loss** to **your insured auto** and its **permanently attached equipment** from any cause other than those covered under Collision Coverage.

0068

Any **loss** caused by missiles, falling objects, fire, theft, collision with an animal, or accidental glass breakage shall be deemed a Comprehensive **loss**. However, **you** have the option of having glass breakage caused by a covered **auto's** collision or overturn considered a **loss** under Collision Coverage.

## INSURING AGREEMENT—FIRE AND THEFT WITH COMBINED ADDITIONAL COVERAGE (CAC)

Subject to the Limits of Liability, if **you** pay the premium for Fire and Theft with Combined Additional Coverage (CAC), **we** will pay for **loss** to **your insured auto** and its **permanently attached equipment** caused by:

1. fire, lightning or explosion;
2. theft;
3. windstorm or hail;
4. earthquake;
5. flood or rising water;
6. malicious mischief or vandalism;
7. the stranding, sinking, burning, collision, or derailment of any conveyance in or upon which **your insured auto** is being transported; or
8. collision with a bird or animal.

No **losses** other than those specifically described above will be covered under Part II of this policy.

## ADDITIONAL COVERAGE

### 1. **Transportation Expenses**

**We** will pay up to $30 per day, up to a maximum of $900, for temporary transportation expenses incurred by **you** because of the theft of an **insured auto** that is a **private passenger auto**. This coverage applies only to those **insured autos** for which **you** carry Comprehensive Coverage. **We** will pay for temporary transportation expenses incurred during the period beginning 48 hours after **you** report the theft to **us**, and ending when the **insured auto** is returned to use, or **we** pay for its **loss**.

### 2. **Coverage for Temporary Substitute Autos**

If a **temporary substitute auto** is involved in a **loss**, **we** will provide the same coverage and deductible that would have applied to the **insured auto** for which it is a substitute. The most **we** will pay for **loss** to a **temporary substitute auto** is the lesser of the Actual Cash Value at the time of **loss** or the cost of repairing or replacing the damaged or stolen property with like kind and quality, less the applicable deductible.

0069

16

### 3. Pet Injury Coverage

If **you** have purchased Collision Coverage for at least one **insured auto** listed on the **declarations page**, Pet Injury Coverage is included in **your** policy.

#### Insuring Agreement

If a **pet** sustains injury or death while inside an **insured auto** at the time of a **loss** covered under Collision, Comprehensive, or Fire & Theft with Combined Additional Coverage, **we** will pay:
1. for reasonable and customary veterinary fees incurred by **you** or the owner of the **pet** if the **pet** is injured in, or as a direct result of, the covered **loss**; or
2. a death benefit if the **pet** dies in, or as a direct result of, the covered **loss**.

In the event of a covered **loss** due to the theft of an **insured auto**, **we** will provide the death benefit provided the **pet** is not recovered.

#### Limits of Liability

The following additional Limits of Liability apply to Pet Injury Coverage:
1. The most **we** will pay for all damages in any one **loss** is a total of $1,000 regardless of the number of **pets** involved.
2. If the **pet** dies in, or as a direct result of, a covered **loss**, **we** will provide a death benefit of $1,000, less any payment **we** made toward veterinary expenses for the **pet**.
3. No deductible shall apply to this coverage.

### ADDITIONAL PAYMENTS

If **you** have paid the premium for Comprehensive Coverage, Collision Coverage, or Fire and Theft with Combined Additional Coverage, then in addition to **our** Limit of Liability, **we** will pay:

1. All reasonable expenses necessary to return a stolen **insured auto** to **you**, unless **we** determine the **auto** to be a total loss.
2. All reasonable expenses necessary to remove an **insured auto** from the site of an **accident** or **loss** and transport it to a repair facility.

### ADDITIONAL DEFINITIONS USED IN THIS PART ONLY

When used in Part II—Damage To Your Auto:

1. "**Finance agreement**" means a written lease or loan contract, entered into as a part of **your** business, pertaining to the lease or purchase by **you** of an

0070

17

**insured auto**, and subject to a valid promissory note or written payment obligation contained in a lease, and security agreement or other written agreement establishing a security interest, executed concurrently with a purchase or lease of the **insured auto** that is commensurate with fair market value.

2. "**Permanently attached equipment**" or **PAE** means equipment and devices that are permanently installed or attached to **your insured auto**. **Permanently attached equipment** also includes:
   a. accessories designed to work as part of the equipment or devices;
   b. load securing equipment and devices; and
   c. custom paint or decals.

3. "**Pet**" means a dog or cat occupying an **insured auto** with **your** express or implied consent.

**EXCLUSIONS—PLEASE READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE FOR AN ACCIDENT OR LOSS WILL NOT BE AFFORDED UNDER THIS PART II—DAMAGE TO YOUR AUTO.**

1. **We** will not pay for loss caused by or resulting from any of the following. Such **loss** is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**.
   a. **War or Military Action**
      (1) war, including undeclared or civil war;
      (2) warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or agents;
      (3) insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.
   b. **Nuclear Hazard**
      (1) the explosion of any weapon employing atomic fission or fusion; or
      (2) nuclear reaction or radiation, or radioactive contamination, however caused.

2. **We** will not pay for **loss** to any sound equipment, video equipment, or transmitting equipment not permanently installed in **your insured auto**, or to tapes, records, compact discs, DVDs, or similar items used with sound or video equipment.

3. **We** will not pay for **loss** to radar detectors or to any other equipment or device designed or used to detect speed measuring equipment, or to any equipment designed or used to jam or disrupt any speed measuring equipment.

4. **We** will not pay for **loss** due and confined to:
   a. wear and tear, freezing, mechanical or electrical breakdown, or structural failure caused by material fatigue, decomposition, or corrosion.

0071

18

b. blowouts, punctures, flat spots, or other road damage to tires.

But, coverage does apply if the damage is the result of other **loss** covered by the policy.

5. **We** will not pay for **loss** incurred while **your insured auto** is used in any illicit trade or transportation, or due to **your insured auto's** destruction or confiscation by governmental or civil authorities because **you**, or, if **you** are a natural person, any **relative**, engaged in illegal activities.

6. **We** will not pay for **loss** caused by **you** or an insured participating in or preparing for a prearranged or organized racing, speed or demolition contest, stunting activity or performance contest.

7. **We** will not pay for **loss** to an **insured auto** for diminution of value.

8. If **we** pay **your** financial obligation under a **finance agreement**, **we** will not pay:
   a. Overdue **finance agreement** payments including any type of late fees or penalties;
   b. Financial penalties imposed under a **finance agreement** for excessive use, abnormal wear and tear, or high mileage;
   c. Security deposits not normally refunded by the lessor or lender;
   d. Cost of **finance agreement** related products such as, but not limited to, Credit Life Insurance, Health, Accident or Disability insurance purchased by **you**;
   e. Carryover balances from previous **finance agreements** or other amounts not associated with the **insured auto**; or
   f. Unpaid principal included in the outstanding **finance agreement** balance that was not used by **you** to purchase the **insured auto**.

9. **We** will not pay for **loss** to an **insured auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of an **insured auto** by **you**.

**LIMIT OF LIABILITY**

1. If the **declarations page** shows actual cash value for the **insured auto**, then the most **we** will pay for **loss** to **your insured auto** is the least of:
   a. the actual cash value of the stolen or damaged property at the time of **loss**;
   b. the amount necessary to replace the stolen or damaged property with other of like kind and quality; or
   c. the amount necessary to repair the damaged property to its pre-loss physical condition; however, if **we** determine that the **insured auto** is a total loss, **we** may, at **our** option, pay the lesser of the actual cash value, or the cost to replace, rather than repair, the **insured auto**.

Permanently attached equipment (PAE) is coverage the limit shown on the **declarations page**. This limit includes transfer of undamaged **PAE** to another **insured auto**, but will not increase the **PAE** limit shown on the **declarations page**.

2. If the **declarations page** shows Stated Amount for the **insured auto**, then the most **we** will pay for **loss** to **your insured auto** is the least of:
   a. the actual cash value of the stolen or damaged property at the time of **loss**;
   b. the amount necessary to replace the stolen or damaged property with other of like kind and quality;
   c. the amount necessary to repair the damaged property to its pre-loss physical condition; however, if **we** determine that the **insured auto** is a total loss, **we** may, at **our** option, pay the lesser of the actual cash value, Stated Amount, or the cost to replace, rather than repair, the **insured auto**; or
   d. the applicable Stated Amount of the property as shown on the **declarations page**.

   However, if there is a **finance agreement** in place for the **insured auto**, the most **we** will pay for a total loss where the outstanding financial obligation under a **finance agreement** for the **insured auto** at the time of the **loss** is:
   a. greater than the actual cash value of the **insured auto** at the time of **loss**; and
   b. the Stated Amount shown on the **declarations page** is greater than the actual cash value of the **insured auto** at the time of **loss**;
   is the lesser of:
   a. the applicable Stated Amount of the **insured auto** as shown on the **declarations page**; or
   b. the outstanding financial obligation under a **finance agreement** for the **insured auto** at the time of the **loss**.

   **PAE** is included in the value of the **insured auto**, but only to the extent the value of the equipment has been included in the Stated Amount shown on the **declarations page**. The transfer of undamaged **PAE** to another **insured auto** will be covered if the aggregate of all damage and cost to move is within the Stated Amount shown on the **declarations page**.

3. Payments for **loss** covered under Collision Coverage, Comprehensive Coverage, or Fire and Theft with Combined Additional Coverage are subject to the following provisions:
   a. in determining the amount necessary to repair damaged property to its pre-loss physical condition, the amount to be paid by **us**:
      (i) shall not exceed the prevailing competitive labor rates charged in the area where the property is to be repaired, and the cost of repair or

0073

20

replacement parts and equipment, as reasonably determined by **us**; and

   (ii) will be based on the cost of repair or replacement parts and equipment which may be new, reconditioned, remanufactured, or used, including, but not limited to:
      (a) original manufacturer parts or equipment; and
      (b) non-original manufacturer parts or equipment;

b. the actual cash value is determined by the market value, age and condition of the **auto** at the time the **loss** occurs; and

c. duplicate recovery for the same elements of damages is not permitted.

4. To determine the amount necessary to repair the damaged property to its pre-loss physical condition as referred to in Paragraph 1.c., the total cost of necessary repairs will be reduced by:

   a. the cost of labor, parts and materials necessary to repair or replace damage, deterioration, defects, or wear and tear on exterior body parts, windshields and other glass, wheels, and paint, that existed prior to the **accident** and that is eliminated as a result of the repair or replacement of property damaged in the **loss**. This adjustment for physical condition includes, but is not limited to, broken, cracked or missing parts, rust, dents, scrapes, gouges, and peeling paint;

   b. an amount for depreciation (also referred to as betterment) that represents a portion of the cost of mechanical parts (parts that wear out over time and have a useful life typically shorter than the life of the **auto** as a whole) that are installed as replacements for existing mechanical parts that were defective, inoperable or nonfunctional prior to the **accident**, which **we** deem necessary to replace in the course of repair; and

   c. an amount for depreciation (also referred to as betterment) on high-wear parts that have a measurable life, such as tires, batteries, engine or transmission, determined by the proportional increase in the useful life of the replacement part when compared to the replaced part. For example, if **we** replace a 24-month old battery that had a manufacturer's rated life of 60 months with a new 60-month rated battery, **our** payment for the battery is reduced by 40 percent and **you** are responsible to pay that 40 percent portion of the cost of the battery.

**DEDUCTIBLE**

For each **loss** that qualifies for coverage under Comprehensive, Collision, or Fire and Theft with Combined Additional Coverage, the deductible shown on the **declarations page** for the **insured auto** will be applied. A single deductible will be applied to any **loss**. In the event there are different deductible amounts applicable to the **loss**, the higher deductible will be applied. In all events, the deductible will be applied against the limit of liability. If a **loss** involves another coverage added by endorsement to this policy, only one deductible will apply to the entire **loss** event.

0074

If **your insured auto** is an additional **auto** that **you** have requested to be added to **your** policy within 30 days of **your** acquisition of the **auto**, and no deductible has been designated for the additional **auto** prior to the **loss**, then:

1.   when the **insured auto** is a **private passenger auto**, **we** will apply the lowest deductible listed for any one **auto** listed on the **declarations page**; or
2.   when the **insured auto** is an **auto** other than a **private passenger auto**, **we** will apply the highest deductible listed for any one **auto** listed on the **declarations page**.

No deductible will apply to a **loss** to window glass when the glass is repaired instead of replaced.

No deductible will apply to payments made under the Additional Payments section for expenses necessary to return a stolen **insured auto** to **you**.

### SALVAGE

If **we** pay the actual cash value of **your insured auto** less the deductible, or if **we** pay the amount necessary to replace **your insured auto** less the deductible, **we** are entitled to all salvage. If **your insured auto** is a total loss and **we** pay the applicable Limit of Liability or Stated Amount as shown on the **declarations page** less the deductible, **we** are entitled to the same percent of salvage as **our** payment bears to the actual cash value of **your insured auto**.

### NO BENEFIT TO BAILEE

No bailee or carrier shall benefit, directly or indirectly, from this Part II—Damage To Your Auto.

### APPRAISAL

If **we** cannot agree with **you** on the amount of **your loss**, then **you** or **we** may demand an appraisal of the **loss**. Each party shall appoint a competent and disinterested appraiser. If the appraisers agree on the amount of the **loss**, they shall submit a written report to **us** and this shall be deemed to be the amount of the **loss**.

If the appraisers cannot agree on the amount of the **loss** within a reasonable time, they shall then choose a competent, impartial umpire, provided that if they cannot agree on an umpire within 15 days, either **you** or **we** may petition a judge of a court having jurisdiction to choose an umpire. The disagreement of the appraisers shall then be submitted to the umpire. Subject to the provisions of the policy, a written agreement signed by both appraisers or by one appraiser and the umpire will be the amount of the **loss**.

**You** must pay **your** fees and expenses and those of **your** appraiser. **We** will pay **our** fees and expenses and those of **our** appraiser. All other expenses of the

appraisal, including payment of the umpire if one is necessary, will be shared equally by **you** and **us**.

By agreeing to an appraisal, **we** do not waive any of **our** rights under any other part of this policy, including **our** right to deny the claim.

**PAYMENT OF LOSS**

At **our** option, **we** may pay the **loss** in money, or repair or replace the damaged or stolen property. **We** may, at any time before the **loss** is paid or the property is replaced, return, at **our** expense, any stolen property either to **you** or to the address shown on the **declarations page**, with payment for the resulting damage less any applicable deductibles. **We** may keep all or part of the property at the agreed or appraised value, but there shall be no abandonment to **us**.

**We** may make payment for a **loss** either to **you** or the owner of the property. Payment for a **loss** is required only if **you** have fully complied with the terms of this policy.

**You** must convey title to and possession of the damaged, destroyed, or stolen property to **us** if **we** pay the actual cash value of **your insured auto** less the deductible or if **we** pay the amount necessary to replace **your insured auto** less the deductible.

**LOSS PAYEE AGREEMENT**

**We** will pay the Loss Payee named in the policy for **loss** to **your insured auto**, as the interest of the Loss Payee may appear.

This insurance covers the interest of the Loss Payee unless:
1. the **loss** results from fraudulent acts or omissions on **your** part; or
2. the **loss** is otherwise not covered under the terms of this policy.
Cancellation, nonrenewal, termination, or voiding ends this agreement as to the Loss Payee's interest.

If **we** make any payment to the Loss Payee, **we** will obtain the Loss Payee's rights against any other party.

### GENERAL PROVISIONS

1. **Policy Period and Territory**

   This policy applies only to **accidents** and **losses** occurring during the policy period shown on the **declarations page** and that occur within a state, territory, or possession of the United States of America, or a province or territory of Canada, or while an **insured auto** is being transported between their ports.

2. **Policy Changes**

This policy, **your** insurance application (which is made a part of this policy as if attached hereto), the **declarations page**, as amended, and endorsements to this policy issued by **us** contain all the agreements between **you** and **us**. Subject to the following, its terms may not be changed or waived except by an endorsement issued by **us**.

The premium for this policy is based on information **we** have received from **you** or other sources. **You** agree to cooperate with **us** in determining if this information is correct and complete, and **you** will notify **us** if it changes during the policy period. If this information is incorrect, incomplete, or changes during the policy period, **you** agree that **we** may adjust **your** premium during the policy period, or take other appropriate action.

Changes that may result in a premium adjustment include, but are not limited to, changes in:
a. the number, type, or use classification of **insured autos**;
b. operators using **insured autos**, their ages, driving histories, license status, state or country of license issuance, or marital status;
c. the place of principal garaging of any **insured auto**;
d. coverage, deductibles, or limits of liability; or
e. rating territory or discount eligibility.

If **you** ask **us** to delete a vehicle from this policy, no coverage will apply to that vehicle as of the date and time **you** ask **us** to delete it.

Nothing contained in this section will limit **our** right to void this policy for fraud, misrepresentation or concealment of any material fact by **you**, or anyone acting on **your** behalf.

3. **Other Insurance**

a. For any **insured auto** that is specifically described on the **declarations page**, this policy provides primary coverage. For an **insured auto** which is not specifically described on the **declarations page**, coverage under this policy will be excess over any and all other valid and collectible insurance, whether primary, excess or contingent. However, if the **insured auto** that is specifically described on the **declarations page** is a **trailer**, this policy will be excess over any and all other valid and collectible insurance, whether primary, excess or contingent, unless the **trailer** is attached to an **insured auto** that is a power unit **you** own and that is specifically described on the **declarations page**.

b. If coverage under more than one policy applies on the same basis, either excess or primary, **we** will pay only **our** proportionate share. **Our** pro-

portionate share is the proportion that the Limit of Liability of this policy bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

4. **Two or More Policies Issued By Us**

If any applicable insurance other than this policy is issued to **you** by **us**, or any company affiliated with **us**, and applies to the same **accident** or **loss**, the total amount payable among all such policies shall not exceed the limits provided by the single policy with the highest limits of liability.

5. **Legal Action Against Us**

**We** may not be sued unless there is full compliance with all the terms of this policy.

**We** may not be sued for payment under Part I—Liability To Others until the obligation of an insured under Part I to pay is finally determined either by judgment against that insured after actual trial or by written agreement of the insured, the claimant, and **us**. No one will have any right to make us a party to a lawsuit to determine the liability of an insured.

6. **Our Recovery Rights**

In the event of any payment under this policy, **we** are entitled to all the rights of recovery of the person or organization to whom payment was made. That person or organization must sign and deliver to **us** any legal papers relating to that recovery, do whatever else is necessary to help **us** exercise those rights, and do nothing after the **loss** or **accident** to harm **our** rights.

When a person has been paid damages by **us** under this policy and also recovers from another, the amount recovered from the other shall be held in trust for **us** and reimbursed to **us** to the extent of **our** payment, provided that the person to or on behalf of whom such payment is made is fully compensated for their **loss**.

In the event recovery has already been made from the responsible party, any rights to recovery by the person(s) claiming coverage under this policy no longer exist.

7. **Assignment**

Interest in this policy may not be assigned without **our** written consent. If the policyholder named on the **declarations page** is a natural person and that person dies, the policy will cover:
a. any other named insured on the policy;

0078

25

b. the legal representative of the deceased person while acting within the scope of duty of a legal representative; and

c. any person having proper custody of **your insured auto** until a legal representative is appointed, but in no event for more than 30 days after the date of death.

8. **Waiver**

Notice to any agent or knowledge possessed by any agent or other person shall not change or effect a waiver on any portion of this policy nor prevent **us** from exercising any of **our** rights under this policy.

9. **Bankruptcy**

**We** are not relieved of any obligation under this policy because of the bankruptcy or insolvency of an insured.

10. **Inspection and Audit**

**We** shall have the right to inspect **your** property and operations at any time. This includes, but is not limited to, the right to inspect and audit the maintenance of any **autos** covered hereunder, the identity of **your** drivers and their driving records, and **your** radius of operations. In doing so, **we** do not warrant that the property or operations are safe and healthful, or are in compliance with any law, rule or regulation.

**We** shall also have the right to examine and audit **your** books and records at any time during the policy period and any extensions of that period and within three years after termination of the policy, as far as they relate to the subject matter of this insurance.

11. **Fraud or Misrepresentation**

This policy was issued in reliance upon the information provided on **your** insurance application. **We** may void this policy at any time, including after the occurrence of an **accident** or **loss**, if **you**:
1. made incorrect statements or representations to **us** with regard to any material fact or circumstance;
2. concealed or misrepresented any material fact or circumstance; or
3. engaged in fraudulent conduct;
at the time of application. This means that **we** will not be liable for any claims or damages that would otherwise be covered.

Any changes **we** make at **your** request to this policy after inception will be made in reliance upon information **you** provide. If **you**:
1. make incorrect statements or representations to **us** with regard to any material fact or circumstance;

26

0079

2. conceal or misrepresent any material fact or circumstance, or

3. engage in fraudulent conduct;

in connection with a requested change, **we** may void the policy or reform it as it existed immediately prior to the requested change. **We** may do this at any time, including after the occurrence of an **accident** or **loss**.

When **we** have not voided or reformed the policy, **we** may still deny coverage for an **accident** or **loss** if **you**, in connection with the policy application, or in connection with any requested change, have concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, and that concealment, misrepresentation, or fraudulent conduct was material to a risk **we** assumed.

**We** may deny coverage for an **accident** or **loss** if **you** or any other insured knowingly concealed or misrepresented any material fact or circumstance or engaged in fraudulent conduct in connection with the presentation or settlement of a claim. **We** reserve all rights to indemnity against a person committing fraud or misrepresentation for all payments made and costs incurred.

12. **Liberalization**

If **we** make a change that broadens a coverage **you** have under this edition of **your** policy without additional charge, **you** will receive the broadened coverage. The broadened coverage applies on the date the coverage change is implemented in **your** state. This provision does not apply to a general program revision or **our** issuance of a subsequent edition of **your** policy. Otherwise, this policy can be changed only by endorsement issued by **us**.

13. **Severability**

Except with respect to the Limit of Liability, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or lawsuit is brought.

14. **Settlement of Claims**

**We** may use estimating, appraisal, or injury evaluation systems to adjust claims under this policy and to determine the amount of damages, expenses, or loss payable under this policy. Such systems may be developed by **us** or a third party and may include computer software, databases, and specialized technology.

15. **Automatic Termination**

If **we** or an affiliate offers to renew or continue this policy and **you** or **your** representative does not accept, this policy will automatically terminate at

the end of the current policy period at 12:01 a.m. Failure to pay the required renewal or continuation premium when due will mean that **you** have not accepted **our** offer.

If **you** obtain other insurance on an **insured auto**, any similar insurance provided by this policy will terminate as to that **insured auto** on the effective date and at the effective time of the other insurance.

If an **insured auto** is sold or transferred, any insurance provided by this policy will terminate as to that **insured auto** on the effective date of the sale or transfer.

16. **Duty to Report Changes**

   **You** must promptly notify **us** when:
   1. **your** mailing or business address changes;
   2. the principal garaging address of an **insured auto** changes;
   3. there is any change with respect to the persons who operate an **insured auto**;
   4. there is a change in the driver's license status, or state or country of license issuance, of any person using an **insured auto**; or
   5. **you** acquire, sell, or dispose of **autos**.

17. **Terms of Policy Conformed to Statutes**

   If any provision of this policy fails to conform to the statutes of the state listed on **your** application as **your** business location, the provision shall be deemed amended to conform to such statutes. All other provisions shall be given full force and effect. Any disputes as to the coverages provided or the provisions of this policy shall be governed by the law of the state listed on **your** application as **your** business location.

Form 6912 (02/19)

0081

# INDEX OF ENDORSEMENTS

**All forms appearing in this endorsement section do not automatically pertain to your policy. Only those endorsements whose form numbers appear on your declarations page apply to your policy.**

**Form No./Description**          **Page**

1797 (02/19)
**Contingent Liability Endorsement—Limited Liability Coverage
For Non-Trucking Use Of An Automobile** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

1890 (02/19)
**Employer's Non-Ownership Liability Endorsement** . . . . . . . . . . . . . . . . . . . . . . . 31

1891 (02/19)
**Hired Auto Coverage Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

2366 (02/11)
**Blanket Additional Insured Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

2367 (06/10)
**Blanket Waiver of Subrogation Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

2368 (06/10)
**Loan/Lease Gap Coverage Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

2852 IL (02/19)
**Uninsured/Underinsured Motorist Coverage Endorsement** . . . . . . . . . . . . . . . 35

4717 (02/19)
**Trailer Interchange Coverage Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

4757 IL (02/19)
**Medical Payments Coverage Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

4852 IL (02/19)
**Cancellation and Nonrenewal Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

4881 IL (02/19)
**Illinois Amendatory Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

5701 IL (02/19)
**Individual Named Insured Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Z228 (01/11)

**Mobile Equipment As Insured Autos Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . 52

Z438 IL (02/19)

**Garage Operations Physical Damage Legal Liability Coverage and
Limited Garage Liability (Towing Only) Coverage Endorsement** . . . . . . . . . . . 54

Z439 (02/19)

**Non-Owned Trailer Physical Damage Coverage Endorsement**. . . . . . . . . . . . . 61

Z442 (02/19)

**Any Automobile Legal Liability Coverage Endorsement** . . . . . . . . . . . . . . . . . . . 63

Form 1797 (02/19)

## CONTINGENT LIABILITY ENDORSEMENT—LIMITED LIABILITY COVERAGE FOR NON-TRUCKING USE OF AN AUTOMOBILE

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### PART I—LIABILITY TO OTHERS

A. Under the Additional Definitions Used In This Part Only section:

Subsection A.3. is deleted and replaced by the following:

3. Any other person or organization, but only with respect to the legal liability of that person or organization for acts or omissions of any person otherwise covered under this Part I—Liability To Others. However, **insured** does not include anyone engaged in the business of transporting property by auto for hire that is liable for **your** conduct.

B. Under the Exclusions of Part I, the following exclusion is added:

**Trucking Use**
Coverage under this Part I, including **our** duty to defend, does not apply to an **insured auto** or any attached **trailer** while operated, maintained, or used:
a. To carry property or while such property is being loaded or unloaded from the **insured auto** or an attached **trailer**; or
b. In any business or for any business purpose.

### ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form 1890 (02/19)

## EMPLOYER'S NON-OWNERSHIP LIABILITY ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

0084

**ADDITIONAL DEFINITION USED IN THIS ENDORSEMENT**

If **you** pay a premium for this Employer's Non-Ownership Liability coverage, then the following definition is added:

"**Non-owned auto**" means an **auto** that **you** do not own, lease, hire, rent, or borrow, and that is used in connection with **your** business. This includes **autos** owned by **your employees**, partners (if **you** are a partnership), members (if **you** are a limited liability company), or members of their households, but only while such **autos** are used in **your** business.

**CHANGES TO PART I—LIABILITY TO OTHERS**

The definition of **insured auto** is modified to include a **non-owned auto** when used in connection with **your** business by **you** or any of **your employees**. The definition of **insured** does not include the owner of a **non-owned auto**.

**EXCLUSIONS**

The insurance provided by this endorsement does not apply to **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any **non-owned auto** in the conduct of any partnership or joint venture of which **you** are a partner or member and which is not shown as the named insured on the **declarations page**.

**OTHER INSURANCE**

The insurance provided by this endorsement is excess over any other valid and collectible insurance.

**PREMIUM AGREEMENT**

**We** may audit the number of employees and charge appropriately for additional premium up to three years after the policy expiration.

This does not alter or limit **our** general audit rights under the General Provisions section of this policy.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form 1891 (02/19)

## HIRED AUTO COVERAGE ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

0085

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

## Additional definitions used in this endorsement

If **you** pay a premium for this Hired Auto Coverage, then the following definitions are added:
1. "**Hired auto**" means an **auto**:
   a. **you** lease, hire, rent or borrow; or
   b. **your employee** leases, hires or rents:
      i.   under a contract in that individual **employee's** name;
      ii.  at **your** direction and with **your** express permission; and
      iii. only while being used in the conduct of **your** business.

   This does not include any **auto you** or an **employee** leases, hires, rents or borrows from any of **your employees**, partners (if **you** are a partnership), members (if **you** are a limited liability company), or member of their households.
2. "**Cost of hire**" means the total amount paid by **you** for the hire of **autos**.

## Changes to Part I—Liability To Others

When used in Part I—Liability To Others, the definition of **insured auto** is amended to include **hired auto**.

## Other Insurance

The insurance provided by this Hired Auto Coverage endorsement is excess over any other valid and collectible insurance, whether primary, excess, or contingent.

## Premium agreement

The premium for this Hired Auto Coverage is based on the **cost of hire**, and is subject to a minimum **cost of hire**. **We** may audit the **cost of hire** and charge appropriately for additional premium for up to three years after the policy expiration.

This does not alter or limit **our** general audit rights under the General Provisions section of this policy.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form 2366 (02/11)

## BLANKET ADDITIONAL INSURED ENDORSEMENT

This endorsement modifies insurance provided by the Commercial Auto Policy, Motor Truck Cargo Legal Liability Coverage Endorsement, and/or Commercial General Li-

0086

33

ability Coverage Endorsement, as appears on the **declarations page**. All terms and conditions of the policy apply unless modified by this endorsement.

If **you** pay the fee for this Blanket Additional Insured Endorsement, **we** agree with **you** that any person or organization with whom **you** have executed a written agreement prior to any **loss** is added as an additional **insured** with respect to such liability coverage as is afforded by the policy, but this insurance applies to such additional **insured** only as a person or organization liable for **your** operations and then only to the extent of that liability. This endorsement does not apply to acts, omissions, products, work, or operations of the additional **insured**.

Regardless of the provisions of paragraph a. and b. of the "Other Insurance" clause of this policy, if the person or organization with whom **you** have executed a written agreement has other insurance under which it is the first named **insured** and that insurance also applies, then this insurance is primary to and non-contributory with that other insurance when the written contract or agreement between **you** and that person or organization, signed and executed by **you** before the **bodily injury** or **property damage** occurs and in effect during the policy period, requires this insurance to be primary and non-contributory.

In no way does this endorsement waive the "Other Insurance" clause of the policy, nor make this policy primary to third parties hired by the **insured** to perform work for the **insured** or on the **insured's** behalf.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form 2367 (06/10)

## BLANKET WAIVER OF SUBROGATION ENDORSEMENT

This endorsement modifies insurance provided by the Commercial Auto Policy, Motor Truck Cargo Legal Liability Coverage Endorsement, and/or Commercial General Liability Coverage Endorsement, as appears on the **declarations page**. All terms and conditions of the policy apply unless modified by this endorsement.

If **you** pay the fee for this Blanket Waiver of Subrogation Endorsement, **we** agree to waive any and all subrogation claims against any person or organization with whom a written waiver agreement has been executed by the named insured, as required by written contract, prior to the occurrence of any **loss**.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

0087

Form 2368 (06/10)

### **LOAN/LEASE GAP COVERAGE ENDORSEMENT**

This endorsement modifies insurance provided by the Commercial Auto Policy. All terms and conditions of the policy apply unless modified by this endorsement.

### **INSURING AGREEMENT—LOAN/LEASE PAYOFF COVERAGE**

If **you** pay the premium for this coverage, and the **insured auto** for which this coverage was purchased is deemed by **us** to be a **total loss**, **we** will pay, in addition to any amounts otherwise payable under Part II of **your** policy, the difference between:
1. the actual cash value of the **insured auto** at the time of the **total loss**; and
2. any greater amount the owner of the **insured auto** is legally obligated to pay under a written loan or lease agreement to which the **insured auto** is subject at the time of the **total loss**, reduced by:
   a. unpaid finance charges or refunds due to the owner for such charges;
   b. excess mileage charges or charges for wear and tear;
   c. charges for extended warranties or refunds due to the owner for extended warranties;
   d. charges for credit insurance or refunds due to the owner for credit insurance;
   e. past due payments and charges for past due payments; and
   f. collection or repossession expenses.

However, **our** payment under this coverage shall not exceed the limit of liability shown on the **declarations page**. The limit of liability is a percentage of the actual cash value of the **insured auto** at the time of the loss.

This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **insured auto** and the loss is covered under one of those coverages.

### **ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form 2852 IL (02/19)

### **UNINSURED/UNDERINSURED MOTORIST COVERAGE ENDORSEMENT**

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

0088

35

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy, and related endorsements, is modified as follows:

## INSURING AGREEMENT—UNINSURED/UNDERINSURED MOTORIST
## BODILY INJURY COVERAGE

Subject to the Limits of Liability, if **you** pay the premium for Uninsured/Underinsured Motorist Coverage, **we** will pay for damages, other than punitive or exemplary damages, which an **insured** is legally entitled to recover from the **owner** or operator of an **uninsured auto** or **underinsured auto** because of **bodily injury**:
1. sustained by an **insured**;
2. caused by an **accident**; and
3. arising out of the ownership, maintenance, or use of an **uninsured auto** or **underinsured auto**.

## INSURING AGREEMENT—UNINSURED MOTORIST
## PROPERTY DAMAGE COVERAGE

Subject to the limits of liability, if **you** pay a premium for Uninsured Motorist Property Damage Coverage, **we** will pay for damages, other than punitive or exemplary damages, which an **insured** is entitled to recover from the **owner** or operator of an **uninsured auto** due to **property damage**:
1. to an **insured auto** for which Uninsured Motorist Property Damage Coverage has been purchased;
2. caused by an **accident**; and
3. arising out of the ownership, maintenance, or use of an **uninsured auto**.

Subject to any deductible applicable under this endorsement, **we** will replace, or reimburse the reasonable cost to replace, any child restraint system that was in use by a child in an **insured auto** and was damaged during an **accident** to which Uninsured Motorist Property Damage Coverage applies due to the liability of the **owner** or operator of an **uninsured auto**.

**We** will pay under this endorsement only after the limits of liability under all applicable liability bonds and policies have been exhausted by payment of judgments or settlements. However, this shall not apply if **we** and the **insured** agree, without arbitration, that the **insured** has suffered **bodily injury**, death, or **property damage**, and also agree on the amount of damages within the limit of liability that the **insured** is legally entitled to collect under this endorsement.

An **insured** must notify **us** in writing at least 30 days before entering into any settlement with the **owner** or operator of an **uninsured auto** or **underinsured auto**, or any liability insurer. In order to preserve **our** right of subrogation, **we** may elect to pay any sum offered in settlement by, or on behalf of, the **owner** or operator of an **uninsured auto** or **underinsured auto**. If **we** do this, **you** agree to assign to **us** all rights that **you** have against the **owner** or operator of the **uninsured auto** or **underinsured auto**.

0089

36

**ADDITIONAL DEFINITIONS**

When used in this endorsement, whether in the singular, plural, or possessive:

1. "**Insured**" means:
   a. if the named insured shown on the **declarations page** is a natural person:
      (i) **you** or a **relative**;
      (ii) any person **occupying your insured auto** or a **temporary substitute auto**; and
      (iii) any person who is entitled to recover damages covered by this endorsement because of **bodily injury** sustained by a person described in (i) or (ii) above; or
   b. if the named insured shown on the **declarations page** is a corporation, partnership, organization, or any other entity that is not a natural person:
      (i) any person **occupying your insured auto** or a **temporary substitute auto**; and
      (ii) any person who is entitled to recover damages covered by this endorsement because of **bodily injury** sustained by a person described in (i) above.

   For purposes of this definition, **insured auto** includes **mobile equipment** that is:
   a. owned by **you**;
   b. leased, hired, or borrowed by **you** and **you** have purchased either "Hired Auto Coverage" or "Any Automobile Legal Liability Coverage" from **us**; or
   c. not owned, leased, hired, or borrowed by **you** and **you** have purchased either "Employer's Non-Ownership Liability Coverage" or "Any Automobile Legal Liability Coverage" from **us**.

   However, **mobile equipment** meeting any of those three criteria will be included in the definition only if at the time of **loss** it is being:
   (i) used in **your** business;
   (ii) operated on a public highway; and
   (iii) operated in a state or province where it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law.

2. "**Non-owned auto**" means any **auto** that is not **owned** by **you** or furnished for **your** regular use and, if the named insured is a natural person, not **owned** or furnished for the regular use of the named insured's spouse or **relative**.

3. "**Owned**" means the person or organization:
   a. holds legal title to the vehicle;
   b. has legal possession of the vehicle that is subject to a written security agreement with an original term of six months or more; or
   c. has legal possession of the vehicle that is leased to that person or organization under a written agreement for a continuous period of six months or more.

4. "**Owner**" means the person or organization who, with respect to a vehicle:
   a. holds legal title to the vehicle;
   b. has legal possession of the vehicle that is subject to a written security agreement with an original term of six months or more; or
   c. has legal possession of the vehicle that is leased to that person or organization under a written agreement for a continuous period of six months or more.

0090

37

5. **Property damage** means only physical damage to or destruction of an **insured auto**. **Property damage** does not include loss of use of an **insured auto** resulting from its physical damage or destruction.

6. "**Underinsured auto**" means a land motor vehicle to which a bodily injury liability bond or policy applies at the time of the **accident**, but the sum of all applicable limits of liability for **bodily injury** is less than the coverage limit for Uninsured/Underinsured Motorist Bodily Injury Coverage as shown on the **declarations page**.

   An "**underinsured auto**" does not include any vehicle or equipment:
   a. **owned** by **you** or a **relative**;
   b. **owned** by any governmental unit or agency;
   c. operated on rails or crawler treads;
   d. designed mainly for use off public roads, while not on public roads;
   e. while used as a residence or premises;
   f. shown on the **declarations page** of this policy;
   g. not required to be registered as a motor vehicle; or
   h. which is an **uninsured auto**.

7. "**Uninsured auto**" means a land motor vehicle of any type:
   a. to which no bodily injury liability bond or policy applies at the time of the **accident**;
   b. to which a bodily injury liability bond or policy applies at the time of the **accident**, but the bonding or insuring company:
      (i) denies coverage; or
      (ii) is or becomes insolvent;
   c. to which a bodily injury liability bond or policy applies at the time of the **accident**, but its limit of liability for **bodily injury** is less than the minimum limit of liability for **bodily injury** specified by the financial responsibility law of the state in which the **insured auto** is principally garaged; or
   d. that is a hit-and-run vehicle whose operator or **owner** cannot be identified and which strikes or causes an object to strike:
      (i) an **insured auto** or **temporary substitute auto**; or
      (ii) if the named insured is a natural person:
         (a) **you** or a **relative**; or
         (b) a motor vehicle that **you** or a **relative** are occupying,

      provided that the **insured**, or someone on his or her behalf, reports the **accident** to the police or civil authority within 24 hours or as soon as practicable after the **accident**.

   An "**uninsured auto**" does not include any motorized auto or equipment:
   a. **owned** by, furnished to, or available for the regular use of **you** or, if the named insured is a natural person, a **relative**, other than an **insured auto**;
   b. **owned** or operated by a self-insurer under any applicable vehicle law, except a self-insurer that is or becomes insolvent;
   c. **owned** by any governmental unit or agency;
   d. designed mainly for use off public roads, while not on public roads;
   e. while being used as a residence or premises;

0091

38

    f.  not required to be registered as a motor vehicle; or
    g.  which is an **insured auto**.

**EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EX-CLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS EN-DORSEMENT.**

1.  Coverage under this endorsement is not provided for **bodily injury** sustained by any person while using or **occupying**:
    a.  an **insured auto** without the express or implied permission of **you** or, if the named insured is a natural person, a **relative**;
    b.  a **non-owned auto** without the express or implied permission of the **owner**; or
    c.  an **auto** or device of any type designed to be operated on the public roads that is **owned** by, furnished to, or available for the regular use of **you** or, if the named insured is a natural person, a **relative**, other than an **insured auto** or **temporary substitute auto**.
2.  Coverage under this endorsement is not provided for **property damage**:
    a.  to an **insured auto** while being used or driven by a person while employed or engaged in the **business** of selling, leasing, repairing, parking, storing, servicing, delivering, or testing vehicles. However, this exclusion does not apply to **you**, a **relative**, or an agent or employee of **you** or a **relative**, when using an **insured auto**;
    b.  to an **insured auto** resulting from any pre-arranged or organized racing, speed or demolition contest, stunting activity, or in practice or preparation for any such contest or activity;
    c.  to an **insured auto** due to a nuclear reaction or radiation;
    d.  to an **insured auto** for which insurance is afforded under a nuclear energy liability insurance contract;
    e.  to a **trailer**;
    f.  which is not caused by the actual physical contact of an **uninsured auto** with the **insured auto**; or
    g.  if the **owner** or operator of the at-fault **uninsured auto** cannot be identified.
3.  Coverage under this endorsement will not apply directly or indirectly to benefit any insurer or self-insurer under any of the following or similar laws:
    a.  workers' compensation law; or
    b.  disability benefits law.

**LIMITS OF LIABILITY**

Regardless of the number of premiums paid, or the number of **insured autos** or trailers shown on the **declarations page**, or the number of policies issued by **us**, or the number of vehicles or **insureds** involved in the **accident**, or the number of claims or lawsuits arising out of an **accident**, **we** will pay no more than the limit of liability shown for Uninsured/Underinsured Motorist Coverage on the **declarations page**.

If the **declarations page** shows that "combined single limit" or "CSL" applies, the amount shown is the most **we** will pay for the total of all damages resulting from any

0092

one **accident**. However, without changing this total "each accident" limit of liability, **we** will comply with any law that requires **us** to provide any separate limits.

If **your declarations page** shows a split limit:
1.  the amount shown for "each person" is the most **we** will pay for all damages due to a **bodily injury** to one person;
2.  subject to the "each person" limit, the amount shown for "each accident" is the most **we** will pay for all damages due to **bodily injury** sustained by two or more persons in any one **accident**; and
3.  the amount shown for "property damage" is the most **we** will pay for the aggregate of all **property damage** caused by any one **accident**.

The "each person" limit of liability includes the total of all claims made for **bodily injury** to an **insured** and all claims of others derived from such **bodily injury**, including, but not limited to, emotional injury or mental anguish resulting from the **bodily injury** of another or from witnessing the **bodily injury** to another, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

The limit of liability under this endorsement for **property damage** to an **insured auto** arising out of one **accident** is the lowest of:
1.  $15,000;
2.  the actual cash value of the **insured auto** at the time of the **accident**, reduced by the deductible shown on the **declarations page**, and by its salvage value if the **insured auto** is more than eight years old and **we** allow **you** or the **owner** to retain the salvage;
3.  the amount necessary to replace the **insured auto**, reduced by the deductible shown on the **declarations page**, and by its salvage value if the **insured auto** is more than eight years old and **we** allow **you** or the **owner** to retain the salvage;
4.  the amount necessary to repair the **insured auto** to its pre-loss condition, reduced by the deductible shown on the **declarations page**; or
5.  any limit of liability shown on the **declarations page** for **property damage** under this endorsement, reduced by the salvage value of the **insured auto** if the **insured auto** is more than eight years old and **we** allow **you** or the **owner** to retain the salvage.

Payments for **property damage** under this endorsement are subject to the following provisions:
1.  no more than one deductible shall be applied to any one **accident**; and
2.  an adjustment for depreciation or physical condition, which may also be referred to as betterment, wear and tear, or prior damage, will be made in determining the limit of liability at the time of the **accident**.

The Limits of Liability under this endorsement shall be reduced by all sums:
1.  paid because of **bodily injury** by or on behalf of any persons or organizations that may be legally responsible, including, but not limited to, all sums paid under Part I—Liability To Others; and
2.  paid, payable, or that should apply, because of **bodily injury** under any workers' compensation law.

0093

40

The limits of liability for **property damage** under this endorsement shall be reduced by all sums paid because of **property damage**:

a. by or on behalf of the persons or organizations who may be legally responsible; and

b. under Part II—Damage To Your Auto.

Any payment made to a person under this endorsement shall reduce any amount that the person is entitled to recover under Part I—Liability To Others.

No one will be entitled to duplicate payments for the same elements of damages.

Any judgment or settlement for damages against an operator or **owner** of an **uninsured auto** or an **underinsured auto** that arises out of a lawsuit brought without **our** written consent is not binding on **us**.

### OTHER INSURANCE

When the named insured is a natural person, if there is other applicable uninsured or underinsured motorist coverage, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all available coverage limits. If this policy and any other policy providing similar insurance apply to the same **accident**, the maximum limit of liability under all the policies shall be the highest limit of liability under any one policy. However, any insurance **we** provide shall be excess over any other uninsured or underinsured motorist coverage, except for **bodily injury** to **you** or a **relative** when **occupying** an **insured auto**.

When the named insured is a corporation, partnership, organization or any other entity that is not a natural person, if there is other applicable uninsured or underinsured motorist coverage, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all available coverage limits. However, any insurance **we** provide for the occupant of an **insured auto** shall be excess over any other uninsured or underinsured motorist coverage.

**We** will not pay for any damages that would duplicate any payment made for damages under other insurance.

### ARBITRATION

If **we** and an **insured** cannot agree on:

1. the legal liability of the operator or **owner** of an **uninsured auto** or an **underinsured auto**; or

2. the amount of the damages sustained by the **insured**;

this will be determined by arbitration if **we** or the **insured** make a written demand for arbitration prior to the expiration of the bodily injury statute of limitations in the state in which the **accident** occurred.

0094

41

If a written demand for arbitration is made, each party shall select an arbitrator. The two arbitrators will select a third. If the two arbitrators cannot agree on a third arbitrator within 45 days, then either the party may request that the arbitration be submitted to the American Arbitration Association, or on joint application by the **insured** and **us**, the third arbitrator may be appointed by a court having jurisdiction.

Each party will pay the costs and fees of its arbitrator and any other expenses it incurs. The costs and fees of the third arbitrator will be shared equally. In the event the arbitrators award reasonable arbitration costs, fees, or expenses, **we** will pay only that portion of such awarded costs, fees, or expenses as is necessary to prevent the amount available under this policy for payment of compensatory damages awarded by the arbitrators from being reduced to an amount less than the minimum amount required under the Illinois Vehicle Code and the Illinois Insurance Code, as amended.

Unless both parties agree otherwise, arbitration will take place in the county in which the **insured** resides. Rules of procedure and evidence will apply according to Illinois law.

A decision agreed to by two of the arbitrators will be binding with respect to a determination of:
1. the legal liability of the operator or **owner** of an **uninsured auto** or an **underinsured auto**; and
2. the amount of the damages sustained by the **insured**.

The arbitrators shall have no authority to award compensatory damages in an amount in excess of the limit of liability. The decision of the arbitrators is binding only if the amount of the award does not exceed $75,000 for **bodily injury** or death of any one person, $150,000 for **bodily injury** or death of two or more persons in any one motor vehicle accident, or the corresponding policy limits for **bodily injury** or death, whichever is less. If the award of the arbitrators for damages caused by an **uninsured auto** or an **underinsured auto** exceeds the applicable limit set forth in this paragraph, either party may demand the right to a trial. This demand must be made in writing within 60 days of the arbitrators' decision. If the demand is not made within 60 days, the amount of damages agreed to by the arbitrators will be binding.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form 4717 (02/19)

### TRAILER INTERCHANGE COVERAGE ENDORSEMENT

This endorsement modifies insurance provided by the Commercial Auto Policy. All terms and conditions of the policy apply unless modified by this endorsement.

0095

# INSURING AGREEMENT

Subject to the Limits of Liability, if **you** pay the premium for Trailer Interchange Coverage, **we** will pay damages for **property damage** for which **you** become legally responsible because of **loss** to a **trailer** not owned by **you**, and its equipment, while in **your** possession. The **trailer** must be in **your** possession under a written trailer or equipment interchange agreement in which **you** assume liability for **loss** to the **trailer** while in **your** possession.

**We** will pay for a **loss** to the **trailer** and its equipment under the coverages described below, as reflected on **your declarations page**:

a. Collision Coverage. For **loss** caused by:
   (i) The **trailer's** collision with another object; or
   (ii) The **trailer's** overturn.
b. Comprehensive Coverage. For any **loss** except one caused by:
   (i) The **trailer's** collision with another object; or
   (ii) The **trailer's** overturn.

**We** will settle or defend, at **our** option, any claim or lawsuit for damages covered by this endorsement. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the Limit of Liability for this coverage has been exhausted by payment of judgments or settlements.

## ADDITIONAL DEFINITION

"**Trailer**", when used in this endorsement, includes a shipping container.

## ADDITIONAL PAYMENTS

In addition to **our** Limit of Liability, **we** will pay for an **insured**:

a. all expenses **we** incur in the settlement of any claim or defense of any lawsuit;
b. interest accruing after entry of judgment on that part of the judgment that does not exceed **our** Limit of Liability. This payment does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured**. **Our** payment, offer in writing, or deposit in court of that part of the judgment which does not exceed **our** Limit of Liability ends **our** duty to pay interest that accrues after the date of **our** payment, written offer, or deposit.
c. the premiums on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in a principal amount exceeding **our** Limit of Liability, and **we** have no duty to apply for or furnish these bonds;
d. reasonable expenses, including loss of earnings up to $250 a day, incurred at **our** request;
e. all reasonable expenses necessary to return a stolen **trailer** to **you**, unless **we** determine the **trailer** to be a total loss; and
f. all reasonable expenses necessary to remove a **trailer** from the site of an **accident** or **loss** and transport it to a repair facility.

0096

43

**EXCLUSIONS**

a. **We** will not pay for **loss** caused by or resulting from any of the following. Such **loss** is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**.
   (i) Nuclear Hazard.
       (1) The explosion of any weapon employing atomic fission or fusion; or
       (2) Nuclear reaction or radiation, or radioactive contamination, however caused.
   (ii) War or Military Action.
       (1) War, including undeclared or civil war;
       (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or agents; or
       (3) Insurrection, rebellion, revolution, usurped power, or action taken by a governmental authority in hindering or defending against any of these.
b. **We** will not pay for loss of use.
c. **We** will not pay for **loss** caused by, or resulting from, any of the following unless caused by another **loss** that is covered by this insurance;
   (i) Wear and tear, freezing, mechanical or electrical breakdown, or structural failure caused by material fatigue, decomposition, or corrosion; or
   (ii) Blowouts, punctures, or other road damage to tires.

**LIMIT OF INSURANCE AND DEDUCTIBLE**

The most **we** will pay for **loss** to any one **trailer** is the least of the following amounts minus any applicable deductible shown on the **declarations page**:
a. The actual cash value of the damaged or stolen property at the time of the **loss**;
b. The amount necessary to replace the stolen or damaged property with other of like kind and quality;
c. The amount necessary to repair the damaged property to its pre-loss condition; or
d. The applicable Limit of Liability for the property as shown on the **declarations page**.

A single deductible will be applied to any **loss**. In the event there are different deductible amounts applicable to the **loss**, the higher deductible will be applied. In all events, the deductible will be applied against the limit of liability. If a **loss** involves another coverage added by endorsement to the policy, only one deductible will apply to the entire **loss** event. No deductible will apply to payments made under the Additional Payments section for expenses necessary to return a stolen **trailer** to **you**.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

0097

Form 4757 IL (02/19)

## MEDICAL PAYMENTS COVERAGE ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### INSURING AGREEMENT

Subject to the Limits of Liability, if **you** pay the premium for Medical Payments Coverage, **we** will pay the **usual and customary charge** for reasonable and necessary expenses, incurred within three years from the date of an **accident**, for medical and funeral services because of **bodily injury**:
1. sustained by an **insured**;
2. caused by an **accident**; and
3. arising out of the ownership, maintenance or use of a motor vehicle or **trailer**.

Any dispute as to the **usual and customary charge** will be resolved between the service provider and **us**.

### ADDITIONAL DEFINITIONS

When used in this endorsement, whether in the singular, plural, or possessive:
1. "**Insured**" means:
   a. if the named insured shown on the **declarations page** is a natural person:
      (i) **you** while **occupying** any **auto**, other than an **auto owned** by **you** which is not an **insured auto**;
      (ii) a **relative** while **occupying** an **insured auto**, **temporary substitute auto**, or **non-owned auto**;
      (iii) **you** or any **relative** when struck by a land motor vehicle of any type, or a **trailer**, while not **occupying** a motor vehicle; and
      (iv) any other person while **occupying** an **insured auto**, **temporary substitute auto**, or a **trailer** while attached to an **insured auto**; or
   b. if the named insured shown on the **declarations page** is a corporation, partnership, organization or any other entity that is not a natural person, any person **occupying your insured auto**, **temporary substitute auto**, or a **trailer** while attached to an **insured auto**.

   For purposes of this definition, **insured auto** includes **mobile equipment** that is:
      (i) owned by **you**;
      (ii) leased, hired, or borrowed by **you** and **you** have purchased either "Hired Auto Coverage" or "Any Automobile Legal Liability Coverage" from **us**; or

0098

45

(iii) not owned, leased, hired, or borrowed by **you** and **you** have purchased either "Employer's Non-Ownership Liability Coverage" or "Any Automobile Legal Liability Coverage" from **us**.

However, **mobile equipment** meeting any of those three criteria will be included in the definition only if at the time of **loss** it is being:
  (i) used in **your** business;
  (ii) operated on a public highway; and
  (iii) operated in a state or province where it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law.

2. "**Non-owned auto**" means any **auto** that is not **owned** by **you** or furnished for **your** regular use and, if the named insured is a natural person, not **owned** by or furnished for the regular use of the named insured's spouse or a **relative**.

3. "**Owned**" means the person or organization:
  a. holds legal title to the vehicle;
  b. has legal possession of the vehicle that is subject to a written security agreement with an original term of six months or more; or
  c. has legal possession of the vehicle that is leased to that person or organization under a written agreement for a continuous period of six months or more.

4. "**Owner**" means the person or organization who, with respect to a vehicle:
  a. holds legal title to the vehicle;
  b. has legal possession of the vehicle that is subject to a written security agreement with an original term of six months or more; or
  c. has legal possession of the vehicle that is leased to that person or organization under a written agreement for a continuous period of six months or more.

5. "**Usual and customary charge**" means an amount which **we** determine represents a customary charge for services in the geographical area in which the service is rendered. **We** shall determine the usual and customary charge through the use of independent sources of **our** choice.

**EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS ENDORSEMENT.**

Coverage under this endorsement does not apply to **bodily injury**:

1. sustained while **occupying** any **auto** or **trailer** while being used as a residence or premises;
2. occurring during the course of employment if workers' compensation coverage is payable or required;
3. arising out of an **accident** involving an **auto** or **trailer** while being used by a person while employed or engaged in the business of selling, leasing, repairing, parking, storing, servicing, delivering, or testing vehicles, unless that business is **yours**;
4. resulting from any pre-arranged or organized racing, speed or demolition contest, stunting activity, or in practice or preparation for any such contest or activity;
5. due to a nuclear reaction or radiation;
6. for which insurance is afforded under a nuclear energy liability insurance contract;
7. for which the United States Government is liable under the Federal Tort Claims Act;
8. sustained by any person while **occupying** an **insured auto**, **temporary sub-**

0099

46

**stitute auto**, or **trailer** without the express or implied permission of **you** or, if the named insured is a natural person, a **relative**;

9. sustained by any person while **occupying** a **non-owned auto** without the express or implied permission of the **owner**;

10. that is intentionally inflicted on an **insured** at that person's request or self-inflicted; or

11. sustained while **occupying** any vehicle that has less than four wheels or is not designed for operation principally upon public roads.

## LIMITS OF LIABILITY

Regardless of the number of premiums paid, or the number of **insured autos** or **trailers** shown on the **declarations page**, or the number of policies issued by **us**, or the number of vehicles or **insureds** involved in an **accident**, or the number of claims or lawsuits arising out of an **accident**, **we** will pay no more than the Limit of Liability shown for Medical Payments Coverage on the **declarations page**.

Any amount payable to an **insured** under this endorsement will be reduced by any amount paid or payable for the same expense under Part I—Liability To Others or any applicable Uninsured/Underinsured Motorist Coverage Endorsement.

No one will be entitled to duplicate payments under this policy for the same elements of damages.

## OTHER INSURANCE

If there is other applicable **auto** medical payments insurance, **we** will pay only **our** share of the medical and funeral services. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. However, any insurance **we** provide for an **insured occupying**:

1. an **auto**, other than an **insured auto** or **temporary substitute auto**; or

2. a **trailer**, other than a **trailer** while connected to an **insured auto**;

will be excess over any other **auto** or **trailer** insurance providing payments for medical or funeral expenses.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form 4852 IL (02/19)

### CANCELLATION AND NONRENEWAL ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

0100

47

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

## CANCELLATION

**You** may cancel this policy by calling or writing **us** and stating the future date that **you** wish the cancellation to be effective.

**We** may cancel this policy by mailing a notice of cancellation to the named insured shown on the **declarations page** at the last known address appearing in **our** records. If **we** cancel this policy during the first 60 days of the initial policy period for any reason other than nonpayment of premium, notice of cancellation will be mailed at least 30 days before the effective date of cancellation. If this policy has been in effect for more than 60 days, or if this is a renewal or continuation policy, and **we** cancel for any reason other than nonpayment of premium, notice of cancellation will be mailed at least 60 days before the effective date of cancellation. If **we** cancel this policy at any time due to nonpayment of premium, notice of cancellation will be mailed at least 10 days before the effective date of cancellation. **Our** notice of cancellation will state the reason(s) for cancellation.

**We** may cancel this policy for any reason within the first 60 days of the initial policy period.

After this policy is in effect for more than 60 days, or if this is a renewal or continuation policy, **we** may only cancel for one or more of the following reasons:
1. **you** do not pay the required premium for this policy when due;
2. this policy was obtained through a material misrepresentation;
3. any insured has violated any of the terms and conditions of the policy;
4. the risk originally accepted has measurably increased;
5. certification to the Director of the loss of reinsurance by the insurer which provided coverage for **us** for all or a substantial part of the underlying risk insured; or
6. a determination by the Director that the continuation of the policy could place **us** in violation of the insurance laws of this state.

With respect to cancellation, this policy is neither severable nor divisible. Any cancellation will be effective for all coverage for all persons and all **autos**.

If this policy is canceled, coverage will not be provided as of the effective date and time shown in the notice of cancellation.

## CANCELLATION REFUND

Upon cancellation, **you** may be entitled to a premium refund. However, **our** making or offering of a refund is not a condition of cancellation.

If this policy is canceled, any refund due will be computed on a daily pro-rata basis.

0101

48

**NONRENEWAL**

If **we** decide not to renew or continue this policy, **we** will mail to the named insured, **your** agent and loss payee a notice of nonrenewal at the last known address appearing in **our** records. Notice will be mailed at least 60 days before the end of the policy period.

**PROOF OF NOTICE**

Proof of mailing of any notice will be sufficient proof of notice.

Form 4881 IL (02/19)

### ILLINOIS AMENDATORY ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

**GENERAL DEFINITIONS**

The definition of "**relative**" in the General Definitions section is deleted in its entirety and replaced by the following:

13. "**Relative**" means any person living in the household in which the named insured resides who is related to the named insured by blood, marriage, civil union, or adoption, including a ward or foster child. This term only applies if the named insured is a natural person.

**PART I—LIABILITY TO OTHERS**

The second paragraph in Part I—Liability To Others is amended to include the following:

If a lawsuit is brought against an **insured** with respect to a claim for acts or alleged acts covered under this Part I, seeking both compensatory and punitive or exemplary damages, **we** will provide a defense to such lawsuit without liability for any punitive or exemplary damages.

**EXCLUSIONS**

The following is added as an additional paragraph at the end of the Exclusions section:

0102

49

**Pollution Exclusion Buy Back** If a payment is made subject to the MCS90 endorsement is removed for a claim that is not covered under **covered pollution cost or expense** or is excluded under Exclusion 7 or 10 under Part I—Liability to Others.

## PART II—DAMAGE TO YOUR AUTO

A.  The following is added to the Collision Coverage provision in Part II—Damage To Your Auto:

Subject to any deductible applicable to a collision **loss**, **we** will replace, or reimburse the reasonable cost to replace, any child restraint system damaged in an **accident** to which this Collision Coverage applies.

B.  The following is added to the Comprehensive Coverage provision in Part II—Damage To Your Auto:

Subject to any deductible applicable to a comprehensive **loss**, **we** will replace, or reimburse the reasonable cost to replace, any child restraint system damaged in an **accident** to which this Comprehensive Coverage applies.

C.  The following is added to the Salvage provision in Part II—Damage To Your Auto:

In the event of a **total loss**, **we** will retain all salvage if the **insured auto** is eight model years old or newer.

## GENERAL PROVISIONS

Subsection 6—Our Recovery Rights is deleted in its entirety and replaced by the following:

In the event of any payment under any applicable Uninsured/Underinsured Motorist Coverage endorsement, **we** are entitled to all the rights of recovery that an insured, as defined under such Uninsured/Underinsured Motorist Coverage endorsement, to whom or for whom payment was made, has against the **owner** or operator of an uninsured auto or underinsured auto. In the event of any other payment under this policy, **we** are entitled to all the rights of recovery that the insured to whom or for whom payment was made has against another. That insured must sign and deliver to **us** any legal papers relating to that recovery, do whatever else is necessary to help **us** exercise those rights, and do nothing after an **accident** or **loss** to prejudice **our** rights.

However, **we** may not assert rights of recovery against:
a.  any person who was using an **insured auto** with **your** express or implied permission for any payment made under Part II—Damage To Your Auto; or
b.  the **owner** or operator of an uninsured auto or underinsured auto, if the insured, as defined under such Uninsured/Underinsured Motorist Coverage endorsement, provides **us** with written notice 30 days prior to entering into a settlement that an offer of settlement has been made by, or on behalf of, the **owner** or operator of an uninsured auto or underinsured auto, and **we** do not elect to pay that insured an

50

0103

amount equal to the amount offered in full settlement by, or on behalf of, the **owner** or operator of the uninsured auto or underinsured auto.

When a person has been paid damages by **us** under this policy and also recovers from another, the amount recovered from the other shall be held in trust for **us** and reimbursed to **us** to the extent of **our** payment, provided that the person to or on behalf of whom such payment is made is fully compensated for their **loss**.

In the event recovery has already been made from the responsible party, any rights to recovery by the person(s) claiming coverage under this policy no longer exist.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form 5701 IL (02/19)

## INDIVIDUAL NAMED INSURED ENDORSEMENT

Not all customers are eligible for this coverage. This endorsement applies to **your** policy only if the form number appears on **your declarations page**. In no event will this coverage apply if the named insured is a corporation, partnership, organization, or any other entity that is not a natural person.

This endorsement changes **your** policy. Please read it carefully.

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

### ADDITIONAL DEFINITIONS USED IN THIS ENDORSEMENT

As used in this endorsement:
1. "**You**" and "**yours**" include **your** spouse or partner in a civil union, if a resident of the same household, except for notice of cancellation.
2. "**Non-owned auto**" means any **private passenger auto**, pickup, van, or **trailer** not owned by or furnished or available for the regular use of **you** or any **relative**, while it is in the custody of or being operated by **you** or any **relative**, with the permission of its owner.

### CHANGES IN PART I—LIABILITY TO OTHERS

A. If **you** are an individual, Exclusion 6 does not apply to **bodily injury** to **your** or any **relative's** fellow **employees**.

B. If any **private passenger auto you** own is an **insured auto** under Part I—Liability To Others and that **auto** is not used for any business purpose other than

0104

51

1. **Relatives** are **insureds** for any **insured auto you** own that is a **private passenger auto** and is not used for any business purpose other than ranching or farming, and for any other **auto** described in paragraph B.2. of this endorsement.

2. Any **auto you** do not own is an **insured auto** while being used, with the permission of its owner, by **you** or by any **relative** except:
   a. Any **auto** owned by any **relative**.
   b. Any **auto** furnished or available for **your** or any **relative's** regular use, including any **auto** rented for a period of more than 30 days.
   c. Any **auto** used by **you** or by any of **your relatives** while working in a business of selling, servicing, repairing, or parking **autos**.
   d. Any **auto** other than a **private passenger auto** used by **you** or any of **your relatives** while working in any business or occupation.

3. Exclusion 10 does not apply to any **insured auto** that is a **private passenger auto** and is not used for any business purpose other than ranching or farming.

4. Exclusion 16 is deleted and replaced by the following:
   **Vehicle Sharing—Private Passenger Autos**
   **Bodily injury** or **property damage** arising out of the use of an **insured auto** that is a **private passenger auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of an **insured auto** by **you** or a **relative**.

## CHANGES IN PART II—DAMAGE TO YOUR AUTO

A. If any **private passenger auto you** own is an **insured auto** under Part II—Damage To Your Auto, and that **auto** is not used for any business purpose other than ranching or farming, then a **non-owned auto** will also be considered an **insured auto**. However, the most **we** will pay for **loss** to a **non-owned auto** that is a **trailer** is $500.

B. Exclusion 9 is deleted and replaced by the following:
   **We** will not pay for **loss** to an **insured auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of an **insured auto** by **you** or a **relative**.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THIS POLICY REMAIN UNCHANGED.

Form Z228 (01/11)

## MOBILE EQUIPMENT AS INSURED AUTOS ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

0105

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

## PART I—LIABILITY TO OTHERS

**ADDITIONAL DEFINITIONS USED IN THIS PART ONLY** is modified as follows:

B. When used in PART I—LIABILITY TO OTHERS, **insured auto** also includes:
   1. **Trailers**, designed primarily for travel on public roads, while connected to **your insured auto** that is a power unit;
   2. **Mobile equipment** while being carried or towed by an **insured auto**;
   3. Any **temporary substitute auto**; and
   4. Any **mobile equipment** owned by **you**, or if **you** have purchased Hired Auto or Non-owned Auto coverage, leased or hired by **you**, when subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged. This does not change the effect of exclusion 13 concerning the operation of **mobile equipment**.

## MEDICAL PAYMENTS COVERAGE

If **you** pay the premium for Medical Payments Coverage, that endorsement is modified as follows:

## ADDITIONAL DEFINITIONS

The definition of "**Insured**" is deleted and replaced by:

   "**Insured**" means:
   a. if the named insured shown on the **Declarations Page** is a natural person:
      (i) **you** while **occupying** any **auto**, other than an **auto owned** by **you** which is not an **insured auto**;
      (ii) a **relative** while **occupying** an **insured auto**, **temporary substitute auto**, or **non-owned auto**;
      (iii) **you** or any **relative** when struck by a land motor vehicle of any type, or a **trailer**, while not **occupying** a motor vehicle; and
      (iv) any other person while **occupying** an **insured auto**, **temporary substitute auto**, or a **trailer** while attached to an **insured auto**; or
   b. if the named insured shown on the **Declarations Page** is a corporation, partnership, organization or any other entity that is not a natural person, any person **occupying your insured auto**, **temporary substitute auto**, or a **trailer** while attached to an **insured auto**.

   For purposes of this definition, **insured auto** includes **mobile equipment owned** by **you**, or if **you** have purchased Hired Auto or Non-owned Auto coverage, leased or hired by **you**, when it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged.

53

0106

**UNINSURED MOTORIST AND UNDERINSURED MOTORIST COVERAGES**

If **you** pay the premium for Uninsured Motorist Coverage and/or Underinsured Motorist Coverage, that endorsement is modified as follows:

**ADDITIONAL DEFINITIONS**

The definition of "**Insured**" is deleted and replaced by:

"**Insured**" means:
  a. if the named insured shown on the **Declarations Page** is a natural person:
     (i) **you** or a **relative**;
     (ii) any person **occupying your insured auto** or a **temporary substitute auto**; and
     (iii) any person who is entitled to recover damages covered by this endorsement because of **bodily injury** sustained by a person described in (i) or (ii) above; or
  b. if the named insured shown on the **Declarations Page** is a corporation, partnership, organization or any other entity that is not a natural person:
     (i) any person **occupying your insured auto** or a **temporary substitute auto**; and
     (ii) any person who is entitled to recover damages covered by this endorsement because of **bodily injury** sustained by a person described in (i) above.

For purposes of this definition, **insured auto** includes **mobile equipment owned** by **you**, or if **you** have purchased Hired Auto or Non-owned Auto coverage, leased or hired by **you**, when it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form Z438 IL (02/19)

### GARAGE OPERATIONS PHYSICAL DAMAGE LEGAL LIABILITY COVERAGE AND LIMITED GARAGE LIABILITY (TOWING ONLY) COVERAGE ENDORSEMENT

This endorsement modifies **your** Commercial Auto Policy. Except as specifically modified by this endorsement, all provisions of the Commercial Auto Policy apply.

THIS ENDORSEMENT APPLIES ON A LEGAL LIABILITY BASIS UNLESS ONE OF THE DIRECT COVERAGE OPTIONS LISTED BELOW IS SHOWN ON **YOUR DECLARATIONS PAGE**.

0107

## DIRECT COVERAGE OPTIONS

**Direct Excess Insurance.** If this "Direct Excess" option is shown on **your declarations page**, the On-Hook Towing Physical Damage Legal Liability and Garagekeepers Storage Location Physical Damage Legal Liability coverages provided by this endorsement are modified to apply without regard to **your** or any other **insured's** legal liability for **loss** to a **customer's auto** or **towed property**, and is excess over any other collectible insurance regardless of whether the other insurance covers **your** or any other **insured's** interest or the interest of the owner of the **customer's auto** or **towed property**.

**Direct Primary Insurance.** If this "Direct Primary" option is shown on **your declarations page**, the On-Hook Towing Physical Damage Legal Liability and Garagekeepers Storage Location Physical Damage Legal Liability coverages provided by this endorsement are modified to apply without regard to **your** or any other **insured's** legal liability for **loss** to a **customer's auto**, or **towed property**, and is primary insurance.

### INSURING AGREEMENT—ON-HOOK TOWING PHYSICAL DAMAGE LEGAL LIABILITY COVERAGE

If **you** pay the premium for this On-Hook Towing Physical Damage Legal Liability coverage and it is shown on **your declarations page** as "On-Hook Legal Liability," **we** will pay all sums for which an **insured** is legally liable to pay for **property damage** for **loss** to **towed property**. **We** will pay under this coverage only if a limit of liability and a premium is shown for this coverage on the **declarations page**.

**We** will have the right and duty to defend any **insured** against a lawsuit asking for these damages. However, **we** have no duty to defend any **insured** against a lawsuit seeking damages for **loss** to which this insurance does not apply. **We** may investigate and settle any claim or lawsuit as **we** consider appropriate. **Our** duty to defend or settle ends when the limit of liability for this coverage has been exhausted by payment of judgments or settlements.

### INSURING AGREEMENT—GARAGEKEEPERS STORAGE LOCATION PHYSICAL DAMAGE LEGAL LIABILITY COVERAGE

If **you** pay the premium for this Garagekeepers Storage Location Physical Damage Legal Liability coverage and it is shown on **your declarations page** as "Garagekeepers Legal Liability," **we** will pay all sums for which an **insured** is legally liable to pay as **property damage** for **loss** to a **customer's auto** or **customer's auto** equipment left in the **insured's** care while the **insured** is attending, servicing, repairing, parking, or storing it in **your garage operations** under:

1. Comprehensive Coverage.
   From any cause except:
   a. Collision of the **customer's auto** with another object; or
   b. Overturn of the **customer's auto**.

55

0108

**2. Collision Coverage.**

Caused by:

a. Collision of the **customer's auto** with another object; or

b. Overturn of the **customer's auto**.

**We** will have the right and duty to defend any **insured** against a lawsuit asking for these damages. However, **we** have no duty to defend any **insured** against a lawsuit seeking damages for **loss** to which this insurance does not apply. **We** may investigate and settle any claim or lawsuit as **we** consider appropriate. **Our** duty to defend or settle ends when the limit of liability for this coverage has been exhausted by payment of judgments or settlements.

**We** will pay under this coverage only if a limit of liability and a premium is shown for this coverage on the **declarations page**, and only for the locations listed on **your declarations page**.

## INSURING AGREEMENT—LIMITED GARAGE LIABILITY (TOWING ONLY) COVERAGE

If **you** pay the premium for On-Hook Towing Physical Damage Legal Liability Coverage, **we** will pay damages, other than punitive or exemplary damages, for **bodily injury**, **property damage**, and **covered pollution cost or expense**, for which an **insured** becomes legally responsible because of an **accident** arising out of the operation of a **customer's auto** necessary to **your** on-hook towing activity. However, **we** will only pay for the **covered pollution cost or expense** if the same **accident** also caused **bodily injury** or **property damage** to which this insurance applies.

## ADDITIONAL DEFINITIONS

The following additional definitions apply throughout this Garage Operations Physical Damage Legal Liability Coverage endorsement whenever the defined term appears in boldface type, whether in the singular, plural, or possessive:

1. "**Customer's auto**" means a customer's land motor vehicle, **trailer**, or **watercraft**, including a **customer's auto** left with **you** for service, repair, storage, or safekeeping. Customers include **your employees** and their **relatives** who pay for services performed.

2. "**Garage operations**" means the ownership, maintenance, or use of the locations shown on **your declarations page** for the purpose of a business of selling, servicing, repairing, parking, or storing **customers' autos**, and that portion of the roads or other accesses that adjoin such locations. **Garage operations** also includes all operations necessary or incidental to the performance of **garage operations**.

3. "**Insured**" means:
   a. **you**; and

56

0109

b. **your** partners (if **you** are a partnership), members (if **you** are a limited liability company), employees, directors, or shareholders, but only while acting within the scope of their duties.

4. "**Loaded in or on**" means connected to.

5. "**Towed property**" means tangible property, not owned by or registered to **you**, in transit while **loaded in or on**, or conveyed by, an **insured auto**. **Towed property** also means property when it is moved from the place where **you** accept it for movement by or onto **your insured auto** and after it is moved from **your insured auto** to the place where it is finally delivered by **you**. **Towed property** includes a towed **auto** or **watercraft**.

6. "**Watercraft**" means any craft, boat, vessel, or ship designed to transport persons or property by water.

7. "**Work you performed**" includes:
   a. Work that someone performed on **your** behalf; and
   b. The providing of, or the failure to provide, warnings or instructions.

## ADDITIONAL PAYMENTS

In addition to **our** limit of liability, **we** will pay for an **insured** under this endorsement:
1. All expenses **we** incur in the settlement of any claim or defense of any lawsuit;
2. The premium on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in a principal amount exceeding **our** limit of liability, and **we** have no duty to apply for or furnish these bonds;
3. Reasonable expenses incurred by that **insured** at **our** request, including loss of earnings up to $250 per day;
4. All costs taxed against the **insured** in any lawsuit against that **insured we** defend; and
5. Interest accruing after entry of judgment on that part of the judgment that does not exceed **our** limit of liability. This does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured**.

   **Our** payment, offer in writing, or deposit in court of that part of the judgment that does not exceed **our** limit of liability ends **our** duty to pay interest that accrues after the date of **our** payment, written offer, or deposit.

## EXCLUSIONS—PLEASE READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE PROVIDED.

1. The On-Hook Towing Physical Damage Legal Liability and Garagekeepers Storage Location Physical Damage Legal Liability coverages under this endorsement do not apply to any of the following:
   a. Liability resulting from any contract or agreement by which the **insured** ac-

57

0110

cepts responsibility for **loss**. This exclusion does not apply to an agreement that is an **insured contract** that was executed prior to the occurrence of any **property damage**;

b. **Loss** due to theft or conversion caused in any way by **you** or **your** employees, partners, members, directors, or shareholders;

c. Defective parts or materials;

d. Faulty **work you performed**;

e. **Loss** to any of the following:

   (i) Tape decks or other sound-reproducing equipment unless permanently installed in a **customer's auto**;

   (ii) Tapes, records, or other sound-reproducing devices designed to be used with sound-reproducing equipment;

   (iii) Sound-receiving equipment designed for use as a citizens band radio, two-way mobile radio, or telephone or scanning monitor receiver, including its antennas and other accessories, unless permanently installed in the dash or console opening normally used by the **customer's auto** manufacturer for the installation of a radio; or

   (iv) Any device designed or used to detect speed measurement equipment such as radar or laser detectors and any jamming apparatus intended to elude or disrupt speed measurement equipment;

f. **Loss** caused by:

   (i) War, including undeclared or civil war;

   (ii) Warlike action by a military force, including any action to hinder or defend against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents;

   (iii) Insurrection, rebellion, revolution, usurped power, or any action taken by a governmental authority to hinder or defend against any of these; or

   (iv) Nuclear reaction or radioactive contamination.

   This exclusion applies regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**;

g. **Loss** caused by strikes, lockouts, riots, civil commotion, or disorder; or

h. **Loss** due to inherent vice, delay, loss of profit, loss of market, loss of market value, or loss of use.

2. On-Hook Towing Physical Damage Legal Liability Coverage does not apply to:

a. **Loss** to tarpaulins, tools, repair equipment, or materials and equipment for loading or unloading, which are carried in or on the **insured auto**;

b. **Loss** to any **towed property** while it is in the custody of anyone other than an **insured**;

c. **Loss** to objects of art, including paintings and statuary;

d. **Loss** to jewelry; precious or semi-precious stones; gold, silver, platinum, or other precious metals or alloys;

e. **Loss** to live animals;

f. **Loss** to papers of any kind, including, but not limited to, money, securities, accounts, bills, currency, food stamps, notes, tickets, any other evidences of debt, passports, deeds, mechanical drawings, blueprints, manuscripts, or exhibits;

58

0111

g. **Debris** removal, including extraction of pollutants from land or water; or removal, restoration, or replacement of polluted land or water;

h. **Loss** caused by order of any civil authority, including seizure, confiscation, destruction, or quarantine of property;

i. **Loss** to contraband or property in the course of illegal transportation or trade;

j. **Loss** to property caused by contamination or deterioration, including corrosion; decay; fungus; mildew; mold; rot; rust; any quality, fault, or weakness in the property that causes it to damage or destroy itself; or humidity, dampness, dryness, or changes in or extremes of temperature;

k. **Loss** caused by or resulting from release, discharge, seepage, migration, dispersal, or escape of **pollutants**;

l. **Loss** caused by or resulting from criminal, fraudulent, dishonest, or illegal acts committed alone or in collusion with another by an **insured**, anyone to whom **you** entrust the **towed property**, or anyone who has an interest in the property;

m. **Loss** caused by or resulting from voluntary parting with title to or possession of any property because of any fraudulent scheme, trick, or false pretense;

n. **Loss** caused by the explosion of explosives; or

o. **Loss** to computers and electronic goods, including, but not limited to, computer hardware and component parts, televisions, DVD players, stereo or other sound reproduction equipment, or any other electronic equipment, antennas, and other devices used exclusively to send or receive audio, visual, or data signals, or to store or play back recorded media.

3. Limited Bodily Injury and Property Damage Liability (Towing Only) Coverage is subject to all exclusions as listed in Part I of the Commercial Auto Policy.

**LIMITS OF LIABILITY**

1. **On-Hook Towing Physical Damage Legal Liability Coverage.**
   Regardless of the number, amount, or units of **towed property** or **insured autos**, **insureds**, premiums paid, claims made or lawsuits brought, the most **we** will pay for each **loss** is the aggregate amount of damages to all **towed property** while being **loaded in or on** or conveyed by one **insured auto**, not to exceed the limit of liability shown on the **declarations page** for this "On-Hook Legal Liability" coverage.

   The most **we** will pay for **loss** to any **towed property** is the least of the following amounts:
   a. The actual cash value of the damaged or stolen property at the time of **loss**;
   b. The cost of repairing or replacing the damaged or stolen property with other of like kind and quality to the extent practicable; or
   c. An agreed or appraised value for the property. **We** may keep all or part of the property at the agreed or appraised value, but there shall be no abandonment to **us**.

0112

2. **Garagekeepers Storage Location Physical Damage Legal Liability Coverage.**

Regardless of the number of **customer's autos** or **insured autos**, **insureds**, premiums paid, claims made, or lawsuits brought, the most **we** will pay for each **loss** at each location is the "Garagekeepers Legal Liability" coverage limit shown on the **declarations page** for that location.

The most **we** will pay for a **loss** to any one **customer's auto** or all **customer's auto** equipment is the least of the following amounts:
a. The actual cash value of the damaged or stolen property at the time of **loss**;
b. The cost of repairing or replacing the damaged or stolen property with other of like kind and quality to the extent practicable; or
c. An agreed or appraised value for the property. **We** may keep all or part of the property at the agreed or appraised value, but there shall be no abandonment to **us**.

If the repair or replacement results in better than like kind and quality, **we** will not pay for the amount of the betterment.

An adjustment for depreciation or physical condition will be made in determining actual cash value in the event of a total loss.

In the event of payment of actual cash value for a total loss, **we** are entitled to all salvage, or credit for salvage, resulting from such **loss**.

3. **Limited Bodily Injury and Property Damage Liability (Towing Only) Coverage.**

Regardless of the number of premiums paid, or the number of **insured autos** or **trailers** shown on the **declarations page**, or the number of policies issued by **us**, or the number of vehicles or **insureds** involved in an **accident**, or the number of claims or lawsuits arising out of an **accident**, **we** will pay no more than the Limit of Liability shown on the **declarations page** for Liability Coverage, subject to all of the terms and conditions of Part I of the Commercial Auto Policy.

4. **Deductibles.**

For each **loss** that qualifies for coverage under the On-Hook Towing Physical Damage Legal Liability Coverage, the deductible shown on the **declarations page** will be applied.

For each **loss** that qualifies for coverage under the Garagekeepers Storage Location Physical Damage Legal Liability Coverage, the "Each auto" deductible shown on the **declarations page** will be applied separately to each **customer's auto** or **towed property** sustaining **loss** as a result of a single **loss** event. The maximum aggregate deductible applied for a single **loss** event will not exceed the "Each occurrence" deductible shown on the **declarations page**.

if **we** pay all or any part of a deductible in the settlement of any claim or lawsuit, **you** must reimburse **us** for the deductible or the portion thereof that **we** paid.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form Z439 (02/19)

### NON-OWNED TRAILER PHYSICAL DAMAGE COVERAGE ENDORSEMENT

This endorsement modifies insurance provided by the Commercial Auto Policy. All terms and conditions of the policy apply unless modified by this endorsement.

#### INSURING AGREEMENT

Subject to the Limits of Liability, if **you** pay the premium for Non-Owned Trailer Physical Damage Coverage, **we** will pay damages for **property damage** for which **you** become legally responsible because of **loss** to a **trailer** not owned by **you**, and its equipment, while in **your** possession.

**We** will pay for a **loss** to the non-owned **trailer** and its equipment under the coverages described below, as reflected on **your declarations page**:
a.  Collision Coverage. For **loss** caused by:
    (i)   The **trailer's** collision with another object; or
    (ii)  The **trailer's** overturn.
b.  Comprehensive Coverage. For any **loss** except one caused by:
    (i)   The **trailer's** collision with another object; or
    (ii)  The **trailer's** overturn.

**We** will settle or defend, at **our** option, any claim or lawsuit for damages covered by this endorsement. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the Limit of Liability for this coverage has been exhausted by payment of judgments or settlements.

#### ADDITIONAL PAYMENTS

In addition to **our** Limit of Liability, **we** will pay for an **insured**:
a.  all expenses **we** incur in the settlement of any claim or defense of any lawsuit;
b.  interest accruing after entry of judgment on that part of the judgment that does not exceed **our** Limit of Liability. This payment does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured**. **Our** payment, offer in writing, or deposit in court of that part of the judgment which does not exceed **our** Limit of Liability ends **our** duty to pay interest that accrues after the date of **our** payment, written offer, or deposit;

0114

61

c. the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in a principal amount exceeding **our** Limit of Liability, and **we** have no duty to apply for or furnish these bonds;

d. reasonable expenses, including loss of earnings up to $250 a day, incurred at **our** request;

e. all reasonable expenses necessary to return a stolen **trailer** to **you**, unless **we** determine the **trailer** to be a total loss; and

f. all reasonable expenses necessary to remove a **trailer** from the site of an **accident** or **loss** and transport it to a repair facility.

## ADDITIONAL DEFINITION USED IN THIS ENDORSEMENT

The following definition applies to this endorsement only:

"**Trailer**", when used in this endorsement, includes a shipping container.

## EXCLUSIONS

a. **We** will not pay for **loss** caused by or resulting from any of the following. Such **loss** is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**.
   (i) Nuclear Hazard.
      (1) The explosion of any weapon employing atomic fission or fusion; or
      (2) Nuclear reaction or radiation, or radioactive contamination, however caused.
   (ii) War or Military Action.
      (1) War, including undeclared or civil war;
      (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or agents; or
      (3) Insurrection, rebellion, revolution, usurped power, or action taken by a governmental authority in hindering or defending against any of these.

b. **We** will not pay for loss of use.

c. **We** will not pay for **loss** caused by, or resulting from, any of the following unless caused by another **loss** that is covered by this insurance;
   (i) Wear and tear, freezing, mechanical or electrical breakdown, or structural failure caused by material fatigue, decomposition, or corrosion.
   (ii) Blowouts, punctures, or other road damage to tires.

## LIMIT OF INSURANCE AND DEDUCTIBLE

The most **we** will pay for **loss** to any one **trailer** is the least of the following amounts minus any applicable deductible shown on the **declarations page**:

a. The actual cash value of the damaged or stolen property at the time of the **loss**;

b. The amount necessary to replace the stolen or damaged property with other of like kind and quality;

c. The amount necessary to repair the damaged property to its pre-loss condition; or

0115

62

d. The applicable Limit of Liability for the property as shown on the **declarations page**.

A single deductible will be applied to any **loss**. In the event there are different deductible amounts applicable to the **loss**, the higher deductible will be applied. In all events, the deductible will be applied against the limit of liability. If a **loss** involves another coverage added by endorsement to the policy, only one deductible will apply to the entire **loss** event. No deductible will apply to payments made under the Additional Payments section for expenses necessary to return a stolen **trailer** to **you**.

## OTHER INSURANCE

The insurance provided for a **loss** to a non-owned **trailer** is primary.

If coverage under more than one policy applies on the same basis, **we** will pay only **our** proportionate share. **Our** proportionate share is the proportion that the Limit of Liability of this policy bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form Z442 (02/19)

### ANY AUTOMOBILE LEGAL LIABILITY COVERAGE ENDORSEMENT

Except as specifically modified by this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

## CHANGES TO PART I—LIABILITY TO OTHERS

I. The following changes are made to the Additional Definitions Used in This Part Only section:

   A. The definition of "**insured auto**" is modified to include:

   1. **Hired autos**;
   2. **Non-owned autos**; and
   3. Any other **autos** owned by **you**:
      a. only while being used in the conduct of **your** business; and
      b. that do not qualify as either **hired autos** or as **non-owned autos**.

0116

63

However, this modification to the definition of **insured auto** does not apply to any **auto** acquired prior to the current policy period. But, for any type of **auto** that **you** acquire during the current policy period, this modification extends coverage to that **auto** during the remainder of the policy period.

B.  The following definitions are added:

  1.  "**Hired auto**" means an **auto**:
      a.  **you** lease, hire, rent or borrow; or
      b.  **your employee** leases, hires or rents:
          i.  under a contract in that individual **employee's** name;
          ii. at **your** direction and with your express permission; and
          iii. only while being used in the conduct of **your** business.

      However, this does not include any **auto you** or an **employee** leases, hires, rents or borrows from any of **your employees**, partners (if **you** are a partnership), members (if **you** are a limited liability company), or member of their households.

  2.  "**Non-owned auto**" means an **auto**:
      a.  that **you** do not own;
      b.  that is not a **hired auto**; and
      c.  that is being used by **you** in connection with **your** business.

      This includes **autos** owned by **your employees**, partners (if **you** are a partnership), members (if **you** are a limited liability company), or members of their households, but only while such **autos** are used in **your** business.

II. The first paragraph under the Limit of Liability section is deleted and replaced by the following:

Regardless of the number of premiums paid, or the number of **insured autos** or **trailers**, or the number of policies issued by **us**, or the number of vehicles or **insureds** involved in an **accident**, or the number of claims or lawsuits arising out of an **accident**, **we** will pay no more than the limit of liability shown on the **declarations page** for the coverage provided by this endorsement.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THIS POLICY REMAIN UNCHANGED.**

0117





# Exhibit 2

# CARRIER AGREEMENT

This CARRIER AGREEMENT ("**Agreement**") is made and entered into this ☐☐ day of _____, 20☐☐ ("**Effective Date**"), by and between H.C. Schmieding Produce Company, LLC, a Florida Limited Liability Company ("**HCS**"), and _____, a licensed motor carrier ("**Carrier**") pursuant to USDOT#_____ & MC#_____ (collectively, the "**Parties**" and individually, a "**Party**"). The purpose of this Agreement is to provide the terms and conditions under which HCS will engage Carrier to perform motor contract carriage and related services, and under which Carrier will render those services.

## I. RECITALS

**WHEREAS,** HCS is duly registered as a Broker of property with the Federal Motor Carrier Safety Administration ("**FMCSA**"), and desires to arrange for the transportation of products in interstate and foreign commerce by registered motor carrier;

**WHEREAS,** HCS performs services as a Broker for goods shipped by and on behalf of certain HCS customers;

**WHEREAS,** HCS performs services for its customers which prohibit its employees, agents, and Carriers used to perform the Services for customer from the use of, possessing of, solicitation for, manufacturing, dispensing, selling, or distributing narcotics or other illegal drugs, alcohol, or prescription medication without a prescription, or any other controlled substances on or around anywhere the Services are being performed.

**WHEREAS,** HCS also requires from time to time, motor carriage service for goods owned by HCS, as a shipper;

**WHEREAS,** Carrier is duly registered with FMCSA as a for-hire motor carrier to transport general commodities in interstate commerce, and desires to provide qualified expertise, personnel and equipment for motor carrier transportation and related services as further described herein, in connection with shipments tendered by HCS and HCS customers;

**NOW THEREFORE**, in consideration of the terms, covenants and conditions herein set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

## II. REPRESENTATIONS AND WARRANTIES

1. HCS represents and warrants that it is duly registered as a Broker of property with the FMCSA, No. 165901, and is in compliance with the regulations at 49 C.F.R. Part 371.

2. HCS represents and warrants that its performance under this Agreement, whether as a Broker, or when applicable when performing under this Agreement as a shipper, will be in compliance with all applicable federal, state, and local laws, regulations, and codes in such performance.

3. Carrier represents and warrants that it is duly registered with FMCSA as a for-hire motor carrier to transport general commodities in interstate commerce.

4. Carrier represents and warrants that its performance under this Agreement will be in compliance with all applicable federal, state, and local laws, regulations, and codes in such performance.

5. Carrier represents and warrants that it holds at minimum, and shall maintain during the Term of this Agreement, a "satisfactory" or "unrated" safety rating, or a substantively equivalent rating under any other system implemented by the FMCSA with respect to Carrier's operations.

6. Carrier represents and warrants that if Carrier uses the service of owner-operators to perform its obligations under this Agreement, Carrier shall: a) comply with all applicable laws and regulations, including but not limited to the provisions of 49 C.F.R. 376, Lease and Interchange of Vehicles; b) enter into a written lease that will provide Carrier, as the authorized carrier lessee, will have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide the authorized carrier lessee will assume complete responsibility for the operation of the equipment for the duration of the leases; and c) under no circumstances will Carrier's obligations under this Agreement, including but not limited to its liabilities to third parties or its liability for loss, damage, or delay to property, be effected or diminished by reason of it use of owner-operators.

7. Carrier represents and warrants that when transporting Food Shipments, it will strictly observe and enforce the procedures set forth in this Agreement, including all documents incorporated by reference, and will require its employees, agents and representatives to comply with such requirements in addition to other sanitation and cleanliness standards.

8. The Parties represent and warrant the persons who signed below represent their respective Party, are authorized to, and intend to, bind their respective Party.

9. Each Party represents to the other that its entry into this Agreement does not, and will not, violate the term of any judgment, decree or ruling, or any contract with any third party.

## III. GENERAL TERMS

1. **Applicability.** This Agreement applies to all services, as further defined herein, arranged for by HCS and provided by Carrier ("**Services**"). Services provided by Carrier may be related to a shipment originating with HCS, as the "**Shipper**," or with a customer of HCS as the "**Shipper**."

2. **Independent Contractor**. The relationship between HCS and Carrier shall be that of an independent contractor and at no time shall the employees, agents, or associates of one be considered to be employees, agents, or associates of the other.

    A. Carrier shall have the sole responsibility for, and control of, the performance of the Services including the delivery of the goods, provided hereunder, and shall provide all direction for the method and manner of performing Carrier's obligations to this Agreement, and shall bear all costs and expenses arising out of such Services and delivery of goods.

    B. Carrier shall procure necessary licenses, provide appropriate maintenance, and furnish all supplies necessary for the proper operation of the equipment used and furnished in performance of the Services.

    C. Carrier shall have sole responsibility for, and pay any and all wages, fees, payroll taxes, assessments, or other expenses relating to, employees or agents of Carrier which may be required to be paid under any law.

    D. HCS shall neither have, nor exercise, control, direction or supervision over Carrier or the personnel furnished or used by Carrier to perform the Services under this Agreement.

    E. Carrier shall be the "employer" of himself and any carrier employee within the meaning of 3401(d) of the Internal Revenue Code.

Schmeding
Carrier Agreement

3. **Contract Carriage**. All Services performed by Carrier pursuant to this Agreement shall be as a motor contract carrier of property and will be subject only to the terms of this Agreement and all applicable law. All Services are being provided as "contract carriage" within the meaning of 49 U.S.C. 13102(4)(B), and HCS and Carrier each expressly waive all rights and remedies they may have as to each other under 49 U.S.C., Subtitle IV, Part B to the extent such rights and remedies conflict with this Agreement.

4. **Term of Agreement.** This Agreement shall remain in full force and effect for the initial term of one (1) year commencing on the Effective Date, and shall automatically renew for additional twelve (12) month terms thereafter until terminated by either Party in accordance with the terms of this Agreement ("**Term**").

   A. This Agreement may be terminated by either Party, at any time, with or without cause, upon thirty (30) days notice in writing to the other Party.

   B. If any shipment within the scope of the Services remains in transit on the effective date of a termination of this Agreement, both Parties' rights and duties under this Agreement shall remain in effect with respect to such shipments until it is delivered, and all related invoices and claims are satisfied.

5. **Default.** Both parties will discuss any perceived deficiency in performance and will promptly endeavor to resolve all disputes in good faith. However, if either party materially fails to perform its duties under this Agreement, the party claiming default may terminate this Agreement on 30 (thirty) days written notice to the other Party.

6. **Termination.** HCS may additionally terminate this Agreement immediately upon written notice in any of the following events:

   A. Carrier's Personnel used to perform the Services be impaired or under the influence of legal or illegal drugs or alcohol and such impairment or influence adversely affects the employee's work performance, the safety of the employee or of others, or puts at risk the Company's reputation.

   B. Carrier be found to be conducting business illegally in any way or conducts themselves in a manner in which puts HCS's company reputation at risk.

   C. Carrier loses its operating authority or otherwise becomes disqualified to perform its obligations under this Agreement.

   D. Carrier breaches any covenant, obligation, condition, or requirement imposed upon it by this Agreement, and such breach continues for a period of ten (30) days after written notice thereof from HCS to Carrier.

   E. Carrier becomes insolvent or becomes unable to pay its debts in a timely manner.

   F. Carrier fails to comply with the performance metrics or selection criteria, if any, imposed upon it at any time by HCS.

   G. Carrier fails to procure and maintain any of the insurance coverages required by this Agreement.

   H. Carrier utilizes the services of any Brokers, or brokers or subcontracts transportation of freight tendered by HCS hereunder to any third-party motor carrier or other transportation provider

or utilizes a third-party logistics provider to perform its obligations under this Agreement without prior written consent of HCS.

7. **Compliance with Applicable Laws.** Carrier will comply with all applicable Legal Requirements. As used in this Agreement, "**Legal Requirements**" means any and all statutes, rulings, rules, regulations, permits, certificates, or ordinances of any local, state, or federal governmental authority, in any way applicable to HCS, Carrier, or the Services, including but not limited to provisions of the Interstate Commerce Act, laws, rules and regulations of the FMCSA and any other laws, rules, or regulations to the extent they govern Carrier's operations.

I. Carrier will maintain its permits, licenses, operating authorities, and all required insurance, in full force and effect with the FMCSA and all other applicable regulatory and state agencies during the Term.

J. The Parties agree that in the event the failure of Carrier to comply with or conform to any Legal Requirements results in different or additional charges for the Services, Carrier shall indemnify HCS from such charges, and will pay HCS immediately upon demand, damages equal to any additional charges required to be paid, and any costs or attorneys' fees incurred by HCS in connection therewith.

8. **Carrier's Change in Status**. In the event that all or any portion of Carrier's permits, licenses, operating authorities, safety ratings or required insurance are revoked, canceled, downgraded, suspended or discontinued by operation of law or otherwise, Carrier will immediately notify HCS.

9. **HCS or Shipper Name**. Carrier will not display the name of HCS or the Shipper upon Carrier's vehicles.

## IV. SERVICES

1. **Goods**. During the term of this Agreement, HCS, as Broker or as Shipper, may tender to Carrier, on a non-exclusive basis, and Carrier agrees to accept from HCS, from time-to-time, shipments consisting of certain goods ("**Goods**") for transport. As will be addressed in more detail throughout the Agreement, the Goods are primarily food products that will ultimately be consumed by humans or animals ("**Food Shipments**") which are required to be transported in a sanitary and temperature-controlled environment.

A. Upon acceptance of such tender, Carrier will, using due care, pick-up, transport in a safe and timely manner; and deliver in good order and condition, the Goods which are tendered by HCS to Carrier, in accordance with the terms and provisions set forth in this Agreement, (all of which are included in the Services as described herein).

B. Carrier shall comply with all instructions provided to Carrier by HCS regarding the transportation of the Goods tendered to it, including but not limited to the food safety and security instructions required as set forth in this Agreement, and all documents incorporated by reference. To the extent Carrier receives contradictory or confusing instructions regarding any shipment; Carrier must resolve the contradictory or confusing instructions prior to accepting the shipment for transport. Failure to resolve any issue with the instructions prior to transport shall bar Carrier from using the contradictory or confusing instructions as a defense.

2. **Exempt Commodities.** In the event HCS tenders to Carrier commodities the transportation of which by motor vehicle is not subject to the jurisdiction of the Surface Transportation Board

(STB) as specified in 49 §13506, such service and the Parties' rights and obligations with respect thereto shall also be governed by this Agreement.

3. **Carrier Compliance with all Applicable Requirements of this Agreement.** Carrier agrees to be in strict compliance with all requirements of carriage in this Agreement and all Legal Requirements applicable to the transport of any Food Shipments. Carrier acknowledges that Food Shipments require a high degree of care and agrees and acknowledges that failure to follow the requirements as set forth in this Agreement and all applicable Legal Requirements may result in possible contamination, adulteration or degradation of product quality, which could have a detrimental effect on HCS's reputation and image in the marketplace as well as potential exposure for product liability.

4. **Customer Service**. Carrier will provide a dedicated customer service representative to be available to assist HCS with service issues, between the hours of 7:00 a.m. and 7:00 p.m. Central Time, Monday through Friday. Carrier will further provide backup customer service coverage available to HCS on a 24x7x365 on-call basis. HCS will also provide Carrier with 24x7x365 on-call information for after-hours purposes.

5. **Diversion and Reconsignment**. Carrier will not divert or reconsign any shipment except upon written instructions of HCS.

6. **Failure to Perform**. Carrier shall immediately notify HCS if for any reason, Carrier is unable to perform the Services in accordance with the applicable confirmation or Shippers instructions. If Carrier violates this Agreement in such a manner so as to fail to complete transportation of any shipment, abandons a shipment, or otherwise subject HCS to potential liabilities or losses, Carrier agrees that HCS shall have the right to make alternative arrangements for the delivery of said shipment. Carrier waives any recourse against HCS or Shipper for any such action and shall reimburse HCS for any cost and expense arising out of the completion of any shipment and pay HCS any damages for which it may be liable as a result of such failure to perform, including reasonable attorney fees.

7. **Operation within Scope of FMCSA**. Under no circumstance shall Carrier render Services beyond the scope of its FMCSA registration unless the Services are exempt from legal requirements for such registration or authority.

8. **No Gratuities**. Carrier shall not offer or provide to any of HCS/Shipper's employees, agents or other representatives any gratuities, gifts, payments, favors, nor anything else of value, whether or not in an attempt to influence such person's administration of the provisions of this Agreement, or to otherwise gain an advantage of HCS/Shipper individually or relative to any competing carriers.

9. **Owner-Operators.** Carrier may use the service of owner-operators to perform its obligations under this Agreement. In such circumstances, Carrier will comply with all applicable Legal Requirements, including but not limited to the provisions of 49 C.F.R. 376, Lease and Interchange of Vehicles. Further, Carrier will enter into a written lease that will provide that Carrier, as the authorized carrier lessee, will have exclusive possession, control, and use of the equipment for the duration of the lease. The lease will further provide that the authorized carrier lessee will assume complete responsibility for the operation of the equipment for the duration of the leases. Under no circumstances will Carrier's obligations under this Agreement, including but not limited to its liabilities to third parties or its liability for loss, damage, or delay to property, be affected or diminished by reason of it use of owner-operators.

10. **Brokering**. Carrier shall not broker any shipment hereunder without the express written permission of HCS. In the event where HCS gives express written permission to carrier to

broker the shipment, the carrier must ensure carrier hired has a 'satisfactory' safety rating and meets all requirements and provisions of this Agreement. If Carrier directly or indirectly brokers any shipments to another carrier without the express written permission of HCS, Carrier will assume full reasonability and liability for the act and omissions of the carrier handling the shipment as though Carrier transported the shipment itself.  If Carrier breaches this provision, HCS reserves the right of paying the monies it owes the Carrier directly to the delivering Carrier in lieu of payments to the Carrier. Under no circumstance shall Carrier's obligations under this Agreement, including but not limited to its liabilities to third parties or its liabilities for loss, damages, or delay to property, be affected or diminished by reason of its brokering shipments to another carrier.

11. **Assignment; Subcontracting**. Carrier shall not assign, transfer, pledge or encumber any of its rights or obligations under this Agreement without HCS's prior written consent, such consent to be given or withheld in HCS's sole discretion. Carrier agrees not to use subcontractors (other than owner-operators under a written lease and per all requirements as described above), or to interline with other carriers, or to broker shipments, or to use "substitute services" by rail for Shippers' Goods without prior written consent of HCS.

12. **Carrier Liability.** Carrier shall not, in any way, have any right to negate, eliminate, circumvent, or alleviate Carrier's liability to HCS or Shipper which may be inconsistent with the provisions of this Agreement.

13. **Preservation of Records**.  Carrier shall comply with the requirement of 49 CFR 371.3 or any successor provision thereto, with regard to the preservation of records related to the Services, and shall, in any event, maintain and preserve all such records for a period of not less than three (3) years from delivery of the last shipment pursuant to this Agreement.

14. **Driver Hours**. Carrier agrees and acknowledges that, by accepting tender, the time between time of tender and the due date designated by HCS is reasonable and can be performed by Carrier and its drivers under the federal hours of service regulations contained in 49 C.F.R. Part 395. Carrier will promptly notify HCS by telephone in the event that any designated delivery due date cannot be legally met because of such federal regulations.

15. **Delay, Accident or Undeliverable Freight**.  Carrier will notify HCS immediately by telephone or email of any accident, spill, theft, hijacking or other events that impair the safe and prompt delivery of the Goods in its control.  Carrier will notify HCS immediately by phone or email of any undeliverable freight and request additional instructions regarding delivery.

16. **GPS Tracking.**  Carrier shall be required to comply with GPS Tracking instructions provided to Carrier by HCS for the duration of the load, from pick up to delivery. Non-Compliance of this requirement shall result in fines determined as per **Appendix A** (Schmieding Transportation Fees).

17. **Missed Appointments.** Carrier shall arrive to all shipping and delivery appointments no later than set appointment times provided in writing to carrier by email or EDI by HCS. HCS shall notify Carrier of any appointment changes in writing by email or EDI. Carrier shall not be responsible for delays arising from a force majeure event or other event beyond Carrier's control. Carrier shall be responsible for any late fees incurred for missed appointments as indicated in **Appendix A** (Schmieding Transportation Fees).

  A.  Carriers cannot be one (1) minute later than the set appointment time provided by HCS to any loading or unloading facility to be considered on time for any set appointment.

B. Carriers cannot be one (1) minute later than the set end appointment time provided by HCS to any loading or unloading facility to be considered on time for a range appointment.

## V. EQUIPMENT

1. **Cost of Equipment.** Carrier will, at its sole cost and expense, provide only commercially suitable motor vehicles and other necessary equipment required to provide the Services ("**Equipment**"), and said Equipment will be in good repair and condition and operate in a safe manner and in compliance with all applicable Legal Requirements. Equipment used to provide the Services, shall be clean, insect and rodent free, odor-free, dry, leak-proof, meet the food safety requirements in this Agreement, and otherwise be safe to transport the commodities tendered. HCS has the right to reject unsatisfactory equipment. In the event HCS rejects Carrier's equipment, Carrier shall immediately provide HCS with satisfactory replacement equipment.

2. **Operating Expense.** Carrier will bear the cost and expense of all fuel, oil, parts, tires, road service, repair, and maintenance in connection with the use and operation of the Equipment and which may be required to keep the Equipment in good repair and mechanical condition. Neither HCS nor Shipper will be liable to Carrier for any damage sustained by, or to, the Equipment, or for loss by confiscation or seizure of the Equipment by any public authority, except Shipper shall be liable to the extent such damage or loss is directly attributable to the negligence or willful misconduct of Shipper, its employees, or representatives.

3. **Operation in California.** To the extent any shipments are transported within the State of California, Carrier warrants that (a) all 53 foot trailers, including both dry-van and refrigerated equipment it operates, and the Heavy-Duty Tractors that haul them within California under this Agreement, are in compliance with the California Air Resources Board (ARB) Heavy-Duty Vehicle Greenhouse Gas (Tractor-Trailer GHG) Emission Reduction Regulations; and (b) all refrigerated Equipment it operates within California under this Agreement is in full compliance with the California ARB TRU ACTM in-use regulations.

## VI. PERSONNEL

1. Carrier, at its sole cost and expense, will supply only personnel who are legally permitted to be employed in the United States and who are legally licensed, qualified, fit, competent, and able personnel who have met all Legal Requirements for the operating of said Equipment and the provision of all other Services. Carrier will have the sole responsibility for the acts and conduct of such personnel during the entire period of time said personnel are used to deliver Goods and to perform the Services. Carrier's drivers shall be considered professionals and a representative of the Carrier of which they are employed.

2. Carrier will employ, train, supervise and control all necessary personnel required in performing the Services (including drivers and any helpers) and in performing all other obligations under this Agreement. All such individuals will be employees of, or owner-operators leased to Carrier only, and will be subject to employment, discharge, discipline, and control solely and exclusively by Carrier.

3. Carrier will (a) instruct all personnel that will be picking up and delivering Goods, of the need to comply with all posted security and safety policies and will be responsible for failure of Carrier personnel to do so and (b) maintain, and cause its personnel to maintain, the highest standards of professionalism and industry best practices in the performance of the Services to be provided to HCS. All such personnel may be required to display identification prior to being allowed access to designated facilities where Goods will be picked up or delivered.

4. Carrier shall ensure all personnel that will be picking up and delivering Goods and to perform the Services shall follow all FMCSA regulations and all provisions of this Agreement.

5. Carrier shall ensure all personnel used to pick up or deliver Goods and to perform the Services shall not be in the use of, possession of, solicitation for, or sale of narcotics, or other illegal drugs, alcohol, or prescription medication without a prescription while picking up or delivering Goods and performing the Services.

## VII. SANITARY FOOD TRANSPORTATION REQUIREMENTS

1. **High Degree of Care**. Carrier acknowledges that transportation of Food Shipments, which include refrigerated and/or frozen foods and related products, requires a high degree of care in order to prevent possible contamination, adulteration, or degradation of product quality, which could have a detrimental effect on HCS's or Shippers' reputation and image in the marketplace as well as potential exposure for product liability. Carrier agrees and warrants that it will strictly observe and enforce the following procedures, and will require its employees, agents and representatives to comply with the following requirements in addition to other sanitation and cleanliness standards.

2. **Food Safety Law Compliance**. Carrier must comply with the Legal Requirements governing the safe and secure transportation of Food Shipments, including, but not limited to, the Food Safety Modernization Act (21 U.S.C. 2201, *et. seq.*) ("FSMA"), the Federal Food, Drug and Cosmetic Act (21 U.S.C. 41, *et seq.*) ("FD&C Act"), the Sanitary Food Transportation Act (49 U.S.C. 5701, *et seq.*), the U.S. Food and Drug Administration's Final Rule on the Sanitary Transportation of Human and Animal Food (21 C.F.R. 1.900, *et seq.*), the Food Safety Modernization Act of 2013 and all applicable U.S. Department of Agriculture and Food Safety and Inspection Service regulations (collectively, the "Food Safety Laws").

3. **Instructions**. Carrier is responsible for the sanitary conditions of Food Shipments during their transportation and complying with HCS's and/or Shippers' written instructions, including without limitation, any temperature set point or temperature range, as provided to the Carrier by HCS or Shipper in physical or electronic form. Carrier shall apply all written instructions to future Food Shipments of the same Goods tendered for the same Shipper, unless instructed otherwise in writing. If HCS's or Shippers' instructions require a cargo seal, the lack of a seal or seal irregularities shall be sufficient to consider the shipment unsafe and a total loss. If seal integrity has been jeopardized, Carrier shall duly note it on the bill of lading. Carrier agrees that when transporting food for human consumption, late delivery (i.e. delivery after the deadline indicated on the transportation documents) alone shall be sufficient to reject a shipment and consider the cargo a total loss.

4. **Recording Food Shipment Temperature**. Carrier shall verify the temperature of Food Shipments before loading. Carrier must write the recorded temperature on shipping document(s) used by the Parties for the pick-up, transport, or delivery of Goods, including without limitation any bill of lading ("**Shipping Document**"). If the temperature is more than two degrees different from the required temperature stated in the written instructions or Shipping Document, then the Carrier shall immediately notify HCS, and refuse to load the Goods. In the event Carrier is unable to verify the temperature due to restrictions imposed by the Shipper, consignor, or due to the physical circumstances of loading, Carrier shall notify HCS immediately, note its inability to verify and the reason for such inability, and is otherwise excused from performing such verification. The foregoing exception shall not relieve Carrier of compliance with any other provision of this Section VII. Carriers shall provide downloadable temperature monitoring and equipment performance data within twenty-four (24) hours of

request. Noncompliance with this provision shall result in fees as indicated in **Appendix A** (Schmieding Transportation Fees) and Carrier being solely liable for any and all claims and/or losses of goods.

5. **Equipment used to transport Food Shipments**. Carrier represents and warrants that all Equipment used in transporting Food Shipments (as defined in the Food Safety Laws and herein) is in safe and sanitary condition and appropriate for performance of the Services for Food Shipments, including but not limited to, Equipment free from contamination, pest infestation, and evidence of prior cargo that could render the Food Shipments unsafe. Carrier represents and warrants that all Equipment used in transporting Food Shipments is equipped with an operational air-chute at least forty-three (43) feet in length and fully attached from the beginning to the end to the refrigeration unit. Carrier represents and warrants that all Equipment used in transporting Food Shipments is equipped with refrigeration equipment that allows data monitoring of temperatures and refrigeration equipment performance inside the trailer from the time of precooling the trailer, while trailer is being loaded with goods, and through when the goods have been unloaded from the trailer and it is empty.

A. If Carrier transports partial load shipments (also known as less-than-truckload, or LTL, shipments), Carrier shall conduct appropriate inspections and take necessary actions upon receiving the first shipment and each subsequent shipment to ensure that:

   i. the Equipment remains in safe and sanitary condition;
   ii. any Food Shipments will not be contaminated by any previously or subsequently loaded cargo; and
   iii. the temperature of any temperature-controlled Food Shipment will not be materially disrupted.

B. When required by and as specified in Shipper's instructions or Shipping Document, Carrier must ensure that the cold storage compartments are prepared for safely transporting the Food Shipments. Carrier must set temperature controls to pre-cool mechanically refrigerated cold storage compartments before offering equipment with auxiliary refrigeration units for transportation of Food Shipments requiring temperature control and set the operating temperature to ensure the Food Shipments at all times are maintained at the temperature set point or within the temperature range specified on the Shipper's instructions or Shipping Document.

C. Carrier will not utilize or tender trailers that have been used for transporting poison, refuse, garbage, trash, solid or liquid waste, or any other noxious product, of any kind whatsoever, whether hazardous or non-hazardous. If Carrier is unsure whether any prior cargo would disqualify the trailer, prior to accepting a load, Carrier shall advise HCS of any potentially hazardous or noxious product or material which has been previously hauled or stored on the trailer being used to transport the Food Shipment. HCS may approve or disqualify the trailer based on the information provided.

D. The trailer and all items used to transport the Goods, shall be clean, insect and rodent free, odor-free, dry, leak-proof, meet the food safety requirements in this Agreement, and otherwise be safe to transport the commodities tendered.

6. **Carrier's Food Safety Procedures**. Carrier acknowledges and agrees the temperature of the Goods is a material condition of this Agreement. Carrier shall develop and maintain written procedures related to the safe transport of Food Shipments tendered to it by HCS and shall train its drivers and staff regarding safe transport of Shipper's Goods.

7. **Recordkeeping**. Carrier shall maintain all documentation and records related to the transport of Food Shipments governed by this Agreement, including documentation of personnel training and Equipment cleanings, sanitization and inspections, and the safe and sanitary transport of Food Shipments, and shall make the records available to HCS and/or the Shipper upon request for any period within the Term of this Agreement.

   A. Carrier must provide temperature recorder readings upon request from HCS or Shipper.

   B. Carriers must provide a reefer download within twenty-four (24) hours of request from HCS or Shipper.

8. **Provision of Information**. Immediately upon request or as promptly as practicable thereafter, Carrier will provide HCS and/or Shipper:

   A. Evidence of the operating temperature of Food Shipments maintained during Services in the manner acceptable to HCS and/or Shipper;

   B. Documented written processes for maintaining food safety, including maintenance of temperature control, and cleaning, sanitizing, and inspecting Equipment;

   C. Evidence of transportation traceability, including information regarding:

      i. Previous cargo hauled in bulk or in other Equipment; and
      ii. Maintenance and intervening cleaning procedures for docks and Equipment.

   D. Appropriate training processes for each person under Carrier's supervision or control involved in providing Services; and

   E. Evidence that the Food Shipments have not been adulterated, as defined in the FD&C Act, 21 U.S.C. 342(a)(i)(4), and have been transported under sanitary conditions to protect the shipments against temperature abuse or excessive fluctuations and any physical, chemical, or microbial contamination.

9. **Liability Related to Food Shipments**

   A. Carrier agrees that Food Shipments which have been transported or offered for transport, pursuant to this Agreement, under conditions that are not in compliance with the written instructions or requirements set forth in the Shipping Document, including any seal, temperature, quality control standards, and delivery date requirements, will be considered "adulterated" within the meaning of the FD&C Act (21 U.S.C. 342(a)(i)(4), 342(i)). Carrier understands that adulterated shipments may be refused by the Shipper, customer, or receiver upon their tender for delivery at destination, with or without inspection.

   B. Carrier assumes liability for the result of breach of any of the requirements specified in this Agreement. Carrier agrees HCS is not responsible for, and shall in no way be held liable to, Carrier for Carrier's, or any Shipper's, customer's, receiver's or loader's obligations or their failure to adhere to their respective obligations under the laws and regulations governing the safe and sanitary transport of food for human consumption, including the Food Safety Laws referenced above in Section VII (2).

## VIII. Hazardous Materials

With respect to the transportation of hazardous materials requiring vehicle placarding under 49 C.F.R.  Part 181, Carrier agrees that the following provisions shall apply for all such shipments:

1. Carrier represents and warrants that it has obtained all necessary federal permits and registrations to transport hazardous materials or wasted in inter-provincial, interstate and/or intrastate commerce.  Upon request, Carrier shall provide HCS with a copy of all such federal and state permits and registrations.  Additionally, Carrier agrees to notify HCS immediately upon any revocation or suspension of Carrier's state of federal hazardous material permits or registration as well as the suspension or revocation of Carrier's "Satisfactory" Safety Fitness Rating issued by the U.S. Department of Transportation, which satisfactory rating is prerequisite to providing transportation for hazardous materials under this Agreement.

2. Carrier represents and warrants that all drivers used to transport hazardous material shipments have undergone the necessary training requirements of state and federal laws, including, but not limited to, the training requirements under 49 C.F.R. Part 126(F).  Carrier further warrants and certifies that all drivers used to transport hazardous material have the proper endorsements on their Commercial Driver's License to legally transport such shipments.  Carrier further agrees to comply with all federal, state and local laws regarding the transportation of hazardous material, including, but not limited to, the requirements specified under 49 C.F.R. Part 181, and 49 C.F.R. Part 397.

## IX.  RATES

1. **Rates**.  The Parties agree that the rates as between HCS and Carrier will be determined from time-to-time based on the market conditions then prevailing unless there is a separate contract existing between the Parties as to specific lanes.  The methodology for determining the applicable rate will be as follows:

   After a rate is agreed to by the Parties, HCS shall transmit by facsimile (or other electronic means) to the Carrier, a Rate Confirmation Sheet (or substantively similar document), which document will identify the shipment by:  DATE OF TENDER, ORIGIN, DESTINATION, COMMODITY, ESTIMATED WEIGHT, PICK-UP TIME AND DATE, DELIVERY TIME AND DATE, AND AGREED UPON RATE.

2. **Rate Confirmation Sheets**. Rate Confirmation Sheets shall be deemed to be an accepted amendment to this Agreement. Due to document storage considerations, the Rate Confirmation Sheet need not be attached to the original Agreement but may be kept with the shipping papers that are retained as to the individual shipment.  The same requirements of retention and availability of inspection of documents, that apply pursuant to this Agreement, shall apply to the Rate Confirmation Sheets.  If either Party disputes the accuracy of any amended rate, that Party shall notify the other Party within twenty-four (24) hours of receipt of the Rate Confirmation Sheet.  Upon notification, the disputed rate shall not become an amended rate until agreed to by both Parties.

3. **Mileage Calculations**. Unless otherwise specified in the applicable Rate Confirmation Sheet, the Parties hereby agree that, for the Term of this Agreement, all mileage for origin-to-destination combinations, for purposes of determining rates hereunder, will be calculated with Google Maps.  Any invoices not utilizing such calculations will be adjusted and paid by HCS based on its calculation using Google Maps.

## X. PICK-UP AND DELIVERY RECEIPTS

1. **Pick-Up Receipts**.  Each shipment received by Carrier will be evidenced by a bill of lading, signed by Carrier showing the quantity and description of Goods, together with any relevant shipping instructions, and to the extent the cargo is a Food Shipment designated as temperature-controlled, that the temperature of the Food Shipment is at the required temperature set point or within the temperature range according to the procedures set forth in this Agreement. Such form will be evidence of receipt of such Goods by Carrier in apparent good order and condition.  Carrier shall be responsible for providing immediate notice to HCS of any alleged exception to, or defect, damage, or shortage of the Goods prior to Carrier movement of it.  In the event the Carrier deems the Goods not being of good order and condition or loaded improperly, the Carrier shall notify HCS before signing the Bill of Lading (BOL) accepting the Goods from the shipper.  Upon acceptance of the shipment, Carrier shall assume liability for the Goods until proper delivery is made and may not thereafter allege that any injury which Carrier sustained in the course of transportation was due to such insufficient crating, boxing, packing or loading.  Carrier shall ensure the Goods are adequately secured in adherence with FMCSA 49 §392.9(a)(1) and 49 §393.104 with exception to Shipper Load & Count (SL&C) by shipper as cited with 49 §392.9(b)(4).  In the event of any inconsistency between the terms and condition of any individual bill of lading and this Agreement, the terms and conditions of this Agreement shall prevail.

2. **Delivery Receipts**.  Upon delivery of each shipment, Carrier will obtain a written delivery receipt, signed by an authorized agent of the receiving customer confirming 1) the time of delivery of Goods from the point of loading to the point of unloading, and 2) that the freight was received in good condition and without exception, or with documentation of any damages, shortages and/or overages.   Carrier will provide HCS upon request, within twenty-four (24) hours, copies of all such delivery receipts where damages, shortages, or overages occur.

3. **Period of Carrier Responsibility**.  Carrier's duties and responsibilities under this Agreement will commence when Carrier takes possession and control of Shippers' property or upon execution of a bill of lading or receipt by Carrier, whichever occurs first, and will not end until the shipment is properly delivered to the customer named in the bill of lading.

## XI. INVOICING AND PAYMENT

1. **Invoicing.** Carrier agrees to conduct all billing services to HCS for payment owed to them, as mutually agreed in writing, by fax, or by electronic means, contained in Carrier's Load Confirmation Sheet(s)/dispatch sheets incorporated herein by this reference. Any such additional, modified, amended rates, or changes in rates shall automatically be incorporated herein by this reference.

2. **Responsible Party**. Carrier agrees that it shall look solely to HCS for payment of any Service, and shall not look to, or make any demand upon, Shipper (other than when HCS is the Shipper), or any third-party, for any such payment.

3. **Compensation**.

   A. Carrier will submit to HCS an invoice for freight charges along with proof of delivery, and HCS shall pay each invoice within thirty (30) days from the date of the invoice. HCS will be under no obligation to accept or pay any invoices received after one hundred eighty (180) days from the date of shipment delivery, and Carrier hereby releases HCS from any and all responsibility for such amounts.

B. For any compensation premised upon mileage, the applicable mileage used to calculate such compensation shall be determined through the use of Google Maps unless the calculation of mileage is otherwise specified on the Rate Confirmation Sheet (or substantively similar document).

C. **No Lien.** Carrier shall not obtain title to, or any other rights to, the Goods, and hereby waives any rights to any lien now or hereafter created by any law or regulation. Further, Carrier will not withhold the Goods from delivery on account of any dispute as to the rates, or any alleged failure of HCS to pay charges incurred under this Agreement.

D. HCS shall have the right to offset compensation or other charges owed to Carrier against any amounts owed by Carrier pursuant to this Agreement.

E. Accessorials and Fees are listed in **Appendix A** of this Agreement.

F. **Offsets.** In the event that the cargo being transported by Carrier is damaged through the actions or negligence of the Carrier, triggering the indemnification provisions of this Agreement, HCS reserves the right to offset and withhold any payments or fees provided for in the Rate Confirmation from Carrier in an amount equal to the value of the damaged Cargo. In the event that the offset of the payment for damaged cargo is insufficient to fully and completely indemnify HCS, a customer or shipper of the HCS, then HCS may offset and withhold payments for other shipments that may be subject to this Carrier Agreement, whether or not such freight of shipment is on behalf of the same customer or shipper.

G. **Undercharge or Overcharge**. The time limit for filing overcharge or undercharge claims shall be ninety (90) days from the date such Goods are delivered and shall be processed in accordance with 49 CFR 378 or any successor provision thereto. Any civil action to recover freight charges, overcharges or undercharges related to the Services, must be commenced within nine (9) months from the date of delivery of the applicable Goods.

4. **Audits**. Upon reasonable request, Carrier shall make available to HCS, or its designee, for audit purposes, its books and records pertaining to the Services provided under this Agreement and the charges related thereto. Such records include copies of all freight bills, invoices, receipts and other documents related to the Services provided. Carrier will retain all bills of lading and delivery receipts for a period of no less than three (3) years from the latter of the date of delivery, or creation of the record.

5. **Civil Action for Non-Payment**. Any civil action for alleged nonpayment for Carrier services hereunder must be commenced within one year of date of delivery or scheduled date of delivery whichever is earlier in order to avoid being permanently barred.

## XII. CARGO LOSS AND DAMAGE

1. **Basis for Liability.**

A. Carrier shall be solely responsible for the loading, securing, and unloading of Goods upon Equipment, and if performed by Shipper, it shall be under the direct authority and control of Carrier or its representatives. To the extent the cargo is a Food Shipment designated as temperature-controlled, Carrier shall also ensure that the Food Shipment is at the set point or within the temperature range specified on the Shipping Document. If Carrier requests, but is not allowed to observe the loading process, Carrier must immediately notify HCS and indicate in writing "Shipper Load and Count" or "SLC" on the pick-up receipt.

B. Carrier will have the sole and exclusive care, custody, and control of the Goods from the time they are tendered to Carrier for transportation until delivery to the customer accompanied by the appropriate receipts as specified in this Agreement. Carrier, whether acting in the capacity of a broker, carrier, or otherwise, assumes the liability of a common carrier (i.e., Carmack Amendment liability as set forth under 49 U.S.C. 14706) for loss, delay, damage to, or destruction to any and all of the Goods.

C. Carrier shall be liable to HCS and Shipper for the loss, damage, injury, theft, or delay of the Goods occurring while in the custody, possession, or control of Carrier or Carrier's for-hire personnel providing unloading service or resulting from Carrier's performance of or failure to perform the Services provided for in this Agreement. Carrier shall immediately notify HCS of any loss, damage, or delay to the Goods with regard to any shipment, including but not limited to accident, spill, theft, or discrepancies.

D. Carrier shall also immediately notify HCS of any variance in trailer temperature, excluding normal defrost cycling, for any period in excess of one (1) hour from refrigeration. Temperature for Food Shipments is a material aspect of this Agreement, and Food Shipments must be within the ranges specified in the written instructions and/or Shipping Documents when Carrier delivers such Goods to the customer or receiver, or it may be rejected as adulterated and/or damaged at customer's or receiver's sole discretion, regardless of any other measure of quality including, but not limited to, USDA inspections.

E. If the Goods are lost, damaged or destroyed, Carrier will be liable for, and will pay to HCS, the actual invoice price charged for the kind and quantity of the Goods lost, damaged or destroyed, and, in addition, all freight charges, taxes, fees, disposal, and other charges of any kind or nature which HCS may incur with respect to such Goods. Notwithstanding the above, Carrier's liability to HCS for any loss or damage will not exceed $100,000.00 per shipment unless agreed to in writing prior to Carrier accepting shipment. Carrier agrees that no additional released rates or other liability limitations will apply except as specified herein.

2. **Rejected Shipments**. Carrier shall immediately notify HCS upon any customer rejection of any shipment, and provide to HCS any documentation from customer, including photographs of rejected goods. If any customer rejects any Shipment, or if HCS advises or instructs Carrier to stop movement of the Shipment and hold it in transit, HCS shall instruct Carrier to either 1) have the shipment placed in public storage, 2) have the Shipment returned to the point of origin, or 3) have the Shipment returned to some other point of destination designated by Shipper or HCS, at a rate to be agreed to by the Parties.

3. **Replacement Shipments**. Carrier acknowledges that HCS may utilize other carriers to facilitate the movement of delayed shipments, or to ship replacement Goods. HCS agrees that Carrier will first be afforded a reasonable opportunity to complete the movement in a timely manner. In the event Carrier is unable to facilitate the movement, Carrier will be responsible for reasonable and necessary expenses incurred by HCS for arranging alternative service to facilitate movement of the shipment.

## XIII. DETERMINATION OF DAMAGE, SALVAGEABILITY

Failure to comply with all provisions set forth in this Agreement, including all attachments, or any written instructions may result in a determination by HCS or Shipper, in their respective discretion that the Goods are damaged or unsafe and if such a determination is made by HCS or Shipper, Carrier shall not sell or otherwise dispose of the Goods.

Carrier Agreement

1. The determination regarding the acceptability, salvageability and/or the adulterated status of Food Shipments transported by Carrier shall be within the sole discretion of Shipper or HCS and shall be binding on Carrier. Carrier accepts and agrees that it will be required to pay for the actual invoice value of adulterated or damaged Food Shipments, plus all freight, taxes, fees, disposal, and other charges of any kind or nature which HCS may incur with respect to such Food Shipment, less any salvage if the goods are not destroyed, notwithstanding any other measure of quality, including but not limited to USDA inspection.

2. HCS shall provide Carrier mitigation options for rejected goods if 1) Goods are not damaged to the point preventing any type of salvageability. 2) salvaging the Goods would not be placing HCS in violation of Food Safety statutes. 3) salvaging the Goods would not cause damage to HCS in any way. 4) Carrier agrees to hold HCS harmless from notations or comments derogatory to the reason the Goods were rejected. 5) To the fullest extent allowed by law, Carrier will defend, indemnify and hold harmless HCS, and its officers, directors, members, agents, customers, and employees from and against all loss, liability, damage, claim, fine, cost, or expense, including reasonable attorney fees, resulting from attempting to salvage the rejected Goods.

3. The determination regarding the salvageability of any damaged Goods (other than Food Shipments) shall be determined by Shipper, and Carrier shall be liable for all costs and expenses associated with Shipper's mitigation of damages including any inspection; storage; preparation of the Goods for reshipping; and the reshipping, if applicable.

4. No salvage of any kind or nature will be sold or offered for sale or in any way disposed of to any third party by Carrier without the prior written consent of HCS. Unless HCS directs otherwise, all damaged Goods subject to salvage will be returned to Shipper, at Carrier's sole cost and expense, for salvage and appropriate credit. Shipper may determine, in its sole discretion, whether the Goods may be salvaged and, if salvageable, the value of such salvage. Any salvage value will be deducted from Shipper's claim against Carrier for the loss or damage. With respect to the handling of any damaged Goods, Carrier agrees that Shipper will have the sole right to dispose of or destroy such Goods. For any damaged Goods which Shipper permits Carrier to resell, Shipper will have the right to remove all identifying marks and labels on such Goods.

5. Claims based on concealed loss/damage reported to Carrier by HCS within five (5) business days of the date of delivery will be treated as though an exception notation had been made on the delivery receipt at the time of delivery.

6. HCS will provide Carrier with an inspection notification form with pertinent information regarding the damage and the location where the Goods may be inspected, if so desired by Carrier and permitted by Shipper. If inspection of the Goods is permitted by the Shipper, it is the obligation of Carrier to properly inspect the Goods upon the discovery of damage. In the event Carrier fails to inspect the Goods within five (5) business days of the date Carrier becomes aware of the damage, or upon receipt of the Goods to be returned to the consignor because of the damage, whichever is earlier, Carrier hereby waives its rights to inspect the Goods and agrees to be bound by the facts presented by the claimant.

7. If Carrier is unable to deliver a shipment or if a shipment is refused by the customer, Carrier's liability as a warehouseman, rather than a contract carrier pursuant to the terms of this Agreement, will begin after seven (7) days of the Goods being placed in Carrier's terminal or other storage facility under proper security and storage conditions.

## XIV. THE CLAIMS MANAGEMENT PROCESS

Carrier agrees that the provisions contained in 49 CFR Part 370, shall govern the processing of claims for loss, damage, injury, theft, or delay to Goods and the processing of salvage. Any claim made by HCS against Carrier for loss, damage, injury, theft, or delay to the Goods will be handled in the following manner:

1. HCS shall notify Carrier as soon as possible once HCS discovers a possible cargo loss, damage, injury, theft, or delay claim. The Parties agree that HCS will have nine (9) months after delivery of such shipment (or, if no delivery, by nine (9) months after the scheduled delivery date), to file a written claim for such loss, damage, injury, theft, or delay to the Goods. The term "**written claim**" means delivering a written claim or notice of claim, which reasonably alerts Carrier, that loss, damage, injury, theft, or delay has occurred to the Goods.

   A. Carrier must acknowledge the receipt of a written notice of a claim as promptly as possible, but in no event later than thirty (30) days after the date of Carrier's receipt of HCS's written claim, Carrier will notify HCS what, if any, additional documentary evidence or other pertinent information may be required by Carrier to process the claim.

   B. Notwithstanding the terms of 49 CFR 370.9, Carrier shall pay, decline, or make a settlement offer in writing on all cargo loss or damage claims within 120 days of receipt of the claim. ***Failure of Carrier to pay, decline, or offer settlement within this 120-day period shall be deemed an admission by Carrier of full liability for the amount claimed and a material breach of this Agreement***.

2. Any action at law to recover any portion of a cargo claim shall be instituted by HCS against Carrier no later than two (2) years after Carrier has delivered written declination of claim to HCS. If HCS prevails in litigation against Carrier for recovery of a claim, HCS will be entitled to recover all of its actual costs and expenses, including reasonable attorney fees, court costs, and interest.

3. There shall be an administration fee on cargo claims as outlined in Appendix A (*Accessorial and Miscellaneous Charges*) of this Agreement.

## XV. INSURANCE AND INDEMNIFICATION FOR CARRIER

1. **Insurance Requirements of Carriers**.

   A. Carrier agrees to provide and maintain any insurance coverages required by any government body for the types of transportation and related Services pursuant to this Agreement. All insurance required by this Agreement must be written by an insurance company having a Best's rating of "A-" VII or better and must be authorized to do business under the laws of the state(s) or province(s) in which Carrier provides the transportation and related services as specified in load confirmation communications received from HCS. Carrier's insurance shall be primary and required to respond and pay prior to any other available coverage. Carrier agrees that Carrier, Carrier's insurer(s), and anyone claiming by, through or under Carrier shall have no claim, right of action, or right of subrogation against HCS, its affiliates, or its Customer based on any loss or liability insured under the insurance stipulated herein. Carrier represents and warrants that it will continuously fulfill the requirements of this Section throughout the duration of this Agreement. Nothing in this Agreement shall be construed to avoid Carrier's liability due to any exclusion or deductible in an insurance policy. HCS shall be notified in writing by Carrier's insurance company at least thirty (30) days prior to the cancellation, change or non-renewal of the submitted insurance policies. Carrier shall at all times during the term of this agreement have and maintain in full force and effect, at its

expense:

i. **Motor Truck Cargo** Insurance or a superior equivalent covering all risks of loss, damage, or delay to goods in transit, with a minimum limit amount no less than US$100,000.00 and a deductible no greater than US$2,500 per trailer, container, or vehicle, including a loss payable clause for HCS as its interests may appear and at least the same coverage limit and deductible per shipment while in storage in a trailer, container, at a storage facility, at a facility being used as a storage facility, or enroute to the consignee. Such insurance shall contain no exclusion or limitation likely to render coverage for operations hereunder inapplicable including, but not limited to; refrigerator unit malfunction (including failure to fuel refrigerator unit), unattached vehicle, or unattended vehicle, transportation of food product, infidelity, theft, or other criminal act of Carrier's employees.

ii. **Business Automobile Liability Insurance with Contractual Liability Insurance** covering all owned, leased, hired and non-owned vehicles and specifically endorsed to cover the indemnity provisions listed herein between Parties, with limits of liability not less than $1,000,000.00 for bodily injury and property damage per occurrence and without aggregate limits.

iii. **Commercial General Liability with Contractual Liability Insurance** specifically endorsed to cover the indemnity provisions listed herein between Parties, with limits of liability of not less than $1,000,000.00 per occurrence.

iv. **Worker's Compensation insurance** in the amounts required by statute, and Employer's Liability insurance with limits not less than US$500,000 per occurrence, per person. When Carrier performs Services that involve origins and destinations solely within Canada, Carrier shall be current in its remittances to the appropriate Worker's Compensation Board of the Carrier's province, shall provide a certificate issued by the appropriate Worker's Compensation Board of the Carrier's province certifying that the Carrier is not delinquent and is current in its remittances to that authority, and shall have such other insurance or higher coverage limits required by applicable Canadian national or provincial law or regulation. Insurance will meet or exceed the requirements of federal, state and/or Provincial regulatory bodies having jurisdiction over Carrier's performances pursuant to this agreement. Carrier will hold harmless and indemnify HCS for any claim for insurance premium or any claim by any employee of the Carrier for injuries sustained in the ordinary course of business, including, but not limited to, drivers, lumpers, helpers, agents or sub-contractors of Carrier.

v. **Hazardous Materials.** If Carrier provides Transportation Services for hazardous materials under United States Department of Transportation ("DOT") regulations, public insurance including Commercial Automobile insurance limits required for the commodity transported under 49 C.F.R § 387.7 and 387.9 (or successor regulations thereto) and statutory required Commercial Automobile insurance limits pertaining to the hazard classification of the cargo as defined by DOT, an MCS-90 and Broadened Pollution Liability endorsements for limits required by law and full policy limits. Carrier shall procure and maintain, at its sole cost and expense, public liability and property damage insurance with a reputable and financially responsible insurance company insuring Carrier in an amount not less than US$2,000,000 per occurrence. Such insurance policy shall name HCS and Carrier as insureds with respect to any and all liabilities for personal injuries (including death) and property damage, including environmental damage due to the release of a hazardous material or waste, arising out of the ownership, maintenance, use or operation, including loading and unloading, of the equipment operated by Carrier under this Agreement.

    vi.   Any other insurance required by any Legal Requirements.

    vii.   Carrier shall, prior to providing transportation and related services pursuant to this Agreement, name HCS, as a certificate holder, as required on the foregoing insurance policies and shall cause its insurance company to issue a certificate to HCS, evidencing the foregoing.

B.   Carrier will provide certificates of insurance evidencing the insurance coverage required under this Agreement.

C.   Carrier shall be responsible to ensure all insurance coverage required.

D.   Pursuant to this Agreement, the insurance policies required hereunder and any replacement policies will insure the interests of HCS, cover all drivers, equipment and cargo used in providing Services, and not contain any exclusions or restrictions as to designated premises or project, pertaining to unattended equipment or cargo, for unscheduled equipment, for unscheduled drivers or cargo, for fraud or infidelity, for tarp warranty, for wetness or dampness, for geographical location in the United States, for trailers unattached to the power unit, or for a particular radius of operation.

2.   **Indemnification**.  To the fullest extent allowed by law, Carrier will defend, indemnify and hold harmless HCS, and its officers, directors, members, agents, customers,  and employees from and against all loss, liability, damage, claim, fine, cost, or expense, including all costs of defense as they accrue, including, but not limited to legal costs, arising out of claims by third parties and, directly or indirectly, arising from Carrier's performance of, or failure to perform any Service under this Agreement, or in any way related to performance or breach of this Agreement by Carrier, its employees, subcontractors or independent contractors (collectively, "**Claims**"), including, but not limited to, claims for or related to personal injury (including death) and property damage related in any way to Carrier's possession, use, maintenance, custody or operation of the Equipment or provision of Services; provided, however, that Carrier's indemnification obligations under this paragraph will not apply to any portion of such claims caused by or resulting from the negligence or other wrongful conduct of HCS.  Any offset and withholding of payment by HCS from Carrier pursuant to this Agreement shall, in no way be deemed or construed to release the Carrier from any liability from any personal injury, bodily harm, or other damages that may have resulted from any incident, accident, or event that caused the damage to the Cargo, and all provisions of this Agreement  shall remain in full force and effect. The Parties agree that Carrier's indemnification obligations will survive the termination of this Agreement.

## XVI.  MISCELLANEOUS

1.   **Survival**.  This Agreement is binding on and for the benefit of both Parties and their respective successors and assigns. Upon termination of this Agreement, all obligations will remain in effect after such termination.

2.   **Confidentiality**.  Neither Party may disclose the terms of this Agreement to a third party without the written consent of the other Party except 1) as required by regulation or law; 2) disclosure is made to a parent, affiliate, subsidiary or related entity; 3) to facilitate rating or auditing of transportation charges by an authorized agent, and such agent agrees to be subject to the terms of this Confidentiality clause.  Further, Carrier will not use HCS's name or identity on any promotional or advertising communications without HCS's written authorization.

3.   **Non-compete**.  Carrier shall not solicit, accept, or arrange for the transportation of goods from

any customer of HCS where 1) the availability of such customer or opportunity of transportation of goods became known to Carrier as a result of HCS's efforts, or as a result of Services performed under this Agreement; or, 2) the goods were first tendered to Carrier by HCS.

If Carrier breaches this Agreement and directly or indirectly solicits freight, accepts freight from, or arranges for the transportation of freight from customers of HCS, or obtains freight from such customer during the term of this Agreement or for twelve (12) months thereafter, Carrier agrees to pay HCS commission, in the amount of fifteen percent (15%) of the transportation revenue resulting from freight transported for the customer, for a period of fifteen (15) month after first obtaining such freight.

4. **Force Majeure**.  Neither Party will be liable to the other for failing to perform or discharge any obligation under this Agreement where such failure is caused by acts of God, labor disorders, fire or other casualty, closing of the public highways, governmental interference, war, riot, act of terrorism, and other causes beyond the affected Party's control. In such case, both Parties will make every commercially reasonable effort to remedy or cure such event as soon as practically possible.

5. **Governing Law and Venue**.  This Agreement will be governed by and construed in accordance with the laws of the State of Arkansas, regardless of its conflict of law provisions, and the Parties hereby submit to the jurisdiction and venue of the state and federal courts in and for Washington County, Arkansas for all disputes related to or arising out of this Agreement.

6. **Non-Waiver**.  The failure of either Party at any time to timely enforce any provision of this Agreement, or to exercise any option provided, or to require performance of any provision, shall in no way be construed to be a waiver of any such provision, nor in any way to affect the validity of this Agreement, nor to affect such Party's right thereafter to enforce each and every provision of this Agreement.  However, a Party may waive a term of this Agreement by a written instrument signed by the Party that would have been able to require compliance.

7. **Severability**.  If any phrase, sentence, clause, or other provision contained in this Agreement violates any applicable ordinance, rule, law, or statute, such phrase, sentence, clause, or other provision will be ineffective to the extent of such violations without invalidating any other provision of this Agreement.

8. **Non-exclusive Agreement**.  Neither Party intends to give the other Party any exclusive rights or privileges under this Agreement, and both Parties agree that HCS will be free to use the services of other carriers, and Carrier will be free to accept and transport freight for other parties, subject to the non-compete provision stated herein.

9. **Electronic Data Interchange**.  Shipping instructions, delivery receipts, bills of lading, manifest logs, claims and any other shipping documentation may be transmitted by Electronic Data Interchange ("**EDI**") in such format as may be agreed to by the Parties.  Such records will be retained by Carrier for a period of three (3) years from the date of shipment, or two (2) years after final resolution of a disputed or unsettled claim, whichever is later, or for such greater time period as may be required by Legal Requirements.  Upon written request, said records will be made available to HCS.  It is stipulated that records maintained in the manner provided herein will be admissible for all purposes in the event of a dispute or litigation.

10. **Entire Agreement**.  This Agreement represents the entire agreement and understanding of the Parties with regard to its subject matter. No prior understandings or agreements by the Parties, whether written or oral, nor any documents not specifically incorporated into this

Agreement, nor any course of conduct of the Parties before or after the Effective Date of this Agreement, shall have the effect of modifying the Parties' rights and obligation under this Agreement in any way. This Agreement cannot be amended unless in writing and agreed to by both Parties.

**11. Counterparts.** This Agreement may be executed in counterparts, each of which will be an original and all of which will together constitute one and the same instrument.

**12. Captions**. The captions and headings set forth in this Agreement are for convenience only. They shall not be considered a part of this Agreement, nor affect in any way the meaning of its term and conditions.

**13. Construction**. Each Party has reviewed this Agreement and had the opportunity to consult with counsel. They have ascertained and weighed all the facts and circumstances likely to influence their judgment herein, they have given due consideration to the provisions contained herein, and they thoroughly understand and consent to all provisions hereof; and, accordingly, the rule of construction to the effect any ambiguities are to be resolved against the drafting party will not be employed in any interpretation of this Agreement.

**14. Notice.** Unless the PARTIES notify each other in writing of a change of address, any and all notices required or permitted to be given under this Agreement shall be in writing (certified or registered mail or email with confirmed receipt) and shall be addressed as follows.

H. C. Schmieding Produce Company LLC (HCS)           _____

                                                 (Carrier)

Attn: Carrier Relations Department        Attn: _____

Address: PO Box 369                 Address: _____

              Springdale, AR 72765-0369    _____

Email: trucks@schmieding.com         Email: _____

    IN WITNESS WHEROF, the Parties have caused this Agreement to be executed by their duly authorized representative as of the Effective Date.

_____      H.C. Schmieding Produce Company, LLC

             Carrier Name                            (HCS)

_____      _____

            Signature                                Signature

_____      _____

     Representative Printed Name

_____      _____

               Title

_____      _____

               Date                                  Date

APPENDIX A
# ACCESSORIAL and MISCELLANEOUS CHARGES

## I.  SCHMIEDING TRANSPORTATION ACCESSORIAL LIST

**A.  Detention**

Carrier must be on time to qualify for detention.  Carrier will be considered late if driver is one minute late for an appointment.
2 Free Hours on pallet loads.
4 Free Hours on floor loads.
$5 for each 15 minutes after free period expires.
$20 for each hour for maximum of 10 hours.
After 10-hour delay 1-day layover paid of $200.

**B.  TONU**

$2.50 per mile charge from the last destination to the original designated pickup, subject to a maximum charge of $250, shall apply. No charge shall apply to loads cancelled Eight (8) hours prior to scheduled pickup.

**C.  Layover**

$200 for 24 hours.

**D.  Hazardous Materials**

An additional charge amount of $.15 cents per mile with a minimum of $100 over the applicable linehaul rate shall apply for any loads placarded or non-placarded specified by DOT regulations as hazardous.

**E.  Diversion**

Non-Carrier related Diversions shall be calculated as follows:
$35 extra stop
Rates for additional miles for a diversion shall be the same rate per mile as agreed upon for the original load rate per mile.
All other applicable accessorials will apply.

**F.  Reconsignment**

Non-Carrier related Reconsignments shall be calculated as follows:
$35 extra stop if applicable.
Rates shall be negotiated.
All other applicable accessorials will apply.

**G.  Redelivery**

Non-Carrier related Redeliveries shall be calculated as follows:
$35 extra stop
Rates shall be negotiated.
All other applicable accessorials will apply.

**H.** **Extra Stops**

$35 per stop for each additional stop in transit.

**I.** **Tarping Flatbed Loads**

$75 shall apply per shipment.


## II. SCHMIEDING TRANSPORTATION FEES

**A.** **Comchecks**

The following fees for receiving comchecks are deducted automatically from the carrier rate:

$5.00 fee for load related comchecks such as lumpers, pallets, late fees, and scales.

$20.00 fee for non-load related comchecks between the amounts of $1.00 - $500.00.

$25.00 fee for non-load related comchecks between the amounts of $501.00 - $1000.00.

No more than $1,000.00 in a single day shall be issued.

No more than 40% of the rate amount shall be advanced on any one load for any reason.

No comchecks, including fuel advances, shall be issued to a carrier on their first load being transported for HCS.

Comcheck fees are not reimbursable without written approval by HCS management.

Carrier freight rate pay advances shall not be allowed.

**B.** **GPS Tracking**

$250 to $500 fee which shall be deducted from the Carrier's freight rate settlement for noncompliance specified in this Agreement. Fine amount shall be determined within load comments on the Rate Confirmation.

**C.** **Reefer Downloads**

$500 fee for failure to provide a reefer download as per this agreement shall be deducted from the Carrier's freight rate.

**D.** **Late Fee**

$250 minimum fee for each missed appointment each day unless stated otherwise in load comments on the Rate Confirmation provided to Carriers by HCS.

**D.** **Claims Administration Fees**

$20.00 fee = $0 to $249.00 claim amount

$50.00 fee = $250.00 to $499.00 claim amount

$100.00 fee = $500.00 to $999.00 claim amount

$150.00 fee = $1,000.00 to $1,499.00 claim amount

$200.00 fee = $15,000.00 or greater claim amount

# Exhibit 3



# Carrier Load Tender

| | |
|---|---|
| **Reference:** LD134110 ( Load ID ) | **Carrier:** BUKHARA TRANS INC ( 18160 )     **Tender:** 10/10/2022 07:09 |
| Origin: | **LINEAGE 2357 S WOOD ST  CHICAGO, IL 60608** <br> phone: fax: email: |
| Pickup: | **Appointment:** 10/11/2022 10:00AM - 10/11/2022 10:00AM |
| Destination: | **BNCC Sysco Knoxville, LLC 900 Tennessee Avenue  Knoxville, TN 37921** <br> phone:  fax:  email: |
| Delivery: | **Appointment:** 10/12/2022 10:00AM - 10/12/2022 10:00AM |
| Bill To: | **H.C. Schmieding Produce Company, LLC P.O. Box 369  Springdale, AR 72765** <br> Accounts Payable phone: 479-751-0515 fax: 479-751-6831 email: AP@schmieding.com |

## Comments
**Contact Information: Jesenia Ruiz**

## Equipment
**Reefer 53' (R)**

## Items

| Item ID | HM | Description | Weight | Class | NMFC | Dimensions |
|---|---|---|---|---|---|---|
| Item Number | | Item Description | 32277.0 | 0.0 | | |

## Stop 1 (pickup)

**Appointment:** 10/11/2022 10:00AM - 10/11/2022 10:00AM
door 46

PO#06543610 - CALUMET
PO#06558960 - JASPER
PO#06459640 - TRADEX
PO#06543650 - DEVI
PO#06543680 - FW BRYCE
PO#06543710 - PIAZZA&SON
PO#06543720 - SUNNYVALE
PO#06543480 - BSCC
PREFER
PO#06543690 - MILMAR
PO#06543700 - OGGI
PO#06543670 - FGF BRANDS
PO#06543660 - EASTERN

| | | |
|---|---|---|
| LINEAGE, 2357 S WOOD ST, CHICAGO, IL 60608 | | |
| SN147983 (Shipment ID) | 32,277 lb | 2292.0 CAS |

**Stop 2 (drop)**

| |
|---|
| Appointment: 10/12/2022 10:00AM - 10/12/2022 10:00AM |
| 32886 |
| **LUMPER IS PREPAID LOGISTICS/DO NOT PAY/WILL NOT REIMBURSED/DRIVER TO TRACK IN FOUR KITES OR FINED $500 & NOT ELEGIBLE FOR DETENTION |

| |
|---|
| BNCC Sysco Knoxville, LLC, 900 Tennessee Avenue, Knoxville, TN 37921 |

| SN147983 (Shipment ID) | 32,277 lb | 2292.0 CAS |
|---|---|---|
| | | |

**Freight Terms**

**Charge Details**

| Description | Rate | | Quantity | Charge |
|---|---|---|---|---|
| Quoted Amount | 2525.0 | Flat Charge | | $2525.0 |
| | | | Total: | $2525.0 |

Freight Terms: 2525.0, Third Party (32277.0 lb) (543.97 miles)

**References**

| Reference Type | Reference Value |
|---|---|
| Commodity | baking |
| Temperature Range | FROZEN: PRECOOL ZERO, FOLLOW BOL FOR TRANSIT, FRZN |

*PROOF OF DELIVERY (POD) & LUMPER RECEIPTS ARE REQUIRED WITHIN 48 HOURS
TO AP@SCHMIEDING.COM
*ACCEPTANCE AND LOADING OF THIS ORDER CONSTITUTES AGREEMENT SET FORTH ON THIS RATE CONFIRMATION
*LUMPER, PALLETS, OS&D MUST BE REPORTED AT TIME OF OCCURRENCE. FAILURE TO COMPLY WILL RESULT IN NON-PAYMENT
*DRIVER IS RESPONSIBLE TO VERIFY LOAD IS BLOCKED, BRACED AND SECURE AS PER DOT SAFETY REGULATIONS BEFORE LEAVING SHIPPER.
*DRIVER IS RESPONSIBLE TO ENSURE PROPER BLOCKING AND BRACING AS PER DOT SAFETY REGULATIONS BEFORE LEAVING EACH STOP ON MULTI STOP LOADS.
*DRIVER IS RESPONSIBLE TO VERIFY PRODUCT COUNT AT SHIPPERS AND EACH STOP ON MULTI STOP LOADS.
*DRIVER IS RESPONSIBLE TO NOTIFY SCHMIEDING BY EMAIL OR CALL BEFORE LEAVING SHIPPER IF NOT ALLOWED ON SHIPPER DOCK TO VERIFY PRODUCT COUNT.
*REFRIGERATED TRAILERS MUST BE ABLE TO PROVIDE DOWNLOAD THROUGHOUT LOAD TRANSIT
*MARKET FEES AND ALL SURCHARGES ARE INCLUDED IN RATE.
*PRODUCE LOADS ARE PAID ON DELIVERED WEIGHT OF BULK OR BAG/BOX COUNT. DRIVER IS RESPONSIBLE FOR CHECKING DELIVERED WEIGHT AND REPORTING ANY DISCREPANCY
*CARRIERS ARE RESPONSIBLE FOR ANY CARGO CLAIMS
*DRIVERS MAY REQUEST TO INSPECT PRODUCE AT SHIPPER AND MUST NOTIFY SCHMIEDING WHILE ON SITE
*CARRIER IS RESPONSIBLE FOR LATE DELIVERY FEES AND ANY CLAIMS ASSOCIATED WITH LATE DELIVERY
*CARRIER IS REQUIRED TO CONTACT SCHMIEDING IN THE EVENT THE TEMP ON THE BOL IS DIFFERENT FROM THE RATE CONFIRMATION
*BROKERS ARE NOT ALLOWED ON ANY LOGISTICS LOAD AND ONLY ON PRODUCE LOADS
*IF YOU ARE SIGNED UP FOR QUICK PAY, PLEASE SEND ALL INVOICES TO QUICKPAY@SCHMIEDING.COM

# Exhibit 4

BILL OF LADING     Order # : 4-264146
                                            08:55AM

# Lineage Logistics PFS, LLC

2357 South Wood St  Chicago, IL 60608 • PHONE: (773) 268-3400
FAX: (773) 268-3401  EMAIL: d3orders@lineagelogistics.com

Page    1 of    2

**FROM ACCOUNT OF:** SYSCOC
SYSCO MERCHANDISING SERVICES
1390 CORPORATION
Houston, TX
77077

**CONSIGNED TO:** Manual
BNCC SYSCO KNOXVILLE  LLC
900 TENNESSEE AVENUE
KNOXVILLE, TN
379212630

4-264146

Order Date     : 10.06.22
Cust. Ord. Num : WS0107
P.O. Number    : 06558960

Shipped Date : 10.11.22
Freight Term : COLLECT
Carrier : SCHMIEDING 10:00 10.11.22

LOT Code             Description                                  Unit Wgt.
(ITEM Code)   Units SKU        Pallets in _O_  Pallets out _22_ *total spots*

*Frozen product loaded on Dry VAN. Product is not usable. Product is ruined.*

```
*********** Order MESSAGE ************
*                *RECORD TEMPS*       *
*   NOSE  39   MIDDLE 37   TAIL  50    *
*                                      *
*      **NUMBER OF PALLETS SHIPPED**   *
*                                      *
*  _____ # of CHEP     _____ # of WHITE  *
*                                      *
* SEAL #   01581513                    *
*                                      *
* MUST BE KEPT AT 0 DEGREES            *
* PERISHABLE PRODUCT MAINTAIN AT PROPER*
* TEMPERATURE                          *
*                                      *
*                                      *
*                                      *
****************************************
```

SHIPPER : 199000 - JASPER WYMAN & SONS
=====================================
D3247033     55 CS     2527653 IQF CRANBERRY WHOLE 2/5        12.00
                             02.11.24

(Item : 2527653)
00967398D3
                1-I106A     0      1-STAGE    55 CS
-----------------------------------------------
D3247033     35 CS     2527653 IQF CRANBERRY WHOLE 2/5        12.00
                             02.11.24

(Item : 2527653)
00967405D3
                1-J060A     0      1-STAGE    35 CS

SYSCOC-264146

"IMPORTANT: THIS IS PERISHABLE PRODUCT MAINTAIN PROPER TEMPERATURE

REC'D BY

Lineage Logistics PFS, LLC

SHIPPED BY

0001

# Exhibit 5

| Sysco Location | Date |
|---|---|
| Sysco Knoxville | 10/12/2022 |

## Temperature NUOCA

Initiate when one of the Food Safety Monitoring Techniques have exceeded its Critical Limit and the three follow-up product surface temperatures warrant further investigation.

📺 A NO Requires a Photo
🌡 Requires a Temp

| Is the Time/Temperature Device (if present) alarmed? | YES | NO | N/A ✓ | Serial Number: No TTR |
|---|---|---|---|---|
| ✱ Saving the device is recommended | | | | |

PO Number(s): 06560950, 06543480, 06543610, 06459640, 06543650, 06543820, 06543710, 06543720, 06543730

Hazard Code(s): H S 00 , H ⊞ ⊞    H S 001 and H S 007 3

Temperature Critical Limit: 15F

Product Description: IQF Fruit, Frozen Seafood, Frozen dough, Frozen burger patties, Frozen ground pork

Supplier Name & Address: Jasper Wyman & Son, BSCC Lineage Logistics; Calumet Diversified Meats; Baugh SE RDC, Devi Seafood, FW Bryce Inc, Paul Piazza & Sons; Sunnyvale Seafood, Milmar Food Group; OGGI Foods Inc.

| Time Table | Vehicle Arrival TIME: 12:30PM EST | Opening of Trailer TIME: 1:00PM EST | First Product Surface Temp TIME: 1:15PM EST | Last Pulp Product Temp From Box 2 TIME: 2:00PM EST |
|---|---|---|---|---|

### 1 Evaluate Product Surface Temperature

a. Product Surface Temp > it's Critical Limit   OR   TTR and 3 receiving surface temps indicate > Critical Limit *during* shipment:   List the 3 product surface temps in the next box.

b. If any of the three temps exceed their Critical Limits take 9 product surface temperatures (between products with probe thermometer only) and list the SUPC of each item in the block below.

| Top of Pallet | Middle of Pallet | Bottom of Pallet |
|---|---|---|
| 39F 🌡 | 37F 🌡 | 50F 🌡 |

### 2 PULP Product Temperature

Take internal 📺 product temps of the 3 highest cases identified in the adjacent box and list them in the box below

| | Pallet Positioned in the Tail of the Trailer | Pallet Positioned in the Middle of the Trailer | Pallet Positioned in the Nose of the Trailer | |
|---|---|---|---|---|
| Top Case (Side) | SUPC 7071080 - 46.2F 🌡 | SUPC 6275515 - 24.8F 🌡 | SUPC 3664541 - 29.2F 🌡 | SUPC/Temp: 7071080 - 46.2F 🌡 |
| Middle Case (Center) | SUPC 4438911 - 29.2F 🌡 | SUPC 4190373 - 26.8F 🌡 | SUPC 8496341 - 27.9F 🌡 | SUPC/Temp: 7571335 - 30.1F 🌡 |
| Bottom Case (Side) | SUPC 1410976 - 23.9F 🌡 | SUPC 3664541 - 24.1 F 🌡 | SUPC 7078993 - 26.1F 🌡 | SUPC/Temp: 7209271 - 29.0F 🌡 |

### 3 Evaluate the Loading Pattern

| | YES | NO | NOTES |
|---|---|---|---|
| a. Are pallets loaded to eliminate contact with the wall? If no, take surface temps of the products loaded against the wall and document in the notes. | ✓ | | 📺 |
| b. Is there at least 9 inches of space between the pallets and the ceiling? | ✓ | | 📺 |
| c. Is the load secured using load locks, straps, etc.? | | ✓ | 📺 |
| d. Is the Time/Temperature Device located on the last pallet facing the doors? | | ✓ | If not, where? No TTR |

### 4 Evaluate the Trailer Condition

| | YES | NO | NOTES |
|---|---|---|---|
| a. Is the reefer unit set properly? Document the set point and current temperature of the trailer in the notes to the right. | | ✓ | There is no reefer on this trailer |
| b. Are the walls and ceiling free of holes and other damage? | ✓ | | 📺 |
| c. Are the seals on all doors free of damage? | ✓ | | 📺 |
| d. Is the air chute free of damage and properly attached? (if applicable) | | ✓ | 📺 No air chute |
| e. Are the supply & return air vents free of obstruction? | | ✓ | 📺 No supply and return air vents |
| f. Are there drain caps (kazoos) on the floor drains? | | ✓ | 📺 |
| g. Is the floor clean and free of debris? | ✓ | | 📺 |

### 5 Shipment Info

| Sysco Arranged: ✓ | Supplier Arranged: | Reefer Type/Model: No Reefer on Trailer |
|---|---|---|

Carrier, Trailer Number & Year: JBHZ 677271 - Carrier is Schmieding

### 6 Disposition Process Checklist

| | YES | NO |
|---|---|---|
| a. Has a disposition decision been made? | | ✓ |
| b. Has the Merchandiser been consulted? | ✓ | |
| c. Are the products that were determined to have exceeded their Critical Limits placed back on trailer or placed on hold? | ✓ | |
| d. Are all pictures attached? Are they clear enough to be used as supporting evidence? | ✓ | |

| | | | |
|---|---|---|---|
| e. | Has the following been completed and attached?    OS&D - TempTale - BOL - PO | ✓ | |
| f. | If applicable, has the driver/carrier and downstream customer/warehouse been notified? | ✓ | |
| g. | Has the Site designee initiated a Corrective Action request from the Supplier/Carrier? | ✓ | |
| h. | If applicable, has the claim been processed with Corporate Supply Chain or Legal Counsel Initiated ? | | ✓ |

Completed By: Jim Lucas          Signature: _James Lucas-jluc7787_          Date 10/12/2022

Reviewed By: _____          Signature: _____          Date _____

## Corrective Action Resource

1. **Cool Product to Ideal Temperature Prior to Loading:**
   a. Cool the product at or close to the *ideal* temperature.
   b. Cool the product uniformly throughout the pallet, and throughout the load.

2. **Prepare the Trailer Properly:**
   a. Set the reefer to the correct set point. Utilize continuous mode for perishable shipments.
   b. Precool the trailer for 30 to 60 minutes.
   c. Inspect the walls, ceiling, and floor.  Ensure they are free from unrepaired damage.
   d. Inspect the chute and ensure it is properly attached, and free from damage.
   e. Ensure the return air vent is free from obstruction.
   f. Ensure the floor is free of debris.
   g. Inspect the drain hole (Kazoos) and replace if missing or damaged.
   h. Inspect the door seals. Trailers with damaged/excessively worn door seals need to be repaired prior to shipment.
   i. Ensure the trailer is free of objectionable odors.

3. **Load the Trailer Properly:**
   a. Center line load the trailer.  Ensure there is a gap between the walls and the pallets.
   b. Do not load pallets with heights that exceed the red line.  If no red line is present, ensure there is a 9" gap between the pallets and ceiling.
   c. Secure pallets with load locks.

4. **Recommend Documenting Transport Temperatures with TempTale:**
   a. Document the TempTale SN and place a 'TempTale On Board' sticker on the BOL.
   b. Start the TempTale.  Verify the sun icon is present on the LCD screen.
   c. Place the TempTale on the last pallet loaded on the right, at eye level.

**Supplier or Carrier Agreement**

Supplier and/or Carrier hereby agrees to supply corrective actions.

Supplier/Carrier Name & Location
Carrier - Schmieding

# Exhibit 6

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | | |
|---|---|---|
| **H.C. SCHMIEDING PRODUCE** | ) | |
| **COMPANY, LLC** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 5:23-cv-05011-TLB |
| | ) | |
| **BUKHARA TRANS INC.** | ) | |
| Defendant. | ) | |

**COMPLAINT**

COMES NOW, Plaintiff, H.C. Schmieding Produce Company, LLC ("Schmieding") by and through its counsel, Hall Estill Attorneys at Law, and for its Complaint pursuant to 49 U.S.C. § 14706 against Bukhara Trans Inc. ("Bukhara") and states the following:

**PARTIES, JURISDICTION AND VENUE**

1.    Plaintiff, Schmieding, is a Florida limited liability company with a major operations facility in Springdale, Arkansas.

2.    Upon information and belief, Defendant, Bukhara, is an Illinois Corporation with its principal place of business in Illinois, and is a motor vehicle carrier engaged in the transportation of freight including operating through the State of Arkansas.

3.     At all times material hereto, Defendant acted by and through its agents, employees, servants, workmen, and/or ostensible agents engaged within the course and scope of their employment.

4.     Upon information and belief, at all times material hereto, Defendant was authorized to and did operate through Washington County, Arkansas.

5.     This case arises from a Carrier Agreement (attached hereto as Exhibit 1) and Carrier Load Tender (attached hereto as Exhibit 2), between the parties which was formed and executed in Springdale, Arkansas.

6.     A substantial part of events or omissions giving rise to these claims occurred in Washington County, Arkansas.

7.     Jurisdiction is proper in the U.S. District Court for the Western District of Arkansas pursuant to 28 U.S.C. § 1331 and 49 U.S.C. § 14706(d).

8.     This District is a proper venue pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

9.     Plaintiff adopts and incorporates by reference its allegations contained in Paragraphs 1 through 8.

10.     On or about October 11, 2022, pursuant to the Carrier Agreement (Exh. 1), the Carrier Load Tender Reference Number LD134110 (Exh. 2), and a Bill of Lading Order # 4-264146 (Exh. 3), Bukhara picked up a load of cargo from Houston, Texas to be delivered to Sysco Corporation ("Sysco") in Knoxville, Tennessee.

2

11.     At the time of loading, the cargo was inspected and found to be in good condition. (See Exh. 3, Bill of Lading with driver's signature).

12.     The Carrier Load Tender listed the required temperature to be pre-cooled to 0 degrees. (Exh. 2). In addition, the Bill of Lading required the temperature to be between maintained at 0 degrees. (Exh. 3). The Bill of Lading noted several times this was perishable product and proper temperature must be maintained. (Exh. 3).

13.     Bukhara arrived with a dry trailer, with no refrigeration capabilities.

14.     Upon arrival at the consignee on October 12, 2022, the trailer temperature data showed the product surface temperature was between 23 and 50 degrees. The temperature critical limit was 15 degrees. (See Exh. 4, Temp Analysis).

15.     The Carrier Agreement required the carrier to transport the load in accordance with the food safety and security instructions. (Exh. 1).

16.     The Carrier Agreement also stated the Carrier represents and warrants all equipment used to transport food shipments will be equipped with refrigeration units. (Exh. 1).

17.     The driver signature on the BOL verified the product was in good condition at the time of loading. (Exh. 3).

18.     Upon delivery, the pulp temperature of the product ranged from 29 and 46 degrees. The temperature critical limit was 15 degrees. (Exh. 4).

19.     Due to the high temperatures, the product was deemed unsafe and the load was rejected.

20.     Bukhara is liable for the entire loss of the shipment due to the high temperature of the product.

21.     The high temperatures were noted on the Bill of Lading. (See Exh. 3).

22.     Bukhara was notified of this claim upon delivery on October 12, 2022. (See Exh. 4).

23.     The claim was properly and timely submitted to Bukhara on or about October 20, 2022. (See Exh. 5, Claim demand).

24.     Bukhara did not accept liability.

25.     Schmieding, as broker, has or will compensate Sysco for its losses in the amount of $113,277.64.

26.     Schmieding is subrogated to the rights of Sysco, the receiver/consignee, to collect against the carrier for damaged cargo pursuant to 49 U.S.C.A. § 14706. Schmieding has been damaged in the amount of $113,277.64.

27.     Bukhara had an obligation to avoid damaging the cargo during transport, and deliver the cargo in substantially the same condition as received from the shipper.

28.     Bukhara breached its duty by failing to provide a refrigerated unit for the transport of the food shipment as required on the Load Tender (Exh. 2) and the Bill of Lading (Exh. 3), and agreed upon in the Carrier Agreement. (Exh. 1).

29.     Bukhara improperly allowed the cargo to be damaged while it was in Bukhara's possession and control, and failed to deliver the cargo, undamaged, to the consignee.

30.     Bukhara's breach was the proximate cause of damage to the cargo, specifically the entire cargo load was damaged at the cost of $113,277.64.

31.     Schmieding properly and timely filed a claim with Bukhara for costs due to Schmieding as a result of the damage to the cargo pursuant to 49 C.F.R. § 370.3. (See Exh. 5).

32.     Bukhara denied liability and rejected the request by Schmieding to compensate Schmieding for its loss proximately caused by Bukhara's negligent transport of the cargo.

33.     Those losses and expenses, which were incurred as a result of the damaged cargo have accrued in the amount of $113,277.64, plus pre and post judgment interest as allowed by Arkansas and Federal law.

34.     Schmieding has fulfilled all of its performance obligations under all applicable contracts and applicable state and federal laws.

## COUNT I

35.     Plaintiff adopts and incorporates by reference the allegations contained in Paragraphs 1 through 34.

36.     Upon information and belief, and based on documentation on the applicable Bill of Lading, the cargo for the Carrier Load Tender Reference Number 134110 (Exh. 2), and Bill of Lading Order # 4-264146 (Exh. 3), was delivered to Bukhara in proper condition for transportation and in an undamaged condition.

37.     The Bill of Lading bears a signature from the carrier certifying the cargo was in proper condition for transportation.

38.     The cargo was damaged due to the failure of Bukhara to provide a refrigerated unit and maintain the proper temperature on the trailer.

39.     Schmieding, on behalf of Sysco, timely and properly informed Bukhara of the damaged cargo and filed a claim for damaged cargo pursuant to 49 C.F.R. § 370.3.

40.     Bukhara improperly denied liability for the damaged cargo and refused to compensate Sysco or Schmieding for such damages.

41.     Pursuant to 49 U.S.C.A. § 14706, Bukhara is liable to Schmieding, who is subrogated to the rights of shipper, under the Carrier Load Tender Reference Number LD134110 (Exh. 2), and a Bill of Lading Order # 4-264146 (Exh. 3), for the damages to the cargo.

42.     Bukhara was negligent in transporting the cargo and such negligence was the proximate cause of the damages to the cargo.

43.     Bukhara had a duty to transport the cargo in a manner that would not damage such cargo. Bukhara breached that duty and such breach was the proximate cause of the damage to the cargo.

44.     Bukhara's breach of duty and/or negligence proximately caused Schmieding to suffer damages, and Schmieding is therefore entitled to recover from Bukhara, damages in the amount of $113,277.64 plus pre and post judgment interest, attorney's fees and costs as allowed by Arkansas and Federal law.

45.     Plaintiff demands a jury trial.

46.     Plaintiff reserves the right to move this Court to allow Plaintiff to amend this Complaint upon completion of investigation and discovery.

WHEREFORE, Plaintiff, Schmieding, prays this Court enter judgment in its favor and against Bukhara in the amount of $113,277.64, plus pre and post judgment interest, attorney's fees, cost of this suit and such other relief as it may be entitled.

Respectfully submitted,

**H.C. SCHMIEDING PRODUCE COMPANY, LLC**

BY: /s/ Grace K. Johnson
        Grace K. Johnson (Ark. Bar No. 09203)
        **HALL ESTILL ATTORNEYS AT LAW**
        75 N. East Ave, Suite 500
        Fayetteville, AR   72701-5388
        Telephone:  (479) 973-5253
        Facsimile:  (479) 973-0520
        Email:  gjohnson@hallestill.com
            *Attorney for the Plaintiff*