114PCI-825 (FJS/ARM/mh)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARTISAN AND TRUCKERS CASUALTY COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:23-CV-04439 |
| BUKHARA TRANS, INC., | ) ) | |
| Defendant. | ) | |

**PLAINTIFF ARTISAN AND TRUCKERS CASUALTY COMPANY'S MOTION FOR
SUMMARY JUDGMENT ON ITS COMPLAINT AND BUKHARA'S COUNTERCLAIM**

NOW COMES Plaintiff, ARTISAN AND TRUCKERS CASUALTY COMPANY, by and through its attorneys, SUDEKUM, CASSIDY & SHULRUFF, CHTD., for its Motion for Summary Judgment on its Complaint and Bukhara's Counterclaim states as follows:

**INTRODUCTION**

1.      Plaintiff, ARTISAN AND TRUCKERS CASUALTY COMPANY ("Progressive") brings this motion and seeks judgment in its favor because there is no genuine issue of material fact that Defendant, Bukhara Trans. Inc. ("Bukhara") used a trailer without refrigeration capabilities on the date of loss, Progressive reserved its right to defend Bukhara for the loss pursuant to a bona fide coverage dispute, and Progressive denied coverage to Bukhara.

2.      For the reasons discussed below, judgment should be entered in Progressive's favor pursuant to Federal Rules of Civil Procedure Rule 56.

**FACTS**

3.      On or about October 11, 2022, pursuant to the Carrier Agreement, the Carrier Load Tender Reference Number LD134110, and the Bill of Lading Order Number 4-264146, Bukhara

picked up a load of cargo ("the cargo") at a Sysco facility in Houston, Texas to be delivered to a Sysco facility in Knoxville, Tennessee. *See* Complaint for Declaratory Judgment ¶ 11 attached hereto as **Exhibit 1.**

4.  The cargo consisted of 32,277 pounds of frozen whole cranberries. *See* Complaint for Declaratory Judgment ¶ 12 attached hereto as **Exhibit 1** and Bukhara's corresponding Admission in Bukhara's Answer to the Complaint for Declaratory Judgment ¶ 12 attached hereto as **Exhibit 2**.

5.  The Carrier Load Tender required the trailer used to transport the load to be precooled to 0 degrees. See **Exhibit 1** ¶ 14.

6.  The Bill of Lading required the temperature to be maintained at 0 degrees. See **Exhibit 1** ¶ 15.

7.  Bukhara took possession of the cargo and placed it in a dry trailer with no refrigeration capabilities. See **Exhibit 1** ¶ 17.

8.  Upon arrival at the Sysco facility in Houston, Texas, on October 12, 2022, the product surface temperature was between 23 and 50 degrees, compromising the cargo. See **Exhibit 1** ¶ 18.

9.  The Carrier Agreement required Bukhara to transport the load in accordance with food safety and security instructions. See **Exhibit 1** ¶ 20.

10.  The Carrier Agreement also stated Bukhara represented and warranted all equipment used to transport food shipments will be equipped with refrigeration units. See **Exhibit 1** ¶ 21.

11.     On October 12, 2022, when Bukhara made delivery of the cargo to the Sysco facility in Knoxville, Tennessee, the pulp temperature of the product ranged from 29 to 46 degrees, compromising the cargo. See **Exhibit 1** ¶ 23.

12.     Due to the high temperatures, Sysco deemed the cargo to be unsafe and rejected delivery. See **Exhibit 1** ¶ 25.

13.     On January 10, 2023, H.C. Schmieding Produce Co., LLC ("Schmieding"), as the broker, filed suit against Bukhara seeking to recover damages. See **Exhibit 1** ¶ 28 and **Exhibit 2** ¶ 28.

14.     On May 11, 2023, Progressive declined to provide coverage to Bukhara for the claim. See **Exhibit 1** ¶ 30 and **Exhibit 2** ¶ 30.

## PROCEDURAL POSTURE

15.     On January 10, 2023, a lawsuit was filed against Bukhara in the United States District Court for the Western District of Arkansas, Fayetteville Division in the matter entitled, *H.C. Schmieding Produce Co., LLC, v. Bukhara Trans., Inc.,* Case No. 5:23-CV-05011-TLB seeking to recover damages in the amount of $113,277.64. ("the Schmieding lawsuit").

16.     On May 11, 2023, Progressive denied coverage to Bukhara.

17.     On June 2, 2023, a Default Judgment was entered against Bukhara in the amount of $119,133.30.

18.     On July 10, 2023, Progressive filed a Complaint for Declaratory Relief alleging no duty to defend and indemnify Bukhara as related to a lawsuit filed against Bukhara in the Schmieding lawsuit pursuant to the Insurance Policy.

19.     On November 10, 2023, Bukhara filed its Answer to Progressive's Complaint and filed its Counterclaim alleging a breach of contract, violation of Section 155 of the Illinois Insurance Code, and estoppel.

20.     On January 30, 2024, this Court entered the Agreed Motion to Stay of Discovery Schedule.

21.     Per the Agreed Motion to Stay of Discovery Schedule, written discovery was to be answered by January 31, 2024.

22.     On February 27, 2024, Bukhara's Counsel, John M. Liston ("Mr. Liston"), filed his appearance.

23.     On March 25, 2024, this Court entered a Minute Order indicating that the Parties are to issue written discovery by April 4, 2024; the Parties are to answer written discovery by May 2, 2024; the Parties' Federal Rules of Civil Procedure Rule 26 witnesses are to be deposed by May 30, 2024; and dispositive motions shall be filed and noticed by July 1, 2024.

24.     On April 24, 2024, Progressive's Counsel contacted Mr. Liston regarding the discovery interrogatories and requests that were issued to Bukhara on January 3, 2024.

25.     On April 24, 2024, Progressive's Counsel reissued the discovery interrogatories and requests to Mr. Liston.

26.     On May 2, 2024, Progressive answered Bukhara's discovery interrogatories and requests.

27.     On June 24, 2024, Progressive answered Bukhara's Counterclaim.

28.     On June 25, 2024, this Court granted Progressive's Motion to Compel.

29.     On July 11, 2024, Progressive filed its Motion for Sanctions in connection with not receiving Bukhara's answers to written discovery.

30.     On July 25, 2024, Bukhara answered Progressive's written discovery.

31.     On July 25, 2024, the Court ordered that the parties were to file a Motion to Extend the Discovery Schedule by July 31, 2024, due to the delay in receiving Bukhara's answers to written discovery.

32.     On July 31, 2024, the Court extended Fact Discovery to September 20, 2024.

33.     On August 26, 2024, Progressive advised the Court that the depositions of Bukhara's Federal Rules of Civil Procedure Rule 26 witnesses would not be completed by the September 20, 2024, deadline. A copy of Docket #60 is attached hereto as **Exhibit 3.**

34.     As a result, the Court extended Fact Discovery to October 14, 2024, and ordered that dispositive motions be filed by October 28, 2024. A copy of Docket #62 is attached hereto as **Exhibit 4**.

35.     In addition, on August 27, 2024, the parties stated to the Court that depositions have been scheduled and there was an agreement for attorney's fees. See **Exhibit 4**.

36.     On October 7, 2024, the depositions of Anna Romano ("Ms. Romano") and Fahkriddin Avezov ("Mr. Avezov") were completed.

## PERTINENT POLICY LANGUAGE

37.     In its pertinent parts, the Insurance Policy, attached as **Exhibit 5**, provides:

A person seeking coverage must:

1.  cooperate with **us** in any matter concerning a claim or lawsuit

    **DUTIES IN CASE OF A LOSS**

    The following additional duties apply under this Motor Truck Cargo Legal Liability Coverage endorsement:

1.  **You** must take all reasonable steps to protect **covered property** and **business equipment** at the time of and after a **loss** to avoid further damage.
2.  **You** must allow **us** to have all property involved in an **accident** or **loss** inspected and appraised before its repair or disposal.

3. **You** must give **us** a copy of the descriptions and schedules from all insurance policies applicable to the **covered property** or **business equipment**, whichever the case may be, that was destroyed or damaged.

4. **You** must send **us** a signed, sworn proof of loss containing all the information **we** request to settle the claim. **You** must do this within 60 days after **our** request. **We** will supply **you** with the necessary forms.

5. **You** must, as often as **we** reasonably require, submit, and so far as is within **your** power, cause all other persons interested in the **covered property** or **business equipment**, whichever the case may be, and members of their households and employees to submit, to examination under oath by any person **we** name, and, in connection with any claim made, to produce for examination all books of accounts, uniform bills of lading, shipping receipts, invoices, drivers' log books, and any other documents, at such reasonable time and place as **we** may designate, and permit extracts and copies thereof to be made.

### INSURING AGREEMENT—LOSS TO COVERED PROPERTY

Subject to the Limit of Liability, if **you** pay the premium for this Motor Truck Cargo Legal Liability Coverage, **we** will pay for the direct physical **loss** to **covered property** that **you** are legally liable to pay as a **trucker** under a written: bill of lading, tariff document, rate confirmation sheet, shipping receipt, or contract of carriage. For this coverage to apply, the **covered property** must, at the time of **loss**, be in **your** exclusive physical custody and control:

1. while **in due course of transit** in, on, or attached to an **insured auto**; or
2. during **loading or unloading**.

Coverage applies for **loss** to **covered property** only if the **loss** is caused by a **covered peril**. For **covered property** that is **your** property, **our** payment is not contingent upon **your** liability.

**We** have the option to settle or defend any claim or lawsuit for damages covered by this endorsement. However, **we** have no duty to defend **you** against any lawsuit to which this insurance does not apply. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the limit of liability for this **covered property** coverage has been exhausted by payment of judgments or settlements.

### ADDITIONAL DEFINITIONS

The following additional definitions apply only to Motor Truck Cargo Legal Liability Coverage, as set forth in this endorsement, and any endorsements thereto that solely pertain to this coverage, whenever the defined term appears therein in boldface type, whether in the singular, plural, or possessive:

1. "**Business equipment**" means computer and related computer hardware, used exclusively in the management of **your** business, that **you** own or that is leased or loaned to **you**. **Business equipment** does not include computer, cell phone, smart phone, or any other electronic equipment, used or intended to be used for personal non-business use.

2. "**Covered peril**" means any external risks of direct physical **loss** to **covered property** or **business equipment**, except for those listed in a. through m. below as Excluded Perils.

**Excluded Perils:** Please read the following list of excluded perils carefully. Coverage will not be afforded under this Motor Truck Cargo Legal Liability Coverage endorsement for these types of perils. **We** will not pay for any **losses** to **covered property** or **business equipment** caused by, resulting in or from, or arising out of these excluded perils regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**.

d. **Inherent Vice**

Deterioration; wear and tear; obsolescence; hidden or latent defect; gradual decay; fungus; mildew; mold; rot; rust; insects; vermin; change in flavor; or any quality, fault, or weakness in the **covered property** or **business equipment** that causes it to damage or destroy itself…

    f. **Consequential Loss**
Loss of use, loss of market, loss of market value, or delay; or any other remote or consequential loss, other than direct physical **loss**, to **covered property** or **business equipment**…

5. "**In due course of transit**" means being shipped from the time **you** assume exclusive physical custody and control of the **covered property** for the purpose of the actual movement of **covered property** from the point of shipment bound for a specific destination and ending when one of the following first occurs:

a. the **covered property** is accepted by, or on behalf of, the consignee at the intended destination;
b. the **covered property** is accepted by, or on behalf of, the consignee at any intermediate point short of reaching the original intended destination;
c. 72 hours after arrival at destination; or
d. any other stop that exceeds 72 hours.

    **In due course of transit** includes ordinary and necessary stops, interruptions, delays, or transfers incidental to the route and method of shipment.

6. "**Insured auto**" means:

a. Any **auto** specifically described on the **declarations page** that is not a **trailer**;
b. An additional **auto** that is not a **trailer** on the date **you** become the owner if:

   i. **you** acquire the **auto** during the policy period shown on the **declarations page**;
  ii. **we** insure all **autos** owned by **you** that are used in **your** business;
 iii. no other insurance policy provides coverage for that **auto**; and
 iv. **you** tell **us** within 30 days after **you** acquire it that **you** want **us** to cover it;

c.  Any replacement **auto** that is not a **trailer** on the date **you** become the owner if:

   i. **you** acquire the **auto** during the policy period shown on the **declarations page**;
  ii. the **auto** that **you** acquire replaces one specifically described on the **declarations page** due to termination of **your** ownership of the replaced **auto** or due to mechanical breakdown of, deterioration of, or **loss** to the replaced **auto** that renders it permanently inoperable;
 iii. no other insurance policy provides coverage for that **auto**; and
 iv. **you** tell **us** within 30 days after **you** acquire it that **you** want **us** to cover it;

d. A **trailer** designed primarily for travel on public roads, only when the **trailer** is attached to a power unit that is an **insured auto** or while it is in **due course of transit** by a power unit that is an **insured auto**; and

e. Any **temporary substitute auto** that is not a **trailer**.

### REFRIGERATION BREAKDOWN COVERAGE ENDORSMENT

**DUTIES IN A CASE OF LOSS**

The following are added to the Duties in Case of a Loss section:

7. **You** must take all reasonable steps or **covered property** at the time of and after a **loss** to avoid further damage, including but not limited to storage of the cargo in a properly temperature controlled facility or alternate trailer;

8. **You** must allow **us** access to the refrigeration or heating equipment prior to its repair unless a delay in repair would imperil the cargo;
9. **You** must provide **us** access to all maintenance and repair records for the failed refrigeration or heating unit; and
10. **You** must allow **us** access to all records establishing the proper use of the equipment, including any and all electronic records or logs generated by the unit.

**Insuring Agreement**

The following is added to the Insuring Agreement:

Subject to the Limit of Liability, if you pay the premium for the Refrigeration Breakdown Coverage endorsement, we will pay for your legal liability for direct physical loss to covered property, caused by spoilage, or change in temperature, resulting directly from the sudden and accidental breakdown of refrigeration or heating units on an insured auto.

**Additional Definitions**

Under the definition of "covered peril", Excluded Peril "g." is deleted and replaced by:

g. Breakdown, Temperature, Humidity

i. Humidity, dampness, dryness, or changes in or extremes of temperature, other than such loss caused by the sudden and accidental breakdown of refrigeration or heating units on the insured auto; or
ii. Mechanical or electrical breakdown or failure, other than the sudden and accidental breakdown of refrigeration or heating units on the insured auto. However, this Excluded Peril does not apply to loss caused by a fire or explosion if such fire or explosion would be covered under this endorsement...

**Exclusions**

The following exclusions are added:

Coverage under this Refrigeration Breakdown Coverage endorsement will not apply for loss caused by, resulting from, or arising out of breakdown of the refrigeration or heating unit due to any of the following:

1. Failure to provide adequate fuel supply;
2. Failure to maintain crankcase oil or refrigerant level within the manufacturer's specifications;
3. Intentional destruction or damage to automatic temperature control units by an employee; or
4. Failure to maintain the calibration of the refrigeration or heating unit and/or failure to maintain the refrigeration or heating unit within the manufacturer's specifications.

**General Provisions**

The following is added to the General Provisions section:

I. Refrigeration/Heating Equipment Maintenance.

1. You, or your employee, must check the refrigeration and heating equipment every 12 hours while it is being operated; and
2. At least once a month, you must:

a. Have the refrigeration and heating equipment inspected by a manufacturer-authorized representative, or other trained refrigeration specialist, which may include you or your employee;
b. Promptly perform the proper maintenance according to manufacturer's specifications;

c.  Make any appropriate or necessary repairs; and
d.  Keep and update written records with respect to item 1. and items 2.a. through 2.c. above. You must allow us to inspect these records as often as we may reasonably require. If you fail to maintain these records, coverage will be void under this endorsement.
e.

## SUMMARY JUDGMENT STANDARD

38.    Summary judgment is appropriate when the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. *Cutter v. Biomet, Inc.*, 244 F.Supp.3d 793 (2017).

39.    The court considers all evidence in the record, including depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations. *City of Chicago v. Equte LLC*, 693 F.Supp.3d 879 (2023).

## ARGUMENT

## PROGRESSIVE'S COMPLAINT

40.    Progressive denied coverage because the damage to the cargo arose out of Bukhara's failure to transport the load in accordance with the food safety and security instructions and lack of a refrigeration unit, Progressive's Insurance Policy excludes coverage for damages to the cargo alleged in the underlying Complaint.

41.    The Carrier Agreement was signed between Bukhara and Schmieding on June 14, 2022. A copy of the Carrier Agreement is attached hereto as **Exhibit 6**.

42.    Bukhara is listed as the "Carrier" in the Carrier Agreement. See **Exhibit 6**.

43.    Mr. Avezov agreed that the Carrier Load Tender listed Bukhara as the carrier for this load and he was transporting for Schmieding. See **Exhibit 7**, Avezov Dep. 11: 23-24 and 12:1-17.

44.    The Carrier Agreement states, "Carrier represents and warrants that all Equipment used in transporting the Food Shipments is equipped with an operational air-chute at least forty-

three (43) feet in length and fully attached form the beginning to the end of the refrigeration unit."
See **Exhibit 6.**

45.     The Carrier Agreement also states,

> Carrier represents and warrants that all Equipment used in transporting
> Food Shipments is equipped with refrigeration equipment that allows data
> monitoring of temperatures and refrigeration equipment performance inside
> the trailer form the time of precooling the trailer, while the trailer is being
> loaded with goods, and through when the goods have been unloaded from
> the trailer and it is empty.

See **Exhibit 6.**

46.     Mr. Avezov testified that he used a dry van trailer despite the fact that Bukhara has
trucks with refrigeration capabilities. See **Exhibit 7**, Avezov Dep. 19:19-24, 20:1-18, 22:3-9, 23:8-
10, and 32:5-7.

47.     Additionally, Mr. Avezov testified that he has never used a truck with refrigeration
equipment for Bukhara over a thousand loads. See **Exhibit 7**, Avezov Dep. 21:23-24 and 22:1-9.

48.     The Carrier Load Tender listed the temperature range of the product as "FROZEN:
PRECOOL ZERO, FOLLOW BOL FOR TRANSIT, FRZN." A copy of the Carrier Load Tender
is attached hereto as **Exhibit 7**.

49.     Mr. Avezov agreed that the Carrier Load Tender listed the Temperature Range of
the product to be Frozen. See **Exhibit 7**, Avezov Dep. 14:2-6.

50.     The Bill of Lading states, "MUST BE KEPT AT 0 DEGREES PERISHABLE
PDOCUT MAINTAIN AT PROPER TEMPERATURE." A copy of the Bill of Lading is attached
hereto as **Exhibit 9**.

51.     Mr. Avezov testified that he signed the Bill of Lading despite not reading it, but the
signature on the Bill of Lading was not Mr. Avezov's signature. See **Exhibit 7**, Avezov Dep. 24:
19-24, 25:1-24, and 26:1-15.

52.     Ms. Romano testified that the trailer used on the date of loss did not have a refrigeration unit attached and that the goods were damaged because they were frozen and transported in a dry trailer. See **Exhibit 8**, Romano Dep. 37: 7-18.

53.     Based on the testimonies of Ms. Romano and Mr. Avezov, the loss was caused by Bukhara's failure to use a trailer with refrigeration capabilities.

54.     The Reservation of Rights letter stated that Progressive did not receive evidence that the loss occurred as a result of a sudden and accidental breakdown of refrigeration or heating units.  See **Exhibit 10**.

55.     There are no material facts that dispute that Bukhara used a dry trailer that was not equipped with refrigeration equipment necessary to transport the frozen goods.

56.     There are no material facts that dispute that the frozen goods were not damaged by the sudden and accidental breakdown of refrigeration or heating units.

## SUMMARY JUDMGNET ON BUKHARA'S COUNTERCLAIM

57.     Bukhara alleges that Progressive breached its contract for insurance by refusing to defend and/or indemnify Bukhara in the Schmieding lawsuit, a violation of Section 155 of the Illinois Insurance Code, and allegations of estoppel.

## BREACH OF CONTRACT

58.     Under Illinois law, the elements of a breach of insurance contract claim include: (1) the policy was in effect at the time of the loss; (2) the specific loss falls within the coverage terms of the policy; (3) the amount of the covered loss is the amount claimed; (4) the claimant is the entity entitled to the proceeds or benefits; (5) the insurer's obligation to pay has matured; and (6) the insurer has breached that obligation by denying the claim. *Patrick Schaumburg Automobiles, Inc. v. Hanover Ins. Co.*, 452 F.Supp.2d 857 (2006).

59. At the outset, Progressive was investigating the cause of the loss for this matter.

60. Progressive sent its Reservation of Rights letter to Bukhara on October 31, 2022. A copy of the Reservations of Rights letter is attached hereto as **Exhibit 10**.

61. The Reservations of Rights letter indicates that Progressive had not received evidence that the loss occurred as a result of a sudden and accidental breakdown of refrigeration or heating units and that the Progressive may not be obligated to pay for the damages alleged in the loss. See **Exhibit 10.**

62. Ms. Romano recalled receiving and reviewing the Reservations of Rights letter and worked with Bukhara's claim department after receipt of this letter. See **Exhibit 8**, Romano Dep. 34: 13-23. Ms. Romano stated she worked with Bukhara's claim department after receipt of this letter. See **Exhibit 8**, Romano Dep. 35: 5-9. Ms. Romano testified that the trailer used on the date of loss did not have a refrigeration unit attached and that the goods were damaged here because they were frozen and transported in a dry trailer. See **Exhibit 8**, Romano Dep. 37: 7-18.

63. Mr. Avezov was shown the Reservations of Rights letter and Denial letter from Progressive. A Copy of the Denial Letter is attached hereto as **Exhibit 11**.

64. Based on the dates of the letters, Mr. Avezov recalled he was in the process of moving to California, could not recall receiving the specific documents, but recalled receiving documents pertaining to a lawsuit against Bukhara. See **Exhibit 7**, Avezov Dep. 28:3-24, 29:1-24, and 30:1-7. The documents were given to an individual by the name of Suzana at Bukhara's office in Illinois the documents pertaining to the lawsuit, despite not knowing her role in at the company. See **Exhibit 7**, Avezov Dep. 30: 8-24.

65. Mr. Avezov agreed that Progressive denied coverage to Bukhara on May 11, 2023. See **Exhibit 7**, Avezov Dep. 31:3-9.

66. The Reservation of Rights letter stated that Progressive did not receive evidence that the loss occurred as a result of a sudden and accidental breakdown of refrigeration or heating units. See **Exhibit 10**.

67. There are no material facts that dispute that Bukhara used a dry trailer that was not equipped with refrigeration equipment to transport the frozen goods.

68. There are no material facts that dispute that the frozen goods were not damaged by the sudden and accidental breakdown of refrigeration or heating units.

69. As a result of the loss not being caused by the sudden and accidental breakdown of refrigeration or heating units, the loss does not fall under the Insurance Policy.

70. Therefore, since the cause of the loss does not fall under the Insurance Policy, Progressive had a right to deny coverage and did not breach its contractual obligations under the policy.

## SECTION 155

68. "The sole question in a Section 155 claim is whether the insurer's conduct is unreasonable and vexatious." *Certain Underwriters at Lloyd's London v. Abbott Laboratories*, 2014 IL App. (1st) 132020 ¶ 68.

69. "An insurer does not act vexatiously and unreasonably when (1) there is a *bona fide* dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law." *Citizens First National Bank of Princeton v. Cincinnati Ins. Co.*, 200 F. 3d 1102, 1110 (7th Cir. 2000).

70. An insurer's conduct is not vexatious and unreasonable if the dispute results from a "*bona fide* dispute concerning coverage." *Uhlich Children's Advantage Network v. National fire Co. of Pittsburgh, PA*, 398 Ill. App. 3d 710, 723 (1st Dist. 2010).

71. "*Bona fide* is defined as 'real, actual, genuine, and not feigned.'" *Cook ex rel. Cook v. AAA Life Ins. Co.*, 2014 IL App. (1st) 123700 ¶ 49 *citing McGee v. State Farm Fire & Casualty Co.* 315 Ill. App. 3d 673, 683 (2d Dist. 2000).

72. Progressive denied coverage of the claim due to not receiving evidence that the loss occurred as a result of a sudden and accidental breakdown of refrigeration or heating units.

73. Mr. Avezov testified that the trailer used by Bukhara on the date of loss was a dry trailer with no air chute or reefer. See **Exhibit 7**, Avezov Dep. 23: 8-10.

74. Ms. Romano testified that the trailer used on the date of loss did not have a refrigeration unit attached. See **Exhibit 8**, Romano Dep. 37: 7-10.

75. Progressive completed its investigation and decided to deny due to the lack of evidence that would cause this loss to fall under the Insurance Policy.

## ESTOPPEL

76. In Illinois, estoppel cannot be used to create primary liability or to increase coverage beyond what is provided under the Insurance Policy. *Essex Insurance Company v. Blue Moon Lofts Condominium Association*, 927 F.3d 1007 (2019).

77. The Reservation of Rights letter stated that Progressive did not receive evidence that the loss occurred as a result of a sudden and accidental breakdown of refrigeration or heating units. See **Exhibit 10**.

78.     Ms. Romano and Mr. Avezov both testified that the trailer used on the date of loss was dry trailer without refrigeration capabilities. See **Exhibit 8**, Romano Dep. 37: 7-18. See **Exhibit 7**, Avezov Dep. 23: 8-18.

79.     Ms. Romano agreed that the loss was caused due to the frozen product being transported in a dry trailer. See **Exhibit 8**, Romano Dep. 37: 7-18.

80.     There are no material facts that dispute that Bukhara used a dry trailer that was not equipped with refrigeration equipment to transport the frozen goods.

81.     There are no material facts that dispute that the frozen goods were not damaged by the sudden and accidental breakdown of refrigeration or heating units.

82.     As a result of the loss not being caused by the sudden and accidental breakdown of refrigeration or heating units, the loss does not fall under the Insurance Policy.

83.     Based on testimony and case law, there are no material facts that would allow Bukhara to succeed under a theory of estoppel.

WHEREFORE, Plaintiff, ARTISAN AND TRUCKERS CASUALTY COMPANY, moves this Court for an order granting judgment in its favor as to Plaintiff's Complaint and Defendant's Counterclaim pursuant to Federal Rules of Civil Procedure Rule 56.

Respectfully submitted,

SUDEKUM, CASSIDY & SHULRUFF, CHTD.

By:     */s/ Aaron R. Mudlong*
Attorney for Plaintiff, ARTISAN AND
TRUCKERS CASUALTY COMPANY

Frederick J. Sudekum, III (ARDC No.: 6182381)
Aaron R. Mudlong (ARDC No.: 6344253)
SUDEKUM, CASSIDY & SHULRUFF, CHTD.
20 North Clark Street, Suite 2450
Chicago, Illinois 60602
Telephone: (312) 803-6250

Email: fjs@scslegal.com
Email: arm@scslegal.com

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ARTISAN AND TRUCKERS CASUALTY
COMPANY,

               Plaintiff,

    v.

BUKHARA TRANS, INC.

               Defendants.

No.    1:23-cv-4439

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff, the Artisan and Truckers Casualty Company ("Progressive") by and through its counsel, Sudekum, Cassidy & Shulruff, Chtd. for its Complaint for Declaratory Relief pursuant to 28 U.S.C. §2201 and Rule 57 of the Rules of Federal Civil Procedure against Bukhara Trans, Inc. ("Bukhara") states the following:

### INTRODUCTION

1.     This is an action for declaratory judgment pursuant to 28 U.S.C. §2201 and Rule 57 of the Rules of Federal Civil Procedure based on the complete diversity of citizenship of the parties as provided in 28 U.S.C. § 1332.

2.     This action arises from damage to cargo that was not refrigerated when Bukhara was contractually required to do so. Progressive seeks a declaration that it is not required to either defend or indemnify its insured, Bukhara in an action brough by the cargo broker who engaged Bukhara to transport the damaged cargo that is the subject of this litigation.

**PARTIES AND NON-PARTIES**

3.     Plaintiff, Progressive is an Ohio corporation with its principal place of business in the State of Ohio. At all relevant times, Progressive was and is authorized to issue policies of insurance in the State of Illinois.

4.     At all times relevant, Progressive issued a policy of insurance to Bukhara that included a Motor Truck Cargo Liability Endorsement Form Z434 IL (02/19) and the Refrigeration Breakdown Coverage Endorsement (Form Z440 (0610) ("the policy"). (**Exhibit 1**).

5.     Defendant, Bukhara, is an Illinois Corporation with its principal place of business in Illinois, located at 1400 Light Road, Apt. 103, Oswego, Illinois. At all times relevant Bukhara was a motor vehicle carrier engaged in the transportation of freight in various states including Illinois and Arkansas.

6.     H.C. Schmieding Produce Company, LLC, ("Schmieding") is a non-party to this lawsuit. On information and belief, Schmieding is a Florida limited liability company doing business in Arkansas. As is set forth more fully below, at all times relevant, Schmieding worked as a cargo broker and engaged Bukhara to transport the damaged cargo that is the subject of this litigation.

7.     Sysco Corporation ("Sysco") is a non-party to this lawsuit. On information and belief, Sysco is an American multinational corporation involved in marketing and distributing food products.

**JURISDICTION AND VENUE**

8.     At all times material hereto, Bukhara acted by and through its agents, employees, servants, workmen, and/or ostensible agents engaged within the course and scope of their employment.

9.      Jurisdiction is proper in the federal district courts because this is an action based on complete diversity of citizenship pursuant to 28 U.S.C. § 1332 and the amount of controversy exceeds $75,000.

10.     Venue is proper in the Federal District Court for the Northern District of Illinois, Eastern Division because Bukhara has its principal place of business at 1400 Light Road, Apt. 103, Oswego, Illinois.

## FACTUAL BACKGROUND

11.     On or about October 11, 2022, pursuant to the Carrier Agreement (**Exhibit 2**), the Carrier Load Tender Reference Number LD134110 (**Exhibit 3**), and a Bill of Lading Order # 4-264146 (**Exhibit 4**), Bukhara picked up a load of cargo ("the cargo") at a Sysco facility in Houston, Texas to be delivered to a Sysco facility in Knoxville, Tennessee.

12.     The cargo consisted of 32,277 pounds of frozen whole cranberries.

13.     At the time it took possession of the cargo, Bukhara inspected it and found it to be in good condition. (Exhibit 4, Bill of Lading with driver's signature).

14.     The Carrier Load Tender required the trailer used to transport the load to be precooled to 0 degrees. (Exhibit 3).

15.     The Bill of Lading required the temperature to be maintained at 0 degrees. (Ex.4).

16.     The Bill of Lading also noted the cargo consisted of perishable product and proper temperature must be maintained. (Exhibit 4).

17.     Bukhara took possession of the cargo and placed it in a dry trailer, with no refrigeration capabilities.

18.     Upon arrival at the Sysco facility in Houston, Texas, on October 12, 2022, the product surface temperature of the product comprising the cargo was between 23 and 50 degrees.

19.    The temperature critical limit of the product comprising the load was 15 degrees. (See **Exhibit 5**, Temperature Analysis).

20.    The Carrier Agreement required Bukhara to transport the load in accordance with the food safety and security instructions. (Exhibit 2).

21.    The Carrier Agreement also stated Bukhara represented and warranted all equipment used to transport food shipments will be equipped with refrigeration units. (Exhibit 2).

22.    The driver's signature on the Bill of Lading verified the product was in good condition at the time of loading into the Bukhara trailer. (Exhibit 4).

23.    On October 12, 2022, when Bukhara made delivery of the cargo to the Sysco facility in Knoxville, Tennessee, the pulp temperature of the product comprising the cargo ranged from 29 to 46 degrees.

24.    The high temperatures referred to min ¶ 17 above, were noted on the Bill of Lading. (See Exhibit 3).

25.    Due to the high temperatures, Sysco deemed the contents of the cargo to be unsafe and rejected the cargo.

26.    On October 12, 2022, upon making delivery of the now damaged cargo, Bukhara was notified that either the broker, Schmieding, or the shipper, Sysco, would be making a claim ("the claim").

27.    Bukhara did not accept liability for damaging the cargo.

28.    On January 10, 2023, Schmieding, as the broker, filed suit against Bukhara in the United States District Court for the Western District of Arkansas, Fayetteville Division in the matter entitled, *H.C. Schmieding, v. Bukhara Trans., Inc.,* Case No 5:23-cv-05011-TLB seeking to recover damages in the amount of $113,277.64. ("the Schmieding lawsuit"). (**Exhibit 6**).

29.     The Schmieding lawsuit seeks to recover damages in the amount of $113,277.64 from Bukhara.

30.     On May 11, 2023, Progressive declined to provide coverage to Bukhara for the claim.

## APPLICABLE TERMS OF THE POLICY

31.     The policy provides, in pertinent part, as follows:

**Form 6912 (02/19)**

### COMMERCIAL AUTO POLICY

### <u>GENERAL DEFINITIONS</u>

The words and phrases below, whether in the singular, plural or possessive, have the following specific meanings when appearing in boldface type in this policy, and in endorsements issued in connection with this policy, unless specifically modified.

1.      "**Accident**" means a sudden, unexpected and unintended event, or a continuous or repeated exposure to that event, that causes **bodily injury** or **property damage**.

***

15.     "**Property damage**" means physical damage to, destruction of, or loss of use of, tangible property.

***

### <u>PART 1-LIABILITY TO OTHERS</u>

### INSURING AGREEMENT-LIABILITY TO OTHERS

Subject to the Limits of Liability, if **you** pay the premium for liability coverage for the **insured auto** involved, **we** will pay damages, other than punitive or exemplary damages, for **bodily injury**, **property damage**, and **covered pollution cost or expense** for which an **insured** becomes legally responsible because of an accident arising out of the ownership, maintenance or use of that **insured auto**. However, we will only pay for the covered pollution cost or expense if the same **accident** also caused **bodily injury** or **property damage** to which this insurance applies.

**We** will settle or defend, at **our** option, any claim or lawsuit for damages covered by this Part I. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the Limit of Liability for this coverage has been exhausted by payment or judgments or settlements.

\*\*\*

**EXCLUSIONS-PLEASE READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE FOR AN ACCIDENT OR LOSS WILL NOT BE AFFORDED UNDER THIS PART-I LIABILITY TO OTHERS.**

Coverage under this Part I, include **our** duty to defend, does not apply to:

1.      **Expected or Intended Injury**
        **Bodily injury** or **property damage** either expected by or caused intentionally by or at the direction of any **insured**.

\*\*\*

**Form Z434 IL (02/19)**

### MOTOR TRUCK CARGO LEGAL LIBILITY COVERAGE ENDORSEMENT

Except as specifically modified by this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with you that the insurance provided under your Commercial Auto Policy is modified as follows:

**INSURING AGREEMENT-LOSS TO COVERED PROPERTY**

Subject to the Limit of Liability, if you pay the premium for this Motor Truck Cargo Legal Liability Coverage, **we** will pay for the direct physical **loss** to **covered property** that **you** are legally liable to pay as a **trucker** under a written: bill of lading, tariff document, rate confirmation sheet, shipping receipt, or contract of carriage. For this coverage to apply, the **covered property** must, at the time of loss, be in your exclusive physical custody and control:
1.      while **in due course of transit** in, on, or attached to an **insured auto**; or
2.      during **loading or unloading**.

6

Coverage applies for **loss** to **covered property** only if the loss is caused by a **covered peril**. For **covered property** that is **your** property, **our** payment is not contingent upon **your** liability.

**We** have the option to settle or defend any claim or lawsuit for damages covered by this endorsement. However, **we** have no duty to defend **you** against any lawsuit to which this insurance does not apply. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the limit of liability for this **covered property** coverage has been exhausted by payment of judgments or settlements.

\*\*\*

**ADDITIONAL DEFINITIONS**

The following additional define apply only to Motor Truck Cargo Legal Liability Coverage, as set forth in this endorsement, and any endorsements thereto that solely pertain to this coverage, whenever the defined term appears therein in boldface type, whether in the singular, plural, or possessive:

2.  "**Covered peril**" means any external risks of direct physical **loss** to **covered property** or **business equipment**, except for those listed in a. through m. below as Excluded Perils.

**Excluded Perils**: Please read the following list of excluded perils carefully. Coverage will not be afforded under this Motor Truck Cargo Legal Liability Coverage endorsement for these types of perils. **We** will not pay for any **losses** to **covered property** or business equipment caused by, resulting in or from, or arising out of these excluded peris regardless of any other cause or even that contributes  concurrently or in any sequence to the **loss**.

d.  **Inherent Vice**
    Deterioration; wear and tear; obsolescence; hidden or latent defect; gradual decay fungus; mildew; mold; rot; rust; insects; vermin; change in flavor; or any quality; fault, or weakness in the **covered property** or **business equipment** that caused it to damage or destroy itself.

g.  **Wetness, Breakdown, Temperature, Humidity**
    (i)  Mechanical or electrical breakdown or failure including breakdown or failure of a refrigeration unit or its associate component parts, or heating equipment installed in a cargo component; or

(ii)     Wetness, humidity, dampness, dryness, or changes in or extremes of temperature unless it results from damage to an **insured auto**.

However, this Excluded Peril does not apply to **loss** caused by a fire or explosion if such fire or explosion would be covered under this endorsement.

m.     **Corrosion, Contamination**
**We** will not pay for corrosion, contamination, marring or scratching to any **covered property** or **business equipment** unless it results from damage to an **insured auto**.

\*\*\*

**Form Z440 (06/10)**

## REFRIGERATION BREAKDOWN COVERAGE ENDORSEMENT

This endorsement modifies the Motor Truck Cargo Legal Liability Coverage endorsement. Except as specifically modified by this Refrigeration Breakdown Coverage endorsement, all provisions of the Motor Truck Cargo Legal Liability Coverage endorsement apply.

**We** agree with **you** that the insurance provided under **your** Motor Truck Cargo Legal Liability Coverage endorsement is modified as follows:

## INSURING AGREEMENT

The following is added to the Insuring Agreement:

Subject to the Limit of Liability, if **you** pay the premium for the Refrigeration Breakdown Coverage endorsement, **we** will pay for **your** legal liability for direct physical **loss** to **covered property**, caused by spoilage or change in temperature, resulting directly from the sudden and accidental breakdown of refrigeration or heating units on an **insured auto**.

\*\*\*

## ADDITIONAL DEFINITIONS

Under the definition of "**covered peril**", Excluded Peril "g." is deleted and replaced by:

g.     **Breakdown, Temperature, Humidity**
(i)     Humidity, dampness, dryness, or changes in or extremes of temperature, other than such **loss** caused by the sudden and

accidental breakdown of refrigeration or heating units on the **insured auto**; or

(ii)     Mechanical or electrical breakdown or failure, other than the sudden and accidental breakdown of refrigeration or heating units on the **insured auto**. However, this Excluded Peril does not apply to **loss** caused by a fire or explosion if such fire or explosion would be covered under this endorsement.

\*\*\*

## EXCLUSIONS

The following exclusions are added:

Coverage under this Refrigeration Breakdown Coverage endorsement will not apply for **loss** caused by, resulting from, or arising out of breakdown of the refrigeration or heating unit due to any of the following, regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**:

1.      Failure to provide adequate fuel supply;
2.      Failure to maintain crankcase oil or refrigerant level within the manufacturer's specifications;
3.      Intentional destruction or damage to automatic temperature control units by an employee; or
4.      Failure to maintain the calibration of the refrigeration or heating unit and/or failure to maintain the refrigeration or heating unit within the manufacturer's specifications.

\*\*\*

## REQUEST FOR DECLARATION

32.     No coverage is afforded under the policy for the claim for the following reasons:

A.      The damage to the cargo was not an "accident" as that term is defined by and used in the policy;

B.      The damage to the cargo was "expected or intended…property damage" as that phrase is defined by and used in the policy;

C.      The damage to the cargo is due to the deterioration, wear and tear, gradual decay, fungus, mold, change in flavor, quality, fault, or weakness of the cargo that causes it to damage or destroy itself within the meaning of the "Inherent Vice" exclusion of the Motor

9

Truck Cargo Legal Liability Coverage endorsement (Form Z434 IL (02/19);

D.     The damage to the cargo was the result of "changes in … temperature" within the meaning of the Wetness, Breakdown, Temperature Humidity exclusion of the Motor Truck Cargo Legal Liability Coverage endorsement (Form Z434 IL (02/19);

E.     The damage to the cargo was the result of "corrosion" and/or "contamination" within the meaning of the Corrosion, Contamination exclusion of the Motor Truck Cargo Legal Liability Coverage endorsement (Form Z434 IL (02/19); and

F.     The damage to the cargo is not within the Breakdown, Temperature Humidity "covered peril" of the Refrigeration Breakdown Coverage Endorsement (Form Z440 (06/10).

33.     As the damage to the cargo arose out of Bukhara's failure to transport the load in accordance with the food safety and security instructions and lack of a refrigeration unit, Progressive's Commercial Auto Policy excludes coverage under the Policy for damages to the cargo alleged in the underlying Complaint.

34.     For the foregoing reasons, the damage to the cargo is not covered by the policy and Progressive is not required to either defend or indemnify Bukhara for the allegations raised in the Schmieding lawsuit.

WHEREFORE, the Artisan and Truckers Casualty Company seeks a declaration pursuant to 28 U.S.C. §2201 and Rule 57 of the Rules of Federal Civil Procedure that it has neither a duty to defend or indemnify Bukhara Trans, Inc. in the lawsuit pending in Western District of Arkansas, Fayetteville Division entitled *H.C. Schmieding, v. Bukhara Trans., Inc*., Case No 5:23-cv-05011-TLB, and for such other relief this Court deems just and appropriate.

Respectfully submitted,
SUDEKUM, CASSIDY & SHULRUFF, CHTD.

By:     /s/: *Frederick J. Sudekum, III*
One of the Attorneys for Plaintiff

Frederick J. Sudekum, III (ARDC No. 6182381)
Mark A. Mitchell (ARDC No. 6344127)
SUDEKUM, CASSIDY & SHULRUFF, CHTD.
20 North Clark Street, Suite 2450
Chicago, IL 60602
Telephone (312) 803-6250
E-mail fjs@scslegal.com; mm@scslegal.com

# Exhibit 1



May 19, 2023
Policy Number: 945885810-001
Claim Number: 22-8735713


Artisan and Truckers Casualty Company


I certify that each of the following is true regarding the attached records, to the best of my knowledge and belief:

1. I am an employee familiar with the manner and process in which these records are created and maintained by virtue of my duties and responsibilities;

2. The records were made at or near the time of the occurrences of the matters set forth by, or from information transmitted by, people with knowledge of those matters;

3. The records were kept in the course of regularly conducted business activity; and

4. It was the regular practice of the business activity to make the record.


*Jennifer Castell*

Jennifer Castell

COLONIAL INS SERVICE
3845 HOLCOMB BRIDGE R
NORCROSS, GA 30092

**PROGRESSIVE**®
*COMMERCIAL*

Named insured

Bukhara Trans Inc
1400 LIGHT RD. APT 103
OSWEGO, IL 60543

**Policy number: 945885810**
Underwritten by:
Artisan and Truckers Casualty Co
October 13, 2022
Policy Period: Jan 26, 2022 - Jan 26, 2023
Page 1 of 5

**agent.progressive.com**
**Online Service**
Make payments, check billing activity, print policy documents, update your policy or check the status of a claim.

**1-678-257-2450**
**COLONIAL INS SERVICE**
Contact your agent for personalized service.

**1-800-444-4487**
For customer service if your agent is unavailable or to report a claim.

# Commercial Auto
# Insurance Coverage Summary
This is your Declarations Page
Your coverage has changed

Your coverage began on January 26, 2022 at 12:01 a.m.  This policy expires on January 26, 2023 at 12:01 a.m.

This coverage summary replaces your prior one. Your insurance policy and any policy endorsements contain a full explanation of your coverage. The policy limits shown for an auto may not be combined with the limits for the same coverage on another auto, unless the policy contract allows the stacking of limits. The policy contract is form 6912 (02/19). The contract is modified by forms 2852IL (02/19), Z433IL (04/08), 2371 (06/10), Z434IL (02/19), Z440 (06/10), MCS90 (99/99), 1198 (07/16), 4717 (02/19), 4852IL (02/19), 4881IL (02/19) and Z228 (01/11).

The named insured organization type is a corporation.

Artisan and Truckers Casualty Co is a stock company (NYSE:PGR).
PO Box 94739 Cleveland, OH  44101.

## Policy changes effective  October 11, 2022

| | |
|---|---|
| Changes processed on: | October 12, 2022 9:21 a.m. |
| Premium change: | $11,418.00 |
| Changes: | Walid Saleh has been removed from the policy. |
| | Mudawi Omer has been removed from the policy. |

The changes shown above will not be effective prior to the time the changes were requested.

0002 Continued 

## Outline of coverage

### Auto coverage part

| Description | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $139,279 |
| Bodily Injury and Property Damage Liability | $1,000,000 combined single limit | | |
| Uninsured Motorist | $1,000,000 combined single limit | | 469 |
| Underinsured Motorist | $1,000,000 combined single limit | | 413 |
| Medical Payments | Rejected | | -- |
| Trailer Interchange | $60,000 | $1,000 | 24,369 |
| **Subtotal policy premium** | | | **$164,530** |

### Commercial General Liability coverage part

| Description | Limits | Premium |
|---|---|---|
| Limited General Liability - Trucking Operations | $1,000,000/$2,000,000 | $1,561 |
| Each Occurrence | $1,000,000 | |
| General Aggregate | $2,000,000 | |
| Products/Completed Operations Aggregate | $2,000,000 | included |
| Personal and Advertising Injury | $1,000,000/any one person or organization | included |
| Damage to Premises Rented to You | $100,000/any one premises | included |
| Medical Expense | $5,000/any one person | included |
| **Subtotal policy premium** | | **$1,561** |

### Motor Truck Cargo coverage part

| Description | Limits | Deductible | Premium |
|---|---|---|---|
| Motor Truck Cargo | $100,000 | $1,000 | $22,001 |
| Refrigeration Breakdown | included in Motor Truck Cargo Limit | $2,500 | included |
| **Subtotal policy premium** | | | **$22,001** |
| Additional Insured Fee | | | 60 |
| **Total 12 month policy premium and fees** | | | **$188,152** |

## Rated drivers

1. Jude Fanfan
2. Fakhriddin Avezov
3. Sylvain Lecler
4. Wisbens Alfred
5. Jumadurdy Glychdurdyyev
6. Loveson Louis
7. Nicolas Compas
8. Myratdurdy Rejepov

## Rated commodities

1. CANNED GOODS
2. FOOD (FROZEN/NOT SEAFOOD)
3. MEATS / DRESSED POULTRY
4. VEGETABLES

Form 6489 IL (08/17)

Policy number: 945885810
Bukhara Trans Inc
Page 3 of 5

## Auto coverage schedule

1. **2021 FREIGHTLINER CASCADIA 126**
   VIN: **3AKJHHDR2MSMU3501** Garaging Zip Code: 60543 Radius: More than 500 miles
   Personal use: N Body type: Truck Tractor

| Liability Premium | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| | $19248 | $67 | $59 | **$19,374** |

2. **2030 Non-owned Attached Trailer** **
   VIN: **None** Garaging Zip Code: 60543 Radius: More than 500 miles
   Personal use: N Body type: 20

| Liability Premium | Liability Premium | Auto Total |
|---|---|---|
| | $649 | **$649** |

3. **2030 Non-owned Attached Trailer** **
   VIN: **None** Garaging Zip Code: 60543 Radius: More than 500 miles
   Personal use: N Body type: 20

| Liability Premium | Liability Premium | Auto Total |
|---|---|---|
| | $649 | **$649** |

4. **2030 Non-owned Attached Trailer** **
   VIN: **None** Garaging Zip Code: 60543 Radius: More than 500 miles
   Personal use: N Body type: 20

| Liability Premium | Liability Premium | Auto Total |
|---|---|---|
| | $649 | **$649** |

5. **2022 FREIGHTLINER CASCADIA 126**
   VIN: **3AKJHHDR6NSNK4356** Garaging Zip Code: 60543 Radius: More than 500 miles
   Personal use: N Body type: Truck Tractor

| Liability Premium | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| | $19248 | $67 | $59 | **$19,374** |

6. **2030 Non-owned Attached Trailer** **
   VIN: **None** Garaging Zip Code: 60543 Radius: More than 500 miles
   Personal use: N Body type: 20

| Liability Premium | Liability Premium | Auto Total |
|---|---|---|
| | $649 | **$649** |

7. **2022 FREIGHTLINER CASCADIA 126**
   VIN: **3AKJHHDR4NSNK4341** Garaging Zip Code: 60543 Radius: More than 500 miles
   Personal use: N Body type: Truck Tractor

| Liability Premium | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| | $19248 | $67 | $59 | **$19,374** |

Policy number: 945885810
Bukhara Trans Inc
Page 4 of 5

8. **2022 FREIGHTLINER CASCADIA 126**
VIN: **3AKJHHDR3NSNK4363**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: Truck Tractor

| | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| Liability Premium | $19248 | $67 | $59 | **$19,374** |

9. **2022 FREIGHTLINER CASCADIA 126**
VIN: **3AKJHHDR2NSNK4354**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: Truck Tractor

| | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| Liability Premium | $19248 | $67 | $59 | **$19,374** |

10. **2022 FREIGHTLINER CASCADIA 126**
VIN: **3AKJHHDRXNSNK4361**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: Truck Tractor

| | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| Liability Premium | $19248 | $67 | $59 | **$19,374** |

11. **2030 Non-owned Attached Trailer \*\***
VIN: **None**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: 20

| | Liability Premium | Auto Total |
|---|---|---|
| Liability Premium | $649 | **$649** |

12. **2030 Non-owned Attached Trailer \*\***
VIN: **None**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: 20

| | Liability Premium | Auto Total |
|---|---|---|
| Liability Premium | $649 | **$649** |

13. **2023 FREIGHTLINER CASCADIA 126**
VIN: **3AKJHHDR8PSUH1741**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: Truck Tractor

| | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| Liability Premium | $19248 | $67 | $59 | **$19,374** |

14. **2030 Non-owned Attached Trailer \*\***
VIN: **None**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: 20

| | Liability Premium | Auto Total |
|---|---|---|
| Liability Premium | $649 | **$649** |

\*\*Non-Owned trailer but only while attached to a listed power unit specifically described on the declarations page.

## Premium discount

| Policy | |
|---|---|
| 945885810 | Electronic Funds Transfer |

Form 6489 IL (08/17)

0005 Continued

Policy number: 945885810
Bukhara Trans Inc
Page 5 of 5

**Additional Insured information**

1.   Additional Insured

Alliance Shippers Inc
15515 S 70th Court
Orland Park, IL 60462

2.   Additional Insured

BEST BAY LOGISTICS INC
13831 Slover Ave
Fontana, CA 92337

3.   Additional Insured

Reliable Transportation Solution
PO BOX 507
Amelia, OH 45102

Form 6489 IL (08/17)



Progressive
P.O. Box 94739
Cleveland, OH 44101

November 11, 2021
Policy number: 945885810

Bukhara Trans Inc
1400 Light Rd. Apt 103
Oswego, IL 60543

Enclosed is the  MCS90.

Please retain this copy for your records.

If this endorsement subjects the Company to public liability for negligence in the insured's operation, maintenance or use of motor vehicles, you are required to inform us of all vehicles that are commercially owned or operated by the insured and to list them on your policy. Please review the current policy declaration page and inform us promptly of any additional vehicles that need to be listed. If you acquire (or acquire the services of) any additional commercially owned or operated vehicles in the future, you must promptly notify us of each such additional vehicle. Failure to promptly inform us of, and list, all current and future commercially owned or operated vehicles may result in the cancellation or nonrenewal of this policy, or in a premium increase.

Thank you,
Commercial Auto
Permit Issuance and Verification
1-800-444-4487

Form COVERLTR (06/04)

0007

**Please note, the expiration date as stated on this form relates to the process for renewing the Information Collection Request for this form with the Office of Management and Budget. This requirement to collect information as requested on this form does not expire. For questions, please contact the Office of Registration and Safety Information, Registration, Licensing, and Insurance Division.**

A Federal Agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a current valid OMB Control Number. The OMB Control Number for this information collection is 2126-0008. Public reporting for this collection of information is estimated to be approximately 2 minutes per response, including the time for reviewing instructions, gathering the data needed, and completing and reviewing the collection of information. All responses to this collection of information are mandatory. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Information Collection Clearance Officer, Federal Motor Carrier Safety Administration, MC-RRA, Washington, D.C. 20590.

**U.S. Department
of Transportation**
Federal Motor Carrier
Safety Administration

OMB No: 2126-0008
Expiration: 05/31/2024
Form MCS-90 Revised 06/03/2021

USDOT Number: 3546628      Date Received:

## FORM MCS-90
### ENDORSEMENT FOR MOTOR CARRIER POLICIES OF INSURANCE FOR PUBLIC LIABILITY UNDER SECTIONS 29 AND 30 OF THE MOTOR CARRIER ACT OF 1980

Issued to Bukhara Trans Inc

(Motor Carrier name)

of 1400 Light Rd. Apt 103 Oswego, IL 60543

(Motor Carrier state or province)

Dated at 09:56 AM on this 11th day of November, 2021
Amending Policy Number: CA 945885810 Effective Date: 12/17/2021
Name of Insurance Company: Artisan and Truckers Casualty Co

Countersigned by: _____

Authorized company representative

The policy to which this endorsement is attached provides primary or excess insurance, as indicated for the limits shown (check only one):

[X] This insurance is primary and the company shall not be liable for amounts in excess of $750,000 for each accident.

[ ] This insurance is excess and the company shall not be liable for amounts in excess of $_____ for each accident in excess of the underlying limit of $_____ for each accident.

Whenever required by the Federal Motor Carrier Safety Administration (FMCSA), the company agrees to furnish the FMCSA a duplicate of said policy and all its endorsements. The company also agrees, upon telephone request by an authorized representative of the FMCSA, to verify that the policy is in force as of a particular date. The telephone number to call is: 1-800-444-4487.

Cancellation of this endorsement may be effected by the company of the insured by giving (1) thirty-five (35) days notice in writing to the other party (said 35 days notice to commence from the date the notice is mailed, proof of mailing shall be sufficient proof of notice), and (2) if the insured is subject to the FMCSA's registration requirements under 49 U.S.C. 13901, by providing thirty (30) days notice to the FMCSA (said 30 days notice to commence from the date the notice is received by the FMCSA at its office in Washington, D.C.).

**Filings must be transmitted online via the Internet at http://www.fmcsa.dot.gov/urs**

## DEFINITIONS AS USED IN THIS ENDORSEMENT

**ACCIDENT** includes continuous or repeated exposure to conditions or which results in bodily injury, property damage, or environmental damage which the insured neither expected nor intended.

**MOTOR VEHICLE** means a land vehicle, machine, truck, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway for transporting property, or any combination thereof.

**BODILY INJURY** means injury to the body, sickness, or disease to any person, including death resulting from any of these.

**PROPERTY DAMAGE** means damage to or loss of use of tangible property.

**ENVIRONMENTAL RESTORATION** means restitution for the loss, damage, or destruction of natural resources arising out of the accidental discharge, dispersal, release or escape into or upon the land, atmosphere, watercourse, or body of water, of any commodity transported by a motor carrier. This shall include the cost of removal and the cost of necessary measures taken to minimize or mitigate damage to human health, the natural environment, fish, shellfish, and wildlife.

**PUBLIC LIABILITY** means liability for bodily injury, property damage, and environmental restoration.



The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Motor Carrier Safety Administration (FMCSA).

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon,

or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

It is further understood and agreed that, upon failure of the company to pay any final judgment recovered against the insured as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the company to compel such payment.

The limits of the company's liability for the amounts prescribed in this endorsement apply separately to each accident and any payment under the policy because of anyone accident shall not operate to reduce the liability of the company for the payment of final judgments resulting from any other accident.

## SCHEDULE OF LIMITS - PUBLIC LIABILITY

| Type of Carriage | Commodity Transported | January 1, 1985 |
|---|---|---|
| **(1)** For-hire (in interstate or foreign commerce, with a gross vehicle weight rating of 10,000 or more pounds). | Property (nonhazardous) | $750,000 |
| **(2)** For-hire and Private (in interstate, foreign, or intrastate commerce, with a gross vehicle weight rating of 10,000 or more pounds). | Hazardous substances, as defined in 49 CFR 171.8, transported in cargo tanks, portable tanks, or hopper-type vehicles with capacities in excess of 3,500 water gallons; or in bulk Division 1.1, 1.2, and 1.3 materials, Division 2.3, Hazard Zone A, or Division 6.1, Packing Group I, Hazard Zone A material; in bulk Division 2.1 or 2.2; or highway route controlled quantities of a Class 7 material, as defined in 49 CFR 173.403. | $5,000,000 |
| **(3)** For-hire and Private (in interstate or foreign commerce, in any quantity; or in intrastate commerce, in bulk only; with a gross vehicle weight rating of 10,000 or more pounds). | Oil listed in 49 CFR 172.101; hazardous waste, hazardous materials, and hazardous substances defined in 49 CFR 171.8 and listed in 49 CFR 172.101, but not mentioned in (2) above or (4) below. | $1,000,000 |
| **(4)** For-hire and Private (In interstate or foreign commerce, with a gross vehicle weight rating of less than 10,000 pounds). | Any quantity of Division 1.1, 1.2 or 1.3 material; any quantity of a Division 2.3, Hazard Zone A, or Division 6.1, Packing Group I, Hazard Zone A material; or highway route controlled quantities of a Class 7 material as defined in 49 CFR 173.403. | $5,000,000 |

* The schedule of limits shown does not provide coverage. The limits shown in the schedule are for information purposes only.

COLONIAL INS SERVICE
3845 HOLCOMB BRIDGE R
NORCROSS, GA 30092


**PROGRESSIVE**®
*COMMERCIAL*

**Policy number: 945885810**

Underwritten by:
Artisan and Truckers Casualty Co
Insured:
Bukhara Trans Inc
July 12, 2022
Policy Period: Jan 26, 2022 - Jan 26, 2023

Bukhara Trans Inc
1400 LIGHT RD. APT 103
OSWEGO, IL 60543

**Mailing Address**

Artisan and Truckers Casualty Co
PO Box 94739
Cleveland, OH 44101

# Additional insured endorsement

**1-800-444-4487**

For customer service, 24 hours a day,
7 days a week

## Name of Person or Organization

Reliable Transportation Solution
PO BOX 507
Amelia, OH 45102

This endorsement modifies insurance provided under the commercial auto policy and any endorsements thereto affording liability coverage.

The person or organization named above is an **insured** with respect to such liability coverage as is afforded by the policy, but this insurance applies to said **insured** only as a person liable for the conduct of another **insured** and then only to the extent of that liability. **We** also agree with **you** that insurance provided by this endorsement will be primary for any power unit specifically described on the **Declarations Page** and showing liability coverage.

### Limit of Liability

| | |
|---|---|
| **Bodily Injury** | Not applicable |
| **Property Damage** | Not applicable |
| **Combined Liability** | $1,000,000 each **accident** |

### All other terms, limits and provisions of this policy remain unchanged.

This endorsement applies to Policy Number: 945885810

Issued to (Name of Insured): Bukhara Trans Inc

Effective date of endorsement: July 9, 2022        Policy expiration date: January 26, 2023

Form 1198 (07/16)

0010

COLONIAL INS SERVICE
3845 HOLCOMB BRIDGE R
NORCROSS, GA 30092



**Policy number: 945885810**

Underwritten by:
Artisan and Truckers Casualty Co
Insured:
Bukhara Trans Inc
June 24, 2022
Policy Period: Jan 26, 2022 - Jan 26, 2023

BEST BAY LOGISTICS INC
13831 SLOVER AVE
FONTANA, CA 92337

**Mailing Address**

Artisan and Truckers Casualty Co
PO Box 94739
Cleveland, OH 44101

# Additional insured endorsement

**1-800-444-4487**

For customer service, 24 hours a day,
7 days a week

## Name of Person or Organization

BEST BAY LOGISTICS INC

13831 Slover Ave

Fontana, CA 92337

This endorsement modifies insurance provided under the commercial auto policy and any endorsements thereto affording liability coverage.

The person or organization named above is an **insured** with respect to such liability coverage as is afforded by the policy, but this insurance applies to said **insured** only as a person liable for the conduct of another **insured** and then only to the extent of that liability. **We** also agree with **you** that insurance provided by this endorsement will be primary for any power unit specifically described on the **Declarations Page** and showing liability coverage.

### Limit of Liability

| | |
|---|---|
| **Bodily Injury** | Not applicable |
| **Property Damage** | Not applicable |
| **Combined Liability** | $1,000,000 each **accident** |

### All other terms, limits and provisions of this policy remain unchanged.

This endorsement applies to Policy Number: 945885810

Issued to (Name of Insured): Bukhara Trans Inc

Effective date of endorsement: June 23, 2022        Policy expiration date: January 26, 2023

Form 1198 (07/16)

0011

COLONIAL INS SERVICE
3845 HOLCOMB BRIDGE R
NORCROSS, GA 30092



**Policy number:  945885810**

Underwritten by:
Artisan and Truckers Casualty Co
Insured:
Bukhara Trans Inc
June 22, 2022
Policy Period: Jan 26, 2022 - Jan 26, 2023

Alliance Shippers Inc
15515 S 70TH COURT
ORLAND PARK, IL 60462

**Mailing Address**

Artisan and Truckers Casualty Co
PO Box 94739
Cleveland, OH 44101

# Additional insured endorsement

**1-800-444-4487**

For customer service, 24 hours a day,
7 days a week

## Name of Person or Organization

Alliance Shippers Inc

15515 S 70th Court

Orland Park, IL 60462

This endorsement modifies insurance provided under the commercial auto policy and any endorsements thereto affording liability coverage.

The person or organization named above is an **insured** with respect to such liability coverage as is afforded by the policy, but this insurance applies to said **insured** only as a person liable for the conduct of another **insured** and then only to the extent of that liability. **We** also agree with **you** that insurance provided by this endorsement will be primary for any power unit specifically described on the **Declarations Page** and showing liability coverage.

### Limit of Liability

| | |
|---|---|
| **Bodily Injury** | Not applicable |
| **Property Damage** | Not applicable |
| **Combined Liability** | $1,000,000 each **accident** |

### All other terms, limits and provisions of this policy remain unchanged.

This endorsement applies to Policy Number: 945885810

Issued to (Name of Insured): Bukhara Trans Inc

Effective date of endorsement: June 21, 2022     Policy expiration date: January 26, 2023

Form 1198 (07/16)

0012

Form Z434 IL (02/19)

## MOTOR TRUCK CARGO LEGAL LIABILITY
## COVERAGE ENDORSEMENT

Except as specifically modified by this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### INSURING AGREEMENT—LOSS TO COVERED PROPERTY

Subject to the Limit of Liability, if **you** pay the premium for this Motor Truck Cargo Legal Liability Coverage, **we** will pay for the direct physical **loss** to **covered property** that **you** are legally liable to pay as a **trucker** under a written: bill of lading, tariff document, rate confirmation sheet, shipping receipt, or contract of carriage. For this coverage to apply, the **covered property** must, at the time of **loss**, be in **your** exclusive physical custody and control:

1. while **in due course of transit** in, on, or attached to an **insured auto**; or
2. during **loading or unloading**.

Coverage applies for **loss** to **covered property** only if the **loss** is caused by a **covered peril**. For **covered property** that is **your** property, **our** payment is not contingent upon **your** liability.

**We** have the option to settle or defend any claim or lawsuit for damages covered by this endorsement. However, **we** have no duty to defend **you** against any lawsuit to which this insurance does not apply. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the limit of liability for this **covered property** coverage has been exhausted by payment of judgments or settlements.

### INSURING AGREEMENT—LOSS TO BUSINESS EQUIPMENT

Subject to the Limit of Liability, if **you** pay the premium for this Motor Truck Cargo Legal Liability Coverage, **we** will pay for the direct physical **loss** to **business equipment**. For this coverage to apply, the **business equipment** must, at the time of **loss**, be in **your** exclusive physical custody and control. Coverage applies for **loss** to **business equipment** only if the **loss** is caused by a **covered peril**.

**We** have the option to settle or defend any claim or lawsuit for damages covered by this endorsement. However, **we** have no duty to defend **you** against any lawsuit to which this insurance does not apply. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the limit of liability for **business equipment** coverage has been exhausted by payment of judgments or settlements.

### ADDITIONAL DEFINITIONS

The following additional definitions apply only to Motor Truck Cargo Legal Liability Coverage, as set forth in this endorsement, and any endorsements thereto that solely pertain to this coverage, whenever the defined term appears therein in boldface type, whether in the singular, plural, or possessive:

1. "**Business equipment**" means computer and related computer hardware, used exclusively in the management of **your**

1

0013

business, that **you** own or that is leased or loaned to **you**. **Business equipment** does not include computer, cell phone, smart phone, or any other electronic equipment, used or intended to be used for personal non-business use.

2. "**Covered peril**" means any external risks of direct physical **loss** to **covered property** or **business equipment**, except for those listed in a. through m. below as Excluded Perils.

**Excluded Perils:** Please read the following list of excluded perils carefully. Coverage will not be afforded under this Motor Truck Cargo Legal Liability Coverage endorsement for these types of perils. **We** will not pay for any **losses** to **covered property** or **business equipment** caused by, resulting in or from, or arising out of these excluded perils regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**.

a. **Civil Authority**

Order of any civil authority, including seizure, confiscation, destruction, or quarantine of property. However, **we** will pay for **loss** or damage caused by or resulting from acts of destruction ordered by any governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this endorsement.

b. **Nuclear Hazard, Pollutants**

(i) Any weapon employing atomic fission or fusion; or

(ii) Nuclear reaction or radiation, or radioactive contamination from any other cause. But **we** will pay for direct **loss** caused by resulting fire if the fire would be covered under this endorsement.

(iii) The release, discharge, seepage, migration, dispersal, or escape of **pollutants**, unless the release, discharge, seepage, migration, dispersal, or escape is caused by a **specified peril**.

c. **War, Civil Commotion**

(i) **War**, including undeclared or civil war;

(ii) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or agents;

(iii) Insurrection, rebellion, revolution, usurped power, or action taken by a governmental authority to hinder or defend against any of these; or

(iv) Strikers, locked-out workmen, or persons taking part in labor disturbances or riots, or civil commotions.

d. **Inherent Vice**

Deterioration; wear and tear; obsolescence; hidden or latent defect; gradual decay; fungus; mildew; mold; rot; rust; insects; vermin; change in flavor; or any quality, fault, or weakness in the **covered property** or **business equipment** that causes it to damage or destroy itself.

e. **Criminal, Fraudulent, or Dishonest Acts**

Criminal, fraudulent, dishonest, or illegal acts alone or in collusion with another, whether or not such acts occurred during regular hours of employment, by:

(i) **you**;

(ii) **your** partners, officers, directors, trustees, or joint ventures;

(iii) others to whom **you**, **your** partners, officers, directors, trustees, or joint ventures entrust the property;

(iv) others who have an interest in the property; or

(v) the employees or agents of any party specified in (i) through (iv) above.

This Excluded Peril does not apply to acts of destruction by **your** employees, but **we** will not pay for theft by employees.

2

0014

f. **Consequential Loss**

Loss of use, loss of market, loss of market value, or delay; or any other remote or consequential loss, other than direct physical **loss**, to **covered property** or **business equipment**.

g. **Wetness**, **Breakdown, Temperature, Humidity**

(i) Mechanical or electrical breakdown or failure including breakdown or failure of a refrigeration unit or its associate component parts, or heating equipment installed in a cargo component; or

(ii) Wetness, humidity, dampness, dryness, or changes in or extremes of temperature unless it results from damage to an **insured auto**.

However, this Excluded Peril does not apply to **loss** caused by a fire or explosion if such fire or explosion would be covered under this endorsement.

h. **Voluntary Parting, Nondelivery, Mysterious Disappearance**

(i) Voluntary parting with title to, or possession of, the property due to fraudulent scheme, trick, or false pretense;

(ii) Nondelivery or misdelivery; or

(iii) Mysterious or unexplained disappearance; shortage of any property upon taking inventory; or theft of a part of the contents of any shipping package.

i. **Fines, Penalties, and Costs**

Any costs, fines, punitive damages, assessments, attorney fees, court costs, or other penalties that **you** are required or liable to pay as a result of **your** violation of any law or regulation, or as a result of the violation of any law or regulation relating to any delay in the payment, denial, or settlement of any claim.

j. **Pre-existing Damage**

**We** will not pay for pre-existing damage to any **covered property** or **business equipment**.

With respect to auto haulers, **we** will not pay for pre-existing damage to vehicles being transported by the **insured**. For coverage to apply, the **insured** auto hauler must provide to **us** a signed inspection document attesting to the condition of **covered property** before loading.

k. **Installation Operations**

**Your** operation as rigger, hoister, erector, installer, or dismantler.

l. **Business Equipment Damage**

**We** will not pay for the following damage to **business equipment**:

(i) Wear and tear, any quality in the equipment that causes it to damage or destroy itself, hidden or latent defect, or gradual deterioration;

(ii) Structural, mechanical, or electrical failure or breakdown; or

(iii) Damage caused by maintenance or a software upgrade or download.

m. **Corrosion, Contamination**

**We** will not pay for corrosion, contamination, marring or scratching to any **covered property** or **business equipment** unless it results from damage to an **insured auto**.

3. "**Covered property**" means lawful goods and merchandise of others, except for the items listed in a. through j. below as Excluded Properties. **Covered property** includes **goods and merchandise** owned by **you** while loaded for shipment in or on an **insured auto**, whether or not shipped under a bill of lading or shipping receipt. When used in this endorsement, **goods and**

3

0015

**merchandise** means products destined for market and/or sale. **Covered property** does not include any equipment **you** own that is being transported between work sites. **Covered property** also does not include **autos you** lease, hire, rent, or borrow.

**Excluded Properties:** Please read the following list of excluded properties carefully. Coverage will not be afforded under this Motor Truck Cargo Legal Liability Coverage endorsement for **loss** to these types of properties.

a. **Art, Jewelry, Metals, Money, Papers**

Objects of art, including paintings and statuary; jewelry, precious or semi-precious stones; precious or semi-precious metals or alloys; money and securities of any kind, including monies collected or not collected under a C.O.D., bill of lading, or shipping receipt; food stamps, lottery tickets, notes, money orders, traveler's checks, accounts, bills, deeds, or other evidences of debt; valuable papers of any kind, including passports, manuscripts, mechanical drawings, and blueprints.

b. **Contraband**

Contraband or property in the course of illegal transportation or trade.

c. **Live Animals**

Live animals, birds, or fish, including cattle or poultry, unless death results or is made necessary within 24 hours by a **specified peril**; or unless they escape or stray from the scene of **loss** and cannot be located, but only if the escape or straying is caused by a **specified peril**. **We** do not cover **your** liability for reduction in the market value or downgrading of live animals, birds, or fish due to minor injuries, scrapes, and bruises.

d. **Other Carrier**

Any property while in the physical custody of any other carrier.

e. **Property Not Under Bill of Lading**

Any property for which no bill of lading, tariff document, rate confirmation sheet, shipping receipt, or contract of carriage has been issued, or which is carried gratuitously or without charge. This exclusion does not include poultry cages owned by the shipper while being utilized in the transportation of **covered property**.

f. **Storage**

Any property in or on an **insured auto** after it has remained at any location for more than 72 hours. This includes locations **you** own or use. This exclusion does not apply to delays in transportation outside of **your** control due to severe weather, as long as transport resumes as soon as the weather emergency has ended.

g. **Transporting Vehicles and Equipment**

Any transporting vehicle or conveyance, including its equipment such as tarpaulins and fittings, chains, binders, and intermodal shipping containers, unless specified on a bill of lading.

h. **Explosive or Radioactive Material**

Explosives, ammunition, fireworks, or radioactive material.

i. **Pharmaceuticals, Tobacco, Marijuana Products, Alcohol**

Prescription pharmaceuticals, tobacco products, marijuana products, or alcoholic beverages, other than beer or wine.

j. **Mobile/Modular Homes and Buildings**

0016

**Mobile/Modular homes and buildings** whether carried on or attached to the **insured auto**.

4. "**Earned freight charges**" means freight charges from the point of departure to the point of **loss**.

5. "**In due course of transit**" means being shipped from the time **you** assume exclusive physical custody and control of the **covered property** for the purpose of the actual movement of **covered property** from the point of shipment bound for a specific destination and ending when one of the following first occurs:
   a. the **covered property** is accepted by, or on behalf of, the consignee at the intended destination;
   b. the **covered property** is accepted by, or on behalf of, the consignee at any intermediate point short of reaching the original intended destination;
   c. 72 hours after arrival at destination; or
   d. any other stop that exceeds 72 hours.
   **In due course of transit** includes ordinary and necessary stops, interruptions, delays, or transfers incidental to the route and method of shipment.

6. "**Insured auto**" means:
   a. Any **auto** specifically described on the **declarations page** that is not a **trailer**;
   b. An additional **auto** that is not a **trailer** on the date **you** become the owner if:
      (i) **you** acquire the **auto** during the policy period shown on the **declarations page**;
      (ii) **we** insure all **autos** owned by **you** that are used in **your** business;
      (iii) no other insurance policy provides coverage for that **auto**; and
      (iv) **you** tell **us** within 30 days after **you** acquire it that **you** want **us** to cover it;
   c. Any replacement **auto** that is not a **trailer** on the date **you** become the owner if:
      (i) **you** acquire the **auto** during the policy period shown on the **declarations page**;
      (ii) the **auto** that **you** acquire replaces one specifically described on the **declarations page** due to termination of **your** ownership of the replaced **auto** or due to mechanical breakdown of, deterioration of, or **loss** to the replaced **auto** that renders it permanently inoperable;
      (iii) no other insurance policy provides coverage for that **auto**; and
      (iv) **you** tell **us** within 30 days after **you** acquire it that **you** want **us** to cover it;
   d. A **trailer** designed primarily for travel on public roads, only when the **trailer** is attached to a power unit that is an **insured auto** or while it is in **due course of transit** by a power unit that is an **insured auto**; and
   e. Any **temporary substitute auto** that is not a **trailer**.

7. "**Loading or unloading**" means the direct physical process of hoisting, lifting, or moving **covered property**:
   a. onto an **insured auto** from the ground or loading docks adjacent to such **insured auto**; or
   b. off of an **insured auto** to the place where it is finally delivered.
   However, for auto haulers, **loading or unloading** means moving **covered property** onto or off of **your insured auto**, including moving a motor vehicle under its own power solely for the purpose of **loading or unloading** it from the **insured auto**, but no more than one road mile from the **insured auto**.

8. "**Mobile/Modular Homes and Buildings**" means prefabricated housing units and buildings, factory-built homes and buildings, mobile homes, and modular homes and buildings. The term does not include motor homes or travel trailers designed for use on public roads.

9. "**Pollutant**" is used in this endorsement as defined in the General Definitions section of **your** Commercial Auto Policy.

0017

10. "**Specified peril**" means:

    a.  fire, lightning, or explosion;

    b.  smoke, but this cause of **loss** does not include smoke from exhaust fumes or gases of the transporting vehicle, agricultural smudging, or industrial operations;

    c.  windstorm or hail, but this cause of **loss** does not include **loss** caused by or resulting from:

        (i)  heat, cold, or change in or extremes of temperature; or

        (ii)  ice (other than hail), snow, or sleet, whether driven by wind or not;

    d.  collision, overturn, or derailment of a transporting conveyance. With respect to live animals, birds, or fish, this cause of **loss** does not include **loss** caused by or resulting from the **insured auto** coming in contact with:

        (i)  the roadbed;

        (ii)  curbing;

        (iii)  rails or ties of railways; or

        (iv)  a stationary object while backing for **loading or unloading** purposes;

    e.  collapse of a bridge, wharf, dock, platform, or culvert;

    f.  stranding, sinking, burning, or collision on any ferry;

    g.  flood, meaning the rising of any natural body of water; and

    h.  theft, but excluding pilferage by **you** or **your** employees, anyone with a financial interest in the cargo or their employees, authorized representatives or anyone else entrusted with the cargo. Theft does not include **loss** caused by or resulting from:

        (i)  wrongful conversion; or

        (ii)  acceptance of counterfeit money, fraudulent post office or express money orders, or checks or promissory notes not paid upon presentation.

    With respect to live animals, birds, or fish, **we** will extend this theft coverage to pay for direct physical **loss** to live animals, birds, or fish caused by theft of:

    (i)  the entire load of live animals, birds, or fish; or

    (ii)  the **insured auto** in or on which the live animals, birds, or fish are loaded.

    However, this coverage extension does not apply to the loss of individual animals or less than the entire load of live animals, birds, or fish unless the entire **insured auto** is first stolen.

11. "**Trucker**" means any person, organization, or motor carrier engaged in the business of transporting property for hire.

## ADDITIONAL PAYMENTS

In addition to the applicable limit of liability:

1. **Earned Freight**

    **We** will pay **earned freight charges** that are due to **you** if **you** are unable to collect them from others because of a **loss** to **covered property** that is caused by a **covered peril**. The most **we** will pay under this additional coverage for all freight charges in any one **loss** is $10,000.

2. **Removal Expenses**

    a.  **We** will pay removal expenses incurred to remove debris of **covered property**, which results from a **loss** caused by a **covered peril** that occurs during the policy period. The term "debris" does not include **pollutants**.

    b.  **We** will also pay removal expenses incurred to extract **pollutants** from land or water, if the discharge, dispersal, migration, or release of the **pollutants** is caused by or results from **loss** to **covered property**, and if such **loss** is caused by a **covered peril** during the policy period.

    **We** do not pay for:

6

(i) the cost of testing; evaluating; observing; or recording the existence, level, or effects of **pollutants**. However, **we** will pay the cost of testing that is necessary for the extraction of **pollutants** from land or water.

(ii) any damage to **your insured auto** from **pollutants**.

c. The most **we** will pay for all removal expenses described in a. or b. above arising out of any one **loss** is $25,000.

d. The expenses for removal of **covered property** debris and **pollutants** will be paid only if they are reported to **us** in writing within 180 days of the earlier of:

(i) the date of the direct physical **loss**; or

(ii) the end of the policy period.

3. **Expenses in Defense or Settlement of Claims**

**We** will pay, with respect to any claim **we** investigate or settle, or with respect to any lawsuit against any insured **we** defend:

a. all expenses **we** incur.

b. the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. However, **we** have no duty to purchase a bond in a principal amount exceeding **our** limit of liability, and **we** have no duty to apply for or furnish these bonds.

c. all reasonable expenses incurred by **you** at **our** request, including actual loss of earnings up to $250 per day because of time off from work.

d. all costs taxed against the insured in any lawsuit against the insured **we** defend.

e. interest accruing after entry of judgment on that part of the judgment that does not exceed **our** limit of liability for any lawsuit **we** defend. This does not apply if **we** have not been given notice of suit or the opportunity to defend an insured. **Our** payment, offer in writing, or deposit in court of that part of the judgment that does not exceed **our** limit of liability ends **our** duty to pay interest that accrues after the date of **our** payment, written offer, or deposit.

f. interest accruing before entry of judgment on that part of the judgment that does not exceed **our** limit of liability for any lawsuit **we** defend. **Our** offer to pay that part of the judgment that does not exceed **our** limit of liability ends **our** duty to pay interest that accrues after **our** offer.

4. **Sue and Labor**

a. **We** will pay the necessary expenses **you** incur to prevent further **loss** to **covered property** if that expense is incurred within a 12-hour period after the **covered peril** occurs.

b. If, in the event of an occurrence, it becomes necessary to move the **covered property** in order to avoid a **loss** to the **covered property**, **we** will pay the reasonable and necessary costs incurred by **you** to move the **covered property** away from the location of the occurrence.

c. The most **we** will pay for the aggregate of all expenses incurred under subparts a. and b. above is $7,500.

## LIMITS OF LIABILITY

1. **Amount of Payment**

a. Subject to subsections 2., 3., and 4. below, in the event of a **loss** to **covered property**, **we** will pay the least of the following:

(i) **Your** legal liability for the direct physical **loss** to the **covered property**;

(ii) The declared value of the **covered property** shown in the bill of lading, tariff documents, rate confirmation sheet, shipping receipt, or contract of carriage;

(iii) For household goods, the amount specified in any advice of coverage, or other document evidencing an agreed valuation for property in transit;

(iv) The actual cost to the shipper to repair or replace the **covered property** with material of like kind and quality, not including any claim for diminution of value to the **covered property**; or

(v) The "Cargo" limit shown on the **declarations page**.

7

b.  Regardless of the number of **insured autos** or **trailers** involved, insureds, premiums paid, policies issued by **us**, claims made, or lawsuits brought, the most **we** will pay for **loss** to **covered property** in any one occurrence is the limit of liability shown on the **declarations page** for "Cargo Liability" coverage.

c.  With respect to **business equipment**, subject to subsections 2., 3., and 4. below, in the event of a **loss**, **we** will pay the lower of:

  (i)   the amount necessary to replace the **business equipment**; or

  (ii)  the amount necessary to repair the **business equipment**.

  **We** will not pay the amount necessary to repair or replace **business equipment** unless the equipment has been, or is actually going to be, repaired or replaced. Subject to the limit of liability for this coverage, **we** will pay only the amount **you** are required to spend to repair or replace the **business equipment**.

  The most **we** will pay for **loss** to **business equipment** in any one occurrence is the $5,000 limit of liability for this **business equipment** coverage.

2.  **Deductible**

  For each **loss** to **covered property** that qualifies for coverage under this endorsement, the deductible shown on the **declarations page** for this "Cargo Liability" coverage will be applied to reduce the **loss** payable on the **covered property**. A $250 deductible will apply to each **business equipment loss**. For each **loss** to **business equipment** that qualifies for coverage under this endorsement, the **business equipment** deductible will be applied to reduce the **loss** payable on the **business equipment**.

  If there is other **loss** arising out of a single occurrence that applies under this endorsement, or under the associated Commercial Auto Policy, and/or any other endorsement attached thereto, only one deductible will be applied to the aggregate of all **loss** components. The highest deductible applicable to any single coverage implicated in the **loss** will apply.

  If **we** pay for any part of a deductible in the settlement of any claim or lawsuit, **you** must reimburse **us** for the deductible or the portion thereof that **we** paid.

3.  **Insurable Interest**

  **We** will not cover more than **your** insurable interest in any **covered property** or **business equipment**.

4.  **Sets or Parts**

  a.  Sets

  The **loss** to an article that is part of a set will not be considered a **loss** to the entire set. Therefore, if there is a **loss** to **covered property** or **business equipment** that is part of a set, **we** at **our** option may choose to:

  (a)  repair or replace any part to restore the pair or set to its value before the **loss** or damage; or

  (b)  pay the difference between the value of the pair or set before and after the **loss** or damage.

  b.  Parts

  If **loss** is to a part of **covered property** or **business equipment** that consists of several parts, **we** will pay for only the lost or damaged part.

**DUTIES IN CASE OF A LOSS**

The following additional duties apply under this Motor Truck Cargo Legal Liability Coverage endorsement:

1.  **You** must take all reasonable steps to protect **covered property** and **business equipment** at the time of and after a **loss** to

0020

avoid further damage.

2.   **You** must allow **us** to have all property involved in an **accident** or **loss** inspected and appraised before its repair or disposal.

3.   **You** must give **us** a copy of the descriptions and schedules from all insurance policies applicable to the **covered property** or **business equipment**, whichever the case may be, that was destroyed or damaged.

4.   **You** must send **us** a signed, sworn proof of loss containing all the information **we** request to settle the claim. **You** must do this within 60 days after **our** request. **We** will supply **you** with the necessary forms.

5.   **You** must, as often as **we** reasonably require, submit, and so far as is within **your** power, cause all other persons interested in the **covered property** or **business equipment**, whichever the case may be, and members of their households and employees to submit, to examination under oath by any person **we** name, and, in connection with any claim made, to produce for examination all books of accounts, uniform bills of lading, shipping receipts, invoices, drivers' log books, and any other documents, at such reasonable time and place as **we** may designate, and permit extracts and copies thereof to be made.

6.   Unless **we** give **our** permission, **you** may not dispose of the carcass(es) of animals, birds, or fish until **we** inspect or examine such carcass(es). However, this clause does not apply if such disposal is required by law or ordinance.

**GENERAL PROVISIONS**

1.   When used in this endorsement, subsection 3—Other Insurance of the General Provisions section of **your** Commercial Auto Policy is deleted in its entirety and replaced by the following:

   a.   **Other Insurance**
      (i)   **You** may have other insurance subject to the same terms, conditions, and provisions as the insurance provided by this endorsement. If **you** do, **we** will pay **our** share of the covered **loss**. **Our** share is the proportion that the applicable limit of liability under this endorsement bears to the total of the limits of liability of all policies covering on the same basis.
      (ii)  If there is other insurance covering the same **loss**, other than that described in paragraph (i) above, **we** will pay only for the amount of the covered **loss** in excess of the amount due from that other insurance, whether **you** can collect on it or not. However, **we** will not pay more than **our** applicable limit of liability.

   b.   **Insurance Under Two or More Coverages**
      If two or more of this endorsement's coverages apply to the same **loss**, **we** will not pay more than the amount of the **loss** as determined under subsection 1—Amount of Payment in the Limits of Liability section of this endorsement, or the limit of liability applicable to the most specific coverage, whichever is less.

2.   The following additional General Provisions apply to this Motor Truck Cargo Legal Liability Coverage endorsement:

   a.   **Payment of Loss**
      (i)   A covered **loss** will be payable 30 days after a satisfactory proof of loss is received or a final judgment award has been entered.

      **We** may make payment for a **loss** either to **you** or the owner of the property. **We** will not pay the owner more than their financial interest in the property. If **we** make a payment to the owner of the property, this shall be in full satisfaction of any claim by **you** for which such payment has been made.

0021

If a **loss** has been paid or made good by others, **we** will not be liable for any part of the **loss**. Payment for a **loss** is required only if **you** have fully complied with all the terms of this policy.

(ii)  With respect to **covered property**, **we** have the following options:

    (a)  pay the value of the **loss** as determined under subsection 1—Amount of Payment in the Limits of Liability section of this endorsement;

    (b)  pay the cost of repairing or replacing the **covered property**;

    (c)  rebuild, repair, or replace the **covered property** with property of like kind and quality, to the extent practicable, and within a reasonable time; or

    (d)  take all or any part of the damaged property at an agreed value.

(iii)  With respect to **business equipment**, **we** will pay the loss as determined under subsection 1—Amount of Payment in the Limits of Liability section of this endorsement.

b.  **Abandonment**

    **We** may keep all or part of the property at the agreed or appraised value, but **you** may not abandon any property to **us** without **our** written consent.

c.  **Conformity with Statute**

    When a condition of this coverage is in conflict with an applicable law, that condition is amended to conform to that law.

d.  **Recovered Property**

    If **you** or **we** recover any **covered property** or **business equipment** for which **we** have made payment under this policy, **you** or **we** will promptly notify the other of the recovery. At **your** option, the property will be returned to or retained by **you** or it will become **our** property. If **you** keep the property, **you** must return to **us** the amount **we** paid to **you** for the **covered property** or **business equipment**, whichever the case may be. **We** will pay recovery expenses and the expenses to repair the recovered **covered property** and **business equipment**, subject to the limit of liability.

    If **we** have already paid **you** the **loss** amount at the time of any salvage or recovery, the amount **you** receive for the recovered **covered property** will accrue entirely to **our** benefit until **you** have paid any amounts owed to **us** as a result of the adjustment to the **loss** amount.

e.  **Salvage**

    Any recovery of salvage on a **loss** will accrue entirely to **our** benefit until the sum **we** paid has been replaced. If **our** benefit of salvage recovery exceeds the sum that **we** paid, **we** will return the difference to **you**, less any salvage recovery expenses.

f.  **Policy Period and Territory**

    Coverage under this endorsement applies only to **losses** that occur during the policy period shown on the **declarations page** and which occur within the United States or Canada.

g.  **Coverage Required by Filings**

    If **we** have filed a certificate of insurance on **your** behalf with any regulatory or governmental agency, and:

    (i)  **we** are required to pay any judgment entered against **you**; or

    (ii)  **we** agree to settle a claim or lawsuit;

    arising out of a **loss** that is covered solely because of the existence of such certificate of insurance, **we** will be obligated to

0022

pay no more than the minimum amount required by that agency or any applicable law. If any payment is based solely on the existence of such certificate, **you** must reimburse **us** in full for **our** payment, including legal fees and costs **we** incurred, whether the payment is made as a result of judgment or settlement.

h.  **No Benefit to Bailee**

No person or organization other than **you**, having custody of **covered property** or **business equipment**, will benefit from this insurance.

i.  **Transfer of Rights of Recovery Against Others to Us**

If any person or organization to or for whom **we** make payment under this endorsement has rights to recover damages from another, those rights are transferred to **us** to the extent of **our** payment. That person or organization must do everything necessary to secure **our** rights and must do nothing after **loss** to impair them. But **you** may waive **your** rights against another party in writing:

(i)  Prior to a **loss** to the **covered property** or **business equipment**.

(ii) After a **loss** to the **covered property** or **business equipment**, but only if, at the time of **loss**, that party is one of the following:

(a)  someone insured by this insurance; or

(b)  a business firm:

(1)  owned or controlled by **you**; or

(2)  that owns or controls **you**.

j.  **Legal Action Against Us**

No one may bring a legal action against **us** under this endorsement unless:

(i)  there has been full compliance with all the terms of this policy; and

(ii) the action is brought within two years after **you** first have knowledge of the direct **loss** or damage.

k.  **Premiums**

The first named insured shown on the **declarations page**:

(i)  is responsible for the payment of all premiums; and

(ii) will be the payee for any return premiums **we** pay.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THIS POLICY REMAIN UNCHANGED.**

0023

# COMMERCIAL GENERAL LIABILITY ENDORSEMENT

Various provisions in this endorsement restrict coverage.  Read the entire endorsement carefully to determine **your** rights, duties, and what is and is not covered.

**We** agree with **you** that the following coverage is added to your Commercial Auto Policy:

## ADDITIONAL DEFINITIONS USED IN THIS ENDORSEMENT

The following definitions are in addition to those found in the Commercial Auto Policy.  Except as otherwise defined in this endorsement, terms appearing in boldface type, whether in the singular, plural or possessive, will have the following meanings.

1. "**Advertisement**" means a notice that is broadcast or published to the general public or specific market segments about **your** goods, products or services for the purpose of attracting customers or supporters.  **Advertisement** includes material placed on the Internet or on similar electronic means of communication; however, regarding websites, only that part of a website that is about **your** goods, products or services for the purpose of attracting customers or supporters is considered an **advertisement**.

2. "**Coverage territory**" means:
   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;
   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or
   c. All other parts of the world if the injury or damage arises out of:
      (i) Goods or products made or sold by **you** in the territory described in a. above;
      (ii) The activities of a person whose home is in the territory described in a. above, but who is away for a short time on **your** business; or
      (iii) Personal and advertising injury offenses that take place through the Internet or similar electronic means of communication;
   provided that the **insured's** responsibility to pay damages is determined in a **suit** on the merits, in the territory described in a. above or in a settlement agreed to by **us**.

3. "**Executive officer**" means a person holding any of the officer positions created by **your** charter, constitution, by-laws or any other similar governing document.

4. "**Fungi**" means any type of form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

5. "**Hostile fire**" means a fire or explosion that is uncontrolled or breaks out from where it was intended to be.

6. "**Impaired property**" means tangible property, other than **your product** or **your work**, that cannot be used or is less useful than intended by its manufacturer or designer because:
   a. It incorporates **your product** or **your work** that is known or thought to be defective, deficient, inadequate or dangerous; or
   b. **You** have failed to fulfill the terms of a contract or agreement;
   if such property can be restored to use by:

1

0024

a.  The repair, replacement, adjustment or removal of **your product** or **your work**; or

b.  **Your** fulfilling the terms of the contract or agreement.

7.  "**Insured**" means:

    a.  If **you** are designated in on the **Declarations Page** as:

        i.     An individual:  **you** and **your** spouse, but only with respect to the conduct of a business of which **you** are the sole owner.

        ii.    A partnership or joint venture:  **you**. **Your** members, partners, and their spouses, are also **insureds**, but only with respect to the conduct of **your** business.

        iii.   A limited liability company:  **you**. **Your** members are also **insureds**, but only with respect to the conduct of **your** business. **Your** managers are **insureds**, but only with respect to their duties as **your** managers.

        iv.   An organization other than a partnership, joint venture or limited liability company: **you**. **Your** "executive officers" and directors are also **insureds**, but only with respect to their duties as **your** officers or directors. **Your** stockholders are also insureds, but only with respect to their liability as stockholders.

        v.    A trust:  **you**. **Your** trustees are also insureds, but only with respect to their duties as trustees.

    b.  Each of the following is also an **insured**:

        i.     **Your** volunteer workers, but only while performing duties related to the conduct of **your** business.

        ii.    **Your** employees, other than **your executive officers** (if **you** are an organization other than a partnership, joint venture or limited liability company) or **your** managers (if **you** are a limited liability company), but only for acts within the scope of their employment by **you** or while performing duties related to the conduct of **your** business.

No employee or volunteer worker is an insured for:

    (1) **Bodily injury** or **personal and advertising injury**:

        (a) to **you**, to **your** partners or members (if **you** are a partnership or joint venture), to **your** members (if **you** are a limited liability company), to a co-employee while in the course of his or her employment or performing duties related to the conduct of **your** business, or to **your** other volunteer workers while performing duties related to the conduct of **your** business;

        (b) to the spouse, child, parent, brother, or sister of the co-employee or volunteer worker as a consequence of paragraph (1)(a) above;

        (c) for which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs (1)(a) or (b) above; or

        (d) arising out of his or her providing or failing to provide professional health care services.

    (2) **Property damage** to property:

        (a) owned, occupied, or used by,

        (b) rented to, in the care, custody, or control of, or over which physical control is being exercised for any purpose by

    **you**, any of **your** employees, volunteer workers, any partner or member (if **you** are a partnership or joint venture), or any member (if **you** are a limited liability company).

        iii.   Any person (other than **your** employee or volunteer worker), or any organization while acting as **your** real estate manager.

0025

        iv.    Any person or organization having proper temporary custody of your property if **you** die, but only:

            A.  with respect to liability arising out of the maintenance or use of that property; and

            B.  until **your** legal representative has been appointed.

        v.    **Your** legal representative if **you** die, but only with respect to duties as such. That representative will have all **your** rights and duties under this endorsement.

c.  Any organization **you** newly acquire or form, other than a partnership, joint venture or limited liability company, and over which **you** maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to the organization. However:

        i.    Coverage under this provision is afforded only until the 90th day after **you** acquire or form the organization or the end of the policy period, whichever is earlier;

        ii.   Coverage A does not apply to **bodily injury** or **property damage** that occurred before **you** acquired or formed the organization; and

        iii.  Coverage B does not apply to **personal and advertising injury** arising out of an offense committed before **you** acquired or formed the organization.

No person or organization is an **insured** with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

8.  "**Insured contract**" for purposes of this endorsement only, means:

a.  A contract for a lease of premises. However, any portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to **you** or temporarily occupied by **you** with permission of the owner is not an **insured contract**;

b.  A sidetrack agreement;

c.  Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d.  An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e.  An elevator maintenance agreement; and

f.  That part of any other contract or agreement pertaining to **your** business (including an indemnification of a municipality in connection with work performed for a municipality) under which **you** assume the tort liability of another party to pay for **bodily injury** or **property damage** to a third person or organization. Tort liability, as referred to in this provision, means a liability that would be imposed by law in the absence of any contract or agreement.

However, this paragraph f. does not include that part of any contract or agreement:

    (1)  That indemnifies a railroad for **bodily injury** or **property damage** arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

    (2)  That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

        (a)  Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

        (b)  Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

    (3)  Under which the **insured**, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the **insured's** rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

9. "**Loading or unloading**" means the handling of property:

   a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or **auto**;

   b. While it is in or on an aircraft, watercraft or **auto**; or

   c. While it is being moved from an aircraft, watercraft or **auto** to the place where it is finally delivered; however, **loading or unloading** does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or **auto**.

10. "**Occurrence**" means an **accident**, happening or event, including continuous or repeated exposure to substantially the same general harmful conditions.

11. "**Personal and advertising injury**" means injury, including consequential **bodily injury**, arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Oral or written publication in any manner, including, but not limited to, e-mail, blogs, and other electronic publication, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e. Oral or written publication, in any manner including but not limited to e-mail, blogs, and other electronic publication, of material that violates a person's right of privacy;

   f. The use of another's advertising idea in **your advertisement**; or

   g. Infringing upon another's copyright, trademark, trade dress or slogan in **your advertisement**.

12. "**Product/completed operations hazard**":

   a. Includes all **bodily injury** and **property damage** occurring away from premises **you** own or rent and arising out of **your product** or **your work** except:

     (i) Injury or damage caused by products that are still in **your** physical possession; or

     (ii) Work that has not yet been completed or abandoned. **Your work** will be deemed completed at the earliest of the following times:

       (a) When all of the work called for in **your** contract has been completed;

       (b) When all of the work to be done at the job site has been completed if **your** contract calls for work at more than one job site; or

       (c) When that part of the work done at a particular job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

     Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

   b. Does not include **bodily injury** or **property damage** arising out of:

     (i) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle, including an aircraft or watercraft, not owned or operated by **you**, and that condition was created by the **loading or unloading** of that vehicle by any **insured**;

     (ii) The existence of tools, uninstalled equipment, or abandoned or unused materials

13. "**Property damage**" for purposes of this endorsement only, means:

0027

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **occurrence** that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

14. "**Silica**" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

15. "**Silica-related dust**" means a mixture or combination of silica and other dust or particles.

16. "**Suit**" means a civil proceeding involving allegations of damages because of **bodily injury**, **property damage** or **personal and advertising injury** to which this insurance applies. **Suit** includes but is not limited to:

a. An arbitration proceeding in which such damages are claimed and to which the **insured** must submit or does submit with **our** consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the **insured** submits with **our** consent.

17. "**Your product**" means:

a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
   (i)   **You**;
   (ii)  Others trading under **your** name; or
   (iii) A person or organization whose business or assets **you** have acquired: and

b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**Your product** includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your product**; and

b. The providing of or failure to provide warnings or instructions.

**Your product** does not include vending machines or other property rented to or located for the use of others but not sold.

18. "**Your work**" means:

a. Work or operations performed by **you** or on **your** behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

**Your work** includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your work**; and

b. The providing of or failure to provide warnings or instructions.

## SECTION I – COVERAGES

## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. **We** will pay those sums, OTHER THAN PUNITIVE OR EXEMPLARY DAMAGES, that the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** to which this insurance applies. **We** will have the right and duty to defend the **insured** against any **suit** seeking those damages. However, **we** will have no duty to defend the **insured** against any **suit** seeking damages for **bodily injury** or **property damage** to which this insurance does not apply. **We** may, at **our** discretion, investigate any **occurrence** and settle any claim or **suit** that may result. However:

      (1) The amount **we** will pay for damages is limited as described in Section II – Limits Of Liability; and

      (2) **Our** right and duty to defend ends when **we** have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A and B or medical expenses under Coverage C;

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

   b. This insurance applies to **bodily injury** and **property damage** only if:

      (1) The **bodily injury** or **property damage** is caused by an **occurrence** that takes place in the **coverage territory**; and

      (2) The **bodily injury** or **property damage** occurs during the policy period.

      Any **bodily injury** or **property damage**, whether such **bodily injury** or **property damage** is known or unknown, that first occurred prior to the inception date of this policy (or the retroactive date of this policy, if any, whichever is earlier), or that is, or alleged to be, in the process of occurring at the inception date of this policy (or the retroactive date of this policy, if any, whichever is earlier), even if the **occurrence** continues during this policy period, will be deemed to have occurred prior to the policy period. Any **bodily injury** or **property damage**, whether known or unknown, which is in the process of settlement, adjustment or **suit** as of the inception date of this policy (or the retroactive date of this policy, if any, whichever is earlier) will also be deemed to have occurred prior to the policy period.

      **Bodily injury** or **property damage** that first occurs during this policy period includes any continuation, change or resumption of that **bodily injury** or **property damage** after the end of this policy period.

   c. Damages because of **bodily injury** or **property damage** include damages claimed by any person or organization for care, loss of services, or death resulting at any time from the **bodily injury**.

   d. In the event that a claim or **suit** seeks damages, some of which are covered and others of which are not covered by this policy, the **insured** must agree to a reasonable allocation of the costs and fees of defense, and the **insured** will be responsible for payment of the costs and fees to defend the damages

6

0029

or claims not covered by this policy.  This agreement shall be reached in writing, signed by the **insured** and **us**, prior to the date when a responsive pleading to the claim or **suit** is filed on behalf of the **insured**.  In the absence of such agreement, **our** duty to defend will apply only to those specific portions of the **suit** that are covered.

## EXCLUSIONS - READ THE FOLLOWING EXCLUSIONS CAREFULLY.  IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS ENDORSEMENT.

Coverage under Coverage A does not apply to:

**a.  Expected or Intended Injury**

**Bodily injury** or **property damage** expected or intended from the standpoint of any **insured**.  This exclusion does not apply to **bodily injury** resulting from the use of reasonable force to protect persons or property.

**b.  Contractual Liability**

**Bodily injury** or **property damage** for which the **insured** is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:
(1)   That the **insured** would have in the absence of the contract or agreement; or
(2)   Assumed in a contract or agreement that is an **insured contract**, provided the **bodily injury** or **property damage** occurs subsequent to the execution of the contract or agreement.  Solely for the purposes of liability assumed in an **insured contract**, reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an **insured** are deemed to be damages because of **bodily injury** or **property damage**, provided:
(i) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same **insured contract**; and
(ii)   Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c.  Liquor Liability**

**Bodily injury** or **property damage** for which any **insured** may be held liable by reason of:
(1)   Causing or contributing to the intoxication of any person;
(2)   The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or
(3)   Any statute, ordinance or regulation relating to the sale, gift, distribution, selling, or use of alcoholic beverages.

This exclusion applies only if **you** are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d.  Workers' Compensation and Similar Laws**

7

Any obligation for which an **insured** or an insurer of that **insured**, even if one does not exist, may be held liable under workers' compensation, unemployment compensation, disability benefits law, or any similar law.

**e. Employer's Liability**

**Bodily injury** to:
(1)  An employee of any **insured** arising out of or within the course of:
    i.  that employee's employment by any **insured**; or
    ii. performing duties related to the conduct of any **insured's** business; or
(2)  The spouse, child, parent, brother or sister of that employee as a consequence of Paragraph a. above.

This exclusion applies:
(a)  Whether the **insured** may be liable as an employer or in any other capacity; and
(b)  To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the **insured** under an **insured contract**.

**f. Aircraft, Auto or Watercraft**

**Bodily injury** or **property damage** arising out of:
(1)  The ownership, maintenance, use, or entrustment to others of any aircraft, **auto** or watercraft owned or operated by or rented, leased or loaned to any **insured**; or
(2)  Any **auto you** do not own, lease, hire, rent or borrow that is used in connection with **your** business.
Use includes operation and **loading or unloading**.

This exclusion applies even if the claims against any **insured** allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that **insured**, if the **occurrence** which caused the **bodily injury** or **property damage** involved the ownership, maintenance, use or entrustment to others of any aircraft, **auto** or watercraft that is owned or operated by or rented or loaned to any **insured**.

This exclusion does not apply to:
(1)  A watercraft while ashore on premises **you** own or rent;
(2)  A watercraft **you** do not own that is:
    (a)  Less than 26 feet long; and
    (b)  Not being used to carry persons or property for a charge;
(3)  Parking an **auto** on, or on the ways next to, premises **you** own or rent, provided the **auto** is not owned by or rented or loaned to **you** or the **insured**;
(4)  Liability assumed under any **insured contract** for the ownership, maintenance or use of aircraft or watercraft; or
(5)  **Bodily injury** or **property damage** arising out of:
    (a)  The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of **mobile equipment** if it were not subject to a

8

compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

(b) the operation of any of the machinery or equipment listed in Paragraph B or C of the definition of **auto**.

## g. Mobile Equipment

**Bodily injury** or **property damage** arising out of:

(1) The transportation of **mobile equipment** by an **auto** owned or operated by or rented or loaned to any **insured**; or

(2) The use of **mobile equipment** in, while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

## h. Damage to Property

**Property damage** to:

(1) Property **you** own, rent, or occupy, including any costs or expenses incurred by **you**, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises **you** sell, give away, or abandon, if the **property damage** arises out of any part of those premises;

(3) Property loaned to **you**;

(4) Personal property in the care, custody or control of the **insured**;

(5) That particular part of real property on which **you** or any contractors or subcontractors working directly or indirectly on **your** behalf are performing operations, if the **property damage** arises out of those operations; or

(6) That particular part of any property that must be restored, repaired, or replaced because **your work** was incorrectly performed on it.

Paragraphs (1), (3), and (4) of this exclusion do not apply to **property damage** (other than damage by fire) to premises, including the contents of such premises, rented to **you** for a period of 7 or fewer consecutive days.  A separate limit of insurance applies to Damage To Premises Rented To **You** as described in Section II – Limits of Insurance, subsection 6.

Paragraph (2) of this exclusion does not apply if the premises are **your work** and were never occupied, rented or held for rental by **you**.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to **property damage** included in the **products-completed operation hazard**.

## i. Damage to Your Product

**Property damage** to **your product** arising out of it or any part of it.

9

0032

**j. Damage to Your Work**

**Property damage** to **your work** arising out of it or any part of it and included in the **products/completed operations hazard**.

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on **your** behalf by a subcontractor.

**k. Damage to Impaired Property or Property Not Physically Injured**

**Property damage** to **impaired property** or property that has not been physically injured, arising out of:
(1)   A defect, deficiency, inadequacy or dangerous condition in **your product** or **your work**; or
(2)   A delay or failure by **you** or anyone acting on **your** behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to **your product** or **your work** after it has been put to its intended use.

**l.  Recall of Products, Work or Impaired Property**

Damages claimed for any **loss**, cost or expense incurred by **you** or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
(1)   **Your product**;
(2)   **Your work**; or
(3)   **Impaired property**;
if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**m. Personal and Advertising Injury**

**Bodily injury** arising out of **personal and advertising injury**.

**n. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

Exclusions c. through n. under this Coverage A do not apply to damage by fire to premises while rented to **you** or temporarily occupied by **you** with permission of the owner.  A separate limit of insurance applies to this coverage as described in Section II – Limits Of Insurance.

0033

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

1. **Insuring Agreement**
   a. **We** will pay those sums, OTHER THAN PUNITIVE OR EXEMPLARY DAMAGES, that the **insured** becomes legally obligated to pay as damages because of **personal and advertising injury** to which this insurance applies. **We** will have the right and duty to defend the **insured** against any **suit** seeking those damages. However, **we** will have no duty to defend the **insured** against any **suit** seeking damages for **personal and advertising injury** to which this insurance does not apply. **We** may, at **our** discretion, investigate any offense and settle any claim or **suit** that may result. However:
      (1) The amount **we** will pay for damages is limited as described in Section II – Limits Of Liability; and
      (2) **Our** right and duty to defend end when **we** have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A and B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

   b. This insurance applies to **personal and advertising injury** caused by an offense arising out of **your** business but only if the offense was committed in the **coverage territory** during the policy period.

**EXCLUSIONS - READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS ENDORSEMENT.**

Coverage under Coverage B does not apply to **personal and advertising injury**:

a. **Knowing Violation of Rights of Another**
   Caused by or at the direction of any **insured** with the knowledge that the act would violate the rights of another and would inflict **personal and advertising injury**.

b. **Material Published with Knowledge of Falsity**
   Arising out of oral or written publication of material, if published by or at the direction of the **insured** with knowledge of its falsity.

c. **Material Published Prior to Policy Period**
   Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

d. **Criminal Acts**
   Arising out of a criminal act committed by or at the direction of any **insured**.

e. **Contractual Liability**
   For any **loss** for which the **insured** has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the **insured** would have in the absence of the contract or agreement.

f. **Breach of Contract**

0034

Arising out of a breach of contract, except an implied contract to use another's advertising idea in **your advertisement**.

**g. Quality or Performance of Goods – Failure to Conform to Statements**
Arising out of the failure of goods, products or services to conform to any statement of quality or performance made in **your advertisement**.

**h. Wrong Description of Prices**
Arising out of the wrong description of price of goods, products or services stated in **your advertisement**.

**i. Insureds in Media and Internet Type Businesses**
Committed by an **insured** whose business is:
(i) Advertising, broadcasting, publishing or telecasting;
(ii) Designing or determining content of websites for others; or
(iii) An Internet search, access, content or service provider.
However, this exclusion does not apply to Paragraphs 11.a, 11.b and 11.c. of **personal and advertising injury** under the Additional Definitions Used In This Endorsement Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for **you** or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**j. Infringement of Copyright, Patent, Trademark or Trade Secret**
Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in **your advertisement**, of copyright, trade dress or slogan.

**k. Electronic Chatrooms or Bulletin Boards**
Arising out of an electronic chatroom or bulletin board the **insured** hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use of Another's Name or Product**
Arising out of the unauthorized use of another's name or product in **your** e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

## GENERAL POLICY EXCLUSIONS

**The following exclusions are applicable to both Coverage A and Coverage B.**

This endorsement provides no coverage for the following:

**a. Asbestos**

**Bodily injury**, **property damage** or **personal and advertising injury** arising out of, resulting from, caused by, or contributed to, either directly or indirectly, by:

12

1.  inhaling, ingesting, or prolonged physical exposure to asbestos or goods or products containing asbestos; or
2.  the use of asbestos in constructing or manufacturing any good, product or structure; or
3.  the removal of asbestos from any good, product or structure; or
4.  the manufacture, transportation, storage or disposal of asbestos or goods or products containing asbestos;

This exclusion includes, but is not limited to, any cost for investigation, defense, abatement, mitigation, removal or disposal of asbestos or asbestos containing materials.

**b.  Lead**

**Bodily injury**, **property damage** or **personal and advertising injury** arising out of, resulting from, caused by, or contributed to, either directly or indirectly, by lead or lead based products or any exposure or contamination of any person or property to such lead or lead based product.  This exclusion includes but is not limited to any cost for abatement, mitigation, removal or disposal of paint, plumbing solder, pipes and fixtures or other items containing lead.

**c.  Fungi or bacteria**

**Bodily injury**, **property damage** or **personal and advertising injury** which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any **fungi** or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

This coverage also does not apply to any **loss**, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, **fungi** or bacteria, by any **insured** or by any other person or entity.

This exclusion does not apply to any **fungi** or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**d.  Silica or silica-related dust**

1.  **Bodily injury**, **property damage**, or **personal and advertising injury** arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, **silica** or **silica-related dust**.

2.  Any **loss**, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of **silica** or **silica-related dust**, by any **insured** or by any other person or entity.

**e.  Employment-Related Practices Exclusion**

**Bodily injury** or **personal and advertising injury** to:

0036

(1) A person arising out of any:
 1. Refusal to employ that person;
 2. Termination of that person's employment; or
 3. Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or
(2) The spouse, child, parent, brother or sister of that person as a consequence of **bodily injury** to that person at whom any of the employment-related practices described in paragraphs 1, 2 or 3 above is directed.

This exclusion applies:
(a) Whether the **insured** may be liable as an employer or in any other capacity; and
(b) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**f. Assault and/or Battery Exclusion**

The coverage under this policy does not apply to any claim, **suit**, cost or expense arising out of assault and/or battery, or out of any act or omission in connection with the prevention or suppression of such acts, whether caused by or at the instigation or direction of any **insured** or **insured's** employees, patrons or any other person.

**g. Sexual Abuse and/or Molestation Exclusion**

The coverages under this policy do not apply to **bodily injury**, **property damage** or **personal and advertising injury** arising out of
(1) The actual or threatened abuse or molestation or licentious, immoral or sexual behavior whether or not intended to lead to, or culminating in any sexual act, of any person, whether caused by, or at the instigation of, or at the direction of, or omission by, any **insured**, his/her employees, or any other person; or
(2) The actual or alleged transmission of any sexually transmitted disease.
Abuse includes, but is not limited to, negligent or intentional infliction of physical, emotional or psychological injury or harm.

This exclusion does not apply to the vicarious liability of the named insured for the acts or omissions of employees.

**h. Firearms Exclusion**

This insurance does not apply to any claims, **suits**, accusations or charges or any **loss**, cost, or expense arising out of **bodily injury**, **property damage**, or **personal or advertising injury** arising out of the ownership, rental, maintenance, use or misuse of any firearms.

**l. War**

**Bodily injury**, **property damage** or **personal or advertising injury** due to war, whether declared or undeclared, civil war, insurrection, rebellion, revolution, or to any act or condition incident to these.

14

**j. Pollution**

**Bodily injury, property damage,** or **personal or advertising injury** that would not have occurred in whole or part but for the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of **pollutants** at any time.

This includes any **loss**, cost, or expense arising out of any:
1. Request, demand, order, or statutory or regulatory requirement that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of **pollutants**; or
2. Claim or **suit** by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to, or assessing the effects of, "**pollutants**".

**s. Nuclear Energy Liability**

(1) **Bodily injury** or **property damage**:
  (a) With respect to which an **insured** under the policy is also an **insured** under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an **insured** under any such policy but for its termination upon exhaustion of its limit of liability; or
  (b) Resulting from the **hazardous properties** of **nuclear material** and with respect to which:
    1. any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or
    2. the **insured** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.
(2) **Bodily injury** resulting from the **hazardous properties** of **nuclear material** and arising out of the operation of a **nuclear facility** by any person or organization.
(3) **Bodily injury** or **property damage** resulting from **hazardous properties** of **nuclear material**, if:
  (a) The **nuclear material**:
    1. is at any **nuclear facility** owned by, or operated by or on behalf of, an **insured**; or
    2. has been discharged or dispersed from any **nuclear facility** owned by, or operated by or on behalf of, an **insured**.
  (b) The **nuclear material** is contained in **spent fuel** or **waste** at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an **insured**; or
  (c) The **bodily injury** or **property damage** arises out of the furnishing by an **insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **nuclear facility**, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) only applies to **property damage** to such **nuclear facility** and any property threat.
(4) When used in this exclusion:
  (a) **Hazardous properties** includes radioactive, toxic or explosive properties.

0038

(b) **Nuclear material** means **source material**, **special nuclear material**, or **by-product material**.

(c) **Source material**, **special nuclear material**, and **by-product material** have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

(d) **Spent fuel** means any fuel element or fuel component, solid, or liquid, which has been used or exposed to radiation in a **nuclear reactor**.

(e) **Waste** means any waste material:

1. containing **by-product material** other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its **source material** content; and

2. resulting from the operation by any person or organization of any **nuclear facility** included under the first two paragraphs of the definition of **nuclear facility**.

(f) **Nuclear facility** means:

1. Any **nuclear reactor**;

2. Any equipment or device designed or used for:

   a) separating the isotopes of uranium or plutonium;

   b) processing or utilizing **spent fuel**; or

   c) handling, processing or packaging **waste**.

3. Any equipment or device used for the processing, fabricating or alloying of **special nuclear material** if at any time the total amount of such material in the custody of the **insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; or

4. any structure, basic, excavation, premises or place prepared or used for the storage or disposal of **waste**;

   and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

(g) **Nuclear reactor** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

(h) **Property damage** includes all forms of radioactive contamination of property.

## SUPPLEMENTARY PAYMENT – COVERAGES A AND B

1. **We** will pay, with respect to any claim **we** investigate or settle, or any **suit** against an **insured we** defend:

   a. All expenses **we** incur.

   b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage under this policy applies. **We** do not have to furnish these bonds.

   c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. **We** do not have to furnish these bonds.

   d. All reasonable expenses incurred by the **insured** at **our** request to assist **us** in the investigation or defense of the claim or **suit**, including actual loss earnings up to $250 a day because of time off from work.

   e. All cost taxed against the **insured** in the **suit**.

   f. Prejudgment interest awarded against the **insured** on the part of the judgment **we** pay. If **we** make an offer to pay the applicable limit of insurance, **we** will not pay any prejudgment interest based on that period of time after the offer.

16

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before **we** have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If **we** defend an **insured** against a **suit** and an indemnitee of the **insured** is also named as a party of the **suit**, **we** will defend that indemnitee if all of the following conditions are met:

a. The **suit** against the indemnitee seeks damages for which the **insured** has assumed the liability of the indemnitee in a contract or agreement that is an **insured contract**;

b. This insurance applies to such liability assumed by the **insured**;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the **insured** in the same **insured contract**;

d. The allegations in the **suit** and the information **we** know about the **occurrence** are such that no conflict appears to exist between the interests of the **insured** and the interests of the indemnitee;

e. The indemnitee and the **insured** ask **us** to conduct and control the defense of that indemnite against such **suit** and agree that **we** can assign the same counsel to defend the **insured** and the indemnitee; and

f. The indemnitee:

  (1) Agrees in writing to:

    (a) Cooperate with **us** in the investigation, settlement or defense of the **suit**;

    (b) Immediately send **us** copies of any demands, notices, summonses or legal papers received in connection with the **suit**;

    (c) Notify any other insurer whose coverage is available to the indemnitee; and

    (d) Cooperate with **us** with respect to coordinating other applicable insurance available to the indemnitee; and

  (2) Provides **us** with written authorization to:

    (a) Obtain records and other information related to the **suit**; and

    (b) Conduct and control the defense of the indemnitee in such **suit**.

So long as the above conditions are met, attorneys' fees incurred by **us** in the defense of that indemnitee, necessary litigation expenses incurred by **us** and necessary litigation expenses incurred by the indemnitee at **our** request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for **bodily injury** and **property damage** and will not reduce the limits of insurance.

**Our** obligation to defend an **insured's** indemnitee and pay attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

a. **We** have used up the applicable limit of insurance in the payment of judgments or settlements; or

b. The conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

## COVERAGE C – MEDICAL PAYMENTS

1. **Insuring Agreement**

a. **We** will pay medical expenses as described below for **bodily injury** caused by an **accident**:

  (1) On premises **you** own or rent;

  (2) On ways next to premise **you** own or rent; or

0040

(3)   Because of **your** operations;
Provided that:
(1)   The **accident** takes place in the **coverage territory** and during the policy period;
(2)   The expenses are incurred and reported to **us** within one year of the date of the **accident**; and
(3)   The injured person submits to examination, at **our** expense, by physicians of **our** choice as often as **we** reasonably require.
b.  **We** will make these payments regardless of fault.  These payments will not exceed the applicable limit of insurance.  **We** will pay reasonable expenses for:
(1)   First aid administered at the time of an accident;
(2)   Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and
(3)   Necessary ambulance, hospital, professional nursing and funeral services.

2.  **Exclusions**
**We** will not pay expenses for **bodily injury**:
**a.  Any Insured**
To any **insured.**

**b.  Hired Person**
To a person hired to do work for or on behalf of any **insured** or a tenant of any **insured.**

**c.  Injury on Normally Occupied Premises**
To a person injured on that part of premises **you** own or rent that the person normally occupies.

**d.  Workers Compensation and Similar Laws**
To a person, whether or not an **employee** of any **insured**, if benefits for the **bodily injury** are payable or must be provided under a workers' compensation, disability benefits, or unemployment law or a similar law.

**e.  Athletic Activities**
To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f.  Products-Completed Operations Hazard**
Included within the **product-completed operations hazard**.

**g.  Coverage A Exclusions**
To a person if the **bodily injury** would be excluded under Coverage A.

**h.  War**
Due to war, whether or not declared, or any act or condition incident of war.  War includes civil war, insurrection, rebellion or revolution.

## SECTION II – LIMITS OF LIABILITY

1.  The Limits of Liability shown on the **Declarations Page** and the rules below fix the most **we** will pay regardless of the number of:
a.  **Insureds**;

18

0041

b. Claims made or **suits** brought: or

c. Persons or organizations making claims or bringing **suits**.

2. The General Aggregate Limit is the most **we** will pay for the sum of:

    a. Medical expenses under Coverage C;

    b. Damages under Coverage A, except damages because of **bodily injury** or **property damage** included in the **products-completed operations hazard**; and

    c. Damages under Coverage B.

3. The Product-Completed Operations Aggregate Limit is the most **we** will pay under Coverage A for damages because of **bodily injury** and **property damage** included in the **product-completed operations hazard**.

4. Subject to Paragraph 2. above, the Personal and Advertising Injury Limit is the most **we** will pay under Coverage B for the sum of all damages because of all **personal and advertising injury** sustained by any one person or organization.

5. Subject to Paragraph 2. or 3. above, whichever applies, the Each **Occurrence** Limit is the most **we** will pay for the sum of:

    a. Damages under Coverage A; and

    b. Medical expenses under Coverage C;

    because of all **bodily injury** and **property damage** arising out of any one **occurrence**.

6. Subject to Paragraph 5. above, the Damage To Premises Rented To **You** Limit is the most **we** will pay under Coverage A for damages because of **property damage** to any one premises, while rented to **you**, or in the case of damage by fire, while rented to **you** or temporarily occupied by **you** with permission of the owner.

7. Subject to Paragraph 5. above, the Medical Expense Limit is the most **we** will pay under Coverage C for all medical expenses because of **bodily injury** sustained by any one person.

The Limits of Liability of this policy apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown on the **Declarations Page**, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Liability.

## SECTION III – COMMERCIAL GENERAL LIABILITY PROVISIONS AND CONDITIONS

The following provisions and conditions apply to this endorsement, and are in addition to the General Provisions of the Commercial Auto Policy, and to any schedules, endorsements, or modifications thereto:

1. **Legal Action Against Us**

    No person or organization has a right under this endorsement:

    (a)    To join **us** as a party or otherwise bring **us** into a **suit** asking for damages from an **insured**; or

    (b)    To sue **us** on this endorsement unless all of its terms have been fully complied with.

    A person or organization may sue **us** to recover on an agreed settlement or on a final judgment against an **insured**, but **we** will not be liable for damages that are not payable under the terms of this endorsement or that are in excess of the applicable limit of liability. An agreed settlement means a settlement and release of liability signed by **us**, the **insured** and the claimant or the claimant's legal representative.

2. **Other Insurance**

0042

If other valid and collectible insurance is available to the **insured** for a **loss we** cover under Coverages A and B of this policy, **our** obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when Paragraph b. below applies.  If this insurance is primary, **our** obligations are not affected unless any of the other insurance is also primary.  Then, **we** will share with all that other insurance by the method described in Paragraph c. below.

b. Excess Insurance

When this insurance applies, it is excess over:

(1) Any of the other insurance, whether primary, excess, contingent or on any other basis:

    (a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for **your work**;

    (b) That is Fire insurance for premises rented to **you** or temporarily occupied by **you** with permission of the owner;

    (c) That is insurance purchased by **you** to cover **your** liability as a tenant for **property damage** to premises rented to **you** or temporarily occupied by **you** with permission of the owner; or

    (d) If the **loss** arises out of the maintenance or use of an **auto**, aircraft or watercraft to the extent not subject to Exclusions m., n. or o. of Section I – Coverage A – Bodily Injury And Property Damage Liability.

(2) Any other primary insurance available to **you** covering liability for damages arising out of the premises or operations for which **you** have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, **we** will have no duty under Coverages A and B to defend the **insured** against any **suit** if any other insurer has a duty to defend the **insured** against that **suit**.  If no other insurer defends, **we** will undertake to do so, but **we** will be entitled to the **insured's** right against all those other insurers.

When this insurance is excess over other insurance, **we** will pay only **our** share of the amount of the **loss**, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the **loss** in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

**We** will share the remaining **loss**, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the **Declarations Page** of this policy.

c. Method of Sharing

If all of the other insurance permits contribution by equal shares, **we** will follow this method also.  Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the **loss** remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, **we** will contribute by limits.  Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

0043

3. **Premium Audit**
   a. **We** will compute all premiums for this policy in accordance with **our** rules and rates.
   b. Premium shown in this policy as advance premium is a deposit premium only. At the close of each audit period **we** will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, **we** will return the excess to the first Named Insured.
   c. The first Named Insured must keep records of the information **we** need for premium computation, and send **us** copies at such times as **we** may request.

4. **Representations**
   By accepting this policy, **you** agree:
   a. The statements in the **Declarations Page** are accurate and complete;
   b. Those statements are based upon representation **you** made to **us**; and
   c. **We** have issued this policy in reliance upon **your** representations.

5. **Cancellation**
   **You** may cancel this policy by calling or writing **us**, and stating the future date that **you** wish the cancellation to be effective.

   **We** may cancel this policy by mailing a notice of cancellation to the named insured shown on the **Declarations Page** at the last known address appearing in **our** records. If **we** cancel this policy during the first sixty (60) days of the initial policy period for any reason other than nonpayment of premium, notice of cancellation will be mailed at least thirty (30) days before the effective date of cancellation. If **we** cancel this policy at any time due to nonpayment of premium, notice of cancellation will be mailed at least ten (10) days before the effective date of cancellation. After this policy is in effect for more than sixty (60) days, or if this is a renewal or continuation policy, notice of cancellation will be mailed at least sixty (60) days before the effective date of cancellation. **Our** notice of cancellation will state the reason(s) for cancellation.

   **We** may cancel this policy for any reason within the first sixty (60) days of the initial policy period.

   After this policy is in effect for more than sixty (60) days, or if this is a renewal or continuation policy, **we** may only cancel for one or more of the following reasons:
   1. **you** do not pay the required premium for this policy when due;
   2. this policy was obtained through a material misrepresentation;
   3. any insured has violated any of the terms and conditions of the policy;
   4. the risk originally accepted has measurably increased;
   5. certification to the Director of the loss of reinsurance by the insurer which provided coverage for **us** for all or a substantial part of the underlying risk insured; or
   6. a determination by the Director that the continuation of the policy could place **us** in violation of the insurance laws of this state.

0044

6. **When We Do Not Renew**
If **we** decide not to renew this policy, **we** will mail or deliver to the first Named Insured shown in the **Declarations Page** written notice of the nonrenewal not less than 60 days before the expiration date. If notice is mailed, proof of mailing will be sufficient proof of notice.

7. **Examination of Your Books and Records**
**We** may examine and audit **your** books and records as they relate to this policy at any time during the policy period and up to three years afterward.

8. **Inspections and Surveys**
**We** have the right but are not obligated to:
a. Make inspections and surveys at any time:
b. Give **you** reports on the conditions **we** find; and
c. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. **We** do not make safety inspections. **We** do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. **We** do not warrant that conditions:
a. Are safe or healthful; or
b. Comply with laws, regulation, codes or standard.

This condition applies to **us** and to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

9. **Premiums**
The first Named Insured shown on the **Declarations Page**
a. Is responsible for the payment of all premiums, and
b. Will be the payee for any return premiums **we** pay.

10. **Knowledge and Notice of Occurrence**
It is agreed that knowledge of an **occurrence** or offense by an agent, servant or employee of the **insured** shall not constitute knowledge to the **insured** unless the corporate risk manager shall have received such notice.

It is also agreed that if the **insured** reports an **occurrence** or offense to its workers' compensation carrier that develops into a liability claim, failure to report such **occurrence** or offense to **us** at the time of the **occurrence** or offense shall not be deemed in violation of Duties in the Event of **Occurrence**, Offense, Claim or **Suit**.

11. **Headings and Subheadings**
The headings and subheadings in this policy and any endorsements or schedules hereto are included solely to aid the reader and do not affect the terms of this policy.

12. **Bankruptcy**
**We** are not relieved of any obligation under this policy because of the bankruptcy or insolvency of an insured.

22

Form Z433 IL (04/08)

0046

Form 2371 (06/10)

## **LIMITED GENERAL LIABILITY - TRUCKING OPERATIONS ENDORSEMENT**

This endorsement modifies insurance provided under the Commercial General Liability coverage form.

If **your declarations page** shows Limited General Liability, and this form number shows on the attachment line, then the Commercial General Liability coverage form is modified as follows:

### **GENERAL POLICY EXCLUSIONS**

### **The following exclusion is applicable to both Coverage A and Coverage B.**

This endorsement provides no coverage for the following:

### 12. **Other than Trucking Operations**

**Bodily injury**, **property damage**, or **personal or advertising injury** arising out of any activity other than the insured's trucking operations or suffered by any person present at the **insured's** premises for reasons that, principally, are not related to the conduct of the **insured's** trucking operations. For purposes of this exclusion, the following are deemed to be other than trucking operations and are excluded:

(i) the use of the **insured's** property for any non-business purpose, such as, for example, a residence; or

(ii) the conduct of any business activity or the rendering of any professional service that is not a necessary part of the **insured's** trucking operations.

## **ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

1

0047

Form Z440 (06/10)

# REFRIGERATION BREAKDOWN COVERAGE **ENDORSEMENT**

This endorsement modifies the Motor Truck Cargo Legal Liability Coverage endorsement. Except as specifically modified by this Refrigeration Breakdown Coverage endorsement, all provisions of the Motor Truck Cargo Legal Liability Coverage endorsement apply.

**We** agree with **you** that the insurance provided under **your** Motor Truck Cargo Legal Liability Coverage endorsement is modified as follows:

**INSURING AGREEMENT**

The following is added to the Insuring Agreement:

Subject to the Limit of Liability, if **you** pay the premium for the Refrigeration Breakdown Coverage endorsement, **we** will pay for **your** legal liability for direct physical **loss** to **covered property**, caused by spoilage or change in temperature, resulting directly from the sudden and accidental breakdown of refrigeration or heating units on an **insured auto**.

**ADDITIONAL DEFINITIONS**

Under the definition of "**covered peril**", Excluded Peril "g." is deleted and replaced by:

g. **Breakdown, Temperature, Humidity**
   (i)  Humidity, dampness, dryness, or changes in or extremes of temper-ature, other than such **loss** caused by the sudden and accidental breakdown of refrigeration or heating units on the **insured auto**; or
   (ii) Mechanical or electrical breakdown or failure, other than the sudden and accidental breakdown of refrigeration or heating units on the **insured auto**. However, this Excluded Peril does not apply to **loss** caused by a fire or explosion if such fire or explosion would be covered under this endorsement.

**ADDITIONAL PAYMENTS**

The following is added to the Additional Payments section:

5. **Additional Expense to Temporarily Store Covered Property**
   In addition to the applicable limit of liability for the Refrigeration Breakdown Coverage, **we** will pay any reasonable additional expenses that **you** incur to temporarily store **covered property** in a controlled-temperature environment in order to avoid or minimize **loss** to such property due to spoilage or change in temperature. Such temporary storage must be directly made necessary by the sudden and accidental breakdown of a refrigeration or heating unit of **your insured auto**. However, under this Additional Expense to Temporarily Store Covered Property coverage, **we** will not pay for:
   a.  Expenses incurred to repair or replace the refrigeration or heating unit;
   b.  Costs or penalties incurred for detention or delay of vehicles, **trailers**, or containers to which the refrigeration or heating unit is attached; or
   c.  Additional lodging or meal expenses for the driver of the **insured auto** that exceed $150 per day or $300 total.
   The most **we** will pay with respect to any one occurrence under this Additional Expense to Temporarily Store Covered Property coverage is $2,500.

## LIMITS OF LIABILITY

The following is added to subsection 2, Deductible:

For each **loss** that qualifies for coverage under the Refrigeration Breakdown Coverage endorsement, a deductible of $2,500 will be applied to reduce the **loss** payable with respect to the **covered property**.

## EXCLUSIONS

The following exclusions are added:

Coverage under this Refrigeration Breakdown Coverage endorsement will not apply for **loss** caused by, resulting from, or arising out of breakdown of the refrigeration or heating unit due to any of the following, regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**:
1.  Failure to provide adequate fuel supply;
2.  Failure to maintain crankcase oil or refrigerant level within the manufacturer's specifications;
3.  Intentional destruction or damage to automatic temperature control units by an employee; or
4.  Failure to maintain the calibration of the refrigeration or heating unit and/or failure to maintain the refrigeration or heating unit within the manufacturer's

specifications.

**DUTIES IN CASE OF A LOSS**

The following are added to the Duties in Case of a Loss section:

7.  **You** must take all reasonable steps to protect **covered property** at the time of and after a **loss** to avoid further damage, including but not limited to storage of the cargo in a properly temperature controlled facility or alternate trailer;
8.  **You** must allow **us** access to the refrigeration or heating equipment prior to its repair unless a delay in repair would imperil the cargo;
9.  **You** must provide **us** access to all maintenance and repair records for the failed refrigeration or heating unit; and
10. **You** must allow **us** access to all records establishing the proper use of the equipment, including any and all electronic records or logs generated by the unit.

**GENERAL PROVISIONS**

The following is added to the General Provisions section:

I.  Refrigeration/Heating Equipment Maintenance.
    1.  **You**, or **your** employee, must check the refrigeration and heating equipment every 12 hours while it is being operated; and
    2.  At least once a month, **you** must:
        a.  Have the refrigeration and heating equipment inspected by a manufacturer-authorized representative, or other trained refrigeration specialist, which may include **you** or **your** employee;
        b.  Promptly perform the proper maintenance according to manufacturer's specifications;
        c.  Make any appropriate or necessary repairs; and
        d.  Keep and update written records with respect to item 1. and items 2.a. through 2.c. above. **You** must allow **us** to inspect these records as often as **we** may reasonably require. If **you** fail to maintain these records, coverage will be void under this endorsement.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE MOTOR TRUCK CARGO LEGAL LIABILITY COVERAGE ENDORSEMENT REMAIN UNCHANGED.**

# ILLINOIS
## COMMERCIAL AUTO FORMS

**PLEASE READ YOUR POLICY AGREEMENT CAREFULLY.**
**Provisions of this Agreement and its endorsements restrict coverage. Be certain you understand all of the coverage terms, the exclusions, and your rights and duties.**

**All forms in the endorsement section do not automatically pertain to your policy.**
**Please refer to your declarations page for form numbers associated with your policy. Only those endorsements whose form numbers appear on your declarations page apply to your policy. All other parts of the policy that have not been modified by an endorsement will remain unchanged.**

**This booklet contains Form 6912 (02/19) and a section of optional endorsements.**



0051

Form 6912 (02/19)

## COMMERCIAL AUTO POLICY

---

### INDEX OF POLICY PROVISIONS

**PAGE**

**DUTIES IN THE EVENT OF AN ACCIDENT OR LOSS**. . . . . . . . . . . . . . . . . . . .1

**GENERAL DEFINITIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

**PART I—LIABILITY TO OTHERS**
  Insuring Agreement—Liability To Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
  Additional Definitions Used in This Part Only . . . . . . . . . . . . . . . . . . . . . . . . .6
  Additional Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
  Out-Of-State Coverage Extension . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
  Exclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
  Limit of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

**PART II—DAMAGE TO YOUR AUTO**
  Insuring Agreement—Collision Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . .15
  Insuring Agreement—Comprehensive Coverage . . . . . . . . . . . . . . . . . . . . . .15
  Insuring Agreement—Fire and Theft with Combined
    Additional Coverage (CAC) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
  Additional Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
  Additional Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
  Additional Definitions Used in This Part Only . . . . . . . . . . . . . . . . . . . . . . . .17
  Exclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18
  Limit of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
  Deductible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21
  Salvage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
  No Benefit to Bailee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
  Appraisal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
  Payment of Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23
  Loss Payee Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

**GENERAL PROVISIONS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

**COMMERCIAL AUTO POLICY**

If **you** pay **your** premium when due, **we** will provide the insurance described in this policy.

## DUTIES IN THE EVENT OF AN ACCIDENT OR LOSS

For coverage to apply under this policy, **you** or the person seeking coverage must promptly report each **accident** or **loss** even if **you** or the person seeking coverage is not at fault. Refer to your policy documents for the claims phone number.

**You** or the person seeking coverage must also obtain and provide **us** the names and addresses of all persons involved in the **accident** or **loss**, the names and addresses of any witnesses, and the license plate numbers of the vehicles involved.

If **you** or the person seeking coverage cannot identify the owner or operator of a vehicle involved in the **accident**, or if theft or vandalism has occurred, **you** or the person seeking coverage must notify the police within 24 hours or as soon as practicable. However, for purposes of uninsured motorist coverage when the owner or operator of a vehicle involved in the accident cannot be identified, **you** or the person seeking coverage must notify the police no more than 30 days after the accident.

A person seeking coverage must:
1. cooperate with **us** in any matter concerning a claim or lawsuit;
2. provide any written proof of **loss we** may reasonably require;
3. allow **us** to take signed and recorded statements, including sworn statements and examinations under oath, which **we** may conduct outside the presence of **you**, a **relative**, or any person claiming coverage, and answer all reasonable questions **we** may ask as often as **we** may reasonably require;
4. promptly call **us** to notify **us** about any claim or lawsuit and send **us** any and all legal papers relating to any claim or lawsuit;
5. attend hearings and trials as **we** require;
6. submit to medical examinations at **our** expense by doctors **we** select as often as **we** may reasonably require;
7. authorize **us** to obtain medical and other records;
8. take reasonable steps after a **loss** to protect the **insured auto** from further **loss**. **We** will pay reasonable expenses incurred in providing that protection. If failure to provide such protection results in further loss, any additional damages will not be covered under this policy;
9. allow **us** to have access to an **insured auto** or other **auto** involved in an **accident** or **loss** and to have it inspected and appraised before its repair or disposal; and
10. authorize **us** access to **your** business or personal records as often as **we** may reasonably require.

0054

1

**GENERAL DEFINITIONS**

**The words and phrases below, whether in the singular, plural or possessive, have the following special meanings when appearing in boldface type in this policy, and in endorsements issued in connection with this policy, unless specifically modified.**

1. "**Accident**" means a sudden, unexpected and unintended event, or a continuous or repeated exposure to that event, that causes **bodily injury** or **property damage**.

2. "**Auto**" means a land motor vehicle or **trailer** designed for travel on public roads, or any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged. It does not include **mobile equipment**. Self-propelled vehicles with the following types of permanently attached equipment are **autos**, not **mobile equipment**:
   a. equipment designed and used primarily for:
      (i) snow removal;
      (ii) road maintenance, but not construction or resurfacing;
      (iii) street cleaning;
   b. cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and
   c. air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well-servicing equipment.

3. "**Bodily injury**" means bodily harm, sickness, or disease, including death that results from bodily harm, sickness, or disease.

4. "**Declarations**" or "**declarations page**" means the document prepared by **us** listing **your** policy information, which may include the types of coverage **you** have elected, the limit for each coverage, the cost for each coverage, the specifically described **autos** covered by this policy, and the types of coverage for each specifically described **auto**.

5. "**Employee**" includes a **leased worker** and a statutory employee. **Employee** does not include a **temporary worker**.

6. "**Insured auto**" or "**your insured auto**" means:
   a. Any **auto** specifically described on the **declarations page**; or
   b. An additional **auto** for Part I—Liability To Others and/or Part II—Damage To Your Auto on the date **you** become the owner if:
      (i) **you** acquire the **auto** during the policy period shown on the **declarations page**;

0055

2

(ii) **we** insure all **autos** owned by **you** that are used in **your** business;
(iii) no other insurance policy provides coverage for that **auto**; and
(iv) **you** tell **us** within 30 days after **you** acquire it that **you** want **us** to cover it for that coverage.

If **you** add any coverage, increase **your** limits, or make any other changes to this policy during the 30-day period after **you** acquire an additional **auto**, these changes to **your** policy will not become effective until after **you** ask **us** to add the coverage, increase **your** limits, or make such changes for the additional **auto**. **We** may charge premium for the additional **auto** from the date **you** acquire the **auto**.

With respect to Part I—Liability To Others, if **we** provide coverage for an additionally acquired **auto** in accordance with this paragraph b., **we** will provide the same coverage for such additional **auto** as **we** provide for any **auto** shown on the **declarations page**.

With respect to Part II—Damage To Your Auto, if **we** provide coverage for an **auto you** acquire in addition to any **auto** specifically described on the **declarations page**, and the additional **auto** is:
(i) a **private passenger auto**, **we** will provide the broadest coverage **we** provide for any **auto** shown on the **declarations page**; or
(ii) any **auto** other than a **private passenger auto**, and **you** have purchased Physical Damage coverage for at least one **auto** other than a **private passenger auto**, **we** will provide the broadest coverage for which the newly acquired **auto** is eligible.

c. Any replacement **auto** on the date **you** become the owner if:
(i) **you** acquire the **auto** during the policy period shown on the **declarations page**;
(ii) the **auto** that **you** acquire replaces one specifically described on the **declarations page** due to termination of **your** ownership of the replaced **auto** or due to mechanical breakdown of, deterioration of, or **loss** to the replaced **auto** that renders it permanently inoperable; and
(iii) no other insurance policy provides coverage for that **auto**.
If **we** provide coverage for a replacement **auto**, **we** will provide the same coverage for the replacement **auto** as **we** provide for the replaced **auto**. **We** will provide that coverage for a period of 30 days after **you** become the owner of such replacement **auto**. **We** will not provide any coverage after this 30-day period unless within this period **you** ask **us** to insure the replacement **auto**. If **you** add any coverage, increase **your** limits, or make any other changes to **your** policy during this 30-day period, these changes to **your** policy will not become effective until after **you** ask **us** to add the coverage, increase **your** limits, or make such changes.

7. 3 "**Insured contract**" means:

    a. A lease of premises;

    b. A sidetrack agreement;

    c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

    d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

    e. That part of any other contract or agreement pertaining to **your** business (including an indemnification of a municipality in connection with work performed for a municipality) under which **you** assume the tort liability that is vicariously imposed on another for **your** negligence or that of **your employees** or agents; or

    f. That part of any contract or agreement, entered into as part of **your** business, for the rental of an **insured auto**. However, such contract or agreement shall not be considered an **insured contract** to the extent that it obligates **you** or any of **your employees** to pay for **property damage** to any **auto** rented or leased to **you** or any of **your employees**.

An "**insured contract**" does not include that part of any contract or agreement:

    1. That indemnifies a railroad for **bodily injury** or **property damage** arising out of construction or demolition operations within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass, or crossing; or

    2. That pertains to the loan, lease or rental of an **auto** to **you** or any of **your employees**, if the **auto** is loaned, leased or rented with a driver; or

    3. That holds a person or organization engaged in the business of transporting property by **auto** for hire harmless for **your** use of an **insured auto** over a route or territory that person or organization is authorized to serve by public authority.

8. "**Leased worker**" means a person leased to **you** by a labor leasing firm under an agreement between **you** and the labor leasing firm to perform duties related to the conduct of **your** business. **Leased worker** does not include a **temporary worker**.

9. "**Loss**" means sudden, direct and accidental loss or damage.

10. "**Mobile equipment**" means any of the following types of land vehicles, including, but not limited to, any attached machinery or equipment:

    a. Bulldozers, farm implements and machinery, forklifts, and other vehicles designed for use principally off public roads;

    b. Vehicles **you** use solely on premises **you** own or rent and on accesses to public roads from these premises, unless specifically described on the **declarations page** and not defined as **mobile equipment** under other parts of this definition;

0057

4

c. Any vehicle that travels on crawler treads, or that does not require licensing in the state in which **you** reside or **your** business is licensed;

d. Vehicles, whether self-propelled or not, used primarily to provide mobility to permanently attached:
   (i) Power cranes, shovels, loaders, diggers, or drills; or
   (ii) Road construction or resurfacing equipment, such as graders, scrapers or rollers.

e. Vehicles not described in Paragraphs a., b., c., or d. above that are not self-propelled and are used primarily to provide mobility to permanently attached equipment of the following types:
   (i) Air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well-servicing equipment; or
   (ii) Cherry pickers and similar devices used to raise or lower workers.

f. Vehicles not described in Paragraphs a., b., c., or d. above that are self-propelled and used primarily for purposes other than transportation of persons or cargo.

However, **mobile equipment** does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged.

11. "**Occupying**" means in, on, entering or exiting.

12. "**Personal vehicle sharing program**" means a system or process, operated by a business, organization, network, group, or individual, that facilitates the sharing of **private passenger autos** for use by individuals, businesses, or other entities.

13. "**Pollutants**" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

14. "**Private passenger auto**" means a land motor vehicle:
   a. of the private passenger, pickup body, or cargo van type;
   b. designed for operation principally upon public roads;
   c. with at least four wheels; and
   d. with a gross vehicle weight rating of 12,000 pounds or less, according to the manufacturer's specifications.

   However, **private passenger auto** does not include step-vans, parcel delivery vans, or cargo cutaway vans or other vans with cabs separate from the cargo area.

15. "**Property damage**" means physical damage to, destruction of, or loss of use of, tangible property.

16. "**Relative**" means any person residing in the household in which the named insured resides who is related to the named insured by blood, marriage, or

0058

5

adoption, including a ward or foster child. This term only applies if the named insured is a natural person.

17. "**Temporary substitute auto**" means any **auto you** do not own while used with the permission of its owner as a temporary substitute for an **insured auto** that has been withdrawn from normal use due to breakdown, repair, servicing, loss or destruction. However, **temporary substitute auto** does not include any **auto** available for the regular or frequent use of **you**, a **relative**, or **your employees** unless that **auto** is insured under a separate policy of insurance that provides at least the minimum required limits of financial responsibility under the applicable state and federal laws.

18. "**Temporary worker**" means:
    a. a person who is furnished to **you** to substitute for a permanent **employee** on leave or to meet seasonal or short-term workload conditions; or
    b. a day laborer.

19. "**Trailer**" includes a semi-trailer and any piece of equipment used to convert a semi-trailer to a full trailer while it is attached to the semi-trailer.

20. "**We**", "**us**" and "**our**" mean the company providing this insurance as shown on the **declarations page**.

21. "**You**", "**your**" and "**yours**" refer to the named insured shown on the **declarations page**.

## PART I—LIABILITY TO OTHERS

### INSURING AGREEMENT—LIABILITY TO OTHERS

Subject to the Limits of Liability, if **you** pay the premium for liability coverage for the **insured auto** involved, **we** will pay damages, other than punitive or exemplary damages, for **bodily injury**, **property damage**, and **covered pollution cost or expense** for which an **insured** becomes legally responsible because of an **accident** arising out of the ownership, maintenance or use of that **insured auto**. However, **we** will only pay for the **covered pollution cost or expense** if the same **accident** also caused **bodily injury** or **property damage** to which this insurance applies.

**We** will settle or defend, at **our** option, any claim or lawsuit for damages covered by this Part I. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the Limit of Liability for this coverage has been exhausted by payment of judgments or settlements.

### ADDITIONAL DEFINITIONS USED IN THIS PART ONLY

A. When used in Part I—Liability To Others, **insured** means:
   1. **You** with respect to an **insured auto**.

0059

6

2. Any person while using, with **your** permission, and within the scope of that permission, an **insured auto you** own, hire, or borrow except:

   (a) Any person while he or she is working in a business of selling, leasing, repairing, parking, storing, servicing, delivering or testing **autos**, unless that business is **yours** and it was so represented in **your** application.

   (b) Any person while he or she is moving property to or from an **insured auto**, other than one of **your employees**, partners (if you are a partnership), members (if you are a limited liability company), or officers or directors (if you are a corporation).

   (c) The owner or anyone else from whom the **insured auto** is leased, hired, or borrowed. However, this exception does not apply if the **insured auto** is specifically described on the **declarations page**.

   (d) The employees or agents of an owner or anyone else from whom the **insured auto** is leased, hired or borrowed. However, this exception does not apply if the **insured auto** is specifically described on the **declarations page**.

   For purposes of this subsection A.2., an **insured auto you** own includes any **auto** specifically described on the **declarations page**.

3. Any other person or organization, but only with respect to the legal liability of that person or organization for acts or omissions of any person otherwise covered under this Part I—Liability To Others. If **we** make a filing or submit a certificate of insurance on **your** behalf with a regulatory or governmental agency, the term "**insured**" as used in such filing or certificate, and in any related endorsement, refers only to the person or organization named on such filing, certificate or endorsement.

B. When used in Part I—Liability To Others, **insured auto** also includes:

   1. **Trailers** designed primarily for travel on public roads, while connected to **your insured auto** that is a power unit;
   2. **Mobile equipment** while being carried or towed by an **insured auto**;
   3. Any **temporary substitute auto**; and
   4. **Mobile equipment** that is:
      a. owned by **you**;
      b. leased, hired, or borrowed by **you** and **you** have purchased either "Hired Auto Coverage" or "Any Automobile Legal Liability Coverage" from **us**; or
      c. not owned, leased, hired, or borrowed by **you** and **you** have purchased either "Employer's Non-Ownership Liability Coverage" or "Any Automobile Legal Liability Coverage" from **us**.

   However, **mobile equipment** meeting any of those three criteria will qualify only if at the time of **loss** it is being:

   a. used in **your** business;
   b. operated on a public highway; and
   c. operated in a state or province where it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law.

0060

7

O. When used in Part I - Liability To Others, "**covered pollution cost or expense**" means any cost or expense arising out of:

1. Any request, demand, order, or statutory or regulatory requirement; or
2. Any claim or suit by or on behalf of a governmental authority demanding that the **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of, **pollutants**.

**Covered pollution cost or expense** does not include any cost or expense arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of **pollutants**:

a. That are, or that are contained in any property that is:
   (i) Being transported or towed by, handled, or handled for movement into, onto, or from, the **insured auto**;
   (ii) Otherwise in the course of transit by or on behalf of the **insured**; or
   (iii) Being stored, disposed of, treated, or processed in or upon the **insured auto**;
b. Before the **pollutants** or any property in which the **pollutants** are contained are moved from the place where they are accepted by the **insured** for movement into or onto the **insured auto**; or
c. After the **pollutants** or any property in which the **pollutants** are contained are moved from the **insured auto** to the place where they are finally delivered, disposed of, or abandoned by the **insured**.

The above Paragraph a. of this definition does not apply to fuels, lubricants, fluids, exhaust gasses, or other similar **pollutants** that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the **insured auto** or its parts if:

(1) The **pollutants** escape, seep, migrate, or are discharged, dispersed or released directly from an **insured auto** part designed by its manufacturer to hold, store, receive or dispose of such **pollutants** and is a part that would be required for the customary operation of the **insured auto**; and
(2) The **bodily injury**, **property damage** or **covered pollution cost or expense** does not arise out of the operation of any equipment listed in Paragraphs b. and c. of the definition of **auto**.

The above Paragraphs b. and c. of this definition do not apply to **accidents** that occur away from premises owned by or rented to an **insured** with respect to **pollutants** not in or upon an **insured auto** if:

(1) The **pollutants** or any property in which the **pollutants** are contained are upset, overturned or damaged as a result of the maintenance or use of an **insured auto**; and
(2) The discharge, dispersal, release or escape of the **pollutants** is caused directly by such upset, overturn or damage.

0061

8

## ADDITIONAL PAYMENTS

In addition to **our** Limit of Liability, **we** will pay for an **insured**:

1. all expenses that **we** incur in the settlement of any claim or defense of any lawsuit;

2. interest accruing after entry of judgment on that part of the judgment that does not exceed **our** Limit of Liability. This payment does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured**. **Our** payment, offer in writing, or deposit in court of that part of the judgment which does not exceed **our** Limit of Liability ends **our** duty to pay interest which accrues after the date of **our** payment, written offer, or deposit;

3. the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in a principal amount exceeding **our** Limit of Liability, and **we** have no duty to apply for or furnish these bonds;

4. up to $2,000 for cost of bail bonds required because of an **accident we** cover. **We** have no duty to apply for or furnish these bonds;

5. reasonable expenses incurred by an **insured** at **our** request, including loss of earnings up to $250 a day; and

6. all court costs taxed against the **insured** in any "suit" against the **insured** we defend. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the **insured**.

### OUT-OF-STATE COVERAGE EXTENSION

If an **accident** to which this Part I applies occurs in any state, territory, or possession of the United States of America, Puerto Rico, or any province or territory of Canada, other than the state in which an **insured auto** is principally garaged, and the state, province, territory or possession has:
1. a financial responsibility or similar law requiring limits of liability for **bodily injury** or **property damage** higher than the limits shown on the **declarations page**, this policy will provide the higher limit; or
2. a compulsory insurance or similar law requiring a non-resident to maintain insurance whenever the non-resident uses an **auto** in that state, province, territory or possession, this policy will provide the greater of:
   a. the required minimum amounts and types of coverage; or
   b. the Limits of Liability under this policy.

This extension does not apply to the limit or limits specified by any law governing commercial carriers of passengers or property.

0062

**We** will not pay anyone more than once for the same elements of **loss** because of this extension.

**EXCLUSIONS—PLEASE READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE FOR AN ACCIDENT OR LOSS WILL NOT BE AFFORDED UNDER THIS PART I—LIABILITY TO OTHERS.**

Coverage under this Part I, including **our** duty to defend, does not apply to:

1. **Expected or Intended Injury**
   **Bodily injury** or **property damage** either expected by or caused intentionally by or at the direction of any **insured**.

2. **Contractual**
   Any liability assumed by an **insured** under any contract or agreement, unless the agreement is an **insured contract** that was executed prior to the occurrence of any **bodily injury** or **property damage**.

   However, this exclusion does not apply to liability for damages that an **insured** would have in the absence of the contract or agreement.

3. **Worker's Compensation**
   Any obligation for which an **insured** or an insurer of that **insured**, even if one does not exist, may be held liable under workers' compensation, unemployment compensation, disability benefits law, or any similar law.

4. **Nuclear Energy Liability**
   An **accident** for which any person is insured under nuclear energy liability insurance. This exclusion applies even if the limits of that insurance are exhausted.

5. **Employee Indemnification and Employer's Liability**
   **Bodily injury** to:
   a. An **employee** of any **insured** arising out of or within the course of:
      (i) That **employee's** employment by any **insured**; or
      (ii) Performing duties related to the conduct of any **insured's** business; or
   b. The spouse, child, parent, brother or sister of that **employee** as a consequence of Paragraph a. above.

   This exclusion applies:
   a. Whether the **insured** may be liable as an employer or in any other capacity; and
   b. To any obligation to share damages with or repay someone else who must pay damages because of the injury.

0063

10

But this exclusion does not apply to **bodily injury** to a domestic **employee** if benefits are neither paid nor required to be provided under any workers' compensation, disability benefits, or similar law, or to liability for **bodily injury** assumed by the **insured** under an **insured contract**. For the purposes of this policy, a domestic **employee** is a person engaged in household or domestic work performed principally in connection with a residence premises.

6. **Fellow Employee**
   **Bodily injury** to:
   a. a fellow **employee** of an **insured** injured while within the course of their employment or while performing duties related to the conduct of **your** business.
   b. the spouse, child, parent, brother, or sister of that fellow **employee** as a consequence of Paragraph a. above.

7. **Care, Custody or Control**
   **Property damage** to, towing or removal expense for, or **covered pollution cost or expense** involving, any property owned by, rented to, being transported by, used by, or in the care, custody or control of any **insured**, including any motor vehicle operated or being towed. But this exclusion does not apply to liability assumed under a sidetrack agreement.

8. **Movement of Property by Mechanical Device**
   **Bodily injury** or **property damage** resulting from or caused by the movement of property by a mechanical device, other than a hand truck, not attached to an **insured auto**.

9. **Handling of Property**
   **Bodily injury** or **property damage** resulting from or caused by the handling of property:
   a. before it is moved from the place where it is accepted by the **insured** for movement into or onto **your insured auto**; or
   b. after it has been moved from **your insured auto** to the place where it is finally delivered by the **insured**.

10. **Pollution**
    **Bodily injury** or **property damage** resulting from or caused by the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of any **pollutants**:
    a. That are, or that are contained in any property that is:
       (i) Being transported or towed by, handled, or handled for movement into, onto, or from, the **insured auto**;
       (ii) Otherwise in the course of transit by or on behalf of the **insured**; or
       (iii) Being stored, disposed of, treated, or processed in or upon the **insured auto**;

0064

b. Before the **pollutants** or any property in which the **pollutants** are contained are moved from the place where they are accepted by the **insured** for movement into or onto the **insured auto**; or

c. After the **pollutants** or any property in which the **pollutants** are contained are moved from the **insured auto** to the place where they are finally delivered, disposed of, or abandoned by the **insured**.

The above Paragraph a. of this exclusion does not apply to fuels, lubricants, fluids, exhaust gasses, or other similar **pollutants** that are needed for or result from the normal electrical, hydraulic, or mechanical functioning of the **insured auto** or its parts if:

(1) The **pollutants** escape, seep, migrate, or are discharged, dispersed, or released directly from an **insured auto** part designed by its manufacturer to hold, store, receive, or dispose of such **pollutants** and is a part that would be required for the customary operation of the **insured auto**; and

(2) The **bodily injury**, **property damage**, or **covered pollution cost or expense** does not arise out of the operation of any equipment listed in Paragraphs b. and c. of the definition of **auto**.

The above Paragraphs b. and c. of this exclusion do not apply to **accidents** that occur away from premises owned by or rented to an **insured** with respect to **pollutants** not in or upon an **insured auto** if:

(1) The **pollutants** or any property in which the **pollutants** are contained are upset, overturned, or damaged as a result of the maintenance or use of an **insured auto**; and

(2) The discharge, dispersal, seepage, migration, release, or escape of the **pollutants** is caused directly by such upset, overturn, or damage.

11. **Racing**
**Bodily injury** or **property damage** arising out of **you** or an **insured** participating in, or preparing for, a prearranged or organized racing, speed or demolition contest, stunting activity, or performance contest.

12. **War**
**Bodily injury** or **property damage** arising directly or indirectly out of:

a. War, including undeclared or civil war;

b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

13. **Operations**
**Bodily injury**, **property damage**, or **covered pollution cost or expense** arising out of the operation of:

a. any equipment listed in Paragraphs b. and c. of the definition of **auto**; or

0065

12

b. machinery or equipment that is on, attached to, or part of, a land vehicle that meets the definition of **mobile equipment**.

14. **Completed Operations**
**Bodily injury** or **property damage** arising out of, or caused by, **your** work after that work has been completed or abandoned.

For purposes of this exclusion, **your** work means:
a. Work or operations performed by **you** or on **your** behalf;
b. Materials, parts, or equipment furnished in connection with such work or operations; and
c. The delivery of liquids.

**Your** work includes warranties or representations made at any time with respect to the fitness, quality, durability, or performance of any of the items included in Paragraphs a., b., or c. above.

**Your** work will be deemed completed at the earliest of the following times:
a. When all of the work called for in **your** contract has been completed.
b. When all of the work to be done at a particular site has been completed if **your** contract calls for work at more than one site.
c. When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or sub-contractor working on the same project.
Work that may need service, maintenance, correction, repair, or replacement, but which is otherwise complete, will be treated as completed.

15. **Criminal Acts**
**Bodily injury** or **property damage** caused by, or reasonably expected to result from, a criminal act or omission of an **insured**. This exclusion applies regardless of whether that **insured** is actually charged with, or convicted of, a crime. For purposes of this exclusion, criminal acts or omissions do not include traffic violations.

16. **Vehicle Sharing—Private Passenger Autos**
**Bodily injury** or **property damage** arising out of the use of an **insured auto** that is a **private passenger auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of an **insured auto** by **you**.

## LIMIT OF LIABILITY

**We** will pay no more than the Limit of Liability shown on the **declarations page** for this coverage for the **insured auto** involved in the **accident** regardless of:
1. the number of premiums paid;
2. the number of **insured autos** or trailers shown on the **declarations page**;

0066

13

3. the number of policies issued by **us**;
4. the number of vehicles or **insureds** involved in an **accident**; or
5. the number of claims or lawsuits arising out of an **accident**;

subject to the following:

1. **Coverage Required by Filings**

   If **we** have filed a certificate of insurance on **your** behalf with any regulatory or governmental agency, and:
   (i) **we** are required to pay any judgment entered against **you**; or
   (ii) **we** agree to settle a claim or lawsuit;
   for **bodily injury**, **property damage**, or **covered pollution cost or expense** arising out of an **accident** or **loss** otherwise not covered under the terms of this policy solely because of such certificate of insurance, **we** will be obligated to pay no more than the minimum amount required by that agency or applicable law. If any payment is based solely on such certificate, **you** must reimburse **us** in full for **our** payment, including legal fees and costs **we** incurred, whether the payment is made as a result of judgment or settlement.

2. **Combined Bodily Injury and Property Damage Limits**

   Subject to the terms of Section 1 above, if **your declarations page** indicates that combined **bodily injury** and **property damage** limits apply for "each accident" or "combined single limit" applies, the most **we** will pay for the aggregate of all damages and **covered pollution cost or expense** combined, resulting from any one **accident**, is the combined liability insurance limit shown on the **declarations page** for the **insured auto** involved in the **accident**.

3. **Separate Bodily Injury Liability and Property Damage Liability Limits**

   Subject to the terms of Section 1 above, if **your declarations page** indicates that separate **bodily injury** liability and **property damage** liability limits apply:

   a. The "each person" **bodily injury** liability limit listed on the **declarations page** for the **insured auto** involved in the **accident** is the maximum **we** will pay for **bodily injury** sustained by any one person in any one **accident**, and that "each person" maximum limit will apply to the aggregate of claims made for such **bodily injury** and any and all claims derived from such **bodily injury**, including, but not limited to, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

   b. Subject to the **bodily injury** liability limit for "each person", the "each accident" **bodily injury** liability limit listed on the **declarations page** for the **insured auto** involved in the **accident** is the maximum **we** will pay for

0067

14

**bodily injury** sustained by two or more persons in any one **accident**, including all derivative claims which include, but are not limited to, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

c. The "each accident" **property damage** liability limit listed on the **declarations page** for the **insured auto** involved in the **accident** is the maximum **we** will pay for the aggregate of all **property damage** and **covered pollution cost or expense** combined, sustained in any one **accident**.

For the purpose of determining **our** Limit of Liability under Sections 1., 2., and 3. above, all **bodily injury**, **property damage**, and **covered pollution cost or expense**, resulting from continuous or repeated exposure to substantially the same event, shall be considered as resulting from one **accident**.

An **insured auto** and any **trailer** or **trailers** attached thereto shall be deemed to be one **auto** with respect to **our** Limit of Liability.

When coverage is afforded for an **accident** involving an **insured auto** that, at the time of loss:

a. is a **trailer** specifically described on the **declarations page**; and
b. is attached to any power unit that is not an **insured auto** specifically described on the **declarations page**;

the maximum amount we will pay will be limited to the lesser of an amount not to exceed the applicable compulsory or financial responsibility law limits of the state identified in **your** address as shown on the **declarations page** or the Limit of Liability shown on the **declarations page**.

Any amount payable under Part I—Liability To Others to or for an injured person will be reduced by any payment made to that person under any Uninsured Motorist Coverage, Underinsured Motorist Coverage, Personal Injury Protection Coverage, or Medical Payments Coverage provided by this policy.

## PART II—DAMAGE TO YOUR AUTO

### INSURING AGREEMENT—COLLISION COVERAGE

Subject to the Limits of Liability, if **you** pay the premium for Collision Coverage, **we** will pay for **loss** to **your insured auto** and its **permanently attached equipment** when it collides with another object or overturns.

### INSURING AGREEMENT—COMPREHENSIVE COVERAGE

Subject to the Limits of Liability, if **you** pay the premium for Comprehensive Coverage, **we** will pay for **loss** to **your insured auto** and its **permanently attached equipment** from any cause other than those covered under Collision Coverage.

0068

Any **loss** caused by missiles, falling objects, fire, theft, collision with an animal, or accidental glass breakage shall be deemed a Comprehensive **loss**. However, **you** have the option of having glass breakage caused by a covered **auto's** collision or overturn considered a **loss** under Collision Coverage.

**INSURING AGREEMENT—FIRE AND THEFT WITH COMBINED ADDITIONAL COVERAGE (CAC)**

Subject to the Limits of Liability, if **you** pay the premium for Fire and Theft with Combined Additional Coverage (CAC), **we** will pay for **loss** to **your insured auto** and its **permanently attached equipment** caused by:

1. fire, lightning or explosion;
2. theft;
3. windstorm or hail;
4. earthquake;
5. flood or rising water;
6. malicious mischief or vandalism;
7. the stranding, sinking, burning, collision, or derailment of any conveyance in or upon which **your insured auto** is being transported; or
8. collision with a bird or animal.

No **losses** other than those specifically described above will be covered under Part II of this policy.

**ADDITIONAL COVERAGE**

1. **Transportation Expenses**

   **We** will pay up to $30 per day, up to a maximum of $900, for temporary transportation expenses incurred by **you** because of the theft of an **insured auto** that is a **private passenger auto**. This coverage applies only to those **insured autos** for which **you** carry Comprehensive Coverage. **We** will pay for temporary transportation expenses incurred during the period beginning 48 hours after **you** report the theft to **us**, and ending when the **insured auto** is returned to use, or **we** pay for its **loss**.

2. **Coverage for Temporary Substitute Autos**

   If a **temporary substitute auto** is involved in a **loss**, **we** will provide the same coverage and deductible that would have applied to the **insured auto** for which it is a substitute. The most **we** will pay for **loss** to a **temporary substitute auto** is the lesser of the Actual Cash Value at the time of **loss** or the cost of repairing or replacing the damaged or stolen property with like kind and quality, less the applicable deductible.

0069

### 3. Pet Injury Coverage

If **you** have purchased Collision Coverage for at least one **insured auto** listed on the **declarations page**, Pet Injury Coverage is included in **your** policy.

#### Insuring Agreement

If a **pet** sustains injury or death while inside an **insured auto** at the time of a **loss** covered under Collision, Comprehensive, or Fire & Theft with Combined Additional Coverage, **we** will pay:
1. for reasonable and customary veterinary fees incurred by **you** or the owner of the **pet** if the **pet** is injured in, or as a direct result of, the covered **loss**; or
2. a death benefit if the **pet** dies in, or as a direct result of, the covered **loss**.

In the event of a covered **loss** due to the theft of an **insured auto**, **we** will provide the death benefit provided the **pet** is not recovered.

#### Limits of Liability

The following additional Limits of Liability apply to Pet Injury Coverage:
1. The most **we** will pay for all damages in any one **loss** is a total of $1,000 regardless of the number of **pets** involved.
2. If the **pet** dies in, or as a direct result of, a covered **loss**, **we** will provide a death benefit of $1,000, less any payment **we** made toward veterinary expenses for the **pet**.
3. No deductible shall apply to this coverage.

## ADDITIONAL PAYMENTS

If **you** have paid the premium for Comprehensive Coverage, Collision Coverage, or Fire and Theft with Combined Additional Coverage, then in addition to **our** Limit of Liability, **we** will pay:

1. All reasonable expenses necessary to return a stolen **insured auto** to **you**, unless **we** determine the **auto** to be a total loss.
2. All reasonable expenses necessary to remove an **insured auto** from the site of an **accident** or **loss** and transport it to a repair facility.

## ADDITIONAL DEFINITIONS USED IN THIS PART ONLY

When used in Part II—Damage To Your Auto:

1. "**Finance agreement**" means a written lease or loan contract, entered into as a part of **your** business, pertaining to the lease or purchase by **you** of an

17

0070

**insured auto**, and subject to a valid promissory note or written payment obligation contained in a lease, and security agreement or other written agreement establishing a security interest, executed concurrently with a purchase or lease of the **insured auto** that is commensurate with fair market value.

2. "**Permanently attached equipment**" or **PAE** means equipment and devices that are permanently installed or attached to **your insured auto**. **Permanently attached equipment** also includes:
   a. accessories designed to work as part of the equipment or devices;
   b. load securing equipment and devices; and
   c. custom paint or decals.

3. "**Pet**" means a dog or cat occupying an **insured auto** with **your** express or implied consent.

**EXCLUSIONS—PLEASE READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE FOR AN ACCIDENT OR LOSS WILL NOT BE AFFORDED UNDER THIS PART II—DAMAGE TO YOUR AUTO.**

1. **We** will not pay for loss caused by or resulting from any of the following. Such **loss** is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**.
   a. **War or Military Action**
      (1) war, including undeclared or civil war;
      (2) warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or agents;
      (3) insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.
   b. **Nuclear Hazard**
      (1) the explosion of any weapon employing atomic fission or fusion; or
      (2) nuclear reaction or radiation, or radioactive contamination, however caused.

2. **We** will not pay for **loss** to any sound equipment, video equipment, or transmitting equipment not permanently installed in **your insured auto**, or to tapes, records, compact discs, DVDs, or similar items used with sound or video equipment.

3. **We** will not pay for **loss** to radar detectors or to any other equipment or device designed or used to detect speed measuring equipment, or to any equipment designed or used to jam or disrupt any speed measuring equipment.

4. **We** will not pay for **loss** due and confined to:
   a. wear and tear, freezing, mechanical or electrical breakdown, or structural failure caused by material fatigue, decomposition, or corrosion.

0071

18

b. blowouts, punctures, flat spots, or other road damage to tires.

But, coverage does apply if the damage is the result of other **loss** covered by the policy.

5. **We** will not pay for **loss** incurred while **your insured auto** is used in any illicit trade or transportation, or due to **your insured auto's** destruction or confiscation by governmental or civil authorities because **you**, or, if **you** are a natural person, any **relative**, engaged in illegal activities.

6. **We** will not pay for **loss** caused by **you** or an insured participating in or preparing for a prearranged or organized racing, speed or demolition contest, stunting activity or performance contest.

7. **We** will not pay for **loss** to an **insured auto** for diminution of value.

8. If **we** pay **your** financial obligation under a **finance agreement**, **we** will not pay:
   a. Overdue **finance agreement** payments including any type of late fees or penalties;
   b. Financial penalties imposed under a **finance agreement** for excessive use, abnormal wear and tear, or high mileage;
   c. Security deposits not normally refunded by the lessor or lender;
   d. Cost of **finance agreement** related products such as, but not limited to, Credit Life Insurance, Health, Accident or Disability insurance purchased by **you**;
   e. Carryover balances from previous **finance agreements** or other amounts not associated with the **insured auto**; or
   f. Unpaid principal included in the outstanding **finance agreement** balance that was not used by **you** to purchase the **insured auto**.

9. **We** will not pay for **loss** to an **insured auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of an **insured auto** by **you**.

## LIMIT OF LIABILITY

1. If the **declarations page** shows actual cash value for the **insured auto**, then the most **we** will pay for **loss** to **your insured auto** is the least of:
   a. the actual cash value of the stolen or damaged property at the time of **loss**;
   b. the amount necessary to replace the stolen or damaged property with other of like kind and quality; or
   c. the amount necessary to repair the damaged property to its pre-loss physical condition; however, if **we** determine that the **insured auto** is a total loss, **we** may, at **our** option, pay the lesser of the actual cash value, or the cost to replace, rather than repair, the **insured auto**.

0072

19

**Permanently attached equipment (PAE)** is covered up to the limit shown on the **declarations page**. This limit includes transfer of undamaged **PAE** to another **insured auto**, but will not increase the **PAE** limit shown on the **declarations page**.

2. If the **declarations page** shows Stated Amount for the **insured auto**, then the most **we** will pay for **loss** to **your insured auto** is the least of:
   a. the actual cash value of the stolen or damaged property at the time of **loss**;
   b. the amount necessary to replace the stolen or damaged property with other of like kind and quality;
   c. the amount necessary to repair the damaged property to its pre-loss physical condition; however, if **we** determine that the **insured auto** is a total loss, **we** may, at **our** option, pay the lesser of the actual cash value, Stated Amount, or the cost to replace, rather than repair, the **insured auto**; or
   d. the applicable Stated Amount of the property as shown on the **declarations page**.

   However, if there is a **finance agreement** in place for the **insured auto**, the most **we** will pay for a total loss where the outstanding financial obligation under a **finance agreement** for the **insured auto** at the time of the **loss** is:
   a. greater than the actual cash value of the **insured auto** at the time of **loss**; and
   b. the Stated Amount shown on the **declarations page** is greater than the actual cash value of the **insured auto** at the time of **loss**;
   is the lesser of:
   a. the applicable Stated Amount of the **insured auto** as shown on the **declarations page**; or
   b. the outstanding financial obligation under a **finance agreement** for the **insured auto** at the time of the **loss**.

   **PAE** is included in the value of the **insured auto**, but only to the extent the value of the equipment has been included in the Stated Amount shown on the **declarations page**. The transfer of undamaged **PAE** to another **insured auto** will be covered if the aggregate of all damage and cost to move is within the Stated Amount shown on the **declarations page**.

3. Payments for **loss** covered under Collision Coverage, Comprehensive Coverage, or Fire and Theft with Combined Additional Coverage are subject to the following provisions:
   a. in determining the amount necessary to repair damaged property to its pre-loss physical condition, the amount to be paid by **us**:
      (i) shall not exceed the prevailing competitive labor rates charged in the area where the property is to be repaired, and the cost of repair or

0073

20

        replacement parts and equipment, as reasonably determined by **us**; and

- (ii) will be based on the cost of repair or replacement parts and equipment which may be new, reconditioned, remanufactured, or used, including, but not limited to:
  - (a) original manufacturer parts or equipment; and
  - (b) non-original manufacturer parts or equipment;
- b. the actual cash value is determined by the market value, age and condition of the **auto** at the time the **loss** occurs; and
- c. duplicate recovery for the same elements of damages is not permitted.

4. To determine the amount necessary to repair the damaged property to its pre-loss physical condition as referred to in Paragraph 1.c., the total cost of necessary repairs will be reduced by:
   a. the cost of labor, parts and materials necessary to repair or replace damage, deterioration, defects, or wear and tear on exterior body parts, windshields and other glass, wheels, and paint, that existed prior to the **accident** and that is eliminated as a result of the repair or replacement of property damaged in the **loss**. This adjustment for physical condition includes, but is not limited to, broken, cracked or missing parts, rust, dents, scrapes, gouges, and peeling paint;
   b. an amount for depreciation (also referred to as betterment) that represents a portion of the cost of mechanical parts (parts that wear out over time and have a useful life typically shorter than the life of the **auto** as a whole) that are installed as replacements for existing mechanical parts that were defective, inoperable or nonfunctional prior to the **accident**, which **we** deem necessary to replace in the course of repair; and
   c. an amount for depreciation (also referred to as betterment) on high-wear parts that have a measurable life, such as tires, batteries, engine or transmission, determined by the proportional increase in the useful life of the replacement part when compared to the replaced part. For example, if **we** replace a 24-month old battery that had a manufacturer's rated life of 60 months with a new 60-month rated battery, **our** payment for the battery is reduced by 40 percent and **you** are responsible to pay that 40 percent portion of the cost of the battery.

## DEDUCTIBLE

For each **loss** that qualifies for coverage under Comprehensive, Collision, or Fire and Theft with Combined Additional Coverage, the deductible shown on the **declarations page** for the **insured auto** will be applied. A single deductible will be applied to any **loss**. In the event there are different deductible amounts applicable to the **loss**, the higher deductible will be applied. In all events, the deductible will be applied against the limit of liability. If a **loss** involves another coverage added by endorsement to this policy, only one deductible will apply to the entire **loss** event.

0074

If **your insured auto** is an additional **auto** that **you** have requested to be added to **your** policy within 30 days of **your** acquisition of the **auto**, and no deductible has been designated for the additional **auto** prior to the **loss**, then:

1.  when the **insured auto** is a **private passenger auto**, **we** will apply the lowest deductible listed for any one **auto** listed on the **declarations page**; or
2.  when the **insured auto** is an **auto** other than a **private passenger auto**, **we** will apply the highest deductible listed for any one **auto** listed on the **declarations page**.

No deductible will apply to a **loss** to window glass when the glass is repaired instead of replaced.

No deductible will apply to payments made under the Additional Payments section for expenses necessary to return a stolen **insured auto** to **you**.

### SALVAGE

If **we** pay the actual cash value of **your insured auto** less the deductible, or if **we** pay the amount necessary to replace **your insured auto** less the deductible, **we** are entitled to all salvage. If **your insured auto** is a total loss and **we** pay the applicable Limit of Liability or Stated Amount as shown on the **declarations page** less the deductible, **we** are entitled to the same percent of salvage as **our** payment bears to the actual cash value of **your insured auto**.

### NO BENEFIT TO BAILEE

No bailee or carrier shall benefit, directly or indirectly, from this Part II—Damage To Your Auto.

### APPRAISAL

If **we** cannot agree with **you** on the amount of **your loss**, then **you** or **we** may demand an appraisal of the **loss**. Each party shall appoint a competent and disinterested appraiser. If the appraisers agree on the amount of the **loss**, they shall submit a written report to **us** and this shall be deemed to be the amount of the **loss**.

If the appraisers cannot agree on the amount of the **loss** within a reasonable time, they shall then choose a competent, impartial umpire, provided that if they cannot agree on an umpire within 15 days, either **you** or **we** may petition a judge of a court having jurisdiction to choose an umpire. The disagreement of the appraisers shall then be submitted to the umpire. Subject to the provisions of the policy, a written agreement signed by both appraisers or by one appraiser and the umpire will be the amount of the **loss**.

**You** must pay **your** fees and expenses and those of **your** appraiser. **We** will pay **our** fees and expenses and those of **our** appraiser. All other expenses of the

appraisal, including payment of the umpire if one is necessary, will be shared equally by **you** and **us**.

By agreeing to an appraisal, **we** do not waive any of **our** rights under any other part of this policy, including **our** right to deny the claim.

**PAYMENT OF LOSS**

At **our** option, **we** may pay the **loss** in money, or repair or replace the damaged or stolen property. **We** may, at any time before the **loss** is paid or the property is replaced, return, at **our** expense, any stolen property either to **you** or to the address shown on the **declarations page**, with payment for the resulting damage less any applicable deductibles. **We** may keep all or part of the property at the agreed or appraised value, but there shall be no abandonment to **us**.

**We** may make payment for a **loss** either to **you** or the owner of the property. Payment for a **loss** is required only if **you** have fully complied with the terms of this policy.

**You** must convey title to and possession of the damaged, destroyed, or stolen property to **us** if **we** pay the actual cash value of **your insured auto** less the deductible or if **we** pay the amount necessary to replace **your insured auto** less the deductible.

**LOSS PAYEE AGREEMENT**

**We** will pay the Loss Payee named in the policy for **loss** to **your insured auto**, as the interest of the Loss Payee may appear.

This insurance covers the interest of the Loss Payee unless:
1. the **loss** results from fraudulent acts or omissions on **your** part; or
2. the **loss** is otherwise not covered under the terms of this policy.
Cancellation, nonrenewal, termination, or voiding ends this agreement as to the Loss Payee's interest.

If **we** make any payment to the Loss Payee, **we** will obtain the Loss Payee's rights against any other party.

## **GENERAL PROVISIONS**

1. **Policy Period and Territory**

   This policy applies only to **accidents** and **losses** occurring during the policy period shown on the **declarations page** and that occur within a state, territory, or possession of the United States of America, or a province or territory of Canada, or while an **insured auto** is being transported between their ports.

0076

23

## 2. **Policy Changes**

This policy, **your** insurance application (which is made a part of this policy as if attached hereto), the **declarations page**, as amended, and endorsements to this policy issued by **us** contain all the agreements between **you** and **us**. Subject to the following, its terms may not be changed or waived except by an endorsement issued by **us**.

The premium for this policy is based on information **we** have received from **you** or other sources. **You** agree to cooperate with **us** in determining if this information is correct and complete, and **you** will notify **us** if it changes during the policy period. If this information is incorrect, incomplete, or changes during the policy period, **you** agree that **we** may adjust **your** premium during the policy period, or take other appropriate action.

Changes that may result in a premium adjustment include, but are not limited to, changes in:

a. the number, type, or use classification of **insured autos**;
b. operators using **insured autos**, their ages, driving histories, license status, state or country of license issuance, or marital status;
c. the place of principal garaging of any **insured auto**;
d. coverage, deductibles, or limits of liability; or
e. rating territory or discount eligibility.

If **you** ask **us** to delete a vehicle from this policy, no coverage will apply to that vehicle as of the date and time **you** ask **us** to delete it.

Nothing contained in this section will limit **our** right to void this policy for fraud, misrepresentation or concealment of any material fact by **you**, or anyone acting on **your** behalf.

## 3. **Other Insurance**

a. For any **insured auto** that is specifically described on the **declarations page**, this policy provides primary coverage. For an **insured auto** which is not specifically described on the **declarations page**, coverage under this policy will be excess over any and all other valid and collectible insurance, whether primary, excess or contingent. However, if the **insured auto** that is specifically described on the **declarations page** is a **trailer**, this policy will be excess over any and all other valid and collectible insurance, whether primary, excess or contingent, unless the **trailer** is attached to an **insured auto** that is a power unit **you** own and that is specifically described on the **declarations page**.

b. If coverage under more than one policy applies on the same basis, either excess or primary, **we** will pay only **our** proportionate share. **Our** pro-

0077

24

portionate share is the proportion that the Limit of Liability of this policy bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

4. **Two or More Policies Issued By Us**

If any applicable insurance other than this policy is issued to **you** by **us**, or any company affiliated with **us**, and applies to the same **accident** or **loss**, the total amount payable among all such policies shall not exceed the limits provided by the single policy with the highest limits of liability.

5. **Legal Action Against Us**

**We** may not be sued unless there is full compliance with all the terms of this policy.

**We** may not be sued for payment under Part I—Liability To Others until the obligation of an insured under Part I to pay is finally determined either by judgment against that insured after actual trial or by written agreement of the insured, the claimant, and **us**. No one will have any right to make us a party to a lawsuit to determine the liability of an insured.

6. **Our Recovery Rights**

In the event of any payment under this policy, **we** are entitled to all the rights of recovery of the person or organization to whom payment was made. That person or organization must sign and deliver to **us** any legal papers relating to that recovery, do whatever else is necessary to help **us** exercise those rights, and do nothing after the **loss** or **accident** to harm **our** rights.

When a person has been paid damages by **us** under this policy and also recovers from another, the amount recovered from the other shall be held in trust for **us** and reimbursed to **us** to the extent of **our** payment, provided that the person to or on behalf of whom such payment is made is fully compensated for their **loss**.

In the event recovery has already been made from the responsible party, any rights to recovery by the person(s) claiming coverage under this policy no longer exist.

7. **Assignment**

Interest in this policy may not be assigned without **our** written consent. If the policyholder named on the **declarations page** is a natural person and that person dies, the policy will cover:
a. any other named insured on the policy;

0078

25

   b. the legal representative of the deceased person while acting within the scope of duty of a legal representative; and
   c. any person having proper custody of **your insured auto** until a legal representative is appointed, but in no event for more than 30 days after the date of death.

8. **Waiver**

   Notice to any agent or knowledge possessed by any agent or other person shall not change or effect a waiver on any portion of this policy nor prevent **us** from exercising any of **our** rights under this policy.

9. **Bankruptcy**

   **We** are not relieved of any obligation under this policy because of the bankruptcy or insolvency of an insured.

10. **Inspection and Audit**

    **We** shall have the right to inspect **your** property and operations at any time. This includes, but is not limited to, the right to inspect and audit the maintenance of any **autos** covered hereunder, the identity of **your** drivers and their driving records, and **your** radius of operations. In doing so, **we** do not warrant that the property or operations are safe and healthful, or are in compliance with any law, rule or regulation.

    **We** shall also have the right to examine and audit **your** books and records at any time during the policy period and any extensions of that period and within three years after termination of the policy, as far as they relate to the subject matter of this insurance.

11. **Fraud or Misrepresentation**

    This policy was issued in reliance upon the information provided on **your** insurance application. **We** may void this policy at any time, including after the occurrence of an **accident** or **loss**, if **you**:
    1. made incorrect statements or representations to **us** with regard to any material fact or circumstance;
    2. concealed or misrepresented any material fact or circumstance; or
    3. engaged in fraudulent conduct;
    at the time of application. This means that **we** will not be liable for any claims or damages that would otherwise be covered.

    Any changes **we** make at **your** request to this policy after inception will be made in reliance upon information **you** provide. If **you**:
    1. make incorrect statements or representations to **us** with regard to any material fact or circumstance;

0079

26

2. conceal or misrepresent any material fact or circumstance, or

3. engage in fraudulent conduct;

in connection with a requested change, **we** may void the policy or reform it as it existed immediately prior to the requested change. **We** may do this at any time, including after the occurrence of an **accident** or **loss**.

When **we** have not voided or reformed the policy, **we** may still deny coverage for an **accident** or **loss** if **you**, in connection with the policy application, or in connection with any requested change, have concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, and that concealment, misrepresentation, or fraudulent conduct was material to a risk **we** assumed.

**We** may deny coverage for an **accident** or **loss** if **you** or any other insured knowingly concealed or misrepresented any material fact or circumstance or engaged in fraudulent conduct in connection with the presentation or settlement of a claim. **We** reserve all rights to indemnity against a person committing fraud or misrepresentation for all payments made and costs incurred.

12. **Liberalization**

If **we** make a change that broadens a coverage **you** have under this edition of **your** policy without additional charge, **you** will receive the broadened coverage. The broadened coverage applies on the date the coverage change is implemented in **your** state. This provision does not apply to a general program revision or **our** issuance of a subsequent edition of **your** policy. Otherwise, this policy can be changed only by endorsement issued by **us**.

13. **Severability**

Except with respect to the Limit of Liability, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or lawsuit is brought.

14. **Settlement of Claims**

**We** may use estimating, appraisal, or injury evaluation systems to adjust claims under this policy and to determine the amount of damages, expenses, or loss payable under this policy. Such systems may be developed by **us** or a third party and may include computer software, databases, and specialized technology.

15. **Automatic Termination**

If **we** or an affiliate offers to renew or continue this policy and **you** or **your** representative does not accept, this policy will automatically terminate at

0080

27

renewal or continuation premium when due will mean that **you** have not accepted **our** offer.

If **you** obtain other insurance on an **insured auto**, any similar insurance provided by this policy will terminate as to that **insured auto** on the effective date and at the effective time of the other insurance.

If an **insured auto** is sold or transferred, any insurance provided by this policy will terminate as to that **insured auto** on the effective date of the sale or transfer.

16. **Duty to Report Changes**

    **You** must promptly notify **us** when:
    1. **your** mailing or business address changes;
    2. the principal garaging address of an **insured auto** changes;
    3. there is any change with respect to the persons who operate an **insured auto**;
    4. there is a change in the driver's license status, or state or country of license issuance, of any person using an **insured auto**; or
    5. **you** acquire, sell, or dispose of **autos**.

17. **Terms of Policy Conformed to Statutes**

    If any provision of this policy fails to conform to the statutes of the state listed on **your** application as **your** business location, the provision shall be deemed amended to conform to such statutes. All other provisions shall be given full force and effect. Any disputes as to the coverages provided or the provisions of this policy shall be governed by the law of the state listed on **your** application as **your** business location.

Form 6912 (02/19)

0081

# INDEX OF ENDORSEMENTS

**All forms appearing in this endorsement section do not automatically pertain to your policy. Only those endorsements whose form numbers appear on your declarations page apply to your policy.**

**Form No./Description**                          **Page**

1797 (02/19)
**Contingent Liability Endorsement—Limited Liability Coverage
For Non-Trucking Use Of An Automobile** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

1890 (02/19)
**Employer's Non-Ownership Liability Endorsement** . . . . . . . . . . . . . . . . . . . . . . . 31

1891 (02/19)
**Hired Auto Coverage Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

2366 (02/11)
**Blanket Additional Insured Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

2367 (06/10)
**Blanket Waiver of Subrogation Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

2368 (06/10)
**Loan/Lease Gap Coverage Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

2852 IL (02/19)
**Uninsured/Underinsured Motorist Coverage Endorsement** . . . . . . . . . . . . . . . 35

4717 (02/19)
**Trailer Interchange Coverage Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

4757 IL (02/19)
**Medical Payments Coverage Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

4852 IL (02/19)
**Cancellation and Nonrenewal Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

4881 IL (02/19)
**Illinois Amendatory Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

5701 IL (02/19)
**Individual Named Insured Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

0082

29

Z228 (01/11)
**Mobile Equipment As Insured Autos Endorsement** . . . . . . . . . . . . . . . . . . . . . . 52

Z438 IL (02/19)
**Garage Operations Physical Damage Legal Liability Coverage and
Limited Garage Liability (Towing Only) Coverage Endorsement** . . . . . . . . . . . 54

Z439 (02/19)
**Non-Owned Trailer Physical Damage Coverage Endorsement**. . . . . . . . . . . . . 61

Z442 (02/19)
**Any Automobile Legal Liability Coverage Endorsement** . . . . . . . . . . . . . . . . . . . 63

## CONTINGENT LIABILITY ENDORSEMENT—LIMITED LIABILITY COVERAGE FOR NON-TRUCKING USE OF AN AUTOMOBILE

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### PART I—LIABILITY TO OTHERS

A. Under the Additional Definitions Used In This Part Only section:

Subsection A.3. is deleted and replaced by the following:

3. Any other person or organization, but only with respect to the legal liability of that person or organization for acts or omissions of any person otherwise covered under this Part I—Liability To Others. However, **insured** does not include anyone engaged in the business of transporting property by auto for hire that is liable for **your** conduct.

B. Under the Exclusions of Part I, the following exclusion is added:

**Trucking Use**
Coverage under this Part I, including **our** duty to defend, does not apply to an **insured auto** or any attached **trailer** while operated, maintained, or used:
a. To carry property or while such property is being loaded or unloaded from the **insured auto** or an attached **trailer**; or
b. In any business or for any business purpose.

### ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form 1890 (02/19)

## EMPLOYER'S NON-OWNERSHIP LIABILITY ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

0084

If **you** pay a premium for this Employer's Non-Ownership Liability coverage, then the following definition is added:

"**Non-owned auto**" means an **auto** that **you** do not own, lease, hire, rent, or borrow, and that is used in connection with **your** business. This includes **autos** owned by **your employees**, partners (if **you** are a partnership), members (if **you** are a limited liability company), or members of their households, but only while such **autos** are used in **your** business.

## CHANGES TO PART I—LIABILITY TO OTHERS

The definition of **insured auto** is modified to include a **non-owned auto** when used in connection with **your** business by **you** or any of **your employees**. The definition of **insured** does not include the owner of a **non-owned auto**.

## EXCLUSIONS

The insurance provided by this endorsement does not apply to **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any **non-owned auto** in the conduct of any partnership or joint venture of which **you** are a partner or member and which is not shown as the named insured on the **declarations page**.

## OTHER INSURANCE

The insurance provided by this endorsement is excess over any other valid and collectible insurance.

## PREMIUM AGREEMENT

**We** may audit the number of employees and charge appropriately for additional premium up to three years after the policy expiration.

This does not alter or limit **our** general audit rights under the General Provisions section of this policy.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form 1891 (02/19)

## HIRED AUTO COVERAGE ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

0085

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### Additional definitions used in this endorsement

If **you** pay a premium for this Hired Auto Coverage, then the following definitions are added:
1. "**Hired auto**" means an **auto**:
   a. **you** lease, hire, rent or borrow; or
   b. **your employee** leases, hires or rents:
      i. under a contract in that individual **employee's** name;
      ii. at **your** direction and with **your** express permission; and
      iii. only while being used in the conduct of **your** business.

   This does not include any **auto you** or an **employee** leases, hires, rents or borrows from any of **your employees**, partners (if **you** are a partnership), members (if **you** are a limited liability company), or member of their households.
2. "**Cost of hire**" means the total amount paid by **you** for the hire of **autos**.

### Changes to Part I—Liability To Others

When used in Part I—Liability To Others, the definition of **insured auto** is amended to include **hired auto**.

### Other Insurance

The insurance provided by this Hired Auto Coverage endorsement is excess over any other valid and collectible insurance, whether primary, excess, or contingent.

### Premium agreement

The premium for this Hired Auto Coverage is based on the **cost of hire**, and is subject to a minimum **cost of hire**. **We** may audit the **cost of hire** and charge appropriately for additional premium for up to three years after the policy expiration.

This does not alter or limit **our** general audit rights under the General Provisions section of this policy.

### ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form 2366 (02/11)

## BLANKET ADDITIONAL INSURED ENDORSEMENT

This endorsement modifies insurance provided by the Commercial Auto Policy, Motor Truck Cargo Legal Liability Coverage Endorsement, and/or Commercial General Li-

33

0086

ability Coverage Endorsement, as appears on the **declarations page**. All terms and conditions of the policy apply unless modified by this endorsement.

If **you** pay the fee for this Blanket Additional Insured Endorsement, **we** agree with **you** that any person or organization with whom **you** have executed a written agreement prior to any **loss** is added as an additional **insured** with respect to such liability coverage as is afforded by the policy, but this insurance applies to such additional **insured** only as a person or organization liable for **your** operations and then only to the extent of that liability. This endorsement does not apply to acts, omissions, products, work, or operations of the additional **insured**.

Regardless of the provisions of paragraph a. and b. of the "Other Insurance" clause of this policy, if the person or organization with whom **you** have executed a written agreement has other insurance under which it is the first named **insured** and that insurance also applies, then this insurance is primary to and non-contributory with that other insurance when the written contract or agreement between **you** and that person or organization, signed and executed by **you** before the **bodily injury** or **property damage** occurs and in effect during the policy period, requires this insurance to be primary and non-contributory.

In no way does this endorsement waive the "Other Insurance" clause of the policy, nor make this policy primary to third parties hired by the **insured** to perform work for the **insured** or on the **insured's** behalf.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form 2367 (06/10)

## BLANKET WAIVER OF SUBROGATION ENDORSEMENT

This endorsement modifies insurance provided by the Commercial Auto Policy, Motor Truck Cargo Legal Liability Coverage Endorsement, and/or Commercial General Liability Coverage Endorsement, as appears on the **declarations page**. All terms and conditions of the policy apply unless modified by this endorsement.

If **you** pay the fee for this Blanket Waiver of Subrogation Endorsement, **we** agree to waive any and all subrogation claims against any person or organization with whom a written waiver agreement has been executed by the named insured, as required by written contract, prior to the occurrence of any **loss**.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

0087

Form 2368 (06/10)

## **LOAN/LEASE GAP COVERAGE ENDORSEMENT**

This endorsement modifies insurance provided by the Commercial Auto Policy. All terms and conditions of the policy apply unless modified by this endorsement.

### **INSURING AGREEMENT—LOAN/LEASE PAYOFF COVERAGE**

If **you** pay the premium for this coverage, and the **insured auto** for which this coverage was purchased is deemed by **us** to be a **total loss**, **we** will pay, in addition to any amounts otherwise payable under Part II of **your** policy, the difference between:
1. the actual cash value of the **insured auto** at the time of the **total loss**; and
2. any greater amount the owner of the **insured auto** is legally obligated to pay under a written loan or lease agreement to which the **insured auto** is subject at the time of the **total loss**, reduced by:
   a. unpaid finance charges or refunds due to the owner for such charges;
   b. excess mileage charges or charges for wear and tear;
   c. charges for extended warranties or refunds due to the owner for extended warranties;
   d. charges for credit insurance or refunds due to the owner for credit insurance;
   e. past due payments and charges for past due payments; and
   f. collection or repossession expenses.

However, **our** payment under this coverage shall not exceed the limit of liability shown on the **declarations page**. The limit of liability is a percentage of the actual cash value of the **insured auto** at the time of the loss.

This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **insured auto** and the loss is covered under one of those coverages.

### **ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form 2852 IL (02/19)

## **UNINSURED/UNDERINSURED MOTORIST COVERAGE ENDORSEMENT**

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

0088

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy, and related endorsements, is modified as follows:

## INSURING AGREEMENT—UNINSURED/UNDERINSURED MOTORIST
## BODILY INJURY COVERAGE

Subject to the Limits of Liability, if **you** pay the premium for Uninsured/Underinsured Motorist Coverage, **we** will pay for damages, other than punitive or exemplary damages, which an **insured** is legally entitled to recover from the **owner** or operator of an **uninsured auto** or **underinsured auto** because of **bodily injury**:

1. sustained by an **insured**;
2. caused by an **accident**; and
3. arising out of the ownership, maintenance, or use of an **uninsured auto** or **underinsured auto**.

## INSURING AGREEMENT—UNINSURED MOTORIST
## PROPERTY DAMAGE COVERAGE

Subject to the limits of liability, if **you** pay a premium for Uninsured Motorist Property Damage Coverage, **we** will pay for damages, other than punitive or exemplary damages, which an **insured** is entitled to recover from the **owner** or operator of an **uninsured auto** due to **property damage**:

1. to an **insured auto** for which Uninsured Motorist Property Damage Coverage has been purchased;
2. caused by an **accident**; and
3. arising out of the ownership, maintenance, or use of an **uninsured auto**.

Subject to any deductible applicable under this endorsement, **we** will replace, or reimburse the reasonable cost to replace, any child restraint system that was in use by a child in an **insured auto** and was damaged during an **accident** to which Uninsured Motorist Property Damage Coverage applies due to the liability of the **owner** or operator of an **uninsured auto**.

**We** will pay under this endorsement only after the limits of liability under all applicable liability bonds and policies have been exhausted by payment of judgments or settlements. However, this shall not apply if **we** and the **insured** agree, without arbitration, that the **insured** has suffered **bodily injury**, death, or **property damage**, and also agree on the amount of damages within the limit of liability that the **insured** is legally entitled to collect under this endorsement.

An **insured** must notify **us** in writing at least 30 days before entering into any settlement with the **owner** or operator of an **uninsured auto** or **underinsured auto**, or any liability insurer. In order to preserve **our** right of subrogation, **we** may elect to pay any sum offered in settlement by, or on behalf of, the **owner** or operator of an **uninsured auto** or **underinsured auto**. If **we** do this, **you** agree to assign to **us** all rights that **you** have against the **owner** or operator of the **uninsured auto** or **underinsured auto**.

0089

36

**ADDITIONAL DEFINITIONS**

When used in this endorsement, whether in the singular, plural, or possessive:

1. "**Insured**" means:
   a. if the named insured shown on the **declarations page** is a natural person:
      (i) **you** or a **relative**;
      (ii) any person **occupying your insured auto** or a **temporary substitute auto**; and
      (iii) any person who is entitled to recover damages covered by this endorsement because of **bodily injury** sustained by a person described in (i) or (ii) above; or
   b. if the named insured shown on the **declarations page** is a corporation, partnership, organization, or any other entity that is not a natural person:
      (i) any person **occupying your insured auto** or a **temporary substitute auto**; and
      (ii) any person who is entitled to recover damages covered by this endorsement because of **bodily injury** sustained by a person described in (i) above.

   For purposes of this definition, **insured auto** includes **mobile equipment** that is:
   a. owned by **you**;
   b. leased, hired, or borrowed by **you** and **you** have purchased either "Hired Auto Coverage" or "Any Automobile Legal Liability Coverage" from **us**; or
   c. not owned, leased, hired, or borrowed by **you** and **you** have purchased either "Employer's Non-Ownership Liability Coverage" or "Any Automobile Legal Liability Coverage" from **us**.

   However, **mobile equipment** meeting any of those three criteria will be included in the definition only if at the time of **loss** it is being:
      (i) used in **your** business;
      (ii) operated on a public highway; and
      (iii) operated in a state or province where it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law.

2. "**Non-owned auto**" means any **auto** that is not **owned** by **you** or furnished for **your** regular use and, if the named insured is a natural person, not **owned** or furnished for the regular use of the named insured's spouse or **relative**.

3. "**Owned**" means the person or organization:
   a. holds legal title to the vehicle;
   b. has legal possession of the vehicle that is subject to a written security agreement with an original term of six months or more; or
   c. has legal possession of the vehicle that is leased to that person or organization under a written agreement for a continuous period of six months or more.

4. "**Owner**" means the person or organization who, with respect to a vehicle:
   a. holds legal title to the vehicle;
   b. has legal possession of the vehicle that is subject to a written security agreement with an original term of six months or more; or
   c. has legal possession of the vehicle that is leased to that person or organization under a written agreement for a continuous period of six months or more.

0090

37

3. **Property damage** means only physical damage to or destruction of an **insured auto**. **Property damage** does not include loss of use of an **insured auto** resulting from its physical damage or destruction.

6. "**Underinsured auto**" means a land motor vehicle to which a bodily injury liability bond or policy applies at the time of the **accident**, but the sum of all applicable limits of liability for **bodily injury** is less than the coverage limit for Uninsured/Underinsured Motorist Bodily Injury Coverage as shown on the **declarations page**.

An "**underinsured auto**" does not include any vehicle or equipment:
   a. **owned** by **you** or a **relative**;
   b. **owned** by any governmental unit or agency;
   c. operated on rails or crawler treads;
   d. designed mainly for use off public roads, while not on public roads;
   e. while used as a residence or premises;
   f. shown on the **declarations page** of this policy;
   g. not required to be registered as a motor vehicle; or
   h. which is an **uninsured auto**.

7. "**Uninsured auto**" means a land motor vehicle of any type:
   a. to which no bodily injury liability bond or policy applies at the time of the **accident**;
   b. to which a bodily injury liability bond or policy applies at the time of the **accident**, but the bonding or insuring company:
      (i) denies coverage; or
      (ii) is or becomes insolvent;
   c. to which a bodily injury liability bond or policy applies at the time of the **accident**, but its limit of liability for **bodily injury** is less than the minimum limit of liability for **bodily injury** specified by the financial responsibility law of the state in which the **insured auto** is principally garaged; or
   d. that is a hit-and-run vehicle whose operator or **owner** cannot be identified and which strikes or causes an object to strike:
      (i) an **insured auto** or **temporary substitute auto**; or
      (ii) if the named insured is a natural person:
         (a) **you** or a **relative**; or
         (b) a motor vehicle that **you** or a **relative** are occupying,

      provided that the **insured**, or someone on his or her behalf, reports the **accident** to the police or civil authority within 24 hours or as soon as practicable after the **accident**.

An "**uninsured auto**" does not include any motorized auto or equipment:
   a. **owned** by, furnished to, or available for the regular use of **you** or, if the named insured is a natural person, a **relative**, other than an **insured auto**;
   b. **owned** or operated by a self-insurer under any applicable vehicle law, except a self-insurer that is or becomes insolvent;
   c. **owned** by any governmental unit or agency;
   d. designed mainly for use off public roads, while not on public roads;
   e. while being used as a residence or premises;

0091

38

f. not required to be registered as a motor vehicle; or

g. which is an **insured auto**.

**EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS ENDORSEMENT.**

1. Coverage under this endorsement is not provided for **bodily injury** sustained by any person while using or **occupying**:
   a. an **insured auto** without the express or implied permission of **you** or, if the named insured is a natural person, a **relative**;
   b. a **non-owned auto** without the express or implied permission of the **owner**; or
   c. an **auto** or device of any type designed to be operated on the public roads that is **owned** by, furnished to, or available for the regular use of **you** or, if the named insured is a natural person, a **relative**, other than an **insured auto** or **temporary substitute auto**.
2. Coverage under this endorsement is not provided for **property damage**:
   a. to an **insured auto** while being used or driven by a person while employed or engaged in the **business** of selling, leasing, repairing, parking, storing, servicing, delivering, or testing vehicles. However, this exclusion does not apply to **you**, a **relative**, or an agent or employee of **you** or a **relative**, when using an **insured auto**;
   b. to an **insured auto** resulting from any pre-arranged or organized racing, speed or demolition contest, stunting activity, or in practice or preparation for any such contest or activity;
   c. to an **insured auto** due to a nuclear reaction or radiation;
   d. to an **insured auto** for which insurance is afforded under a nuclear energy liability insurance contract;
   e. to a **trailer**;
   f. which is not caused by the actual physical contact of an **uninsured auto** with the **insured auto**; or
   g. if the **owner** or operator of the at-fault **uninsured auto** cannot be identified.
3. Coverage under this endorsement will not apply directly or indirectly to benefit any insurer or self-insurer under any of the following or similar laws:
   a. workers' compensation law; or
   b. disability benefits law.

## LIMITS OF LIABILITY

Regardless of the number of premiums paid, or the number of **insured autos** or trailers shown on the **declarations page**, or the number of policies issued by **us**, or the number of vehicles or **insureds** involved in the **accident**, or the number of claims or lawsuits arising out of an **accident**, **we** will pay no more than the limit of liability shown for Uninsured/Underinsured Motorist Coverage on the **declarations page**.

If the **declarations page** shows that "combined single limit" or "CSL" applies, the amount shown is the most **we** will pay for the total of all damages resulting from any

0092

39

one **accident**. However, without changing this total each accident limit of liability, **we** will comply with any law that requires **us** to provide any separate limits.

If **your declarations page** shows a split limit:
1. the amount shown for "each person" is the most **we** will pay for all damages due to a **bodily injury** to one person;
2. subject to the "each person" limit, the amount shown for "each accident" is the most **we** will pay for all damages due to **bodily injury** sustained by two or more persons in any one **accident**; and
3. the amount shown for "property damage" is the most **we** will pay for the aggregate of all **property damage** caused by any one **accident**.

The "each person" limit of liability includes the total of all claims made for **bodily injury** to an **insured** and all claims of others derived from such **bodily injury**, including, but not limited to, emotional injury or mental anguish resulting from the **bodily injury** of another or from witnessing the **bodily injury** to another, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

The limit of liability under this endorsement for **property damage** to an **insured auto** arising out of one **accident** is the lowest of:
1. $15,000;
2. the actual cash value of the **insured auto** at the time of the **accident**, reduced by the deductible shown on the **declarations page**, and by its salvage value if the **insured auto** is more than eight years old and **we** allow **you** or the **owner** to retain the salvage;
3. the amount necessary to replace the **insured auto**, reduced by the deductible shown on the **declarations page**, and by its salvage value if the **insured auto** is more than eight years old and **we** allow **you** or the **owner** to retain the salvage;
4. the amount necessary to repair the **insured auto** to its pre-loss condition, reduced by the deductible shown on the **declarations page**; or
5. any limit of liability shown on the **declarations page** for **property damage** under this endorsement, reduced by the salvage value of the **insured auto** if the **insured auto** is more than eight years old and **we** allow **you** or the **owner** to retain the salvage.

Payments for **property damage** under this endorsement are subject to the following provisions:
1. no more than one deductible shall be applied to any one **accident**; and
2. an adjustment for depreciation or physical condition, which may also be referred to as betterment, wear and tear, or prior damage, will be made in determining the limit of liability at the time of the **accident**.

The Limits of Liability under this endorsement shall be reduced by all sums:
1. paid because of **bodily injury** by or on behalf of any persons or organizations that may be legally responsible, including, but not limited to, all sums paid under Part I—Liability To Others; and
2. paid, payable, or that should apply, because of **bodily injury** under any workers' compensation law.

0093

40

The limits of liability for **property damage** under this endorsement shall be reduced by all sums paid because of **property damage**:

a. by or on behalf of the persons or organizations who may be legally responsible; and
b. under Part II—Damage To Your Auto.

Any payment made to a person under this endorsement shall reduce any amount that the person is entitled to recover under Part I—Liability To Others.

No one will be entitled to duplicate payments for the same elements of damages.

Any judgment or settlement for damages against an operator or **owner** of an **uninsured auto** or an **underinsured auto** that arises out of a lawsuit brought without **our** written consent is not binding on **us**.

## OTHER INSURANCE

When the named insured is a natural person, if there is other applicable uninsured or underinsured motorist coverage, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all available coverage limits. If this policy and any other policy providing similar insurance apply to the same **accident**, the maximum limit of liability under all the policies shall be the highest limit of liability under any one policy. However, any insurance **we** provide shall be excess over any other uninsured or underinsured motorist coverage, except for **bodily injury** to **you** or a **relative** when **occupying** an **insured auto**.

When the named insured is a corporation, partnership, organization or any other entity that is not a natural person, if there is other applicable uninsured or underinsured motorist coverage, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all available coverage limits. However, any insurance **we** provide for the occupant of an **insured auto** shall be excess over any other uninsured or underinsured motorist coverage.

**We** will not pay for any damages that would duplicate any payment made for damages under other insurance.

## ARBITRATION

If **we** and an **insured** cannot agree on:

1. the legal liability of the operator or **owner** of an **uninsured auto** or an **underinsured auto**; or
2. the amount of the damages sustained by the **insured**;

this will be determined by arbitration if **we** or the **insured** make a written demand for arbitration prior to the expiration of the bodily injury statute of limitations in the state in which the **accident** occurred.

0094

41

If a written demand for arbitration is made, each party shall select an arbitrator. The two arbitrators will select a third. If the two arbitrators cannot agree on a third arbitrator within 45 days, then either the party may request that the arbitration be submitted to the American Arbitration Association, or on joint application by the **insured** and **us**, the third arbitrator may be appointed by a court having jurisdiction.

Each party will pay the costs and fees of its arbitrator and any other expenses it incurs. The costs and fees of the third arbitrator will be shared equally. In the event the arbitrators award reasonable arbitration costs, fees, or expenses, **we** will pay only that portion of such awarded costs, fees, or expenses as is necessary to prevent the amount available under this policy for payment of compensatory damages awarded by the arbitrators from being reduced to an amount less than the minimum amount required under the Illinois Vehicle Code and the Illinois Insurance Code, as amended.

Unless both parties agree otherwise, arbitration will take place in the county in which the **insured** resides. Rules of procedure and evidence will apply according to Illinois law.

A decision agreed to by two of the arbitrators will be binding with respect to a determination of:
1. the legal liability of the operator or **owner** of an **uninsured auto** or an **underinsured auto**; and
2. the amount of the damages sustained by the **insured**.

The arbitrators shall have no authority to award compensatory damages in an amount in excess of the limit of liability. The decision of the arbitrators is binding only if the amount of the award does not exceed $75,000 for **bodily injury** or death of any one person, $150,000 for **bodily injury** or death of two or more persons in any one motor vehicle accident, or the corresponding policy limits for **bodily injury** or death, whichever is less. If the award of the arbitrators for damages caused by an **uninsured auto** or an **underinsured auto** exceeds the applicable limit set forth in this paragraph, either party may demand the right to a trial. This demand must be made in writing within 60 days of the arbitrators' decision. If the demand is not made within 60 days, the amount of damages agreed to by the arbitrators will be binding.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form 4717 (02/19)

## TRAILER INTERCHANGE COVERAGE ENDORSEMENT

This endorsement modifies insurance provided by the Commercial Auto Policy. All terms and conditions of the policy apply unless modified by this endorsement.

0095

42

**INSURING AGREEMENT**

Subject to the Limits of Liability, if **you** pay the premium for Trailer Interchange Coverage, **we** will pay damages for **property damage** for which **you** become legally responsible because of **loss** to a **trailer** not owned by **you**, and its equipment, while in **your** possession. The **trailer** must be in **your** possession under a written trailer or equipment interchange agreement in which **you** assume liability for **loss** to the **trailer** while in **your** possession.

**We** will pay for a **loss** to the **trailer** and its equipment under the coverages described below, as reflected on **your declarations page**:
a. Collision Coverage. For **loss** caused by:
    (i) The **trailer's** collision with another object; or
    (ii) The **trailer's** overturn.
b. Comprehensive Coverage. For any **loss** except one caused by:
    (i) The **trailer's** collision with another object; or
    (ii) The **trailer's** overturn.

**We** will settle or defend, at **our** option, any claim or lawsuit for damages covered by this endorsement. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the Limit of Liability for this coverage has been exhausted by payment of judgments or settlements.

**ADDITIONAL DEFINITION**

"**Trailer**", when used in this endorsement, includes a shipping container.

**ADDITIONAL PAYMENTS**

In addition to **our** Limit of Liability, **we** will pay for an **insured**:
a. all expenses **we** incur in the settlement of any claim or defense of any lawsuit;
b. interest accruing after entry of judgment on that part of the judgment that does not exceed **our** Limit of Liability. This payment does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured**. **Our** payment, offer in writing, or deposit in court of that part of the judgment which does not exceed **our** Limit of Liability ends **our** duty to pay interest that accrues after the date of **our** payment, written offer, or deposit.
c. the premiums on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in a principal amount exceeding **our** Limit of Liability, and **we** have no duty to apply for or furnish these bonds;
d. reasonable expenses, including loss of earnings up to $250 a day, incurred at **our** request;
e. all reasonable expenses necessary to return a stolen **trailer** to **you**, unless **we** determine the **trailer** to be a total loss; and
f. all reasonable expenses necessary to remove a **trailer** from the site of an **accident** or **loss** and transport it to a repair facility.

0096

43

a. **We** will not pay for **loss** caused by or resulting from any of the following. Such **loss** is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**.
   (i) Nuclear Hazard.
       (1) The explosion of any weapon employing atomic fission or fusion; or
       (2) Nuclear reaction or radiation, or radioactive contamination, however caused.
   (ii) War or Military Action.
       (1) War, including undeclared or civil war;
       (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or agents; or
       (3) Insurrection, rebellion, revolution, usurped power, or action taken by a governmental authority in hindering or defending against any of these.
b. **We** will not pay for loss of use.
c. **We** will not pay for **loss** caused by, or resulting from, any of the following unless caused by another **loss** that is covered by this insurance;
   (i) Wear and tear, freezing, mechanical or electrical breakdown, or structural failure caused by material fatigue, decomposition, or corrosion; or
   (ii) Blowouts, punctures, or other road damage to tires.

## LIMIT OF INSURANCE AND DEDUCTIBLE

The most **we** will pay for **loss** to any one **trailer** is the least of the following amounts minus any applicable deductible shown on the **declarations page**:
a. The actual cash value of the damaged or stolen property at the time of the **loss**;
b. The amount necessary to replace the stolen or damaged property with other of like kind and quality;
c. The amount necessary to repair the damaged property to its pre-loss condition; or
d. The applicable Limit of Liability for the property as shown on the **declarations page**.

A single deductible will be applied to any **loss**. In the event there are different deductible amounts applicable to the **loss**, the higher deductible will be applied. In all events, the deductible will be applied against the limit of liability. If a **loss** involves another coverage added by endorsement to the policy, only one deductible will apply to the entire **loss** event. No deductible will apply to payments made under the Additional Payments section for expenses necessary to return a stolen **trailer** to **you**.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

0097

Form 4757 IL (02/19)

## **MEDICAL PAYMENTS COVERAGE ENDORSEMENT**

---

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### **INSURING AGREEMENT**

Subject to the Limits of Liability, if **you** pay the premium for Medical Payments Coverage, **we** will pay the **usual and customary charge** for reasonable and necessary expenses, incurred within three years from the date of an **accident**, for medical and funeral services because of **bodily injury**:

1. sustained by an **insured**;
2. caused by an **accident**; and
3. arising out of the ownership, maintenance or use of a motor vehicle or **trailer**.

Any dispute as to the **usual and customary charge** will be resolved between the service provider and **us**.

### **ADDITIONAL DEFINITIONS**

When used in this endorsement, whether in the singular, plural, or possessive:
1. "**Insured**" means:
   a. if the named insured shown on the **declarations page** is a natural person:
      (i) **you** while **occupying** any **auto**, other than an **auto owned** by **you** which is not an **insured auto**;
      (ii) a **relative** while **occupying** an **insured auto**, **temporary substitute auto**, or **non-owned auto**;
      (iii) **you** or any **relative** when struck by a land motor vehicle of any type, or a **trailer**, while not **occupying** a motor vehicle; and
      (iv) any other person while **occupying** an **insured auto**, **temporary substitute auto**, or a **trailer** while attached to an **insured auto**; or
   b. if the named insured shown on the **declarations page** is a corporation, partnership, organization or any other entity that is not a natural person, any person **occupying your insured auto**, **temporary substitute auto**, or a **trailer** while attached to an **insured auto**.

   For purposes of this definition, **insured auto** includes **mobile equipment** that is:
      (i) owned by **you**;
      (ii) leased, hired, or borrowed by **you** and **you** have purchased either "Hired Auto Coverage" or "Any Automobile Legal Liability Coverage" from **us**; or

0098

45

(iii) not owned, leased, hired, or borrowed by **you** and **you** have purchased either "Employer's Non-Ownership Liability Coverage" or "Any Automobile Legal Liability Coverage" from **us**.

However, **mobile equipment** meeting any of those three criteria will be included in the definition only if at the time of **loss** it is being:
- (i) used in **your** business;
- (ii) operated on a public highway; and
- (iii) operated in a state or province where it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law.

2. "**Non-owned auto**" means any **auto** that is not **owned** by **you** or furnished for **your** regular use and, if the named insured is a natural person, not **owned** by or furnished for the regular use of the named insured's spouse or a **relative**.

3. "**Owned**" means the person or organization:
   a. holds legal title to the vehicle;
   b. has legal possession of the vehicle that is subject to a written security agreement with an original term of six months or more; or
   c. has legal possession of the vehicle that is leased to that person or organization under a written agreement for a continuous period of six months or more.

4. "**Owner**" means the person or organization who, with respect to a vehicle:
   a. holds legal title to the vehicle;
   b. has legal possession of the vehicle that is subject to a written security agreement with an original term of six months or more; or
   c. has legal possession of the vehicle that is leased to that person or organization under a written agreement for a continuous period of six months or more.

5. "**Usual and customary charge**" means an amount which **we** determine represents a customary charge for services in the geographical area in which the service is rendered. **We** shall determine the usual and customary charge through the use of independent sources of **our** choice.

## EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS ENDORSEMENT.

Coverage under this endorsement does not apply to **bodily injury**:
1. sustained while **occupying** any **auto** or **trailer** while being used as a residence or premises;
2. occurring during the course of employment if workers' compensation coverage is payable or required;
3. arising out of an **accident** involving an **auto** or **trailer** while being used by a person while employed or engaged in the business of selling, leasing, repairing, parking, storing, servicing, delivering, or testing vehicles, unless that business is **yours**;
4. resulting from any pre-arranged or organized racing, speed or demolition contest, stunting activity, or in practice or preparation for any such contest or activity;
5. due to a nuclear reaction or radiation;
6. for which insurance is afforded under a nuclear energy liability insurance contract;
7. for which the United States Government is liable under the Federal Tort Claims Act;
8. sustained by any person while **occupying** an **insured auto**, **temporary sub-**

46

0099

**stitute auto**, or **trailer** without the express or implied permission of **you** or, if **the** named insured is a natural person, a **relative**;

9. sustained by any person while **occupying** a **non-owned auto** without the express or implied permission of the **owner**;

10. that is intentionally inflicted on an **insured** at that person's request or self-inflicted; or

11. sustained while **occupying** any vehicle that has less than four wheels or is not designed for operation principally upon public roads.

## LIMITS OF LIABILITY

Regardless of the number of premiums paid, or the number of **insured autos** or **trailers** shown on the **declarations page**, or the number of policies issued by **us**, or the number of vehicles or **insureds** involved in an **accident**, or the number of claims or lawsuits arising out of an **accident**, **we** will pay no more than the Limit of Liability shown for Medical Payments Coverage on the **declarations page**.

Any amount payable to an **insured** under this endorsement will be reduced by any amount paid or payable for the same expense under Part I—Liability To Others or any applicable Uninsured/Underinsured Motorist Coverage Endorsement.

No one will be entitled to duplicate payments under this policy for the same elements of damages.

## OTHER INSURANCE

If there is other applicable **auto** medical payments insurance, **we** will pay only **our** share of the medical and funeral services. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. However, any insurance **we** provide for an **insured occupying**:

1. an **auto**, other than an **insured auto** or **temporary substitute auto**; or

2. a **trailer**, other than a **trailer** while connected to an **insured auto**;

will be excess over any other **auto** or **trailer** insurance providing payments for medical or funeral expenses.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form 4852 IL (02/19)

## CANCELLATION AND NONRENEWAL ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

0100

47

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

## CANCELLATION

**You** may cancel this policy by calling or writing **us** and stating the future date that **you** wish the cancellation to be effective.

**We** may cancel this policy by mailing a notice of cancellation to the named insured shown on the **declarations page** at the last known address appearing in **our** records. If **we** cancel this policy during the first 60 days of the initial policy period for any reason other than nonpayment of premium, notice of cancellation will be mailed at least 30 days before the effective date of cancellation. If this policy has been in effect for more than 60 days, or if this is a renewal or continuation policy, and **we** cancel for any reason other than nonpayment of premium, notice of cancellation will be mailed at least 60 days before the effective date of cancellation. If **we** cancel this policy at any time due to nonpayment of premium, notice of cancellation will be mailed at least 10 days before the effective date of cancellation. **Our** notice of cancellation will state the reason(s) for cancellation.

**We** may cancel this policy for any reason within the first 60 days of the initial policy period.

After this policy is in effect for more than 60 days, or if this is a renewal or continuation policy, **we** may only cancel for one or more of the following reasons:
1. **you** do not pay the required premium for this policy when due;
2. this policy was obtained through a material misrepresentation;
3. any insured has violated any of the terms and conditions of the policy;
4. the risk originally accepted has measurably increased;
5. certification to the Director of the loss of reinsurance by the insurer which provided coverage for **us** for all or a substantial part of the underlying risk insured; or
6. a determination by the Director that the continuation of the policy could place **us** in violation of the insurance laws of this state.

With respect to cancellation, this policy is neither severable nor divisible. Any cancellation will be effective for all coverage for all persons and all **autos**.

If this policy is canceled, coverage will not be provided as of the effective date and time shown in the notice of cancellation.

## CANCELLATION REFUND

Upon cancellation, **you** may be entitled to a premium refund. However, **our** making or offering of a refund is not a condition of cancellation.

If this policy is canceled, any refund due will be computed on a daily pro-rata basis.

0101

48

If **we** decide not to renew or continue this policy, **we** will mail to the named insured, **your** agent and loss payee a notice of nonrenewal at the last known address appearing in **our** records. Notice will be mailed at least 60 days before the end of the policy period.

**PROOF OF NOTICE**

Proof of mailing of any notice will be sufficient proof of notice.

Form 4881 IL (02/19)

## ILLINOIS AMENDATORY ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

**GENERAL DEFINITIONS**

The definition of "**relative**" in the General Definitions section is deleted in its entirety and replaced by the following:

13. "**Relative**" means any person living in the household in which the named insured resides who is related to the named insured by blood, marriage, civil union, or adoption, including a ward or foster child. This term only applies if the named insured is a natural person.

**PART I—LIABILITY TO OTHERS**

The second paragraph in Part I—Liability To Others is amended to include the following:

If a lawsuit is brought against an **insured** with respect to a claim for acts or alleged acts covered under this Part I, seeking both compensatory and punitive or exemplary damages, **we** will provide a defense to such lawsuit without liability for any punitive or exemplary damages.

**EXCLUSIONS**

The following is added as an additional paragraph at the end of the Exclusions section:

0102

49

**Pollution Exclusion Buy Back**—if a payment is made subject the MCS90 endorsement is removed for a claim that is not covered under **covered pollution cost or expense** or is excluded under Exclusion 7 or 10 under Part I—Liability to Others.

## PART II—DAMAGE TO YOUR AUTO

A. The following is added to the Collision Coverage provision in Part II—Damage To Your Auto:

Subject to any deductible applicable to a collision **loss**, **we** will replace, or reimburse the reasonable cost to replace, any child restraint system damaged in an **accident** to which this Collision Coverage applies.

B. The following is added to the Comprehensive Coverage provision in Part II—Damage To Your Auto:

Subject to any deductible applicable to a comprehensive **loss**, **we** will replace, or reimburse the reasonable cost to replace, any child restraint system damaged in an **accident** to which this Comprehensive Coverage applies.

C. The following is added to the Salvage provision in Part II—Damage To Your Auto:

In the event of a **total loss**, **we** will retain all salvage if the **insured auto** is eight model years old or newer.

## GENERAL PROVISIONS

Subsection 6—Our Recovery Rights is deleted in its entirety and replaced by the following:

In the event of any payment under any applicable Uninsured/Underinsured Motorist Coverage endorsement, **we** are entitled to all the rights of recovery that an insured, as defined under such Uninsured/Underinsured Motorist Coverage endorsement, to whom or for whom payment was made, has against the **owner** or operator of an uninsured auto or underinsured auto. In the event of any other payment under this policy, **we** are entitled to all the rights of recovery that the insured to whom or for whom payment was made has against another. That insured must sign and deliver to **us** any legal papers relating to that recovery, do whatever else is necessary to help **us** exercise those rights, and do nothing after an **accident** or **loss** to prejudice **our** rights.

However, **we** may not assert rights of recovery against:
a. any person who was using an **insured auto** with **your** express or implied permission for any payment made under Part II—Damage To Your Auto; or
b. the **owner** or operator of an uninsured auto or underinsured auto, if the insured, as defined under such Uninsured/Underinsured Motorist Coverage endorsement, provides **us** with written notice 30 days prior to entering into a settlement that an offer of settlement has been made by, or on behalf of, the **owner** or operator of an uninsured auto or underinsured auto, and **we** do not elect to pay that insured an

0103

50

amount equal to the amount offered in full settlement by, or on behalf of, the **owner** or operator of the uninsured auto or underinsured auto.

When a person has been paid damages by **us** under this policy and also recovers from another, the amount recovered from the other shall be held in trust for **us** and reimbursed to **us** to the extent of **our** payment, provided that the person to or on behalf of whom such payment is made is fully compensated for their **loss**.

In the event recovery has already been made from the responsible party, any rights to recovery by the person(s) claiming coverage under this policy no longer exist.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form 5701 IL (02/19)

## INDIVIDUAL NAMED INSURED ENDORSEMENT

Not all customers are eligible for this coverage. This endorsement applies to **your** policy only if the form number appears on **your declarations page**. In no event will this coverage apply if the named insured is a corporation, partnership, organization, or any other entity that is not a natural person.

This endorsement changes **your** policy. Please read it carefully.

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

## ADDITIONAL DEFINITIONS USED IN THIS ENDORSEMENT

As used in this endorsement:
1. "**You**" and "**yours**" include **your** spouse or partner in a civil union, if a resident of the same household, except for notice of cancellation.
2. "**Non-owned auto**" means any **private passenger auto**, pickup, van, or **trailer** not owned by or furnished or available for the regular use of **you** or any **relative**, while it is in the custody of or being operated by **you** or any **relative**, with the permission of its owner.

## CHANGES IN PART I—LIABILITY TO OTHERS

A. If **you** are an individual, Exclusion 6 does not apply to **bodily injury** to **your** or any **relative's** fellow **employees**.

B. If any **private passenger auto you** own is an **insured auto** under Part I—Liability To Others and that **auto** is not used for any business purpose other than

51

0104

1. **Relatives** are **insureds** for any **insured auto you** own that is a **private passenger auto** and is not used for any business purpose other than ranching or farming, and for any other **auto** described in paragraph B.2. of this endorsement.

2. Any **auto you** do not own is an **insured auto** while being used, with the permission of its owner, by **you** or by any **relative** except:
   a. Any **auto** owned by any **relative**.
   b. Any **auto** furnished or available for **your** or any **relative's** regular use, including any **auto** rented for a period of more than 30 days.
   c. Any **auto** used by **you** or by any of **your relatives** while working in a business of selling, servicing, repairing, or parking **autos**.
   d. Any **auto** other than a **private passenger auto** used by **you** or any of **your relatives** while working in any business or occupation.

3. Exclusion 10 does not apply to any **insured auto** that is a **private passenger auto** and is not used for any business purpose other than ranching or farming.

4. Exclusion 16 is deleted and replaced by the following:
   **Vehicle Sharing—Private Passenger Autos**
   **Bodily injury** or **property damage** arising out of the use of an **insured auto** that is a **private passenger auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of an **insured auto** by **you** or a **relative**.

## CHANGES IN PART II—DAMAGE TO YOUR AUTO

A. If any **private passenger auto you** own is an **insured auto** under Part II—Damage To Your Auto, and that **auto** is not used for any business purpose other than ranching or farming, then a **non-owned auto** will also be considered an **insured auto**. However, the most **we** will pay for **loss** to a **non-owned auto** that is a **trailer** is $500.

B. Exclusion 9 is deleted and replaced by the following:
   **We** will not pay for **loss** to an **insured auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of an **insured auto** by **you** or a **relative**.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THIS POLICY REMAIN UNCHANGED.

Form Z228 (01/11)

## MOBILE EQUIPMENT AS INSURED AUTOS ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

0105

52

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

## PART I—LIABILITY TO OTHERS

**ADDITIONAL DEFINITIONS USED IN THIS PART ONLY** is modified as follows:

B. When used in PART I—LIABILITY TO OTHERS, **insured auto** also includes:
1. **Trailers**, designed primarily for travel on public roads, while connected to **your insured auto** that is a power unit;
2. **Mobile equipment** while being carried or towed by an **insured auto**;
3. Any **temporary substitute auto**; and
4. Any **mobile equipment** owned by **you**, or if **you** have purchased Hired Auto or Non-owned Auto coverage, leased or hired by **you**, when subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged. This does not change the effect of exclusion 13 concerning the operation of **mobile equipment**.

## MEDICAL PAYMENTS COVERAGE

If **you** pay the premium for Medical Payments Coverage, that endorsement is modified as follows:

## ADDITIONAL DEFINITIONS

The definition of "**Insured**" is deleted and replaced by:

"**Insured**" means:

a. if the named insured shown on the **Declarations Page** is a natural person:
   (i) **you** while **occupying** any **auto**, other than an **auto owned** by **you** which is not an **insured auto**;
   (ii) a **relative** while **occupying** an **insured auto**, **temporary substitute auto**, or **non-owned auto**;
   (iii) **you** or any **relative** when struck by a land motor vehicle of any type, or a **trailer**, while not **occupying** a motor vehicle; and
   (iv) any other person while **occupying** an **insured auto**, **temporary substitute auto**, or a **trailer** while attached to an **insured auto**; or

b. if the named insured shown on the **Declarations Page** is a corporation, partnership, organization or any other entity that is not a natural person, any person **occupying your insured auto**, **temporary substitute auto**, or a **trailer** while attached to an **insured auto**.

For purposes of this definition, **insured auto** includes **mobile equipment owned** by **you**, or if **you** have purchased Hired Auto or Non-owned Auto coverage, leased or hired by **you**, when it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged.

0106

53

**UNINSURED MOTORIST AND UNDERINSURED MOTORIST COVERAGES**

If **you** pay the premium for Uninsured Motorist Coverage and/or Underinsured Motorist Coverage, that endorsement is modified as follows:

## ADDITIONAL DEFINITIONS

The definition of "**Insured**" is deleted and replaced by:

"**Insured**" means:

a. if the named insured shown on the **Declarations Page** is a natural person:
   (i) **you** or a **relative**;
   (ii) any person **occupying your insured auto** or a **temporary substitute auto**; and
   (iii) any person who is entitled to recover damages covered by this endorsement because of **bodily injury** sustained by a person described in (i) or (ii) above; or

b. if the named insured shown on the **Declarations Page** is a corporation, partnership, organization or any other entity that is not a natural person:
   (i) any person **occupying your insured auto** or a **temporary substitute auto**; and
   (ii) any person who is entitled to recover damages covered by this endorsement because of **bodily injury** sustained by a person described in (i) above.

For purposes of this definition, **insured auto** includes **mobile equipment owned** by **you**, or if **you** have purchased Hired Auto or Non-owned Auto coverage, leased or hired by **you**, when it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form Z438 IL (02/19)

### GARAGE OPERATIONS PHYSICAL DAMAGE LEGAL LIABILITY COVERAGE AND LIMITED GARAGE LIABILITY (TOWING ONLY) COVERAGE ENDORSEMENT

This endorsement modifies **your** Commercial Auto Policy. Except as specifically modified by this endorsement, all provisions of the Commercial Auto Policy apply.

THIS ENDORSEMENT APPLIES ON A LEGAL LIABILITY BASIS UNLESS ONE OF THE DIRECT COVERAGE OPTIONS LISTED BELOW IS SHOWN ON **YOUR DECLARATIONS PAGE**.

0107

## DIRECT COVERAGE OPTIONS

**Direct Excess Insurance.** If this "Direct Excess" option is shown on **your declarations page**, the On-Hook Towing Physical Damage Legal Liability and Garagekeepers Storage Location Physical Damage Legal Liability coverages provided by this endorsement are modified to apply without regard to **your** or any other **insured's** legal liability for **loss** to a **customer's auto** or **towed property**, and is excess over any other collectible insurance regardless of whether the other insurance covers **your** or any other **insured's** interest or the interest of the owner of the **customer's auto** or **towed property**.

**Direct Primary Insurance.** If this "Direct Primary" option is shown on **your declarations page**, the On-Hook Towing Physical Damage Legal Liability and Garagekeepers Storage Location Physical Damage Legal Liability coverages provided by this endorsement are modified to apply without regard to **your** or any other **insured's** legal liability for **loss** to a **customer's auto**, or **towed property**, and is primary insurance.

### INSURING AGREEMENT—ON-HOOK TOWING PHYSICAL DAMAGE LEGAL LIABILITY COVERAGE

If **you** pay the premium for this On-Hook Towing Physical Damage Legal Liability coverage and it is shown on **your declarations page** as "On-Hook Legal Liability," **we** will pay all sums for which an **insured** is legally liable to pay for **property damage** for **loss** to **towed property**. **We** will pay under this coverage only if a limit of liability and a premium is shown for this coverage on the **declarations page**.

**We** will have the right and duty to defend any **insured** against a lawsuit asking for these damages. However, **we** have no duty to defend any **insured** against a lawsuit seeking damages for **loss** to which this insurance does not apply. **We** may investigate and settle any claim or lawsuit as **we** consider appropriate. **Our** duty to defend or settle ends when the limit of liability for this coverage has been exhausted by payment of judgments or settlements.

### INSURING AGREEMENT—GARAGEKEEPERS STORAGE LOCATION PHYSICAL DAMAGE LEGAL LIABILITY COVERAGE

If **you** pay the premium for this Garagekeepers Storage Location Physical Damage Legal Liability coverage and it is shown on **your declarations page** as "Garagekeepers Legal Liability," **we** will pay all sums for which an **insured** is legally liable to pay as **property damage** for **loss** to a **customer's auto** or **customer's auto** equipment left in the **insured's** care while the **insured** is attending, servicing, repairing, parking, or storing it in **your garage operations** under:

1. Comprehensive Coverage.
   From any cause except:
   a. Collision of the **customer's auto** with another object; or
   b. Overturn of the **customer's auto**.

55

0108

2. **Collision Coverage**.

Caused by:

a. Collision of the **customer's auto** with another object; or

b. Overturn of the **customer's auto**.

**We** will have the right and duty to defend any **insured** against a lawsuit asking for these damages. However, **we** have no duty to defend any **insured** against a lawsuit seeking damages for **loss** to which this insurance does not apply. **We** may investigate and settle any claim or lawsuit as **we** consider appropriate. **Our** duty to defend or settle ends when the limit of liability for this coverage has been exhausted by payment of judgments or settlements.

**We** will pay under this coverage only if a limit of liability and a premium is shown for this coverage on the **declarations page**, and only for the locations listed on **your declarations page**.

### INSURING AGREEMENT—LIMITED GARAGE LIABILITY (TOWING ONLY) COVERAGE

If **you** pay the premium for On-Hook Towing Physical Damage Legal Liability Coverage, **we** will pay damages, other than punitive or exemplary damages, for **bodily injury**, **property damage**, and **covered pollution cost or expense**, for which an **insured** becomes legally responsible because of an **accident** arising out of the operation of a **customer's auto** necessary to **your** on-hook towing activity. However, **we** will only pay for the **covered pollution cost or expense** if the same **accident** also caused **bodily injury** or **property damage** to which this insurance applies.

### ADDITIONAL DEFINITIONS

The following additional definitions apply throughout this Garage Operations Physical Damage Legal Liability Coverage endorsement whenever the defined term appears in boldface type, whether in the singular, plural, or possessive:

1. "**Customer's auto**" means a customer's land motor vehicle, **trailer**, or **watercraft**, including a **customer's auto** left with **you** for service, repair, storage, or safekeeping. Customers include **your employees** and their **relatives** who pay for services performed.

2. "**Garage operations**" means the ownership, maintenance, or use of the locations shown on **your declarations page** for the purpose of a business of selling, servicing, repairing, parking, or storing **customers' autos**, and that portion of the roads or other accesses that adjoin such locations. **Garage operations** also includes all operations necessary or incidental to the performance of **garage operations**.

3. "**Insured**" means:
   a. **you**; and

56

0109

b. **your** partners (if **you** are a partnership), members (if **you** are a limited liability company), employees, directors, or shareholders, but only while acting within the scope of their duties.

4. "**Loaded in or on**" means connected to.

5. "**Towed property**" means tangible property, not owned by or registered to **you**, in transit while **loaded in or on**, or conveyed by, an **insured auto**. **Towed property** also means property when it is moved from the place where **you** accept it for movement by or onto **your insured auto** and after it is moved from **your insured auto** to the place where it is finally delivered by **you**. **Towed property** includes a towed **auto** or **watercraft**.

6. "**Watercraft**" means any craft, boat, vessel, or ship designed to transport persons or property by water.

7. "**Work you performed**" includes:
   a. Work that someone performed on **your** behalf; and
   b. The providing of, or the failure to provide, warnings or instructions.

## ADDITIONAL PAYMENTS

In addition to **our** limit of liability, **we** will pay for an **insured** under this endorsement:
1. All expenses **we** incur in the settlement of any claim or defense of any lawsuit;
2. The premium on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in a principal amount exceeding **our** limit of liability, and **we** have no duty to apply for or furnish these bonds;
3. Reasonable expenses incurred by that **insured** at **our** request, including loss of earnings up to $250 per day;
4. All costs taxed against the **insured** in any lawsuit against that **insured we** defend; and
5. Interest accruing after entry of judgment on that part of the judgment that does not exceed **our** limit of liability. This does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured**.

   **Our** payment, offer in writing, or deposit in court of that part of the judgment that does not exceed **our** limit of liability ends **our** duty to pay interest that accrues after the date of **our** payment, written offer, or deposit.

## EXCLUSIONS—PLEASE READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE PROVIDED.

1. The On-Hook Towing Physical Damage Legal Liability and Garagekeepers Storage Location Physical Damage Legal Liability coverages under this endorsement do not apply to any of the following:
   a. Liability resulting from any contract or agreement by which the **insured** ac-

0110

57

cepts responsibility for **loss**. This exclusion does not apply to an agreement that is an **insured contract** that was executed prior to the occurrence of any **property damage**;

b. **Loss** due to theft or conversion caused in any way by **you** or **your** employees, partners, members, directors, or shareholders;

c. Defective parts or materials;

d. Faulty **work you performed**;

e. **Loss** to any of the following:

   (i) Tape decks or other sound-reproducing equipment unless permanently installed in a **customer's auto**;

   (ii) Tapes, records, or other sound-reproducing devices designed to be used with sound-reproducing equipment;

   (iii) Sound-receiving equipment designed for use as a citizens band radio, two-way mobile radio, or telephone or scanning monitor receiver, including its antennas and other accessories, unless permanently installed in the dash or console opening normally used by the **customer's auto** manufacturer for the installation of a radio; or

   (iv) Any device designed or used to detect speed measurement equipment such as radar or laser detectors and any jamming apparatus intended to elude or disrupt speed measurement equipment;

f. **Loss** caused by:

   (i) War, including undeclared or civil war;

   (ii) Warlike action by a military force, including any action to hinder or defend against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents;

   (iii) Insurrection, rebellion, revolution, usurped power, or any action taken by a governmental authority to hinder or defend against any of these; or

   (iv) Nuclear reaction or radioactive contamination.

   This exclusion applies regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**;

g. **Loss** caused by strikes, lockouts, riots, civil commotion, or disorder; or

h. **Loss** due to inherent vice, delay, loss of profit, loss of market, loss of market value, or loss of use.

2. On-Hook Towing Physical Damage Legal Liability Coverage does not apply to:

a. **Loss** to tarpaulins, tools, repair equipment, or materials and equipment for loading or unloading, which are carried in or on the **insured auto**;

b. **Loss** to any **towed property** while it is in the custody of anyone other than an **insured**;

c. **Loss** to objects of art, including paintings and statuary;

d. **Loss** to jewelry; precious or semi-precious stones; gold, silver, platinum, or other precious metals or alloys;

e. **Loss** to live animals;

f. **Loss** to papers of any kind, including, but not limited to, money, securities, accounts, bills, currency, food stamps, notes, tickets, any other evidences of debt, passports, deeds, mechanical drawings, blueprints, manuscripts, or exhibits;

0111

g. **Debris** removal, including extraction of pollutants from land or water, or removal, restoration, or replacement of polluted land or water;

h. **Loss** caused by order of any civil authority, including seizure, confiscation, destruction, or quarantine of property;

i. **Loss** to contraband or property in the course of illegal transportation or trade;

j. **Loss** to property caused by contamination or deterioration, including corrosion; decay; fungus; mildew; mold; rot; rust; any quality, fault, or weakness in the property that causes it to damage or destroy itself; or humidity, dampness, dryness, or changes in or extremes of temperature;

k. **Loss** caused by or resulting from release, discharge, seepage, migration, dispersal, or escape of **pollutants**;

l. **Loss** caused by or resulting from criminal, fraudulent, dishonest, or illegal acts committed alone or in collusion with another by an **insured**, anyone to whom **you** entrust the **towed property**, or anyone who has an interest in the property;

m. **Loss** caused by or resulting from voluntary parting with title to or possession of any property because of any fraudulent scheme, trick, or false pretense;

n. **Loss** caused by the explosion of explosives; or

o. **Loss** to computers and electronic goods, including, but not limited to, computer hardware and component parts, televisions, DVD players, stereo or other sound reproduction equipment, or any other electronic equipment, antennas, and other devices used exclusively to send or receive audio, visual, or data signals, or to store or play back recorded media.

3. Limited Bodily Injury and Property Damage Liability (Towing Only) Coverage is subject to all exclusions as listed in Part I of the Commercial Auto Policy.

**LIMITS OF LIABILITY**

1. **On-Hook Towing Physical Damage Legal Liability Coverage.**
   Regardless of the number, amount, or units of **towed property** or **insured autos**, **insureds**, premiums paid, claims made or lawsuits brought, the most **we** will pay for each **loss** is the aggregate amount of damages to all **towed property** while being **loaded in or on** or conveyed by one **insured auto**, not to exceed the limit of liability shown on the **declarations page** for this "On-Hook Legal Liability" coverage.

   The most **we** will pay for **loss** to any **towed property** is the least of the following amounts:
   a. The actual cash value of the damaged or stolen property at the time of **loss**;
   b. The cost of repairing or replacing the damaged or stolen property with other of like kind and quality to the extent practicable; or
   c. An agreed or appraised value for the property. **We** may keep all or part of the property at the agreed or appraised value, but there shall be no abandonment to **us**.

0112

2. **Garagekeepers Storage Location Physical Damage Legal Liability Coverage.**

Regardless of the number of **customer's autos** or **insured autos**, **insureds**, premiums paid, claims made, or lawsuits brought, the most **we** will pay for each **loss** at each location is the "Garagekeepers Legal Liability" coverage limit shown on the **declarations page** for that location.

The most **we** will pay for a **loss** to any one **customer's auto** or all **customer's auto** equipment is the least of the following amounts:

a. The actual cash value of the damaged or stolen property at the time of **loss**;
b. The cost of repairing or replacing the damaged or stolen property with other of like kind and quality to the extent practicable; or
c. An agreed or appraised value for the property. **We** may keep all or part of the property at the agreed or appraised value, but there shall be no abandonment to **us**.

If the repair or replacement results in better than like kind and quality, **we** will not pay for the amount of the betterment.

An adjustment for depreciation or physical condition will be made in determining actual cash value in the event of a total loss.

In the event of payment of actual cash value for a total loss, **we** are entitled to all salvage, or credit for salvage, resulting from such **loss**.

3. **Limited Bodily Injury and Property Damage Liability (Towing Only) Coverage.**

Regardless of the number of premiums paid, or the number of **insured autos** or **trailers** shown on the **declarations page**, or the number of policies issued by **us**, or the number of vehicles or **insureds** involved in an **accident**, or the number of claims or lawsuits arising out of an **accident**, **we** will pay no more than the Limit of Liability shown on the **declarations page** for Liability Coverage, subject to all of the terms and conditions of Part I of the Commercial Auto Policy.

4. **Deductibles.**

For each **loss** that qualifies for coverage under the On-Hook Towing Physical Damage Legal Liability Coverage, the deductible shown on the **declarations page** will be applied.

For each **loss** that qualifies for coverage under the Garagekeepers Storage Location Physical Damage Legal Liability Coverage, the "Each auto" deductible shown on the **declarations page** will be applied separately to each **customer's auto** or **towed property** sustaining **loss** as a result of a single **loss** event. The maximum aggregate deductible applied for a single **loss** event will not exceed the "Each occurrence" deductible shown on the **declarations page**.

0113

60

If **we** pay all or any part of a deductible in the settlement of any claim or lawsuit, **you** must reimburse **us** for the deductible or the portion thereof that **we** paid.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form Z439 (02/19)

### NON-OWNED TRAILER PHYSICAL DAMAGE
### COVERAGE ENDORSEMENT

This endorsement modifies insurance provided by the Commercial Auto Policy. All terms and conditions of the policy apply unless modified by this endorsement.

#### INSURING AGREEMENT

Subject to the Limits of Liability, if **you** pay the premium for Non-Owned Trailer Physical Damage Coverage, **we** will pay damages for **property damage** for which **you** become legally responsible because of **loss** to a **trailer** not owned by **you**, and its equipment, while in **your** possession.

**We** will pay for a **loss** to the non-owned **trailer** and its equipment under the coverages described below, as reflected on **your declarations page**:
a. Collision Coverage. For **loss** caused by:
   (i) The **trailer's** collision with another object; or
   (ii) The **trailer's** overturn.
b. Comprehensive Coverage. For any **loss** except one caused by:
   (i) The **trailer's** collision with another object; or
   (ii) The **trailer's** overturn.

**We** will settle or defend, at **our** option, any claim or lawsuit for damages covered by this endorsement. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the Limit of Liability for this coverage has been exhausted by payment of judgments or settlements.

#### ADDITIONAL PAYMENTS

In addition to **our** Limit of Liability, **we** will pay for an **insured**:
a. all expenses **we** incur in the settlement of any claim or defense of any lawsuit;
b. interest accruing after entry of judgment on that part of the judgment that does not exceed **our** Limit of Liability. This payment does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured**. **Our** payment, offer in writing, or deposit in court of that part of the judgment which does not exceed **our** Limit of Liability ends **our** duty to pay interest that accrues after the date of **our** payment, written offer, or deposit;

0114

61

c. the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in a principal amount exceeding **our** Limit of Liability, and **we** have no duty to apply for or furnish these bonds;

d. reasonable expenses, including loss of earnings up to $250 a day, incurred at **our** request;

e. all reasonable expenses necessary to return a stolen **trailer** to **you**, unless **we** determine the **trailer** to be a total loss; and

f. all reasonable expenses necessary to remove a **trailer** from the site of an **accident** or **loss** and transport it to a repair facility.

## ADDITIONAL DEFINITION USED IN THIS ENDORSEMENT

The following definition applies to this endorsement only:

"**Trailer**," when used in this endorsement, includes a shipping container.

## EXCLUSIONS

a. **We** will not pay for **loss** caused by or resulting from any of the following. Such **loss** is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**.
   (i) Nuclear Hazard.
       (1) The explosion of any weapon employing atomic fission or fusion; or
       (2) Nuclear reaction or radiation, or radioactive contamination, however caused.
   (ii) War or Military Action.
       (1) War, including undeclared or civil war;
       (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or agents; or
       (3) Insurrection, rebellion, revolution, usurped power, or action taken by a governmental authority in hindering or defending against any of these.

b. **We** will not pay for loss of use.

c. **We** will not pay for **loss** caused by, or resulting from, any of the following unless caused by another **loss** that is covered by this insurance;
   (i) Wear and tear, freezing, mechanical or electrical breakdown, or structural failure caused by material fatigue, decomposition, or corrosion.
   (ii) Blowouts, punctures, or other road damage to tires.

## LIMIT OF INSURANCE AND DEDUCTIBLE

The most **we** will pay for **loss** to any one **trailer** is the least of the following amounts minus any applicable deductible shown on the **declarations page**:

a. The actual cash value of the damaged or stolen property at the time of the **loss**;

b. The amount necessary to replace the stolen or damaged property with other of like kind and quality;

c. The amount necessary to repair the damaged property to its pre-loss condition; or

0115

62

d. The applicable Limit of Liability for the property as shown on the **declarations page**.

A single deductible will be applied to any **loss**. In the event there are different deductible amounts applicable to the **loss**, the higher deductible will be applied. In all events, the deductible will be applied against the limit of liability. If a **loss** involves another coverage added by endorsement to the policy, only one deductible will apply to the entire **loss** event. No deductible will apply to payments made under the Additional Payments section for expenses necessary to return a stolen **trailer** to **you**.

## OTHER INSURANCE

The insurance provided for a **loss** to a non-owned **trailer** is primary.

If coverage under more than one policy applies on the same basis, **we** will pay only **our** proportionate share. **Our** proportionate share is the proportion that the Limit of Liability of this policy bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form Z442 (02/19)

## ANY AUTOMOBILE LEGAL LIABILITY COVERAGE ENDORSEMENT

Except as specifically modified by this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

## CHANGES TO PART I—LIABILITY TO OTHERS

I. The following changes are made to the Additional Definitions Used in This Part Only section:

A. The definition of "**insured auto**" is modified to include:

1. **Hired autos**;
2. **Non-owned autos**; and
3. Any other **autos** owned by **you**:
   a. only while being used in the conduct of **your** business; and
   b. that do not qualify as either **hired autos** or as **non-owned autos**.

0116

63

However, this modification to the definition of **insured auto** does not apply to any **auto** acquired prior to the current policy period. But, for any type of **auto** that **you** acquire during the current policy period, this modification extends coverage to that **auto** during the remainder of the policy period.

    B.  The following definitions are added:

        1.  "**Hired auto**" means an **auto**:
           a.  **you** lease, hire, rent or borrow; or
           b.  **your employee** leases, hires or rents:
               i.  under a contract in that individual **employee's** name;
               ii.  at **your** direction and with your express permission; and
               iii.  only while being used in the conduct of **your** business.

           However, this does not include any **auto you** or an **employee** leases, hires, rents or borrows from any of **your employees**, partners (if **you** are a partnership), members (if **you** are a limited liability company), or member of their households.

        2.  "**Non-owned auto**" means an **auto**:
           a.  that **you** do not own;
           b.  that is not a **hired auto**; and
           c.  that is being used by **you** in connection with **your** business.

           This includes **autos** owned by **your employees**, partners (if **you** are a partnership), members (if **you** are a limited liability company), or members of their households, but only while such **autos** are used in **your** business.

II.  The first paragraph under the Limit of Liability section is deleted and replaced by the following:

Regardless of the number of premiums paid, or the number of **insured autos** or **trailers**, or the number of policies issued by **us**, or the number of vehicles or **insureds** involved in an **accident**, or the number of claims or lawsuits arising out of an **accident**, **we** will pay no more than the limit of liability shown on the **declarations page** for the coverage provided by this endorsement.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THIS POLICY REMAIN UNCHANGED.**

0117



# Exhibit 2

# CARRIER AGREEMENT

This CARRIER AGREEMENT ("**Agreement**") is made and entered into this ☐☐☐ day of ☐☐☐☐☐☐☐☐☐☐☐☐, 20☐☐ ("**Effective Date**"), by and between H.C. Schmieding Produce Company, LLC, a Florida Limited Liability Company ("**HCS**"), and ☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐, a licensed motor carrier ("**Carrier**") pursuant to USDOT#☐☐☐☐☐☐☐☐ & MC#☐☐☐☐☐☐☐☐ (collectively, the "**Parties**" and individually, a "**Party**"). The purpose of this Agreement is to provide the terms and conditions under which HCS will engage Carrier to perform motor contract carriage and related services, and under which Carrier will render those services.

## I.   RECITALS

**WHEREAS,** HCS is duly registered as a Broker of property with the Federal Motor Carrier Safety Administration ("**FMCSA**"), and desires to arrange for the transportation of products in interstate and foreign commerce by registered motor carrier;

**WHEREAS,** HCS performs services as a Broker for goods shipped by and on behalf of certain HCS customers;

**WHEREAS,** HCS performs services for its customers which prohibit its employees, agents, and Carriers used to perform the Services for customer from the use of, possessing of, solicitation for, manufacturing, dispensing, selling, or distributing narcotics or other illegal drugs, alcohol, or prescription medication without a prescription, or any other controlled substances on or around anywhere the Services are being performed.

**WHEREAS,** HCS also requires from time to time, motor carriage service for goods owned by HCS, as a shipper;

**WHEREAS,** Carrier is duly registered with FMCSA as a for-hire motor carrier to transport general commodities in interstate commerce, and desires to provide qualified expertise, personnel and equipment for motor carrier transportation and related services as further described herein, in connection with shipments tendered by HCS and HCS customers;

**NOW THEREFORE**, in consideration of the terms, covenants and conditions herein set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

## II.   REPRESENTATIONS AND WARRANTIES

1.   HCS represents and warrants that it is duly registered as a Broker of property with the FMCSA, No. 165901, and is in compliance with the regulations at 49 C.F.R. Part 371.

2.   HCS represents and warrants that its performance under this Agreement, whether as a Broker, or when applicable when performing under this Agreement as a shipper, will be in compliance with all applicable federal, state, and local laws, regulations, and codes in such performance.

3.   Carrier represents and warrants that it is duly registered with FMCSA as a for-hire motor carrier to transport general commodities in interstate commerce.

4.   Carrier represents and warrants that its performance under this Agreement will be in compliance with all applicable federal, state, and local laws, regulations, and codes in such performance.

5. Carrier represents and warrants that it holds at minimum, and shall maintain during the Term of this Agreement, a "satisfactory" or "unrated" safety rating, or a substantively equivalent rating under any other system implemented by the FMCSA with respect to Carrier's operations.

6. Carrier represents and warrants that if Carrier uses the service of owner-operators to perform its obligations under this Agreement, Carrier shall: a) comply with all applicable laws and regulations, including but not limited to the provisions of 49 C.F.R. 376, Lease and Interchange of Vehicles; b) enter into a written lease that will provide Carrier, as the authorized carrier lessee, will have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide the authorized carrier lessee will assume complete responsibility for the operation of the equipment for the duration of the leases; and c) under no circumstances will Carrier's obligations under this Agreement, including but not limited to its liabilities to third parties or its liability for loss, damage, or delay to property, be effected or diminished by reason of it use of owner-operators.

7. Carrier represents and warrants that when transporting Food Shipments, it will strictly observe and enforce the procedures set forth in this Agreement, including all documents incorporated by reference, and will require its employees, agents and representatives to comply with such requirements in addition to other sanitation and cleanliness standards.

8. The Parties represent and warrant the persons who signed below represent their respective Party, are authorized to, and intend to, bind their respective Party.

9. Each Party represents to the other that its entry into this Agreement does not, and will not, violate the term of any judgment, decree or ruling, or any contract with any third party.

## III. GENERAL TERMS

1. **Applicability.** This Agreement applies to all services, as further defined herein, arranged for by HCS and provided by Carrier ("**Services**"). Services provided by Carrier may be related to a shipment originating with HCS, as the "**Shipper**," or with a customer of HCS as the "**Shipper**."

2. **Independent Contractor**. The relationship between HCS and Carrier shall be that of an independent contractor and at no time shall the employees, agents, or associates of one be considered to be employees, agents, or associates of the other.

   A. Carrier shall have the sole responsibility for, and control of, the performance of the Services including the delivery of the goods, provided hereunder, and shall provide all direction for the method and manner of performing Carrier's obligations to this Agreement, and shall bear all costs and expenses arising out of such Services and delivery of goods.

   B. Carrier shall procure necessary licenses, provide appropriate maintenance, and furnish all supplies necessary for the proper operation of the equipment used and furnished in performance of the Services.

   C. Carrier shall have sole responsibility for, and pay any and all wages, fees, payroll taxes, assessments, or other expenses relating to, employees or agents of Carrier which may be required to be paid under any law.

   D. HCS shall neither have, nor exercise, control, direction or supervision over Carrier or the personnel furnished or used by Carrier to perform the Services under this Agreement.

   E. Carrier shall be the "employer" of himself and any carrier employee within the meaning of 3401(d) of the Internal Revenue Code.

Schmeding
Carrier Agreement

3. **Contract Carriage**. All Services performed by Carrier pursuant to this Agreement shall be as a motor contract carrier of property and will be subject only to the terms of this Agreement and all applicable law.  All Services are being provided as "contract carriage" within the meaning of 49 U.S.C. 13102(4)(B), and HCS and Carrier each expressly waive all rights and remedies they may have as to each other under 49 U.S.C., Subtitle IV, Part B to the extent such rights and remedies conflict with this Agreement.

4. **Term of Agreement.**  This Agreement shall remain in full force and effect for the initial term of one (1) year commencing on the Effective Date, and shall automatically renew for additional twelve (12) month terms thereafter until terminated by either Party in accordance with the terms of this Agreement ("**Term**").

   A. This Agreement may be terminated by either Party, at any time, with or without cause, upon thirty (30) days notice in writing to the other Party.

   B. If any shipment within the scope of the Services remains in transit on the effective date of a termination of this Agreement, both Parties' rights and duties under this Agreement shall remain in effect with respect to such shipments until it is delivered, and all related invoices and claims are satisfied.

5. **Default.**  Both parties will discuss any perceived deficiency in performance and will promptly endeavor to resolve all disputes in good faith. However, if either party materially fails to perform its duties under this Agreement, the party claiming default may terminate this Agreement on 30 (thirty) days written notice to the other Party.

6. **Termination.**  HCS may additionally terminate this Agreement immediately upon written notice in any of the following events:

   A. Carrier's Personnel used to perform the Services be impaired or under the influence of legal or illegal drugs or alcohol and such impairment or influence adversely affects the employee's work performance, the safety of the employee or of others, or puts at risk the Company's reputation.

   B. Carrier be found to be conducting business illegally in any way or conducts themselves in a manner in which puts HCS's company reputation at risk.

   C. Carrier loses its operating authority or otherwise becomes disqualified to perform its obligations under this Agreement.

   D. Carrier breaches any covenant, obligation, condition, or requirement imposed upon it by this Agreement, and such breach continues for a period of ten (30) days after written notice thereof from HCS to Carrier.

   E. Carrier becomes insolvent or becomes unable to pay its debts in a timely manner.

   F. Carrier fails to comply with the performance metrics or selection criteria, if any, imposed upon it at any time by HCS.

   G. Carrier fails to procure and maintain any of the insurance coverages required by this Agreement.

   H. Carrier utilizes the services of any Brokers, or brokers or subcontracts transportation of freight tendered by HCS hereunder to any third-party motor carrier or other transportation provider

or utilizes a third-party logistics provider to perform its obligations under this Agreement without prior written consent of HCS.

7. **Compliance with Applicable Laws.**  Carrier will comply with all applicable Legal Requirements.  As used in this Agreement, "**Legal Requirements**" means any and all statutes, rulings, rules, regulations, permits, certificates, or ordinances of any local, state, or federal governmental authority, in any way applicable to HCS, Carrier, or the Services, including but not limited to provisions of the Interstate Commerce Act, laws, rules and regulations of the FMCSA and any other laws, rules, or regulations to the extent they govern Carrier's operations.

I. Carrier will maintain its permits, licenses, operating authorities, and all required insurance, in full force and effect with the FMCSA and all other applicable regulatory and state agencies during the Term.

J. The Parties agree that in the event the failure of Carrier to comply with or conform to any Legal Requirements results in different or additional charges for the Services, Carrier shall indemnify HCS from such charges, and will pay HCS immediately upon demand, damages equal to any additional charges required to be paid, and any costs or attorneys' fees incurred by HCS in connection therewith.

8. **Carrier's Change in Status**. In the event that all or any portion of Carrier's permits, licenses, operating authorities, safety ratings or required insurance are revoked, canceled, downgraded, suspended or discontinued by operation of law or otherwise, Carrier will immediately notify HCS.

9. **HCS or Shipper Name**.  Carrier will not display the name of HCS or the Shipper upon Carrier's vehicles.

## IV.  SERVICES

1. **Goods**.  During the term of this Agreement, HCS, as Broker or as Shipper, may tender to Carrier, on a non-exclusive basis, and Carrier agrees to accept from HCS, from time-to-time, shipments consisting of certain goods ("**Goods**") for transport.  As will be addressed in more detail throughout the Agreement, the Goods are primarily food products that will ultimately be consumed by humans or animals ("**Food Shipments**") which are required to be transported in a sanitary and temperature-controlled environment.

A. Upon acceptance of such tender, Carrier will, using due care, pick-up, transport in a safe and timely manner; and deliver in good order and condition, the Goods which are tendered by HCS to Carrier, in accordance with the terms and provisions set forth in this Agreement, (all of which are included in the Services as described herein).

B. Carrier shall comply with all instructions provided to Carrier by HCS regarding the transportation of the Goods tendered to it, including but not limited to the food safety and security instructions required as set forth in this Agreement, and all documents incorporated by reference.  To the extent Carrier receives contradictory or confusing instructions regarding any shipment; Carrier must resolve the contradictory or confusing instructions prior to accepting the shipment for transport.  Failure to resolve any issue with the instructions prior to transport shall bar Carrier from using the contradictory or confusing instructions as a defense.

2. **Exempt Commodities.**  In the event HCS tenders to Carrier commodities the transportation of which by motor vehicle is not subject to the jurisdiction of the Surface Transportation Board

(STB) as specified in 49 §13506, such service and the Parties' rights and obligations with respect thereto shall also be governed by this Agreement.

3. **Carrier Compliance with all Applicable Requirements of this Agreement.** Carrier agrees to be in strict compliance with all requirements of carriage in this Agreement and all Legal Requirements applicable to the transport of any Food Shipments. Carrier acknowledges that Food Shipments require a high degree of care and agrees and acknowledges that failure to follow the requirements as set forth in this Agreement and all applicable Legal Requirements may result in possible contamination, adulteration or degradation of product quality, which could have a detrimental effect on HCS's reputation and image in the marketplace as well as potential exposure for product liability.

4. **Customer Service**. Carrier will provide a dedicated customer service representative to be available to assist HCS with service issues, between the hours of 7:00 a.m. and 7:00 p.m. Central Time, Monday through Friday. Carrier will further provide backup customer service coverage available to HCS on a 24x7x365 on-call basis. HCS will also provide Carrier with 24x7x365 on-call information for after-hours purposes.

5. **Diversion and Reconsignment**. Carrier will not divert or reconsign any shipment except upon written instructions of HCS.

6. **Failure to Perform**. Carrier shall immediately notify HCS if for any reason, Carrier is unable to perform the Services in accordance with the applicable confirmation or Shippers instructions. If Carrier violates this Agreement in such a manner so as to fail to complete transportation of any shipment, abandons a shipment, or otherwise subject HCS to potential liabilities or losses, Carrier agrees that HCS shall have the right to make alternative arrangements for the delivery of said shipment. Carrier waives any recourse against HCS or Shipper for any such action and shall reimburse HCS for any cost and expense arising out of the completion of any shipment and pay HCS any damages for which it may be liable as a result of such failure to perform, including reasonable attorney fees.

7. **Operation within Scope of FMCSA**. Under no circumstance shall Carrier render Services beyond the scope of its FMCSA registration unless the Services are exempt from legal requirements for such registration or authority.

8. **No Gratuities**. Carrier shall not offer or provide to any of HCS/Shipper's employees, agents or other representatives any gratuities, gifts, payments, favors, nor anything else of value, whether or not in an attempt to influence such person's administration of the provisions of this Agreement, or to otherwise gain an advantage of HCS/Shipper individually or relative to any competing carriers.

9. **Owner-Operators.** Carrier may use the service of owner-operators to perform its obligations under this Agreement. In such circumstances, Carrier will comply with all applicable Legal Requirements, including but not limited to the provisions of 49 C.F.R. 376, Lease and Interchange of Vehicles. Further, Carrier will enter into a written lease that will provide that Carrier, as the authorized carrier lessee, will have exclusive possession, control, and use of the equipment for the duration of the lease. The lease will further provide that the authorized carrier lessee will assume complete responsibility for the operation of the equipment for the duration of the leases. Under no circumstances will Carrier's obligations under this Agreement, including but not limited to its liabilities to third parties or its liability for loss, damage, or delay to property, be affected or diminished by reason of it use of owner-operators.

10. **Brokering**. Carrier shall not broker any shipment hereunder without the express written permission of HCS. In the event where HCS gives express written permission to carrier to

broker the shipment, the carrier must ensure carrier hired has a 'satisfactory' safety rating and meets all requirements and provisions of this Agreement. If Carrier directly or indirectly brokers any shipments to another carrier without the express written permission of HCS, Carrier will assume full reasonability and liability for the act and omissions of the carrier handling the shipment as though Carrier transported the shipment itself. If Carrier breaches this provision, HCS reserves the right of paying the monies it owes the Carrier directly to the delivering Carrier in lieu of payments to the Carrier. Under no circumstance shall Carrier's obligations under this Agreement, including but not limited to its liabilities to third parties or its liabilities for loss, damages, or delay to property, be affected or diminished by reason of its brokering shipments to another carrier.

11. **Assignment; Subcontracting**. Carrier shall not assign, transfer, pledge or encumber any of its rights or obligations under this Agreement without HCS's prior written consent, such consent to be given or withheld in HCS's sole discretion. Carrier agrees not to use subcontractors (other than owner-operators under a written lease and per all requirements as described above), or to interline with other carriers, or to broker shipments, or to use "substitute services" by rail for Shippers' Goods without prior written consent of HCS.

12. **Carrier Liability.** Carrier shall not, in any way, have any right to negate, eliminate, circumvent, or alleviate Carrier's liability to HCS or Shipper which may be inconsistent with the provisions of this Agreement.

13. **Preservation of Records**. Carrier shall comply with the requirement of 49 CFR 371.3 or any successor provision thereto, with regard to the preservation of records related to the Services, and shall, in any event, maintain and preserve all such records for a period of not less than three (3) years from delivery of the last shipment pursuant to this Agreement.

14. **Driver Hours**. Carrier agrees and acknowledges that, by accepting tender, the time between time of tender and the due date designated by HCS is reasonable and can be performed by Carrier and its drivers under the federal hours of service regulations contained in 49 C.F.R. Part 395. Carrier will promptly notify HCS by telephone in the event that any designated delivery due date cannot be legally met because of such federal regulations.

15. **Delay, Accident or Undeliverable Freight**. Carrier will notify HCS immediately by telephone or email of any accident, spill, theft, hijacking or other events that impair the safe and prompt delivery of the Goods in its control. Carrier will notify HCS immediately by phone or email of any undeliverable freight and request additional instructions regarding delivery.

16. **GPS Tracking.** Carrier shall be required to comply with GPS Tracking instructions provided to Carrier by HCS for the duration of the load, from pick up to delivery. Non-Compliance of this requirement shall result in fines determined as per **Appendix A** (Schmieding Transportation Fees).

17. **Missed Appointments.** Carrier shall arrive to all shipping and delivery appointments no later than set appointment times provided in writing to carrier by email or EDI by HCS. HCS shall notify Carrier of any appointment changes in writing by email or EDI. Carrier shall not be responsible for delays arising from a force majeure event or other event beyond Carrier's control. Carrier shall be responsible for any late fees incurred for missed appointments as indicated in **Appendix A** (Schmieding Transportation Fees).

A. Carriers cannot be one (1) minute later than the set appointment time provided by HCS to any loading or unloading facility to be considered on time for any set appointment.

Schmeding
Carrier Agreement

    B. Carriers cannot be one (1) minute later than the set end appointment time provided by HCS to any loading or unloading facility to be considered on time for a range appointment.

## V. EQUIPMENT

1. **Cost of Equipment.** Carrier will, at its sole cost and expense, provide only commercially suitable motor vehicles and other necessary equipment required to provide the Services ("**Equipment**"), and said Equipment will be in good repair and condition and operate in a safe manner and in compliance with all applicable Legal Requirements. Equipment used to provide the Services, shall be clean, insect and rodent free, odor-free, dry, leak-proof, meet the food safety requirements in this Agreement, and otherwise be safe to transport the commodities tendered. HCS has the right to reject unsatisfactory equipment. In the event HCS rejects Carrier's equipment, Carrier shall immediately provide HCS with satisfactory replacement equipment.

2. **Operating Expense**. Carrier will bear the cost and expense of all fuel, oil, parts, tires, road service, repair, and maintenance in connection with the use and operation of the Equipment and which may be required to keep the Equipment in good repair and mechanical condition. Neither HCS nor Shipper will be liable to Carrier for any damage sustained by, or to, the Equipment, or for loss by confiscation or seizure of the Equipment by any public authority, except Shipper shall be liable to the extent such damage or loss is directly attributable to the negligence or willful misconduct of Shipper, its employees, or representatives.

3. **Operation in California.** To the extent any shipments are transported within the State of California, Carrier warrants that (a) all 53 foot trailers, including both dry-van and refrigerated equipment it operates, and the Heavy-Duty Tractors that haul them within California under this Agreement, are in compliance with the California Air Resources Board (ARB) Heavy-Duty Vehicle Greenhouse Gas (Tractor-Trailer GHG) Emission Reduction Regulations; and (b) all refrigerated Equipment it operates within California under this Agreement is in full compliance with the California ARB TRU ACTM in-use regulations.

## VI. PERSONNEL

1. Carrier, at its sole cost and expense, will supply only personnel who are legally permitted to be employed in the United States and who are legally licensed, qualified, fit, competent, and able personnel who have met all Legal Requirements for the operating of said Equipment and the provision of all other Services. Carrier will have the sole responsibility for the acts and conduct of such personnel during the entire period of time said personnel are used to deliver Goods and to perform the Services. Carrier's drivers shall be considered professionals and a representative of the Carrier of which they are employed.

2. Carrier will employ, train, supervise and control all necessary personnel required in performing the Services (including drivers and any helpers) and in performing all other obligations under this Agreement. All such individuals will be employees of, or owner-operators leased to Carrier only, and will be subject to employment, discharge, discipline, and control solely and exclusively by Carrier.

3. Carrier will (a) instruct all personnel that will be picking up and delivering Goods, of the need to comply with all posted security and safety policies and will be responsible for failure of Carrier personnel to do so and (b) maintain, and cause its personnel to maintain, the highest standards of professionalism and industry best practices in the performance of the Services to be provided to HCS. All such personnel may be required to display identification prior to being allowed access to designated facilities where Goods will be picked up or delivered.

4. Carrier shall ensure all personnel that will be picking up and delivering Goods and to perform the Services shall follow all FMCSA regulations and all provisions of this Agreement.

5. Carrier shall ensure all personnel used to pick up or deliver Goods and to perform the Services shall not be in the use of, possession of, solicitation for, or sale of narcotics, or other illegal drugs, alcohol, or prescription medication without a prescription while picking up or delivering Goods and performing the Services.

## VII. SANITARY FOOD TRANSPORTATION REQUIREMENTS

1. **High Degree of Care**.  Carrier acknowledges that transportation of Food Shipments, which include refrigerated and/or frozen foods and related products, requires a high degree of care in order to prevent possible contamination, adulteration, or degradation of product quality, which could have a detrimental effect on HCS's or Shippers' reputation and image in the marketplace as well as potential exposure for product liability.  Carrier agrees and warrants that it will strictly observe and enforce the following procedures, and will require its employees, agents and representatives to comply with the following requirements in addition to other sanitation and cleanliness standards.

2. **Food Safety Law Compliance**.  Carrier must comply with the Legal Requirements governing the safe and secure transportation of Food Shipments, including, but not limited to, the Food Safety Modernization Act (21 U.S.C. 2201, *et. seq.*) ("FSMA"), the Federal Food, Drug and Cosmetic Act (21 U.S.C. 41, *et seq.*) ("FD&C Act"), the Sanitary Food Transportation Act (49 U.S.C. 5701, *et seq.*), the U.S. Food and Drug Administration's Final Rule on the Sanitary Transportation of Human and Animal Food (21 C.F.R. 1.900, *et seq.*), the Food Safety Modernization Act of 2013 and all applicable U.S. Department of Agriculture and Food Safety and Inspection Service regulations (collectively, the "Food Safety Laws").

3. **Instructions**.  Carrier is responsible for the sanitary conditions of Food Shipments during their transportation and complying with HCS's and/or Shippers' written instructions, including without limitation, any temperature set point or temperature range, as provided to the Carrier by HCS or Shipper in physical or electronic form.  Carrier shall apply all written instructions to future Food Shipments of the same Goods tendered for the same Shipper, unless instructed otherwise in writing.  If HCS's or Shippers' instructions require a cargo seal, the loss of a seal or seal irregularities shall be sufficient to consider the shipment unsafe and a total loss.  If seal integrity has been jeopardized, Carrier shall duly note it on the bill of lading.  Carrier agrees that when transporting food for human consumption, late delivery (i.e. delivery after the deadline indicated on the transportation documents) alone shall be sufficient to reject a shipment and consider the cargo a total loss.

4. **Recording Food Shipment Temperature**.  Carrier shall verify the temperature of Food Shipments before loading.  Carrier must write the recorded temperature on shipping document(s) used by the Parties for the pick-up, transport, or delivery of Goods, including without limitation any bill of lading ("**Shipping Document**").  If the temperature is more than two degrees different from the required temperature stated in the written instructions or Shipping Document, then the Carrier shall immediately notify HCS, and refuse to load the Goods.  In the event Carrier is unable to verify the temperature due to restrictions imposed by the Shipper, consignor, or due to the physical circumstances of loading, Carrier shall notify HCS immediately, note its inability to verify and the reason for such inability, and is otherwise excused from performing such verification.  The foregoing exception shall not relieve Carrier of compliance with any other provision of this Section VII. Carriers shall provide downloadable temperature monitoring and equipment performance data within twenty-four (24) hours of

request. Noncompliance with this provision shall result in fees as indicated in **Appendix A** (Schmieding Transportation Fees) and Carrier being solely liable for any and all claims and/or losses of goods.

5. **Equipment used to transport Food Shipments**.  Carrier represents and warrants that all Equipment used in transporting Food Shipments (as defined in the Food Safety Laws and herein) is in safe and sanitary condition and appropriate for performance of the Services for Food Shipments, including but not limited to, Equipment free from contamination, pest infestation, and evidence of prior cargo that could render the Food Shipments unsafe.  Carrier represents and warrants that all Equipment used in transporting Food Shipments is equipped with an operational air-chute at least forty-three (43) feet in length and fully attached from the beginning to the end to the refrigeration unit. Carrier represents and warrants that all Equipment used in transporting Food Shipments is equipped with refrigeration equipment that allows data monitoring of temperatures and refrigeration equipment performance inside the trailer from the time of precooling the trailer, while trailer is being loaded with goods, and through when the goods have been unloaded from the trailer and it is empty.

A. If Carrier transports partial load shipments (also known as less-than-truckload, or LTL, shipments), Carrier shall conduct appropriate inspections and take necessary actions upon receiving the first shipment and each subsequent shipment to ensure that:

   i. the Equipment remains in safe and sanitary condition;
   ii. any Food Shipments will not be contaminated by any previously or subsequently loaded cargo; and
   iii. the temperature of any temperature-controlled Food Shipment will not be materially disrupted.

B. When required by and as specified in Shipper's instructions or Shipping Document, Carrier must ensure that the cold storage compartments are prepared for safely transporting the Food Shipments. Carrier must set temperature controls to pre-cool mechanically refrigerated cold storage compartments before offering equipment with auxiliary refrigeration units for transportation of Food Shipments requiring temperature control and set the operating temperature to ensure the Food Shipments at all times are maintained at the temperature set point or within the temperature range specified on the Shipper's instructions or Shipping Document.

C. Carrier will not utilize or tender trailers that have been used for transporting poison, refuse, garbage, trash, solid or liquid waste, or any other noxious product, of any kind whatsoever, whether hazardous or non-hazardous. If Carrier is unsure whether any prior cargo would disqualify the trailer, prior to accepting a load, Carrier shall advise HCS of any potentially hazardous or noxious product or material which has been previously hauled or stored on the trailer being used to transport the Food Shipment. HCS may approve or disqualify the trailer based on the information provided.

D. The trailer and all items used to transport the Goods, shall be clean, insect and rodent free, odor-free, dry, leak-proof, meet the food safety requirements in this Agreement, and otherwise be safe to transport the commodities tendered.

6. **Carrier's Food Safety Procedures**.  Carrier acknowledges and agrees the temperature of the Goods is a material condition of this Agreement.  Carrier shall develop and maintain written procedures related to the safe transport of Food Shipments tendered to it by HCS and shall train its drivers and staff regarding safe transport of Shipper's Goods.

7. **Recordkeeping**. Carrier shall maintain all documentation and records related to the transport of Food Shipments governed by this Agreement, including documentation of personnel training and Equipment cleanings, sanitization and inspections, and the safe and sanitary transport of Food Shipments, and shall make the records available to HCS and/or the Shipper upon request for any period within the Term of this Agreement.

   A. Carrier must provide temperature recorder readings upon request from HCS or Shipper.

   B. Carriers must provide a reefer download within twenty-four (24) hours of request from HCS or Shipper.

8. **Provision of Information**. Immediately upon request or as promptly as practicable thereafter, Carrier will provide HCS and/or Shipper:

   A. Evidence of the operating temperature of Food Shipments maintained during Services in the manner acceptable to HCS and/or Shipper;

   B. Documented written processes for maintaining food safety, including maintenance of temperature control, and cleaning, sanitizing, and inspecting Equipment;

   C. Evidence of transportation traceability, including information regarding:

      i. Previous cargo hauled in bulk or in other Equipment; and
      ii. Maintenance and intervening cleaning procedures for docks and Equipment.

   D. Appropriate training processes for each person under Carrier's supervision or control involved in providing Services; and

   E. Evidence that the Food Shipments have not been adulterated, as defined in the FD&C Act, 21 U.S.C. 342(a)(i)(4), and have been transported under sanitary conditions to protect the shipments against temperature abuse or excessive fluctuations and any physical, chemical, or microbial contamination.

9. **Liability Related to Food Shipments**

   A. Carrier agrees that Food Shipments which have been transported or offered for transport, pursuant to this Agreement, under conditions that are not in compliance with the written instructions or requirements set forth in the Shipping Document, including any seal, temperature, quality control standards, and delivery date requirements, will be considered "adulterated" within the meaning of the FD&C Act (21 U.S.C. 342(a)(i)(4), 342(i)). Carrier understands that adulterated shipments may be refused by the Shipper, customer, or receiver upon their tender for delivery at destination, with or without inspection.

   B. Carrier assumes liability for the result of breach of any of the requirements specified in this Agreement. Carrier agrees HCS is not responsible for, and shall in no way be held liable to, Carrier for Carrier's, or any Shipper's, customer's, receiver's or loader's obligations or their failure to adhere to their respective obligations under the laws and regulations governing the safe and sanitary transport of food for human consumption, including the Food Safety Laws referenced above in Section VII (2).

## VIII. Hazardous Materials

With respect to the transportation of hazardous materials requiring vehicle placarding under 49 C.F.R. Part 181, Carrier agrees that the following provisions shall apply for all such shipments:

1. Carrier represents and warrants that it has obtained all necessary federal permits and registrations to transport hazardous materials or wasted in inter-provincial, interstate and/or intrastate commerce. Upon request, Carrier shall provide HCS with a copy of all such federal and state permits and registrations. Additionally, Carrier agrees to notify HCS immediately upon any revocation or suspension of Carrier's state of federal hazardous material permits or registration as well as the suspension or revocation of Carrier's "Satisfactory" Safety Fitness Rating issued by the U.S. Department of Transportation, which satisfactory rating is prerequisite to providing transportation for hazardous materials under this Agreement.

2. Carrier represents and warrants that all drivers used to transport hazardous material shipments have undergone the necessary training requirements of state and federal laws, including, but not limited to, the training requirements under 49 C.F.R. Part 126(F). Carrier further warrants and certifies that all drivers used to transport hazardous material have the proper endorsements on their Commercial Driver's License to legally transport such shipments. Carrier further agrees to comply with all federal, state and local laws regarding the transportation of hazardous material, including, but not limited to, the requirements specified under 49 C.F.R. Part 181, and 49 C.F.R. Part 397.

## IX. RATES

1. **Rates**. The Parties agree that the rates as between HCS and Carrier will be determined from time-to-time based on the market conditions then prevailing unless there is a separate contract existing between the Parties as to specific lanes. The methodology for determining the applicable rate will be as follows:

   After a rate is agreed to by the Parties, HCS shall transmit by facsimile (or other electronic means) to the Carrier, a Rate Confirmation Sheet (or substantively similar document), which document will identify the shipment by: DATE OF TENDER, ORIGIN, DESTINATION, COMMODITY, ESTIMATED WEIGHT, PICK-UP TIME AND DATE, DELIVERY TIME AND DATE, AND AGREED UPON RATE.

2. **Rate Confirmation Sheets**. Rate Confirmation Sheets shall be deemed to be an accepted amendment to this Agreement. Due to document storage considerations, the Rate Confirmation Sheet need not be attached to the original Agreement but may be kept with the shipping papers that are retained as to the individual shipment. The same requirements of retention and availability of inspection of documents, that apply pursuant to this Agreement, shall apply to the Rate Confirmation Sheets. If either Party disputes the accuracy of any amended rate, that Party shall notify the other Party within twenty-four (24) hours of receipt of the Rate Confirmation Sheet. Upon notification, the disputed rate shall not become an amended rate until agreed to by both Parties.

3. **Mileage Calculations**. Unless otherwise specified in the applicable Rate Confirmation Sheet, the Parties hereby agree that, for the Term of this Agreement, all mileage for origin-to-destination combinations, for purposes of determining rates hereunder, will be calculated with Google Maps. Any invoices not utilizing such calculations will be adjusted and paid by HCS based on its calculation using Google Maps.

## X. PICK-UP AND DELIVERY RECEIPTS

1. **Pick-Up Receipts**.  Each shipment received by Carrier will be evidenced by a bill of lading, signed by Carrier showing the quantity and description of Goods, together with any relevant shipping instructions, and to the extent the cargo is a Food Shipment designated as temperature-controlled, that the temperature of the Food Shipment is at the required temperature set point or within the temperature range according to the procedures set forth in this Agreement. Such form will be evidence of receipt of such Goods by Carrier in apparent good order and condition.  Carrier shall be responsible for providing immediate notice to HCS of any alleged exception to, or defect, damage, or shortage of the Goods prior to Carrier movement of it.  In the event the Carrier deems the Goods not being of good order and condition or loaded improperly, the Carrier shall notify HCS before signing the Bill of Lading (BOL) accepting the Goods from the shipper.  Upon acceptance of the shipment, Carrier shall assume liability for the Goods until proper delivery is made and may not thereafter allege that any injury which Carrier sustained in the course of transportation was due to such insufficient crating, boxing, packing or loading.  Carrier shall ensure the Goods are adequately secured in adherence with FMCSA 49 §392.9(a)(1) and 49 §393.104 with exception to Shipper Load & Count (SL&C) by shipper as cited with 49 §392.9(b)(4).  In the event of any inconsistency between the terms and condition of any individual bill of lading and this Agreement, the terms and conditions of this Agreement shall prevail.

2. **Delivery Receipts**.  Upon delivery of each shipment, Carrier will obtain a written delivery receipt, signed by an authorized agent of the receiving customer confirming 1) the time of delivery of Goods from the point of loading to the point of unloading, and 2) that the freight was received in good condition and without exception, or with documentation of any damages, shortages and/or overages.   Carrier will provide HCS upon request, within twenty-four (24) hours, copies of all such delivery receipts where damages, shortages, or overages occur.

3. **Period of Carrier Responsibility**.  Carrier's duties and responsibilities under this Agreement will commence when Carrier takes possession and control of Shippers' property or upon execution of a bill of lading or receipt by Carrier, whichever occurs first, and will not end until the shipment is properly delivered to the customer named in the bill of lading.

## XI. INVOICING AND PAYMENT

1. **Invoicing.** Carrier agrees to conduct all billing services to HCS for payment owed to them, as mutually agreed in writing, by fax, or by electronic means, contained in Carrier's Load Confirmation Sheet(s)/dispatch sheets incorporated herein by this reference. Any such additional, modified, amended rates, or changes in rates shall automatically be incorporated herein by this reference.

2. **Responsible Party**. Carrier agrees that it shall look solely to HCS for payment of any Service, and shall not look to, or make any demand upon, Shipper (other than when HCS is the Shipper), or any third-party, for any such payment.

3. **Compensation**.

   A. Carrier will submit to HCS an invoice for freight charges along with proof of delivery, and HCS shall pay each invoice within thirty (30) days from the date of the invoice. HCS will be under no obligation to accept or pay any invoices received after one hundred eighty (180) days from the date of shipment delivery, and Carrier hereby releases HCS from any and all responsibility for such amounts.

B. For any compensation premised upon mileage, the applicable mileage used to calculate such compensation shall be determined through the use of Google Maps unless the calculation of mileage is otherwise specified on the Rate Confirmation Sheet (or substantively similar document).

C. **No Lien.** Carrier shall not obtain title to, or any other rights to, the Goods, and hereby waives any rights to any lien now or hereafter created by any law or regulation. Further, Carrier will not withhold the Goods from delivery on account of any dispute as to the rates, or any alleged failure of HCS to pay charges incurred under this Agreement.

D. HCS shall have the right to offset compensation or other charges owed to Carrier against any amounts owed by Carrier pursuant to this Agreement.

E. Accessorials and Fees are listed in **Appendix A** of this Agreement.

F. **Offsets.** In the event that the cargo being transported by Carrier is damaged through the actions or negligence of the Carrier, triggering the indemnification provisions of this Agreement, HCS reserves the right to offset and withhold any payments or fees provided for in the Rate Confirmation from Carrier in an amount equal to the value of the damaged Cargo. In the event that the offset of the payment for damaged cargo is insufficient to fully and completely indemnify HCS, a customer or shipper of the HCS, then HCS may offset and withhold payments for other shipments that may be subject to this Carrier Agreement, whether or not such freight of shipment is on behalf of the same customer or shipper.

G. **Undercharge or Overcharge**. The time limit for filing overcharge or undercharge claims shall be ninety (90) days from the date such Goods are delivered and shall be processed in accordance with 49 CFR 378 or any successor provision thereto. Any civil action to recover freight charges, overcharges or undercharges related to the Services, must be commenced within nine (9) months from the date of delivery of the applicable Goods.

4. **Audits**. Upon reasonable request, Carrier shall make available to HCS, or its designee, for audit purposes, its books and records pertaining to the Services provided under this Agreement and the charges related thereto. Such records include copies of all freight bills, invoices, receipts and other documents related to the Services provided. Carrier will retain all bills of lading and delivery receipts for a period of no less than three (3) years from the latter of the date of delivery, or creation of the record.

5. **Civil Action for Non-Payment**. Any civil action for alleged nonpayment for Carrier services hereunder must be commenced within one year of date of delivery or scheduled date of delivery whichever is earlier in order to avoid being permanently barred.

## XII. CARGO LOSS AND DAMAGE

1. **Basis for Liability.**

A. Carrier shall be solely responsible for the loading, securing, and unloading of Goods upon Equipment, and if performed by Shipper, it shall be under the direct authority and control of Carrier or its representatives. To the extent the cargo is a Food Shipment designated as temperature-controlled, Carrier shall also ensure that the Food Shipment is at the set point or within the temperature range specified on the Shipping Document. If Carrier requests, but is not allowed to observe the loading process, Carrier must immediately notify HCS and indicate in writing "Shipper Load and Count" or "SLC" on the pick-up receipt.

B. Carrier will have the sole and exclusive care, custody, and control of the Goods from the time they are tendered to Carrier for transportation until delivery to the customer accompanied by the appropriate receipts as specified in this Agreement. Carrier, whether acting in the capacity of a broker, carrier, or otherwise, assumes the liability of a common carrier (i.e., Carmack Amendment liability as set forth under 49 U.S.C. 14706) for loss, delay, damage to, or destruction to any and all of the Goods.

C. Carrier shall be liable to HCS and Shipper for the loss, damage, injury, theft, or delay of the Goods occurring while in the custody, possession, or control of Carrier or Carrier's for-hire personnel providing unloading service or resulting from Carrier's performance of or failure to perform the Services provided for in this Agreement. Carrier shall immediately notify HCS of any loss, damage, or delay to the Goods with regard to any shipment, including but not limited to accident, spill, theft, or discrepancies.

D. Carrier shall also immediately notify HCS of any variance in trailer temperature, excluding normal defrost cycling, for any period in excess of one (1) hour from refrigeration. Temperature for Food Shipments is a material aspect of this Agreement, and Food Shipments must be within the ranges specified in the written instructions and/or Shipping Documents when Carrier delivers such Goods to the customer or receiver, or it may be rejected as adulterated and/or damaged at customer's or receiver's sole discretion, regardless of any other measure of quality including, but not limited to, USDA inspections.

E. If the Goods are lost, damaged or destroyed, Carrier will be liable for, and will pay to HCS, the actual invoice price charged for the kind and quantity of the Goods lost, damaged or destroyed, and, in addition, all freight charges, taxes, fees, disposal, and other charges of any kind or nature which HCS may incur with respect to such Goods. Notwithstanding the above, Carrier's liability to HCS for any loss or damage will not exceed $100,000.00 per shipment unless agreed to in writing prior to Carrier accepting shipment. Carrier agrees that no additional released rates or other liability limitations will apply except as specified herein.

2. **Rejected Shipments**. Carrier shall immediately notify HCS upon any customer rejection of any shipment, and provide to HCS any documentation from customer, including photographs of rejected goods. If any customer rejects any Shipment, or if HCS advises or instructs Carrier to stop movement of the Shipment and hold it in transit, HCS shall instruct Carrier to either 1) have the shipment placed in public storage, 2) have the Shipment returned to the point of origin, or 3) have the Shipment returned to some other point of destination designated by Shipper or HCS, at a rate to be agreed to by the Parties.

3. **Replacement Shipments**. Carrier acknowledges that HCS may utilize other carriers to facilitate the movement of delayed shipments, or to ship replacement Goods. HCS agrees that Carrier will first be afforded a reasonable opportunity to complete the movement in a timely manner. In the event Carrier is unable to facilitate the movement, Carrier will be responsible for reasonable and necessary expenses incurred by HCS for arranging alternative service to facilitate movement of the shipment.

## XIII.  DETERMINATION OF DAMAGE, SALVAGEABILITY

Failure to comply with all provisions set forth in this Agreement, including all attachments, or any written instructions may result in a determination by HCS or Shipper, in their respective discretion that the Goods are damaged or unsafe and if such a determination is made by HCS or Shipper, Carrier shall not sell or otherwise dispose of the Goods.

1. The determination regarding the acceptability, salvageability and/or the adulterated status of Food Shipments transported by Carrier shall be within the sole discretion of Shipper or HCS and shall be binding on Carrier. Carrier accepts and agrees that it will be required to pay for the actual invoice value of adulterated or damaged Food Shipments, plus all freight, taxes, fees, disposal, and other charges of any kind or nature which HCS may incur with respect to such Food Shipment, less any salvage if the goods are not destroyed, notwithstanding any other measure of quality, including but not limited to USDA inspection.

2. HCS shall provide Carrier mitigation options for rejected goods if 1) Goods are not damaged to the point preventing any type of salvageability. 2) salvaging the Goods would not be placing HCS in violation of Food Safety statutes. 3) salvaging the Goods would not cause damage to HCS in any way. 4) Carrier agrees to hold HCS harmless from notations or comments derogatory to the reason the Goods were rejected. 5) To the fullest extent allowed by law, Carrier will defend, indemnify and hold harmless HCS, and its officers, directors, members, agents, customers, and employees from and against all loss, liability, damage, claim, fine, cost, or expense, including reasonable attorney fees, resulting from attempting to salvage the rejected Goods.

3. The determination regarding the salvageability of any damaged Goods (other than Food Shipments) shall be determined by Shipper, and Carrier shall be liable for all costs and expenses associated with Shipper's mitigation of damages including any inspection; storage; preparation of the Goods for reshipping; and the reshipping, if applicable.

4. No salvage of any kind or nature will be sold or offered for sale or in any way disposed of to any third party by Carrier without the prior written consent of HCS. Unless HCS directs otherwise, all damaged Goods subject to salvage will be returned to Shipper, at Carrier's sole cost and expense, for salvage and appropriate credit. Shipper may determine, in its sole discretion, whether the Goods may be salvaged and, if salvageable, the value of such salvage. Any salvage value will be deducted from Shipper's claim against Carrier for the loss or damage. With respect to the handling of any damaged Goods, Carrier agrees that Shipper will have the sole right to dispose of or destroy such Goods. For any damaged Goods which Shipper permits Carrier to resell, Shipper will have the right to remove all identifying marks and labels on such Goods.

5. Claims based on concealed loss/damage reported to Carrier by HCS within five (5) business days of the date of delivery will be treated as though an exception notation had been made on the delivery receipt at the time of delivery.

6. HCS will provide Carrier with an inspection notification form with pertinent information regarding the damage and the location where the Goods may be inspected, if so desired by Carrier and permitted by Shipper. If inspection of the Goods is permitted by the Shipper, it is the obligation of Carrier to properly inspect the Goods upon the discovery of damage. In the event Carrier fails to inspect the Goods within five (5) business days of the date Carrier becomes aware of the damage, or upon receipt of the Goods to be returned to the consignor because of the damage, whichever is earlier, Carrier hereby waives its rights to inspect the Goods and agrees to be bound by the facts presented by the claimant.

7. If Carrier is unable to deliver a shipment or if a shipment is refused by the customer, Carrier's liability as a warehouseman, rather than a contract carrier pursuant to the terms of this Agreement, will begin after seven (7) days of the Goods being placed in Carrier's terminal or other storage facility under proper security and storage conditions.

## XIV. THE CLAIMS MANAGEMENT PROCESS

Carrier agrees that the provisions contained in 49 CFR Part 370, shall govern the processing of claims for loss, damage, injury, theft, or delay to Goods and the processing of salvage.  Any claim made by HCS against Carrier for loss, damage, injury, theft, or delay to the Goods will be handled in the following manner:

1.  HCS shall notify Carrier as soon as possible once HCS discovers a possible cargo loss, damage, injury, theft, or delay claim. The Parties agree that HCS will have nine (9) months after delivery of such shipment (or, if no delivery, by nine (9) months after the scheduled delivery date), to file a written claim for such loss, damage, injury, theft, or delay to the Goods. The term "**written claim**" means delivering a written claim or notice of claim, which reasonably alerts Carrier, that loss, damage, injury, theft, or delay has occurred to the Goods.

    A.  Carrier must acknowledge the receipt of a written notice of a claim as promptly as possible, but in no event later than thirty (30) days after the date of Carrier's receipt of HCS's written claim, Carrier will notify HCS what, if any, additional documentary evidence or other pertinent information may be required by Carrier to process the claim.

    B.  Notwithstanding the terms of 49 CFR 370.9, Carrier shall pay, decline, or make a settlement offer in writing on all cargo loss or damage claims within 120 days of receipt of the claim. *Failure of Carrier to pay, decline, or offer settlement within this 120-day period shall be deemed an admission by Carrier of full liability for the amount claimed and a material breach of this Agreement*.

2.  Any action at law to recover any portion of a cargo claim shall be instituted by HCS against Carrier no later than two (2) years after Carrier has delivered a written declination of claim to HCS. If HCS prevails in litigation against Carrier for recovery of a claim, HCS will be entitled to recover all of its actual costs and expenses, including reasonable attorney fees, court costs, and interest.

3.  There shall be an administration fee on cargo claims as outlined in Appendix A (*Accessorial and Miscellaneous Charges*) of this Agreement.

## XV.  INSURANCE AND INDEMNIFICATION FOR CARRIER

1.  **Insurance Requirements of Carriers**.

    A.  Carrier agrees to provide and maintain any insurance coverages required by any government body for the types of transportation and related Services pursuant to this Agreement. All insurance required by this Agreement must be written by an insurance company having a Best's rating of "A-" VII or better and must be authorized to do business under the laws of the state(s) or province(s) in which Carrier provides the transportation and related services as specified in load confirmation communications received from HCS. Carrier's insurance shall be primary and required to respond and pay prior to any other available coverage. Carrier agrees that Carrier, Carrier's insurer(s), and anyone claiming by, through or under Carrier shall have no claim, right of action, or right of subrogation against HCS, its affiliates, or its Customer based on any loss or liability insured under the insurance stipulated herein. Carrier represents and warrants that it will continuously fulfill the requirements of this Section throughout the duration of this Agreement.  Nothing in this Agreement shall be construed to avoid Carrier's liability due to any exclusion or deductible in an insurance policy.  HCS shall be notified in writing by Carrier's insurance company at least thirty (30) days prior to the cancellation, change or non-renewal of the submitted insurance policies. Carrier shall at all times during the term of this agreement have and maintain in full force and effect, at its

expense:

   i.   **Motor Truck Cargo** Insurance or a superior equivalent covering all risks of loss, damage, or delay to goods in transit, with a minimum limit amount no less than US$100,000.00 and a deductible no greater than US$2,500 per trailer, container, or vehicle, including a loss payable clause for HCS as its interests may appear and at least the same coverage limit and deductible per shipment while in storage in a trailer, container, at a storage facility, at a facility being used as a storage facility, or enroute to the consignee. Such insurance shall contain no exclusion or limitation likely to render coverage for operations hereunder inapplicable including, but not limited to; refrigerator unit malfunction (including failure to fuel refrigerator unit), unattached vehicle, or unattended vehicle, transportation of food product, infidelity, theft, or other criminal act of Carrier's employees.

   ii.   **Business Automobile Liability Insurance with Contractual Liability Insurance** covering all owned, leased, hired and non-owned vehicles and specifically endorsed to cover the indemnity provisions listed herein between Parties, with limits of liability not less than $1,000,000.00 for bodily injury and property damage per occurrence and without aggregate limits.

   iii.   **Commercial General Liability with Contractual Liability Insurance** specifically endorsed to cover the indemnity provisions listed herein between Parties, with limits of liability of not less than $1,000,000.00 per occurrence.

   iv.   **Worker's Compensation insurance** in the amounts required by statute, and Employer's Liability insurance with limits not less than US$500,000 per occurrence, per person. When Carrier performs Services that involve origins and destinations solely within Canada, Carrier shall be current in its remittances to the appropriate Worker's Compensation Board of the Carrier's province, shall provide a certificate issued by the appropriate Worker's Compensation Board of the Carrier's province certifying that the Carrier is not delinquent and is current in its remittances to that authority, and shall have such other insurance or higher coverage limits required by applicable Canadian national or provincial law or regulation. Insurance will meet or exceed the requirements of federal, state and/or Provincial regulatory bodies having jurisdiction over Carrier's performances pursuant to this agreement. Carrier will hold harmless and indemnify HCS for any claim for insurance premium or any claim by any employee of the Carrier for injuries sustained in the ordinary course of business, including, but not limited to, drivers, lumpers, helpers, agents or sub-contractors of Carrier.

   v.   **Hazardous Materials.** If Carrier provides Transportation Services for hazardous materials under United States Department of Transportation ("DOT") regulations, public insurance including Commercial Automobile insurance limits required for the commodity transported under 49 C.F.R § 387.7 and 387.9 (or successor regulations thereto) and statutory required Commercial Automobile insurance limits pertaining to the hazard classification of the cargo as defined by DOT, an MCS-90 and Broadened Pollution Liability endorsements for limits required by law and full policy limits. Carrier shall procure and maintain, at its sole cost and expense, public liability and property damage insurance with a reputable and financially responsible insurance company insuring Carrier in an amount not less than US$2,000,000 per occurrence. Such insurance policy shall name HCS and Carrier as insureds with respect to any and all liabilities for personal injuries (including death) and property damage, including environmental damage due to the release of a hazardous material or waste, arising out of the ownership, maintenance, use or operation, including loading and unloading, of the equipment operated by Carrier under this Agreement.

vi.   Any other insurance required by any Legal Requirements.

vii.  Carrier shall, prior to providing transportation and related services pursuant to this Agreement, name HCS, as a certificate holder, as required on the foregoing insurance policies and shall cause its insurance company to issue a certificate to HCS, evidencing the foregoing.

B.   Carrier will provide certificates of insurance evidencing the insurance coverage required under this Agreement.

C.   Carrier shall be responsible to ensure all insurance coverage required.

D.   Pursuant to this Agreement, the insurance policies required hereunder and any replacement policies will insure the interests of HCS, cover all drivers, equipment and cargo used in providing Services, and not contain any exclusions or restrictions as to designated premises or project, pertaining to unattended equipment or cargo, for unscheduled equipment, for unscheduled drivers or cargo, for fraud or infidelity, for tarp warranty, for wetness or dampness, for geographical location in the United States, for trailers unattached to the power unit, or for a particular radius of operation.

2.   **Indemnification**.  To the fullest extent allowed by law, Carrier will defend, indemnify and hold harmless HCS, and its officers, directors, members, agents, customers,  and employees from and against all loss, liability, damage, claim, fine, cost, or expense, including all costs of defense as they accrue, including, but not limited to legal costs, arising out of claims by third parties and, directly or indirectly, arising from Carrier's performance of, or failure to perform any Service under this Agreement, or in any way related to performance or breach of this Agreement by Carrier, its employees, subcontractors or independent contractors (collectively, "**Claims**"), including, but not limited to, claims for or related to personal injury (including death) and property damage related in any way to Carrier's possession, use, maintenance, custody or operation of the Equipment or provision of Services; provided, however, that Carrier's indemnification obligations under this paragraph will not apply to any portion of such claims caused by or resulting from the negligence or other wrongful conduct of HCS.  Any offset and withholding of payment by HCS from Carrier pursuant to this Agreement shall, in no way be deemed or construed to release the Carrier from any liability from any personal injury, bodily harm, or other damages that may have resulted from any incident, accident, or event that caused the damage to the Cargo, and all provisions of this Agreement  shall remain in full force and effect. The Parties agree that Carrier's indemnification obligations will survive the termination of this Agreement.

## XVI.  MISCELLANEOUS

1.   **Survival**.  This Agreement is binding on and for the benefit of both Parties and their respective successors and assigns. Upon termination of this Agreement, all obligations will remain in effect after such termination.

2.   **Confidentiality**.  Neither Party may disclose the terms of this Agreement to a third party without the written consent of the other Party except 1) as required by regulation or law; 2) disclosure is made to a parent, affiliate, subsidiary or related entity; 3) to facilitate rating or auditing of transportation charges by an authorized agent, and such agent agrees to be subject to the terms of this Confidentiality clause.  Further, Carrier will not use HCS's name or identity on any promotional or advertising communications without HCS's written authorization.

3.   **Non-compete**.  Carrier shall not solicit, accept, or arrange for the transportation of goods from

any customer of HCS where 1) the availability of such customer or opportunity of transportation of goods became known to Carrier as a result of HCS's efforts, or as a result of Services performed under this Agreement; or, 2) the goods were first tendered to Carrier by HCS.

If Carrier breaches this Agreement and directly or indirectly solicits freight, accepts freight from, or arranges for the transportation of freight from customers of HCS, or obtains freight from such customer during the term of this Agreement or for twelve (12) months thereafter, Carrier agrees to pay HCS commission, in the amount of fifteen percent (15%) of the transportation revenue resulting from freight transported for the customer, for a period of fifteen (15) month after first obtaining such freight.

4. **Force Majeure**. Neither Party will be liable to the other for failing to perform or discharge any obligation under this Agreement where such failure is caused by acts of God, labor disorders, fire or other casualty, closing of the public highways, governmental interference, war, riot, act of terrorism, and other causes beyond the affected Party's control. In such case, both Parties will make every commercially reasonable effort to remedy or cure such event as soon as practically possible.

5. **Governing Law and Venue**. This Agreement will be governed by and construed in accordance with the laws of the State of Arkansas, regardless of its conflict of law provisions, and the Parties hereby submit to the jurisdiction and venue of the state and federal courts in and for Washington County, Arkansas for all disputes related to or arising out of this Agreement.

6. **Non-Waiver**. The failure of either Party at any time to timely enforce any provision of this Agreement, or to exercise any option provided, or to require performance of any provision, shall in no way be construed to be a waiver of any such provision, nor in any way to affect the validity of this Agreement, nor to affect such Party's right thereafter to enforce each and every provision of this Agreement. However, a Party may waive a term of this Agreement by a written instrument signed by the Party that would have been able to require compliance.

7. **Severability**. If any phrase, sentence, clause, or other provision contained in this Agreement violates any applicable ordinance, rule, law, or statute, such phrase, sentence, clause, or other provision will be ineffective to the extent of such violations without invalidating any other provision of this Agreement.

8. **Non-exclusive Agreement**. Neither Party intends to give the other Party any exclusive rights or privileges under this Agreement, and both Parties agree that HCS will be free to use the services of other carriers, and Carrier will be free to accept and transport freight for other parties, subject to the non-compete provision stated herein.

9. **Electronic Data Interchange**. Shipping instructions, delivery receipts, bills of lading, manifest logs, claims and any other shipping documentation may be transmitted by Electronic Data Interchange ("**EDI**") in such format as may be agreed to by the Parties. Such records will be retained by Carrier for a period of three (3) years from the date of shipment, or two (2) years after final resolution of a disputed or unsettled claim, whichever is later, or for such greater time period as may be required by Legal Requirements. Upon written request, said records will be made available to HCS. It is stipulated that records maintained in the manner provided herein will be admissible for all purposes in the event of a dispute or litigation.

10. **Entire Agreement**. This Agreement represents the entire agreement and understanding of the Parties with regard to its subject matter. No prior understandings or agreements by the Parties, whether written or oral, nor any documents not specifically incorporated into this

Agreement, nor any course of conduct of the Parties before or after the Effective Date of this Agreement, shall have the effect of modifying the Parties' rights and obligation under this Agreement in any way. This Agreement cannot be amended unless in writing and agreed to by both Parties.

**11. Counterparts**. This Agreement may be executed in counterparts, each of which will be an original and all of which will together constitute one and the same instrument.

**12. Captions**. The captions and headings set forth in this Agreement are for convenience only. They shall not be considered a part of this Agreement, nor affect in any way the meaning of its term and conditions.

**13. Construction**. Each Party has reviewed this Agreement and had the opportunity to consult with counsel. They have ascertained and weighed all the facts and circumstances likely to influence their judgment herein, they have given due consideration to the provisions contained herein, and they thoroughly understand and consent to all provisions hereof; and, accordingly, the rule of construction to the effect any ambiguities are to be resolved against the drafting party will not be employed in any interpretation of this Agreement.

**14. Notice.** Unless the PARTIES notify each other in writing of a change of address, any and all notices required or permitted to be given under this Agreement shall be in writing (certified or registered mail or email with confirmed receipt) and shall be addressed as follows.

H. C. Schmieding Produce Company LLC (HCS)        _____ (Carrier)
Attn: Carrier Relations Department        Attn: _____
Address: PO Box 369        Address: _____
       Springdale, AR 72765-0369        _____
Email: trucks@schmieding.com        Email: _____

IN WITNESS WHEROF, the Parties have caused this Agreement to be executed by their duly authorized representative as of the Effective Date.

_____        H.C. Schmieding Produce Company, LLC
Carrier Name        (HCS)

_____        _____
Signature        Signature

_____        _____
Representative Printed Name

_____        _____
Title

_____        _____
Date        Date

# ACCESSORIAL and MISCELLANEOUS CHARGES

## I. <u>SCHMIEDING TRANSPORTATION ACCESSORIAL LIST</u>

### A. <u>Detention</u>
Carrier must be on time to qualify for detention.  Carrier will be considered late if driver is one minute late for an appointment.
2 Free Hours on pallet loads.
4 Free Hours on floor loads.
$5 for each 15 minutes after free period expires.
$20 for each hour for maximum of 10 hours.
After 10-hour delay 1-day layover paid of $200.

### B. <u>TONU</u>
$2.50 per mile charge from the last destination to the original designated pickup, subject to a maximum charge of $250, shall apply. No charge shall apply to loads cancelled Eight (8) hours prior to scheduled pickup.

### C. <u>Layover</u>
$200 for 24 hours.

### D. <u>Hazardous Materials</u>
An additional charge amount of $.15 cents per mile with a minimum of $100 over the applicable linehaul rate shall apply for any loads placarded or non-placarded specified by DOT regulations as hazardous.

### E. <u>Diversion</u>
Non-Carrier related Diversions shall be calculated as follows:
$35 extra stop
Rates for additional miles for a diversion shall be the same rate per mile as agreed upon for the original load rate per mile.
All other applicable accessorials will apply.

### F. <u>Reconsignment</u>
Non-Carrier related Reconsignments shall be calculated as follows:
$35 extra stop if applicable.
Rates shall be negotiated.
All other applicable accessorials will apply.

### G. <u>Redelivery</u>
Non-Carrier related Redeliveries shall be calculated as follows:
$35 extra stop
Rates shall be negotiated.
All other applicable accessorials will apply.

### H. **Extra Stops**
$35 per stop for each additional stop in transit.

### I. **Tarping Flatbed Loads**
$75 shall apply per shipment.

## II. **SCHMIEDING TRANSPORTATION FEES**

### A. **Comchecks**
The following fees for receiving comchecks are deducted automatically from the carrier rate:
$5.00 fee for load related comchecks such as lumpers, pallets, late fees, and scales.
$20.00 fee for non-load related comchecks between the amounts of $1.00 - $500.00.
$25.00 fee for non-load related comchecks between the amounts of $501.00 - $1000.00.
No more than $1,000.00 in a single day shall be issued.
No more than 40% of the rate amount shall be advanced on any one load for any reason.
No comchecks, including fuel advances, shall be issued to a carrier on their first load being transported for HCS.
Comcheck fees are not reimbursable without written approval by HCS management.
Carrier freight rate pay advances shall not be allowed.

### B. **GPS Tracking**
$250 to $500 fee which shall be deducted from the Carrier's freight rate settlement for noncompliance specified in this Agreement. Fine amount shall be determined within load comments on the Rate Confirmation.

### C. **Reefer Downloads**
$500 fee for failure to provide a reefer download as per this agreement shall be deducted from the Carrier's freight rate.

### D. **Late Fee**
$250 minimum fee for each missed appointment each day unless stated otherwise in load comments on the Rate Confirmation provided to Carriers by HCS.

### D. **Claims Administration Fees**
$20.00 fee = $0 to $249.00 claim amount
$50.00 fee = $250.00 to $499.00 claim amount
$100.00 fee = $500.00 to $999.00 claim amount
$150.00 fee = $1,000.00 to $1,499.00 claim amount
$200.00 fee = $15,000.00 or greater claim amount

# Exhibit 3



# Carrier Load Tender

| Reference: LD134110 | Carrier: BUKHARA TRANS INC ( 18160 ) | Tender: 10/10/2022 07:09 |
|---|---|---|

( Load ID )

| Origin: | **LINEAGE 2357 S WOOD ST  CHICAGO, IL 60608** |
|---|---|
| | phone: fax: email: |
| Pickup: | **Appointment:** 10/11/2022 10:00AM - 10/11/2022 10:00AM |
| Destination: | **BNCC Sysco Knoxville, LLC 900 Tennessee Avenue  Knoxville, TN 37921** |
| | phone:  fax:  email: |
| Delivery: | **Appointment:** 10/12/2022 10:00AM - 10/12/2022 10:00AM |
| Bill To: | **H.C. Schmieding Produce Company, LLC P.O. Box 369  Springdale, AR 72765** |
| | Accounts Payable phone: 479-751-0515 fax: 479-751-6831 email: AP@schmieding.com |

**Comments**

**Contact Information: Jesenia Ruiz**

**Equipment**

**Reefer 53' (R)**

**Items**

| Item ID | HM | Description | Weight | Class | NMFC | Dimensions |
|---|---|---|---|---|---|---|
| Item Number | | Item Description | 32277.0 | 0.0 | | |

**Stop 1 (pickup)**

**Appointment:** 10/11/2022 10:00AM - 10/11/2022 10:00AM

door 46

PO#06543610 - CALUMET
PO#06558960 - JASPER
PO#06459640 - TRADEX
PO#06543650 - DEVI
PO#06543680 - FW BRYCE
PO#06543710 - PIAZZA&SON
PO#06543720 - SUNNYVALE
PO#06543480 - BSCC
PREFER
PO#06543690 - MILMAR
PO#06543700 - OGGI
PO#06543670 - FGF BRANDS
PO#06543660 - EASTERN

LINEAGE, 2357 S WOOD ST, CHICAGO, IL 60608

| SN147983 (Shipment ID) | 32,277 lb | 2292.0 CAS |
|---|---|---|

**Appointment:** 10/12/2022 10:00AM - 10/12/2022 10:00AM

32886

**LUMPER IS PREPAID LOGISTICS/DO NOT PAY/WILL NOT REIMBURSED/DRIVER TO TRACK IN FOUR KITES OR FINED $500 & NOT ELEGIBLE FOR DETENTION

---

BNCC Sysco Knoxville, LLC, 900 Tennessee Avenue, Knoxville, TN 37921

| | | |
|---|---|---|
| SN147983 (Shipment ID) | 32,277 lb | 2292.0 CAS |
| | | |

## Freight Terms

### Charge Details

| Description | Rate | | Quantity | Charge |
|---|---|---|---|---|
| Quoted Amount | 2525.0 | Flat Charge | | $2525.0 |
| | | | Total: | $2525.0 |

Freight Terms: 2525.0, Third Party (32277.0 lb) (543.97 miles)

## References

| Reference Type | Reference Value |
|---|---|
| Commodity | baking |
| Temperature Range | FROZEN: PRECOOL ZERO, FOLLOW BOL FOR TRANSIT, FRZN |

*PROOF OF DELIVERY (POD) & LUMPER RECEIPTS ARE REQUIRED WITHIN 48 HOURS TO AP@SCHMIEDING.COM
*ACCEPTANCE AND LOADING OF THIS ORDER CONSTITUTES AGREEMENT SET FORTH ON THIS RATE CONFIRMATION
*LUMPER, PALLETS, OS&D MUST BE REPORTED AT TIME OF OCCURRENCE.  FAILURE TO COMPLY WILL RESULT IN NON-PAYMENT
*DRIVER IS RESPONSIBLE TO VERIFY LOAD IS BLOCKED, BRACED AND SECURE AS PER DOT SAFETY REGULATIONS BEFORE LEAVING SHIPPER.
*DRIVER IS RESPONSIBLE TO ENSURE PROPER BLOCKING AND BRACING AS PER DOT SAFETY REGULATIONS BEFORE LEAVING EACH STOP ON MULTI STOP LOADS.
*DRIVER IS RESPONSIBLE TO VERIFY PRODUCT COUNT AT SHIPPERS AND EACH STOP ON MULTI STOP LOADS.
*DRIVER IS RESPONSIBLE TO NOTIFY SCHMIEDING BY EMAIL OR CALL BEFORE LEAVING SHIPPER IF NOT ALLOWED ON SHIPPER DOCK TO VERIFY PRODUCT COUNT.
*REFRIGERATED TRAILERS MUST BE ABLE TO PROVIDE DOWNLOAD THROUGHOUT LOAD TRANSIT
*MARKET FEES AND ALL SURCHARGES ARE INCLUDED IN RATE.
*PRODUCE LOADS ARE PAID ON DELIVERED WEIGHT OF BULK OR BAG/BOX COUNT.  DRIVER IS RESPONSIBLE FOR CHECKING DELIVERED WEIGHT AND REPORTING ANY DISCREPANCY
*CARRIERS ARE RESPONSIBLE FOR ANY CARGO CLAIMS
*DRIVERS MAY REQUEST TO INSPECT PRODUCE AT SHIPPER AND MUST NOTIFY SCHMIEDING WHILE ON SITE
*CARRIER IS RESPONSIBLE FOR LATE DELIVERY FEES AND ANY CLAIMS ASSOCIATED WITH LATE DELIVERY
*CARRIER IS REQUIRED TO CONTACT SCHMIEDING IN THE EVENT THE TEMP ON THE BOL IS DIFFERENT FROM THE RATE CONFIRMATION
*BROKERS ARE NOT ALLOWED ON ANY LOGISTICS LOAD AND ONLY ON PRODUCE LOADS
*IF YOU ARE SIGNED UP FOR QUICK PAY, PLEASE SEND ALL INVOICES TO QUICKPAY@SCHMIEDING.COM

# Exhibit 4

BILL OF LADING

Order # : 4-264146
08:55AM

# Lineage Logistics PFS, LLC

2357 South Wood St Chicago , IL 60608 • PHONE: (773) 268-3400
FAX: (773) 268-3401 EMAIL: d3orders@lineagelogistics.com

Page    1 of    2

**FROM ACCOUNT OF:** SYSCOC
SYSCO MERCHANDISING SERVICES
1390 CORPORATION
Houston, TX
77077

**CONSIGNED TO:** Manual
BNCC SYSCO KNOXVILLE  LLC
900 TENNESSEE AVENUE
KNOXVILLE, TN
379212630

4-264146

Order Date    : 10.06.22
Cust. Ord. Num : WS0107
P.O. Number   : 06558960

Shipped Date : 10.11.22
Freight Term : COLLECT
Carrier : SCHMIEDING 10:00 10.11.22

LOT Code           Description
(ITEM Code)  Units SKU           Pallets in ⭕ Pallets out  22 *Unit Wgt.* *total spots*

*Frozen product*
*loaded on Dry*
*VAN.*
*Product is*
*not usable.*
*Product is*
*ruined.*

```
************** Order MESSAGE **************
*                    *RECORD TEMPS*          *
*  NOSE  39  MIDDLE 37  TAIL  50             *
*                                            *
*        **NUMBER OF PALLETS SHIPPED**       *
*                                            *
*  _____ # of CHEP    _____ # of WHITE   *
*                                            *
*  SEAL #   01581513                         *
*                                            *
*  MUST BE KEPT AT 0 DEGREES                 *
*  PERISHABLE PRODUCT MAINTAIN AT PROPER     *
*  TEMPERATURE                               *
*                                            *
*                                            *
*                                            *
************************************************
```

SHIPPER : 199900 - JASPER WYMAN & SONS
=====================================
D3247033     55 CS     2527653 IQF CRANBERRY WHOLE 2/5          12.00
                       02.11.24

(Item : 2527653)
00967398D3
                       1-I106A    0        1-STAGE   55 CS
------------------------------------------------------------------
D3247033     35 CS     2527653 IQF CRANBERRY WHOLE 2/5          12.00
                       02.11.24

(Item : 2527653)
00967405D3
                       1-J060A    0        1-STAGE   35 CS
------------------------------------------------------------------

SYSCOC-264146

"IMPORTANT: THIS IS PERISHABLE PRODUCT MAINTAIN PROPER TEMPERATURE

REC'D BY:

SHIPPED BY:

Lineage Logistics PFS, LLC

0001

# Exhibit 5

| Sysco Location | | Date |
|---|---|---|
| Sysco Knoxville | | 10/12/2022 |

## Temperature NUOCA

Initiate when one of the Food Safety Monitoring Techniques have exceeded its Critical Limit and the three follow-up product surface temperatures warrant further investigation.

📺 A NO Requires a Photo
🌡 Requires a Temp

| Is the Time/Temperature Device (if present) alarmed? | YES | NO | N/A ✓ | Serial Number: No TTR |
|---|---|---|---|---|
| ❋ Saving the device is recommended | | | | |

PO Number(s) 0656860, 0654340, 0654360, 0649640, 0654360, 0654380, 0654370, 0654720, 0654390,

Hazard Code(s): $^H$S 00, $^H$ 00  $^H$S 001 and $^H$S 00 7 3

Temperature Critical Limit: 15F

Product Description: IQF Fruit, Frozen Seafood, Frozen dough, Frozen burger patties, Frozen ground pork

Supplier Name & Address: Jasper Wyman & Son, BSCC Lineage Logistics; Calumet Diversified Meats; Baugh SE RDC, Devi Seafood, FW Bryce Inc, Paul Piazza & Sons; Sunnyvale Seafood, Milmar Food Group; OGGI Foods Inc.

| Time Table | Vehicle Arrival TIME: 12:30PM EST | Opening of Trailer TIME: 1:00PM EST | First Product Surface Temp TIME: 1:15PM EST | Last Pulp Product Temp *From Box 2* TIME: 2:00PM EST |
|---|---|---|---|---|

**1** Evaluate Product Surface Temperature

a. Product Surface Temp > it's Critical Limit  OR  TTR and 3 receiving surface temps indicate > Critical Limit *during* shipment:  List the 3 product surface temps in the next box.

b. If any of the three temps exceed their Critical Limits take 9 product surface temperatures (between products with probe thermometer only) and list the SUPC of each item in the block below.

| Top of Pallet | Middle of Pallet | Bottom of Pallet |
|---|---|---|
| 39F 🌡 | 37F 🌡 | 50F 🌡 |



**2** PULP Product Temperature Take internal 📗 product temps of the 3 highest cases identified in the adjacent box and list them in the box below

| | Pallet Positioned in the Tail of the Trailer | Pallet Positioned in the Middle of the Trailer | Pallet Positioned in the Nose of the Trailer | |
|---|---|---|---|---|
| Top Case (Side) | SUPC 7071080 - 46.2F 🌡 | SUPC 6275515 - 24.8F 🌡 | SUPC 3664541 - 29.2F 🌡 | SUPC/Temp: 7071080 - 46.2F 🌡 |
| Middle Case (Center) | SUPC 4438911 - 29.2F 🌡 | SUPC 4190373 - 26.8F 🌡 | SUPC 8496341 - 27.9F 🌡 | SUPC/Temp: 7571335 - 30.1F 🌡 |
| Bottom Case (Side) | SUPC 1410976 - 23.9F 🌡 | SUPC 3664541 - 24.1 F 🌡 | SUPC 7078993 - 26.1F 🌡 | SUPC/Temp: 7209271 - 29.0F 🌡 |

| **3** Evaluate the Loading Pattern | YES | NO | NOTES |
|---|---|---|---|
| a. Are pallets loaded to eliminate contact with the wall?  If no, take surface temps of the products loaded against the wall and document in the notes. | ✓ | | 📺 |
| b. Is there at least 9 inches of space between the pallets and the ceiling? | ✓ | | 📺 |
| c. Is the load secured using load locks, straps, etc.? | | ✓ | 📺 |
| d. Is the Time/Temperature Device located on the last pallet facing the doors? | | ✓ | If not, where? No TTR |

| **4** Evaluate the Trailer Condition | YES | NO | NOTES |
|---|---|---|---|
| a. Is the reefer unit set properly? Document the set point and current temperature of the trailer in the notes to the right. | | ✓ | ❋ There is no reefer on this trailer |
| b. Are the walls and ceiling free of holes and other damage? | ✓ | | 📺 |
| c. Are the seals on all doors free of damage? | ✓ | | 📺 |
| d. Is the air chute free of damage and properly attached?  (if applicable) | | ✓ | 📺 No air chute |
| e. Are the supply & return air vents free of obstruction? | | ✓ | 📺 No supply and return air vents |
| f. Are there drain caps (kazoos) on the floor drains? | | ✓ | 📺 |
| g. Is the floor clean and free of debris? | ✓ | | 📺 |

| **5** Shipment Info | Sysco Arranged: ✓   Supplier Arranged: | Reefer Type/Model: No Reefer on Trailer |
|---|---|---|

Carrier, Trailer Number & Year: JBHZ 677271 - Carrier is Schmieding

| **6** Disposition Process Checklist | YES | NO |
|---|---|---|
| a. Has a disposition decision been made? | | ✓ |
| b. Has the Merchandiser been consulted? | ✓ | |
| c. Are the products that were determined to have exceeded their Critical Limits placed back on trailer or placed on hold? | ✓ | |
| d. Are all pictures attached? Are they clear enough to be used as supporting evidence? | ✓ | |

| e. | Has the following been completed and attached?   OS&D - TempTale - BOL - PO | ✓ | |
|----|---|---|---|
| f. | If applicable, has the driver/carrier and downstream customer/warehouse been notified? | ✓ | |
| g. | Has the Site designee initiated a Corrective Action request from the Supplier/Carrier? | ✓ | |
| h. | If applicable, has the claim been processed with Corporate Supply Chain or Legal Counsel Initiated ? | | ✓ |

Completed By: Jim Lucas          Signature: *James Lucas-jluc7787*          Date 10/12/2022

Reviewed By: _____          Signature: _____          Date _____

## Corrective Action Resource

**1. Cool Product to Ideal Temperature Prior to Loading:**

   a. Cool the product at or close to the *ideal* temperature.

   b. Cool the product uniformly throughout the pallet, and throughout the load.

**2. Prepare the Trailer Properly:**

   a. Set the reefer to the correct set point. Utilize continuous mode for perishable shipments.

   b. Precool the trailer for 30 to 60 minutes.

   c. Inspect the walls, ceiling, and floor.  Ensure they are free from unrepaired damage.

   d. Inspect the chute and ensure it is properly attached, and free from damage.

   e. Ensure the return air vent is free from obstruction.

   f. Ensure the floor is free of debris.

   g. Inspect the drain hole (Kazoos) and replace if missing or damaged.

   h. Inspect the door seals. Trailers with damaged/excessively worn door seals need to be repaired prior to shipment.

   i. Ensure the trailer is free of objectionable odors.

**3. Load the Trailer Properly:**

   a. Center line load the trailer.  Ensure there is a gap between the walls and the pallets.

   b. Do not load pallets with heights that exceed the red line.  If no red line is present, ensure there is a 9" gap between the pallets and the ceiling.

   c. Secure pallets with load locks.

**4. Recommend Documenting Transport Temperatures with TempTale:**

   a. Document the TempTale SN and place a 'TempTale On Board' sticker on the BOL.

   b. Start the TempTale.  Verify the sun icon is present on the LCD screen.

   c. Place the TempTale on the last pallet loaded on the right, at eye level.

**Supplier or Carrier Agreement**

Supplier and/or Carrier hereby agrees to supply corrective actions.

Supplier/Carrier Name & Location

Carrier - Schmieding
_____

# Exhibit 6

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

| | |
|---|---|
| **H.C. SCHMIEDING PRODUCE COMPANY, LLC** | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      CASE NO.: 5:23-cv-05011-TLB |
| | ) |
| **BUKHARA TRANS INC.** | ) |
| Defendant. | ) |

## COMPLAINT

COMES NOW, Plaintiff, H.C. Schmieding Produce Company, LLC ("Schmieding") by and through its counsel, Hall Estill Attorneys at Law, and for its Complaint pursuant to 49 U.S.C. § 14706 against Bukhara Trans Inc. ("Bukhara") and states the following:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff, Schmieding, is a Florida limited liability company with a major operations facility in Springdale, Arkansas.

2. Upon information and belief, Defendant, Bukhara, is an Illinois Corporation with its principal place of business in Illinois, and is a motor vehicle carrier engaged in the transportation of freight including operating through the State of Arkansas.

3. At all times material hereto, Defendant acted by and through its agents, employees, servants, workmen, and/or ostensible agents engaged within the course and scope of their employment.

4. Upon information and belief, at all times material hereto, Defendant was authorized to and did operate through Washington County, Arkansas.

5. This case arises from a Carrier Agreement (attached hereto as Exhibit 1) and Carrier Load Tender (attached hereto as Exhibit 2), between the parties which was formed and executed in Springdale, Arkansas.

6. A substantial part of events or omissions giving rise to these claims occurred in Washington County, Arkansas.

7. Jurisdiction is proper in the U.S. District Court for the Western District of Arkansas pursuant to 28 U.S.C. § 1331 and 49 U.S.C. § 14706(d).

8. This District is a proper venue pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

9. Plaintiff adopts and incorporates by reference its allegations contained in Paragraphs 1 through 8.

10. On or about October 11, 2022, pursuant to the Carrier Agreement (Exh. 1), the Carrier Load Tender Reference Number LD134110 (Exh. 2), and a Bill of Lading Order # 4-264146 (Exh. 3), Bukhara picked up a load of cargo from Houston, Texas to be delivered to Sysco Corporation ("Sysco") in Knoxville, Tennessee.

2

11.     At the time of loading, the cargo was inspected and found to be in good condition. (See Exh. 3, Bill of Lading with driver's signature).

12.     The Carrier Load Tender listed the required temperature to be pre-cooled to 0 degrees. (Exh. 2). In addition, the Bill of Lading required the temperature to be between maintained at 0 degrees. (Exh. 3). The Bill of Lading noted several times this was perishable product and proper temperature must be maintained. (Exh. 3).

13.     Bukhara arrived with a dry trailer, with no refrigeration capabilities.

14.     Upon arrival at the consignee on October 12, 2022, the trailer temperature data showed the product surface temperature was between 23 and 50 degrees. The temperature critical limit was 15 degrees. (See Exh. 4, Temp Analysis).

15.     The Carrier Agreement required the carrier to transport the load in accordance with the food safety and security instructions. (Exh. 1).

16.     The Carrier Agreement also stated the Carrier represents and warrants all equipment used to transport food shipments will be equipped with refrigeration units. (Exh. 1).

17.     The driver signature on the BOL verified the product was in good condition at the time of loading. (Exh. 3).

18.     Upon delivery, the pulp temperature of the product ranged from 29 and 46 degrees. The temperature critical limit was 15 degrees. (Exh. 4).

19.     Due to the high temperatures, the product was deemed unsafe and the load was rejected.

20. Bukhara is liable for the entire loss of the shipment due to the high temperature of the product.

21. The high temperatures were noted on the Bill of Lading. (See Exh. 3).

22. Bukhara was notified of this claim upon delivery on October 12, 2022. (See Exh. 4).

23. The claim was properly and timely submitted to Bukhara on or about October 20, 2022. (See Exh. 5, Claim demand).

24. Bukhara did not accept liability.

25. Schmieding, as broker, has or will compensate Sysco for its losses in the amount of $113,277.64.

26. Schmieding is subrogated to the rights of Sysco, the receiver/consignee, to collect against the carrier for damaged cargo pursuant to 49 U.S.C.A. § 14706. Schmieding has been damaged in the amount of $113,277.64.

27. Bukhara had an obligation to avoid damaging the cargo during transport, and deliver the cargo in substantially the same condition as received from the shipper.

28. Bukhara breached its duty by failing to provide a refrigerated unit for the transport of the food shipment as required on the Load Tender (Exh. 2) and the Bill of Lading (Exh. 3), and agreed upon in the Carrier Agreement. (Exh. 1).

29. Bukhara improperly allowed the cargo to be damaged while it was in Bukhara's possession and control, and failed to deliver the cargo, undamaged, to the consignee.

4

30.     Bukhara's breach was the proximate cause of damage to the cargo, specifically the entire cargo load was damaged at the cost of $113,277.64.

31.     Schmieding properly and timely filed a claim with Bukhara for costs due to Schmieding as a result of the damage to the cargo pursuant to 49 C.F.R. § 370.3. (See Exh. 5).

32.     Bukhara denied liability and rejected the request by Schmieding to compensate Schmieding for its loss proximately caused by Bukhara's negligent transport of the cargo.

33.     Those losses and expenses, which were incurred as a result of the damaged cargo have accrued in the amount of $113,277.64, plus pre and post judgment interest as allowed by Arkansas and Federal law.

34.     Schmieding has fulfilled all of its performance obligations under all applicable contracts and applicable state and federal laws.

## COUNT I

35.     Plaintiff adopts and incorporates by reference the allegations contained in Paragraphs 1 through 34.

36.     Upon information and belief, and based on documentation on the applicable Bill of Lading, the cargo for the Carrier Load Tender Reference Number 134110 (Exh. 2), and Bill of Lading Order # 4-264146 (Exh. 3), was delivered to Bukhara in proper condition for transportation and in an undamaged condition.

37.     The Bill of Lading bears a signature from the carrier certifying the cargo was in proper condition for transportation.

38.    The cargo was damaged due to the failure of Bukhara to provide a refrigerated unit and maintain the proper temperature on the trailer.

39.    Schmieding, on behalf of Sysco, timely and properly informed Bukhara of the damaged cargo and filed a claim for damaged cargo pursuant to 49 C.F.R. § 370.3.

40.    Bukhara improperly denied liability for the damaged cargo and refused to compensate Sysco or Schmieding for such damages.

41.    Pursuant to 49 U.S.C.A. § 14706, Bukhara is liable to Schmieding, who is subrogated to the rights of shipper, under the Carrier Load Tender Reference Number LD134110 (Exh. 2), and a Bill of Lading Order # 4-264146 (Exh. 3), for the damages to the cargo.

42.    Bukhara was negligent in transporting the cargo and such negligence was the proximate cause of the damages to the cargo.

43.    Bukhara had a duty to transport the cargo in a manner that would not damage such cargo. Bukhara breached that duty and such breach was the proximate cause of the damage to the cargo.

44.    Bukhara's breach of duty and/or negligence proximately caused Schmieding to suffer damages, and Schmieding is therefore entitled to recover from Bukhara, damages in the amount of $113,277.64 plus pre and post judgment interest, attorney's fees and costs as allowed by Arkansas and Federal law.

45.    Plaintiff demands a jury trial.

46. Plaintiff reserves the right to move this Court to allow Plaintiff to amend this Complaint upon completion of investigation and discovery.

WHEREFORE, Plaintiff, Schmieding, prays this Court enter judgment in its favor and against Bukhara in the amount of $113,277.64, plus pre and post judgment interest, attorney's fees, cost of this suit and such other relief as it may be entitled.

Respectfully submitted,

**H.C. SCHMIEDING PRODUCE COMPANY, LLC**

BY: /s/ Grace K. Johnson
Grace K. Johnson (Ark. Bar No. 09203)
**HALL ESTILL ATTORNEYS AT LAW**
75 N. East Ave, Suite 500
Fayetteville, AR 72701-5388
Telephone: (479) 973-5253
Facsimile: (479) 973-0520
Email: gjohnson@hallestill.com
*Attorney for the Plaintiff*

7

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ARTISAN AND TRUCKERS CASUALTY COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:23-cv-4439 |
| BUKHARA TRANS, INC. | ) ) | |
| Defendant. | ) ) | |

## ANSWER TO COMPLAINT FOR DECLARATORY RELIEF

NOW COMES Defendant, BUKHARA TRANS, INC. ("Bukhara") by and through one of its attorneys, Andrea M. Ross of STONE & JOHNSON, CHTD., and for its Answer to Plaintiff ARTISAN AND TRUCKERS CASUALTY COMPANY'S ("Progressive") Complaint for Declaratory Relief, states as follows:

### INTRODUCTION

1.      This is an action for declaratory judgment pursuant to 28 U.S.C. §2201 and Rule 57 of the Rules of Federal Civil Procedure based on the complete diversity of citizenship of the parties as provided in 28 U.S.C. § 1332.

<u>Answer</u>:       Defendant admits the allegations contained in paragraph 1 of Plaintiff's complaint for declaratory relief.

2.      This action arises from damage to cargo that was not refrigerated when Bukhara was contractually required to do so. Progressive seeks a declaration that it is not required to either defend or indemnify its insured, Bukhara in an action brought by the cargo broker who engaged Bukhara to transport the damaged cargo that is the subject of this litigation.

<u>Answer</u>:       Defendant admits only that Progressive is seeking declaratory relief in this

litigation and denies the remaining allegations contained in paragraph 2 of Plaintiff's complaint for declaratory relief.

## PARTIES AND NON-PARTIES

3.      Plaintiff, Progressive is an Ohio corporation with its principal place of business in the State of Ohio. At all relevant times, Progressive was and is authorized to issue policies of insurance in the State of Illinois.

Answer:      Defendant admits the allegations contained in paragraph 3 of Plaintiff's complaint for declaratory relief.

4.      At all times relevant, Progressive issued a policy of insurance to Bukhara that included a Motor Truck Cargo Liability Endorsement Form Z434 IL (02/19) and the Refrigeration Breakdown Coverage Endorsement (Form Z440 (0610) ("the policy"). (**Exhibit 1**).

Answer:      Defendant admits only that Progressive issued a policy of insurance to Bukhara and states that that document speaks for itself and denies the remaining allegation in Plaintiff's complaint for declaratory relief.

5.      Defendant, Bukhara, is an Illinois Corporation with its principal place of business in Illinois, located at 1400 Light Road, Apt. 103, Oswego, Illinois. At all times relevant Bukhara was a motor vehicle carrier engaged in the transportation of freight in various states including Illinois and Arkansas.

Answer:      Defendant admits the allegations contained in paragraph 5 of Plaintiff's complaint for declaratory relief.

6.      H.C. Schmieding Produce Company, LLC, ("Schmieding") is a non-party to this lawsuit. On information and belief, Schmieding is a Florida limited liability company doing business in Arkansas. As is set forth more fully below, at all times relevant, Schmieding worked

as a cargo broker and engaged Bukhara to transport the damaged cargo that is the subject of this litigation.

<u>Answer</u>:      Defendant admits only that Schmieding engaged Bukhara to transport products and denies the remaining allegations contained in paragraph 6 of Plaintiff's complaint for declaratory relief.

7.      Sysco Corporation ("Sysco") is a non-party to this lawsuit. On information and belief, Sysco is an American multinational corporation involved in marketing and distributing food products.

<u>Answer</u>:      Defendant admits the allegations contained in paragraph 7 of Plaintiff's complaint for declaratory relief.

## JURISDICTION AND VENUE

8.      At all times material hereto, Bukhara acted by and through its agents, employees, servants, workmen, and/or ostensible agents engaged within the course and scope of their employment.

<u>Answer</u>:      Defendant admits the allegations contained in paragraph 8 of Plaintiff's complaint for declaratory relief.

9.      Jurisdiction is proper in the federal district courts because this is an action based on complete diversity of citizenship pursuant to 28 U.S.C. § 1332 and the amount of controversy exceeds $75,000.

<u>Answer</u>:      Defendant admits the allegations contained in paragraph 9 of Plaintiff's complaint for declaratory relief.

10.      Venue is proper in the Federal District Court for the Northern District of Illinois, Eastern Division because Bukhara has its principal place of business at 1400 Light Road, Apt.

103, Oswego, Illinois.

Answer:     Defendant admits the allegations in paragraph 10 of Plaintiff's complaint for declaratory relief.

## FACTUAL BACKGROUND

11.     On or about October 11, 2022, pursuant to the Carrier Agreement (**Exhibit 2**), the Carrier Load Tender Reference Number LD134110 (**Exhibit 3**), and a Bill of Lading Order # 4- 264146 (**Exhibit 4**), Bukhara picked up a load of cargo ("the cargo") at a Sysco facility in Houston, Texas to be delivered to a Sysco facility in Knoxville, Tennessee.

Answer:     Defendant admits only that Exhibit 2, Exhibit 3 and Exhibit 4 attached to Plaintiff's complaint appear to be copies of the Carrier Agreement, Carrier Load Tender and Bill of Lading, respectively, and that those documents speak for themselves.  Plaintiff denies the remaining allegations contained in paragraph 11 of Plaintiff's complaint for declaratory relief.

12.     The cargo consisted of 32,277 pounds of frozen whole cranberries.

Answer:     Defendant admits only that the product at issue consisted of cranberries and denies the remaining allegations contained in paragraph 12 of Plaintiff's complaint for declaratory relief.

13.     At the time it took possession of the cargo, Bukhara inspected it and found it to be in good condition. (Exhibit 4, Bill of Lading with driver's signature).

Answer:     Defendant admits only that Exhibit 4 appears to be a copy of the Bill of Lading and that that document speaks for itself.  Defendant denies the remaining allegations contained in paragraph 13 of Plaintiff's complaint for declaratory relief.

14.     The Carrier Load Tender required the trailer used to transport the load to be precooled to 0 degrees. (Exhibit 3).

Answer: Defendant admits only that Exhibit 3 appears to be a copy of the Carrier Load Tender and that that document speaks for itself. Defendant denies the remaining allegations contained in paragraph 14 of Plaintiff's complaint for declaratory relief.

15. The Bill of Lading required the temperature to be maintained at 0 degrees. (Ex.4).

Answer: Defendant admits only that Exhibit 4 appears to be a copy of the Bill of Lading and that that document speaks for itself. Defendant denies the remaining allegations contained in paragraph 15 of Plaintiff's complaint for declaratory relief.

16. The Bill of Lading also noted the cargo consisted of perishable product and proper temperature must be maintained. (Exhibit 4).

Answer: Defendant admits only that Exhibit 4 appears to be a copy of the Bill of Lading and that that document speaks for itself. Defendant denies the remaining allegations contained in paragraph 16 of Plaintiff's complaint for declaratory relief.

17. Bukhara took possession of the cargo and placed it in a dry trailer, with no refrigeration capabilities.

Answer: Defendant admits that it took possession of the cranberries and denies the remaining allegations contained in paragraph 17 of Plaintiff's complaint for declaratory relief.

18. Upon arrival at the Sysco facility in Houston, Texas, on October 12, 2022, the product surface temperature of the product comprising the cargo was between 23 and 50 degrees.

Answer: Defendant lacks sufficient information and belief to either admit or deny the allegations contained in paragraph 18 of Plaintiff's complaint for declaratory relief.

19. The temperature critical limit of the product comprising the load was 15 degrees. (See **Exhibit 5**, Temperature Analysis).

Answer: Defendant admits only that Exhibit 5 appears to be a document from

Sysco entitled "Temperature NUOCA" and that that document speaks for itself. Defendant denies the remaining allegations contained in paragraph 19 of Plaintiff's complaint for declaratory relief.

20. The Carrier Agreement required Bukhara to transport the load in accordance with the food safety and security instructions. (Exhibit 2).

Answer: Defendant admits only that Exhibit 2 appears to be a copy of the Carrier Agreement and that that document speaks for itself. Defendant denies the remaining allegations contained in paragraph 20 of Plaintiff's complaint for declaratory relief.

21. The Carrier Agreement also stated Bukhara represented and warranted all equipment used to transport food shipments will be equipped with refrigeration units. (Exhibit 2).

Answer: Defendant admits only that Exhibit 2 appears to be a copy of the Carrier Agreement and that that document speaks for itself. Defendant denies the remaining allegations contained in paragraph 21 of Plaintiff's complaint for declaratory relief.

22. The driver's signature on the Bill of Lading verified the product was in good condition at the time of loading into the Bukhara trailer. (Exhibit 4).

Answer: Defendant admits only that Exhibit 4 appears to be copy of the Bill of Lading and that that document speaks for itself. Defendant denies the remaining allegations contained in paragraph 22 of Plaintiff's complaint for declaratory relief.

23. On October 12, 2022, when Bukhara made delivery of the cargo to the Sysco facility in Knoxville, Tennessee, the pulp temperature of the product comprising the cargo ranged from 29 to 46 degrees.

Answer: Defendant admits that on October 12, 2022 it made a delivery of product to the Sysco facility in Knoxville, Tennessee. Defendant denies the remaining allegations

contained in paragraph 23 of Plaintiff's complaint for declaratory relief.

24.     The high temperatures referred to in ¶ 17 above, were noted on the Bill of Lading. (See Exhibit 3).

Answer:     Defendant admits only that Exhibit 3 appears to be a copy of the Bill of Lading and that that document speaks for itself. Defendant denies the remaining allegations contained in paragraph 24 of Plaintiff's complaint for declaratory relief.

25.     Due to the high temperatures, Sysco deemed the contents of the cargo to be unsafe and rejected the cargo.

Answer:     Defendant admits only that Sysco rejected the contents and denies the remaining allegations contained in paragraph 25 of Plaintiff's complaint for declaratory relief.

26.     On October 12, 2022, upon making delivery of the now damaged cargo, Bukhara was notified that either the broker, Schmieding, or the shipper, Sysco, would be making a claim ("the claim").

Answer:     Defendant admits only that, at some point, it was notified that a claim was going to be made related to the contents it transported for Schmieding and denies the remaining allegations contained in paragraph 26 of Plaintiff's complaint for declaratory relief.

27.     Bukhara did not accept liability for damaging the cargo.

Answer:     Defendant admits the allegations contained in paragraph 27 of Plaintiff's complaint for declaratory relief.

28.     On January 10, 2023, Schmieding, as the broker, filed suit against Bukhara in the United States District Court for the Western District of Arkansas, Fayetteville Division in the matter entitled, *H.G. Schmieding, v. Bukhara Trans., Inc.,* Case No 5:23-cv-05011-TLB seeking to recover damages in the amount of $113,277.64. ("the Schmieding lawsuit"). (**Exhibit 6**).

Answer:       Defendant admits the allegations contained in paragraph 28 of Plaintiff's complaint for declaratory relief.

29.    The Schmieding lawsuit seeks to recover damages in the amount of $113,277.64 from Bukhara.

Answer:       Defendant admits the allegations contained in paragraph 29 of Plaintiff's complaint for declaratory relief.

30.    On May 11, 2023, Progressive declined to provide coverage to Bukhara for the claim.

Answer:       Defendant admits the allegations contained in paragraph 30 of Plaintiff's complaint for declaratory relief.

## APPLICABLE TERMS OF THE POLICY

31.    The policy provides, in pertinent part, as follows: **Form 6912 (02/19)**

## COMMERCIAL AUTO POLICY

## GENERAL DEFINITIONS

The words and phrases below, whether in the singular, plural or possessive, have the following specific meanings when appearing in boldface type in this policy, and in endorsements issued in connection with this policy, unless specifically modified.

1.    "**Accident**" means a sudden, unexpected and unintended event, or a continuous or repeated exposure to that event, that causes **bodily injury** or **property damage**.

\* \* \*

15.    "**Property damage**" means physical damage to, destruction of, or loss of use of, tangible property.

\* \* \*

## PART 1-LIABILITY TO OTHERS

8

## INSURING AGREEMENT-LIABILITY TO OTHERS

Subject to the Limits of Liability, if **you** pay the premium for liability coverage for the **insured auto** involved, **we** will pay damages, other than punitive or exemplary damages, for **bodily injury**, **property damage**, and **covered pollution cost or expense** for which an **insured** becomes legally responsible because of an accident arising out of the ownership, maintenance or use of that **insured auto**. However, we will only pay for the covered pollution cost or expense if the same **accident** also caused **bodily injury** or **property damage** to which this insurance applies.

**We** will settle or defend, at **our** option, any claim or lawsuit for damages covered by this Part I. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the Limit of Liability for this coverage has been exhausted by payment or judgments or settlements.

\*\*\*

## EXCLUSIONS-PLEASE READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE FOR AN ACCIDENT OR LOSS WILL NOT BE AFFORDED UNDER THIS PART-I LIABILITY TO OTHERS.

Coverage under this Part I, include **our** duty to defend, does not apply to:

1. **Expected or Intended Injury**
   **Bodily injury** or **property damage** either expected by or caused intentionally by or at the direction of any **insured**.

\*\*\*

**Form Z434 IL (02/19)**

## MOTOR TRUCK CARGO LEGAL LIBILITY
## COVERAGE ENDORSEMENT

Except as specifically modified by this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with you that the insurance provided under your Commercial Auto Policy is modified as follows:

## INSURING AGREEMENT-LOSS TO COVERED PROPERTY

Subject to the Limit of Liability, if you pay the premium for this Motor Truck

9

Cargo Legal Liability Coverage, **we** will pay for the direct physical **loss** to **covered property** that **you** are legally liable to pay as a **trucker** under a written: bill of lading, tariff document, rate confirmation sheet, shipping receipt, or contract of carriage. For this coverage to apply, the **covered property** must, at the time of loss, be in your exclusive physical custody and control:

1.      while **in due course of transit** in, on, or attached to an **insured auto**; or
2.      during **loading or unloading**.

Coverage applies for **loss** to **covered property** only if the loss is caused by a **covered peril**. For **covered property** that is **your** property, **our** payment is not contingent upon **your** liability.

**We** have the option to settle or defend any claim or lawsuit for damages covered by this endorsement. However, **we** have no duty to defend **you** against any lawsuit to which this insurance does not apply. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the limit of liability for this **covered property** coverage has been exhausted by payment of judgments or settlements.

\* \* \*

## ADDITIONAL DEFINITIONS

The following additional define apply only to Motor Truck Cargo Legal Liability Coverage, as set forth in this endorsement, and any endorsements thereto that solely pertain to this coverage, whenever the defined term appears therein in boldface type, whether in the singular, plural, or possessive:

2.      "**Covered peril**" means any external risks of direct physical **loss** to **covered property** or **business equipment**, except for those listed in a. through m. below as Excluded Perils.

<u>**Excluded Perils**</u>: Please read the following list of excluded perils carefully. Coverage will not be afforded under this Motor Truck Cargo Legal Liability Coverage endorsement for these types of perils. **We** will not pay for any **losses** to **covered property** or business equipment caused by, resulting in or from, or arising out of these excluded peris regardless of any other cause or even that contributes concurrently or in any sequence to the **loss**.

d.      **Inherent Vice**
Deterioration; wear and tear; obsolescence; hidden or latent defect; gradual decay fungus; mildew; mold; rot; rust; insects; vermin; change in flavor; or any quality; fault, or weakness in the **covered property** or **business equipment** that caused it to damage or destroy itself.

g.      **Wetness, Breakdown, Temperature, Humidity**

(i)        Mechanical or electrical breakdown or failure including breakdown or failure of a refrigeration unit or its associate component parts, or heating equipment installed in a cargo component; or

    (ii)        Wetness, humidity, dampness, dryness, or changes in or extremes of temperature unless it results from damage to an **insured auto**.
However, this Excluded Peril does not apply to **loss** caused by a fire or explosion if such fire or explosion would be covered under this endorsement.

m.      **Corrosion, Contamination**
**We** will not pay for corrosion, contamination, marring or scratching to any **covered property** or **business equipment** unless it results from damage to an **insured auto**.

\*\*\*

**Form Z440 (06/10)**

### REFRIGERATION BREAKDOWN COVERAGE ENDORSEMENT

This endorsement modifies the Motor Truck Cargo Legal Liability Coverage endorsement. Except as specifically modified by this Refrigeration Breakdown Coverage endorsement, all provisions of the Motor Truck Cargo Legal Liability Coverage endorsement apply.

**We** agree with **you** that the insurance provided under **your** Motor Truck Cargo Legal Liability Coverage endorsement is modified as follows:

### INSURING AGREEMENT

The following is added to the Insuring Agreement:

Subject to the Limit of Liability, if **you** pay the premium for the Refrigeration Breakdown Coverage endorsement, **we** will pay for **your** legal liability for direct physical **loss** to **covered property**, caused by spoilage or change in temperature, resulting directly from the sudden and accidental breakdown of refrigeration or heating units on an **insured auto**.

\*\*\*

### ADDITIONAL DEFINITIONS

Under the definition of "**covered peril**", Excluded Peril "g." is deleted and

11

replaced by:

g. **Breakdown, Temperature, Humidity**

(i) Humidity, dampness, dryness, or changes in or extremes of temperature, other than such **loss** caused by the sudden and accidental breakdown of refrigeration or heating units on the **insured auto**; or

(ii) Mechanical or electrical breakdown or failure, other than the sudden and accidental breakdown of refrigeration or heating units on the **insured auto**. However, this Excluded Peril does not apply to **loss** caused by a fire or explosion if such fire or explosion would be covered under this endorsement.

* * *

## EXCLUSIONS

The following exclusions are added:

Coverage under this Refrigeration Breakdown Coverage endorsement will not apply for **loss** caused by, resulting from, or arising out of breakdown of the refrigeration or heating unit due to any of the following, regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**:

1. Failure to provide adequate fuel supply;
2. Failure to maintain crankcase oil or refrigerant level within the manufacturer's specifications;
3. Intentional destruction or damage to automatic temperature control units by an employee; or
4. Failure to maintain the calibration of the refrigeration or heating unit and/or failure to maintain the refrigeration or heating unit within the manufacturer's specifications.

* * *

<u>Answer</u>:     Defendant admits only that Exhibit 1 appears to be a copy of the Progressive policy issued to Bukhara and that that document speaks for itself.

## REQUEST FOR DECLARATION

32.    No coverage is afforded under the policy for the claim for the following reasons:

A.    The damage to the cargo was not an "accident" as that term is defined by and used in the policy;

      B.     The damage to the cargo was "expected or intended...property damage" as that phrase is defined by and used in the policy;

      C.     The damage to the cargo is due to the deterioration, wear and tear, gradual decay, fungus, mold, change in flavor, quality, fault, or weakness of the cargo that causes it to damage or destroy itself within the meaning of the "Inherent Vice" exclusion of the Motor

               Truck Cargo Legal Liability Coverage endorsement (Form Z434 IL (02/19);

      D.     The damage to the cargo was the result of "changes in ... temperature" within the meaning of the Wetness, Breakdown, Temperature Humidity exclusion of the Motor Truck Cargo Legal Liability Coverage endorsement (Form Z434 IL (02/19);

      E.     The damage to the cargo was the result of "corrosion" and/or "contamination" within the meaning of the Corrosion, Contamination exclusion of the Motor Truck Cargo Legal Liability Coverage endorsement (Form Z434 IL (02/19); and

      F.     The damage to the cargo is not within the Breakdown, Temperature Humidity "covered peril" of the Refrigeration Breakdown Coverage Endorsement (Form Z440 (06/10).

<u>Answer</u>:     Defendant denies the allegations contained in paragraph 32 of Plaintiff's complaint for declaratory relief.

33.     As the damage to the cargo arose out of Bukhara's failure to transport the load in accordance with the food safety and security instructions and lack of a refrigeration unit, Progressive's Commercial Auto Policy excludes coverage under the Policy for damages to the cargo alleged in the underlying Complaint.

<u>Answer</u>:     Defendant denies the allegations contained in paragraph 33 of complaint for declaratory judgment.

34.     For the foregoing reasons, the damage to the cargo is not covered by the policy and Progressive is not required to either defend or indemnify Bukhara for the allegations raised in the Schmieding lawsuit.

Answer: Defendant denies the allegations contained in paragraph 34 of Plaintiff's complaint for declaratory relief.

WHEREFORE, Defendant, BUKHARA TRANS, INC. denies that Plaintiff is entitled to the relief requested in its complaint for declaratory relief and prays that this Court and find and declare that Plaintiff has an obligation to defend and/or indemnify Defendant Bukhara with respect to the Schmieding lawsuit, and for any other relief this Court deems equitable and just.

## **AFFIRMATIVE DEFENSES**

NOW COMES Defendant, BUKHARA TRANS, INC. ("Bukhara") by and through one of its attorneys, Andrea M. Ross of Stone & STONE & JOHNSON, CHARTERED, and for its Affirmative Defenses to Plaintiff ARTISAN AND TRUCKERS CASUALTY COMPANY'S ("Progressive") Complaint for Declaratory Relief, states as follows:

### **ESTOPPEL**

1.      On January 10, 2023, Schmieding, as the broker, filed suit against Bukhara in the United States District Court for the Western District of Arkansas, Fayetteville Division in the matter entitled, *H.G. Schmieding, v. Bukhara Trans., Inc.,* Case No 5:23-cv-05011-TLB seeking to recover damages in the amount of $113,277.64. ("the Schmieding lawsuit").

2.      On May 11, 2023, Progressive sent a letter to Bukhara denying coverage for the Schmieding lawsuit.

3.      Progressive did not defend Bukhara under a reservation of rights in the Schmieding lawsuit.

4.      Due to Progressive's wrongful refusal to defend and indemnify Bukhara in the Schmieding lawsuit, a default judgment was entered against Bukhara on June 2, 2023 in the amount of $119,133.30 plus post-judgment interest.

5.      Progressive filed its complaint for declaratory relief on July 10, 2023, seeking a declaration that it had no duty to defend and/or indemnify Bukhara in the Schmieding lawsuit.

6.      Progressive did not file its complaint declaratory relief regarding its duty to defend until over a month after a default judgment had already been entered against Bukhara in the Schmieding lawsuit.

7.   Progressive did not defend Bukhara under a reservation of rights and Progressive's declaratory judgment action is untimely as it was not instituted until after a default judgment was entered against its insured Bukhara.

8.   As a result of its breach of its duty to defend its insured, Progressive is estopped from asserting any policy defenses to coverage and is responsible to indemnify for the default judgment entered against Bukhara.

WHEREFORE, Bukhara prays that this Honorable Court enter a judgment finding and declaring that Progressive is estopped from asserting any coverage defenses regarding its duty to defend and indemnify Bukhara against the Schmieding lawsuit, that Progressive must reimburse all defense fees and costs incurred by Bukhara, and for any other relief this Court deems equitable and just.

## BUKHARA TRANS, INC.'S COUNTERCLAIM

NOW COMES Defendant/Counter-Plaintiff BUKHARA TRANS, INC. ("Bukhara") by and through one of its attorneys, Andrea M. Ross of STONE & JOHNSON, CHTD., and for its Counterclaim against Plaintiff/Counter-Defendant ARTISAN AND TRUCKERS CASUALTY COMPANY ("Progressive") states as follows:

## <u>GENERAL ALLEGATIONS</u>

1.      Defendant/Counter-Plaintiff, Bukhara, is an Illinois Corporation with its principal

Place of business located at 1400 Light Road, Apt. 103, Oswego, Illinois.

2. Plaintiff/Counter-Defendant, Progressive, is an Ohio corporation with its principal place of business in the State of Ohio. At all relevant times, Progressive was and is authorized to issue policies of insurance in the State of Illinois.

3. Progressive issued a Commercial Auto Insurance Policy to Bukhara under policy number 945885810 for the policy period of January 26, 2022 through January 26, 2023. A copy of the policy is attached to Progressive's complaint for declaratory relief as Exhibit 1. ("the Progressive policy")

4. The Progressive policy issued to Bukhara included an Auto coverage part with liability limits of $1,000,000 for bodily injury and property damage.

5. The Progressive policy issued to Bukhara included a Commercial General Liability coverage with liability limits $1,000,000.00 per occurrence and $2,000,000 aggregate.

6. The Progressive policy issued to Bukhara also included Motor Truck Cargo coverage with $100,000 limits.

7. On January 10, 2023, a lawsuit was filed against Bukhara in the United States District Court for the Western District of Arkansas, Fayetteville Division in the matter entitled, *H.G. Schmieding, v. Bukhara Trans., Inc.,* Case No 5:23-cv-05011-TLB seeking to recover damages in the amount of $113,277.64. ("the Schmieding lawsuit"). A copy of that suit is attached as Exhibit 6 to Plaintiff's complaint for declaratory relief.

8. The Schmieding lawsuit alleges that Bukhara's negligence in transporting certain products proximately caused that property to be damaged, resulting in damages to the plaintiff in that suit.

9. Bukhara tendered the Schmieding lawsuit to Progressive and sought defense and

indemnification from Progressive based on a policy of insurance issued by Progressive to Bukhara.

10.     Progressive has refused to defend and indemnify Bukhara for the claims brought against Bukhara in the Schmieding lawsuit.

11.     Due to Progressive's wrongful refusal to defend and indemnify Bukhara in the Schmieding lawsuit, a default judgment was entered against Bukhara on June 2, 2023 in the amount of $119,133.30 plus post-judgment interest.

12.     Progressive filed a complaint for declaratory relief on July 10, 2023, more than a month after the default judgment was entered against Bukhara in the Schmieding lawsuit.

13.     Bukhara's claims brought pursuant to this Counterclaim arise out of the same transaction and involve the same parties that are the subject of the complaint brought by Progressive against Bukhara.

### COUNT I – BREACH OF CONTRACT

14.     Bukhara incorporates paragraphs 1-13 above as if set forth fully herein.

15.     Bukhara is a named insured under the Progressive policy and Progressive owes a duty to defend and indemnify under that policy pursuant to the Commercial General Liability coverage portion, Motor Truck Cargo coverage portion and/or Auto coverage portion as the Schmieding complaint alleges Bukhara's negligence proximately caused the plaintiff in the Schmieding case to suffer property damage.

16.     Progressive refused to defend and/or indemnify its insured, Bukhara, for the Schmieding lawsuit.

17.     Bukhara substantially performed its obligations pursuant to the contracted for insurance between it and Progressive.

18.     Progressive breached its duties pursuant to the contracts for insurance between it and Bukhara by refusing to defend and/or indemnify Bukhara for the Schmieding lawsuit.

19.     As a result of Progressive's breach of contract, a default judgment was entered against Bukhara in the Schmieding lawsuit in the amount of $119,133.30, plus post-judgment interest.

20.     Additionally, a subsequent garnishment action was instituted against Bukhara in which Bukhara entered into a settlement agreement and agreed to pay $123,000 to satisfy the default judgment plus post-judgment interest entered against it in the Schmieding lawsuit.  See **Ex. A** – Settlement Agreement.

21.     Bukhara has suffered damages as a result of Progressive's breach of contract in that Bukhara must pay $123,000 to satisfy the judgment entered against it in the Schmieding lawsuit without indemnification from its insurer, Progressive.

WHEREFORE, Defendant/Counter-Plaintiff BUKHARA TRANS, INC. prays that this Court grant judgment in its favor and against Plaintiff/Counter-Defendant ARTISAN AND TRUCKERS CASUALTY COMPANY, and order that

A.     Monetary damages of $123,000, plus direct and consequential damages;

B.     Pre-judgment interest, costs, expenses, and attorneys' fees; and,

C.     Such other and further relief that this Court deems equitable and just.

.

## COUNT II – DAMAGES UNDER
## SECTION 155 OF THE ILLINOIS INSURANCE CODE

22.     Bukhara incorporates and re-alleges paragraphs 1-21 of this Complaint as if fully set forth herein.

23.     Section 155 of the Illinois Insurance Code provides:

(1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling the claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable cost in the action, reasonable attorney's fees, other costs, plus an amount not to exceed any one of the following amounts:

(a)      60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

(b)      $60,000;

(c)      the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

24.      The Schmieding lawsuit was filed against Bukhara on January 10, 2023.

25.      Progressive wrongfully refused to defend Bukhara in the lawsuit.

26.      Progressive sent a letter to Bukhara on May 11, 2023 stating that it would not provide Bukhara with a defense in the Schmieding lawsuit.

27.      Due to Progressive's wrongful failure to defend Bukhara, Bukhara was without representation in the Schmieding lawsuit and a default judgment was entered against Bukhara on June 2, 2023.

28.      After a default judgment was entered against Bukhara in the Schmieding lawsuit, a subsequent garnishment action was instituted against Bukhara.

29.      Progressive failed to defend Bukhara in the Schmieding lawsuit and failed to file a complaint for declaratory judgment for months while Bukhara was left with no defense in the Schmieding lawsuit and in the subsequent garnishment action.

30.      Eventually Bukhara entered into a settlement agreement and payment plan in that garnishment action as to the default judgment previously entered against Bukhara in the Schmieding lawsuit. See Settlement Agreement attached as **Ex. A**.

31.     Progressive acted unreasonably and vexatiously by wrongfully failing to defend its insured Bukhara in the Schmieding lawsuit, even under a reservation of rights, which ultimately resulted in a judgment against Bukhara and subsequent garnishment action.

32.     Progressive's unreasonable and vexatious actions as described above violated Section 155 of the Illinois Insurance Code.

WHEREFORE, Defendant/Counter-Plaintiff BUKHARA TRANS, INC. prays that this Court grant judgment in its favor and against Plaintiff/Counter-Defendant ARTISAN AND TRUCKERS CASUALTY COMPANY, and award the following relief:

A.      Statutory damages in the amount of $60,000;

B.      Consequential damages;

C.      Attorneys' fees and costs; and

D.      Such other and further relief that this Court deems equitable and just.

**COUNT III**
**Estoppel**

33.     Plaintiff incorporates paragraphs 1 through 32 as though set forth fully herein.

34.     Progressive breached its duty to defend Bukhara against the Schmieding litigation by failing to defend Bukhara under a reservation of rights in that litigation.

35.     Progressive did not file a complaint for declaratory relief regarding its duty to defend until over a month after a default judgment was entered against Bukhara in the Schmieding lawsuit.

36.     Progressive did not defend Bukhara under a reservation of rights and Progressive's declaratory judgment action was untimely as it was not instituted until after a default judgment was entered against its insured Bukhara.

37.     As a result of its breach of its duty to defend its insured, Progressive is estopped from asserting any policy defenses to coverage and is responsible to indemnify for the default judgment entered against Bukhara.

WHEREFORE, Bukhara prays that this Honorable Court enter a judgment finding and declaring that Progressive breached its duty to defend and indemnify Bukhara in the Schmieding lawsuit, that Progressive must reimburse all defense fees and costs incurred by Bukhara, and that Progressive is estopped from asserting any coverage defense to its duty to defend and indemnify Bukhara against the Schmieding lawsuit, and for any other relief this Court deems equitable and just.

Respectfully submitted,

**BUKHARA TRANS, INC.**

By: /s/ Andrea M. Ross
Andrea M. Ross,
Attorney for Defendant Bukhara Trans, Inc.
Stone & Johnson, Chtd.
111 West Washington St., Suite 1800
Chicago, Illinois 60602
(312) 332-5656
E-Mail: ARoss@stonejohnsonlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 10, 2023, I electronically filed the foregoing Answer and Counterclaim with the Clerk of the Court using the CM/ECF system, which sends electronic notification to all registered participants of such filings to all attorneys of record.


<u>/s/ Andrea M. Ross</u>
Andrea M. Ross

# SETTLEMENT AGREEMENT

**THIS SETTLEMENT AGREEMENT** (this "**Agreement**") is made effective as of the _24_ day of August 2023, (the "**Execution Date**") by and between H.C. Schmieding Produce Company, LLC ("**Schmieding**") and Bukhara Trans, Inc. ("**Bukhara**"). Schmieding and Bukhara may be individually referred to herein as a "**Party**" and are collectively referred to herein as the "**Parties.**"

**WHEREAS,** Schmieding obtained a judgment against Bukhara in a case styled _H.C. Schmieding Produce Company, LLC v. Bukhara Trans, Inc._, Case No. 5:23-cv-5011 in the U.S. District Court of the Western District of Arkansas; and,

**WHEREAS,** the judgment was domesticated in the District Court of Johnson County, Kansas, and a garnishment action was initiated styled _H.C. Schmieding Produce Company, LLC v. Bukhara Trans, Inc. v RTS Financial Service, Inc. ("RTS")_ as the garnishee. Case No. 2023-cv-03571; and,

**WHEREAS,** the Parties have reached an agreement in the form of a payment plan for Bukhara to pay the judgment obtained by Schmieding over time; and,

**WHEREAS,** RTS Financial Service, Inc. has agreed to facilitate the payment plan in conjunction with a Letter Agreement between RTS and the Parties, executed by the Parties on _8/24/23_, ("Letter Agreement"), and which the execution and performance of such Letter Agreement is a material term and condition of this Agreement; and,

**WHEREAS,** the Parties agree to release the pending garnishment and the funds currently held by RTS pursuant to such garnishment, and satisfy the agreed upon judgment amount, on the terms set forth herein.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. **Execution of the Letter Agreement.** The Parties agree that each will execute and perform the Letter Agreement and any other documents necessary to facilitate such agreement for payment of the Judgment Amount through the facilitation of RTS.

2. **Payment.** Bukhara shall pay to Schmieding the sum of One Hundred and Twenty-Three Thousand, and No/100 Dollars ($123,000.00) (the "**Judgment Amount**"). Payment to be made in 12 monthly payments of Ten Thousand Two Hundred Fifty and 00/100 Dollars ($10,250.00) beginning September _5th_, 2023, and made pursuant to the RTS Letter Agreement every month until paid in full.

Exhibit "A"

a. If for any reason, the Letter Agreement is terminated by its terms or by a breach, prior to full payment of the Judgment Amount, Bukhara agrees to continue timely payments of the Judgment Amount directly to Schmieding in the amounts agreed upon in the Letter Agreement, and as stated above.

b. Bukhara agrees and acknowledges this payment plan is in lieu of the above referenced garnishment on funds held by RTS and that any breach or default of this Agreement or the RTS Letter Agreement will result in additional collection actions against it for the outstanding and unpaid Judgment Amount, as well as any costs and expense incurred as a result of the collection efforts.

c. Bukhara agrees and acknowledges that Schmieding is willing to forgo the funds held by RTS pursuant to the garnishment based on the reliance of the representations and warranties of Bukhara: i) that it needs the funds held to continue operations, ii) that it intends to use such funds to continue operations; and, iii) that it does not intend to, and will not, file for bankruptcy during the time of payment of the judgment up until 91 days after the last payment made to satisfy the judgment.

3. **Stay of Garnishment.** As soon as practicable, following execution of this Agreement and the Letter Agreement, Schmieding shall cause the garnishment to be stayed by submitting a joint proposed order staying the garnishment order, and releasing the funds held by RTS, during the payment of the Judgment Amount pursuant to the Letter Agreement.

4. **Representations and Warranties.** The Parties mutually warrant and represent that (a) they have the necessary power and authority to execute and deliver this Agreement, individually or in the capacity in which such party executes this Agreement; (b) they have not been coerced or in any way unduly influenced into signing this Agreement or any other document required herein; (c) their signatures are a voluntary act, following consultation with counsel of their choice; and (d) none of them have heretofore assigned or transferred or purported to assign or transfer to any person not a party hereto any claims, demands, obligations, losses, causes of action, liabilities, invoices, and indemnities released hereunder.

Bukhara represents and warrants that it needs the funds currently held by RTS pursuant to the garnishment action to continue operations. Bukhara further represents and warrants that it intends to use such funds to continue operations; and that it does not intend to, and will not, file for bankruptcy during the time of payment of the judgment up until 91 days after the last payment made to satisfy the judgment.

Bukhara acknowledges and understands that Schmieding has reasonably relied on the representations and warranties of Bukhara in entering into this Agreement and the Letter Agreement, and any breach of such warranties or representations will cause Schmieding damages.

5.      **Joint Preparation.** Each of the Parties to this Agreement is willing to and does assume joint responsibility for the form and composition of each and all of the contents of this Agreement. The Parties further agree the terms of this Agreement shall be interpreted and construed as though each of them participated equally in its preparation.

6.      **Binding Nature.** To the fullest extent allowed by law, the terms of this Agreement shall be binding upon the shareholders, directors, officers, employees, agents, subsidiaries, parent company, affiliates, heirs, executors, administrators, successors and assigns of the Parties.

7.      **Severability.** If any provision of this Agreement is held to be invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

8.      **Counterparts/Execution.** This Agreement may be executed in counterparts, each of which shall be an original, but which together constitute one and the same instrument, and in pleading or proving any provision of this Agreement it shall not be necessary to produce more than one counterpart. The counterparts of this Agreement may be executed and delivered by facsimile, pdf or similar file type transmitted *via* electronic mail, cloud-based server, e-signature technology or other similar electronic means and the receiving Party may rely on the receipt of such document so executed and delivered by facsimile or other electronic means as if the original had been received.

9.      **Governing Law; Venue.** All questions concerning the construction, interpretation, validity and enforceability of this Agreement shall be governed by and construed and enforced in accordance with the domestic laws of the State of Arkansas, without giving effect to any choice or conflict of law provision or rule that would cause the laws of any jurisdiction other than the State of Arkansas to apply.

10.     **Full and Independent Knowledge.** The Parties represent they have discussed thoroughly all aspects of this Agreement with their respective attorneys, fully understand all of the provisions of the Agreement, and are voluntarily entering into this Agreement.

11.     **Attorneys' Fees and Costs.** The Parties will bear their own respective costs and fees, including attorneys' fees, incurred in connection with negotiation and execution of this Agreement and the Litigation. If, however, any Party breaches any terms of this Agreement, to the extent authorized by Arkansas law, the breaching Party will be responsible for payment of all reasonable attorneys' fees and costs that any non-breaching Party incurred in the course of enforcing the terms of the Agreement, including demonstrating the existence of a breach and any other contract enforcement efforts.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Execution Date above.

**H.C. SCHMIEDING PRODUCE COMPANY, LLC**

By: _____

Printed Name:    Chris Gryskiewicz

Title:   CFO

**BUKHARA TRANS, INC.**

By: _____

Printed Name:  FAKHRIDDIN AVEZOV

Title:  PRESIDEN

*[Signature Page to Settlement Agreement]*

**RTS** FINANCIAL™

**Letter Agreement**
**AUGUST 24 , 2023**

**RTS Financial Service, Inc.** ("RTSF") purchases, at its sole option and in accordance with the terms of a Factoring Agreement (the "Factoring Agreement") between **RTSF** and **BUKHARA TRANS, INC.** (the "Customer"), accounts of Customer. Following each such purchase, RTSF may fund a portion of the face amount of each account purchased by RTSF from Customer (each such funding being a "Funding").

**H.C. SCHMIEDING PRODUCE COMPANY, LLC** ("SCHMIEDING") has obtained a judgment against Customer in the approximate amount of $123,000.00 (the "Judgment Amount") as evidenced by a Writ of Garnishment recently sent by Schmieding to RTSF. The parties have agreed that, upon full execution of this Letter Agreement, RTSF may continue to send funds to Customer in accordance with the terms of the Factoring Agreement and without violating the terms of the Writ of Garnishment; provided, however, that RTSF will, prior to sending any funds to Customer, send the following amounts to Schmieding on Customer's behalf out of any available funds in Customer's accounts with RTSF (collectively, the "Payments"): **$10,250.00 per month commencing on** 9/5/23**, and continuing monthly thereafter for a total of 12 months and Schmieding informs RTSF that the Judgment Amount has been paid in full.**

Customer hereby consents and irrevocably authorizes/directs RTSF to remit the Payments directly to Schmieding at the wiring instruction contained below. RTSF's remittances to Schmieding hereunder shall be subject to the following conditions:

    1) Customer is not in default of its obligations to RTSF under the Factoring Agreement;
    2) No third party has a valid claim for such funds;
    3) Such payments by RTSF to Schmieding are understood by Schmieding to be made solely from available Fundings and do not constitute a guarantee of payment, or assumption, by RTSF of Customer's obligation to Schmieding;
    4) Any and all amounts paid by RTSF to Schmieding in accordance with the terms and conditions of this Agreement shall be deemed to have been disbursed in full to Customer for purposes of calculating RTS' obligations to Customer under the Factoring Agreement; and
    5) Nothing herein shall relieve Customer of its obligations relating to the Judgment directly to Schmieding.

If RTSF is unable to send the full amount of the Payment any month due to minimal activity by the Customer, issues with the Customer's accounts resulting in a default or shortage of funds available to address Customer's obligations to RTSF, or for any other reason, this Agreement shall immediately terminate and each party shall have the ability to exercise their legal rights against the other parties.

This Letter Agreement does NOT constitute a subordination in favor of Schmieding of RTSF's existing security interest in any assets of Customer. No person other than Schmieding and RTSF shall have any right, benefit, priority, or interest under or because of the existence of this Letter Agreement.

This Letter Agreement may be executed in multiple counterparts, each of which shall for all purposes be deemed to be an original and all of which, when taken together, shall constitute one and the same instrument. This Letter Agreement may be executed and delivered by facsimile or email (including PDF format) and delivery in such manner shall be deemed to be an original document. Any notice to be given hereunder by any party hereto to any other party hereto shall be in writing and delivered personally or sent by registered or certified mail (including by overnight courier such as FedEx or express mail service),

**RTS** FINANCIAL™

postage or fees prepaid to the addresses set forth below or at such other address for a party as shall be specified by like notice.

**JURY WAIVER.** EACH PARTY ACKNOWLEDGES AND AGREES THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT.

This Letter Agreement shall be construed in accordance with and governed by the laws of the State of Illinois without giving effect to the principles of conflicts of law thereof.

**Bukhara Trans, Inc.**

Name: FAKHRIDDIN AVEZOV
Title: PRESIDENT
Address: 3220 BLAINE CT W
            AURORA, IL 60504

**RTS Financial Service, Inc.**

Name: Brent Hansen
Title: Asst Director of Operations
Address: 9300 Metcalf Ave
            Overland Park, KS 66226

**H.C. Schmieding Produce Company, LLC**

Name: Chris Grzekiewicz
Title: CFO
Address: 2230 N. Thompson St.
            Springdale, AR 72764

**WIRE INSTRUCTIONS**

**Wire Instructions**   Provided to RTS under separate cover
Bank Name:
Bank Address:
Bank City, State, Country:
ABA/Routing Number:
Account Number:
Beneficiary Name:
Reference #1:
Reference #2:

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF NextGen 1.7.1.1**
**Eastern Division**

Artisan and Truckers Casualty Company

　　　　　　　　　　　　　Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　Case No.: 1:23−cv−04439
　　　　　　　　　　　　　　　　　　　　　Honorable Martha M. Pacold

Bukhara Trans, Inc.

　　　　　　　　　　　　　Defendant.

---

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Monday, August 26, 2024:

　　　　MINUTE entry before the Honorable Jeffrey Cole: Video status conference held. Although fact discovery is scheduled to end on 9/20/24, [57], defense counsel has this morning, informed plaintiff's counsel that the depositions, which plaintiff has been trying unsuccessfully to schedule, will have to run through the first half of October even though fact discovery is scheduled to end on 9/20/24. [57]. Counsel are reminded that they do not own the discovery schedule. In any event, the remaining depositions shall go forward and be completed not later than 10/14/24 the date which imposed by the defendant's counsel on the Court and the plaintiff's lawyer. If the lawyers continue to disagree on deposition dates, they will be set by the Court, and in no event will go beyond 10/14/24. Accordingly, fact discovery is extended from 9/20/24 to 10/14/24. It may be noted that this will be the 4th extension. The Motions For Sanctions [49] has been responded to by the defendant&#039;s counsel [51], who represents that any delay was due to the defendant's difficulty in securing the requested documents and verifying response to the interrogatories. [51]. The defendant has represented that it is amenable to paying reasonable attorney's fees incurred by the defendant's delay in issuing its discovery responses. [51]. Accordingly, the Motions For Sanctions [49] is denied in part, except for that portion which concedes that the defendant shall pay reasonable attorney's fees in connection with the motion. See *Rickels v. City of South Bend, Indiana,* 33 F.3d 785, 786−87 (7th Cir. 1994)("'The great operative principle of Rule 37(a)(4) is that the loser pays.' Fee shifting when the judge must rule on discovery disputes encourages their voluntary resolution and curtails the ability of litigants to use legal processes to heap detriments on adversaries (or third parties) without regard to the merits of the claims."). The plaintiff shall submit an itemized fee request to defense counsel with a copy to be filed on the record, not later than 9/3/24. In response, if any is thought necessary, will be filed by 9/10/24. If no response is filed, the request for attorney&#0;39;s fees will be honored by the defendant, not later than 9/17/24. The next video status conference is set for 8/27/24 at 9:30am in order to be able to provide firm dates for the depositions. Instructions will be emailed to counsel. Members of the public and media will be able to call in to listen to this hearing. Please call (855) 244−8681, access code 1807229989#. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media

credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Emailed notice (yt)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF NextGen 1.7.1.1
### Eastern Division

Artisan and Truckers Casualty Company

                  Plaintiff,

v.                                 Case No.: 1:23–cv–04439

                                 Honorable Martha M. Pacold

Bukhara Trans, Inc.

                  Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, August 27, 2024:

      MINUTE entry before the Honorable Jeffrey Cole: In light of the fact that the fact discovery schedule has been extended from 9/20/24 to 10/14/24, [61], the dispositive motions shall be filed and noticed by 10/28/24. Response is due by 11/27/24. Reply is due by 12/10/24. Emailed notice (yt)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at **www.ilnd.uscourts.gov**.

# EXHIBIT 5



May 19, 2023
Policy Number: 945885810-001
Claim Number: 22-8735713


Artisan and Truckers Casualty Company


I certify that each of the following is true regarding the attached records, to the best of my knowledge and belief:

1. I am an employee familiar with the manner and process in which these records are created and maintained by virtue of my duties and responsibilities;

2. The records were made at or near the time of the occurrences of the matters set forth by, or from information transmitted by, people with knowledge of those matters;

3. The records were kept in the course of regularly conducted business activity; and

4. It was the regular practice of the business activity to make the record.


*Jennifer Castell*

Jennifer Castell

COLONIAL INS SERVICE
3845 HOLCOMB BRIDGE R
NORCROSS, GA 30092

**PROGRESSIVE®**
COMMERCIAL

Named insured

Bukhara Trans Inc
1400 LIGHT RD. APT 103
OSWEGO, IL 60543

**Policy number:  945885810**

Underwritten by:
Artisan and Truckers Casualty Co
October 13, 2022
Policy Period: Jan 26, 2022 - Jan 26, 2023
Page 1 of  5

**agent.progressive.com**
**Online Service**
Make payments, check billing activity, print policy documents, update your policy or check the status of a claim.

**1-678-257-2450**
**COLONIAL INS SERVICE**
Contact your agent for personalized service.

**1-800-444-4487**
For customer service if your agent is unavailable or to report a claim.

# Commercial Auto
# Insurance Coverage Summary
## This is your Declarations Page
## Your coverage has changed

Your coverage began on January 26, 2022 at 12:01 a.m.  This policy expires on January 26, 2023 at 12:01 a.m.

This coverage summary replaces your prior one. Your insurance policy and any policy endorsements contain a full explanation of your coverage. The policy limits shown for an auto may not be combined with the limits for the same coverage on another auto, unless the policy contract allows the stacking of limits. The policy contract is form 6912 (02/19). The contract is modified by forms 2852IL (02/19), Z433IL (04/08), 2371 (06/10), Z434IL (02/19), Z440 (06/10), MCS90 (99/99), 1198 (07/16), 4717 (02/19), 4852IL (02/19), 4881IL (02/19) and Z228 (01/11).

The named insured organization type is a corporation.

Artisan and Truckers Casualty Co is a stock company (NYSE:PGR).
PO Box 94739 Cleveland, OH  44101.

## Policy changes effective  October 11, 2022

| | |
|---|---|
| Changes processed on: | October 12, 2022 9:21 a.m. |
| Premium change: | $11,418.00 |
| Changes: | Walid Saleh has been removed from the policy. |
| | Mudawi Omer has been removed from the policy. |

The changes shown above will not be effective prior to the time the changes were requested.



Policy number: 945885810
Bukhara Trans Inc
Page 2   of 5

## Outline of coverage

### Auto coverage part

| Description | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $139,279 |
|   Bodily Injury and Property Damage Liability | $1,000,000 combined single limit | | |
| Uninsured Motorist | $1,000,000 combined single limit | | 469 |
| Underinsured Motorist | $1,000,000 combined single limit | | 413 |
| Medical Payments | Rejected | | -- |
| Trailer Interchange | $60,000 | $1,000 | 24,369 |
| **Subtotal policy premium** | | | **$164,530** |

### Commercial General Liability coverage part

| Description | Limits | Premium |
|---|---|---|
| Limited General Liability - Trucking Operations | $1,000,000/$2,000,000 | $1,561 |
|   Each Occurrence | $1,000,000 | |
|   General Aggregate | $2,000,000 | |
|   Products/Completed Operations Aggregate | $2,000,000 | included |
|   Personal and Advertising Injury | $1,000,000/any one person or organization | included |
|   Damage to Premises Rented to You | $100,000/any one premises | included |
|   Medical Expense | $5,000/any one person | included |
| **Subtotal policy premium** | | **$1,561** |

### Motor Truck Cargo coverage part

| Description | Limits | Deductible | Premium |
|---|---|---|---|
| Motor Truck Cargo | $100,000 | $1,000 | $22,001 |
| Refrigeration Breakdown | included in Motor Truck Cargo Limit | $2,500 | included |
| **Subtotal policy premium** | | | **$22,001** |
| Additional Insured Fee | | | 60 |
| **Total 12 month policy premium and fees** | | | **$188,152** |

## Rated drivers

1. Jude Fanfan
2. Fakhriddin Avezov
3. Sylvain Lecler
4. Wisbens Alfred
5. Jumadurdy Glychdurdyyev
6. Loveson Louis
7. Nicolas Compas
8. Myratdurdy Rejepov

## Rated commodities

1. CANNED GOODS
2. FOOD (FROZEN/NOT SEAFOOD)
3. MEATS / DRESSED POULTRY
4. VEGETABLES

Policy number: 945885810
Bukhara Trans Inc
Page 3 of 5

## Auto coverage schedule

1. **2021 FREIGHTLINER CASCADIA 126**
   VIN: **3AKJHHDR2MSMU3501** Garaging Zip Code: 60543 Radius: More than 500 miles
   Personal use: N Body type: Truck Tractor

| Liability Premium | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| | $19248 | $67 | $59 | **$19,374** |

2. **2030 Non-owned Attached Trailer **
   VIN: **None** Garaging Zip Code: 60543 Radius: More than 500 miles
   Personal use: N Body type: 20

| Liability Premium | Liability Premium | Auto Total |
|---|---|---|
| | $649 | **$649** |

3. **2030 Non-owned Attached Trailer **
   VIN: **None** Garaging Zip Code: 60543 Radius: More than 500 miles
   Personal use: N Body type: 20

| Liability Premium | Liability Premium | Auto Total |
|---|---|---|
| | $649 | **$649** |

4. **2030 Non-owned Attached Trailer **
   VIN: **None** Garaging Zip Code: 60543 Radius: More than 500 miles
   Personal use: N Body type: 20

| Liability Premium | Liability Premium | Auto Total |
|---|---|---|
| | $649 | **$649** |

5. **2022 FREIGHTLINER CASCADIA 126**
   VIN: **3AKJHHDR6NSNK4356** Garaging Zip Code: 60543 Radius: More than 500 miles
   Personal use: N Body type: Truck Tractor

| Liability Premium | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| | $19248 | $67 | $59 | **$19,374** |

6. **2030 Non-owned Attached Trailer **
   VIN: **None** Garaging Zip Code: 60543 Radius: More than 500 miles
   Personal use: N Body type: 20

| Liability Premium | Liability Premium | Auto Total |
|---|---|---|
| | $649 | **$649** |

7. **2022 FREIGHTLINER CASCADIA 126**
   VIN: **3AKJHHDR4NSNK4341** Garaging Zip Code: 60543 Radius: More than 500 miles
   Personal use: N Body type: Truck Tractor

| Liability Premium | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| | $19248 | $67 | $59 | **$19,374** |

Policy number: 945885810
Bukhara Trans Inc
Page 4 of 5

**8.**   **2022 FREIGHTLINER CASCADIA 126**
VIN: **3AKJHHDR3NSNK4363**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: Truck Tractor

| Liability Premium | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| | $19248 | $67 | $59 | **$19,374** |

**9.**   **2022 FREIGHTLINER CASCADIA 126**
VIN: **3AKJHHDR2NSNK4354**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: Truck Tractor

| Liability Premium | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| | $19248 | $67 | $59 | **$19,374** |

**10.**   **2022 FREIGHTLINER CASCADIA 126**
VIN: **3AKJHHDRXNSNK4361**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: Truck Tractor

| Liability Premium | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| | $19248 | $67 | $59 | **$19,374** |

**11.**   **2030 Non-owned Attached Trailer \*\***
VIN: **None**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: 20

| Liability Premium | Liability Premium | Auto Total |
|---|---|---|
| | $649 | **$649** |

**12.**   **2030 Non-owned Attached Trailer \*\***
VIN: **None**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: 20

| Liability Premium | Liability Premium | Auto Total |
|---|---|---|
| | $649 | **$649** |

**13.**   **2023 FREIGHTLINER CASCADIA 126**
VIN: **3AKJHHDR8PSUH1741**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: Truck Tractor

| Liability Premium | Liability Premium | UM Premium | UIM Premium | Auto Total |
|---|---|---|---|---|
| | $19248 | $67 | $59 | **$19,374** |

**14.**   **2030 Non-owned Attached Trailer \*\***
VIN: **None**  Garaging Zip Code: 60543  Radius: More than 500 miles
Personal use: N  Body type: 20

| Liability Premium | Liability Premium | Auto Total |
|---|---|---|
| | $649 | **$649** |

\*\*Non-Owned trailer but only while attached to a listed power unit specifically described on the declarations page.

## Premium discount

| Policy | |
|---|---|
| 945885810 | Electronic Funds Transfer |

0005 Continued

**Additional Insured information**

| | | |
|---|---|---|
| 1. | Additional Insured | Alliance Shippers Inc<br>15515 S 70th Court<br>Orland Park, IL 60462 |
| 2. | Additional Insured | BEST BAY LOGISTICS INC<br>13831 Slover Ave<br>Fontana, CA 92337 |
| 3. | Additional Insured | Reliable Transportation Solution<br>PO BOX 507<br>Amelia, OH 45102 |



Progressive
P.O. Box 94739
Cleveland, OH 44101

November 11, 2021
Policy number: 945885810

Bukhara Trans Inc
1400 Light Rd. Apt 103
Oswego, IL 60543

Enclosed is the  MCS90.

Please retain this copy for your records.

If this endorsement subjects the Company to public liability for negligence in the insured's operation, maintenance or use of motor vehicles, you are required to inform us of all vehicles that are commercially owned or operated by the insured and to list them on your policy. Please review the current policy declaration page and inform us promptly of any additional vehicles that need to be listed. If you acquire (or acquire the services of) any additional commercially owned or operated vehicles in the future, you must promptly notify us of each such additional vehicle. Failure to promptly inform us of, and list, all current and future commercially owned or operated vehicles may result in the cancellation or nonrenewal of this policy, or in a premium increase.

Thank you,
Commercial Auto
Permit Issuance and Verification
1-800-444-4487

Form COVERLTR (06/04)

0007

**Please note, the expiration date as stated on this form relates to the process for renewing the Information Collection Request for this form with the Office of Management and Budget. This requirement to collect information as requested on this form does not expire. For questions, please contact the Office of Registration and Safety Information, Registration, Licensing, and Insurance Division.**

A Federal Agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a current valid OMB Control Number. The OMB Control Number for this information collection is 2126-0008. Public reporting for this collection of information is estimated to be approximately 2 minutes per response, including the time for reviewing instructions, gathering the data needed, and completing and reviewing the collection of information. All responses to this collection of information are mandatory. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Information Collection Clearance Officer, Federal Motor Carrier Safety Administration, MC-RRA, Washington, D.C. 20590.

**U.S. Department
of Transportation**
Federal Motor Carrier
Safety Administration

OMB No: 2126-0008
Expiration: 05/31/2024
Form MCS-90 Revised 06/03/2021

USDOT Number: 3546628     Date Received:

### FORM MCS-90
### ENDORSEMENT FOR MOTOR CARRIER POLICIES OF INSURANCE FOR PUBLIC LIABILITY
### UNDER SECTIONS 29 AND 30 OF THE MOTOR CARRIER ACT OF 1980

Issued to Bukhara Trans Inc

(Motor Carrier name)

of 1400 Light Rd. Apt 103 Oswego, IL 60543

(Motor Carrier state or province)

Dated at 09:56 AM on this 11th day of November, 2021
Amending Policy Number: CA 945885810 Effective Date: 12/17/2021
Name of Insurance Company: Artisan and Truckers Casualty Co

Countersigned by: _____

Authorized company representative

The policy to which this endorsement is attached provides primary or excess insurance, as indicated for the limits shown (check only one):

☒ This insurance is primary and the company shall not be liable for amounts in excess of $750,000 for each accident.

☐ This insurance is excess and the company shall not be liable for amounts in excess of $_____ for each accident in excess of the underlying limit of $_____ for each accident.

Whenever required by the Federal Motor Carrier Safety Administration (FMCSA), the company agrees to furnish the FMCSA a duplicate of said policy and all its endorsements. The company also agrees, upon telephone request by an authorized representative of the FMCSA, to verify that the policy is in force as of a particular date. The telephone number to call is: 1-800-444-4487.

Cancellation of this endorsement may be effected by the company of the insured by giving (1) thirty-five (35) days notice in writing to the other party (said 35 days notice to commence from the date the notice is mailed, proof of mailing shall be sufficient proof of notice), and (2) if the insured is subject to the FMCSA's registration requirements under 49 U.S.C. 13901, by providing thirty (30) days notice to the FMCSA (said 30 days notice to commence from the date the notice is received by the FMCSA at its office in Washington, D.C.).

**Filings must be transmitted online via the Internet at http://www.fmcsa.dot.gov/urs**

### DEFINITIONS AS USED IN THIS ENDORSEMENT

**ACCIDENT** includes continuous or repeated exposure to conditions or which results in bodily injury, property damage, or environmental damage which the insured neither expected nor intended.

**MOTOR VEHICLE** means a land vehicle, machine, truck, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway for transporting property, or any combination thereof.

**BODILY INJURY** means injury to the body, sickness, or disease to any person, including death resulting from any of these.

**PROPERTY DAMAGE** means damage to or loss of use of tangible property.

**ENVIRONMENTAL RESTORATION** means restitution for the loss, damage, or destruction of natural resources arising out of the accidental discharge, dispersal, release or escape into or upon the land, atmosphere, watercourse, or body of water, of any commodity transported by a motor carrier. This shall include the cost of removal and the cost of necessary measures taken to minimize or mitigate damage to human health, the natural environment, fish, shellfish, and wildlife.

**PUBLIC LIABILITY** means liability for bodily injury, property damage, and environmental restoration.



The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Motor Carrier Safety Administration (FMCSA).

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon,

or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

It is further understood and agreed that, upon failure of the company to pay any final judgment recovered against the insured as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the company to compel such payment.

The limits of the company's liability for the amounts prescribed in this endorsement apply separately to each accident and any payment under the policy because of anyone accident shall not operate to reduce the liability of the company for the payment of final judgments resulting from any other accident.

## SCHEDULE OF LIMITS - PUBLIC LIABILITY

| Type of Carriage | Commodity Transported | January 1, 1985 |
|---|---|---|
| **(1)** For-hire (in interstate or foreign commerce, with a gross vehicle weight rating of 10,000 or more pounds). | Property (nonhazardous) | $750,000 |
| **(2)** For-hire and Private (in interstate, foreign, or intrastate commerce, with a gross vehicle weight rating of 10,000 or more pounds). | Hazardous substances, as defined in 49 CFR 171.8, transported in cargo tanks, portable tanks, or hopper-type vehicles with capacities in excess of 3,500 water gallons; or in bulk Division 1.1, 1.2, and 1.3 materials, Division 2.3, Hazard Zone A, or Division 6.1, Packing Group I, Hazard Zone A material; in bulk Division 2.1 or 2.2; or highway route controlled quantities of a Class 7 material, as defined in 49 CFR 173.403. | $5,000,000 |
| **(3)** For-hire and Private (in interstate or foreign commerce, in any quantity; or in intrastate commerce, in bulk only; with a gross vehicle weight rating of 10,000 or more pounds). | Oil listed in 49 CFR 172.101; hazardous waste, hazardous materials, and hazardous substances defined in 49 CFR 171.8 and listed in 49 CFR 172.101, but not mentioned in (2) above or (4) below. | $1,000,000 |
| **(4)** For-hire and Private (In interstate or foreign commerce, with a gross vehicle weight rating of less than 10,000 pounds). | Any quantity of Division 1.1, 1.2 or 1.3 material; any quantity of a Division 2.3, Hazard Zone A, or Division 6.1, Packing Group I, Hazard Zone A material; or highway route controlled quantities of a Class 7 material as defined in 49 CFR 173.403. | $5,000,000 |

\* The schedule of limits shown does not provide coverage. The limits shown in the schedule are for information purposes only.

COLONIAL INS SERVICE
3845 HOLCOMB BRIDGE R
NORCROSS, GA 30092



**Policy number: 945885810**

Underwritten by:
Artisan and Truckers Casualty Co
Insured:
Bukhara Trans Inc
July 12, 2022
Policy Period: Jan 26, 2022 - Jan 26, 2023

Bukhara Trans Inc
1400 LIGHT RD. APT 103
OSWEGO, IL 60543

**Mailing Address**

Artisan and Truckers Casualty Co
PO Box 94739
Cleveland, OH 44101

# Additional insured endorsement

**1-800-444-4487**

For customer service, 24 hours a day,
7 days a week

## Name of Person or Organization

Reliable Transportation Solution
PO BOX 507
Amelia, OH 45102

This endorsement modifies insurance provided under the commercial auto policy and any endorsements thereto affording liability coverage.

The person or organization named above is an **insured** with respect to such liability coverage as is afforded by the policy, but this insurance applies to said **insured** only as a person liable for the conduct of another **insured** and then only to the extent of that liability. **We** also agree with **you** that insurance provided by this endorsement will be primary for any power unit specifically described on the **Declarations Page** and showing liability coverage.

### Limit of Liability

**Bodily Injury**                    Not applicable
**Property Damage**                  Not applicable
**Combined Liability**               $1,000,000 each **accident**

### All other terms, limits and provisions of this policy remain unchanged.

This endorsement applies to Policy Number: 945885810

Issued to (Name of Insured): Bukhara Trans Inc

Effective date of endorsement: July 9, 2022          Policy expiration date: January 26, 2023

Form 1198 (07/16)

0010

COLONIAL INS SERVICE
3845 HOLCOMB BRIDGE R
NORCROSS, GA 30092


COMMERCIAL

**Policy number: 945885810**

Underwritten by:
Artisan and Truckers Casualty Co
Insured:
Bukhara Trans Inc
June 24, 2022
Policy Period: Jan 26, 2022 - Jan 26, 2023

BEST BAY LOGISTICS INC
13831 SLOVER AVE
FONTANA, CA 92337

**Mailing Address**

Artisan and Truckers Casualty Co
PO Box 94739
Cleveland, OH 44101

# Additional insured endorsement

**1-800-444-4487**

For customer service, 24 hours a day,
7 days a week

## Name of Person or Organization

BEST BAY LOGISTICS INC
13831 Slover Ave
Fontana, CA 92337

This endorsement modifies insurance provided under the commercial auto policy and any endorsements thereto affording liability coverage.

The person or organization named above is an **insured** with respect to such liability coverage as is afforded by the policy, but this insurance applies to said **insured** only as a person liable for the conduct of another **insured** and then only to the extent of that liability. **We** also agree with **you** that insurance provided by this endorsement will be primary for any power unit specifically described on the **Declarations Page** and showing liability coverage.

### Limit of Liability

| | |
|---|---|
| **Bodily Injury** | Not applicable |
| **Property Damage** | Not applicable |
| **Combined Liability** | $1,000,000 each **accident** |

### All other terms, limits and provisions of this policy remain unchanged.

This endorsement applies to Policy Number: 945885810

Issued to (Name of Insured): Bukhara Trans Inc

Effective date of endorsement: June 23, 2022          Policy expiration date: January 26, 2023

Form 1198 (07/16)

0011

COLONIAL INS SERVICE
3845 HOLCOMB BRIDGE R
NORCROSS, GA 30092



**Policy number: 945885810**

Underwritten by:
Artisan and Truckers Casualty Co
Insured:
Bukhara Trans Inc
June 22, 2022
Policy Period: Jan 26, 2022 - Jan 26, 2023

Alliance Shippers Inc
15515 S 70TH COURT
ORLAND PARK, IL 60462

**Mailing Address**

Artisan and Truckers Casualty Co
PO Box 94739
Cleveland, OH 44101

# Additional insured endorsement

**1-800-444-4487**

For customer service, 24 hours a day,
7 days a week

## Name of Person or Organization

Alliance Shippers Inc
15515 S 70th Court
Orland Park, IL 60462

This endorsement modifies insurance provided under the commercial auto policy and any endorsements thereto affording liability coverage.

The person or organization named above is an **insured** with respect to such liability coverage as is afforded by the policy, but this insurance applies to said **insured** only as a person liable for the conduct of another **insured** and then only to the extent of that liability. **We** also agree with **you** that insurance provided by this endorsement will be primary for any power unit specifically described on the **Declarations Page** and showing liability coverage.

### Limit of Liability

| | |
|---|---|
| **Bodily Injury** | Not applicable |
| **Property Damage** | Not applicable |
| **Combined Liability** | $1,000,000 each **accident** |

### All other terms, limits and provisions of this policy remain unchanged.

This endorsement applies to Policy Number: 945885810

Issued to (Name of Insured): Bukhara Trans Inc

Effective date of endorsement: June 21, 2022          Policy expiration date: January 26, 2023

Form 1198 (07/16)

Form Z434 IL (02/19)

## MOTOR TRUCK CARGO LEGAL LIABILITY
## COVERAGE ENDORSEMENT

Except as specifically modified by this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### INSURING AGREEMENT—LOSS TO COVERED PROPERTY

Subject to the Limit of Liability, if **you** pay the premium for this Motor Truck Cargo Legal Liability Coverage, **we** will pay for the direct physical **loss** to **covered property** that **you** are legally liable to pay as a **trucker** under a written: bill of lading, tariff document, rate confirmation sheet, shipping receipt, or contract of carriage.  For this coverage to apply, the **covered property** must, at the time of **loss**, be in **your** exclusive physical custody and control:

1.   while **in due course of transit** in, on, or attached to an **insured auto**; or
2.   during **loading or unloading**.

Coverage applies for **loss** to **covered property** only if the **loss** is caused by a **covered peril**. For **covered property** that is **your** property, **our** payment is not contingent upon **your** liability.

**We** have the option to settle or defend any claim or lawsuit for damages covered by this endorsement. However, **we** have no duty to defend **you** against any lawsuit to which this insurance does not apply. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the limit of liability for this **covered property** coverage has been exhausted by payment of judgments or settlements.

### INSURING AGREEMENT—LOSS TO BUSINESS EQUIPMENT

Subject to the Limit of Liability, if **you** pay the premium for this Motor Truck Cargo Legal Liability Coverage, **we** will pay for the direct physical **loss** to **business equipment**. For this coverage to apply, the **business equipment** must, at the time of **loss**, be in **your** exclusive physical custody and control. Coverage applies for **loss** to **business equipment** only if the **loss** is caused by a **covered peril**.

**We** have the option to settle or defend any claim or lawsuit for damages covered by this endorsement. However, **we** have no duty to defend **you** against any lawsuit to which this insurance does not apply. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the limit of liability for **business equipment** coverage has been exhausted by payment of judgments or settlements.

### ADDITIONAL DEFINITIONS

The following additional definitions apply only to Motor Truck Cargo Legal Liability Coverage, as set forth in this endorsement, and any endorsements thereto that solely pertain to this coverage, whenever the defined term appears therein in boldface type, whether in the singular, plural, or possessive:

1.   "**Business equipment**" means computer and related computer hardware, used exclusively in the management of **your**

1

0013

business, that **you** own or that is leased or loaned to **you**. **Business equipment** does not include computer, cell phone, smart phone, or any other electronic equipment, used or intended to be used for personal non-business use.

2. "**Covered peril**" means any external risks of direct physical **loss** to **covered property** or **business equipment**, except for those listed in a. through m. below as Excluded Perils.

<u>**Excluded Perils:**</u> Please read the following list of excluded perils carefully. Coverage will not be afforded under this Motor Truck Cargo Legal Liability Coverage endorsement for these types of perils. **We** will not pay for any **losses** to **covered property** or **business equipment** caused by, resulting in or from, or arising out of these excluded perils regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**.

a. **Civil Authority**
   Order of any civil authority, including seizure, confiscation, destruction, or quarantine of property. However, **we** will pay for **loss** or damage caused by or resulting from acts of destruction ordered by any governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this endorsement.

b. **Nuclear Hazard, Pollutants**
   (i) Any weapon employing atomic fission or fusion; or
   (ii) Nuclear reaction or radiation, or radioactive contamination from any other cause. But **we** will pay for direct **loss** caused by resulting fire if the fire would be covered under this endorsement.
   (iii) The release, discharge, seepage, migration, dispersal, or escape of **pollutants**, unless the release, discharge, seepage, migration, dispersal, or escape is caused by a **specified peril**.

c. **War, Civil Commotion**
   (i) **War**, including undeclared or civil war;
   (ii) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or agents;
   (iii) Insurrection, rebellion, revolution, usurped power, or action taken by a governmental authority to hinder or defend against any of these; or
   (iv) Strikers, locked-out workmen, or persons taking part in labor disturbances or riots, or civil commotions.

d. **Inherent Vice**
   Deterioration; wear and tear; obsolescence; hidden or latent defect; gradual decay; fungus; mildew; mold; rot; rust; insects; vermin; change in flavor; or any quality, fault, or weakness in the **covered property** or **business equipment** that causes it to damage or destroy itself.

e. **Criminal, Fraudulent, or Dishonest Acts**
   Criminal, fraudulent, dishonest, or illegal acts alone or in collusion with another, whether or not such acts occurred during regular hours of employment, by:
   (i) **you**;
   (ii) **your** partners, officers, directors, trustees, or joint ventures;
   (iii) others to whom **you**, **your** partners, officers, directors, trustees, or joint ventures entrust the property;
   (iv) others who have an interest in the property; or
   (v) the employees or agents of any party specified in (i) through (iv) above.
   This Excluded Peril does not apply to acts of destruction by **your** employees, but **we** will not pay for theft by employees.

0014

f. **Consequential Loss**

Loss of use, loss of market, loss of market value, or delay; or any other remote or consequential loss, other than direct physical **loss**, to **covered property** or **business equipment**.

g. **Wetness**, **Breakdown, Temperature, Humidity**

(i)   Mechanical or electrical breakdown or failure including breakdown or failure of a refrigeration unit or its associate component parts, or heating equipment installed in a cargo component; or

(ii)  Wetness, humidity, dampness, dryness, or changes in or extremes of temperature unless it results from damage to an **insured auto**.

However, this Excluded Peril does not apply to **loss** caused by a fire or explosion if such fire or explosion would be covered under this endorsement.

h. **Voluntary Parting, Nondelivery, Mysterious Disappearance**

(i)   Voluntary parting with title to, or possession of, the property due to fraudulent scheme, trick, or false pretense;

(ii)  Nondelivery or misdelivery; or

(iii) Mysterious or unexplained disappearance; shortage of any property upon taking inventory; or theft of a part of the contents of any shipping package.

i. **Fines, Penalties, and Costs**

Any costs, fines, punitive damages, assessments, attorney fees, court costs, or other penalties that **you** are required or liable to pay as a result of **your** violation of any law or regulation, or as a result of the violation of any law or regulation relating to any delay in the payment, denial, or settlement of any claim.

j. **Pre-existing Damage**

**We** will not pay for pre-existing damage to any **covered property** or **business equipment**.

With respect to auto haulers, **we** will not pay for pre-existing damage to vehicles being transported by the **insured**. For coverage to apply, the **insured** auto hauler must provide to **us** a signed inspection document attesting to the condition of **covered property** before loading.

k. **Installation Operations**

**Your** operation as rigger, hoister, erector, installer, or dismantler.

l. **Business Equipment Damage**

**We** will not pay for the following damage to **business equipment**:

(i)   Wear and tear, any quality in the equipment that causes it to damage or destroy itself, hidden or latent defect, or gradual deterioration;

(ii)  Structural, mechanical, or electrical failure or breakdown; or

(iii) Damage caused by maintenance or a software upgrade or download.

m. **Corrosion, Contamination**

**We** will not pay for corrosion, contamination, marring or scratching to any **covered property** or **business equipment** unless it results from damage to an **insured auto**.

3.   "**Covered property**" means lawful goods and merchandise of others, except for the items listed in a. through j. below as Excluded Properties. **Covered property** includes **goods and merchandise** owned by **you** while loaded for shipment in or on an **insured auto**, whether or not shipped under a bill of lading or shipping receipt. When used in this endorsement, **goods and**

3

**merchandise** means products destined for market and/or sale. **Covered property** does not include any equipment **you** own that is being transported between work sites. **Covered property** also does not include **autos you** lease, hire, rent, or borrow.

**Excluded Properties:** Please read the following list of excluded properties carefully. Coverage will not be afforded under this Motor Truck Cargo Legal Liability Coverage endorsement for **loss** to these types of properties**.**

a. **Art, Jewelry, Metals, Money, Papers**
Objects of art, including paintings and statuary; jewelry, precious or semi-precious stones; precious or semi-precious metals or alloys; money and securities of any kind, including monies collected or not collected under a C.O.D., bill of lading, or shipping receipt; food stamps, lottery tickets, notes, money orders, traveler's checks, accounts, bills, deeds, or other evidences of debt; valuable papers of any kind, including passports, manuscripts, mechanical drawings, and blueprints.

b. **Contraband**
Contraband or property in the course of illegal transportation or trade.

c. **Live Animals**
Live animals, birds, or fish, including cattle or poultry, unless death results or is made necessary within 24 hours by a **specified peril**; or unless they escape or stray from the scene of **loss** and cannot be located, but only if the escape or straying is caused by a **specified peril**. **We** do not cover **your** liability for reduction in the market value or downgrading of live animals, birds, or fish due to minor injuries, scrapes, and bruises.

d. **Other Carrier**
Any property while in the physical custody of any other carrier.

e. **Property Not Under Bill of Lading**
Any property for which no bill of lading, tariff document, rate confirmation sheet, shipping receipt, or contract of carriage has been issued, or which is carried gratuitously or without charge. This exclusion does not include poultry cages owned by the shipper while being utilized in the transportation of **covered property**.

f. **Storage**
Any property in or on an **insured auto** after it has remained at any location for more than 72 hours. This includes locations **you** own or use. This exclusion does not apply to delays in transportation outside of **your** control due to severe weather, as long as transport resumes as soon as the weather emergency has ended.

g. **Transporting Vehicles and Equipment**
Any transporting vehicle or conveyance, including its equipment such as tarpaulins and fittings, chains, binders, and intermodal shipping containers, unless specified on a bill of lading.

h. **Explosive or Radioactive Material**
Explosives, ammunition, fireworks, or radioactive material.

i. **Pharmaceuticals, Tobacco, Marijuana Products, Alcohol**
Prescription pharmaceuticals, tobacco products, marijuana products, or alcoholic beverages, other than beer or wine.

j. **Mobile/Modular Homes and Buildings**

4

**Mobile/Modular homes and buildings** whether carried on or attached to the **insured auto**.

4.   "**Earned freight charges**" means freight charges from the point of departure to the point of **loss**.

5.   "**In due course of transit**" means being shipped from the time **you** assume exclusive physical custody and control of the **covered property** for the purpose of the actual movement of **covered property** from the point of shipment bound for a specific destination and ending when one of the following first occurs:
   a.   the **covered property** is accepted by, or on behalf of, the consignee at the intended destination;
   b.   the **covered property** is accepted by, or on behalf of, the consignee at any intermediate point short of reaching the original intended destination;
   c.   72 hours after arrival at destination; or
   d.   any other stop that exceeds 72 hours.
   **In due course of transit** includes ordinary and necessary stops, interruptions, delays, or transfers incidental to the route and method of shipment.

6.   "**Insured auto**" means:
   a.   Any **auto** specifically described on the **declarations page** that is not a **trailer**;
   b.   An additional **auto** that is not a **trailer** on the date **you** become the owner if:
      (i)   **you** acquire the **auto** during the policy period shown on the **declarations page**;
      (ii)  **we** insure all **autos** owned by **you** that are used in **your** business;
      (iii) no other insurance policy provides coverage for that **auto**; and
      (iv)  **you** tell **us** within 30 days after **you** acquire it that **you** want **us** to cover it;
   c.   Any replacement **auto** that is not a **trailer** on the date **you** become the owner if:
      (i)   **you** acquire the **auto** during the policy period shown on the **declarations page**;
      (ii)  the **auto** that **you** acquire replaces one specifically described on the **declarations page** due to termination of **your** ownership of the replaced **auto** or due to mechanical breakdown of, deterioration of, or **loss** to the replaced **auto** that renders it permanently inoperable;
      (iii) no other insurance policy provides coverage for that **auto**; and
      (iv)  **you** tell **us** within 30 days after **you** acquire it that **you** want **us** to cover it;
   d.   A **trailer** designed primarily for travel on public roads, only when the **trailer** is attached to a power unit that is an **insured auto** or while it is **in due course of transit** by a power unit that is an **insured auto**; and
   e.   Any **temporary substitute auto** that is not a **trailer**.

7.   "**Loading or unloading**" means the direct physical process of hoisting, lifting, or moving **covered property**:
   a.   onto an **insured auto** from the ground or loading docks adjacent to such **insured auto**; or
   b.   off of an **insured auto** to the place where it is finally delivered.
   However, for auto haulers, **loading or unloading** means moving **covered property** onto or off of **your insured auto**, including moving a motor vehicle under its own power solely for the purpose of **loading or unloading** it from the **insured auto**, but no more than one road mile from the **insured auto**.

8.   "**Mobile/Modular Homes and Buildings**" means prefabricated housing units and buildings, factory-built homes and buildings, mobile homes, and modular homes and buildings. The term does not include motor homes or travel trailers designed for use on public roads.

9.   "**Pollutant**" is used in this endorsement as defined in the General Definitions section of **your** Commercial Auto Policy.

5

10. "**Specified peril**" means:

    a. fire, lightning, or explosion;

    b. smoke, but this cause of **loss** does not include smoke from exhaust fumes or gases of the transporting vehicle, agricultural smudging, or industrial operations;

    c. windstorm or hail, but this cause of **loss** does not include **loss** caused by or resulting from:

        (i) heat, cold, or change in or extremes of temperature; or

        (ii) ice (other than hail), snow, or sleet, whether driven by wind or not;

    d. collision, overturn, or derailment of a transporting conveyance. With respect to live animals, birds, or fish, this cause of **loss** does not include **loss** caused by or resulting from the **insured auto** coming in contact with:

        (i) the roadbed;

        (ii) curbing;

        (iii) rails or ties of railways; or

        (iv) a stationary object while backing for **loading or unloading** purposes;

    e. collapse of a bridge, wharf, dock, platform, or culvert;

    f. stranding, sinking, burning, or collision on any ferry;

    g. flood, meaning the rising of any natural body of water; and

    h. theft, but excluding pilferage by **you** or **your** employees, anyone with a financial interest in the cargo or their employees, authorized representatives or anyone else entrusted with the cargo. Theft does not include **loss** caused by or resulting from:

        (i) wrongful conversion; or

        (ii) acceptance of counterfeit money, fraudulent post office or express money orders, or checks or promissory notes not paid upon presentation.

    With respect to live animals, birds, or fish, **we** will extend this theft coverage to pay for direct physical **loss** to live animals, birds, or fish caused by theft of:

        (i) the entire load of live animals, birds, or fish; or

        (ii) the **insured auto** in or on which the live animals, birds, or fish are loaded.

    However, this coverage extension does not apply to the loss of individual animals or less than the entire load of live animals, birds, or fish unless the entire **insured auto** is first stolen.

11. "**Trucker**" means any person, organization, or motor carrier engaged in the business of transporting property for hire.

## ADDITIONAL PAYMENTS

In addition to the applicable limit of liability:

1. **Earned Freight**

    **We** will pay **earned freight charges** that are due to **you** if **you** are unable to collect them from others because of a **loss** to **covered property** that is caused by a **covered peril**. The most **we** will pay under this additional coverage for all freight charges in any one **loss** is $10,000.

2. **Removal Expenses**

    a. **We** will pay removal expenses incurred to remove debris of **covered property**, which results from a **loss** caused by a **covered peril** that occurs during the policy period. The term "debris" does not include **pollutants**.

    b. **We** will also pay removal expenses incurred to extract **pollutants** from land or water, if the discharge, dispersal, migration, or release of the **pollutants** is caused by or results from **loss** to **covered property**, and if such **loss** is caused by a **covered peril** during the policy period.

    **We** do not pay for:

6

(i)   the cost of testing; evaluating; observing; or recording the existence, level, or effects of **pollutants**. However, **we** will pay the cost of testing that is necessary for the extraction of **pollutants** from land or water.

(ii)  any damage to **your insured auto** from **pollutants**.

c.   The most **we** will pay for all removal expenses described in a. or b. above arising out of any one **loss** is $25,000.

d.   The expenses for removal of **covered property** debris and **pollutants** will be paid only if they are reported to **us** in writing within 180 days of the earlier of:

(i)   the date of the direct physical **loss**; or

(ii)  the end of the policy period.

3.   **Expenses in Defense or Settlement of Claims**

**We** will pay, with respect to any claim **we** investigate or settle, or with respect to any lawsuit against any insured **we** defend:

a.   all expenses **we** incur.

b.   the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. However, **we** have no duty to purchase a bond in a principal amount exceeding **our** limit of liability, and **we** have no duty to apply for or furnish these bonds.

c.   all reasonable expenses incurred by **you** at **our** request, including actual loss of earnings up to $250 per day because of time off from work.

d.   all costs taxed against the insured in any lawsuit against the insured **we** defend.

e.   interest accruing after entry of judgment on that part of the judgment that does not exceed **our** limit of liability for any lawsuit **we** defend. This does not apply if **we** have not been given notice of suit or the opportunity to defend an insured. **Our** payment, offer in writing, or deposit in court of that part of the judgment that does not exceed **our** limit of liability ends **our** duty to pay interest that accrues after the date of **our** payment, written offer, or deposit.

f.   interest accruing before entry of judgment on that part of the judgment that does not exceed **our** limit of liability for any lawsuit **we** defend. **Our** offer to pay that part of the judgment that does not exceed **our** limit of liability ends **our** duty to pay interest that accrues after **our** offer.

4.   **Sue and Labor**

a.   **We** will pay the necessary expenses **you** incur to prevent further **loss** to **covered property** if that expense is incurred within a 12-hour period after the **covered peril** occurs.

b.   If, in the event of an occurrence, it becomes necessary to move the **covered property** in order to avoid a **loss** to the **covered property**, **we** will pay the reasonable and necessary costs incurred by **you** to move the **covered property** away from the location of the occurrence.

c.   The most **we** will pay for the aggregate of all expenses incurred under subparts a. and b. above is $7,500.

**LIMITS OF LIABILITY**

1.   **Amount of Payment**

a.   Subject to subsections 2., 3., and 4. below, in the event of a **loss** to **covered property**, **we** will pay the least of the following:

(i)   **Your** legal liability for the direct physical **loss** to the **covered property**;

(ii)  The declared value of the **covered property** shown in the bill of lading, tariff documents, rate confirmation sheet, shipping receipt, or contract of carriage;

(iii) For household goods, the amount specified in any advice of coverage, or other document evidencing an agreed valuation for property in transit;

(iv)  The actual cost to the shipper to repair or replace the **covered property** with material of like kind and quality, not including any claim for diminution of value to the **covered property**; or

(v)   The "Cargo" limit shown on the **declarations page**.

7

b. Regardless of the number of **insured autos** or **trailers** involved, insureds, premiums paid, policies issued by **us**, claims made, or lawsuits brought, the most **we** will pay for **loss** to **covered property** in any one occurrence is the limit of liability shown on the **declarations page** for "Cargo Liability" coverage.

c. With respect to **business equipment**, subject to subsections 2., 3., and 4. below, in the event of a **loss**, **we** will pay the lower of:

   (i)   the amount necessary to replace the **business equipment**; or

   (ii)  the amount necessary to repair the **business equipment**.

   **We** will not pay the amount necessary to repair or replace **business equipment** unless the equipment has been, or is actually going to be, repaired or replaced. Subject to the limit of liability for this coverage, **we** will pay only the amount **you** are required to spend to repair or replace the **business equipment**.

   The most **we** will pay for **loss** to **business equipment** in any one occurrence is the $5,000 limit of liability for this **business equipment** coverage.

2. **Deductible**

   For each **loss** to **covered property** that qualifies for coverage under this endorsement, the deductible shown on the **declarations page** for this "Cargo Liability" coverage will be applied to reduce the **loss** payable on the **covered property**. A $250 deductible will apply to each **business equipment loss**. For each **loss** to **business equipment** that qualifies for coverage under this endorsement, the **business equipment** deductible will be applied to reduce the **loss** payable on the **business equipment**.

   If there is other **loss** arising out of a single occurrence that applies under this endorsement, or under the associated Commercial Auto Policy, and/or any other endorsement attached thereto, only one deductible will be applied to the aggregate of all **loss** components. The highest deductible applicable to any single coverage implicated in the **loss** will apply.

   If **we** pay for any part of a deductible in the settlement of any claim or lawsuit, **you** must reimburse **us** for the deductible or the portion thereof that **we** paid.

3. **Insurable Interest**

   **We** will not cover more than **your** insurable interest in any **covered property** or **business equipment**.

4. **Sets or Parts**

   a. Sets

      The **loss** to an article that is part of a set will not be considered a **loss** to the entire set. Therefore, if there is a **loss** to **covered property** or **business equipment** that is part of a set, **we** at **our** option may choose to:

      (a)  repair or replace any part to restore the pair or set to its value before the **loss** or damage; or

      (b)  pay the difference between the value of the pair or set before and after the **loss** or damage.

   b. Parts

      If **loss** is to a part of **covered property** or **business equipment** that consists of several parts, **we** will pay for only the lost or damaged part.

**DUTIES IN CASE OF A LOSS**

The following additional duties apply under this Motor Truck Cargo Legal Liability Coverage endorsement:

1. **You** must take all reasonable steps to protect **covered property** and **business equipment** at the time of and after a **loss** to

8

0020

avoid further damage.

2. **You** must allow **us** to have all property involved in an **accident** or **loss** inspected and appraised before its repair or disposal.

3. **You** must give **us** a copy of the descriptions and schedules from all insurance policies applicable to the **covered property** or **business equipment**, whichever the case may be, that was destroyed or damaged.

4. **You** must send **us** a signed, sworn proof of loss containing all the information **we** request to settle the claim. **You** must do this within 60 days after **our** request. **We** will supply **you** with the necessary forms.

5. **You** must, as often as **we** reasonably require, submit, and so far as is within **your** power, cause all other persons interested in the **covered property** or **business equipment**, whichever the case may be, and members of their households and employees to submit, to examination under oath by any person **we** name, and, in connection with any claim made, to produce for examination all books of accounts, uniform bills of lading, shipping receipts, invoices, drivers' log books, and any other documents, at such reasonable time and place as **we** may designate, and permit extracts and copies thereof to be made.

6. Unless **we** give **our** permission, **you** may not dispose of the carcass(es) of animals, birds, or fish until **we** inspect or examine such carcass(es). However, this clause does not apply if such disposal is required by law or ordinance.

**GENERAL PROVISIONS**

1. When used in this endorsement, subsection 3—Other Insurance of the General Provisions section of **your** Commercial Auto Policy is deleted in its entirety and replaced by the following:

   a. **Other Insurance**
      (i) **You** may have other insurance subject to the same terms, conditions, and provisions as the insurance provided by this endorsement. If **you** do, **we** will pay **our** share of the covered **loss**. **Our** share is the proportion that the applicable limit of liability under this endorsement bears to the total of the limits of liability of all policies covering on the same basis.
      (ii) If there is other insurance covering the same **loss**, other than that described in paragraph (i) above, **we** will pay only for the amount of the covered **loss** in excess of the amount due from that other insurance, whether **you** can collect on it or not. However, **we** will not pay more than **our** applicable limit of liability.

   b. **Insurance Under Two or More Coverages**
      If two or more of this endorsement's coverages apply to the same **loss**, **we** will not pay more than the amount of the **loss** as determined under subsection 1—Amount of Payment in the Limits of Liability section of this endorsement, or the limit of liability applicable to the most specific coverage, whichever is less.

2. The following additional General Provisions apply to this Motor Truck Cargo Legal Liability Coverage endorsement:

   a. **Payment of Loss**
      (i) A covered **loss** will be payable 30 days after a satisfactory proof of loss is received or a final judgment award has been entered.

         **We** may make payment for a **loss** either to **you** or the owner of the property. **We** will not pay the owner more than their financial interest in the property. If **we** make a payment to the owner of the property, this shall be in full satisfaction of any claim by **you** for which such payment has been made.

If a **loss** has been paid or made good by others, **we** will not be liable for any part of the **loss**. Payment for a **loss** is required only if **you** have fully complied with all the terms of this policy.

(ii) With respect to **covered property**, **we** have the following options:

    (a) pay the value of the **loss** as determined under subsection 1—Amount of Payment in the Limits of Liability section of this endorsement;

    (b) pay the cost of repairing or replacing the **covered property**;

    (c) rebuild, repair, or replace the **covered property** with property of like kind and quality, to the extent practicable, and within a reasonable time; or

    (d) take all or any part of the damaged property at an agreed value.

(iii) With respect to **business equipment**, **we** will pay the loss as determined under subsection 1—Amount of Payment in the Limits of Liability section of this endorsement.

b. **Abandonment**

**We** may keep all or part of the property at the agreed or appraised value, but **you** may not abandon any property to **us** without **our** written consent.

c. **Conformity with Statute**

When a condition of this coverage is in conflict with an applicable law, that condition is amended to conform to that law.

d. **Recovered Property**

If **you** or **we** recover any **covered property** or **business equipment** for which **we** have made payment under this policy, **you** or **we** will promptly notify the other of the recovery. At **your** option, the property will be returned to or retained by **you** or it will become **our** property. If **you** keep the property, **you** must return to **us** the amount **we** paid to **you** for the **covered property** or **business equipment**, whichever the case may be. **We** will pay recovery expenses and the expenses to repair the recovered **covered property** and **business equipment**, subject to the limit of liability.

If **we** have already paid **you** the **loss** amount at the time of any salvage or recovery, the amount **you** receive for the recovered **covered property** will accrue entirely to **our** benefit until **you** have paid any amounts owed to **us** as a result of the adjustment to the **loss** amount.

e. **Salvage**

Any recovery of salvage on a **loss** will accrue entirely to **our** benefit until the sum **we** paid has been replaced. If **our** benefit of salvage recovery exceeds the sum that **we** paid, **we** will return the difference to **you**, less any salvage recovery expenses.

f. **Policy Period and Territory**

Coverage under this endorsement applies only to **losses** that occur during the policy period shown on the **declarations page** and which occur within the United States or Canada.

g. **Coverage Required by Filings**

If **we** have filed a certificate of insurance on **your** behalf with any regulatory or governmental agency, and:

(i) **we** are required to pay any judgment entered against **you**; or

(ii) **we** agree to settle a claim or lawsuit;

arising out of a **loss** that is covered solely because of the existence of such certificate of insurance, **we** will be obligated to

pay no more than the minimum amount required by that agency or any applicable law. If any payment is based solely on the existence of such certificate, **you** must reimburse **us** in full for **our** payment, including legal fees and costs **we** incurred, whether the payment is made as a result of judgment or settlement.

h. **No Benefit to Bailee**

No person or organization other than **you**, having custody of **covered property** or **business equipment**, will benefit from this insurance.

i. **Transfer of Rights of Recovery Against Others to Us**

If any person or organization to or for whom **we** make payment under this endorsement has rights to recover damages from another, those rights are transferred to **us** to the extent of **our** payment. That person or organization must do everything necessary to secure **our** rights and must do nothing after **loss** to impair them. But **you** may waive **your** rights against another party in writing:

(i) Prior to a **loss** to the **covered property** or **business equipment**.

(ii) After a **loss** to the **covered property** or **business equipment**, but only if, at the time of **loss**, that party is one of the following:

   (a) someone insured by this insurance; or

   (b) a business firm:

      (1) owned or controlled by **you**; or

      (2) that owns or controls **you**.

j. **Legal Action Against Us**

No one may bring a legal action against **us** under this endorsement unless:

(i) there has been full compliance with all the terms of this policy; and

(ii) the action is brought within two years after **you** first have knowledge of the direct **loss** or damage.

k. **Premiums**

The first named insured shown on the **declarations page**:

(i) is responsible for the payment of all premiums; and

(ii) will be the payee for any return premiums **we** pay.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THIS POLICY REMAIN UNCHANGED.**

0023

## COMMERCIAL GENERAL LIABILITY ENDORSEMENT

Various provisions in this endorsement restrict coverage. Read the entire endorsement carefully to determine **your** rights, duties, and what is and is not covered.

**We** agree with **you** that the following coverage is added to your Commercial Auto Policy:

### ADDITIONAL DEFINITIONS USED IN THIS ENDORSEMENT

The following definitions are in addition to those found in the Commercial Auto Policy. Except as otherwise defined in this endorsement, terms appearing in boldface type, whether in the singular, plural or possessive, will have the following meanings.

1. "**Advertisement**" means a notice that is broadcast or published to the general public or specific market segments about **your** goods, products or services for the purpose of attracting customers or supporters. **Advertisement** includes material placed on the Internet or on similar electronic means of communication; however, regarding websites, only that part of a website that is about **your** goods, products or services for the purpose of attracting customers or supporters is considered an **advertisement**.

2. "**Coverage territory**" means:
   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;
   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or
   c. All other parts of the world if the injury or damage arises out of:
      (i) Goods or products made or sold by **you** in the territory described in a. above;
      (ii) The activities of a person whose home is in the territory described in a. above, but who is away for a short time on **your** business; or
      (iii) Personal and advertising injury offenses that take place through the Internet or similar electronic means of communication;

   provided that the **insured's** responsibility to pay damages is determined in a **suit** on the merits, in the territory described in a. above or in a settlement agreed to by **us**.

3. "**Executive officer**" means a person holding any of the officer positions created by **your** charter, constitution, by-laws or any other similar governing document.

4. "**Fungi**" means any type of form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

5. "**Hostile fire**" means a fire or explosion that is uncontrolled or breaks out from where it was intended to be.

6. "**Impaired property**" means tangible property, other than **your product** or **your work**, that cannot be used or is less useful than intended by its manufacturer or designer because:
   a. It incorporates **your product** or **your work** that is known or thought to be defective, deficient, inadequate or dangerous; or
   b. **You** have failed to fulfill the terms of a contract or agreement;
   if such property can be restored to use by:

0024

    a.  The repair, replacement, adjustment or removal of **your product** or **your work**; or

    b.  **Your** fulfilling the terms of the contract or agreement.

7.  "**Insured**" means:

    a.  If **you** are designated in on the **Declarations Page** as:

        i.      An individual:  **you** and **your** spouse, but only with respect to the conduct of a business of which **you** are the sole owner.

        ii.     A partnership or joint venture:  **you**. **Your** members, partners, and their spouses, are also **insureds**, but only with respect to the conduct of **your** business.

        iii.    A limited liability company:  **you**. **Your** members are also **insureds**, but only with respect to the conduct of **your** business. **Your** managers are **insureds**, but only with respect to their duties as **your** managers.

        iv.    An organization other than a partnership, joint venture or limited liability company: **you**. **Your** "executive officers" and directors are also **insureds**, but only with respect to their duties as **your** officers or directors. **Your** stockholders are also insureds, but only with respect to their liability as stockholders.

        v.     A trust:  **you**. **Your** trustees are also insureds, but only with respect to their duties as trustees.

    b.  Each of the following is also an **insured**:

        i.      **Your** volunteer workers, but only while performing duties related to the conduct of **your** business.

        ii.     **Your** employees, other than **your executive officers** (if **you** are an organization other than a partnership, joint venture or limited liability company) or **your** managers (if **you** are a limited liability company), but only for acts within the scope of their employment by **you** or while performing duties related to the conduct of **your** business.

        No employee or volunteer worker is an insured for:

          (1)  **Bodily injury** or **personal and advertising injury**:

             (a)  to **you**, to **your** partners or members (if **you** are a partnership or joint venture), to **your** members (if **you** are a limited liability company), to a co-employee while in the course of his or her employment or performing duties related to the conduct of **your** business, or to **your** other volunteer workers while performing duties related to the conduct of **your** business;

             (b)  to the spouse, child, parent, brother, or sister of the co-employee or volunteer worker as a consequence of paragraph (1)(a) above;

             (c)  for which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs (1)(a) or (b) above; or

             (d)  arising out of his or her providing or failing to provide professional health care services.

          (2)  **Property damage** to property:

             (a) owned, occupied, or used by,

             (b) rented to, in the care, custody, or control of, or over which physical control is being exercised for any purpose by

            **you**, any of **your** employees, volunteer workers, any partner or member (if **you** are a partnership or joint venture), or any member (if **you** are a limited liability company).

        iii.    Any person (other than **your** employee or volunteer worker), or any organization while acting as **your** real estate manager.

0025

      iv.     Any person or organization having proper temporary custody of **your** property if **you** die, but only:

          A.  with respect to liability arising out of the maintenance or use of that property; and

          B.  until **your** legal representative has been appointed.

      v.      **Your** legal representative if **you** die, but only with respect to duties as such. That representative will have all **your** rights and duties under this endorsement.

c.  Any organization **you** newly acquire or form, other than a partnership, joint venture or limited liability company, and over which **you** maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to the organization. However:

      i.      Coverage under this provision is afforded only until the 90th day after **you** acquire or form the organization or the end of the policy period, whichever is earlier;

      ii.     Coverage A does not apply to **bodily injury** or **property damage** that occurred before **you** acquired or formed the organization; and

      iii.    Coverage B does not apply to **personal and advertising injury** arising out of an offense committed before **you** acquired or formed the organization.

No person or organization is an **insured** with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

8. "**Insured contract**" for purposes of this endorsement only, means:

a.  A contract for a lease of premises. However, any portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to **you** or temporarily occupied by **you** with permission of the owner is not an **insured contract**;

b.  A sidetrack agreement;

c.  Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d.  An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e.  An elevator maintenance agreement; and

f.  That part of any other contract or agreement pertaining to **your** business (including an indemnification of a municipality in connection with work performed for a municipality) under which **you** assume the tort liability of another party to pay for **bodily injury** or **property damage** to a third person or organization. Tort liability, as referred to in this provision, means a liability that would be imposed by law in the absence of any contract or agreement.

However, this paragraph f. does not include that part of any contract or agreement:

  (1)  That indemnifies a railroad for **bodily injury** or **property damage** arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

  (2)  That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

     (a)  Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

     (b)  Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

  (3)  Under which the **insured**, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the **insured's** rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

3

9. "**Loading or unloading**" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or **auto**;

b. While it is in or on an aircraft, watercraft or **auto**; or

c. While it is being moved from an aircraft, watercraft or **auto** to the place where it is finally delivered; however, **loading or unloading** does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or **auto**.

10. "**Occurrence**" means an **accident**, happening or event, including continuous or repeated exposure to substantially the same general harmful conditions.

11. "**Personal and advertising injury**" means injury, including consequential **bodily injury**, arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication in any manner, including, but not limited to, e-mail, blogs, and other electronic publication, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner including but not limited to e-mail, blogs, and other electronic publication, of material that violates a person's right of privacy;

f. The use of another's advertising idea in **your advertisement**; or

g. Infringing upon another's copyright, trademark, trade dress or slogan in **your advertisement**.

12. "**Product/completed operations hazard**":

a. Includes all **bodily injury** and **property damage** occurring away from premises **you** own or rent and arising out of **your product** or **your work** except:

   (i) Injury or damage caused by products that are still in **your** physical possession; or

   (ii) Work that has not yet been completed or abandoned. **Your work** will be deemed completed at the earliest of the following times:

      (a) When all of the work called for in **your** contract has been completed;

      (b) When all of the work to be done at the job site has been completed if **your** contract calls for work at more than one job site; or

      (c) When that part of the work done at a particular job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

   Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include **bodily injury** or **property damage** arising out of:

   (i) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle, including an aircraft or watercraft, not owned or operated by **you**, and that condition was created by the **loading or unloading** of that vehicle by any **insured**;

   (ii) The existence of tools, uninstalled equipment, or abandoned or unused materials

13. "**Property damage**" for purposes of this endorsement only, means:

4

0027

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **occurrence** that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

14. "**Silica**" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

15. "**Silica-related dust**" means a mixture or combination of silica and other dust or particles.

16. "**Suit**" means a civil proceeding involving allegations of damages because of **bodily injury**, **property damage** or **personal and advertising injury** to which this insurance applies. **Suit** includes but is not limited to:

a. An arbitration proceeding in which such damages are claimed and to which the **insured** must submit or does submit with **our** consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the **insured** submits with **our** consent.

17. "**Your product**" means:

a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(i) **You**;

(ii) Others trading under **your** name; or

(iii) A person or organization whose business or assets **you** have acquired: and

b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**Your product** includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your product**; and

b. The providing of or failure to provide warnings or instructions.

**Your product** does not include vending machines or other property rented to or located for the use of others but not sold.

18. "**Your work**" means:

a. Work or operations performed by **you** or on **your** behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

**Your work** includes:

5

0028

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your work**; and

b. The providing of or failure to provide warnings or instructions.

## SECTION I – COVERAGES

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1. **Insuring Agreement**
   a. **We** will pay those sums, OTHER THAN PUNITIVE OR EXEMPLARY DAMAGES, that the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** to which this insurance applies. **We** will have the right and duty to defend the **insured** against any **suit** seeking those damages. However, **we** will have no duty to defend the **insured** against any **suit** seeking damages for **bodily injury** or **property damage** to which this insurance does not apply. **We** may, at **our** discretion, investigate any **occurrence** and settle any claim or **suit** that may result. However:
      (1) The amount **we** will pay for damages is limited as described in Section II – Limits Of Liability; and
      (2) **Our** right and duty to defend ends when **we** have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A and B or medical expenses under Coverage C;
      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

   b. This insurance applies to **bodily injury** and **property damage** only if:
      (1) The **bodily injury** or **property damage** is caused by an **occurrence** that takes place in the **coverage territory**; and
      (2) The **bodily injury** or **property damage** occurs during the policy period.
      Any **bodily injury** or **property damage**, whether such **bodily injury** or **property damage** is known or unknown, that first occurred prior to the inception date of this policy (or the retroactive date of this policy, if any, whichever is earlier), or that is, or alleged to be, in the process of occurring at the inception date of this policy (or the retroactive date of this policy, if any, whichever is earlier), even if the **occurrence** continues during this policy period, will be deemed to have occurred prior to the policy period. Any **bodily injury** or **property damage**, whether known or unknown, which is in the process of settlement, adjustment or **suit** as of the inception date of this policy (or the retroactive date of this policy, if any, whichever is earlier) will also be deemed to have occurred prior to the policy period.

      **Bodily injury** or **property damage** that first occurs during this policy period includes any continuation, change or resumption of that **bodily injury** or **property damage** after the end of this policy period.

   c. Damages because of **bodily injury** or **property damage** include damages claimed by any person or organization for care, loss of services, or death resulting at any time from the **bodily injury**.

   d. In the event that a claim or **suit** seeks damages, some of which are covered and others of which are not covered by this policy, the **insured** must agree to a reasonable allocation of the costs and fees of defense, and the **insured** will be responsible for payment of the costs and fees to defend the damages

6

or claims not covered by this policy.  This agreement shall be reached in writing, signed by the **insured** and **us**, prior to the date when a responsive pleading to the claim or **suit** is filed on behalf of the **insured**.  In the absence of such agreement, **our** duty to defend will apply only to those specific portions of the **suit** that are covered.

**EXCLUSIONS** - **READ THE FOLLOWING EXCLUSIONS CAREFULLY.  IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS ENDORSEMENT.**

Coverage under Coverage A does not apply to:

**a. Expected or Intended Injury**

**Bodily injury** or **property damage** expected or intended from the standpoint of any **insured**.  This exclusion does not apply to **bodily injury** resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

**Bodily injury** or **property damage** for which the **insured** is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:
(1) That the **insured** would have in the absence of the contract or agreement; or
(2) Assumed in a contract or agreement that is an **insured contract**, provided the **bodily injury** or **property damage** occurs subsequent to the execution of the contract or agreement.  Solely for the purposes of liability assumed in an **insured contract**, reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an **insured** are deemed to be damages because of **bodily injury** or **property damage**, provided:
  (i) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same **insured contract**; and
  (ii) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

**Bodily injury** or **property damage** for which any **insured** may be held liable by reason of:
(1) Causing or contributing to the intoxication of any person;
(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or
(3) Any statute, ordinance or regulation relating to the sale, gift, distribution, selling, or use of alcoholic beverages.

This exclusion applies only if **you** are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation and Similar Laws**

0030

Any obligation for which an **insured** or an insurer of that **insured**, even if one does not exist, may be held liable under workers' compensation, unemployment compensation, disability benefits law, or any similar law.

**e. Employer's Liability**

**Bodily injury** to:
(1)  An employee of any **insured** arising out of or within the course of:
    i.  that employee's employment by any **insured**; or
    ii. performing duties related to the conduct of any **insured's** business; or
(2)  The spouse, child, parent, brother or sister of that employee as a consequence of Paragraph a. above.

This exclusion applies:
(a)  Whether the **insured** may be liable as an employer or in any other capacity; and
(b)  To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the **insured** under an **insured contract**.

**f. Aircraft, Auto or Watercraft**

**Bodily injury** or **property damage** arising out of:
(1)  The ownership, maintenance, use, or entrustment to others of any aircraft, **auto** or watercraft owned or operated by or rented, leased or loaned to any **insured**; or
(2)  Any **auto you** do not own, lease, hire, rent or borrow that is used in connection with **your** business.
Use includes operation and **loading or unloading**.

This exclusion applies even if the claims against any **insured** allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that **insured**, if the **occurrence** which caused the **bodily injury** or **property damage** involved the ownership, maintenance, use or entrustment to others of any aircraft, **auto** or watercraft that is owned or operated by or rented or loaned to any **insured**.

This exclusion does not apply to:
(1)  A watercraft while ashore on premises **you** own or rent;
(2)  A watercraft **you** do not own that is:
    (a)  Less than 26 feet long; and
    (b)  Not being used to carry persons or property for a charge;
(3)  Parking an **auto** on, or on the ways next to, premises **you** own or rent, provided the **auto** is not owned by or rented or loaned to **you** or the **insured**;
(4)  Liability assumed under any **insured contract** for the ownership, maintenance or use of aircraft or watercraft; or
(5)  **Bodily injury** or **property damage** arising out of:
    (a)  The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of **mobile equipment** if it were not subject to a

8

compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

(b) the operation of any of the machinery or equipment listed in Paragraph B or C of the definition of **auto**.

**g. Mobile Equipment**

**Bodily injury** or **property damage** arising out of:

(1) The transportation of **mobile equipment** by an **auto** owned or operated by or rented or loaned to any **insured**; or

(2) The use of **mobile equipment** in, while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**h. Damage to Property**

**Property damage** to:

(1) Property **you** own, rent, or occupy, including any costs or expenses incurred by **you**, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises **you** sell, give away, or abandon, if the **property damage** arises out of any part of those premises;

(3) Property loaned to **you**;

(4) Personal property in the care, custody or control of the **insured**;

(5) That particular part of real property on which **you** or any contractors or subcontractors working directly or indirectly on **your** behalf are performing operations, if the **property damage** arises out of those operations; or

(6) That particular part of any property that must be restored, repaired, or replaced because **your work** was incorrectly performed on it.

Paragraphs (1), (3), and (4) of this exclusion do not apply to **property damage** (other than damage by fire) to premises, including the contents of such premises, rented to **you** for a period of 7 or fewer consecutive days.  A separate limit of insurance applies to Damage To Premises Rented To **You** as described in Section II – Limits of Insurance, subsection 6.

Paragraph (2) of this exclusion does not apply if the premises are **your work** and were never occupied, rented or held for rental by **you**.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to **property damage** included in the **products-completed operation hazard**.

**i. Damage to Your Product**

**Property damage** to **your product** arising out of it or any part of it.

9

0032

**j. Damage to Your Work**

**Property damage** to **your work** arising out of it or any part of it and included in the **products/completed operations hazard**.

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on **your** behalf by a subcontractor.

**k. Damage to Impaired Property or Property Not Physically Injured**

**Property damage** to **impaired property** or property that has not been physically injured, arising out of:
(1)   A defect, deficiency, inadequacy or dangerous condition in **your product** or **your work**; or
(2)   A delay or failure by **you** or anyone acting on **your** behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to **your product** or **your work** after it has been put to its intended use.

**l. Recall of Products, Work or Impaired Property**

Damages claimed for any **loss**, cost or expense incurred by **you** or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
(1)   **Your product**;
(2)   **Your work**; or
(3)   **Impaired property**;
if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**m. Personal and Advertising Injury**

**Bodily injury** arising out of **personal and advertising injury**.

**n. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

Exclusions c. through n. under this Coverage A do not apply to damage by fire to premises while rented to **you** or temporarily occupied by **you** with permission of the owner.  A separate limit of insurance applies to this coverage as described in Section II – Limits Of Insurance.

0033

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

1. **Insuring Agreement**
   a. **We** will pay those sums, OTHER THAN PUNITIVE OR EXEMPLARY DAMAGES, that the **insured** becomes legally obligated to pay as damages because of **personal and advertising injury** to which this insurance applies. **We** will have the right and duty to defend the **insured** against any **suit** seeking those damages. However, **we** will have no duty to defend the **insured** against any **suit** seeking damages for **personal and advertising injury** to which this insurance does not apply. **We** may, at **our** discretion, investigate any offense and settle any claim or **suit** that may result. However:
      (1) The amount **we** will pay for damages is limited as described in Section II – Limits Of Liability; and
      (2) **Our** right and duty to defend end when **we** have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A and B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

   b. This insurance applies to **personal and advertising injury** caused by an offense arising out of **your** business but only if the offense was committed in the **coverage territory** during the policy period.

**EXCLUSIONS - READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS ENDORSEMENT.**

Coverage under Coverage B does not apply to **personal and advertising injury**:

a. **Knowing Violation of Rights of Another**
   Caused by or at the direction of any **insured** with the knowledge that the act would violate the rights of another and would inflict **personal and advertising injury**.

b. **Material Published with Knowledge of Falsity**
   Arising out of oral or written publication of material, if published by or at the direction of the **insured** with knowledge of its falsity.

c. **Material Published Prior to Policy Period**
   Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

d. **Criminal Acts**
   Arising out of a criminal act committed by or at the direction of any **insured**.

e. **Contractual Liability**
   For any **loss** for which the **insured** has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the **insured** would have in the absence of the contract or agreement.

f. **Breach of Contract**

0034

Arising out of a breach of contract, except an implied contract to use another's advertising idea in **your advertisement**.

**g. Quality or Performance of Goods – Failure to Conform to Statements**
Arising out of the failure of goods, products or services to conform to any statement of quality or performance made in **your advertisement**.

**h. Wrong Description of Prices**
Arising out of the wrong description of price of goods, products or services stated in **your advertisement**.

**i. Insureds in Media and Internet Type Businesses**
Committed by an **insured** whose business is:
(i)    Advertising, broadcasting, publishing or telecasting;
(ii)   Designing or determining content of websites for others; or
(iii)  An Internet search, access, content or service provider.
However, this exclusion does not apply to Paragraphs 11.a, 11.b and 11.c. of **personal and advertising injury** under the Additional Definitions Used In This Endorsement Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for **you** or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**j. Infringement of Copyright, Patent, Trademark or Trade Secret**
Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in **your advertisement**, of copyright, trade dress or slogan.

**k. Electronic Chatrooms or Bulletin Boards**
Arising out of an electronic chatroom or bulletin board the **insured** hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use of Another's Name or Product**
Arising out of the unauthorized use of another's name or product in **your** e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

## GENERAL POLICY EXCLUSIONS

**The following exclusions are applicable to both Coverage A and Coverage B.**

This endorsement provides no coverage for the following:

**a. Asbestos**

**Bodily injury**, **property damage** or **personal and advertising injury** arising out of, resulting from, caused by, or contributed to, either directly or indirectly, by:

0035

1. inhaling, ingesting, or prolonged physical exposure to asbestos or goods or products containing asbestos; or
2. the use of asbestos in constructing or manufacturing any good, product or structure; or
3. the removal of asbestos from any good, product or structure; or
4. the manufacture, transportation, storage or disposal of asbestos or goods or products containing asbestos;

This exclusion includes, but is not limited to, any cost for investigation, defense, abatement, mitigation, removal or disposal of asbestos or asbestos containing materials.

**b. Lead**

**Bodily injury**, **property damage** or **personal and advertising injury** arising out of, resulting from, caused by, or contributed to, either directly or indirectly, by lead or lead based products or any exposure or contamination of any person or property to such lead or lead based product. This exclusion includes but is not limited to any cost for abatement, mitigation, removal or disposal of paint, plumbing solder, pipes and fixtures or other items containing lead.

**c. Fungi or bacteria**

**Bodily injury**, **property damage** or **personal and advertising injury** which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any **fungi** or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

This coverage also does not apply to any **loss**, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, **fungi** or bacteria, by any **insured** or by any other person or entity.

This exclusion does not apply to any **fungi** or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**d. Silica or silica-related dust**

1. **Bodily injury**, **property damage**, or **personal and advertising injury** arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, **silica** or **silica-related dust**.

2. Any **loss**, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of **silica** or **silica-related dust**, by any **insured** or by any other person or entity.

**e. Employment-Related Practices Exclusion**

**Bodily injury** or **personal and advertising injury** to:

13

0036

(1)  A person arising out of any:
1. Refusal to employ that person;
2. Termination of that person's employment; or
3. Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2)  The spouse, child, parent, brother or sister of that person as a consequence of **bodily injury** to that person at whom any of the employment-related practices described in paragraphs 1, 2 or 3 above is directed.

This exclusion applies:
(a)  Whether the **insured** may be liable as an employer or in any other capacity; and
(b)  To any obligation to share damages with or repay someone else who must pay damages because of the injury.

## f.  Assault and/or Battery Exclusion

The coverage under this policy does not apply to any claim, **suit**, cost or expense arising out of assault and/or battery, or out of any act or omission in connection with the prevention or suppression of such acts, whether caused by or at the instigation or direction of any **insured** or **insured's** employees, patrons or any other person.

## g.  Sexual Abuse and/or Molestation Exclusion

The coverages under this policy do not apply to **bodily injury**, **property damage** or **personal and advertising injury** arising out of
(1)  The actual or threatened abuse or molestation or licentious, immoral or sexual behavior whether or not intended to lead to, or culminating in any sexual act, of any person, whether caused by, or at the instigation of, or at the direction of, or omission by, any **insured**, his/her employees, or any other person; or
(2)  The actual or alleged transmission of any sexually transmitted disease.
Abuse includes, but is not limited to, negligent or intentional infliction of physical, emotional or psychological injury or harm.

This exclusion does not apply to the vicarious liability of the named insured for the acts or omissions of employees.

## h.  Firearms Exclusion

This insurance does not apply to any claims, **suits**, accusations or charges or any **loss**, cost, or expense arising out of **bodily injury**, **property damage**, or **personal or advertising injury** arising out of the ownership, rental, maintenance, use or misuse of any firearms.

## l.  War

**Bodily injury**, **property damage** or **personal or advertising injury** due to war, whether declared or undeclared, civil war, insurrection, rebellion, revolution, or to any act or condition incident to these.

14

**j. Pollution**

**Bodily injury, property damage,** or **personal or advertising injury** that would not have occurred in whole or part but for the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of **pollutants** at any time.

This includes any **loss**, cost, or expense arising out of any:
1. Request, demand, order, or statutory or regulatory requirement that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of **pollutants**; or
2. Claim or **suit** by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to, or assessing the effects of, "**pollutants**".

**s. Nuclear Energy Liability**

(1) **Bodily injury** or **property damage**:
   (a) With respect to which an **insured** under the policy is also an **insured** under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an **insured** under any such policy but for its termination upon exhaustion of its limit of liability; or
   (b) Resulting from the **hazardous properties** of **nuclear material** and with respect to which:
      1. any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or
      2. the **insured** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

(2) **Bodily injury** resulting from the **hazardous properties** of **nuclear material** and arising out of the operation of a **nuclear facility** by any person or organization.

(3) **Bodily injury** or **property damage** resulting from **hazardous properties** of **nuclear material**, if:
   (a) The **nuclear material**:
      1. is at any **nuclear facility** owned by, or operated by or on behalf of, an **insured**; or
      2. has been discharged or dispersed from any **nuclear facility** owned by, or operated by or on behalf of, an **insured**.
   (b) The **nuclear material** is contained in **spent fuel** or **waste** at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an **insured**; or
   (c) The **bodily injury** or **property damage** arises out of the furnishing by an **insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **nuclear facility**, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) only applies to **property damage** to such **nuclear facility** and any property threat.

(4) When used in this exclusion:
   (a) **Hazardous properties** includes radioactive, toxic or explosive properties.

0038

(b) **Nuclear material** means **source material**, **special nuclear material**, or **by-product material**.

(c) **Source material**, **special nuclear material**, and **by-product material** have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

(d) **Spent fuel** means any fuel element or fuel component, solid, or liquid, which has been used or exposed to radiation in a **nuclear reactor**.

(e) **Waste** means any waste material:

1. containing **by-product material** other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its **source material** content; and

2. resulting from the operation by any person or organization of any **nuclear facility** included under the first two paragraphs of the definition of **nuclear facility**.

(f) **Nuclear facility** means:

1. Any **nuclear reactor**;

2. Any equipment or device designed or used for:

   a) separating the isotopes of uranium or plutonium;

   b) processing or utilizing **spent fuel**; or

   c) handling, processing or packaging **waste**.

3. Any equipment or device used for the processing, fabricating or alloying of **special nuclear material** if at any time the total amount of such material in the custody of the **insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; or

4. any structure, basic, excavation, premises or place prepared or used for the storage or disposal of **waste**;

   and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

(g) **Nuclear reactor** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

(h) **Property damage** includes all forms of radioactive contamination of property.

## SUPPLEMENTARY PAYMENT – COVERAGES A AND B

1. **We** will pay, with respect to any claim **we** investigate or settle, or any **suit** against an **insured we** defend:

   a. All expenses **we** incur.

   b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage under this policy applies. **We** do not have to furnish these bonds.

   c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. **We** do not have to furnish these bonds.

   d. All reasonable expenses incurred by the **insured** at **our** request to assist **us** in the investigation or defense of the claim or **suit**, including actual loss earnings up to $250 a day because of time off from work.

   e. All cost taxed against the **insured** in the **suit**.

   f. Prejudgment interest awarded against the **insured** on the part of the judgment **we** pay. If **we** make an offer to pay the applicable limit of insurance, **we** will not pay any prejudgment interest based on that period of time after the offer.

0039

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before **we** have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.
These payments will not reduce the limits of insurance.

2. If **we** defend an **insured** against a **suit** and an indemnitee of the **insured** is also named as a party of the **suit**, **we** will defend that indemnitee if all of the following conditions are met:
   a. The **suit** against the indemnitee seeks damages for which the **insured** has assumed the liability of the indemnitee in a contract or agreement that is an **insured contract**;
   b. This insurance applies to such liability assumed by the **insured**;
   c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the **insured** in the same **insured contract**;
   d. The allegations in the **suit** and the information **we** know about the **occurrence** are such that no conflict appears to exist between the interests of the **insured** and the interests of the indemnitee;
   e. The indemnitee and the **insured** ask **us** to conduct and control the defense of that indemnitee against such **suit** and agree that **we** can assign the same counsel to defend the **insured** and the indemnitee; and
   f. The indemnitee:
      (1) Agrees in writing to:
         (a) Cooperate with **us** in the investigation, settlement or defense of the **suit**;
         (b) Immediately send **us** copies of any demands, notices, summonses or legal papers received in connection with the **suit**;
         (c) Notify any other insurer whose coverage is available to the indemnitee; and
         (d) Cooperate with **us** with respect to coordinating other applicable insurance available to the indemnitee; and
      (2) Provides **us** with written authorization to:
         (a) Obtain records and other information related to the **suit**; and
         (b) Conduct and control the defense of the indemnitee in such **suit**.
   So long as the above conditions are met, attorneys' fees incurred by **us** in the defense of that indemnitee, necessary litigation expenses incurred by **us** and necessary litigation expenses incurred by the indemnitee at **our** request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for **bodily injury** and **property damage** and will not reduce the limits of insurance.

   **Our** obligation to defend an **insured's** indemnitee and pay attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:
   a. **We** have used up the applicable limit of insurance in the payment of judgments or settlements; or
   b. The conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

## COVERAGE C – MEDICAL PAYMENTS

1. **Insuring Agreement**
   a. **We** will pay medical expenses as described below for **bodily injury** caused by an **accident**:
      (1) On premises **you** own or rent;
      (2) On ways next to premise **you** own or rent; or

0040

(3)   Because of **your** operations;

Provided that:

(1)   The **accident** takes place in the **coverage territory** and during the policy period;

(2)   The expenses are incurred and reported to **us** within one year of the date of the **accident**; and

(3)   The injured person submits to examination, at **our** expense, by physicians of **our** choice as often as **we** reasonably require.

b.  **We** will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. **We** will pay reasonable expenses for:

(1)   First aid administered at the time of an accident;

(2)   Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3)   Necessary ambulance, hospital, professional nursing and funeral services.

2.  **Exclusions**

**We** will not pay expenses for **bodily injury**:

**a. Any Insured**

To any **insured.**

**b. Hired Person**

To a person hired to do work for or on behalf of any **insured** or a tenant of any **insured.**

**c. Injury on Normally Occupied Premises**

To a person injured on that part of premises **you** own or rent that the person normally occupies.

**d. Workers Compensation and Similar Laws**

To a person, whether or not an **employee** of any **insured**, if benefits for the **bodily injury** are payable or must be provided under a workers' compensation, disability benefits, or unemployment law or a similar law.

**e. Athletic Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the **product-completed operations hazard**.

**g. Coverage A Exclusions**

To a person if the **bodily injury** would be excluded under Coverage A.

**h. War**

Due to war, whether or not declared, or any act or condition incident of war. War includes civil war, insurrection, rebellion or revolution.

## <u>SECTION II – LIMITS OF LIABILITY</u>

1.  The Limits of Liability shown on the **Declarations Page** and the rules below fix the most **we** will pay regardless of the number of:

a. **Insureds**;

18

0041

    b. Claims made or **suits** brought: or

    c. Persons or organizations making claims or bringing **suits**.

2. The General Aggregate Limit is the most **we** will pay for the sum of:

    a. Medical expenses under Coverage C;

    b. Damages under Coverage A, except damages because of **bodily injury** or **property damage** included in the **products-completed operations hazard**; and

    c. Damages under Coverage B.

3. The Product-Completed Operations Aggregate Limit is the most **we** will pay under Coverage A for damages because of **bodily injury** and **property damage** included in the **product-completed operations hazard**.

4. Subject to Paragraph 2. above, the Personal and Advertising Injury Limit is the most **we** will pay under Coverage B for the sum of all damages because of all **personal and advertising injury** sustained by any one person or organization.

5. Subject to Paragraph 2. or 3. above, whichever applies, the Each **Occurrence** Limit is the most **we** will pay for the sum of:

    a. Damages under Coverage A; and

    b. Medical expenses under Coverage C;

    because of all **bodily injury** and **property damage** arising out of any one **occurrence**.

6. Subject to Paragraph 5. above, the Damage To Premises Rented To **You** Limit is the most **we** will pay under Coverage A for damages because of **property damage** to any one premises, while rented to **you**, or in the case of damage by fire, while rented to **you** or temporarily occupied by **you** with permission of the owner.

7. Subject to Paragraph 5. above, the Medical Expense Limit is the most **we** will pay under Coverage C for all medical expenses because of **bodily injury** sustained by any one person.

The Limits of Liability of this policy apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown on the **Declarations Page**, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Liability.

## SECTION III – COMMERCIAL GENERAL LIABILITY PROVISIONS AND CONDITIONS

The following provisions and conditions apply to this endorsement, and are in addition to the General Provisions of the Commercial Auto Policy, and to any schedules, endorsements, or modifications thereto:

1. **Legal Action Against Us**

    No person or organization has a right under this endorsement:

    (a)    To join **us** as a party or otherwise bring **us** into a **suit** asking for damages from an **insured**; or

    (b)    To sue **us** on this endorsement unless all of its terms have been fully complied with.

    A person or organization may sue **us** to recover on an agreed settlement or on a final judgment against an **insured**, but **we** will not be liable for damages that are not payable under the terms of this endorsement or that are in excess of the applicable limit of liability. An agreed settlement means a settlement and release of liability signed by **us**, the **insured** and the claimant or the claimant's legal representative.

2. **Other Insurance**

0042

If other valid and collectible insurance is available to the **insured** for a **loss we** cover under Coverages A and B of this policy, **our** obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when Paragraph b. below applies. If this insurance is primary, **our** obligations are not affected unless any of the other insurance is also primary. Then, **we** will share with all that other insurance by the method described in Paragraph c. below.

b. Excess Insurance

When this insurance applies, it is excess over:

(1) Any of the other insurance, whether primary, excess, contingent or on any other basis:

    (a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for **your work**;

    (b) That is Fire insurance for premises rented to **you** or temporarily occupied by **you** with permission of the owner;

    (c) That is insurance purchased by **you** to cover **your** liability as a tenant for **property damage** to premises rented to **you** or temporarily occupied by **you** with permission of the owner; or

    (d) If the **loss** arises out of the maintenance or use of an **auto**, aircraft or watercraft to the extent not subject to Exclusions m., n. or o. of Section I – Coverage A – Bodily Injury And Property Damage Liability.

(2) Any other primary insurance available to **you** covering liability for damages arising out of the premises or operations for which **you** have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, **we** will have no duty under Coverages A and B to defend the **insured** against any **suit** if any other insurer has a duty to defend the **insured** against that **suit**. If no other insurer defends, **we** will undertake to do so, but **we** will be entitled to the **insured's** right against all those other insurers.

When this insurance is excess over other insurance, **we** will pay only **our** share of the amount of the **loss**, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the **loss** in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

**We** will share the remaining **loss**, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the **Declarations Page** of this policy.

c. Method of Sharing

If all of the other insurance permits contribution by equal shares, **we** will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the **loss** remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, **we** will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

0043

3. **Premium Audit**
    a. **We** will compute all premiums for this policy in accordance with **our** rules and rates.
    b. Premium shown in this policy as advance premium is a deposit premium only.  At the close of each audit period **we** will compute the earned premium for that period.  Audit premiums are due and payable on notice to the first Named Insured.  If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, **we** will return the excess to the first Named Insured.
    c. The first Named Insured must keep records of the information **we** need for premium computation, and send **us** copies at such times as **we** may request.

4. **Representations**
By accepting this policy, **you** agree:
    a. The statements in the **Declarations Page** are accurate and complete;
    b. Those statements are based upon representation **you** made to **us**; and
    c. **We** have issued this policy in reliance upon **your** representations.

5. **Cancellation**
**You** may cancel this policy by calling or writing **us**, and stating the future date that **you** wish the cancellation to be effective.

**We** may cancel this policy by mailing a notice of cancellation to the named insured shown on the **Declarations Page** at the last known address appearing in **our** records.  If **we** cancel this policy during the first sixty (60) days of the initial policy period for any reason other than nonpayment of premium, notice of cancellation will be mailed at least thirty (30) days before the effective date of cancellation.  If **we** cancel this policy at any time due to nonpayment of premium, notice of cancellation will be mailed at least ten (10) days before the effective date of cancellation.  After this policy is in effect for more than sixty (60) days, or if this is a renewal or continuation policy, notice of cancellation will be mailed at least sixty (60) days before the effective date of cancellation.  **Our** notice of cancellation will state the reason(s) for cancellation.

**We** may cancel this policy for any reason within the first sixty (60) days of the initial policy period.

After this policy is in effect for more than sixty (60) days, or if this is a renewal or continuation policy, **we** may only cancel for one or more of the following reasons:
1. **you** do not pay the required premium for this policy when due;
2. this policy was obtained through a material misrepresentation;
3. any insured has violated any of the terms and conditions of the policy;
4. the risk originally accepted has measurably increased;
5. certification to the Director of the loss of reinsurance by the insurer which provided coverage for **us** for all or a substantial part of the underlying risk insured; or
6. a determination by the Director that the continuation of the policy could place **us** in violation of the insurance laws of this state.

0044

6. **When We Do Not Renew**
   If **we** decide not to renew this policy, **we** will mail or deliver to the first Named Insured shown in the **Declarations Page** written notice of the nonrenewal not less than 60 days before the expiration date. If notice is mailed, proof of mailing will be sufficient proof of notice.

7. **Examination of Your Books and Records**
   **We** may examine and audit **your** books and records as they relate to this policy at any time during the policy period and up to three years afterward.

8. **Inspections and Surveys**
   **We** have the right but are not obligated to:
   a. Make inspections and surveys at any time:
   b. Give **you** reports on the conditions **we** find; and
   c. Recommend changes.

   Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. **We** do not make safety inspections. **We** do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. **We** do not warrant that conditions:
   a. Are safe or healthful; or
   b. Comply with laws, regulation, codes or standard.

   This condition applies to **us** and to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

9. **Premiums**
   The first Named Insured shown on the **Declarations Page**
   a. Is responsible for the payment of all premiums, and
   b. Will be the payee for any return premiums **we** pay.

10. **Knowledge and Notice of Occurrence**
    It is agreed that knowledge of an **occurrence** or offense by an agent, servant or employee of the **insured** shall not constitute knowledge to the **insured** unless the corporate risk manager shall have received such notice.

    It is also agreed that if the **insured** reports an **occurrence** or offense to its workers' compensation carrier that develops into a liability claim, failure to report such **occurrence** or offense to **us** at the time of the **occurrence** or offense shall not be deemed in violation of Duties in the Event of **Occurrence**, Offense, Claim or **Suit**.

11. **Headings and Subheadings**
    The headings and subheadings in this policy and any endorsements or schedules hereto are included solely to aid the reader and do not affect the terms of this policy.

12. **Bankruptcy**
    **We** are not relieved of any obligation under this policy because of the bankruptcy or insolvency of an insured.

22

Form Z433 IL (04/08)

0046

Form 2371 (06/10)

## LIMITED GENERAL LIABILITY - TRUCKING OPERATIONS ENDORSEMENT

This endorsement modifies insurance provided under the Commercial General Liability coverage form.

If **your declarations page** shows Limited General Liability, and this form number shows on the attachment line, then the Commercial General Liability coverage form is modified as follows:

**GENERAL POLICY EXCLUSIONS**

**The following exclusion is applicable to both Coverage A and Coverage B.**

This endorsement provides no coverage for the following:

12. **Other than Trucking Operations**

    **Bodily injury**, **property damage**, or **personal or advertising injury** arising out of any activity other than the insured's trucking operations or suffered by any person present at the **insured's** premises for reasons that, principally, are not related to the conduct of the **insured's** trucking operations. For purposes of this exclusion, the following are deemed to be other than trucking operations and are excluded:
    (i)  the use of the **insured's** property for any non-business purpose, such as, for example, a residence; or
    (ii) the conduct of any business activity or the rendering of any professional service that is not a necessary part of the **insured's** trucking operations.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

0047

Form Z440 (06/10)

## REFRIGERATION BREAKDOWN COVERAGE **ENDORSEMENT**

This endorsement modifies the Motor Truck Cargo Legal Liability Coverage endorsement. Except as specifically modified by this Refrigeration Breakdown Coverage endorsement, all provisions of the Motor Truck Cargo Legal Liability Coverage endorsement apply.

**We** agree with **you** that the insurance provided under **your** Motor Truck Cargo Legal Liability Coverage endorsement is modified as follows:

**INSURING AGREEMENT**

The following is added to the Insuring Agreement:

Subject to the Limit of Liability, if **you** pay the premium for the Refrigeration Breakdown Coverage endorsement, **we** will pay for **your** legal liability for direct physical **loss** to **covered property**, caused by spoilage or change in temperature, resulting directly from the sudden and accidental breakdown of refrigeration or heating units on an **insured auto**.

**ADDITIONAL DEFINITIONS**

Under the definition of "**covered peril**", Excluded Peril "g." is deleted and replaced by:

g. **Breakdown, Temperature, Humidity**
   (i)   Humidity, dampness, dryness, or changes in or extremes of temper-ature, other than such **loss** caused by the sudden and accidental breakdown of refrigeration or heating units on the **insured auto**; or
   (ii)  Mechanical or electrical breakdown or failure, other than the sudden and accidental breakdown of refrigeration or heating units on the **insured auto**. However, this Excluded Peril does not apply to **loss** caused by a fire or explosion if such fire or explosion would be covered under this endorsement.

**ADDITIONAL PAYMENTS**

0048

The following is added to the Additional Payments section:

5. **Additional Expense to Temporarily Store Covered Property**
   In addition to the applicable limit of liability for the Refrigeration Breakdown Coverage, **we** will pay any reasonable additional expenses that **you** incur to temporarily store **covered property** in a controlled-temperature environment in order to avoid or minimize **loss** to such property due to spoilage or change in temperature. Such temporary storage must be directly made necessary by the sudden and accidental breakdown of a refrigeration or heating unit of **your insured auto**. However, under this Additional Expense to Temporarily Store Covered Property coverage, **we** will not pay for:
   a. Expenses incurred to repair or replace the refrigeration or heating unit;
   b. Costs or penalties incurred for detention or delay of vehicles, **trailers**, or containers to which the refrigeration or heating unit is attached; or
   c. Additional lodging or meal expenses for the driver of the **insured auto** that exceed $150 per day or $300 total.
   The most **we** will pay with respect to any one occurrence under this Additional Expense to Temporarily Store Covered Property coverage is $2,500.

**LIMITS OF LIABILITY**

The following is added to subsection 2, Deductible:

For each **loss** that qualifies for coverage under the Refrigeration Breakdown Coverage endorsement, a deductible of $2,500 will be applied to reduce the **loss** payable with respect to the **covered property**.

**EXCLUSIONS**

The following exclusions are added:

Coverage under this Refrigeration Breakdown Coverage endorsement will not apply for **loss** caused by, resulting from, or arising out of breakdown of the refrigeration or heating unit due to any of the following, regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**:
1. Failure to provide adequate fuel supply;
2. Failure to maintain crankcase oil or refrigerant level within the manufacturer's specifications;
3. Intentional destruction or damage to automatic temperature control units by an employee; or
4. Failure to maintain the calibration of the refrigeration or heating unit and/or failure to maintain the refrigeration or heating unit within the manufacturer's

specifications.

**DUTIES IN CASE OF A LOSS**

The following are added to the Duties in Case of a Loss section:

7.  **You** must take all reasonable steps to protect **covered property** at the time of and after a **loss** to avoid further damage, including but not limited to storage of the cargo in a properly temperature controlled facility or alternate trailer;
8.  **You** must allow **us** access to the refrigeration or heating equipment prior to its repair unless a delay in repair would imperil the cargo;
9.  **You** must provide **us** access to all maintenance and repair records for the failed refrigeration or heating unit; and
10. **You** must allow **us** access to all records establishing the proper use of the equipment, including any and all electronic records or logs generated by the unit.

**GENERAL PROVISIONS**

The following is added to the General Provisions section:

I.  Refrigeration/Heating Equipment Maintenance.
    1.  **You**, or **your** employee, must check the refrigeration and heating equipment every 12 hours while it is being operated; and
    2.  At least once a month, **you** must:
        a.  Have the refrigeration and heating equipment inspected by a manufacturer-authorized representative, or other trained refrigeration specialist, which may include **you** or **your** employee;
        b.  Promptly perform the proper maintenance according to manufacturer's specifications;
        c.  Make any appropriate or necessary repairs; and
        d.  Keep and update written records with respect to item 1. and items 2.a. through 2.c. above. **You** must allow **us** to inspect these records as often as **we** may reasonably require. If **you** fail to maintain these records, coverage will be void under this endorsement.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE MOTOR TRUCK CARGO LEGAL LIABILITY COVERAGE ENDORSEMENT REMAIN UNCHANGED.**

1781 IL 0219

# ILLINOIS
## COMMERCIAL AUTO FORMS

**PLEASE READ YOUR POLICY AGREEMENT CAREFULLY.**
**Provisions of this Agreement and its endorsements restrict coverage. Be certain you understand all of the coverage terms, the exclusions, and your rights and duties.**

**All forms in the endorsement section do not automatically pertain to your policy.**
**Please refer to your declarations page for form numbers associated with your policy. Only those endorsements whose form numbers appear on your declarations page apply to your policy. All other parts of the policy that have not been modified by an endorsement will remain unchanged.**

**This booklet contains Form 6912 (02/19) and a section of optional endorsements.**



0051

Form 6912 (02/19)

## COMMERCIAL AUTO POLICY

## INDEX OF POLICY PROVISIONS

**PAGE**

**DUTIES IN THE EVENT OF AN ACCIDENT OR LOSS**. . . . . . . . . . . . . . . . . . . . . .1

**GENERAL DEFINITIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

**PART I—LIABILITY TO OTHERS**
   Insuring Agreement—Liability To Others . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
   Additional Definitions Used in This Part Only . . . . . . . . . . . . . . . . . . . . . . . . .6
   Additional Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
   Out-Of-State Coverage Extension. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
   Exclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
   Limit of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

**PART II—DAMAGE TO YOUR AUTO**
   Insuring Agreement—Collision Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . .15
   Insuring Agreement—Comprehensive Coverage . . . . . . . . . . . . . . . . . . . . . .15
   Insuring Agreement—Fire and Theft with Combined
     Additional Coverage (CAC) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
   Additional Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
   Additional Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
   Additional Definitions Used in This Part Only . . . . . . . . . . . . . . . . . . . . . . . .17
   Exclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18
   Limit of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
   Deductible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21
   Salvage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
   No Benefit to Bailee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
   Appraisal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
   Payment of Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23
   Loss Payee Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

**GENERAL PROVISIONS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

**COMMERCIAL AUTO POLICY**

If **you** pay **your** premium when due, **we** will provide the insurance described in this policy.

### DUTIES IN THE EVENT OF AN ACCIDENT OR LOSS

For coverage to apply under this policy, **you** or the person seeking coverage must promptly report each **accident** or **loss** even if **you** or the person seeking coverage is not at fault. Refer to your policy documents for the claims phone number.

**You** or the person seeking coverage must also obtain and provide **us** the names and addresses of all persons involved in the **accident** or **loss**, the names and addresses of any witnesses, and the license plate numbers of the vehicles involved.

If **you** or the person seeking coverage cannot identify the owner or operator of a vehicle involved in the **accident**, or if theft or vandalism has occurred, **you** or the person seeking coverage must notify the police within 24 hours or as soon as practicable. However, for purposes of uninsured motorist coverage when the owner or operator of a vehicle involved in the accident cannot be identified, **you** or the person seeking coverage must notify the police no more than 30 days after the accident.

A person seeking coverage must:
1. cooperate with **us** in any matter concerning a claim or lawsuit;
2. provide any written proof of **loss we** may reasonably require;
3. allow **us** to take signed and recorded statements, including sworn statements and examinations under oath, which **we** may conduct outside the presence of **you**, a **relative**, or any person claiming coverage, and answer all reasonable questions **we** may ask as often as **we** may reasonably require;
4. promptly call **us** to notify **us** about any claim or lawsuit and send **us** any and all legal papers relating to any claim or lawsuit;
5. attend hearings and trials as **we** require;
6. submit to medical examinations at **our** expense by doctors **we** select as often as **we** may reasonably require;
7. authorize **us** to obtain medical and other records;
8. take reasonable steps after a **loss** to protect the **insured auto** from further **loss**. **We** will pay reasonable expenses incurred in providing that protection. If failure to provide such protection results in further loss, any additional damages will not be covered under this policy;
9. allow **us** to have access to an **insured auto** or other **auto** involved in an **accident** or **loss** and to have it inspected and appraised before its repair or disposal; and
10. authorize **us** access to **your** business or personal records as often as **we** may reasonably require.

0054

**The words and phrases below, whether in the singular, plural or possessive, have the following special meanings when appearing in boldface type in this policy, and in endorsements issued in connection with this policy, unless specifically modified.**

1. "**Accident**" means a sudden, unexpected and unintended event, or a continuous or repeated exposure to that event, that causes **bodily injury** or **property damage**.

2. "**Auto**" means a land motor vehicle or **trailer** designed for travel on public roads, or any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged. It does not include **mobile equipment**. Self-propelled vehicles with the following types of permanently attached equipment are **autos**, not **mobile equipment**:
   a. equipment designed and used primarily for:
      (i) snow removal;
      (ii) road maintenance, but not construction or resurfacing;
      (iii) street cleaning;
   b. cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and
   c. air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well-servicing equipment.

3. "**Bodily injury**" means bodily harm, sickness, or disease, including death that results from bodily harm, sickness, or disease.

4. "**Declarations**" or "**declarations page**" means the document prepared by **us** listing **your** policy information, which may include the types of coverage **you** have elected, the limit for each coverage, the cost for each coverage, the specifically described **autos** covered by this policy, and the types of coverage for each specifically described **auto**.

5. "**Employee**" includes a **leased worker** and a statutory employee. **Employee** does not include a **temporary worker**.

6. "**Insured auto**" or "**your insured auto**" means:
   a. Any **auto** specifically described on the **declarations page**; or
   b. An additional **auto** for Part I—Liability To Others and/or Part II—Damage To Your Auto on the date **you** become the owner if:
      (i) **you** acquire the **auto** during the policy period shown on the **declarations page**;

0055

2

(ii) **we** insure all **autos** owned by **you** that are used in **your** business;

(iii) no other insurance policy provides coverage for that **auto**; and

(iv) **you** tell **us** within 30 days after **you** acquire it that **you** want **us** to cover it for that coverage.

If **you** add any coverage, increase **your** limits, or make any other changes to this policy during the 30-day period after **you** acquire an additional **auto**, these changes to **your** policy will not become effective until after **you** ask **us** to add the coverage, increase **your** limits, or make such changes for the additional **auto**. **We** may charge premium for the additional **auto** from the date **you** acquire the **auto**.

With respect to Part I—Liability To Others, if **we** provide coverage for an additionally acquired **auto** in accordance with this paragraph b., **we** will provide the same coverage for such additional **auto** as **we** provide for any **auto** shown on the **declarations page**.

With respect to Part II—Damage To Your Auto, if **we** provide coverage for an **auto you** acquire in addition to any **auto** specifically described on the **declarations page**, and the additional **auto** is:

(i) a **private passenger auto**, **we** will provide the broadest coverage **we** provide for any **auto** shown on the **declarations page**; or

(ii) any **auto** other than a **private passenger auto**, and **you** have purchased Physical Damage coverage for at least one **auto** other than a **private passenger auto**, **we** will provide the broadest coverage for which the newly acquired **auto** is eligible.

c. Any replacement **auto** on the date **you** become the owner if:

(i) **you** acquire the **auto** during the policy period shown on the **declarations page**;

(ii) the **auto** that **you** acquire replaces one specifically described on the **declarations page** due to termination of **your** ownership of the replaced **auto** or due to mechanical breakdown of, deterioration of, or **loss** to the replaced **auto** that renders it permanently inoperable; and

(iii) no other insurance policy provides coverage for that **auto**.

If **we** provide coverage for a replacement **auto**, **we** will provide the same coverage for the replacement **auto** as **we** provide for the replaced **auto**. **We** will provide that coverage for a period of 30 days after **you** become the owner of such replacement **auto**. **We** will not provide any coverage after this 30-day period unless within this period **you** ask **us** to insure the replacement **auto**. If **you** add any coverage, increase **your** limits, or make any other changes to **your** policy during this 30-day period, these changes to **your** policy will not become effective until after **you** ask **us** to add the coverage, increase **your** limits, or make such changes.

0056

3

7. "**Insured contract**" means:

   a. A lease of premises;

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. That part of any other contract or agreement pertaining to **your** business (including an indemnification of a municipality in connection with work performed for a municipality) under which **you** assume the tort liability that is vicariously imposed on another for **your** negligence or that of **your employees** or agents; or

   f. That part of any contract or agreement, entered into as part of **your** business, for the rental of an **insured auto**. However, such contract or agreement shall not be considered an **insured contract** to the extent that it obligates **you** or any of **your employees** to pay for **property damage** to any **auto** rented or leased to **you** or any of **your employees**.

An "**insured contract**" does not include that part of any contract or agreement:

   1. That indemnifies a railroad for **bodily injury** or **property damage** arising out of construction or demolition operations within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass, or crossing; or

   2. That pertains to the loan, lease or rental of an **auto** to **you** or any of **your employees**, if the **auto** is loaned, leased or rented with a driver; or

   3. That holds a person or organization engaged in the business of transporting property by **auto** for hire harmless for **your** use of an **insured auto** over a route or territory that person or organization is authorized to serve by public authority.

8. "**Leased worker**" means a person leased to **you** by a labor leasing firm under an agreement between **you** and the labor leasing firm to perform duties related to the conduct of **your** business. **Leased worker** does not include a **temporary worker**.

9. "**Loss**" means sudden, direct and accidental loss or damage.

10. "**Mobile equipment**" means any of the following types of land vehicles, including, but not limited to, any attached machinery or equipment:

   a. Bulldozers, farm implements and machinery, forklifts, and other vehicles designed for use principally off public roads;

   b. Vehicles **you** use solely on premises **you** own or rent and on accesses to public roads from these premises, unless specifically described on the **declarations page** and not defined as **mobile equipment** under other parts of this definition;

0057

4

c. Any vehicle that travels on crawler treads, or that does not require licensing in the state in which **you** reside or **your** business is licensed;

d. Vehicles, whether self-propelled or not, used primarily to provide mobility to permanently attached:
  (i) Power cranes, shovels, loaders, diggers, or drills; or
  (ii) Road construction or resurfacing equipment, such as graders, scrapers or rollers.

e. Vehicles not described in Paragraphs a., b., c., or d. above that are not self-propelled and are used primarily to provide mobility to permanently attached equipment of the following types:
  (i) Air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well-servicing equipment; or
  (ii) Cherry pickers and similar devices used to raise or lower workers.

f. Vehicles not described in Paragraphs a., b., c., or d. above that are self-propelled and used primarily for purposes other than transportation of persons or cargo.

However, **mobile equipment** does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged.

11. "**Occupying**" means in, on, entering or exiting.

12. "**Personal vehicle sharing program**" means a system or process, operated by a business, organization, network, group, or individual, that facilitates the sharing of **private passenger autos** for use by individuals, businesses, or other entities.

13. "**Pollutants**" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

14. "**Private passenger auto**" means a land motor vehicle:
   a. of the private passenger, pickup body, or cargo van type;
   b. designed for operation principally upon public roads;
   c. with at least four wheels; and
   d. with a gross vehicle weight rating of 12,000 pounds or less, according to the manufacturer's specifications.

   However, **private passenger auto** does not include step-vans, parcel delivery vans, or cargo cutaway vans or other vans with cabs separate from the cargo area.

15. "**Property damage**" means physical damage to, destruction of, or loss of use of, tangible property.

16. "**Relative**" means any person residing in the household in which the named insured resides who is related to the named insured by blood, marriage, or

0058

5

adoption, including a ward or foster child. This term only applies if the named insured is a natural person.

17. "**Temporary substitute auto**" means any **auto you** do not own while used with the permission of its owner as a temporary substitute for an **insured auto** that has been withdrawn from normal use due to breakdown, repair, servicing, loss or destruction. However, **temporary substitute auto** does not include any **auto** available for the regular or frequent use of **you**, a **relative**, or **your employees** unless that **auto** is insured under a separate policy of insurance that provides at least the minimum required limits of financial responsibility under the applicable state and federal laws.

18. "**Temporary worker**" means:
   a. a person who is furnished to **you** to substitute for a permanent **employee** on leave or to meet seasonal or short-term workload conditions; or
   b. a day laborer.

19. "**Trailer**" includes a semi-trailer and any piece of equipment used to convert a semi-trailer to a full trailer while it is attached to the semi-trailer.

20. "**We**", "**us**" and "**our**" mean the company providing this insurance as shown on the **declarations page**.

21. "**You**", "**your**" and "**yours**" refer to the named insured shown on the **declarations page**.

## **PART I—LIABILITY TO OTHERS**

### **INSURING AGREEMENT—LIABILITY TO OTHERS**

Subject to the Limits of Liability, if **you** pay the premium for liability coverage for the **insured auto** involved, **we** will pay damages, other than punitive or exemplary damages, for **bodily injury**, **property damage**, and **covered pollution cost or expense** for which an **insured** becomes legally responsible because of an **accident** arising out of the ownership, maintenance or use of that **insured auto**. However, **we** will only pay for the **covered pollution cost or expense** if the same **accident** also caused **bodily injury** or **property damage** to which this insurance applies.

**We** will settle or defend, at **our** option, any claim or lawsuit for damages covered by this Part I. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the Limit of Liability for this coverage has been exhausted by payment of judgments or settlements.

### **ADDITIONAL DEFINITIONS USED IN THIS PART ONLY**

A. When used in Part I—Liability To Others, **insured** means:
   1. **You** with respect to an **insured auto**.

0059

6

2. Any person while using, with **your** permission, and within the scope of that permission, an **insured auto you** own, hire, or borrow except:

   (a) Any person while he or she is working in a business of selling, leasing, repairing, parking, storing, servicing, delivering or testing **autos**, unless that business is **yours** and it was so represented in **your** application.

   (b) Any person while he or she is moving property to or from an **insured auto**, other than one of **your employees**, partners (if you are a partnership), members (if you are a limited liability company), or officers or directors (if you are a corporation).

   (c) The owner or anyone else from whom the **insured auto** is leased, hired, or borrowed. However, this exception does not apply if the **insured auto** is specifically described on the **declarations page**.

   (d) The employees or agents of an owner or anyone else from whom the **insured auto** is leased, hired or borrowed. However, this exception does not apply if the **insured auto** is specifically described on the **declarations page**.

   For purposes of this subsection A.2., an **insured auto you** own includes any **auto** specifically described on the **declarations page**.

3. Any other person or organization, but only with respect to the legal liability of that person or organization for acts or omissions of any person otherwise covered under this Part I—Liability To Others. If **we** make a filing or submit a certificate of insurance on **your** behalf with a regulatory or governmental agency, the term "**insured**" as used in such filing or certificate, and in any related endorsement, refers only to the person or organization named on such filing, certificate or endorsement.

B. When used in Part I—Liability To Others, **insured auto** also includes:

   1. **Trailers** designed primarily for travel on public roads, while connected to **your insured auto** that is a power unit;

   2. **Mobile equipment** while being carried or towed by an **insured auto**;

   3. Any **temporary substitute auto**; and

   4. **Mobile equipment** that is:

      a. owned by **you**;

      b. leased, hired, or borrowed by **you** and **you** have purchased either "Hired Auto Coverage" or "Any Automobile Legal Liability Coverage" from **us**; or

      c. not owned, leased, hired, or borrowed by **you** and **you** have purchased either "Employer's Non-Ownership Liability Coverage" or "Any Automobile Legal Liability Coverage" from **us**.

   However, **mobile equipment** meeting any of those three criteria will qualify only if at the time of **loss** it is being:

      a. used in **your** business;

      b. operated on a public highway; and

      c. operated in a state or province where it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law.

0060

7

C. When used in Part I—Liability To Others, "**covered pollution cost or expense**" means any cost or expense arising out of:

1. Any request, demand, order, or statutory or regulatory requirement; or
2. Any claim or suit by or on behalf of a governmental authority demanding that the **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of, **pollutants**.

**Covered pollution cost or expense** does not include any cost or expense arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of **pollutants**:

a. That are, or that are contained in any property that is:
   (i) Being transported or towed by, handled, or handled for movement into, onto, or from, the **insured auto**;
   (ii) Otherwise in the course of transit by or on behalf of the **insured**; or
   (iii) Being stored, disposed of, treated, or processed in or upon the **insured auto**;
b. Before the **pollutants** or any property in which the **pollutants** are contained are moved from the place where they are accepted by the **insured** for movement into or onto the **insured auto**; or
c. After the **pollutants** or any property in which the **pollutants** are contained are moved from the **insured auto** to the place where they are finally delivered, disposed of, or abandoned by the **insured**.

The above Paragraph a. of this definition does not apply to fuels, lubricants, fluids, exhaust gasses, or other similar **pollutants** that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the **insured auto** or its parts if:

(1) The **pollutants** escape, seep, migrate, or are discharged, dispersed or released directly from an **insured auto** part designed by its manufacturer to hold, store, receive or dispose of such **pollutants** and is a part that would be required for the customary operation of the **insured auto**; and
(2) The **bodily injury**, **property damage** or **covered pollution cost or expense** does not arise out of the operation of any equipment listed in Paragraphs b. and c. of the definition of **auto**.

The above Paragraphs b. and c. of this definition do not apply to **accidents** that occur away from premises owned by or rented to an **insured** with respect to **pollutants** not in or upon an **insured auto** if:

(1) The **pollutants** or any property in which the **pollutants** are contained are upset, overturned or damaged as a result of the maintenance or use of an **insured auto**; and
(2) The discharge, dispersal, release or escape of the **pollutants** is caused directly by such upset, overturn or damage.

0061

**ADDITIONAL PAYMENTS**

In addition to **our** Limit of Liability, **we** will pay for an **insured**:

1. all expenses that **we** incur in the settlement of any claim or defense of any lawsuit;

2. interest accruing after entry of judgment on that part of the judgment that does not exceed **our** Limit of Liability. This payment does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured**. **Our** payment, offer in writing, or deposit in court of that part of the judgment which does not exceed **our** Limit of Liability ends **our** duty to pay interest which accrues after the date of **our** payment, written offer, or deposit;

3. the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in a principal amount exceeding **our** Limit of Liability, and **we** have no duty to apply for or furnish these bonds;

4. up to $2,000 for cost of bail bonds required because of an **accident we** cover. **We** have no duty to apply for or furnish these bonds;

5. reasonable expenses incurred by an **insured** at **our** request, including loss of earnings up to $250 a day; and

6. all court costs taxed against the **insured** in any "suit" against the **insured** we defend. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the **insured**.

**OUT-OF-STATE COVERAGE EXTENSION**

If an **accident** to which this Part I applies occurs in any state, territory, or possession of the United States of America, Puerto Rico, or any province or territory of Canada, other than the state in which an **insured auto** is principally garaged, and the state, province, territory or possession has:
1. a financial responsibility or similar law requiring limits of liability for **bodily injury** or **property damage** higher than the limits shown on the **declarations page**, this policy will provide the higher limit; or
2. a compulsory insurance or similar law requiring a non-resident to maintain insurance whenever the non-resident uses an **auto** in that state, province, territory or possession, this policy will provide the greater of:
   a. the required minimum amounts and types of coverage; or
   b. the Limits of Liability under this policy.

This extension does not apply to the limit or limits specified by any law governing commercial carriers of passengers or property.

0062

9

**We** will not pay anyone more than once for the same elements of **loss** because of this extension.

**EXCLUSIONS—PLEASE READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE FOR AN ACCIDENT OR LOSS WILL NOT BE AFFORDED UNDER THIS PART I—LIABILITY TO OTHERS.**

Coverage under this Part I, including **our** duty to defend, does not apply to:

1. **Expected or Intended Injury**
   **Bodily injury** or **property damage** either expected by or caused intentionally by or at the direction of any **insured**.

2. **Contractual**
   Any liability assumed by an **insured** under any contract or agreement, unless the agreement is an **insured contract** that was executed prior to the occurrence of any **bodily injury** or **property damage**.

   However, this exclusion does not apply to liability for damages that an **insured** would have in the absence of the contract or agreement.

3. **Worker's Compensation**
   Any obligation for which an **insured** or an insurer of that **insured**, even if one does not exist, may be held liable under workers' compensation, unemployment compensation, disability benefits law, or any similar law.

4. **Nuclear Energy Liability**
   An **accident** for which any person is insured under nuclear energy liability insurance. This exclusion applies even if the limits of that insurance are exhausted.

5. **Employee Indemnification and Employer's Liability**
   **Bodily injury** to:
   a. An **employee** of any **insured** arising out of or within the course of:
      (i) That **employee's** employment by any **insured**; or
      (ii) Performing duties related to the conduct of any **insured's** business; or
   b. The spouse, child, parent, brother or sister of that **employee** as a consequence of Paragraph a. above.

   This exclusion applies:
   a. Whether the **insured** may be liable as an employer or in any other capacity; and
   b. To any obligation to share damages with or repay someone else who must pay damages because of the injury.

0063

10

But this exclusion does not apply to **bodily injury** to a domestic **employee** if benefits are neither paid nor required to be provided under any workers' compensation, disability benefits, or similar law, or to liability for **bodily injury** assumed by the **insured** under an **insured contract**. For the purposes of this policy, a domestic **employee** is a person engaged in household or domestic work performed principally in connection with a residence premises.

6. **Fellow Employee**
   **Bodily injury** to:
   a. a fellow **employee** of an **insured** injured while within the course of their employment or while performing duties related to the conduct of **your** business.
   b. the spouse, child, parent, brother, or sister of that fellow **employee** as a consequence of Paragraph a. above.

7. **Care, Custody or Control**
   **Property damage** to, towing or removal expense for, or **covered pollution cost or expense** involving, any property owned by, rented to, being transported by, used by, or in the care, custody or control of any **insured**, including any motor vehicle operated or being towed. But this exclusion does not apply to liability assumed under a sidetrack agreement.

8. **Movement of Property by Mechanical Device**
   **Bodily injury** or **property damage** resulting from or caused by the movement of property by a mechanical device, other than a hand truck, not attached to an **insured auto**.

9. **Handling of Property**
   **Bodily injury** or **property damage** resulting from or caused by the handling of property:
   a. before it is moved from the place where it is accepted by the **insured** for movement into or onto **your insured auto**; or
   b. after it has been moved from **your insured auto** to the place where it is finally delivered by the **insured**.

10. **Pollution**
    **Bodily injury** or **property damage** resulting from or caused by the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of any **pollutants**:
    a. That are, or that are contained in any property that is:
       (i) Being transported or towed by, handled, or handled for movement into, onto, or from, the **insured auto**;
       (ii) Otherwise in the course of transit by or on behalf of the **insured**; or
       (iii) Being stored, disposed of, treated, or processed in or upon the **insured auto**;

0064

11

b. Before the **pollutants** or any property in which the **pollutants** are contained are moved from the place where they are accepted by the **insured** for movement into or onto the **insured auto**; or

c. After the **pollutants** or any property in which the **pollutants** are contained are moved from the **insured auto** to the place where they are finally delivered, disposed of, or abandoned by the **insured**.

The above Paragraph a. of this exclusion does not apply to fuels, lubricants, fluids, exhaust gasses, or other similar **pollutants** that are needed for or result from the normal electrical, hydraulic, or mechanical functioning of the **insured auto** or its parts if:

(1) The **pollutants** escape, seep, migrate, or are discharged, dispersed, or released directly from an **insured auto** part designed by its manufacturer to hold, store, receive, or dispose of such **pollutants** and is a part that would be required for the customary operation of the **insured auto**; and

(2) The **bodily injury**, **property damage**, or **covered pollution cost or expense** does not arise out of the operation of any equipment listed in Paragraphs b. and c. of the definition of **auto**.

The above Paragraphs b. and c. of this exclusion do not apply to **accidents** that occur away from premises owned by or rented to an **insured** with respect to **pollutants** not in or upon an **insured auto** if:

(1) The **pollutants** or any property in which the **pollutants** are contained are upset, overturned, or damaged as a result of the maintenance or use of an **insured auto**; and

(2) The discharge, dispersal, seepage, migration, release, or escape of the **pollutants** is caused directly by such upset, overturn, or damage.

11. **Racing**
    **Bodily injury** or **property damage** arising out of **you** or an **insured** participating in, or preparing for, a prearranged or organized racing, speed or demolition contest, stunting activity, or performance contest.

12. **War**
    **Bodily injury** or **property damage** arising directly or indirectly out of:
    a. War, including undeclared or civil war;
    b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
    c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

13. **Operations**
    **Bodily injury**, **property damage**, or **covered pollution cost or expense** arising out of the operation of:
    a. any equipment listed in Paragraphs b. and c. of the definition of **auto**; or

b. machinery or equipment that is on, attached to, or part of, a land vehicle that meets the definition of **mobile equipment**.

14. **Completed Operations**
**Bodily injury** or **property damage** arising out of, or caused by, **your** work after that work has been completed or abandoned.

For purposes of this exclusion, **your** work means:
a. Work or operations performed by **you** or on **your** behalf;
b. Materials, parts, or equipment furnished in connection with such work or operations; and
c. The delivery of liquids.

**Your** work includes warranties or representations made at any time with respect to the fitness, quality, durability, or performance of any of the items included in Paragraphs a., b., or c. above.

**Your** work will be deemed completed at the earliest of the following times:
a. When all of the work called for in **your** contract has been completed.
b. When all of the work to be done at a particular site has been completed if **your** contract calls for work at more than one site.
c. When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or sub-contractor working on the same project.
Work that may need service, maintenance, correction, repair, or replace-ment, but which is otherwise complete, will be treated as completed.

15. **Criminal Acts**
**Bodily injury** or **property damage** caused by, or reasonably expected to result from, a criminal act or omission of an **insured**. This exclusion applies regardless of whether that **insured** is actually charged with, or convicted of, a crime. For purposes of this exclusion, criminal acts or omissions do not include traffic violations.

16. **Vehicle Sharing—Private Passenger Autos**
**Bodily injury** or **property damage** arising out of the use of an **insured auto** that is a **private passenger auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of an **insured auto** by **you**.

**LIMIT OF LIABILITY**

**We** will pay no more than the Limit of Liability shown on the **declarations page** for this coverage for the **insured auto** involved in the **accident** regardless of:
1. the number of premiums paid;
2. the number of **insured autos** or trailers shown on the **declarations page**;

0066

13

3. the number of policies issued by **us**;

4. the number of vehicles or **insureds** involved in an **accident**; or

5. the number of claims or lawsuits arising out of an **accident**;

subject to the following:

1. **Coverage Required by Filings**

   If **we** have filed a certificate of insurance on **your** behalf with any regulatory or governmental agency, and:

   (i) **we** are required to pay any judgment entered against **you**; or

   (ii) **we** agree to settle a claim or lawsuit;

   for **bodily injury**, **property damage**, or **covered pollution cost or expense** arising out of an **accident** or **loss** otherwise not covered under the terms of this policy solely because of such certificate of insurance, **we** will be obligated to pay no more than the minimum amount required by that agency or applicable law. If any payment is based solely on such certificate, **you** must reimburse **us** in full for **our** payment, including legal fees and costs **we** incurred, whether the payment is made as a result of judgment or settlement.

2. **Combined Bodily Injury and Property Damage Limits**

   Subject to the terms of Section 1 above, if **your declarations page** indicates that combined **bodily injury** and **property damage** limits apply for "each accident" or "combined single limit" applies, the most **we** will pay for the aggregate of all damages and **covered pollution cost or expense** combined, resulting from any one **accident**, is the combined liability insurance limit shown on the **declarations page** for the **insured auto** involved in the **accident**.

3. **Separate Bodily Injury Liability and Property Damage Liability Limits**

   Subject to the terms of Section 1 above, if **your declarations page** indicates that separate **bodily injury** liability and **property damage** liability limits apply:

   a. The "each person" **bodily injury** liability limit listed on the **declarations page** for the **insured auto** involved in the **accident** is the maximum **we** will pay for **bodily injury** sustained by any one person in any one **accident**, and that "each person" maximum limit will apply to the aggregate of claims made for such **bodily injury** and any and all claims derived from such **bodily injury**, including, but not limited to, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

   b. Subject to the **bodily injury** liability limit for "each person", the "each accident" **bodily injury** liability limit listed on the **declarations page** for the **insured auto** involved in the **accident** is the maximum **we** will pay for

0067

14

**bodily injury** sustained by two or more persons in any one **accident**, including all derivative claims which include, but are not limited to, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

c. The "each accident" **property damage** liability limit listed on the **declarations page** for the **insured auto** involved in the **accident** is the maximum **we** will pay for the aggregate of all **property damage** and **covered pollution cost or expense** combined, sustained in any one **accident**.

For the purpose of determining **our** Limit of Liability under Sections 1., 2., and 3. above, all **bodily injury**, **property damage**, and **covered pollution cost or expense**, resulting from continuous or repeated exposure to substantially the same event, shall be considered as resulting from one **accident**.

An **insured auto** and any **trailer** or **trailers** attached thereto shall be deemed to be one **auto** with respect to **our** Limit of Liability.

When coverage is afforded for an **accident** involving an **insured auto** that, at the time of loss:

a. is a **trailer** specifically described on the **declarations page**; and
b. is attached to any power unit that is not an **insured auto** specifically described on the **declarations page**;

the maximum amount we will pay will be limited to the lesser of an amount not to exceed the applicable compulsory or financial responsibility law limits of the state identified in **your** address as shown on the **declarations page** or the Limit of Liability shown on the **declarations page**.

Any amount payable under Part I—Liability To Others to or for an injured person will be reduced by any payment made to that person under any Uninsured Motorist Coverage, Underinsured Motorist Coverage, Personal Injury Protection Coverage, or Medical Payments Coverage provided by this policy.

## PART II—DAMAGE TO YOUR AUTO

### INSURING AGREEMENT—COLLISION COVERAGE

Subject to the Limits of Liability, if **you** pay the premium for Collision Coverage, **we** will pay for **loss** to **your insured auto** and its **permanently attached equipment** when it collides with another object or overturns.

### INSURING AGREEMENT—COMPREHENSIVE COVERAGE

Subject to the Limits of Liability, if **you** pay the premium for Comprehensive Coverage, **we** will pay for **loss** to **your insured auto** and its **permanently attached equipment** from any cause other than those covered under Collision Coverage.

0068

Any **loss** caused by missiles, falling objects, fire, theft, collision with an animal, or accidental glass breakage shall be deemed a Comprehensive **loss**. However, **you** have the option of having glass breakage caused by a covered **auto's** collision or overturn considered a **loss** under Collision Coverage.

## INSURING AGREEMENT—FIRE AND THEFT WITH COMBINED ADDITIONAL COVERAGE (CAC)

Subject to the Limits of Liability, if **you** pay the premium for Fire and Theft with Combined Additional Coverage (CAC), **we** will pay for **loss** to **your insured auto** and its **permanently attached equipment** caused by:

1. fire, lightning or explosion;
2. theft;
3. windstorm or hail;
4. earthquake;
5. flood or rising water;
6. malicious mischief or vandalism;
7. the stranding, sinking, burning, collision, or derailment of any conveyance in or upon which **your insured auto** is being transported; or
8. collision with a bird or animal.

No **losses** other than those specifically described above will be covered under Part II of this policy.

## ADDITIONAL COVERAGE

1. **Transportation Expenses**

   **We** will pay up to $30 per day, up to a maximum of $900, for temporary transportation expenses incurred by **you** because of the theft of an **insured auto** that is a **private passenger auto**. This coverage applies only to those **insured autos** for which **you** carry Comprehensive Coverage. **We** will pay for temporary transportation expenses incurred during the period beginning 48 hours after **you** report the theft to **us**, and ending when the **insured auto** is returned to use, or **we** pay for its **loss**.

2. **Coverage for Temporary Substitute Autos**

   If a **temporary substitute auto** is involved in a **loss**, **we** will provide the same coverage and deductible that would have applied to the **insured auto** for which it is a substitute. The most **we** will pay for **loss** to a **temporary substitute auto** is the lesser of the Actual Cash Value at the time of **loss** or the cost of repairing or replacing the damaged or stolen property with like kind and quality, less the applicable deductible.

0069

3. **Pet Injury Coverage**

If **you** have purchased Collision Coverage for at least one **insured auto** listed on the **declarations page**, Pet Injury Coverage is included in **your** policy.

### Insuring Agreement

If a **pet** sustains injury or death while inside an **insured auto** at the time of a **loss** covered under Collision, Comprehensive, or Fire & Theft with Combined Additional Coverage, **we** will pay:
1. for reasonable and customary veterinary fees incurred by **you** or the owner of the **pet** if the **pet** is injured in, or as a direct result of, the covered **loss**; or
2. a death benefit if the **pet** dies in, or as a direct result of, the covered **loss**.

In the event of a covered **loss** due to the theft of an **insured auto**, **we** will provide the death benefit provided the **pet** is not recovered.

### Limits of Liability

The following additional Limits of Liability apply to Pet Injury Coverage:
1. The most **we** will pay for all damages in any one **loss** is a total of $1,000 regardless of the number of **pets** involved.
2. If the **pet** dies in, or as a direct result of, a covered **loss**, **we** will provide a death benefit of $1,000, less any payment **we** made toward veterinary expenses for the **pet**.
3. No deductible shall apply to this coverage.

## ADDITIONAL PAYMENTS

If **you** have paid the premium for Comprehensive Coverage, Collision Coverage, or Fire and Theft with Combined Additional Coverage, then in addition to **our** Limit of Liability, **we** will pay:

1. All reasonable expenses necessary to return a stolen **insured auto** to **you**, unless **we** determine the **auto** to be a total loss.
2. All reasonable expenses necessary to remove an **insured auto** from the site of an **accident** or **loss** and transport it to a repair facility.

## ADDITIONAL DEFINITIONS USED IN THIS PART ONLY

When used in Part II—Damage To Your Auto:

1. "**Finance agreement**" means a written lease or loan contract, entered into as a part of **your** business, pertaining to the lease or purchase by **you** of an

0070

17

**insured auto**, and subject to a valid promissory note or written payment obligation contained in a lease, and security agreement or other written agreement establishing a security interest, executed concurrently with a purchase or lease of the **insured auto** that is commensurate with fair market value.

2. "**Permanently attached equipment**" or **PAE** means equipment and devices that are permanently installed or attached to **your insured auto**. **Permanently attached equipment** also includes:
   a. accessories designed to work as part of the equipment or devices;
   b. load securing equipment and devices; and
   c. custom paint or decals.

3. "**Pet**" means a dog or cat occupying an **insured auto** with **your** express or implied consent.

**EXCLUSIONS—PLEASE READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE FOR AN ACCIDENT OR LOSS WILL NOT BE AFFORDED UNDER THIS PART II—DAMAGE TO YOUR AUTO.**

1. **We** will not pay for loss caused by or resulting from any of the following. Such **loss** is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**.
   a. **War or Military Action**
      (1) war, including undeclared or civil war;
      (2) warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or agents;
      (3) insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.
   b. **Nuclear Hazard**
      (1) the explosion of any weapon employing atomic fission or fusion; or
      (2) nuclear reaction or radiation, or radioactive contamination, however caused.

2. **We** will not pay for **loss** to any sound equipment, video equipment, or transmitting equipment not permanently installed in **your insured auto**, or to tapes, records, compact discs, DVDs, or similar items used with sound or video equipment.

3. **We** will not pay for **loss** to radar detectors or to any other equipment or device designed or used to detect speed measuring equipment, or to any equipment designed or used to jam or disrupt any speed measuring equipment.

4. **We** will not pay for **loss** due and confined to:
   a. wear and tear, freezing, mechanical or electrical breakdown, or structural failure caused by material fatigue, decomposition, or corrosion.

0071

18

b. blowouts, punctures, flat spots, or other road damage to tires.

But, coverage does apply if the damage is the result of other **loss** covered by the policy.

5. **We** will not pay for **loss** incurred while **your insured auto** is used in any illicit trade or transportation, or due to **your insured auto's** destruction or confiscation by governmental or civil authorities because **you**, or, if **you** are a natural person, any **relative**, engaged in illegal activities.

6. **We** will not pay for **loss** caused by **you** or an insured participating in or preparing for a prearranged or organized racing, speed or demolition contest, stunting activity or performance contest.

7. **We** will not pay for **loss** to an **insured auto** for diminution of value.

8. If **we** pay **your** financial obligation under a **finance agreement**, **we** will not pay:
   a. Overdue **finance agreement** payments including any type of late fees or penalties;
   b. Financial penalties imposed under a **finance agreement** for excessive use, abnormal wear and tear, or high mileage;
   c. Security deposits not normally refunded by the lessor or lender;
   d. Cost of **finance agreement** related products such as, but not limited to, Credit Life Insurance, Health, Accident or Disability insurance purchased by **you**;
   e. Carryover balances from previous **finance agreements** or other amounts not associated with the **insured auto**; or
   f. Unpaid principal included in the outstanding **finance agreement** balance that was not used by **you** to purchase the **insured auto**.

9. **We** will not pay for **loss** to an **insured auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of an **insured auto** by **you**.

## LIMIT OF LIABILITY

1. If the **declarations page** shows actual cash value for the **insured auto**, then the most **we** will pay for **loss** to **your insured auto** is the least of:
   a. the actual cash value of the stolen or damaged property at the time of **loss**;
   b. the amount necessary to replace the stolen or damaged property with other of like kind and quality; or
   c. the amount necessary to repair the damaged property to its pre-loss physical condition; however, if **we** determine that the **insured auto** is a total loss, **we** may, at **our** option, pay the lesser of the actual cash value, or the cost to replace, rather than repair, the **insured auto**.

0072

19

**Permanently attached equipment (PAE)** is covered to the limit shown on the **declarations page**. This limit includes transfer of undamaged **PAE** to another **insured auto**, but will not increase the **PAE** limit shown on the **declarations page**.

2.  If the **declarations page** shows Stated Amount for the **insured auto**, then the most **we** will pay for **loss** to **your insured auto** is the least of:
    a.  the actual cash value of the stolen or damaged property at the time of **loss**;
    b.  the amount necessary to replace the stolen or damaged property with other of like kind and quality;
    c.  the amount necessary to repair the damaged property to its pre-loss physical condition; however, if **we** determine that the **insured auto** is a total loss, **we** may, at **our** option, pay the lesser of the actual cash value, Stated Amount, or the cost to replace, rather than repair, the **insured auto**; or
    d.  the applicable Stated Amount of the property as shown on the **declarations page**.

    However, if there is a **finance agreement** in place for the **insured auto**, the most **we** will pay for a total loss where the outstanding financial obligation under a **finance agreement** for the **insured auto** at the time of the **loss** is:
    a.  greater than the actual cash value of the **insured auto** at the time of **loss**; and
    b.  the Stated Amount shown on the **declarations page** is greater than the actual cash value of the **insured auto** at the time of **loss**;
    is the lesser of:
    a.  the applicable Stated Amount of the **insured auto** as shown on the **declarations page**; or
    b.  the outstanding financial obligation under a **finance agreement** for the **insured auto** at the time of the **loss**.

    **PAE** is included in the value of the **insured auto**, but only to the extent the value of the equipment has been included in the Stated Amount shown on the **declarations page**. The transfer of undamaged **PAE** to another **insured auto** will be covered if the aggregate of all damage and cost to move is within the Stated Amount shown on the **declarations page**.

3.  Payments for **loss** covered under Collision Coverage, Comprehensive Coverage, or Fire and Theft with Combined Additional Coverage are subject to the following provisions:
    a.  in determining the amount necessary to repair damaged property to its pre-loss physical condition, the amount to be paid by **us**:
        (i)  shall not exceed the prevailing competitive labor rates charged in the area where the property is to be repaired, and the cost of repair or

0073

20

replacement parts and equipment, as reasonably determined by **us**; and

   (ii) will be based on the cost of repair or replacement parts and equipment which may be new, reconditioned, remanufactured, or used, including, but not limited to:
      (a) original manufacturer parts or equipment; and
      (b) non-original manufacturer parts or equipment;

   b. the actual cash value is determined by the market value, age and condition of the **auto** at the time the **loss** occurs; and
   c. duplicate recovery for the same elements of damages is not permitted.

4. To determine the amount necessary to repair the damaged property to its pre-loss physical condition as referred to in Paragraph 1.c., the total cost of necessary repairs will be reduced by:

   a. the cost of labor, parts and materials necessary to repair or replace damage, deterioration, defects, or wear and tear on exterior body parts, windshields and other glass, wheels, and paint, that existed prior to the **accident** and that is eliminated as a result of the repair or replacement of property damaged in the **loss**. This adjustment for physical condition includes, but is not limited to, broken, cracked or missing parts, rust, dents, scrapes, gouges, and peeling paint;

   b. an amount for depreciation (also referred to as betterment) that represents a portion of the cost of mechanical parts (parts that wear out over time and have a useful life typically shorter than the life of the **auto** as a whole) that are installed as replacements for existing mechanical parts that were defective, inoperable or nonfunctional prior to the **accident**, which **we** deem necessary to replace in the course of repair; and

   c. an amount for depreciation (also referred to as betterment) on high-wear parts that have a measurable life, such as tires, batteries, engine or transmission, determined by the proportional increase in the useful life of the replacement part when compared to the replaced part. For example, if **we** replace a 24-month old battery that had a manufacturer's rated life of 60 months with a new 60-month rated battery, **our** payment for the battery is reduced by 40 percent and **you** are responsible to pay that 40 percent portion of the cost of the battery.

## DEACTIBLE

**DEDUCTIBLE**

For each **loss** that qualifies for coverage under Comprehensive, Collision, or Fire and Theft with Combined Additional Coverage, the deductible shown on the **declarations page** for the **insured auto** will be applied. A single deductible will be applied to any **loss**. In the event there are different deductible amounts applicable to the **loss**, the higher deductible will be applied. In all events, the deductible will be applied against the limit of liability. If a **loss** involves another coverage added by endorsement to this policy, only one deductible will apply to the entire **loss** event.

0074

21

**your insured auto** is an additional **auto** that **you** have requested to be added to **your** policy within 30 days of **your** acquisition of the **auto**, and no deductible has been designated for the additional **auto** prior to the **loss**, then:

1. when the **insured auto** is a **private passenger auto**, **we** will apply the lowest deductible listed for any one **auto** listed on the **declarations page**; or
2. when the **insured auto** is an **auto** other than a **private passenger auto**, **we** will apply the highest deductible listed for any one **auto** listed on the **declarations page**.

No deductible will apply to a **loss** to window glass when the glass is repaired instead of replaced.

No deductible will apply to payments made under the Additional Payments section for expenses necessary to return a stolen **insured auto** to **you**.

### SALVAGE

If **we** pay the actual cash value of **your insured auto** less the deductible, or if **we** pay the amount necessary to replace **your insured auto** less the deductible, **we** are entitled to all salvage. If **your insured auto** is a total loss and **we** pay the applicable Limit of Liability or Stated Amount as shown on the **declarations page** less the deductible, **we** are entitled to the same percent of salvage as **our** payment bears to the actual cash value of **your insured auto**.

### NO BENEFIT TO BAILEE

No bailee or carrier shall benefit, directly or indirectly, from this Part II—Damage To Your Auto.

### APPRAISAL

If **we** cannot agree with **you** on the amount of **your loss**, then **you** or **we** may demand an appraisal of the **loss**. Each party shall appoint a competent and disinterested appraiser. If the appraisers agree on the amount of the **loss**, they shall submit a written report to **us** and this shall be deemed to be the amount of the **loss**.

If the appraisers cannot agree on the amount of the **loss** within a reasonable time, they shall then choose a competent, impartial umpire, provided that if they cannot agree on an umpire within 15 days, either **you** or **we** may petition a judge of a court having jurisdiction to choose an umpire. The disagreement of the appraisers shall then be submitted to the umpire. Subject to the provisions of the policy, a written agreement signed by both appraisers or by one appraiser and the umpire will be the amount of the **loss**.

**You** must pay **your** fees and expenses and those of **your** appraiser. **We** will pay **our** fees and expenses and those of **our** appraiser. All other expenses of the

appraisal, including payment of the umpire if one is necessary, will be shared equally by **you** and **us**.

By agreeing to an appraisal, **we** do not waive any of **our** rights under any other part of this policy, including **our** right to deny the claim.

## PAYMENT OF LOSS

At **our** option, **we** may pay the **loss** in money, or repair or replace the damaged or stolen property. **We** may, at any time before the **loss** is paid or the property is replaced, return, at **our** expense, any stolen property either to **you** or to the address shown on the **declarations page**, with payment for the resulting damage less any applicable deductibles. **We** may keep all or part of the property at the agreed or appraised value, but there shall be no abandonment to **us**.

**We** may make payment for a **loss** either to **you** or the owner of the property. Payment for a **loss** is required only if **you** have fully complied with the terms of this policy.

**You** must convey title to and possession of the damaged, destroyed, or stolen property to **us** if **we** pay the actual cash value of **your insured auto** less the deductible or if **we** pay the amount necessary to replace **your insured auto** less the deductible.

## LOSS PAYEE AGREEMENT

**We** will pay the Loss Payee named in the policy for **loss** to **your insured auto**, as the interest of the Loss Payee may appear.

This insurance covers the interest of the Loss Payee unless:
1. the **loss** results from fraudulent acts or omissions on **your** part; or
2. the **loss** is otherwise not covered under the terms of this policy.
Cancellation, nonrenewal, termination, or voiding ends this agreement as to the Loss Payee's interest.

If **we** make any payment to the Loss Payee, **we** will obtain the Loss Payee's rights against any other party.

## GENERAL PROVISIONS

1. **Policy Period and Territory**

   This policy applies only to **accidents** and **losses** occurring during the policy period shown on the **declarations page** and that occur within a state, territory, or possession of the United States of America, or a province or territory of Canada, or while an **insured auto** is being transported between their ports.

0076

23

2. **Policy Changes**

This policy, **your** insurance application (which is made a part of this policy as if attached hereto), the **declarations page**, as amended, and endorsements to this policy issued by **us** contain all the agreements between **you** and **us**. Subject to the following, its terms may not be changed or waived except by an endorsement issued by **us**.

The premium for this policy is based on information **we** have received from **you** or other sources. **You** agree to cooperate with **us** in determining if this information is correct and complete, and **you** will notify **us** if it changes during the policy period. If this information is incorrect, incomplete, or changes during the policy period, **you** agree that **we** may adjust **your** premium during the policy period, or take other appropriate action.

Changes that may result in a premium adjustment include, but are not limited to, changes in:
a. the number, type, or use classification of **insured autos**;
b. operators using **insured autos**, their ages, driving histories, license status, state or country of license issuance, or marital status;
c. the place of principal garaging of any **insured auto**;
d. coverage, deductibles, or limits of liability; or
e. rating territory or discount eligibility.

If **you** ask **us** to delete a vehicle from this policy, no coverage will apply to that vehicle as of the date and time **you** ask **us** to delete it.

Nothing contained in this section will limit **our** right to void this policy for fraud, misrepresentation or concealment of any material fact by **you**, or anyone acting on **your** behalf.

3. **Other Insurance**

a. For any **insured auto** that is specifically described on the **declarations page**, this policy provides primary coverage. For an **insured auto** which is not specifically described on the **declarations page**, coverage under this policy will be excess over any and all other valid and collectible insurance, whether primary, excess or contingent. However, if the **insured auto** that is specifically described on the **declarations page** is a **trailer**, this policy will be excess over any and all other valid and collectible insurance, whether primary, excess or contingent, unless the **trailer** is attached to an **insured auto** that is a power unit **you** own and that is specifically described on the **declarations page**.

b. If coverage under more than one policy applies on the same basis, either excess or primary, **we** will pay only **our** proportionate share. **Our** pro-

0077

24

portionate share is the proportion that the Limit of Liability of this policy bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

4. **Two or More Policies Issued By Us**

   If any applicable insurance other than this policy is issued to **you** by **us**, or any company affiliated with **us**, and applies to the same **accident** or **loss**, the total amount payable among all such policies shall not exceed the limits provided by the single policy with the highest limits of liability.

5. **Legal Action Against Us**

   **We** may not be sued unless there is full compliance with all the terms of this policy.

   **We** may not be sued for payment under Part I—Liability To Others until the obligation of an insured under Part I to pay is finally determined either by judgment against that insured after actual trial or by written agreement of the insured, the claimant, and **us**. No one will have any right to make us a party to a lawsuit to determine the liability of an insured.

6. **Our Recovery Rights**

   In the event of any payment under this policy, **we** are entitled to all the rights of recovery of the person or organization to whom payment was made. That person or organization must sign and deliver to **us** any legal papers relating to that recovery, do whatever else is necessary to help **us** exercise those rights, and do nothing after the **loss** or **accident** to harm **our** rights.

   When a person has been paid damages by **us** under this policy and also recovers from another, the amount recovered from the other shall be held in trust for **us** and reimbursed to **us** to the extent of **our** payment, provided that the person to or on behalf of whom such payment is made is fully compensated for their **loss**.

   In the event recovery has already been made from the responsible party, any rights to recovery by the person(s) claiming coverage under this policy no longer exist.

7. **Assignment**

   Interest in this policy may not be assigned without **our** written consent. If the policyholder named on the **declarations page** is a natural person and that person dies, the policy will cover:
   a. any other named insured on the policy;

0078

25

b. the legal representative of the deceased person while acting within the scope of duty of a legal representative; and
c. any person having proper custody of **your insured auto** until a legal representative is appointed, but in no event for more than 30 days after the date of death.

8. **Waiver**

Notice to any agent or knowledge possessed by any agent or other person shall not change or effect a waiver on any portion of this policy nor prevent **us** from exercising any of **our** rights under this policy.

9. **Bankruptcy**

**We** are not relieved of any obligation under this policy because of the bankruptcy or insolvency of an insured.

10. **Inspection and Audit**

**We** shall have the right to inspect **your** property and operations at any time. This includes, but is not limited to, the right to inspect and audit the maintenance of any **autos** covered hereunder, the identity of **your** drivers and their driving records, and **your** radius of operations. In doing so, **we** do not warrant that the property or operations are safe and healthful, or are in compliance with any law, rule or regulation.

**We** shall also have the right to examine and audit **your** books and records at any time during the policy period and any extensions of that period and within three years after termination of the policy, as far as they relate to the subject matter of this insurance.

11. **Fraud or Misrepresentation**

This policy was issued in reliance upon the information provided on **your** insurance application. **We** may void this policy at any time, including after the occurrence of an **accident** or **loss**, if **you**:
1. made incorrect statements or representations to **us** with regard to any material fact or circumstance;
2. concealed or misrepresented any material fact or circumstance; or
3. engaged in fraudulent conduct;

at the time of application. This means that **we** will not be liable for any claims or damages that would otherwise be covered.

Any changes **we** make at **your** request to this policy after inception will be made in reliance upon information **you** provide. If **you**:
1. make incorrect statements or representations to **us** with regard to any material fact or circumstance;

0079

26

2.  conceal or misrepresent any material fact or circumstance; or

3.  engage in fraudulent conduct;

in connection with a requested change, **we** may void the policy or reform it as it existed immediately prior to the requested change. **We** may do this at any time, including after the occurrence of an **accident** or **loss**.

When **we** have not voided or reformed the policy, **we** may still deny coverage for an **accident** or **loss** if **you**, in connection with the policy application, or in connection with any requested change, have concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, and that concealment, misrepresentation, or fraudulent conduct was material to a risk **we** assumed.

**We** may deny coverage for an **accident** or **loss** if **you** or any other insured knowingly concealed or misrepresented any material fact or circumstance or engaged in fraudulent conduct in connection with the presentation or settlement of a claim. **We** reserve all rights to indemnity against a person committing fraud or misrepresentation for all payments made and costs incurred.

12. **Liberalization**

If **we** make a change that broadens a coverage **you** have under this edition of **your** policy without additional charge, **you** will receive the broadened coverage. The broadened coverage applies on the date the coverage change is implemented in **your** state. This provision does not apply to a general program revision or **our** issuance of a subsequent edition of **your** policy. Otherwise, this policy can be changed only by endorsement issued by **us**.

13. **Severability**

Except with respect to the Limit of Liability, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or lawsuit is brought.

14. **Settlement of Claims**

**We** may use estimating, appraisal, or injury evaluation systems to adjust claims under this policy and to determine the amount of damages, expenses, or loss payable under this policy. Such systems may be developed by **us** or a third party and may include computer software, databases, and specialized technology.

15. **Automatic Termination**

If **we** or an affiliate offers to renew or continue this policy and **you** or **your** representative does not accept, this policy will automatically terminate at

the end of the current policy period at 12:01 a.m. Failure to pay the required renewal or continuation premium when due will mean that **you** have not accepted **our** offer.

If **you** obtain other insurance on an **insured auto**, any similar insurance provided by this policy will terminate as to that **insured auto** on the effective date and at the effective time of the other insurance.

If an **insured auto** is sold or transferred, any insurance provided by this policy will terminate as to that **insured auto** on the effective date of the sale or transfer.

16. **Duty to Report Changes**

**You** must promptly notify **us** when:
1. **your** mailing or business address changes;
2. the principal garaging address of an **insured auto** changes;
3. there is any change with respect to the persons who operate an **insured auto**;
4. there is a change in the driver's license status, or state or country of license issuance, of any person using an **insured auto**; or
5. **you** acquire, sell, or dispose of **autos**.

17. **Terms of Policy Conformed to Statutes**

If any provision of this policy fails to conform to the statutes of the state listed on **your** application as **your** business location, the provision shall be deemed amended to conform to such statutes. All other provisions shall be given full force and effect. Any disputes as to the coverages provided or the provisions of this policy shall be governed by the law of the state listed on **your** application as **your** business location.

Form 6912 (02/19)

0081

# INDEX OF ENDORSEMENTS

**All forms appearing in this endorsement section do not automatically pertain to your policy. Only those endorsements whose form numbers appear on your declarations page apply to your policy.**

**Form No./Description**      **Page**

1797 (02/19)
**Contingent Liability Endorsement—Limited Liability Coverage
For Non-Trucking Use Of An Automobile** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

1890 (02/19)
**Employer's Non-Ownership Liability Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . 31

1891 (02/19)
**Hired Auto Coverage Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

2366 (02/11)
**Blanket Additional Insured Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

2367 (06/10)
**Blanket Waiver of Subrogation Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

2368 (06/10)
**Loan/Lease Gap Coverage Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

2852 IL (02/19)
**Uninsured/Underinsured Motorist Coverage Endorsement** . . . . . . . . . . . . . . . 35

4717 (02/19)
**Trailer Interchange Coverage Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

4757 IL (02/19)
**Medical Payments Coverage Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

4852 IL (02/19)
**Cancellation and Nonrenewal Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

4881 IL (02/19)
**Illinois Amendatory Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

5701 IL (02/19)
**Individual Named Insured Endorsement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

0082

Z228 (01/11)
**Mobile Equipment As Insured Autos Endorsement** . . . . . . . . . . . . . . . . . . . . . . . 52

Z438 IL (02/19)
**Garage Operations Physical Damage Legal Liability Coverage and
Limited Garage Liability (Towing Only) Coverage Endorsement** . . . . . . . . . . . 54

Z439 (02/19)
**Non-Owned Trailer Physical Damage Coverage Endorsement**. . . . . . . . . . . . . 61

Z442 (02/19)
**Any Automobile Legal Liability Coverage Endorsement** . . . . . . . . . . . . . . . . . . . 63

0083

Form 1797 (02/19)

## CONTINGENT LIABILITY ENDORSEMENT—LIMITED LIABILITY COVERAGE FOR NON-TRUCKING USE OF AN AUTOMOBILE

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### PART I—LIABILITY TO OTHERS

A. Under the Additional Definitions Used In This Part Only section:

Subsection A.3. is deleted and replaced by the following:

3. Any other person or organization, but only with respect to the legal liability of that person or organization for acts or omissions of any person otherwise covered under this Part I—Liability To Others. However, **insured** does not include anyone engaged in the business of transporting property by auto for hire that is liable for **your** conduct.

B. Under the Exclusions of Part I, the following exclusion is added:

**Trucking Use**
Coverage under this Part I, including **our** duty to defend, does not apply to an **insured auto** or any attached **trailer** while operated, maintained, or used:
a. To carry property or while such property is being loaded or unloaded from the **insured auto** or an attached **trailer**; or
b. In any business or for any business purpose.

### ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form 1890 (02/19)

## EMPLOYER'S NON-OWNERSHIP LIABILITY ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

0084

31

**ADDITIONAL DEFINITION USED IN THIS ENDORSEMENT**

If **you** pay a premium for this Employer's Non-Ownership Liability coverage, then the following definition is added:

"**Non-owned auto**" means an **auto** that **you** do not own, lease, hire, rent, or borrow, and that is used in connection with **your** business. This includes **autos** owned by **your employees**, partners (if **you** are a partnership), members (if **you** are a limited liability company), or members of their households, but only while such **autos** are used in **your** business.

**CHANGES TO PART I—LIABILITY TO OTHERS**

The definition of **insured auto** is modified to include a **non-owned auto** when used in connection with **your** business by **you** or any of **your employees**. The definition of **insured** does not include the owner of a **non-owned auto**.

**EXCLUSIONS**

The insurance provided by this endorsement does not apply to **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any **non-owned auto** in the conduct of any partnership or joint venture of which **you** are a partner or member and which is not shown as the named insured on the **declarations page**.

**OTHER INSURANCE**

The insurance provided by this endorsement is excess over any other valid and collectible insurance.

**PREMIUM AGREEMENT**

**We** may audit the number of employees and charge appropriately for additional premium up to three years after the policy expiration.

This does not alter or limit **our** general audit rights under the General Provisions section of this policy.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form 1891 (02/19)

## HIRED AUTO COVERAGE ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

0085

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### Additional definitions used in this endorsement

If **you** pay a premium for this Hired Auto Coverage, then the following definitions are added:

1. "**Hired auto**" means an **auto**:
   a. **you** lease, hire, rent or borrow; or
   b. **your employee** leases, hires or rents:
      i. under a contract in that individual **employee's** name;
      ii. at **your** direction and with **your** express permission; and
      iii. only while being used in the conduct of **your** business.

   This does not include any **auto you** or an **employee** leases, hires, rents or borrows from any of **your employees**, partners (if **you** are a partnership), members (if **you** are a limited liability company), or member of their households.
2. "**Cost of hire**" means the total amount paid by **you** for the hire of **autos**.

### Changes to Part I—Liability To Others

When used in Part I—Liability To Others, the definition of **insured auto** is amended to include **hired auto**.

### Other Insurance

The insurance provided by this Hired Auto Coverage endorsement is excess over any other valid and collectible insurance, whether primary, excess, or contingent.

### Premium agreement

The premium for this Hired Auto Coverage is based on the **cost of hire**, and is subject to a minimum **cost of hire**. **We** may audit the **cost of hire** and charge appropriately for additional premium for up to three years after the policy expiration.

This does not alter or limit **our** general audit rights under the General Provisions section of this policy.

### ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form 2366 (02/11)

### BLANKET ADDITIONAL INSURED ENDORSEMENT

This endorsement modifies insurance provided by the Commercial Auto Policy, Motor Truck Cargo Legal Liability Coverage Endorsement, and/or Commercial General Li-

0086

33

ability Coverage Endorsement, as appears on the **declarations page**. All terms and conditions of the policy apply unless modified by this endorsement.

If **you** pay the fee for this Blanket Additional Insured Endorsement, **we** agree with **you** that any person or organization with whom **you** have executed a written agreement prior to any **loss** is added as an additional **insured** with respect to such liability coverage as is afforded by the policy, but this insurance applies to such additional **insured** only as a person or organization liable for **your** operations and then only to the extent of that liability. This endorsement does not apply to acts, omissions, products, work, or operations of the additional **insured**.

Regardless of the provisions of paragraph a. and b. of the "Other Insurance" clause of this policy, if the person or organization with whom **you** have executed a written agreement has other insurance under which it is the first named **insured** and that insurance also applies, then this insurance is primary to and non-contributory with that other insurance when the written contract or agreement between **you** and that person or organization, signed and executed by **you** before the **bodily injury** or **property damage** occurs and in effect during the policy period, requires this insurance to be primary and non-contributory.

In no way does this endorsement waive the "Other Insurance" clause of the policy, nor make this policy primary to third parties hired by the **insured** to perform work for the **insured** or on the **insured's** behalf.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form 2367 (06/10)

## BLANKET WAIVER OF SUBROGATION ENDORSEMENT

This endorsement modifies insurance provided by the Commercial Auto Policy, Motor Truck Cargo Legal Liability Coverage Endorsement, and/or Commercial General Liability Coverage Endorsement, as appears on the **declarations page**. All terms and conditions of the policy apply unless modified by this endorsement.

If **you** pay the fee for this Blanket Waiver of Subrogation Endorsement, **we** agree to waive any and all subrogation claims against any person or organization with whom a written waiver agreement has been executed by the named insured, as required by written contract, prior to the occurrence of any **loss**.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

0087

Form 2368 (06/10)

## **LOAN/LEASE GAP COVERAGE ENDORSEMENT**

This endorsement modifies insurance provided by the Commercial Auto Policy. All terms and conditions of the policy apply unless modified by this endorsement.

### **INSURING AGREEMENT—LOAN/LEASE PAYOFF COVERAGE**

If **you** pay the premium for this coverage, and the **insured auto** for which this coverage was purchased is deemed by **us** to be a **total loss**, **we** will pay, in addition to any amounts otherwise payable under Part II of **your** policy, the difference between:
1. the actual cash value of the **insured auto** at the time of the **total loss**; and
2. any greater amount the owner of the **insured auto** is legally obligated to pay under a written loan or lease agreement to which the **insured auto** is subject at the time of the **total loss**, reduced by:
   a. unpaid finance charges or refunds due to the owner for such charges;
   b. excess mileage charges or charges for wear and tear;
   c. charges for extended warranties or refunds due to the owner for extended warranties;
   d. charges for credit insurance or refunds due to the owner for credit insurance;
   e. past due payments and charges for past due payments; and
   f. collection or repossession expenses.

However, **our** payment under this coverage shall not exceed the limit of liability shown on the **declarations page**. The limit of liability is a percentage of the actual cash value of the **insured auto** at the time of the loss.

This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **insured auto** and the loss is covered under one of those coverages.

### **ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form 2852 IL (02/19)

### **UNINSURED/UNDERINSURED MOTORIST COVERAGE ENDORSEMENT**

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

0088

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy, and related endorsements, is modified as follows:

## INSURING AGREEMENT—UNINSURED/UNDERINSURED MOTORIST
## BODILY INJURY COVERAGE

Subject to the Limits of Liability, if **you** pay the premium for Uninsured/Underinsured Motorist Coverage, **we** will pay for damages, other than punitive or exemplary damages, which an **insured** is legally entitled to recover from the **owner** or operator of an **uninsured auto** or **underinsured auto** because of **bodily injury**:

1. sustained by an **insured**;
2. caused by an **accident**; and
3. arising out of the ownership, maintenance, or use of an **uninsured auto** or **underinsured auto**.

## INSURING AGREEMENT—UNINSURED MOTORIST
## PROPERTY DAMAGE COVERAGE

Subject to the limits of liability, if **you** pay a premium for Uninsured Motorist Property Damage Coverage, **we** will pay for damages, other than punitive or exemplary damages, which an **insured** is entitled to recover from the **owner** or operator of an **uninsured auto** due to **property damage**:

1. to an **insured auto** for which Uninsured Motorist Property Damage Coverage has been purchased;
2. caused by an **accident**; and
3. arising out of the ownership, maintenance, or use of an **uninsured auto**.

Subject to any deductible applicable under this endorsement, **we** will replace, or reimburse the reasonable cost to replace, any child restraint system that was in use by a child in an **insured auto** and was damaged during an **accident** to which Uninsured Motorist Property Damage Coverage applies due to the liability of the **owner** or operator of an **uninsured auto**.

**We** will pay under this endorsement only after the limits of liability under all applicable liability bonds and policies have been exhausted by payment of judgments or settlements. However, this shall not apply if **we** and the **insured** agree, without arbitration, that the **insured** has suffered **bodily injury**, death, or **property damage**, and also agree on the amount of damages within the limit of liability that the **insured** is legally entitled to collect under this endorsement.

An **insured** must notify **us** in writing at least 30 days before entering into any settlement with the **owner** or operator of an **uninsured auto** or **underinsured auto**, or any liability insurer. In order to preserve **our** right of subrogation, **we** may elect to pay any sum offered in settlement by, or on behalf of, the **owner** or operator of an **uninsured auto** or **underinsured auto**. If **we** do this, **you** agree to assign to **us** all rights that **you** have against the **owner** or operator of the **uninsured auto** or **underinsured auto**.

0089

36

**ADDITIONAL DEFINITIONS**

When used in this endorsement, whether in the singular, plural, or possessive:

1. "**Insured**" means:
   a. if the named insured shown on the **declarations page** is a natural person:
      (i) **you** or a **relative**;
      (ii) any person **occupying your insured auto** or a **temporary substitute auto**; and
      (iii) any person who is entitled to recover damages covered by this endorsement because of **bodily injury** sustained by a person described in (i) or (ii) above; or
   b. if the named insured shown on the **declarations page** is a corporation, partnership, organization, or any other entity that is not a natural person:
      (i) any person **occupying your insured auto** or a **temporary substitute auto**; and
      (ii) any person who is entitled to recover damages covered by this endorsement because of **bodily injury** sustained by a person described in (i) above.

   For purposes of this definition, **insured auto** includes **mobile equipment** that is:
   a. owned by **you**;
   b. leased, hired, or borrowed by **you** and **you** have purchased either "Hired Auto Coverage" or "Any Automobile Legal Liability Coverage" from **us**; or
   c. not owned, leased, hired, or borrowed by **you** and **you** have purchased either "Employer's Non-Ownership Liability Coverage" or "Any Automobile Legal Liability Coverage" from **us**.
   However, **mobile equipment** meeting any of those three criteria will be included in the definition only if at the time of **loss** it is being:
      (i) used in **your** business;
      (ii) operated on a public highway; and
      (iii) operated in a state or province where it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law.

2. "**Non-owned auto**" means any **auto** that is not **owned** by **you** or furnished for **your** regular use and, if the named insured is a natural person, not **owned** or furnished for the regular use of the named insured's spouse or **relative**.

3. "**Owned**" means the person or organization:
   a. holds legal title to the vehicle;
   b. has legal possession of the vehicle that is subject to a written security agreement with an original term of six months or more; or
   c. has legal possession of the vehicle that is leased to that person or organization under a written agreement for a continuous period of six months or more.

4. "**Owner**" means the person or organization who, with respect to a vehicle:
   a. holds legal title to the vehicle;
   b. has legal possession of the vehicle that is subject to a written security agreement with an original term of six months or more; or
   c. has legal possession of the vehicle that is leased to that person or organization under a written agreement for a continuous period of six months or more.

5. "**Property damage**" means only physical damage to or destruction of an **insured auto**. **Property damage** does not include loss of use of an **insured auto** resulting from its physical damage or destruction.

6. "**Underinsured auto**" means a land motor vehicle to which a bodily injury liability bond or policy applies at the time of the **accident**, but the sum of all applicable limits of liability for **bodily injury** is less than the coverage limit for Uninsured/Underinsured Motorist Bodily Injury Coverage as shown on the **declarations page**.

   An "**underinsured auto**" does not include any vehicle or equipment:
   a. **owned** by **you** or a **relative**;
   b. **owned** by any governmental unit or agency;
   c. operated on rails or crawler treads;
   d. designed mainly for use off public roads, while not on public roads;
   e. while used as a residence or premises;
   f. shown on the **declarations page** of this policy;
   g. not required to be registered as a motor vehicle; or
   h. which is an **uninsured auto**.

7. "**Uninsured auto**" means a land motor vehicle of any type:
   a. to which no bodily injury liability bond or policy applies at the time of the **accident**;
   b. to which a bodily injury liability bond or policy applies at the time of the **accident**, but the bonding or insuring company:
      (i) denies coverage; or
      (ii) is or becomes insolvent;
   c. to which a bodily injury liability bond or policy applies at the time of the **accident**, but its limit of liability for **bodily injury** is less than the minimum limit of liability for **bodily injury** specified by the financial responsibility law of the state in which the **insured auto** is principally garaged; or
   d. that is a hit-and-run vehicle whose operator or **owner** cannot be identified and which strikes or causes an object to strike:
      (i) an **insured auto** or **temporary substitute auto**; or
      (ii) if the named insured is a natural person:
         (a) **you** or a **relative**; or
         (b) a motor vehicle that **you** or a **relative** are occupying,

      provided that the **insured**, or someone on his or her behalf, reports the **accident** to the police or civil authority within 24 hours or as soon as practicable after the **accident**.

   An "**uninsured auto**" does not include any motorized auto or equipment:
   a. **owned** by, furnished to, or available for the regular use of **you** or, if the named insured is a natural person, a **relative**, other than an **insured auto**;
   b. **owned** or operated by a self-insurer under any applicable vehicle law, except a self-insurer that is or becomes insolvent;
   c. **owned** by any governmental unit or agency;
   d. designed mainly for use off public roads, while not on public roads;
   e. while being used as a residence or premises;

38

0091

f. not required to be registered as a motor vehicle; or

g. which is an **insured auto**.

**EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EX-CLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS EN-DORSEMENT.**

1. Coverage under this endorsement is not provided for **bodily injury** sustained by any person while using or **occupying**:
   a. an **insured auto** without the express or implied permission of **you** or, if the named insured is a natural person, a **relative**;
   b. a **non-owned auto** without the express or implied permission of the **owner**; or
   c. an **auto** or device of any type designed to be operated on the public roads that is **owned** by, furnished to, or available for the regular use of **you** or, if the named insured is a natural person, a **relative**, other than an **insured auto** or **temporary substitute auto**.

2. Coverage under this endorsement is not provided for **property damage**:
   a. to an **insured auto** while being used or driven by a person while employed or engaged in the **business** of selling, leasing, repairing, parking, storing, servicing, delivering, or testing vehicles. However, this exclusion does not apply to **you**, a **relative**, or an agent or employee of **you** or a **relative**, when using an **insured auto**;
   b. to an **insured auto** resulting from any pre-arranged or organized racing, speed or demolition contest, stunting activity, or in practice or preparation for any such contest or activity;
   c. to an **insured auto** due to a nuclear reaction or radiation;
   d. to an **insured auto** for which insurance is afforded under a nuclear energy liability insurance contract;
   e. to a **trailer**;
   f. which is not caused by the actual physical contact of an **uninsured auto** with the **insured auto**; or
   g. if the **owner** or operator of the at-fault **uninsured auto** cannot be identified.

3. Coverage under this endorsement will not apply directly or indirectly to benefit any insurer or self-insurer under any of the following or similar laws:
   a. workers' compensation law; or
   b. disability benefits law.

### LIMITS OF LIABILITY

Regardless of the number of premiums paid, or the number of **insured autos** or trailers shown on the **declarations page**, or the number of policies issued by **us**, or the number of vehicles or **insureds** involved in the **accident**, or the number of claims or lawsuits arising out of an **accident**, **we** will pay no more than the limit of liability shown for Uninsured/Underinsured Motorist Coverage on the **declarations page**.

If the **declarations page** shows that "combined single limit" or "CSL" applies, the amount shown is the most **we** will pay for the total of all damages resulting from any

0092

39

one **accident**. However, without changing this total each **accident** limit of liability, **we** will comply with any law that requires **us** to provide any separate limits.

If **your declarations page** shows a split limit:
1. the amount shown for "each person" is the most **we** will pay for all damages due to a **bodily injury** to one person;
2. subject to the "each person" limit, the amount shown for "each accident" is the most **we** will pay for all damages due to **bodily injury** sustained by two or more persons in any one **accident**; and
3. the amount shown for "property damage" is the most **we** will pay for the aggregate of all **property damage** caused by any one **accident**.

The "each person" limit of liability includes the total of all claims made for **bodily injury** to an **insured** and all claims of others derived from such **bodily injury**, including, but not limited to, emotional injury or mental anguish resulting from the **bodily injury** of another or from witnessing the **bodily injury** to another, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

The limit of liability under this endorsement for **property damage** to an **insured auto** arising out of one **accident** is the lowest of:
1. $15,000;
2. the actual cash value of the **insured auto** at the time of the **accident**, reduced by the deductible shown on the **declarations page**, and by its salvage value if the **insured auto** is more than eight years old and **we** allow **you** or the **owner** to retain the salvage;
3. the amount necessary to replace the **insured auto**, reduced by the deductible shown on the **declarations page**, and by its salvage value if the **insured auto** is more than eight years old and **we** allow **you** or the **owner** to retain the salvage;
4. the amount necessary to repair the **insured auto** to its pre-loss condition, reduced by the deductible shown on the **declarations page**; or
5. any limit of liability shown on the **declarations page** for **property damage** under this endorsement, reduced by the salvage value of the **insured auto** if the **insured auto** is more than eight years old and **we** allow **you** or the **owner** to retain the salvage.

Payments for **property damage** under this endorsement are subject to the following provisions:
1. no more than one deductible shall be applied to any one **accident**; and
2. an adjustment for depreciation or physical condition, which may also be referred to as betterment, wear and tear, or prior damage, will be made in determining the limit of liability at the time of the **accident**.

The Limits of Liability under this endorsement shall be reduced by all sums:
1. paid because of **bodily injury** by or on behalf of any persons or organizations that may be legally responsible, including, but not limited to, all sums paid under Part I—Liability To Others; and
2. paid, payable, or that should apply, because of **bodily injury** under any workers' compensation law.

0093

40

The limits of liability for **property damage** under this endorsement shall be reduced by all sums paid because of **property damage**:

a. by or on behalf of the persons or organizations who may be legally responsible; and
b. under Part II—Damage To Your Auto.

Any payment made to a person under this endorsement shall reduce any amount that the person is entitled to recover under Part I—Liability To Others.

No one will be entitled to duplicate payments for the same elements of damages.

Any judgment or settlement for damages against an operator or **owner** of an **uninsured auto** or an **underinsured auto** that arises out of a lawsuit brought without **our** written consent is not binding on **us**.

### OTHER INSURANCE

When the named insured is a natural person, if there is other applicable uninsured or underinsured motorist coverage, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all available coverage limits. If this policy and any other policy providing similar insurance apply to the same **accident**, the maximum limit of liability under all the policies shall be the highest limit of liability under any one policy. However, any insurance **we** provide shall be excess over any other uninsured or underinsured motorist coverage, except for **bodily injury** to **you** or a **relative** when **occupying** an **insured auto**.

When the named insured is a corporation, partnership, organization or any other entity that is not a natural person, if there is other applicable uninsured or underinsured motorist coverage, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all available coverage limits. However, any insurance **we** provide for the occupant of an **insured auto** shall be excess over any other uninsured or underinsured motorist coverage.

**We** will not pay for any damages that would duplicate any payment made for damages under other insurance.

### ARBITRATION

If **we** and an **insured** cannot agree on:

1. the legal liability of the operator or **owner** of an **uninsured auto** or an **underinsured auto**; or
2. the amount of the damages sustained by the **insured**;

this will be determined by arbitration if **we** or the **insured** make a written demand for arbitration prior to the expiration of the bodily injury statute of limitations in the state in which the **accident** occurred.

0094

41

If a written demand for arbitration is made, each party shall select an arbitrator. The two arbitrators will select a third. If the two arbitrators cannot agree on a third arbitrator within 45 days, then either the party may request that the arbitration be submitted to the American Arbitration Association, or on joint application by the **insured** and **us**, the third arbitrator may be appointed by a court having jurisdiction.

Each party will pay the costs and fees of its arbitrator and any other expenses it incurs. The costs and fees of the third arbitrator will be shared equally. In the event the arbitrators award reasonable arbitration costs, fees, or expenses, **we** will pay only that portion of such awarded costs, fees, or expenses as is necessary to prevent the amount available under this policy for payment of compensatory damages awarded by the arbitrators from being reduced to an amount less than the minimum amount required under the Illinois Vehicle Code and the Illinois Insurance Code, as amended.

Unless both parties agree otherwise, arbitration will take place in the county in which the **insured** resides. Rules of procedure and evidence will apply according to Illinois law.

A decision agreed to by two of the arbitrators will be binding with respect to a determination of:
1. the legal liability of the operator or **owner** of an **uninsured auto** or an **underinsured auto**; and
2. the amount of the damages sustained by the **insured**.

The arbitrators shall have no authority to award compensatory damages in an amount in excess of the limit of liability. The decision of the arbitrators is binding only if the amount of the award does not exceed \$75,000 for **bodily injury** or death of any one person, \$150,000 for **bodily injury** or death of two or more persons in any one motor vehicle accident, or the corresponding policy limits for **bodily injury** or death, whichever is less. If the award of the arbitrators for damages caused by an **uninsured auto** or an **underinsured auto** exceeds the applicable limit set forth in this paragraph, either party may demand the right to a trial. This demand must be made in writing within 60 days of the arbitrators' decision. If the demand is not made within 60 days, the amount of damages agreed to by the arbitrators will be binding.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form 4717 (02/19)

### TRAILER INTERCHANGE COVERAGE ENDORSEMENT

This endorsement modifies insurance provided by the Commercial Auto Policy. All terms and conditions of the policy apply unless modified by this endorsement.

0095

# INSURING AGREEMENT

Subject to the Limits of Liability, if **you** pay the premium for Trailer Interchange Coverage, **we** will pay damages for **property damage** for which **you** become legally responsible because of **loss** to a **trailer** not owned by **you**, and its equipment, while in **your** possession. The **trailer** must be in **your** possession under a written trailer or equipment interchange agreement in which **you** assume liability for **loss** to the **trailer** while in **your** possession.

**We** will pay for a **loss** to the **trailer** and its equipment under the coverages described below, as reflected on **your declarations page**:
a. Collision Coverage. For **loss** caused by:
   (i) The **trailer's** collision with another object; or
   (ii) The **trailer's** overturn.
b. Comprehensive Coverage. For any **loss** except one caused by:
   (i) The **trailer's** collision with another object; or
   (ii) The **trailer's** overturn.

**We** will settle or defend, at **our** option, any claim or lawsuit for damages covered by this endorsement. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the Limit of Liability for this coverage has been exhausted by payment of judgments or settlements.

## ADDITIONAL DEFINITION

"**Trailer**", when used in this endorsement, includes a shipping container.

## ADDITIONAL PAYMENTS

In addition to **our** Limit of Liability, **we** will pay for an **insured**:
a. all expenses **we** incur in the settlement of any claim or defense of any lawsuit;
b. interest accruing after entry of judgment on that part of the judgment that does not exceed **our** Limit of Liability. This payment does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured**. **Our** payment, offer in writing, or deposit in court of that part of the judgment which does not exceed **our** Limit of Liability ends **our** duty to pay interest that accrues after the date of **our** payment, written offer, or deposit.
c. the premiums on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in a principal amount exceeding **our** Limit of Liability, and **we** have no duty to apply for or furnish these bonds;
d. reasonable expenses, including loss of earnings up to $250 a day, incurred at **our** request;
e. all reasonable expenses necessary to return a stolen **trailer** to **you**, unless **we** determine the **trailer** to be a total loss; and
f. all reasonable expenses necessary to remove a **trailer** from the site of an **accident** or **loss** and transport it to a repair facility.

0096

43

a. **We** will not pay for **loss** caused by or resulting from any of the following. Such **loss** is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**.
   (i) Nuclear Hazard.
      (1) The explosion of any weapon employing atomic fission or fusion; or
      (2) Nuclear reaction or radiation, or radioactive contamination, however caused.
   (ii) War or Military Action.
      (1) War, including undeclared or civil war;
      (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or agents; or
      (3) Insurrection, rebellion, revolution, usurped power, or action taken by a governmental authority in hindering or defending against any of these.
b. **We** will not pay for loss of use.
c. **We** will not pay for **loss** caused by, or resulting from, any of the following unless caused by another **loss** that is covered by this insurance;
   (i) Wear and tear, freezing, mechanical or electrical breakdown, or structural failure caused by material fatigue, decomposition, or corrosion; or
   (ii) Blowouts, punctures, or other road damage to tires.

## LIMIT OF INSURANCE AND DEDUCTIBLE

The most **we** will pay for **loss** to any one **trailer** is the least of the following amounts minus any applicable deductible shown on the **declarations page**:
a. The actual cash value of the damaged or stolen property at the time of the **loss**;
b. The amount necessary to replace the stolen or damaged property with other of like kind and quality;
c. The amount necessary to repair the damaged property to its pre-loss condition; or
d. The applicable Limit of Liability for the property as shown on the **declarations page**.

A single deductible will be applied to any **loss**. In the event there are different deductible amounts applicable to the **loss**, the higher deductible will be applied. In all events, the deductible will be applied against the limit of liability. If a **loss** involves another coverage added by endorsement to the policy, only one deductible will apply to the entire **loss** event. No deductible will apply to payments made under the Additional Payments section for expenses necessary to return a stolen **trailer** to **you**.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

0097

Form 4757 IL (02/19)

## **MEDICAL PAYMENTS COVERAGE ENDORSEMENT**

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### **INSURING AGREEMENT**

Subject to the Limits of Liability, if **you** pay the premium for Medical Payments Coverage, **we** will pay the **usual and customary charge** for reasonable and necessary expenses, incurred within three years from the date of an **accident**, for medical and funeral services because of **bodily injury**:

1. sustained by an **insured**;
2. caused by an **accident**; and
3. arising out of the ownership, maintenance or use of a motor vehicle or **trailer**.

Any dispute as to the **usual and customary charge** will be resolved between the service provider and **us**.

### **ADDITIONAL DEFINITIONS**

When used in this endorsement, whether in the singular, plural, or possessive:
1. "**Insured**" means:
   a. if the named insured shown on the **declarations page** is a natural person:
      (i) **you** while **occupying** any **auto**, other than an **auto owned** by **you** which is not an **insured auto**;
      (ii) a **relative** while **occupying** an **insured auto**, **temporary substitute auto**, or **non-owned auto**;
      (iii) **you** or any **relative** when struck by a land motor vehicle of any type, or a **trailer**, while not **occupying** a motor vehicle; and
      (iv) any other person while **occupying** an **insured auto**, **temporary substitute auto**, or a **trailer** while attached to an **insured auto**; or
   b. if the named insured shown on the **declarations page** is a corporation, partnership, organization or any other entity that is not a natural person, any person **occupying your insured auto**, **temporary substitute auto**, or a **trailer** while attached to an **insured auto**.

      For purposes of this definition, **insured auto** includes **mobile equipment** that is:
      (i) owned by **you**;
      (ii) leased, hired, or borrowed by **you** and **you** have purchased either "Hired Auto Coverage" or "Any Automobile Legal Liability Coverage" from **us**; or

0098

45

(iii) not **owned**, leased, hired, or borrowed by **you** and **you** have purchased either "Employer's Non-Ownership Liability Coverage" or "Any Automobile Legal Liability Coverage" from **us**.

However, **mobile equipment** meeting any of those three criteria will be included in the definition only if at the time of **loss** it is being:

(i) used in **your** business;
(ii) operated on a public highway; and
(iii) operated in a state or province where it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law.

2. "**Non-owned auto**" means any **auto** that is not **owned** by **you** or furnished for **your** regular use and, if the named insured is a natural person, not **owned** by or furnished for the regular use of the named insured's spouse or a **relative**.

3. "**Owned**" means the person or organization:
   a. holds legal title to the vehicle;
   b. has legal possession of the vehicle that is subject to a written security agreement with an original term of six months or more; or
   c. has legal possession of the vehicle that is leased to that person or organization under a written agreement for a continuous period of six months or more.

4. "**Owner**" means the person or organization who, with respect to a vehicle:
   a. holds legal title to the vehicle;
   b. has legal possession of the vehicle that is subject to a written security agreement with an original term of six months or more; or
   c. has legal possession of the vehicle that is leased to that person or organization under a written agreement for a continuous period of six months or more.

5. "**Usual and customary charge**" means an amount which **we** determine represents a customary charge for services in the geographical area in which the service is rendered. **We** shall determine the usual and customary charge through the use of independent sources of **our** choice.

## EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS ENDORSEMENT.

Coverage under this endorsement does not apply to **bodily injury**:

1. sustained while **occupying** any **auto** or **trailer** while being used as a residence or premises;
2. occurring during the course of employment if workers' compensation coverage is payable or required;
3. arising out of an **accident** involving an **auto** or **trailer** while being used by a person while employed or engaged in the business of selling, leasing, repairing, parking, storing, servicing, delivering, or testing vehicles, unless that business is **yours**;
4. resulting from any pre-arranged or organized racing, speed or demolition contest, stunting activity, or in practice or preparation for any such contest or activity;
5. due to a nuclear reaction or radiation;
6. for which insurance is afforded under a nuclear energy liability insurance contract;
7. for which the United States Government is liable under the Federal Tort Claims Act;
8. sustained by any person while **occupying** an **insured auto**, **temporary sub-**

0099

46

**stitute auto**, or **trailer** without the express or implied permission of **you** or, if the named insured is a natural person, a **relative**;

9. sustained by any person while **occupying** a **non-owned auto** without the express or implied permission of the **owner**;

10. that is intentionally inflicted on an **insured** at that person's request or self-inflicted; or

11. sustained while **occupying** any vehicle that has less than four wheels or is not designed for operation principally upon public roads.

## LIMITS OF LIABILITY

Regardless of the number of premiums paid, or the number of **insured autos** or **trailers** shown on the **declarations page**, or the number of policies issued by **us**, or the number of vehicles or **insureds** involved in an **accident**, or the number of claims or lawsuits arising out of an **accident**, **we** will pay no more than the Limit of Liability shown for Medical Payments Coverage on the **declarations page**.

Any amount payable to an **insured** under this endorsement will be reduced by any amount paid or payable for the same expense under Part I—Liability To Others or any applicable Uninsured/Underinsured Motorist Coverage Endorsement.

No one will be entitled to duplicate payments under this policy for the same elements of damages.

## OTHER INSURANCE

If there is other applicable **auto** medical payments insurance, **we** will pay only **our** share of the medical and funeral services. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. However, any insurance **we** provide for an **insured occupying**:

1. an **auto**, other than an **insured auto** or **temporary substitute auto**; or

2. a **trailer**, other than a **trailer** while connected to an **insured auto**;

will be excess over any other **auto** or **trailer** insurance providing payments for medical or funeral expenses.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form 4852 IL (02/19)

## CANCELLATION AND NONRENEWAL ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

0100

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

### CANCELLATION

**You** may cancel this policy by calling or writing **us** and stating the future date that **you** wish the cancellation to be effective.

**We** may cancel this policy by mailing a notice of cancellation to the named insured shown on the **declarations page** at the last known address appearing in **our** records. If **we** cancel this policy during the first 60 days of the initial policy period for any reason other than nonpayment of premium, notice of cancellation will be mailed at least 30 days before the effective date of cancellation. If this policy has been in effect for more than 60 days, or if this is a renewal or continuation policy, and **we** cancel for any reason other than nonpayment of premium, notice of cancellation will be mailed at least 60 days before the effective date of cancellation. If **we** cancel this policy at any time due to nonpayment of premium, notice of cancellation will be mailed at least 10 days before the effective date of cancellation. **Our** notice of cancellation will state the reason(s) for cancellation.

**We** may cancel this policy for any reason within the first 60 days of the initial policy period.

After this policy is in effect for more than 60 days, or if this is a renewal or continuation policy, **we** may only cancel for one or more of the following reasons:
1. **you** do not pay the required premium for this policy when due;
2. this policy was obtained through a material misrepresentation;
3. any insured has violated any of the terms and conditions of the policy;
4. the risk originally accepted has measurably increased;
5. certification to the Director of the loss of reinsurance by the insurer which provided coverage for **us** for all or a substantial part of the underlying risk insured; or
6. a determination by the Director that the continuation of the policy could place **us** in violation of the insurance laws of this state.

With respect to cancellation, this policy is neither severable nor divisible. Any cancellation will be effective for all coverage for all persons and all **autos**.

If this policy is canceled, coverage will not be provided as of the effective date and time shown in the notice of cancellation.

### CANCELLATION REFUND

Upon cancellation, **you** may be entitled to a premium refund. However, **our** making or offering of a refund is not a condition of cancellation.

If this policy is canceled, any refund due will be computed on a daily pro-rata basis.

0101

48

If **we** decide not to renew or continue this policy, **we** will mail to the named insured, **your** agent and loss payee a notice of nonrenewal at the last known address appearing in **our** records. Notice will be mailed at least 60 days before the end of the policy period.

## PROOF OF NOTICE

Proof of mailing of any notice will be sufficient proof of notice.

Form 4881 IL (02/19)

### ILLINOIS AMENDATORY ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

## GENERAL DEFINITIONS

The definition of "**relative**" in the General Definitions section is deleted in its entirety and replaced by the following:

13. "**Relative**" means any person living in the household in which the named insured resides who is related to the named insured by blood, marriage, civil union, or adoption, including a ward or foster child. This term only applies if the named insured is a natural person.

## PART I—LIABILITY TO OTHERS

The second paragraph in Part I—Liability To Others is amended to include the following:

If a lawsuit is brought against an **insured** with respect to a claim for acts or alleged acts covered under this Part I, seeking both compensatory and punitive or exemplary damages, **we** will provide a defense to such lawsuit without liability for any punitive or exemplary damages.

## EXCLUSIONS

The following is added as an additional paragraph at the end of the Exclusions section:

0102

49

Pollution Exclusion Buy Back—If a payment is made subject to the MCS90 endorsement is removed for a claim that is not covered under **covered pollution cost or expense** or is excluded under Exclusion 7 or 10 under Part I—Liability to Others.

## PART II—DAMAGE TO YOUR AUTO

A. The following is added to the Collision Coverage provision in Part II—Damage To Your Auto:

Subject to any deductible applicable to a collision **loss**, **we** will replace, or reimburse the reasonable cost to replace, any child restraint system damaged in an **accident** to which this Collision Coverage applies.

B. The following is added to the Comprehensive Coverage provision in Part II—Damage To Your Auto:

Subject to any deductible applicable to a comprehensive **loss**, **we** will replace, or reimburse the reasonable cost to replace, any child restraint system damaged in an **accident** to which this Comprehensive Coverage applies.

C. The following is added to the Salvage provision in Part II—Damage To Your Auto:

In the event of a **total loss**, **we** will retain all salvage if the **insured auto** is eight model years old or newer.

## GENERAL PROVISIONS

Subsection 6—Our Recovery Rights is deleted in its entirety and replaced by the following:

In the event of any payment under any applicable Uninsured/Underinsured Motorist Coverage endorsement, **we** are entitled to all the rights of recovery that an insured, as defined under such Uninsured/Underinsured Motorist Coverage endorsement, to whom or for whom payment was made, has against the **owner** or operator of an uninsured auto or underinsured auto. In the event of any other payment under this policy, **we** are entitled to all the rights of recovery that the insured to whom or for whom payment was made has against another. That insured must sign and deliver to **us** any legal papers relating to that recovery, do whatever else is necessary to help **us** exercise those rights, and do nothing after an **accident** or **loss** to prejudice **our** rights.

However, **we** may not assert rights of recovery against:
a. any person who was using an **insured auto** with **your** express or implied permission for any payment made under Part II—Damage To Your Auto; or
b. the **owner** or operator of an uninsured auto or underinsured auto, if the insured, as defined under such Uninsured/Underinsured Motorist Coverage endorsement, provides **us** with written notice 30 days prior to entering into a settlement that an offer of settlement has been made by, or on behalf of, the **owner** or operator of an uninsured auto or underinsured auto, and **we** do not elect to pay that insured an

0103

50

amount equal to the amount offered in full settlement by, such behalf of, the **owner** or operator of the uninsured auto or underinsured auto.

When a person has been paid damages by **us** under this policy and also recovers from another, the amount recovered from the other shall be held in trust for **us** and reimbursed to **us** to the extent of **our** payment, provided that the person to or on behalf of whom such payment is made is fully compensated for their **loss**.

In the event recovery has already been made from the responsible party, any rights to recovery by the person(s) claiming coverage under this policy no longer exist.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form 5701 IL (02/19)

## INDIVIDUAL NAMED INSURED ENDORSEMENT

Not all customers are eligible for this coverage. This endorsement applies to **your** policy only if the form number appears on **your declarations page**. In no event will this coverage apply if the named insured is a corporation, partnership, organization, or any other entity that is not a natural person.

This endorsement changes **your** policy. Please read it carefully.

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

### ADDITIONAL DEFINITIONS USED IN THIS ENDORSEMENT

As used in this endorsement:
1. "**You**" and "**yours**" include **your** spouse or partner in a civil union, if a resident of the same household, except for notice of cancellation.
2. "**Non-owned auto**" means any **private passenger auto**, pickup, van, or **trailer** not owned by or furnished or available for the regular use of **you** or any **relative**, while it is in the custody of or being operated by **you** or any **relative**, with the permission of its owner.

### CHANGES IN PART I—LIABILITY TO OTHERS

A. If **you** are an individual, Exclusion 6 does not apply to **bodily injury** to **your** or any **relative's** fellow **employees**.

B. If any **private passenger auto you** own is an **insured auto** under Part I— Liability To Others and that **auto** is not used for any business purpose other than

0104

51

ranching or farming.

1. **Relatives** are **insureds** for any **insured auto you** own that is a **private passenger auto** and is not used for any business purpose other than ranching or farming, and for any other **auto** described in paragraph B.2. of this endorsement.

2. Any **auto you** do not own is an **insured auto** while being used, with the permission of its owner, by **you** or by any **relative** except:
   a. Any **auto** owned by any **relative**.
   b. Any **auto** furnished or available for **your** or any **relative's** regular use, including any **auto** rented for a period of more than 30 days.
   c. Any **auto** used by **you** or by any of **your relatives** while working in a business of selling, servicing, repairing, or parking **autos**.
   d. Any **auto** other than a **private passenger auto** used by **you** or any of **your relatives** while working in any business or occupation.

3. Exclusion 10 does not apply to any **insured auto** that is a **private passenger auto** and is not used for any business purpose other than ranching or farming.

4. Exclusion 16 is deleted and replaced by the following:
   **Vehicle Sharing—Private Passenger Autos**
   **Bodily injury** or **property damage** arising out of the use of an **insured auto** that is a **private passenger auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of an **insured auto** by **you** or a **relative**.

## CHANGES IN PART II—DAMAGE TO YOUR AUTO

A. If any **private passenger auto you** own is an **insured auto** under Part II—Damage To Your Auto, and that **auto** is not used for any business purpose other than ranching or farming, then a **non-owned auto** will also be considered an **insured auto**. However, the most **we** will pay for **loss** to a **non-owned auto** that is a **trailer** is $500.

B. Exclusion 9 is deleted and replaced by the following:
   **We** will not pay for **loss** to an **insured auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of an **insured auto** by **you** or a **relative**.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THIS POLICY REMAIN UNCHANGED.

Form Z228 (01/11)

## MOBILE EQUIPMENT AS INSURED AUTOS ENDORSEMENT

Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy apply.

0105

52

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

## PART I—LIABILITY TO OTHERS

**ADDITIONAL DEFINITIONS USED IN THIS PART ONLY** is modified as follows:

B. When used in PART I—LIABILITY TO OTHERS, **insured auto** also includes:
1. **Trailers**, designed primarily for travel on public roads, while connected to **your insured auto** that is a power unit;
2. **Mobile equipment** while being carried or towed by an **insured auto**;
3. Any **temporary substitute auto**; and
4. Any **mobile equipment** owned by **you**, or if **you** have purchased Hired Auto or Non-owned Auto coverage, leased or hired by **you**, when subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged. This does not change the effect of exclusion 13 concerning the operation of **mobile equipment**.

## MEDICAL PAYMENTS COVERAGE

If **you** pay the premium for Medical Payments Coverage, that endorsement is modified as follows:

## ADDITIONAL DEFINITIONS

The definition of "**Insured**" is deleted and replaced by:

"**Insured**" means:

a. if the named insured shown on the **Declarations Page** is a natural person:
   (i) **you** while **occupying** any **auto**, other than an **auto owned** by **you** which is not an **insured auto**;
   (ii) a **relative** while **occupying** an **insured auto**, **temporary substitute auto**, or **non-owned auto**;
   (iii) **you** or any **relative** when struck by a land motor vehicle of any type, or a **trailer**, while not **occupying** a motor vehicle; and
   (iv) any other person while **occupying** an **insured auto**, **temporary substitute auto**, or a **trailer** while attached to an **insured auto**; or
b. if the named insured shown on the **Declarations Page** is a corporation, partnership, organization or any other entity that is not a natural person, any person **occupying your insured auto**, **temporary substitute auto**, or a **trailer** while attached to an **insured auto**.

For purposes of this definition, **insured auto** includes **mobile equipment owned** by **you**, or if **you** have purchased Hired Auto or Non-owned Auto coverage, leased or hired by **you**, when it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged.

0106

53

If **you** pay the premium for Uninsured Motorist Coverage and/or Underinsured Motorist Coverage, that endorsement is modified as follows:

## ADDITIONAL DEFINITIONS

The definition of "**Insured**" is deleted and replaced by:

"**Insured**" means:

a. if the named insured shown on the **Declarations Page** is a natural person:
   (i) **you** or a **relative**;
   (ii) any person **occupying your insured auto** or a **temporary substitute auto**; and
   (iii) any person who is entitled to recover damages covered by this endorsement because of **bodily injury** sustained by a person described in (i) or (ii) above; or

b. if the named insured shown on the **Declarations Page** is a corporation, partnership, organization or any other entity that is not a natural person:
   (i) any person **occupying your insured auto** or a **temporary substitute auto**; and
   (ii) any person who is entitled to recover damages covered by this endorsement because of **bodily injury** sustained by a person described in (i) above.

For purposes of this definition, **insured auto** includes **mobile equipment owned** by **you**, or if **you** have purchased Hired Auto or Non-owned Auto coverage, leased or hired by **you**, when it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state or province where it is licensed or principally garaged.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form Z438 IL (02/19)

### GARAGE OPERATIONS PHYSICAL DAMAGE LEGAL LIABILITY COVERAGE AND LIMITED GARAGE LIABILITY (TOWING ONLY) COVERAGE ENDORSEMENT

This endorsement modifies **your** Commercial Auto Policy. Except as specifically modified by this endorsement, all provisions of the Commercial Auto Policy apply.

THIS ENDORSEMENT APPLIES ON A LEGAL LIABILITY BASIS UNLESS ONE OF THE DIRECT COVERAGE OPTIONS LISTED BELOW IS SHOWN ON **YOUR DECLARATIONS PAGE**.

0107

**DIRECT COVERAGE OPTIONS**

**Direct Excess Insurance.** If this "Direct Excess" option is shown on **your declarations page**, the On-Hook Towing Physical Damage Legal Liability and Garagekeepers Storage Location Physical Damage Legal Liability coverages provided by this endorsement are modified to apply without regard to **your** or any other **insured's** legal liability for **loss** to a **customer's auto** or **towed property**, and is excess over any other collectible insurance regardless of whether the other insurance covers **your** or any other **insured's** interest or the interest of the owner of the **customer's auto** or **towed property**.

**Direct Primary Insurance.** If this "Direct Primary" option is shown on **your declarations page**, the On-Hook Towing Physical Damage Legal Liability and Garagekeepers Storage Location Physical Damage Legal Liability coverages provided by this endorsement are modified to apply without regard to **your** or any other **insured's** legal liability for **loss** to a **customer's auto**, or **towed property**, and is primary insurance.

### INSURING AGREEMENT—ON-HOOK TOWING PHYSICAL DAMAGE LEGAL LIABILITY COVERAGE

If **you** pay the premium for this On-Hook Towing Physical Damage Legal Liability coverage and it is shown on **your declarations page** as "On-Hook Legal Liability," **we** will pay all sums for which an **insured** is legally liable to pay for **property damage** for **loss** to **towed property**. **We** will pay under this coverage only if a limit of liability and a premium is shown for this coverage on the **declarations page**.

**We** will have the right and duty to defend any **insured** against a lawsuit asking for these damages. However, **we** have no duty to defend any **insured** against a lawsuit seeking damages for **loss** to which this insurance does not apply. **We** may investigate and settle any claim or lawsuit as **we** consider appropriate. **Our** duty to defend or settle ends when the limit of liability for this coverage has been exhausted by payment of judgments or settlements.

### INSURING AGREEMENT—GARAGEKEEPERS STORAGE LOCATION PHYSICAL DAMAGE LEGAL LIABILITY COVERAGE

If **you** pay the premium for this Garagekeepers Storage Location Physical Damage Legal Liability coverage and it is shown on **your declarations page** as "Garagekeepers Legal Liability," **we** will pay all sums for which an **insured** is legally liable to pay as **property damage** for **loss** to a **customer's auto** or **customer's auto** equipment left in the **insured's** care while the **insured** is attending, servicing, repairing, parking, or storing it in **your garage operations** under:

1. Comprehensive Coverage.
   From any cause except:
   a. Collision of the **customer's auto** with another object; or
   b. Overturn of the **customer's auto**.

0108

2. Collision Coverage.

Caused by:

a. Collision of the **customer's auto** with another object; or

b. Overturn of the **customer's auto**.

**We** will have the right and duty to defend any **insured** against a lawsuit asking for these damages. However, **we** have no duty to defend any **insured** against a lawsuit seeking damages for **loss** to which this insurance does not apply. **We** may investigate and settle any claim or lawsuit as **we** consider appropriate. **Our** duty to defend or settle ends when the limit of liability for this coverage has been exhausted by payment of judgments or settlements.

**We** will pay under this coverage only if a limit of liability and a premium is shown for this coverage on the **declarations page**, and only for the locations listed on **your declarations page**.

### INSURING AGREEMENT—LIMITED GARAGE LIABILITY (TOWING ONLY) COVERAGE

If **you** pay the premium for On-Hook Towing Physical Damage Legal Liability Coverage, **we** will pay damages, other than punitive or exemplary damages, for **bodily injury**, **property damage**, and **covered pollution cost or expense**, for which an **insured** becomes legally responsible because of an **accident** arising out of the operation of a **customer's auto** necessary to **your** on-hook towing activity. However, **we** will only pay for the **covered pollution cost or expense** if the same **accident** also caused **bodily injury** or **property damage** to which this insurance applies.

### ADDITIONAL DEFINITIONS

The following additional definitions apply throughout this Garage Operations Physical Damage Legal Liability Coverage endorsement whenever the defined term appears in boldface type, whether in the singular, plural, or possessive:

1. "**Customer's auto**" means a customer's land motor vehicle, **trailer**, or **watercraft**, including a **customer's auto** left with **you** for service, repair, storage, or safekeeping. Customers include **your employees** and their **relatives** who pay for services performed.

2. "**Garage operations**" means the ownership, maintenance, or use of the locations shown on **your declarations page** for the purpose of a business of selling, servicing, repairing, parking, or storing **customers' autos**, and that portion of the roads or other accesses that adjoin such locations. **Garage operations** also includes all operations necessary or incidental to the performance of **garage operations**.

3. "**Insured**" means:

a. **you**; and

0109

56

b. **your** partners (if **you** are a partnership), members (if **you** are a limited liability company), employees, directors, or shareholders, but only while acting within the scope of their duties.

4. "**Loaded in or on**" means connected to.

5. "**Towed property**" means tangible property, not owned by or registered to **you**, in transit while **loaded in or on**, or conveyed by, an **insured auto**. **Towed property** also means property when it is moved from the place where **you** accept it for movement by or onto **your insured auto** and after it is moved from **your insured auto** to the place where it is finally delivered by **you**. **Towed property** includes a towed **auto** or **watercraft**.

6. "**Watercraft**" means any craft, boat, vessel, or ship designed to transport persons or property by water.

7. "**Work you performed**" includes:
   a. Work that someone performed on **your** behalf; and
   b. The providing of, or the failure to provide, warnings or instructions.

## ADDITIONAL PAYMENTS

In addition to **our** limit of liability, **we** will pay for an **insured** under this endorsement:
1. All expenses **we** incur in the settlement of any claim or defense of any lawsuit;
2. The premium on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in a principal amount exceeding **our** limit of liability, and **we** have no duty to apply for or furnish these bonds;
3. Reasonable expenses incurred by that **insured** at **our** request, including loss of earnings up to $250 per day;
4. All costs taxed against the **insured** in any lawsuit against that **insured we** defend; and
5. Interest accruing after entry of judgment on that part of the judgment that does not exceed **our** limit of liability. This does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured**.

   **Our** payment, offer in writing, or deposit in court of that part of the judgment that does not exceed **our** limit of liability ends **our** duty to pay interest that accrues after the date of **our** payment, written offer, or deposit.

## EXCLUSIONS—PLEASE READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE PROVIDED.

1. The On-Hook Towing Physical Damage Legal Liability and Garagekeepers Storage Location Physical Damage Legal Liability coverages under this endorsement do not apply to any of the following:
   a. Liability resulting from any contract or agreement by which the **insured** ac-

cepts responsibility for **loss**. This exclusion does not apply to an agreement that is an **insured contract** that was executed prior to the occurrence of any **property damage**;

b. **Loss** due to theft or conversion caused in any way by **you** or **your** employees, partners, members, directors, or shareholders;

c. Defective parts or materials;

d. Faulty **work you performed**;

e. **Loss** to any of the following:
   (i) Tape decks or other sound-reproducing equipment unless permanently installed in a **customer's auto**;
   (ii) Tapes, records, or other sound-reproducing devices designed to be used with sound-reproducing equipment;
   (iii) Sound-receiving equipment designed for use as a citizens band radio, two-way mobile radio, or telephone or scanning monitor receiver, including its antennas and other accessories, unless permanently installed in the dash or console opening normally used by the **customer's auto** manufacturer for the installation of a radio; or
   (iv) Any device designed or used to detect speed measurement equipment such as radar or laser detectors and any jamming apparatus intended to elude or disrupt speed measurement equipment;

f. **Loss** caused by:
   (i) War, including undeclared or civil war;
   (ii) Warlike action by a military force, including any action to hinder or defend against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents;
   (iii) Insurrection, rebellion, revolution, usurped power, or any action taken by a governmental authority to hinder or defend against any of these; or
   (iv) Nuclear reaction or radioactive contamination.
   This exclusion applies regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**;

g. **Loss** caused by strikes, lockouts, riots, civil commotion, or disorder; or

h. **Loss** due to inherent vice, delay, loss of profit, loss of market, loss of market value, or loss of use.

2. On-Hook Towing Physical Damage Legal Liability Coverage does not apply to:
   a. **Loss** to tarpaulins, tools, repair equipment, or materials and equipment for loading or unloading, which are carried in or on the **insured auto**;
   b. **Loss** to any **towed property** while it is in the custody of anyone other than an **insured**;
   c. **Loss** to objects of art, including paintings and statuary;
   d. **Loss** to jewelry; precious or semi-precious stones; gold, silver, platinum, or other precious metals or alloys;
   e. **Loss** to live animals;
   f. **Loss** to papers of any kind, including, but not limited to, money, securities, accounts, bills, currency, food stamps, notes, tickets, any other evidences of debt, passports, deeds, mechanical drawings, blueprints, manuscripts, or exhibits;

0111

58

g. Debris removal, including extraction of **pollutants** from land or water, or removal, restoration, or replacement of polluted land or water;

h. **Loss** caused by order of any civil authority, including seizure, confiscation, destruction, or quarantine of property;

i. **Loss** to contraband or property in the course of illegal transportation or trade;

j. **Loss** to property caused by contamination or deterioration, including corrosion; decay; fungus; mildew; mold; rot; rust; any quality, fault, or weakness in the property that causes it to damage or destroy itself; or humidity, dampness, dryness, or changes in or extremes of temperature;

k. **Loss** caused by or resulting from release, discharge, seepage, migration, dispersal, or escape of **pollutants**;

l. **Loss** caused by or resulting from criminal, fraudulent, dishonest, or illegal acts committed alone or in collusion with another by an **insured**, anyone to whom **you** entrust the **towed property**, or anyone who has an interest in the property;

m. **Loss** caused by or resulting from voluntary parting with title to or possession of any property because of any fraudulent scheme, trick, or false pretense;

n. **Loss** caused by the explosion of explosives; or

o. **Loss** to computers and electronic goods, including, but not limited to, computer hardware and component parts, televisions, DVD players, stereo or other sound reproduction equipment, or any other electronic equipment, antennas, and other devices used exclusively to send or receive audio, visual, or data signals, or to store or play back recorded media.

3. Limited Bodily Injury and Property Damage Liability (Towing Only) Coverage is subject to all exclusions as listed in Part I of the Commercial Auto Policy.

**LIMITS OF LIABILITY**

1. **On-Hook Towing Physical Damage Legal Liability Coverage.**

Regardless of the number, amount, or units of **towed property** or **insured autos**, **insureds**, premiums paid, claims made or lawsuits brought, the most **we** will pay for each **loss** is the aggregate amount of damages to all **towed property** while being **loaded in or on** or conveyed by one **insured auto**, not to exceed the limit of liability shown on the **declarations page** for this "On-Hook Legal Liability" coverage.

The most **we** will pay for **loss** to any **towed property** is the least of the following amounts:

a. The actual cash value of the damaged or stolen property at the time of **loss**;

b. The cost of repairing or replacing the damaged or stolen property with other of like kind and quality to the extent practicable; or

c. An agreed or appraised value for the property. **We** may keep all or part of the property at the agreed or appraised value, but there shall be no abandonment to **us**.

0112

2. **Garagekeepers Storage Location Physical Damage Legal Liability Coverage.**

Regardless of the number of **customer's autos** or **insured autos**, **insureds**, premiums paid, claims made, or lawsuits brought, the most **we** will pay for each **loss** at each location is the "Garagekeepers Legal Liability" coverage limit shown on the **declarations page** for that location.

The most **we** will pay for a **loss** to any one **customer's auto** or all **customer's auto** equipment is the least of the following amounts:

a. The actual cash value of the damaged or stolen property at the time of **loss**;
b. The cost of repairing or replacing the damaged or stolen property with other of like kind and quality to the extent practicable; or
c. An agreed or appraised value for the property. **We** may keep all or part of the property at the agreed or appraised value, but there shall be no abandonment to **us**.

If the repair or replacement results in better than like kind and quality, **we** will not pay for the amount of the betterment.

An adjustment for depreciation or physical condition will be made in determining actual cash value in the event of a total loss.

In the event of payment of actual cash value for a total loss, **we** are entitled to all salvage, or credit for salvage, resulting from such **loss**.

3. **Limited Bodily Injury and Property Damage Liability (Towing Only) Coverage.**

Regardless of the number of premiums paid, or the number of **insured autos** or **trailers** shown on the **declarations page**, or the number of policies issued by **us**, or the number of vehicles or **insureds** involved in an **accident**, or the number of claims or lawsuits arising out of an **accident**, **we** will pay no more than the Limit of Liability shown on the **declarations page** for Liability Coverage, subject to all of the terms and conditions of Part I of the Commercial Auto Policy.

4. **Deductibles.**

For each **loss** that qualifies for coverage under the On-Hook Towing Physical Damage Legal Liability Coverage, the deductible shown on the **declarations page** will be applied.

For each **loss** that qualifies for coverage under the Garagekeepers Storage Location Physical Damage Legal Liability Coverage, the "Each auto" deductible shown on the **declarations page** will be applied separately to each **customer's auto** or **towed property** sustaining **loss** as a result of a single **loss** event. The maximum aggregate deductible applied for a single **loss** event will not exceed the "Each occurrence" deductible shown on the **declarations page**.

0113

If **we** pay all or any part of a deductible in the settlement of any claim or lawsuit, **you** must reimburse **us** for the deductible or the portion thereof that **we** paid.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.**

Form Z439 (02/19)

### NON-OWNED TRAILER PHYSICAL DAMAGE COVERAGE ENDORSEMENT

This endorsement modifies insurance provided by the Commercial Auto Policy. All terms and conditions of the policy apply unless modified by this endorsement.

#### INSURING AGREEMENT

Subject to the Limits of Liability, if **you** pay the premium for Non-Owned Trailer Physical Damage Coverage, **we** will pay damages for **property damage** for which **you** become legally responsible because of **loss** to a **trailer** not owned by **you**, and its equipment, while in **your** possession.

**We** will pay for a **loss** to the non-owned **trailer** and its equipment under the coverages described below, as reflected on **your declarations page**:
a. Collision Coverage. For **loss** caused by:
   (i) The **trailer's** collision with another object; or
   (ii) The **trailer's** overturn.
b. Comprehensive Coverage. For any **loss** except one caused by:
   (i) The **trailer's** collision with another object; or
   (ii) The **trailer's** overturn.

**We** will settle or defend, at **our** option, any claim or lawsuit for damages covered by this endorsement. **We** have no duty to settle or defend any lawsuit, or make any additional payments, after the Limit of Liability for this coverage has been exhausted by payment of judgments or settlements.

#### ADDITIONAL PAYMENTS

In addition to **our** Limit of Liability, **we** will pay for an **insured**:
a. all expenses **we** incur in the settlement of any claim or defense of any lawsuit;
b. interest accruing after entry of judgment on that part of the judgment that does not exceed **our** Limit of Liability. This payment does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured**. **Our** payment, offer in writing, or deposit in court of that part of the judgment which does not exceed **our** Limit of Liability ends **our** duty to pay interest that accrues after the date of **our** payment, written offer, or deposit;

0114

61

c. the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in a principal amount exceeding **our** Limit of Liability, and **we** have no duty to apply for or furnish these bonds;

d. reasonable expenses, including loss of earnings up to $250 a day, incurred at **our** request;

e. all reasonable expenses necessary to return a stolen **trailer** to **you**, unless **we** determine the **trailer** to be a total loss; and

f. all reasonable expenses necessary to remove a **trailer** from the site of an **accident** or **loss** and transport it to a repair facility.

## ADDITIONAL DEFINITION USED IN THIS ENDORSEMENT

The following definition applies to this endorsement only:

"**Trailer**", when used in this endorsement, includes a shipping container.

## EXCLUSIONS

a. **We** will not pay for **loss** caused by or resulting from any of the following. Such **loss** is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the **loss**.
   (i) Nuclear Hazard.
       (1) The explosion of any weapon employing atomic fission or fusion; or
       (2) Nuclear reaction or radiation, or radioactive contamination, however caused.
   (ii) War or Military Action.
       (1) War, including undeclared or civil war;
       (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or agents; or
       (3) Insurrection, rebellion, revolution, usurped power, or action taken by a governmental authority in hindering or defending against any of these.

b. **We** will not pay for loss of use.

c. **We** will not pay for **loss** caused by, or resulting from, any of the following unless caused by another **loss** that is covered by this insurance;
   (i) Wear and tear, freezing, mechanical or electrical breakdown, or structural failure caused by material fatigue, decomposition, or corrosion.
   (ii) Blowouts, punctures, or other road damage to tires.

## LIMIT OF INSURANCE AND DEDUCTIBLE

The most **we** will pay for **loss** to any one **trailer** is the least of the following amounts minus any applicable deductible shown on the **declarations page**:

a. The actual cash value of the damaged or stolen property at the time of the **loss**;

b. The amount necessary to replace the stolen or damaged property with other of like kind and quality;

c. The amount necessary to repair the damaged property to its pre-loss condition; or

0115

62

d. The applicable Limit of Liability for the property as shown on the **declarations page**.

A single deductible will be applied to any **loss**. In the event there are different deductible amounts applicable to the **loss**, the higher deductible will be applied. In all events, the deductible will be applied against the limit of liability. If a **loss** involves another coverage added by endorsement to the policy, only one deductible will apply to the entire **loss** event. No deductible will apply to payments made under the Additional Payments section for expenses necessary to return a stolen **trailer** to **you**.

## OTHER INSURANCE

The insurance provided for a **loss** to a non-owned **trailer** is primary.

If coverage under more than one policy applies on the same basis, **we** will pay only **our** proportionate share. **Our** proportionate share is the proportion that the Limit of Liability of this policy bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

## ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THE POLICY REMAIN UNCHANGED.

Form Z442 (02/19)

## ANY AUTOMOBILE LEGAL LIABILITY COVERAGE ENDORSEMENT

Except as specifically modified by this endorsement, all provisions of the Commercial Auto Policy apply.

**We** agree with **you** that the insurance provided under **your** Commercial Auto Policy is modified as follows:

## CHANGES TO PART I—LIABILITY TO OTHERS

I. The following changes are made to the Additional Definitions Used in This Part Only section:

A. The definition of "**insured auto**" is modified to include:

1. **Hired autos**;
2. **Non-owned autos**; and
3. Any other **autos** owned by **you**:
   a. only while being used in the conduct of **your** business; and
   b. that do not qualify as either **hired autos** or as **non-owned autos**.

0116

63

However, this modification to the definition of **insured auto** does not apply to any **auto** acquired prior to the current policy period. But, for any type of **auto** that **you** acquire during the current policy period, this modification extends coverage to that **auto** during the remainder of the policy period.

B.  The following definitions are added:

1.  "**Hired auto**" means an **auto**:
    a.  **you** lease, hire, rent or borrow; or
    b.  **your employee** leases, hires or rents:
        i.   under a contract in that individual **employee's** name;
        ii.  at **your** direction and with your express permission; and
        iii. only while being used in the conduct of **your** business.

    However, this does not include any **auto you** or an **employee** leases, hires, rents or borrows from any of **your employees**, partners (if **you** are a partnership), members (if **you** are a limited liability company), or member of their households.

2.  "**Non-owned auto**" means an **auto**:
    a.  that **you** do not own;
    b.  that is not a **hired auto**; and
    c.  that is being used by **you** in connection with **your** business.

    This includes **autos** owned by **your employees**, partners (if **you** are a partnership), members (if **you** are a limited liability company), or members of their households, but only while such **autos** are used in **your** business.

II. The first paragraph under the Limit of Liability section is deleted and replaced by the following:

Regardless of the number of premiums paid, or the number of **insured autos** or **trailers**, or the number of policies issued by **us**, or the number of vehicles or **insureds** involved in an **accident**, or the number of claims or lawsuits arising out of an **accident**, **we** will pay no more than the limit of liability shown on the **declarations page** for the coverage provided by this endorsement.

**ALL OTHER TERMS, LIMITS, AND PROVISIONS OF THIS POLICY REMAIN UNCHANGED.**

0117





1781 IL 0219

0118

# EXHIBIT 6

Schmieding
Carrier Agreement

# CARRIER AGREEMENT

This CARRIER AGREEMENT ("**Agreement**") is made and entered into this 14 day of June , 2022 ("**Effective Date**"), by and between H.C. Schmieding Produce Company, LLC, a Florida Limited Liability Company ("**HCS**"), and Bukhara Trans Inc , a licensed motor carrier ("**Carrier**") pursuant to USDOT# 3546628 & MC# 1186215 (collectively, the "**Parties**" and individually, a "**Party**"). The purpose of this Agreement is to provide the terms and conditions under which HCS will engage Carrier to perform motor contract carriage and related services, and under which Carrier will render those services.

## I. RECITALS

**WHEREAS,** HCS is duly registered as a Broker of property with the Federal Motor Carrier Safety Administration ("**FMCSA**"), and desires to arrange for the transportation of products in interstate and foreign commerce by registered motor carrier;

**WHEREAS,** HCS performs services as a Broker for goods shipped by and on behalf of certain HCS customers;

**WHEREAS,** HCS performs services for its customers which prohibit its employees, agents, and Carriers used to perform the Services for customer from the use of, possessing of, solicitation for, manufacturing, dispensing, selling, or distributing narcotics or other illegal drugs, alcohol, or prescription medication without a prescription, or any other controlled substances on or around anywhere the Services are being performed.

**WHEREAS,** HCS also requires from time to time, motor carriage service for goods owned by HCS, as a shipper;

**WHEREAS,** Carrier is duly registered with FMCSA as a for-hire motor carrier to transport general commodities in interstate commerce, and desires to provide qualified expertise, personnel and equipment for motor carrier transportation and related services as further described herein, in connection with shipments tendered by HCS and HCS customers;

**NOW THEREFORE**, in consideration of the terms, covenants and conditions herein set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

## II. REPRESENTATIONS AND WARRANTIES

1. HCS represents and warrants that it is duly registered as a Broker of property with the FMCSA, No. 165901, and is in compliance with the regulations at 49 C.F.R. Part 371.

2. HCS represents and warrants that its performance under this Agreement, whether as a Broker, or when applicable when performing under this Agreement as a shipper, will be in compliance with all applicable federal, state, and local laws, regulations, and codes in such performance.

3. Carrier represents and warrants that it is duly registered with FMCSA as a for-hire motor carrier to transport general commodities in interstate commerce.

4. Carrier represents and warrants that its performance under this Agreement will be in compliance with all applicable federal, state, and local laws, regulations, and codes in such performance.

Schmeling
Carrier Agreement

5. Carrier represents and warrants that it holds at minimum, and shall maintain during the Term of this Agreement, a "satisfactory" or "unrated" safety rating, or a substantively equivalent rating under any other system implemented by the FMCSA with respect to Carrier's operations.

6. Carrier represents and warrants that if Carrier uses the service of owner-operators to perform its obligations under this Agreement, Carrier shall: a) comply with all applicable laws and regulations, including but not limited to the provisions of 49 C.F.R. 376, Lease and Interchange of Vehicles; b) enter into a written lease that will provide Carrier, as the authorized carrier lessee, will have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide the authorized carrier lessee will assume complete responsibility for the operation of the equipment for the duration of the leases; and c) under no circumstances will Carrier's obligations under this Agreement, including but not limited to its liabilities to third parties or its liability for loss, damage, or delay to property, be effected or diminished by reason of it use of owner-operators.

7. Carrier represents and warrants that when transporting Food Shipments, it will strictly observe and enforce the procedures set forth in this Agreement, including all documents incorporated by reference, and will require its employees, agents and representatives to comply with such requirements in addition to other sanitation and cleanliness standards.

8. The Parties represent and warrant the persons who signed below represent their respective Party, are authorized to, and intend to, bind their respective Party.

9. Each Party represents to the other that its entry into this Agreement does not, and will not, violate the term of any judgment, decree or ruling, or any contract with any third party.

## III. GENERAL TERMS

1. **Applicability.**  This Agreement applies to all services, as further defined herein, arranged for by HCS and provided by Carrier ("**Services**").  Services provided by Carrier may be related to a shipment originating with HCS, as the "**Shipper**," or with a customer of HCS as the "**Shipper**."

2. **Independent Contractor**.  The relationship between HCS and Carrier shall be that of an independent contractor and at no time shall the employees, agents, or associates of one be considered to be employees, agents, or associates of the other.

   A. Carrier shall have the sole responsibility for, and control of, the performance of the Services including the delivery of the goods, provided hereunder, and shall provide all direction for the method and manner of performing Carrier's obligations to this Agreement, and shall bear all costs and expenses arising out of such Services and delivery of goods.

   B. Carrier shall procure necessary licenses, provide appropriate maintenance, and furnish all supplies necessary for the proper operation of the equipment used and furnished in performance of the Services.

   C. Carrier shall have sole responsibility for, and pay any and all wages, fees, payroll taxes, assessments, or other expenses relating to, employees or agents of Carrier which may be required to be paid under any law.

   D. HCS shall neither have, nor exercise, control, direction or supervision over Carrier or the personnel furnished or used by Carrier to perform the Services under this Agreement.

   E. Carrier shall be the "employer" of himself and any carrier employee within the meaning of 3401(d) of the Internal Revenue Code.

Schmieding
Carrier Agreement

3. **Contract Carriage**. All Services performed by Carrier pursuant to this Agreement shall be as a motor contract carrier of property and will be subject only to the terms of this Agreement and all applicable law. All Services are being provided as "contract carriage" within the meaning of 49 U.S.C. 13102(4)(B), and HCS and Carrier each expressly waive all rights and remedies they may have as to each other under 49 U.S.C., Subtitle IV, Part B to the extent such rights and remedies conflict with this Agreement.

4. **Term of Agreement.** This Agreement shall remain in full force and effect for the initial term of one (1) year commencing on the Effective Date, and shall automatically renew for additional twelve (12) month terms thereafter until terminated by either Party in accordance with the terms of this Agreement ("**Term**").

   A. This Agreement may be terminated by either Party, at any time, with or without cause, upon thirty (30) days notice in writing to the other Party.

   B. If any shipment within the scope of the Services remains in transit on the effective date of a termination of this Agreement, both Parties' rights and duties under this Agreement shall remain in effect with respect to such shipments until it is delivered, and all related invoices and claims are satisfied.

5. **Default.** Both parties will discuss any perceived deficiency in performance and will promptly endeavor to resolve all disputes in good faith. However, if either party materially fails to perform its duties under this Agreement, the party claiming default may terminate this Agreement on 30 (thirty) days written notice to the other Party.

6. **Termination.** HCS may additionally terminate this Agreement immediately upon written notice in any of the following events:

   A. Carrier's Personnel used to perform the Services be impaired or under the influence of legal or illegal drugs or alcohol and such impairment or influence adversely affects the employee's work performance, the safety of the employee or of others, or puts at risk the Company's reputation.

   B. Carrier be found to be conducting business illegally in any way or conducts themselves in a manner in which puts HCS's company reputation at risk.

   C. Carrier loses its operating authority or otherwise becomes disqualified to perform its obligations under this Agreement.

   D. Carrier breaches any covenant, obligation, condition, or requirement imposed upon it by this Agreement, and such breach continues for a period of ten (30) days after written notice thereof from HCS to Carrier.

   E. Carrier becomes insolvent or becomes unable to pay its debts in a timely manner.

   F. Carrier fails to comply with the performance metrics or selection criteria, if any, imposed upon it at any time by HCS.

   G. Carrier fails to procure and maintain any of the insurance coverages required by this Agreement.

   H. Carrier utilizes the services of any Brokers, or brokers or subcontracts transportation of freight tendered by HCS hereunder to any third-party motor carrier or other transportation provider

or utilizes a third-party logistics provider to perform its obligations under this Agreement without prior written consent of HCS.

7. **Compliance with Applicable Laws.**   Carrier will comply with all applicable Legal Requirements.  As used in this Agreement, "**Legal Requirements**" means any and all statutes, rulings, rules, regulations, permits, certificates, or ordinances of any local, state, or federal governmental authority, in any way applicable to HCS, Carrier, or the Services, including but not limited to provisions of the Interstate Commerce Act, laws, rules and regulations of the FMCSA and any other laws, rules, or regulations to the extent they govern Carrier's operations.

I. Carrier will maintain its permits, licenses, operating authorities, and all required insurance, in full force and effect with the FMCSA and all other applicable regulatory and state agencies during the Term.

J. The Parties agree that in the event the failure of Carrier to comply with or conform to any Legal Requirements results in different or additional charges for the Services, Carrier shall indemnify HCS from such charges, and will pay HCS immediately upon demand, damages equal to any additional charges required to be paid, and any costs or attorneys' fees incurred by HCS in connection therewith.

8. **Carrier's Change in Status**. In the event that all or any portion of Carrier's permits, licenses, operating authorities, safety ratings or required insurance are revoked, canceled, downgraded, suspended or discontinued by operation of law or otherwise, Carrier will immediately notify HCS.

9. **HCS or Shipper Name**.  Carrier will not display the name of HCS or the Shipper upon Carrier's vehicles.


## IV.  SERVICES

1. **Goods**.  During the term of this Agreement, HCS, as Broker or as Shipper, may tender to Carrier, on a non-exclusive basis, and Carrier agrees to accept from HCS, from time-to-time, shipments consisting of certain goods ("**Goods**") for transport.  As will be addressed in more detail throughout the Agreement, the Goods are primarily food products that will ultimately be consumed by humans or animals ("**Food Shipments**") which are required to be transported in a sanitary and temperature-controlled environment.

A. Upon acceptance of such tender, Carrier will, using due care, pick-up, transport in a safe and timely manner; and deliver in good order and condition, the Goods which are tendered by HCS to Carrier, in accordance with the terms and provisions set forth in this Agreement, (all of which are included in the Services as described herein).

B. Carrier shall comply with all instructions provided to Carrier by HCS regarding the transportation of the Goods tendered to it, including but not limited to the food safety and security instructions required as set forth in this Agreement, and all documents incorporated by reference.  To the extent Carrier receives contradictory or confusing instructions regarding any shipment; Carrier must resolve the contradictory or confusing instructions prior to accepting the shipment for transport.  Failure to resolve any issue with the instructions prior to transport shall bar Carrier from using the contradictory or confusing instructions as a defense.

2. **Exempt Commodities.**  In the event HCS tenders to Carrier commodities the transportation of which by motor vehicle is not subject to the jurisdiction of the Surface Transportation Board

(STB) as specified in 49 §13506, such service and the Parties' rights and obligations with respect thereto shall also be governed by this Agreement.

3. **Carrier Compliance with all Applicable Requirements of this Agreement.** Carrier agrees to be in strict compliance with all requirements of carriage in this Agreement and all Legal Requirements applicable to the transport of any Food Shipments. Carrier acknowledges that Food Shipments require a high degree of care and agrees and acknowledges that failure to follow the requirements as set forth in this Agreement and all applicable Legal Requirements may result in possible contamination, adulteration or degradation of product quality, which could have a detrimental effect on HCS's reputation and image in the marketplace as well as potential exposure for product liability.

4. **Customer Service**. Carrier will provide a dedicated customer service representative to be available to assist HCS with service issues, between the hours of 7:00 a.m. and 7:00 p.m. Central Time, Monday through Friday. Carrier will further provide backup customer service coverage available to HCS on a 24x7x365 on-call basis. HCS will also provide Carrier with 24x7x365 on-call information for after-hours purposes.

5. **Diversion and Reconsignment**. Carrier will not divert or reconsign any shipment except upon written instructions of HCS.

6. **Failure to Perform**. Carrier shall immediately notify HCS if for any reason, Carrier is unable to perform the Services in accordance with the applicable confirmation or Shippers instructions. If Carrier violates this Agreement in such a manner so as to fail to complete transportation of any shipment, abandons a shipment, or otherwise subject HCS to potential liabilities or losses, Carrier agrees that HCS shall have the right to make alternative arrangements for the delivery of said shipment. Carrier waives any recourse against HCS or Shipper for any such action and shall reimburse HCS for any cost and expense arising out of the completion of any shipment and pay HCS any damages for which it may be liable as a result of such failure to perform, including reasonable attorney fees.

7. **Operation within Scope of FMCSA**. Under no circumstance shall Carrier render Services beyond the scope of its FMCSA registration unless the Services are exempt from legal requirements for such registration or authority.

8. **No Gratuities**. Carrier shall not offer or provide to any of HCS/Shipper's employees, agents or other representatives any gratuities, gifts, payments, favors, nor anything else of value, whether or not in an attempt to influence such person's administration of the provisions of this Agreement, or to otherwise gain an advantage of HCS/Shipper individually or relative to any competing carriers.

9. **Owner-Operators.** Carrier may use the service of owner-operators to perform its obligations under this Agreement. In such circumstances, Carrier will comply with all applicable Legal Requirements, including but not limited to the provisions of 49 C.F.R. 376, Lease and Interchange of Vehicles. Further, Carrier will enter into a written lease that will provide that Carrier, as the authorized carrier lessee, will have exclusive possession, control, and use of the equipment for the duration of the lease. The lease will further provide that the authorized carrier lessee will assume complete responsibility for the operation of the equipment for the duration of the leases. Under no circumstances will Carrier's obligations under this Agreement, including but not limited to its liabilities to third parties or its liability for loss, damage, or delay to property, be affected or diminished by reason of it use of owner-operators.

10. **Brokering**. Carrier shall not broker any shipment hereunder without the express written permission of HCS. In the event where HCS gives express written permission to carrier to

broker the shipment, the carrier must ensure carrier hired has a 'satisfactory' safety rating and meets all requirements and provisions of this Agreement. If Carrier directly or indirectly brokers any shipments to another carrier without the express written permission of HCS, Carrier will assume full reasonability and liability for the act and omissions of the carrier handling the shipment as though Carrier transported the shipment itself. If Carrier breaches this provision, HCS reserves the right of paying the monies it owes the Carrier directly to the delivering Carrier in lieu of payments to the Carrier. Under no circumstance shall Carrier's obligations under this Agreement, including but not limited to its liabilities to third parties or its liabilities for loss, damages, or delay to property, be affected or diminished by reason of its brokering shipments to another carrier.

11. **Assignment; Subcontracting**. Carrier shall not assign, transfer, pledge or encumber any of its rights or obligations under this Agreement without HCS's prior written consent, such consent to be given or withheld in HCS's sole discretion. Carrier agrees not to use subcontractors (other than owner-operators under a written lease and per all requirements as described above), or to interline with other carriers, or to broker shipments, or to use "substitute services" by rail for Shippers' Goods without prior written consent of HCS.

12. **Carrier Liability.** Carrier shall not, in any way, have any right to negate, eliminate, circumvent, or alleviate Carrier's liability to HCS or Shipper which may be inconsistent with the provisions of this Agreement.

13. **Preservation of Records**. Carrier shall comply with the requirement of 49 CFR 371.3 or any successor provision thereto, with regard to the preservation of records related to the Services, and shall, in any event, maintain and preserve all such records for a period of not less than three (3) years from delivery of the last shipment pursuant to this Agreement.

14. **Driver Hours**. Carrier agrees and acknowledges that, by accepting tender, the time between time of tender and the due date designated by HCS is reasonable and can be performed by Carrier and its drivers under the federal hours of service regulations contained in 49 C.F.R. Part 395. Carrier will promptly notify HCS by telephone in the event that any designated delivery due date cannot be legally met because of such federal regulations.

15. **Delay, Accident or Undeliverable Freight**. Carrier will notify HCS immediately by telephone or email of any accident, spill, theft, hijacking or other events that impair the safe and prompt delivery of the Goods in its control. Carrier will notify HCS immediately by phone or email of any undeliverable freight and request additional instructions regarding delivery.

16. **GPS Tracking.** Carrier shall be required to comply with GPS Tracking instructions provided to Carrier by HCS for the duration of the load, from pick up to delivery. Non-Compliance of this requirement shall result in fines determined as per **Appendix A** (Schmieding Transportation Fees).

17. **Missed Appointments.** Carrier shall arrive to all shipping and delivery appointments no later than set appointment times provided in writing to carrier by email or EDI by HCS. HCS shall notify Carrier of any appointment changes in writing by email or EDI. Carrier shall not be responsible for delays arising from a force majeure event or other event beyond Carrier's control. Carrier shall be responsible for any late fees incurred for missed appointments as indicated in **Appendix A** (Schmieding Transportation Fees).

A. Carriers cannot be one (1) minute later than the set appointment time provided by HCS to any loading or unloading facility to be considered on time for any set appointment.

B. Carriers cannot be one (1) minute later than the set end appointment time provided by HCS to any loading or unloading facility to be considered on time for a range appointment.

## V. EQUIPMENT

1. **Cost of Equipment.** Carrier will, at its sole cost and expense, provide only commercially suitable motor vehicles and other necessary equipment required to provide the Services ("**Equipment**"), and said Equipment will be in good repair and condition and operate in a safe manner and in compliance with all applicable Legal Requirements. Equipment used to provide the Services, shall be clean, insect and rodent free, odor-free, dry, leak-proof, meet the food safety requirements in this Agreement, and otherwise be safe to transport the commodities tendered. HCS has the right to reject unsatisfactory equipment. In the event HCS rejects Carrier's equipment, Carrier shall immediately provide HCS with satisfactory replacement equipment.

2. **Operating Expense**. Carrier will bear the cost and expense of all fuel, oil, parts, tires, road service, repair, and maintenance in connection with the use and operation of the Equipment and which may be required to keep the Equipment in good repair and mechanical condition. Neither HCS nor Shipper will be liable to Carrier for any damage sustained by, or to, the Equipment, or for loss by confiscation or seizure of the Equipment by any public authority, except Shipper shall be liable to the extent such damage or loss is directly attributable to the negligence or willful misconduct of Shipper, its employees, or representatives.

3. **Operation in California.** To the extent any shipments are transported within the State of California, Carrier warrants that (a) all 53 foot trailers, including both dry-van and refrigerated equipment it operates, and the Heavy-Duty Tractors that haul them within California under this Agreement, are in compliance with the California Air Resources Board (ARB) Heavy-Duty Vehicle Greenhouse Gas (Tractor-Trailer GHG) Emission Reduction Regulations; and (b) all refrigerated Equipment it operates within California under this Agreement is in full compliance with the California ARB TRU ACTM in-use regulations.

## VI. PERSONNEL

1. Carrier, at its sole cost and expense, will supply only personnel who are legally permitted to be employed in the United States and who are legally licensed, qualified, fit, competent, and able personnel who have met all Legal Requirements for the operating of said Equipment and the provision of all other Services. Carrier will have the sole responsibility for the acts and conduct of such personnel during the entire period of time said personnel are used to deliver Goods and to perform the Services. Carrier's drivers shall be considered professionals and a representative of the Carrier of which they are employed.

2. Carrier will employ, train, supervise and control all necessary personnel required in performing the Services (including drivers and any helpers) and in performing all other obligations under this Agreement. All such individuals will be employees of, or owner-operators leased to Carrier only, and will be subject to employment, discharge, discipline, and control solely and exclusively by Carrier.

3. Carrier will (a) instruct all personnel that will be picking up and delivering Goods, of the need to comply with all posted security and safety policies and will be responsible for failure of Carrier personnel to do so and (b) maintain, and cause its personnel to maintain, the highest standards of professionalism and industry best practices in the performance of the Services to be provided to HCS. All such personnel may be required to display identification prior to being allowed access to designated facilities where Goods will be picked up or delivered.

4. Carrier shall ensure all personnel that will be picking up and delivering Goods and to perform the Services shall follow all FMCSA regulations and all provisions of this Agreement.

5. Carrier shall ensure all personnel used to pick up or deliver Goods and to perform the Services shall not be in the use of, possession of, solicitation for, or sale of narcotics, or other illegal drugs, alcohol, or prescription medication without a prescription while picking up or delivering Goods and performing the Services.

## VII. SANITARY FOOD TRANSPORTATION REQUIREMENTS

1. **High Degree of Care**.  Carrier acknowledges that transportation of Food Shipments, which include refrigerated and/or frozen foods and related products, requires a high degree of care in order to prevent possible contamination, adulteration, or degradation of product quality, which could have a detrimental effect on HCS's or Shippers' reputation and image in the marketplace as well as potential exposure for product liability.  Carrier agrees and warrants that it will strictly observe and enforce the following procedures, and will require its employees, agents and representatives to comply with the following requirements in addition to other sanitation and cleanliness standards.

2. **Food Safety Law Compliance**.  Carrier must comply with the Legal Requirements governing the safe and secure transportation of Food Shipments, including, but not limited to, the Food Safety Modernization Act (21 U.S.C. 2201, *et. seq.*) ("FSMA"), the Federal Food, Drug and Cosmetic Act (21 U.S.C. 41, *et seq.*) ("FD&C Act"), the Sanitary Food Transportation Act (49 U.S.C. 5701, *et seq.*), the U.S. Food and Drug Administration's Final Rule on the Sanitary Transportation of Human and Animal Food (21 C.F.R. 1.900, *et seq.*), the Food Safety Modernization Act of 2013 and all applicable U.S. Department of Agriculture and Food Safety and Inspection Service regulations (collectively, the "Food Safety Laws").

3. **Instructions**.  Carrier is responsible for the sanitary conditions of Food Shipments during their transportation and complying with HCS's and/or Shippers' written instructions, including without limitation, any temperature set point or temperature range, as provided to the Carrier by HCS or Shipper in physical or electronic form.  Carrier shall apply all written instructions to future Food Shipments of the same Goods tendered for the same Shipper, unless instructed otherwise in writing.  If HCS's or Shippers' instructions require a cargo seal, the absence of a seal or seal irregularities shall be sufficient to consider the shipment unsafe and a total loss.  If seal integrity has been jeopardized, Carrier shall duly note it on the bill of lading.  Carrier agrees that when transporting food for human consumption, late delivery (i.e. delivery after the deadline indicated on the transportation documents) alone shall be sufficient to reject a shipment and consider the cargo a total loss.

4. **Recording Food Shipment Temperature**.  Carrier shall verify the temperature of Food Shipments before loading.  Carrier must write the recorded temperature on shipping document(s) used by the Parties for the pick-up, transport, or delivery of Goods, including without limitation any bill of lading ("**Shipping Document**").  If the temperature is more than two degrees different from the required temperature stated in the written instructions or Shipping Document, then the Carrier shall immediately notify HCS, and refuse to load the Goods.  In the event Carrier is unable to verify the temperature due to restrictions imposed by the Shipper, consignor, or due to the physical circumstances of loading, Carrier shall notify HCS immediately, note its inability to verify and the reason for such inability, and is otherwise excused from performing such verification.  The foregoing exception shall not relieve Carrier of compliance with any other provision of this Section VII. Carriers shall provide downloadable temperature monitoring and equipment performance data within twenty-four (24) hours of

request. Noncompliance with this provision shall result in fees as indicated in **Appendix A** (Schmieding Transportation Fees) and Carrier being solely liable for any and all claims and/or losses of goods.

5. **Equipment used to transport Food Shipments**. Carrier represents and warrants that all Equipment used in transporting Food Shipments (as defined in the Food Safety Laws and herein) is in safe and sanitary condition and appropriate for performance of the Services for Food Shipments, including but not limited to, Equipment free from contamination, pest infestation, and evidence of prior cargo that could render the Food Shipments unsafe. Carrier represents and warrants that all Equipment used in transporting Food Shipments is equipped with an operational air-chute at least forty-three (43) feet in length and fully attached from the beginning to the end to the refrigeration unit. Carrier represents and warrants that all Equipment used in transporting Food Shipments is equipped with refrigeration equipment that allows data monitoring of temperatures and refrigeration equipment performance inside the trailer from the time of precooling the trailer, while trailer is being loaded with goods, and through when the goods have been unloaded from the trailer and it is empty.

A. If Carrier transports partial load shipments (also known as less-than-truckload, or LTL, shipments), Carrier shall conduct appropriate inspections and take necessary actions upon receiving the first shipment and each subsequent shipment to ensure that:

   i. the Equipment remains in safe and sanitary condition;
   ii. any Food Shipments will not be contaminated by any previously or subsequently loaded cargo; and
   iii. the temperature of any temperature-controlled Food Shipment will not be materially disrupted.

B. When required by and as specified in Shipper's instructions or Shipping Document, Carrier must ensure that the cold storage compartments are prepared for safely transporting the Food Shipments. Carrier must set temperature controls to pre-cool mechanically refrigerated cold storage compartments before offering equipment with auxiliary refrigeration units for transportation of Food Shipments requiring temperature control and set the operating temperature to ensure the Food Shipments at all times are maintained at the temperature set point or within the temperature range specified on the Shipper's instructions or Shipping Document.

C. Carrier will not utilize or tender trailers that have been used for transporting poison, refuse, garbage, trash, solid or liquid waste, or any other noxious product, of any kind whatsoever, whether hazardous or non-hazardous. If Carrier is unsure whether any prior cargo would disqualify the trailer, prior to accepting a load, Carrier shall advise HCS of any potentially hazardous or noxious product or material which has been previously hauled or stored on the trailer being used to transport the Food Shipment. HCS may approve or disqualify the trailer based on the information provided.

D. The trailer and all items used to transport the Goods, shall be clean, insect and rodent free, odor-free, dry, leak-proof, meet the food safety requirements in this Agreement, and otherwise be safe to transport the commodities tendered.

6. **Carrier's Food Safety Procedures**. Carrier acknowledges and agrees the temperature of the Goods is a material condition of this Agreement. Carrier shall develop and maintain written procedures related to the safe transport of Food Shipments tendered to it by HCS and shall train its drivers and staff regarding safe transport of Shipper's Goods.

7. **Recordkeeping**.  Carrier shall maintain all documentation and records related to the transport of Food Shipments governed by this Agreement, including documentation of personnel training and Equipment cleanings, sanitization and inspections, and the safe and sanitary transport of Food Shipments, and shall make the records available to HCS and/or the Shipper upon request for any period within the Term of this Agreement.

   A. Carrier must provide temperature recorder readings upon request from HCS or Shipper.

   B. Carriers must provide a reefer download within twenty-four (24) hours of request from HCS or Shipper.

8. **Provision of Information**.  Immediately upon request or as promptly as practicable thereafter, Carrier will provide HCS and/or Shipper:

   A. Evidence of the operating temperature of Food Shipments maintained during Services in the manner acceptable to HCS and/or Shipper;

   B. Documented written processes for maintaining food safety, including maintenance of temperature control, and cleaning, sanitizing, and inspecting Equipment;

   C. Evidence of transportation traceability, including information regarding:

      i.  Previous cargo hauled in bulk or in other Equipment; and
      ii. Maintenance and intervening cleaning procedures for docks and Equipment.

   D. Appropriate training processes for each person under Carrier's supervision or control involved in providing Services; and

   E. Evidence that the Food Shipments have not been adulterated, as defined in the FD&C Act, 21 U.S.C. 342(a)(i)(4), and have been transported under sanitary conditions to protect the shipments against temperature abuse or excessive fluctuations and any physical, chemical, or microbial contamination.

9. **Liability Related to Food Shipments**

   A. Carrier agrees that Food Shipments which have been transported or offered for transport, pursuant to this Agreement, under conditions that are not in compliance with the written instructions or requirements set forth in the Shipping Document, including any seal, temperature, quality control standards, and delivery date requirements, will be considered "adulterated" within the meaning of the FD&C Act (21 U.S.C. 342(a)(i)(4), 342(i)).  Carrier understands that adulterated shipments may be refused by the Shipper, customer, or receiver upon their tender for delivery at destination, with or without inspection.

   B. Carrier assumes liability for the result of breach of any of the requirements specified in this Agreement. Carrier agrees HCS is not responsible for, and shall in no way be held liable to, Carrier for Carrier's, or any Shipper's, customer's, receiver's or loader's obligations or their failure to adhere to their respective obligations under the laws and regulations governing the safe and sanitary transport of food for human consumption, including the Food Safety Laws referenced above in Section VII (2).

Schneider
Carrier Agreement

## VIII. Hazardous Materials

With respect to the transportation of hazardous materials requiring vehicle placarding under 49 C.F.R. Part 181, Carrier agrees that the following provisions shall apply for all such shipments:

1. Carrier represents and warrants that it has obtained all necessary federal permits and registrations to transport hazardous materials or wasted in inter-provincial, interstate and/or intrastate commerce. Upon request, Carrier shall provide HCS with a copy of all such federal and state permits and registrations. Additionally, Carrier agrees to notify HCS immediately upon any revocation or suspension of Carrier's state of federal hazardous material permits or registration as well as the suspension or revocation of Carrier's "Satisfactory" Safety Fitness Rating issued by the U.S. Department of Transportation, which satisfactory rating is prerequisite to providing transportation for hazardous materials under this Agreement.

2. Carrier represents and warrants that all drivers used to transport hazardous material shipments have undergone the necessary training requirements of state and federal laws, including, but not limited to, the training requirements under 49 C.F.R. Part 126(F). Carrier further warrants and certifies that all drivers used to transport hazardous material have the proper endorsements on their Commercial Driver's License to legally transport such shipments. Carrier further agrees to comply with all federal, state and local laws regarding the transportation of hazardous material, including, but not limited to, the requirements specified under 49 C.F.R. Part 181, and 49 C.F.R. Part 397.

## IX. RATES

1. **Rates**. The Parties agree that the rates as between HCS and Carrier will be determined from time-to-time based on the market conditions then prevailing unless there is a separate contract existing between the Parties as to specific lanes. The methodology for determining the applicable rate will be as follows:

   After a rate is agreed to by the Parties, HCS shall transmit by facsimile (or other electronic means) to the Carrier, a Rate Confirmation Sheet (or substantively similar document), which document will identify the shipment by: DATE OF TENDER, ORIGIN, DESTINATION, COMMODITY, ESTIMATED WEIGHT, PICK-UP TIME AND DATE, DELIVERY TIME AND DATE, AND AGREED UPON RATE.

2. **Rate Confirmation Sheets**. Rate Confirmation Sheets shall be deemed to be an accepted amendment to this Agreement. Due to document storage considerations, the Rate Confirmation Sheet need not be attached to the original Agreement but may be kept with the shipping papers that are retained as to the individual shipment. The same requirements of retention and availability of inspection of documents, that apply pursuant to this Agreement, shall apply to the Rate Confirmation Sheets. If either Party disputes the accuracy of any amended rate, that Party shall notify the other Party within twenty-four (24) hours of receipt of the Rate Confirmation Sheet. Upon notification, the disputed rate shall not become an amended rate until agreed to by both Parties.

3. **Mileage Calculations**. Unless otherwise specified in the applicable Rate Confirmation Sheet, the Parties hereby agree that, for the Term of this Agreement, all mileage for origin-to-destination combinations, for purposes of determining rates hereunder, will be calculated with Google Maps. Any invoices not utilizing such calculations will be adjusted and paid by HCS based on its calculation using Google Maps.

Schmelling
Carrier Agreement

## X. PICK-UP AND DELIVERY RECEIPTS

1. **Pick-Up Receipts**.  Each shipment received by Carrier will be evidenced by a bill of lading, signed by Carrier showing the quantity and description of Goods, together with any relevant shipping instructions, and to the extent the cargo is a Food Shipment designated as temperature-controlled, that the temperature of the Food Shipment is at the required temperature set point or within the temperature range according to the procedures set forth in this Agreement. Such form will be evidence of receipt of such Goods by Carrier in apparent good order and condition.  Carrier shall be responsible for providing immediate notice to HCS of any alleged exception to, or defect, damage, or shortage of the Goods prior to Carrier movement of it.  In the event the Carrier deems the Goods not being of good order and condition or loaded improperly, the Carrier shall notify HCS before signing the Bill of Lading (BOL) accepting the Goods from the shipper.  Upon acceptance of the shipment, Carrier shall assume liability for the Goods until proper delivery is made and may not thereafter allege that any injury which Carrier sustained in the course of transportation was due to such insufficient crating, boxing, packing or loading.  Carrier shall ensure the Goods are adequately secured in adherence with FMCSA 49 §392.9(a)(1) and 49 §393.104 with exception to Shipper Load & Count (SL&C) by shipper as cited with 49 §392.9(b)(4).  In the event of any inconsistency between the terms and condition of any individual bill of lading and this Agreement, the terms and conditions of this Agreement shall prevail.

2. **Delivery Receipts**.  Upon delivery of each shipment, Carrier will obtain a written delivery receipt, signed by an authorized agent of the receiving customer confirming 1) the time of delivery of Goods from the point of loading to the point of unloading, and 2) that the freight was received in good condition and without exception, or with documentation of any damages, shortages and/or overages.   Carrier will provide HCS upon request, within twenty-four (24) hours, copies of all such delivery receipts where damages, shortages, or overages occur.

3. **Period of Carrier Responsibility**.  Carrier's duties and responsibilities under this Agreement will commence when Carrier takes possession and control of Shippers' property or upon execution of a bill of lading or receipt by Carrier, whichever occurs first, and will not end until the shipment is properly delivered to the customer named in the bill of lading.

## XI. INVOICING AND PAYMENT

1. **Invoicing.** Carrier agrees to conduct all billing services to HCS for payment owed to them, as mutually agreed in writing, by fax, or by electronic means, contained in Carrier's Load Confirmation Sheet(s)/dispatch sheets incorporated herein by this reference. Any such additional, modified, amended rates, or changes in rates shall automatically be incorporated herein by this reference.

2. **Responsible Party**. Carrier agrees that it shall look solely to HCS for payment of any Service, and shall not look to, or make any demand upon, Shipper (other than when HCS is the Shipper), or any third-party, for any such payment.

3. **Compensation**.

   A. Carrier will submit to HCS an invoice for freight charges along with proof of delivery, and HCS shall pay each invoice within thirty (30) days from the date of the invoice. HCS will be under no obligation to accept or pay any invoices received after one hundred eighty (180) days from the date of shipment delivery, and Carrier hereby releases HCS from any and all responsibility for such amounts.

Schmelling
Carrier Agreement

B. For any compensation premised upon mileage, the applicable mileage used to calculate such compensation shall be determined through the use of Google Maps unless the calculation of mileage is otherwise specified on the Rate Confirmation Sheet (or substantively similar document).

C. **No Lien**.  Carrier shall not obtain title to, or any other rights to, the Goods, and hereby waives any rights to any lien now or hereafter created by any law or regulation. Further, Carrier will not withhold the Goods from delivery on account of any dispute as to the rates, or any alleged failure of HCS to pay charges incurred under this Agreement.

D. HCS shall have the right to offset compensation or other charges owed to Carrier against any amounts owed by Carrier pursuant to this Agreement.

E. Accessorials and Fees are listed in **Appendix A** of this Agreement.

F. **Offsets.**  In the event that the cargo being transported by Carrier is damaged through the actions or negligence of the Carrier, triggering the indemnification provisions of this Agreement, HCS reserves the right to offset and withhold any payments or fees provided for in the Rate Confirmation from Carrier in an amount equal to the value of the damaged Cargo. In the event that the offset of the payment for damaged cargo is insufficient to fully and completely indemnify HCS, a customer or shipper of the HCS, then HCS may offset and withhold payments for other shipments that may be subject to this Carrier Agreement, whether or not such freight of shipment is on behalf of the same customer or shipper.

G. **Undercharge or Overcharge**.  The time limit for filing overcharge or undercharge claims shall be ninety (90) days from the date such Goods are delivered and shall be processed in accordance with 49 CFR 378 or any successor provision thereto. Any civil action to recover freight charges, overcharges or undercharges related to the Services, must be commenced within nine (9) months from the date of delivery of the applicable Goods.

4. **Audits**. Upon reasonable request, Carrier shall make available to HCS, or its designee, for audit purposes, its books and records pertaining to the Services provided under this Agreement and the charges related thereto. Such records include copies of all freight bills, invoices, receipts and other documents related to the Services provided. Carrier will retain all bills of lading and delivery receipts for a period of no less than three (3) years from the latter of the date of delivery, or creation of the record.

5. **Civil Action for Non-Payment**. Any civil action for alleged nonpayment for Carrier services hereunder must be commenced within one year of date of delivery or scheduled date of delivery whichever is earlier in order to avoid being permanently barred.

## XII.  CARGO LOSS AND DAMAGE

1. **Basis for Liability.**

A. Carrier shall be solely responsible for the loading, securing, and unloading of Goods upon Equipment, and if performed by Shipper, it shall be under the direct authority and control of Carrier or its representatives.  To the extent the cargo is a Food Shipment designated as temperature-controlled, Carrier shall also ensure that the Food Shipment is at the set point or within the temperature range specified on the Shipping Document.  If Carrier requests, but is not allowed to observe the loading process, Carrier must immediately notify HCS and indicate in writing "Shipper Load and Count" or "SLC" on the pick-up receipt.

B. Carrier will have the sole and exclusive care, custody, and control of the Goods from the time they are tendered to Carrier for transportation until delivery to the customer accompanied by the appropriate receipts as specified in this Agreement. Carrier, whether acting in the capacity of a broker, carrier, or otherwise, assumes the liability of a common carrier (i.e., Carmack Amendment liability as set forth under 49 U.S.C. 14706) for loss, delay, damage to, or destruction to any and all of the Goods.

C. Carrier shall be liable to HCS and Shipper for the loss, damage, injury, theft, or delay of the Goods occurring while in the custody, possession, or control of Carrier or Carrier's for-hire personnel providing unloading service or resulting from Carrier's performance of or failure to perform the Services provided for in this Agreement. Carrier shall immediately notify HCS of any loss, damage, or delay to the Goods with regard to any shipment, including but not limited to accident, spill, theft, or discrepancies.

D. Carrier shall also immediately notify HCS of any variance in trailer temperature, excluding normal defrost cycling, for any period in excess of one (1) hour from refrigeration. Temperature for Food Shipments is a material aspect of this Agreement, and Food Shipments must be within the ranges specified in the written instructions and/or Shipping Documents when Carrier delivers such Goods to the customer or receiver, or it may be rejected as adulterated and/or damaged at customer's or receiver's sole discretion, regardless of any other measure of quality including, but not limited to, USDA inspections.

E. If the Goods are lost, damaged or destroyed, Carrier will be liable for, and will pay to HCS, the actual invoice price charged for the kind and quantity of the Goods lost, damaged or destroyed, and, in addition, all freight charges, taxes, fees, disposal, and other charges of any kind or nature which HCS may incur with respect to such Goods. Notwithstanding the above, Carrier's liability to HCS for any loss or damage will not exceed $100,000.00 per shipment unless agreed to in writing prior to Carrier accepting shipment. Carrier agrees that no additional released rates or other liability limitations will apply except as specified herein.

2. **Rejected Shipments**. Carrier shall immediately notify HCS upon any customer rejection of any shipment, and provide to HCS any documentation from customer, including photographs of rejected goods. If any customer rejects any Shipment, or if HCS advises or instructs Carrier to stop movement of the Shipment and hold it in transit, HCS shall instruct Carrier to either 1) have the shipment placed in public storage, 2) have the Shipment returned to the point of origin, or 3) have the Shipment returned to some other point of destination designated by Shipper or HCS, at a rate to be agreed to by the Parties.

3. **Replacement Shipments**. Carrier acknowledges that HCS may utilize other carriers to facilitate the movement of delayed shipments, or to ship replacement Goods. HCS agrees that Carrier will first be afforded a reasonable opportunity to complete the movement in a timely manner. In the event Carrier is unable to facilitate the movement, Carrier will be responsible for reasonable and necessary expenses incurred by HCS for arranging alternative service to facilitate movement of the shipment.

## XIII. DETERMINATION OF DAMAGE, SALVAGEABILITY

Failure to comply with all provisions set forth in this Agreement, including all attachments, or any written instructions may result in a determination by HCS or Shipper, in their respective discretion that the Goods are damaged or unsafe and if such a determination is made by HCS or Shipper, Carrier shall not sell or otherwise dispose of the Goods.

Schneiding
Carrier Agreement

1. The determination regarding the acceptability, salvageability and/or the adulterated status of Food Shipments transported by Carrier shall be within the sole discretion of Shipper or HCS and shall be binding on Carrier. Carrier accepts and agrees that it will be required to pay for the actual invoice value of adulterated or damaged Food Shipments, plus all freight, taxes, fees, disposal, and other charges of any kind or nature which HCS may incur with respect to such Food Shipment, less any salvage if the goods are not destroyed, notwithstanding any other measure of quality, including but not limited to USDA inspection.

2. HCS shall provide Carrier mitigation options for rejected goods if 1) Goods are not damaged to the point preventing any type of salvageability. 2) salvaging the Goods would not be placing HCS in violation of Food Safety statutes. 3) salvaging the Goods would not cause damage to HCS in any way. 4) Carrier agrees to hold HCS harmless from notations or comments derogatory to the reason the Goods were rejected.  5)   To the fullest extent allowed by law, Carrier will defend, indemnify and hold harmless HCS, and its officers, directors, members, agents, customers, and employees from and against all loss, liability, damage, claim, fine, cost, or expense, including reasonable attorney fees, resulting from attempting to salvage the rejected Goods.

3. The determination regarding the salvageability of any damaged Goods (other than Food Shipments) shall be determined by Shipper, and Carrier shall be liable for all costs and expenses associated with Shipper's mitigation of damages including any inspection; storage; preparation of the Goods for reshipping; and the reshipping, if applicable.

4. No salvage of any kind or nature will be sold or offered for sale or in any way disposed of to any third party by Carrier without the prior written consent of HCS. Unless HCS directs otherwise, all damaged Goods subject to salvage will be returned to Shipper, at Carrier's sole cost and expense, for salvage and appropriate credit. Shipper may determine, in its sole discretion, whether the Goods may be salvaged and, if salvageable, the value of such salvage. Any salvage value will be deducted from Shipper's claim against Carrier for the loss or damage. With respect to the handling of any damaged Goods, Carrier agrees that Shipper will have the sole right to dispose of or destroy such Goods. For any damaged Goods which Shipper permits Carrier to resell, Shipper will have the right to remove all identifying marks and labels on such Goods.

5. Claims based on concealed loss/damage reported to Carrier by HCS within five (5) business days of the date of delivery will be treated as though an exception notation had been made on the delivery receipt at the time of delivery.

6. HCS will provide Carrier with an inspection notification form with pertinent information regarding the damage and the location where the Goods may be inspected, if so desired by Carrier and permitted by Shipper. If inspection of the Goods is permitted by the Shipper, it is the obligation of Carrier to properly inspect the Goods upon the discovery of damage. In the event Carrier fails to inspect the Goods within five (5) business days of the date Carrier becomes aware of the damage, or upon receipt of the Goods to be returned to the consignor because of the damage, whichever is earlier, Carrier hereby waives its rights to inspect the Goods and agrees to be bound by the facts presented by the claimant.

7. If Carrier is unable to deliver a shipment or if a shipment is refused by the customer, Carrier's liability as a warehouseman, rather than a contract carrier pursuant to the terms of this Agreement, will begin after seven (7) days of the Goods being placed in Carrier's terminal or other storage facility under proper security and storage conditions.

## XIV.  THE CLAIMS MANAGEMENT PROCESS

Carrier agrees that the provisions contained in 49 CFR Part 370, shall govern the processing of claims for loss, damage, injury, theft, or delay to Goods and the processing of salvage. Any claim made by HCS against Carrier for loss, damage, injury, theft, or delay to the Goods will be handled in the following manner:

1. HCS shall notify Carrier as soon as possible once HCS discovers a possible cargo loss, damage, injury, theft, or delay claim. The Parties agree that HCS will have nine (9) months after delivery of such shipment (or, if no delivery, by nine (9) months after the scheduled delivery date), to file a written claim for such loss, damage, injury, theft, or delay to the Goods. The term "**written claim**" means delivering a written claim or notice of claim, which reasonably alerts Carrier, that loss, damage, injury, theft, or delay has occurred to the Goods.

   A. Carrier must acknowledge the receipt of a written notice of a claim as promptly as possible, but in no event later than thirty (30) days after the date of Carrier's receipt of HCS's written claim, Carrier will notify HCS what, if any, additional documentary evidence or other pertinent information may be required by Carrier to process the claim.

   B. Notwithstanding the terms of 49 CFR 370.9, Carrier shall pay, decline, or make a settlement offer in writing on all cargo loss or damage claims within 120 days of receipt of the claim. *Failure of Carrier to pay, decline, or offer settlement within this 120-day period shall be deemed an admission by Carrier of full liability for the amount claimed and a material breach of this Agreement*.

2. Any action at law to recover any portion of a cargo claim shall be instituted by HCS against Carrier no later than two (2) years after Carrier has delivered a written declination of claim to HCS. If HCS prevails in litigation against Carrier for recovery of a claim, HCS will be entitled to recover all of its actual costs and expenses, including reasonable attorney fees, court costs, and interest.

3. There shall be an administration fee on cargo claims as outlined in Appendix A (*Accessorial and Miscellaneous Charges*) of this Agreement.

## XV. INSURANCE AND INDEMNIFICATION FOR CARRIER

1. **Insurance Requirements of Carriers**.

   A. Carrier agrees to provide and maintain any insurance coverages required by any government body for the types of transportation and related Services pursuant to this Agreement. All insurance required by this Agreement must be written by an insurance company having a Best's rating of "A-" VII or better and must be authorized to do business under the laws of the state(s) or province(s) in which Carrier provides the transportation and related services as specified in load confirmation communications received from HCS. Carrier's insurance shall be primary and required to respond and pay prior to any other available coverage. Carrier agrees that Carrier, Carrier's insurer(s), and anyone claiming by, through or under Carrier shall have no claim, right of action, or right of subrogation against HCS, its affiliates, or its Customer based on any loss or liability insured under the insurance stipulated herein. Carrier represents and warrants that it will continuously fulfill the requirements of this Section throughout the duration of this Agreement. Nothing in this Agreement shall be construed to avoid Carrier's liability due to any exclusion or deductible in an insurance policy. HCS shall be notified in writing by Carrier's insurance company at least thirty (30) days prior to the cancellation, change or non-renewal of the submitted insurance policies. Carrier shall at all times during the term of this agreement have and maintain in full force and effect, at its

Schneider
Carrier Agreement

expense:

i. **Motor Truck Cargo** Insurance or a superior equivalent covering all risks of loss, damage, or delay to goods in transit, with a minimum limit amount no less than US$100,000.00 and a deductible no greater than US$2,500 per trailer, container, or vehicle, including a loss payable clause for HCS as its interests may appear and at least the same coverage limit and deductible per shipment while in storage in a trailer, container, at a storage facility, at a facility being used as a storage facility, or enroute to the consignee. Such insurance shall contain no exclusion or limitation likely to render coverage for operations hereunder inapplicable including, but not limited to; refrigerator unit malfunction (including failure to fuel refrigerator unit), unattached vehicle, or unattended vehicle, transportation of food product, infidelity, theft, or other criminal act of Carrier's employees.

ii. **Business Automobile Liability Insurance with Contractual Liability Insurance** covering all owned, leased, hired and non-owned vehicles and specifically endorsed to cover the indemnity provisions listed herein between Parties, with limits of liability not less than $1,000,000.00 for bodily injury and property damage per occurrence and without aggregate limits.

iii. **Commercial General Liability with Contractual Liability Insurance** specifically endorsed to cover the indemnity provisions listed herein between Parties, with limits of liability of not less than $1,000,000.00 per occurrence.

iv. **Worker's Compensation insurance** in the amounts required by statute, and Employer's Liability insurance with limits not less than US$500,000 per occurrence, per person. When Carrier performs Services that involve origins and destinations solely within Canada, Carrier shall be current in its remittances to the appropriate Worker's Compensation Board of the Carrier's province, shall provide a certificate issued by the appropriate Worker's Compensation Board of the Carrier's province certifying that the Carrier is not delinquent and is current in its remittances to that authority, and shall have such other insurance or higher coverage limits required by applicable Canadian national or provincial law or regulation. Insurance will meet or exceed the requirements of federal, state and/or Provincial regulatory bodies having jurisdiction over Carrier's performances pursuant to this agreement. Carrier will hold harmless and indemnify HCS for any claim for insurance premium or any claim by any employee of the Carrier for injuries sustained in the ordinary course of business, including, but not limited to, drivers, lumpers, helpers, agents or sub-contractors of Carrier.

v. **Hazardous Materials.** If Carrier provides Transportation Services for hazardous materials under United States Department of Transportation ("DOT") regulations, public insurance including Commercial Automobile insurance limits required for the commodity transported under 49 C.F.R § 387.7 and 387.9 (or successor regulations thereto) and statutory required Commercial Automobile insurance limits pertaining to the hazard classification of the cargo as defined by DOT, an MCS-90 and Broadened Pollution Liability endorsements for limits required by law and full policy limits. Carrier shall procure and maintain, at its sole cost and expense, public liability and property damage insurance with a reputable and financially responsible insurance company insuring Carrier in an amount not less than US$2,000,000 per occurrence. Such insurance policy shall name HCS and Carrier as insureds with respect to any and all liabilities for personal injuries (including death) and property damage, including environmental damage due to the release of a hazardous material or waste, arising out of the ownership, maintenance, use or operation, including loading and unloading, of the equipment operated by Carrier under this Agreement.

vi.   Any other insurance required by any Legal Requirements.

vii.   Carrier shall, prior to providing transportation and related services pursuant to this Agreement, name HCS, as a certificate holder, as required on the foregoing insurance policies and shall cause its insurance company to issue a certificate to HCS, evidencing the foregoing.

B.   Carrier will provide certificates of insurance evidencing the insurance coverage required under this Agreement.

C.   Carrier shall be responsible to ensure all insurance coverage required.

D.   Pursuant to this Agreement, the insurance policies required hereunder and any replacement policies will insure the interests of HCS, cover all drivers, equipment and cargo used in providing Services, and not contain any exclusions or restrictions as to designated premises or project, pertaining to unattended equipment or cargo, for unscheduled equipment, for unscheduled drivers or cargo, for fraud or infidelity, for tarp warranty, for wetness or dampness, for geographical location in the United States, for trailers unattached to the power unit, or for a particular radius of operation.

2.  **Indemnification**.  To the fullest extent allowed by law, Carrier will defend, indemnify and hold harmless HCS, and its officers, directors, members, agents, customers,  and employees from and against all loss, liability, damage, claim, fine, cost, or expense, including all costs of defense as they accrue, including, but not limited to legal costs, arising out of claims by third parties and, directly or indirectly, arising from Carrier's performance of, or failure to perform any Service under this Agreement, or in any way related to performance or breach of this Agreement by Carrier, its employees, subcontractors or independent contractors (collectively, "**Claims**"), including, but not limited to, claims for or related to personal injury (including death) and property damage related in any way to Carrier's possession, use, maintenance, custody or operation of the Equipment or provision of Services; provided, however, that Carrier's indemnification obligations under this paragraph will not apply to any portion of such claims caused by or resulting from the negligence or other wrongful conduct of HCS.  Any offset and withholding of payment by HCS from Carrier pursuant to this Agreement shall, in no way be deemed or construed to release the Carrier from any liability from any personal injury, bodily harm, or other damages that may have resulted from any incident, accident, or event that caused the damage to the Cargo, and all provisions of this Agreement  shall remain in full force and effect. The Parties agree that Carrier's indemnification obligations will survive the termination of this Agreement.

## XVI.  MISCELLANEOUS

1.  **Survival**.  This Agreement is binding on and for the benefit of both Parties and their respective successors and assigns. Upon termination of this Agreement, all obligations will remain in effect after such termination.

2.  **Confidentiality**.  Neither Party may disclose the terms of this Agreement to a third party without the written consent of the other Party except 1) as required by regulation or law; 2) disclosure is made to a parent, affiliate, subsidiary or related entity; 3) to facilitate rating or auditing of transportation charges by an authorized agent, and such agent agrees to be subject to the terms of this Confidentiality clause.  Further, Carrier will not use HCS's name or identity on any promotional or advertising communications without HCS's written authorization.

3.  **Non-compete**.  Carrier shall not solicit, accept, or arrange for the transportation of goods from

any customer of HCS where 1) the availability of such customer or opportunity of transportation of goods became known to Carrier as a result of HCS's efforts, or as a result of Services performed under this Agreement; or, 2) the goods were first tendered to Carrier by HCS.

If Carrier breaches this Agreement and directly or indirectly solicits freight, accepts freight from, or arranges for the transportation of freight from customers of HCS, or obtains freight from such customer during the term of this Agreement or for twelve (12) months thereafter, Carrier agrees to pay HCS commission, in the amount of fifteen percent (15%) of the transportation revenue resulting from freight transported for the customer, for a period of fifteen (15) month after first obtaining such freight.

4. **Force Majeure**.  Neither Party will be liable to the other for failing to perform or discharge any obligation under this Agreement where such failure is caused by acts of God, labor disorders, fire or other casualty, closing of the public highways, governmental interference, war, riot, act of terrorism, and other causes beyond the affected Party's control. In such case, both Parties will make every commercially reasonable effort to remedy or cure such event as soon as practically possible.

5. **Governing Law and Venue**.  This Agreement will be governed by and construed in accordance with the laws of the State of Arkansas, regardless of its conflict of law provisions, and the Parties hereby submit to the jurisdiction and venue of the state and federal courts in and for Washington County, Arkansas for all disputes related to or arising out of this Agreement.

6. **Non-Waiver**.  The failure of either Party at any time to timely enforce any provision of this Agreement, or to exercise any option provided, or to require performance of any provision, shall in no way be construed to be a waiver of any such provision, nor in any way to affect the validity of this Agreement, nor to affect such Party's right thereafter to enforce each and every provision of this Agreement.  However, a Party may waive a term of this Agreement by a written instrument signed by the Party that would have been able to require compliance.

7. **Severability**.  If any phrase, sentence, clause, or other provision contained in this Agreement violates any applicable ordinance, rule, law, or statute, such phrase, sentence, clause, or other provision will be ineffective to the extent of such violations without invalidating any other provision of this Agreement.

8. **Non-exclusive Agreement**.  Neither Party intends to give the other Party any exclusive rights or privileges under this Agreement, and both Parties agree that HCS will be free to use the services of other carriers, and Carrier will be free to accept and transport freight for other parties, subject to the non-compete provision stated herein.

9. **Electronic Data Interchange**.  Shipping instructions, delivery receipts, bills of lading, manifest logs, claims and any other shipping documentation may be transmitted by Electronic Data Interchange ("**EDI**") in such format as may be agreed to by the Parties.  Such records will be retained by Carrier for a period of three (3) years from the date of shipment, or two (2) years after final resolution of a disputed or unsettled claim, whichever is later, or for such greater time period as may be required by Legal Requirements.  Upon written request, said records will be made available to HCS.  It is stipulated that records maintained in the manner provided herein will be admissible for all purposes in the event of a dispute or litigation.

10. **Entire Agreement**.  This Agreement represents the entire agreement and understanding of the Parties with regard to its subject matter. No prior understandings or agreements by the Parties, whether written or oral, nor any documents not specifically incorporated into this

Agreement, nor any course of conduct of the Parties before or after the Effective Date of this Agreement, shall have the effect of modifying the Parties' rights and obligation under this Agreement in any way. This Agreement cannot be amended unless in writing and agreed to by both Parties.

11. **Counterparts**. This Agreement may be executed in counterparts, each of which will be an original and all of which will together constitute one and the same instrument.

12. **Captions**. The captions and headings set forth in this Agreement are for convenience only. They shall not be considered a part of this Agreement, nor affect in any way the meaning of its term and conditions.

13. **Construction**. Each Party has reviewed this Agreement and had the opportunity to consult with counsel. They have ascertained and weighed all the facts and circumstances likely to influence their judgment herein, they have given due consideration to the provisions contained herein, and they thoroughly understand and consent to all provisions hereof; and, accordingly, the rule of construction to the effect any ambiguities are to be resolved against the drafting party will not be employed in any interpretation of this Agreement.

14. **Notice.** Unless the PARTIES notify each other in writing of a change of address, any and all notices required or permitted to be given under this Agreement shall be in writing (certified or registered mail or email with confirmed receipt) and shall be addressed as follows.

| | |
|---|---|
| H. C. Schmieding Produce Company LLC (HCS) | Bukhara Trans Inc |
| Attn: Carrier Relations Department | **(Carrier)** |
| Address: PO Box 369 | **Attn:** 86        123207 |
| Springdale, AR 72765-0369 | **Address:** 1400 LIGHT RD APT 103, Oswego, IL 60543 |
| Email: trucks@schmieding.com | **Email:** dispatch@bukharatrans.com |

IN WITNESS WHEROF, the Parties have caused this Agreement to be executed by their duly authorized representative as of the Effective Date.

Bukhara Trans Inc
_____
**Carrier Name**

H.C. Schmieding Produce Company, LLC
(HCS)

Franco Alvarez
_____
**Signature**

_____
Signature

Franco Alvarez
_____
**Representative Printed Name**

_____

FA
_____
**Title**

_____

06/14/2022
_____
**Date**

_____
Date

APPENDIX A

# ACCESSORIAL and MISCELLANEOUS CHARGES

## I. SCHMIEDING TRANSPORTATION ACCESSORIAL LIST

### A. Detention

Carrier must be on time to qualify for detention.  Carrier will be considered late if driver is one minute late for an appointment.
2 Free Hours on pallet loads.
4 Free Hours on floor loads.
$5 for each 15 minutes after free period expires.
$20 for each hour for maximum of 10 hours.
After 10-hour delay 1-day layover paid of $200.

### B. TONU

$2.50 per mile charge from the last destination to the original designated pickup, subject to a maximum charge of $250, shall apply. No charge shall apply to loads cancelled Eight (8) hours prior to scheduled pickup.

### C. Layover

$200 for 24 hours.

### D. Hazardous Materials

An additional charge amount of $.15 cents per mile with a minimum of $100 over the applicable linehaul rate shall apply for any loads placarded or non-placarded specified by DOT regulations as hazardous.

### E. Diversion

Non-Carrier related Diversions shall be calculated as follows:
$35 extra stop
Rates for additional miles for a diversion shall be the same rate per mile as agreed upon for the original load rate per mile.
All other applicable accessorials will apply.

### F. Reconsignment

Non-Carrier related Reconsignments shall be calculated as follows:
$35 extra stop if applicable.
Rates shall be negotiated.
All other applicable accessorials will apply.

### G. Redelivery

Non-Carrier related Redeliveries shall be calculated as follows:
$35 extra stop
Rates shall be negotiated.
All other applicable accessorials will apply.

**H.** **Extra Stops**
   $35 per stop for each additional stop in transit.

 **I.** **Tarping Flatbed Loads**
   $75 shall apply per shipment.


## II. SCHMIEDING TRANSPORTATION FEES

**A.** **Comchecks**
   The following fees for receiving comchecks are deducted automatically from the carrier rate:
   $5.00 fee for load related comchecks such as lumpers, pallets, late fees, and scales.
   $20.00 fee for non-load related comchecks between the amounts of $1.00 - $500.00.
   $25.00 fee for non-load related comchecks between the amounts of $501.00 - $1000.00.
   No more than $1,000.00 in a single day shall be issued.
   No more than 40% of the rate amount shall be advanced on any one load for any reason.
   No comchecks, including fuel advances, shall be issued to a carrier on their first load being transported for HCS.
   Comcheck fees are not reimbursable without written approval by HCS management.
   Carrier freight rate pay advances shall not be allowed.

**B.** **GPS Tracking**
   $250 to $500 fee which shall be deducted from the Carrier's freight rate settlement for noncompliance specified in this Agreement. Fine amount shall be determined within load comments on the Rate Confirmation.

**C.** **Reefer Downloads**
   $500 fee for failure to provide a reefer download as per this agreement shall be deducted from the Carrier's freight rate.

**D.** **Late Fee**
   $250 minimum fee for each missed appointment each day unless stated otherwise in load comments on the Rate Confirmation provided to Carriers by HCS.

**D.** **Claims Administration Fees**
   $20.00 fee = $0 to $249.00 claim amount
   $50.00 fee = $250.00 to $499.00 claim amount
   $100.00 fee = $500.00 to $999.00 claim amount
   $150.00 fee = $1,000.00 to $1,499.00 claim amount
   $200.00 fee = $15,000.00 or greater claim amount

# EXHIBIT 7

# IN THE MATTER OF:

# ARTISAN

-v-

# BUKHARA

## FAKHRIDDIN AVEZOV

1:23-CV-04439

October 7, 2024

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992
cagoodreporter@pavesich.com

ARTISAN v. BUKHARA                                    FAKHRIDDIN AVEZOV

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTISAN AND TRUCKERS          )
CASUALTY COMPANY,             )
                              )
              Plaintiff,      )
                              )
       -vs-                   ) No. 23:CV-04439
                              )
BUKHARA TRANS, INC.,          )
                              )
              Defendant.      )


          The Zoom translated videoconference

deposition of FAKHRIDDIN AVEZOV, taken in the

above-captioned cause before Deborah Janicek,

Certified Shorthand Reporter within and for the

State of Illinois, on the 7th day of

October, 2024, at the hour of 12:05 o'clock p.m.

Electronically signed by Deborah Janicek (101-112-275-6733)                    160b8cd4-7115-4342-8fba-3319a7decab7

ARTISAN v. BUKHARA                                    FAKHRIDDIN AVEZOV

```
                                                        Page 2
 1   A P E A R A N C E S:

 2              SUDEKUM CASSIDY & SHULRUFF CHARTERED

 3              (20 North Clark Street

 4               Suite 2450

 5               Chicago, IL  60602

 6               312-262-4862

 7               arm@scslegal.com), by:

 8              MR. AARON R. MUDLONG,

 9                  on behalf of the Plaintiff;

10              HR LAW COUNSEL

11              (29 South Webster Street

12               Suite 350c

13               Naperville, IL  60540

14               630-551-8374

15               ethan@hrlawcounsel.com), by:

16              MR. ETHAN ZELIZER,

17                  on behalf of the Defendant.

18          ALSO PRESENT:

19              MS. ANNA ROMANO, Translator.

20

21

22              *   *   *   *   *   *   *   *   *

23

24
```

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                          FAKHRIDDIN AVEZOV

```
                                                    Page 3
 1                        I-N-D-E-X

 2   Witness:                         Page

 3   Fakhriddin Avezov

 4     Direct Examination by Mr. Mudlong      6

 5                       EXHIBITS

 6   Avezov Exhibit Nos.              Page

 7   1 - Carrier load tender            10

 8   2 - Carrier agreement              15

 9   3 - Temperature report             22

10   4 - Bill of lading                 23

11   5 - Reservation of rights letter   28

12   6 - Denial letter                  28

13

14

15

16

17

18

19

20

21

22

23

24
```

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                          FAKHRIDDIN AVEZOV

```
                                              Page 4
  1            MR. MUDLONG:  We're good to go,
  2    Deborah, whenever you are.
  3            THE REPORTER:  Before we proceed,
  4    pursuant to Federal Rule of Civil Procedure
  5    30(b)(4) providing for conducting depositions by
  6    remote means, I will ask counsel to agree on the
  7    record that there is no objection to this
  8    Certified Shorthand Reporter administering a
  9    binding oath to the witness via videoconference.
 10            I will ask each of you to state your
 11    agreement on the record, starting with counsel for
 12    the plaintiff first and, at the same time, please
 13    identify yourself for the record.
 14            MR. MUDLONG:  This is Attorney Aaron
 15    Mudlong on behalf of the Plaintiff.  We have no
 16    objection to this deposition proceeding via Zoom.
 17            MR. ZELIZER:  This is Ethan Zelizer on
 18    behalf of the Defendant Bukhara and the deponents
 19    today.  We have no objection to this being done
 20    via Zoom nor do we have any objection to Ms.
 21    Romano translating.
 22                    (The translator was duly sworn.)
 23                    (The witness was duly sworn.)
 24            MR. ZELIZER:  Perfect.
```

Electronically signed by Deborah Janicek (101-112-275-6733)          160b8cd4-7115-4342-8fba-3319a7decab7

ARTISAN v. BUKHARA                          FAKHRIDDIN AVEZOV

                                                    Page 5

 1              MR. MUDLONG:  Let me just lead off.

 2    That sounded very impressive.

 3              MR. ZELIZER:  We're all -- We're all

 4    impressed.  Translator is a very impressive human

 5    being, to be quite honest.

 6              MR. MUDLONG:  Agreed.

 7              MS. ROMANO:  Thank you.

 8              MR. MUDLONG:  So, Mr. Avezov, can you

 9    please state your name for the record and spell

10    your last?

11              THE WITNESS:  Fakhriddin Avezov.

12    10-16-1982.

13              MR. MUDLONG:  Okay.  So I'm just going

14    to go over a few ground rules here for the

15    depositions.

16              So the first rule is that there is a

17    court reporter today.  Her name is Deborah and

18    you're obligated to tell the truth.

19              THE WITNESS:  Yes.  He agreed.

20              MR. MUDLONG:  Okay.  The second rule

21    is that you must answer with an audible yes or no.

22    No head nods are allowed.

23              THE WITNESS:  Yes, he agreed.

24              MR. MUDLONG:  And please allow me to

Electronically signed by Deborah Janicek (101-112-275-6733)          160b8cd4-7115-4342-8fba-3319a7decab7

ARTISAN v. BUKHARA                          FAKHRIDDIN AVEZOV

```
                                                    Page 6
 1   finish asking my question and I will return the
 2   same courtesy to you.
 3              THE WITNESS:  He said yes.  Okay.
 4              MR. MUDLONG:  Okay.  If you need a
 5   break during this deposition, just let me know and
 6   we can take one.
 7              THE WITNESS:  He said yes.  Okay.
 8              MR. MUDLONG:  And do you understand
 9   the rules that we have stated to you?
10              THE WITNESS:  He said, yes, I
11   understand.
12              MR. MUDLONG:  Okay.
13                 DIRECT EXAMINATION
14   BY MR. MUDLONG:
15      Q.   So how did you prepare for today?
16      A.   He said I do not need any preparation.
17   I'm in this process and I know everything about
18   it.
19      Q.   Okay.  So what is your current home
20   address?
21      A.   He's looking for his address.  One
22   second.
23      Q.   Sure.
24              (Pause.)
```

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Deborah Janicek (101-112-275-6733)                    160b8cd4-7115-4342-8fba-3319a7decab7

ARTISAN v. BUKHARA                    FAKHRIDDIN AVEZOV

```
                                              Page 7
  1   BY THE WITNESS:

  2         A.    Okay.  31375 Castaic Oaks Lane,

  3   Castaic, California.

  4   BY MR. MUDLONG:

  5         Q.    Can you spell the street?

  6         A.    Zip code 91384.

  7               Spelling and it's K-a-s-t-a-i-k,

  8   Castaic.  And Oaks, O-a-k-s.

  9         Q.    Okay.  Are you currently employed?

 10         A.    So he said he's on a break right now

 11   because he has some health issues with his belly.

 12         Q.    Okay.  When was he last employed?

 13         A.    He said he was -- he was employed

 14   until 1st of September and then he had some health

 15   issues.

 16         Q.    And is that September of 2024?

 17         A.    Yes.

 18         Q.    Okay.  Who was your employer at that

 19   time?

 20         A.    Bukhara Trans he was employed.

 21         Q.    And what was your job title or position

 22   at Bukhara?

 23         A.    So he was truck driver in a -- with

 24   equipment.  We call it flatbed equipment.
```

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                                FAKHRIDDIN AVEZOV

                                                            Page 8
 1       Q.    Okay.  And how long has he been a truck
 2    driver?
 3       A.    Eight years.  He said eight years.
 4       Q.    And what are some of his duties and
 5    responsibilities as a truck driver?
 6       A.    He said his responsibility is to
 7    deliver the loads safe and sound.
 8       Q.    And what states has he delivered to?
 9       A.    Like he has all over the states.  All
10    the states.  He's working with all states.
11       Q.    Okay.  Do you, for any reason, feel
12    that you are mentally or physically incapable of
13    providing true and accurate answers to any of my
14    questions today?
15       A.    He said, no, I'm good.
16       Q.    Okay.  Do you recall the incident on
17    October 12, 2022?
18       A.    Uh-huh.  Yes.  He said yes.
19       Q.    Okay.  And what were you tasked with
20    doing on October 12, 2022?
21       A.    He said that on October 2022, as
22    usual, his dispatcher booked a load for him -- dry
23    van load -- and he went to the shipper and the
24    shipper loaded thereafter frozen load, and he

                  CYNTHIA A. PAVESICH & ASSOCIATES
                          (312) 214-1992

ARTISAN v. BUKHARA                          FAKHRIDDIN AVEZOV

Page 9

1    secured the load.

2              And he mention that he work with the

3    reefer equipment during the four years and he

4    hasn't -- he had not had any issues with this.

5              And he also mentioned that while he

6    working with reefer equipment, every shipper is

7    ever checking the temperature of the trailer

8    before the loading.

9              If it's like lower than like a two or

10   like a higher -- higher than the specific

11   temperature, they're not loading the load and

12   they're smelling and checking the -- if it's

13   trailer clean or not.  They're not loading if this

14   process not going.

15        Q.   Okay.  And has he -- How many jobs of

16   transportation has he completed before

17   October 2022?

18        A.   He said I worked with any kind of

19   equipment since October 2000 -- He said he worked

20   with any kind of equipment since October -- till

21   October -- sorry -- and he mentioned that he's

22   delivering, in one week, four to five loads.

23        Q.   Okay.  Does he have an estimate of how

24   many loads he has transported as a driver?  Any

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                          FAKHRIDDIN AVEZOV

Page 10

1    years.

2         A.    He said, no, I don't know.  And he

3    completed the load amount that he's delivering in

4    one week, four to five.

5         Q.    Okay.

6         A.    He said in one week, I delivered four

7    to five loads.

8         Q.    Okay.  And has he used a truck with a

9    refrigerator unit before?

10        A.    He said I worked before with the

11   reefer equipment for the four years.

12        Q.    Okay.  And he's also -- Does he have

13   experience using the dry trailers as well?

14        A.    He said I worked before with the dry

15   van trailers and I'm turning my equipment like

16   a -- regarding the season.

17             If it's reefer season, I'm driving the

18   reefer.  If it's dry van season, I'm driving the

19   dry van trailer.

20        Q.    Okay.  So I'm going to show Exhibit 1,

21   which is going to be the Carrier load tender.

22             (The document was shared.)

23             MR. ZELIZER:  You're doing great.

24             THE TRANSLATOR:  Thank you.

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                    FAKHRIDDIN AVEZOV

```
                                              Page 11
  1   BY MR. MUDLONG:

  2        Q.    Do you recognize this document?

  3        A.    He said I couldn't recall but it seems

  4   like I know this document.

  5        Q.    Okay.  When would he receive this

  6   document?

  7        A.    He said I'm not sure.  I recall that

  8   approximately I received this document on

  9   October 11 or 12.

 10        Q.    Okay.  Was that before delivering the

 11   product or after delivering the product?

 12        A.    He said that I couldn't recall when I

 13   received this document.  It might be I received

 14   this document after loading the load -- the

 15   shipper loaded the load and he sealed the load and

 16   gave him this paper.

 17        Q.    Okay.  So he might have gotten this

 18   document after the product was put on his trailer.

 19        A.    Yes, and it was sealed.

 20        Q.    Okay.  Is he familiar with Schmieding

 21   Produce?

 22        A.    He said, no, I'm not familiar with it.

 23        Q.    Okay.  Is Bukhara Trans listed as the

 24   carrier of this carrier load tender?
```

Electronically signed by Deborah Janicek (101-112-275-6733)          160b8cd4-7115-4342-8fba-3319a7decab7

ARTISAN v. BUKHARA                                    FAKHRIDDIN AVEZOV

                                                          Page 12
 1        A.    He said, yes, it's written Bukhara

 2    Trans is the carrier.

 3        Q.    Okay.  And what is the tender date of

 4    this document?

 5        A.    He said that I couldn't recall when it

 6    was tendered, the date of the tender, but if I'm

 7    not mistaken, it should -- the date should be 11

 8    October or 12.

 9             I -- It was loaded at afternoon at

10    3:00 p.m. or 4:00 p.m. and I delivered this load

11    to -- like the day after tomorrow at 8:00 a.m.

12        Q.    Okay.  And was he delivering the load

13    for Schmieding Produce?

14        A.    He said that, yes, I delivered to the

15    Schmieding Produce but I couldn't recall the exact

16    name of the brokerage company before, the shipping

17    company before.

18             And he mentioned that he -- when he

19    got there and he checked in to this company and --

20    they ask from him the temperature and he said that

21    I don't have any temperature.  I'm on a dry van

22    trailer.

23        Q.    Okay.

24        A.    And the commodity was shrimp, as he

                CYNTHIA A. PAVESICH & ASSOCIATES
                        (312) 214-1992

ARTISAN v. BUKHARA                          FAKHRIDDIN AVEZOV

                                                      Page 13

 1    mentioned.

 2          Q.    Okay.

 3          A.    It's not baking, yeah.

 4                MR. MUDLONG:  I'm going to try to make

 5    this easier for you, Anna.  So can you just tell

 6    him after each sentence, he pauses so you can

 7    translate for the court reporter so it makes it

 8    easier on you?  Can you just tell him that?

 9                THE WITNESS:  Yes.  He said yes.

10    BY MR. MUDLONG:

11          Q.    So where was this load supposed to be

12    picked up and delivered to?

13          A.    He said it should be from Illinois to

14    Tennessee.

15          Q.    Okay.  And how many hours is -- is it

16    from Illinois to Tennessee?

17          A.    He said it was like 600 miles and I

18    drive like 10 hours and I had a break at that time

19    while the -- delivering the load.

20          Q.    Okay.  So can he see the section titled

21    References on the -- on the screen?

22          A.    Yes, he's saying.

23          Q.    Okay.  And then do you see how it says

24    Temperature range?

Electronically signed by Deborah Janicek (101-112-275-6733)                    160b8cd4-7115-4342-8fba-3319a7decab7

ARTISAN v. BUKHARA                              FAKHRIDDIN AVEZOV

Page 14

1         A.    Um-hum.

2         Q.    And what is the -- What are the words

3    next to temperature range for the Reference value

4    of the table?

5         A.    Frozen.

6               Yes.  Yes, he said it's frozen.

7         Q.    Okay.  And what does frozen generally

8    pertain to?

9               What does that mean for transporting?

10        A.    Frozen.  He said it should be like an

11   eatable thing.

12              THE TRANSLATOR:  I'm not sure about

13   the translation of this word.

14   BY MR. MUDLONG:

15        Q.    So what equipment is required for

16   transporting frozen product?

17        A.    He said for the frozen goods, it

18   should be reefer trailer equipment.

19        Q.    Okay.  And at the time of loading, was

20   he made aware that he was transporting frozen

21   goods?

22        A.    He said, no, I didn't see while

23   they're loading the load.

24              They load it and they also secured it,

Electronically signed by Deborah Janicek (101-112-275-6733)                    160b8cd4-7115-4342-8fba-3319a7decab7

ARTISAN v. BUKHARA                              FAKHRIDDIN AVEZOV

Page 15

1   which means seal it, the load, and I just deliver

2   the load to the address.

3           I didn't see if it's frozen goods or

4   not.

5       Q.    So he did not check his trailer before

6   leaving the site when he picked up the product.

7       A.    No.  He said, no, I didn't see.

8       Q.    Okay.  Let's move on to Exhibit 2.

9   This is the Carrier agreement so let me scroll to

10  the top here.

11          (Scrolling.)

12  BY MR. MUDLONG:

13      Q.    Are you familiar with this agreement

14  between Schmieding and Bukhara?

15      A.    He said no.

16      Q.    So as a driver for Bukhara, do you have

17  to read carrier agreements before delivering

18  product for -- for a broker?

19      A.    He said, no, I'm not familiar with

20  this document.  I didn't review it.

21          And he said I just went to the shipper

22  and they just gave me the bill of lading.  It's

23  not requiring the signing process but it should.

24  They just gave it to him and he left to do

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                          FAKHRIDDIN AVEZOV

                                                      Page 16
 1   delivery.

 2        Q.    Okay.  So I'm going to read a part of

 3   the carrier agreement.

 4             MR. MUDLONG:  Anna, can you translate

 5   for me, Anna?

 6             THE TRANSLATOR:  Yes, sure.

 7             MR. MUDLONG:  Can you just let him

 8   know that's what's going to happen?

 9             THE WITNESS:  He said okay.

10   BY MR. MUDLONG:

11        Q.    Okay.  So Carrier, meaning Bukhara,

12   shall verify the temperature of food shipments

13   before loading.

14             So when you picked up the load, did you

15   check the temperature of the food?  Or of the

16   product?

17        A.    He said how -- He said how can I check

18   if it was the dry van load and my dispatcher

19   booked the dry van load?

20             And before, if it's reefer, always

21   like brokers or shippers are checking the loads'

22   temperature and the trailers' temperature and then

23   loading the load.

24             If it's not specific temperature,

                  CYNTHIA A. PAVESICH & ASSOCIATES
                        (312) 214-1992

ARTISAN v. BUKHARA                          FAKHRIDDIN AVEZOV

Page 17

1   they're not loading it.

2       Q.    Okay.  Did he have an opportunity to

3   check the load before leaving the facility?

4       A.    He said how can I check if it's -- if

5   it wasn't reefer trailer, was dry van trailer?  I

6   couldn't check because I did not have, on the dry

7   van trailer, the temperature control.

8           And before the loading, always brokers

9   are coming -- or shippers are coming and checking

10  the temperature before the loading and checking

11  the condition of the equipment.

12          If it's not -- If it's not met their

13  requirements, they're just rejecting to load the

14  load.

15      Q.    Okay.  So I'm not asking for the

16  temperature.

17          Did he have the ability to look at the

18  product that was in his trailer before leaving the

19  site?

20      A.    He said, no, I didn't check it

21  because -- He said if I will know about it, I will

22  not load this load.  And he said I cannot -- I

23  couldn't check the -- what's inside because the

24  shipper just loaded the load and sealed it.  I

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                          FAKHRIDDIN AVEZOV

```
                                            Page 18
 1    couldn't check it if it's sealed.

 2              So he cannot just break the seal and

 3    check what's inside.

 4        Q.    Okay.  So after it has been sealed by

 5    the shipper, he's not allowed to open the trailer

 6    at that point?

 7        A.    He said no.

 8        Q.    So moving down here.

 9              (Scrolling.)

10              MR. MUDLONG:  So I'm going to read a

11    part of the carrier agreement again and then can

12    you translate for me, Anna?

13              THE TRANSLATOR:  Um-hum.  Sure.

14              THE WITNESS:  He said okay.

15    BY MR. MUDLONG:

16        Q.    So Carrier -- meaning Bukhara --

17    represents and warrants that all equipment used in

18    transporting food shipments is equipped with an

19    operational air chute at least 43 feet in length

20    and fully attached from the beginning to the end of

21    the refrigeration unit.

22              So what type of trailer are you

23    supposed to use when transporting for H.C.

24    Schmieding?
```

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                          FAKHRIDDIN AVEZOV

```
                                            Page 19
 1         A.    He said I use a 53-feet trailer.
 2         Q.    Okay.  And what equipment is required
 3   to be on the trailer based on the Carrier
 4   agreement?
 5         A.    So he said I'm not sure about the
 6   feet.  My trailer was the dry van and I'm not sure
 7   about the 40 feet in the agreement -- 43 feet in
 8   the agreement.
 9         Q.    Okay.  So I'm going to read part of the
10   agreement.
11              So carrier, Bukhara, represents and
12   warrants that all equipment used in transporting
13   food equipment -- food shipments is equipped with
14   refrigeration equipment that allows data monitoring
15   of temperatures and refrigeration equipment
16   performance inside the trailer from the time of
17   precooling of the trailer.
18         A.    I understand.
19         Q.    Okay.  And so does Bukhara Trans have
20   trailers with refrigeration equipment?
21         A.    He said, yes, we have.
22         Q.    And do you know how many or can you
23   estimate how many?
24         A.    He said I couldn't.
```

Electronically signed by Deborah Janicek (101-112-275-6733)                    160b8cd4-7115-4342-8fba-3319a7decab7

ARTISAN v. BUKHARA                    FAKHRIDDIN AVEZOV

Page 20

1              He said our company based on reefer
2    and dry van but I'm not sure about the quantity of
3    them.
4         Q.    Can he estimate more than 10?
5         A.    He said I'm not sure about at all.
6         Q.    Okay.  Has he driven trucks and
7    trailers that have refrigeration equipment before
8    with Bukhara Trans?
9         A.    He said, no, I didn't drive with the
10   Bukhara Trans refrigerator load.
11        Q.    I'm saying has he driven trucks before
12   for Bukhara Trans with refrigeration capability.
13        A.    He said, no, I didn't ride with the
14   Bukhara Trans with the refrigeration.
15        Q.    Okay.  So in his time working for
16   Bukhara Trans, he has never used a truck or trailer
17   with refrigeration equipment?
18        A.    He said no.
19        Q.    Okay.  Does he -- Does Bukhara Trans
20   have trucks with refrigerator capabilities?
21              I apologize if I asked that question
22   already.  I just don't recall the answer.
23        A.    He said, yes, we have.
24        Q.    Okay.  And is there any specific reason

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                           FAKHRIDDIN AVEZOV

                                                    Page 21

 1   as to why we use a dry trailer here versus a

 2   refrigerated-capable trailer?

 3        A.   He said --

 4             MR. ZELIZER:  Tell him we need to

 5   translate.

 6             THE TRANSLATOR:  Can I translate it?

 7             MR. MUDLONG:  Yes, go ahead.

 8   BY THE WITNESS:

 9        A.   So he said that, as usual, I got the

10   dry van load and I went to the shipper.

11             They said sit in the truck and they

12   gave him dock and they loaded on this dock their

13   frozen goods that he didn't know about it and they

14   sealed it.  He thought that they're loading the

15   dry van load, not frozen.

16   BY MR. MUDLONG:

17        Q.   Okay.  And how many loads has he

18   transported in the eight years of being a truck

19   driver for Bukhara?

20        A.   He said I'm not sure about how many

21   loads I delivered in this time but it should be a

22   numerous amount.

23        Q.   Okay.  Would it be fair to say over a

24   thousand loads he has transported in his eight

                CYNTHIA A. PAVESICH & ASSOCIATES
                        (312) 214-1992

ARTISAN v. BUKHARA                          FAKHRIDDIN AVEZOV

Page 22

1    years?

2         A.    He said more than a thousand.

3         Q.    Okay.  And in those thousand loads, he

4    never used a Bukhara truck with refrigeration

5    capabilities?

6         A.    He said I worked with the different

7    companies with the refrigerator equipment but in

8    Bukhara Trans, I only drive with the dry van

9    trailer.

10        Q.    Okay.  And who instructed him to

11   complete this shipment of the frozen product?

12        A.    He said my dispatcher instructed.

13        Q.    Does he recall the name of the

14   dispatcher?

15        A.    He couldn't remember but he said that

16   it should be Connor, if I'm not mistaken.

17        Q.    Okay.  And does he recall a last name

18   for Connor?

19        A.    He said no.

20        Q.    Okay.  So I'm going to show Exhibit 3,

21   the temperature report.

22        A.    Um-hum.

23              (The document was shared.)

24

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                    FAKHRIDDIN AVEZOV

Page 23

```
 1   BY MR. MUDLONG:

 2        Q.    So this report is dated October 12,

 3   2022.

 4              Were you present when they conducted

 5   this test on your trailer?

 6        A.    He said no.

 7              He said, no, I don't know.

 8        Q.    Okay.  So since he used a dry trailer,

 9   there's no air chute or reefer on the trailer?

10        A.    He said no.

11        Q.    And have you transported frozen product

12   before?

13        A.    Yes.

14        Q.    Okay.  And the trailer you used would

15   generally have a reefer or air vent to transport

16   frozen product?

17        A.    He said yes.

18        Q.    Okay.

19        A.    He has.

20        Q.    So let me stop sharing so I can pull up

21   the next exhibit.

22              So this is going to be Exhibit 4.

23                   (The document was shared.)

24
```

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Deborah Janicek (101-112-275-6733)                    160b8cd4-7115-4342-8fba-3319a7decab7

ARTISAN v. BUKHARA                    FAKHRIDDIN AVEZOV

                                              Page 24

 1    BY MR. MUDLONG:

 2          Q.    Do you recognize this document?

 3          A.    He said I couldn't remember.

 4          Q.    Okay.  So -- So here the Shipped date

 5    says October 11, 2022.

 6          A.    Um-hum.

 7          Q.    And here it says the carrier is

 8    Schmieding and it has the same date, October 11,

 9    2022.

10          A.    Um-hum.

11          Q.    Is this document called a bill of

12    lading?

13          A.    He said, yes, it should be bill of

14    lading.

15          Q.    And when do you receive the bill of

16    lading?

17          A.    He said I got this after the loading

18    and the sealing of the load.

19          Q.    Okay.  And so looking at the middle

20    part of the page, here it says Must be kept at zero

21    degrees.  Perishable product.  Maintain at proper

22    temperature.

23                Did he read this document after they

24    sealed his trailer?

                CYNTHIA A. PAVESICH & ASSOCIATES
                        (312) 214-1992

ARTISAN v. BUKHARA                          FAKHRIDDIN AVEZOV

                                                    Page 25

 1        A.    He said, no, I didn't.  I just -- I

 2   just sign it and I send it to the group he

 3   mentioned.

 4        Q.    Is this his signature at the bottom?

 5        A.    He said no.

 6        Q.    Okay.  Where would he have signed it

 7   if -- if anywhere?

 8        A.    He said they gave me the paperwork and

 9   I sign it but this is not my signature, he said.

10   I'm not sure about where I sign it.

11        Q.    So any reason why he did not read the

12   message part of this document regarding the

13   temperature?

14             MR. MUDLONG:  Actually, Anna, wait.

15   We'll wait on -- Okay.  Never mind.  Ethan's still

16   in the room.  Go ahead.

17             MR. ZELIZER:  Just telling people to

18   be quiet.  Sorry.

19             MR. MUDLONG:  No, you're fine.  I just

20   want to make sure you're in the room before he

21   gives his answer.

22   BY THE WITNESS:

23        A.    So he's saying that the reason why he

24   didn't read this note because he's sure that if it

                CYNTHIA A. PAVESICH & ASSOCIATES
                      (312) 214-1992

ARTISAN v. BUKHARA                          FAKHRIDDIN AVEZOV

Page 26

1    was reefer load, every broker and shipper checking

2    temperature before the loading.  Even they are

3    smelling the trailer inside before the loading.

4    BY MR. MUDLONG:

5         Q.    Okay.  But to his knowledge, he did not

6    read this document but he also signed this

7    document.  We just don't have his signature on this

8    particular photograph.

9         A.    He said it's not my signature.

10        Q.    Okay.  But he did -- he does recall

11   signing a document similar to this.

12        A.    He said that I couldn't recall like

13   how many bill of ladings, what kind of bill of

14   ladings I read and sign it.  I'm not sure about it

15   at all.

16        Q.    Okay.  Did you receive any complaints

17   after completing the delivery to Sysco in

18   Tennessee?

19        A.    He said that, yes, I went to Sysco and

20   delivered the load and I checked in and the lady

21   here ask me for the temperature but -- And I said

22   I do not have any temperature.  It's a dry van

23   trailer.

24             And she asked her -- asked him how you

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Deborah Janicek (101-112-275-6733)                    160b8cd4-7115-4342-8fba-3319a7decab7

ARTISAN v. BUKHARA                              FAKHRIDDIN AVEZOV

Page 27

1    loaded this load if it's dry van?  It's -- It's

2    frozen goods.

3              He said I'm not sure about it.  The

4    shipper just loaded the load and sealed it.

5              And she called her supervisor and they

6    gave him doc and they loaded all the goods inside.

7    And he mentioned that there was no smell.  It was

8    just melted a little bit.

9         Q.   Okay.  So you stated that he drove 10

10   hours from Chicago to Tennessee.

11        A.   Um-hum.

12        Q.   Is that a yes?

13        A.   He said I'm not sure about it.  It

14   approximately should be 10 hours.  I drive like at

15   3:00 p.m. or 5:00 and I delivered the load at 8:00

16   a.m.

17              MR. ZELIZER:  Aaron, can we take a

18   quick bathroom break; just two minutes?

19              MR. MUDLONG:  Yeah, no problem.

20                 (Whereupon a recess was taken.)

21              MR. ZELIZER:  Okay.  Aaron, we're

22   back.

23              MR. MUDLONG:  All right.

24              Are you ready to go back on record,

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Deborah Janicek (101-112-275-6733)                    160b8cd4-7115-4342-8fba-3319a7decab7

ARTISAN v. BUKHARA                        FAKHRIDDIN AVEZOV

```
                                              Page 28
 1   Deborah?

 2              THE REPORTER:  Yes.

 3              MR. MUDLONG:  Okay.  So now I'm going

 4   to show you Exhibit 5.  It's going to be our

 5   Reservation of rights letter from Progressive.

 6              (The document was shared.)

 7   BY MR. MUDLONG:

 8       Q.   Did he ever read this letter?

 9       A.   He said no.

10       Q.   Okay.  And I'm going to -- Did he ever

11   receive this letter by chance?

12       A.   He said, no, I don't know.

13       Q.   Okay.  I'm going to go to Exhibit 6

14   here.

15              (The document was shared.)

16   BY MR. MUDLONG:

17       Q.   So this is a denial letter.

18              Does he recognize this letter?

19       A.   So he said that, yes, I got some

20   documents but I'm not sure what kind of document I

21   get -- got and I gave it to my office.

22       Q.   Okay.  And is this letter addressed to

23   him even though I believe his name is spelled

24   incorrectly?
```

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Deborah Janicek (101-112-275-6733)                    160b8cd4-7115-4342-8fba-3319a7decab7

ARTISAN v. BUKHARA                          FAKHRIDDIN AVEZOV

Page 29

1        A.    He said yes.

2              At that time I just moved to the

3    California and my address was in Illinois also.

4    He said, yes, I received some documents for --

5    like in Illinois but I didn't get it and when I

6    get it, I gave it to the office.

7        Q.    Okay.  When did he move to California

8    from Illinois?

9        A.    He said I moved on 2022 at November or

10   December.

11       Q.    Okay.  So going back to Exhibit 5 here,

12   the reservation of rights letter.  It's dated -- Go

13   ahead.  Go ahead.  No, go ahead.

14             All right.  It's dated October 31,

15   2022.

16       A.    Um-hum.

17             THE TRANSLATOR:  Sorry.

18             MR. MUDLONG:  No, that's fine.  Go

19   ahead.  Go ahead.

20             THE TRANSLATOR:  Just let me know when

21   I should translate because I'm just interrupting.

22   Sorry.

23             MR. MUDLONG:  Okay.  Fine.

24   BY MR. MUDLONG:

Electronically signed by Deborah Janicek (101-112-275-6733)                160b8cd4-7115-4342-8fba-3319a7decab7

ARTISAN v. BUKHARA                          FAKHRIDDIN AVEZOV

                                                        Page 30

 1        Q.    Okay.  So on October 31, 2022, were you

 2   still living in Illinois?

 3        A.    He said that on October 31st, 2022, I

 4   went to California looking for the house and he

 5   moved totally to California on January 7th.  But

 6   he was not there on October 31st.  He was in

 7   California looking for the house.

 8        Q.    Okay.  So he stated he sent documents

 9   to his office.

10             What office is he talking about?

11        A.    He said he gave it to the Illinois

12   office of his company, to Suzana.

13        Q.    How do you spell Suzana?

14             THE TRANSLATOR:  S, as in Sam,

15   u-z-a-n-a.

16   BY MR. MUDLONG:

17        Q.    And what is her role with Bukhara

18   Trans?

19        A.    He said I'm not sure what she does --

20   did.  I just gave her the document.

21        Q.    Okay.  So you gave her numerous

22   documents pertaining to a lawsuit when you don't

23   know what she does at your company?

24        A.    He said I just gave her because she

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                    FAKHRIDDIN AVEZOV

                                              Page 31

 1    did, at that time, safety and I asked her to

 2    handle it to the person who is working with it.

 3          Q.    Okay.  So this letter is a coverage --

 4    insurance coverage denial letter dated May 11,

 5    2023.

 6                Is it fair to say that based on this

 7    letter, Progressive denied coverage to Bukhara

 8    Trans on May 11th, 2023?

 9          A.    He said yes.

10          Q.    Okay.

11          A.    He said can I ask you question?

12          Q.    Sure.

13          A.    He said that -- He said that I'm

14    living in U.S. since 10 years and I'm working as a

15    truck driver during the eight years of my life in

16    the U.S. and I never see this kind of shipping,

17    unprofessional -- because I've worked with reefer

18    loads.

19                They're always checking if I have like

20    a -- let's say if I have like a minus seven

21    temperature in my reefer equipment.  They're

22    saying, no, we cannot -- we cannot load this load

23    to your equipment because it's like a -- we have

24    to wait until minus 10, turning to minus 10

Electronically signed by Deborah Janicek (101-112-275-6733)                    160b8cd4-7115-4342-8fba-3319a7decab7

ARTISAN v. BUKHARA                    FAKHRIDDIN AVEZOV

                                              Page 32

 1    temperature of your equipment and then we can

 2    load.

 3              They are taking the picture and

 4    they're saying it's good to go.

 5              But they just got the -- they just

 6    loaded the load inside my trailer, dry van

 7    trailer.  They're seeing that it's dry van trailer

 8    and they're loading the load and they're sealing

 9    it, not showing up to me.

10              I think it's ordered -- it's like

11    order from someone.  We have to call the shipper

12    because it's such unprofessional shipper --

13    shipping company.

14         Q.    Okay.  Well, I don't represent the

15    shipping company in this matter.  I just represent

16    the insurance company for Bukhara so -- But I

17    understand it's frustrating.

18              MR. MUDLONG:  But I'll turn it over to

19    you, Ethan.

20              THE TRANSLATOR:  I just explained him

21    your words and he's saying that I'm -- I'm nervous

22    since -- like two years that this case is ongoing

23    and like I'm explaining to everybody but no one is

24    understanding me.

                CYNTHIA A. PAVESICH & ASSOCIATES
                       (312) 214-1992

ARTISAN v. BUKHARA                    FAKHRIDDIN AVEZOV

Page 33

1              MR. ZELIZER:  Aaron, no questions on

2    this side.  We can finish it.

3              MR. MUDLONG:  Okay.

4              MR. ZELIZER:  We'll reserve signature.

5              MR. MUDLONG:  All right.

6              MR. ZELIZER:  Can you let him know

7    that we're done and thank him?

8              THE TRANSLATOR:  He said that thank

9    you, too.

10             MR. ZELIZER:  Okay.

11                 (AND FURTHER DEPONENT SAITH NOT.)

12

13

14

15

16

17

18

19

20

21

22

23

24

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                                      FAKHRIDDIN AVEZOV

```
                                                           Page 34
  1              IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
  2                       EASTERN DIVISION

  3
      ARTISAN AND TRUCKERS          )
  4   CASUALTY COMPANY,             )
                                    )
  5                   Plaintiff,    )
                                    )
  6         -vs-                    ) No. 23:CV-04439
                                    )
  7   BUKHARA TRANS, INC.,          )
                                    )
  8                   Defendant.    )

  9

 10              I hereby certify that I have read the

 11   foregoing transcript of my deposition given on

 12   10-7-2024 at the time and place aforesaid and I do

 13   again subscribe and make oath that the same is a

 14   true, correct and complete transcript of my

 15   deposition given as aforesaid, with corrections,

 16   if any, appearing on the attached correction

 17   sheet(s).

 18

 19              _____ correction sheets attached.

 20              _____
                        FAKHRIDDIN AVEZOV
 21

 22

 23   SUBSCRIBED AND SWORN to
      before me this _____ day of
 24   _____, A.D., 2024
```

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                          FAKHRIDDIN AVEZOV

Page 35

```
 1   STATE OF ILLINOIS  )
                        )
 2   COUNTY OF C O O K  )

 3

 4              I, Deborah Janicek, Certified

 5   Shorthand Reporter and Notary Public in and for

 6   the County of Cook and State of Illinois, do

 7   hereby certify that FAKHRIDDIN AVEZOV was first

 8   duly sworn by me to testify the truth, the whole

 9   truth, and nothing but the truth, and that the

10   above deposition was recorded stenographically by

11   me and was reduced to typewriting under my

12   personal direction.

13              I further certify that the foregoing

14   transcript of the said deposition is a true,

15   correct and complete record of the testimony given

16   by the said witness at the time and place

17   specified herein before.

18              I further certify that I am not a

19   relative, employee, attorney or counsel of any of

20   the parties, nor a relative or employee of such

21   attorney or counsel, or financially interested

22   directly or indirectly in this action.

23

24
```

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                    FAKHRIDDIN AVEZOV

Page 36

1            In witness whereof, I have hereunto

2    set my hand and affixed my seal of office at

3    Chicago, Illinois, this 10th day of October,

4    A.D., 2024.

5                    _____
                     Deborah Janicek
6                    Certified Shorthand Reporter
                     License No. 084-003352
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Deborah Janicek (101-112-275-6733)                    160b8cd4-7115-4342-8fba-3319a7decab7

# EXHIBIT 8

# IN THE MATTER OF:

## ARTISAN
-v-
## BUKHARA

ANNA ROMANO

1:23-CV-04439

October 7, 2024

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992
cagoodreporter@pavesich.com

ARTISAN v. BUKHARA                                    ANNA ROMANO

Page 1

                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
                            EASTERN DIVISION


        ARTISAN AND TRUCKERS          )
        CASUALTY COMPANY,             )
                                      )
                       Plaintiff,     )
                                      )
              -vs-                    ) No. 23:CV-04439
                                      )
        BUKHARA TRANS, INC.,          )
                                      )
                       Defendant.     )


                    The Zoom videoconference deposition of

        ANNA ROMANO, taken in the above-captioned cause

        before Deborah Janicek, Certified Shorthand

        Reporter within and for the State of Illinois, on

        the 7th day of October, 2024, at the hour of 10:00

        o'clock a.m.


                    CYNTHIA A. PAVESICH & ASSOCIATES
                          (312) 214-1992

ARTISAN v. BUKHARA                                    ANNA ROMANO

```
                                                    Page 2
 1   A P E A R A N C E S:

 2              SUDEKUM CASSIDY & SHULRUFF CHARTERED

 3              (20 North Clark Street

 4               Suite 2450

 5               Chicago, IL  60602

 6               312-262-4862

 7               arm@scslegal.com), by:

 8              MR. AARON R. MUDLONG,

 9                  on behalf of the Plaintiff;

10              HR LAW COUNSEL

11              (29 South Webster Street

12               Suite 350c

13               Naperville, IL  60540

14               630-551-8374

15               ethan@hrlawcounsel.com), by:

16              MR. ETHAN ZELIZER,

17                  on behalf of the Defendant.

18

19

20

21                  *   *   *   *   *   *   *   *

22

23

24
```

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Deborah Janicek (101-112-275-6733)                              b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

                                                          Page 3

1                          I-N-D-E-X

2    Witness:                              Page

3    Anna Romano

4      Direct Examination by Mr. Mudlong      6

5      Cross Examination by Mr. Zelizer      38

6      Redirect Exam by Mr. Mudlong          40

7                        EXHIBITS

8    Romano Exhibit Nos.                   Page

9    1 - Defendant's answers to
          interrogatories                  12
10
     2 - Responses to request to produce   15
11
     3 - Carrier load tender               23
12
     4 - Temperature assessment            27
13
     5 - Bill of lading                    29
14
     6 - Reservation of rights letter      34
15

16

17

18

19

20

21

22

23

24

                CYNTHIA A. PAVESICH & ASSOCIATES
                      (312) 214-1992

ARTISAN v. BUKHARA                                    ANNA ROMANO

                                                          Page 4

 1              MR. MUDLONG:  Ethan, we can start

 2    whenever Anna is ready.

 3              MR. ZELIZER:  No, we're ready when you

 4    are.

 5              MR. MUDLONG:  Go ahead.

 6              THE REPORTER:  Before we proceed,

 7    pursuant to Federal Rule of Civil Procedure

 8    30(b)(4) providing for conducting depositions by

 9    remote means, I will ask counsel to agree on the

10    record that there is no objection to this

11    Certified Shorthand Reporter administering a

12    binding oath to the witness via videoconference.

13              I will ask each of you to state your

14    agreement on the record, starting with counsel for

15    the plaintiff first and, at the same time, please

16    identify yourself for the record.

17              MR. MUDLONG:  Aaron Mudlong for the

18    plaintiff.  I have no objections for this

19    matter -- for this deposition be taken pursuant

20    to -- via Zoom.

21              MR. ZELIZER:  This is Ethan Zelizer on

22    behalf of Bukhara and the deponents today.  We

23    have no objections to this deposition being taken

24    via Zoom.

Electronically signed by Deborah Janicek (101-112-275-6733)            b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

```
                                                    Page 5
 1                  (The witness was duly sworn.)
 2               MR. MUDLONG:  Good morning.  Please
 3    state your name and spell your last name for the
 4    record, please.
 5               THE WITNESS:  Good morning.  This is
 6    Anna Romano.  The first name is A-n-n-a.  The last
 7    name will be R-o-m-a-n-o, Romano.
 8               MR. MUDLONG:  Okay.  Anna, have you
 9    ever taken -- has your deposition ever been taken
10    before?
11               THE WITNESS:  No.
12               MR. MUDLONG:  Okay.  So I'm just going
13    to lay out a few ground rules since we're over
14    Zoom.
15               So today we have Deborah as the court
16    reporter and you have been sworn in so you're
17    obligated to tell the truth.
18               Please answer audibly with a yes or a
19    no.  It's hard for the court reporter to pick up
20    any head nods or uh-huhs or uh-uhs; and then
21    please allow me to finish asking my question and
22    I'll return the same courtesy to you.
23               If you need a break at any time during
24    this deposition, just let me know and we can take
```

Electronically signed by Deborah Janicek (101-112-275-6733)                    b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

                                                          Page 6

 1    a recess for that issue.

 2              Do you understand these rules I've set

 3    before you?

 4              THE WITNESS:  Yes, I understand.

 5              MR. MUDLONG:  Okay.

 6                   ANNA ROMANO,

 7    called as a witness herein, having been first duly

 8    sworn, was examined and testified as follows:

 9                   DIRECT EXAMINATION

10    BY MR. MUDLONG:

11         Q.   So how did you prepare for your

12    deposition today?

13              I'm not asking -- I should also

14    clarify.  I'm not asking for the conversations you

15    had with your attorney.  I'm just curious to know

16    what you did in preparation.

17         A.   So we prepared like a grid.

18         Q.   And what is your current home address?

19         A.   So the home address will be 1851

20    Douglas Road, Montgomery, Illinois, 60503.

21         Q.   And then do you rent or own the house

22    or residence you live in?

23         A.   Rent.

24         Q.   Okay.  And how long have you resided at

                  CYNTHIA A. PAVESICH & ASSOCIATES
                        (312) 214-1992

ARTISAN v. BUKHARA                                    ANNA ROMANO

```
                                             Page 7
 1   that address?
 2         A.    Two years almost.
 3         Q.    Okay.  And who is your current
 4   employer?
 5         A.    The Bukhara Trans.
 6         Q.    Can you spell Bukhara Trans for the
 7   court reporter, please?
 8         A.    Sure, it's B-u-k-h-a-r-a T-r-a-n-s.
 9         Q.    And how long have you been with Bukhara
10   Trans?
11         A.    Almost two years.
12         Q.    And what is your job title or position
13   at Bukhara?
14         A.    Some -- working like a -- as a general
15   consult here -- you know.  Consult any issues,
16   problems with the claims.  Everything regarding
17   this.
18         Q.    Okay.  Do you have like an official
19   title or is it generally you wear a lot of --
20         A.    General, yeah.
21         Q.    Okay.  And -- So can you just list a
22   few duties and responsibilities you have with
23   Bukhara?
24         A.    So I'm working with our company's
```

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                                ANNA ROMANO

                                                      Page 8

1    lawyers, providing the lawyers with

2    documentations, information.  Everything will be

3    needed to the court.

4          Q.    And how many co-workers do you have at

5    Bukhara Trans?

6          A.    I think 20.

7          Q.    Okay.  So what type of business is

8    Bukhara Trans in?

9          A.    In logistics.  Transportation.

10         Q.    Okay.  And what do you guys generally

11   transport?

12         A.    So the loads -- like the dry van

13   loads, flatbed loads.  All regarding the

14   transportation or transporting all goods.

15         Q.    Okay.  And do you -- what states do

16   we -- does Bukhara Trans transport to?

17         A.    Every state.  We're working with every

18   state, yeah.

19         Q.    Okay.  And what type of vehicles do you

20   guys use to transport goods across the 50 states?

21         A.    Truck and trailer.

22         Q.    Do you guys use any other kind of

23   vehicles besides trucks and trailers?

24         A.    No.

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Deborah Janicek (101-112-275-6733)                    b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                ANNA ROMANO

                                                          Page 9

     1          Q.     Okay.  And do you, for any reason, feel

     2     that you are mentally or physically incapable of

     3     providing true and accurate answers to any of my

     4     questions today?

     5          A.     No.

     6          Q.     So do you recall the incident that

     7     occurred on October 12, 2022?

     8          A.     Yeah.

     9          Q.     Okay.  So what is your recollection of

    10     this incident?

    11                    (Exit Mr. Zelizer.)

    12     BY THE WITNESS:

    13          A.     So like the shipment was originally

    14     posted as a wine filler on our load board and we

    15     booked that load.  Our dispatcher booked that

    16     load.

    17                    But in real it was the -- when the

    18     driver went to the shippers, they went with the

    19     frozen goods.  Our driver didn't see that.  And he

    20     load up -- The shipper was by himself, load the

    21     dry van trailer with the frozen goods but -- you

    22     know, it requires the specific temperature

    23     control.

    24                    But like the shipper, knowing that

Electronically signed by Deborah Janicek (101-112-275-6733)                    b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

                                                      Page 10

 1   it's like a dry van trailer, loaded the -- on

 2   October 11 at 9:00 a.m.

 3              THE REPORTER:  You know what?

 4              MR. MUDLONG:  Go ahead, Deborah.

 5              THE REPORTER:  He walked out of the

 6   room.  The attorney walked out of the room.

 7              MR. MUDLONG:  Yes, I didn't really

 8   want to stop the answer but I think we're going to

 9   have to wait until he comes back.  I would prefer

10   that he be in the room when she answers this

11   question so --

12              THE REPORTER:  I didn't know it was

13   going to go on and on.

14                  (Pause.)

15                  (Enter Mr. Zelizer.)

16              MR. ZELIZER:  We're good.  Thank you.

17              MR. MUDLONG:  No problem.

18              So we're just going to restate the

19   question, Anna.

20   BY MR. MUDLONG:

21       Q.   Can you just give me what -- tell us

22   what you recall about this October 12, 2022

23   incident.

24       A.   So I recall that our dispatch booked

                CYNTHIA A. PAVESICH & ASSOCIATES
                      (312) 214-1992

ARTISAN v. BUKHARA                                ANNA ROMANO

Page 11

1    the load with the dry van trailer and when our

2    driver went to the shippers, they were -- they

3    loaded the frozen goods to his trailer and it was

4    damaged because it required a specific temperature

5    and like we -- I think that's all incidents.

6         Q.    Okay.  So if I heard you right, you

7    stated that Bukhara's dispatch booked the dry van

8    trailer for this?  Is that what you said?

9         A.    Yes.

10        Q.    Okay.  And so what was your -- Do you

11   have any kind of role in this delivery on

12   October 12?

13        A.    No.

14        Q.    Okay.  And do you know Fakhriddin

15   Avezov?

16             THE REPORTER:  Will you spell all of

17   that?

18             MR. MUDLONG:  Yes, I will.  His first

19   name is F-a-h-k-r-i-d-d-i-n and then A-v, as in

20   Victor, e-z-o-v.

21   BY THE WITNESS:

22        A.    So Fakhriddin is like our driver since

23   eight years.

24

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                                    ANNA ROMANO

Page 12

1   BY MR. MUDLONG:

2       Q.    Okay.

3       A.    Yeah.

4       Q.    Eight years.  Okay.

5             So I'm just -- Let me just make sure I

6   heard everything correctly because it -- I mean it

7   was a little jumbled but it's my understanding --

8   So Bukhara's dispatch booked a dry trailer for the

9   shipment on October 11, 2022.  Fair?

10      A.    Correct.

11      Q.    Okay.  And the -- what type of goods

12  were to be transported on October 11th?

13      A.     It was frozen goods but I'm not sure

14  like what it was specifically but broker mentioned

15  the name like it was a baking.

16      Q.    Okay.  But it was a frozen good and the

17  trailer that was used was essentially a dry trailer

18  right?

19      A.    (Indicating.)

20      Q.    Okay.  So I'm going to share my screen

21  here.  I'm just going to show you --

22            MR. MUDLONG:  Let's mark this as

23  Exhibit 1.  One second.

24                (The document was shared.)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                              ANNA ROMANO

```
                                            Page 13
 1   BY MR. MUDLONG:

 2        Q.    Are you able to see my screen?

 3        A.    Yes.

 4        Q.    Okay.  So here the title of this

 5   document, this Exhibit 1, is labeled Defendant's

 6   responses to Plaintiff's first set of

 7   interrogatories.

 8             Do you see that?

 9        A.    Yes.

10        Q.    All right.  And at the bottom here, it

11   looks like where -- Actually you guys sent us a

12   separate signature.

13             Do you recall signing these

14   interrogatories, Anna?

15        A.    No.

16        Q.    Give me one second.  I'll find the

17   signature page for you.  Give me one second.

18                (Pause.)

19             MR. ZELIZER:  Aaron, you missed it but

20   she did say that she gave us authority to sign on

21   her behalf.

22             THE WITNESS:  Correct.  Yes.

23             MR. MUDLONG:  Okay.  Understood.  I

24   just wanted to find the signature page; make sure
```

Electronically signed by Deborah Janicek (101-112-275-6733)          b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

```
                                                      Page 14
  1   I had it.

  2              I'm going to share my screen again

  3   here.

  4                 (The document was shared.)

  5   BY MR. MUDLONG:

  6       Q.    And, Ms. Romano -- So this is the

  7   verification page.  Does it state that you -- As

  8   Mr. Zelizer stated, did you give your counsel

  9   authority to sign these interrogatories on your

 10   behalf?

 11       A.    Correct, yes.

 12       Q.    Okay.  So it looks like the only

 13   responses that we received here were to

 14   interrogatories 13 -- or strike that -- 12, 13 and

 15   14.

 16              So the first interrogatory is Identify

 17   all written or other communications between H.C.

 18   Schmieding Produce Company and Bukhara from

 19   January 1, 2021 through the present.

 20              Obviously it states that See document

 21   production herewith.

 22              By chance, how did you come about those

 23   communications?  How did you produce -- Or how did

 24   you find those, I should ask.
```

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Deborah Janicek (101-112-275-6733)                    b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                          ANNA ROMANO

```
                                                      Page 15
1          A.     So I first printed this information.
2    I talked with the driver, with the brokerage.
3    Like I find out E-mails and we found -- we -- like
4    I have -- and we had this conclusion that it
5    was -- that like this, yeah.
6          Q.     Okay.  And that's part of your day to
7    day -- your general responsibilities at Bukhara?
8    That's generally what you do?
9          A.     Yes.
10         Q.     So let's go ahead and move over to --
11               MR. MUDLONG:  So this is going to be
12   marked Group Exhibit 2.  This is going to be the
13   documents that you provided to your attorneys for
14   the responses to request to produce.
15               So I'm not going to go through each
16   document and essentially just ask you -- Actually
17   strike that.
18                 (The document was shared.)
19   BY MR. MUDLONG:
20         Q.     So this first document is called a
21   Settlement agreement.
22               By chance, do you have any knowledge
23   about what this settlement agreement is?
24         A.     Yes, I have.
```

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                           ANNA ROMANO

Page 16

1        Q.    Okay.  So what is your level of

2    knowledge about the settlement agreement?

3        A.    So with RTS Financial, right?

4        Q.    This would be -- Yes, RTS.

5        A.    Yeah, so this settlement was in --

6    like one of our settlements with the Arkansas and

7    with -- we have been settled for the -- the

8    specific amount for this case.

9        Q.    Okay.  And did you partake in the

10   settlement talks for that?

11       A.    No.

12       Q.    Okay.  So this one -- this next

13   document is the RTS Financial Letter Agreement

14   dated August 24, 2023.

15            Do you have any knowledge about this

16   particular document?

17       A.    No.

18       Q.    Okay.  So here -- the next document

19   here is the agreed order staying garnishment; order

20   issued on August 10, 2023.

21            Do you have any knowledge about this

22   document?

23       A.    No.

24       Q.    Okay.  So this document -- Did you

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                                              ANNA ROMANO

```
                                                            Page 17
 1   produce this document to counsel?
 2         A.    No, I'm not.
 3         Q.    Okay.  And further -- So this next
 4   document is called a Carrier load tender.
 5               Are you familiar with carrier load
 6   tender documents with your job at Bukhara?
 7         A.    So the carrier load typically -- No,
 8   I'm not -- I'm not familiar.
 9         Q.    Okay.  That's no problem.
10               So you wouldn't have -- So in your job
11   duties, you generally don't see carrier load
12   tenders day to day -- in your everyday job?
13         A.    So we have like a claims department
14   that's working with this carrier load tenders.
15   They have duties.
16         Q.    Okay.
17         A.    So I -- So they're working with this
18   kind of documents.
19         Q.    Okay.  So your claims department would
20   be the ones most knowledgeable about the carrier
21   load tender.
22         A.    Correct.  Yes.
23         Q.    Okay.  Continuing on.
24               (Scrolling.)
```

Electronically signed by Deborah Janicek (101-112-275-6733)                    b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

```
                                                     Page 18
 1   BY MR. MUDLONG:

 2          Q.    So this is a carrier payment and ACH

 3   options through Schmieding Produce.

 4                Are you familiar with Schmieding

 5   Produce?

 6          A.    Yes, I'm familiar.

 7          Q.    Okay.  Have you had any dealings with

 8   them in the past prior to today?

 9          A.    So I'm not the person who is dealing

10   regarding the money but our owners of the

11   company -- presidents -- they're by themselves

12   like dealing so I'm not needed in this process.

13          Q.    Okay.  And -- So this document is the

14   carrier agreement that is between Schmieding and

15   Bukhara that you guys produced in written

16   discovery.

17                Are you familiar with this carrier

18   agreement?

19          A.    Yes.

20          Q.    Okay.  So is -- Let me see.  Strike

21   that.

22                So moving to Page No. 8 of this carrier

23   agreement.  Let me get there.

24                (Scrolling.)
```

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                                    ANNA ROMANO

```
                                                    Page 19
 1   BY MR. MUDLONG:

 2        Q.    So here it states The carrier shall

 3   verify the temperature of the food shipments before

 4   loading.

 5             Do you see this section here, number 4,

 6   Recording food?

 7        A.    Yes.  Yes.

 8        Q.    Okay.  So going back to your earlier

 9   answer, based on this carrier agreement, it's our

10   understanding that Bukhara Trans, the carrier for

11   this matter, was to basically have the ability to

12   monitor the temperatures of the load.  Is that

13   fair?

14        A.    Yes.

15        Q.    Okay.  And it says here Carrier must

16   write the recorded temperatures on shipping

17   documents used by the parties for the pick up,

18   transport or delivery of goods including, without

19   limitation, any bills of lading.

20             Do you see that part?

21        A.    Yes.

22        Q.    So does Bukhara Trans have trucks that

23   are capable of recording temperatures of the loads?

24        A.    Yes, we have.
```

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Deborah Janicek (101-112-275-6733)                    b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

Page 20

1          Q.    Do you know how many trucks you guys

2    have that are capable of doing that?

3          A.    I'm not sure about amount of how many

4    we have but we have the reefer trucks.

5                MR. ZELIZER:  You have the trucks?

6                THE WITNESS:  We have the trucks.

7    BY MR. MUDLONG:

8          Q.    I'm sorry.  What was the number again?

9          A.    I'm not sure about the number but we

10   have the reefer trucks.

11         Q.    Okay.  And for this -- for this

12   particular shipment that occurred on October 11 and

13   it was shipped over on October 12, what kind of

14   truck and trailer was used?

15         A.    So we used it, the drive van, because

16   the broker posted the load as a dry van.  And they

17   load it by themselves, like to the dry van

18   trailer, like frozen goods.

19         Q.    Sure.

20               And does a dry van or a dry trailer --

21   does that have the ability to monitor the

22   temperature of the food or --

23         A.    No.  No.

24         Q.    Okay.  So moving over to Page 9 of this

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                                    ANNA ROMANO

Page 21

1    carrier agreement.  Looking at -- Let's see here.

2    So looking at Section A here -- I'm just going to

3    let you read this portion just because it's a

4    little long.  Just let me know when you're done

5    reading Subsection A here.

6                    (Pause.)

7                    THE WITNESS:  Yes, I read it.

8    BY MR. MUDLONG:

9         Q.    Okay.  So in Subsection 3, it says The

10   temperature of any temperature-controlled food

11   shipment will not be materially disrupted.

12                  In a dry trailer, since you're not able

13   to monitor the temperature of the load, does that

14   affect the product that you're transporting?

15        A.    Yes, it affects but we like didn't

16   know that it was like the frozen good and that's

17   why we didn't like monitor the load's temperature.

18                  If it billed -- Like broker will post

19   like a reefer load and we load it to the reefer

20   trailer.  We always want to find the temperature

21   of the goods side.

22        Q.    Right.  Okay.

23                  So this carrier agreement here, which

24   is -- Let's scroll to the bottom part of the

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                                    ANNA ROMANO

```
                                                     Page 22
 1   carrier agreement.
 2              (Scrolling.)
 3   BY MR. MUDLONG:
 4        Q.    So the carrier agreement is between
 5   H.C. Schmieding Produce LLC and Bukhara Trans and
 6   down here there is an individual by the name of
 7   Franco Alvarez on top of the signature block.
 8              Who is Franco Alvarez?
 9        A.    So he was our dispatcher in the
10   Bukhara Trans but he already fired from our
11   company.
12        Q.    Okay.  And do you recall when he was
13   fired from your company?
14        A.    No.  I'm not sure.
15        Q.    Okay.  By chance, would you be able to
16   estimate when he was fired?  Like post COVID?
17   During COVID?  Before COVID?
18        A.    I think maybe like in the COVID period
19   but I'm not sure like exact date and time and
20   year.
21        Q.    Okay.  So here -- Since this carrier
22   agreement is between H.C. Schmieding and Bukhara,
23   do you recall what -- Strike that.
24              Do you recall who Bukhara Transport was
```

Electronically signed by Deborah Janicek (101-112-275-6733)                    b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

Page 23

1    transporting goods for on the -- on October 12th,

2    2022?

3         A.    So transporting the goods for?  I

4    think Lineage -- Lineage Logistics, if I'm not

5    mistaken, yeah.

6         Q.    Okay.  So I'm going to move over here

7    to -- I'm going to go back to -- mark this last

8    exhibit 3.

9             So this is the Carrier load tender.

10   It's my understanding you don't really have much

11   knowledge about these carrier load tenders, is that

12   correct?

13        A.    Yes.

14        Q.    Okay.  But do you see here how it says

15   the origin is Lineage, 2357 South Wood Street?

16        A.    Yes.

17        Q.    And you just stated that Bukhara was

18   transporting for Lineage or from Lineage, is that

19   correct?

20        A.    Yes.

21        Q.    Okay.  And the destination of the load

22   was to go to Sysco in Knoxville, Tennessee, is that

23   correct?

24        A.    Correct.

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                                    ANNA ROMANO

```
                                                  Page 24
 1        Q.    And the bill is to go to H.C.
 2   Schmieding Produce Company?
 3        A.    Correct.
 4        Q.    Okay.  So at the bottom of this load
 5   tender here, there's a section called References
 6   and then underneath it states Temperature range.
 7             So under the Reference value, do you
 8   see what it says here under the Reference value
 9   section?
10        A.    Yes, I'm seeing.
11        Q.    Okay.  So based on this carrier load
12   tender -- I understand you don't have much
13   experience with these, but generally speaking, what
14   does this -- this text under the reference value
15   mean to you?
16        A.    So it mean like a frozen goods inside
17   the -- which should be like a -- which would be
18   like a specific temperature range.
19        Q.    Okay.
20             MR. ZELIZER:  Aaron, can I have five
21   seconds?
22             MR. MUDLONG:  Yes, no problem.
23             MR. ZELIZER:  I'm not -- And it can
24   stay on the record because I'm not trying to hide
```

Electronically signed by Deborah Janicek (101-112-275-6733)                    b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                               ANNA ROMANO

                                                     Page 25

 1   anything.

 2              MR. MUDLONG:  No, problem.

 3              MR. ZELIZER:  Tell him about the text

 4   you showed me that has a different description.

 5              THE WITNESS:  Sure.

 6              MR. ZELIZER:  And explain to him what

 7   it is.  You can even show it to the camera if you

 8   want.

 9              THE WITNESS:  So I have here the text

10   from the broker.

11              MR. ZELIZER:  It won't come up.

12              THE WITNESS:  It's like blurry.

13              MR. ZELIZER:  Can you see it?

14              MR. MUDLONG:  I see kind of a white

15   screen.  I mean if you could E-mail it to me, it

16   might be easier.

17              MR. ZELIZER:  Yeah, sure.

18              She'll -- She'll E-mail it to me.

19   I'll E-mail it to you but what it says, Aaron --

20   just so that you know --

21              MR. MUDLONG:  Sure.

22              MR. ZELIZER:  The text from the broker

23   says Pick up 10-11 at 10:00 a.m.  Delivers 10 to

24   12 -- 10-12 at 10:00 a.m.  Commodity.  Baking.

                 CYNTHIA A. PAVESICH & ASSOCIATES
                         (312) 214-1992

ARTISAN v. BUKHARA                                    ANNA ROMANO

Page 26

1    Weight.  32.277.  Rate 2300.

2              And obviously Anna wanted you to know

3    about that because it said baking and it did not

4    have the refrigeration notes.

5              I will send it to you right now.

6              THE WITNESS:  Yeah, and we have proof

7    that the broker posted the load as a dry van not

8    reefer.

9              MR. MUDLONG:  Okay.  Understood.

10             I'm just going to wait for it to come

11   through so I can look at it for a quick second.

12             MR. ZELIZER:  Sure.

13             THE WITNESS:  Sure.  One second.

14             MR. ZELIZER:  It'll just take one

15   second.  Sorry about that, Aaron.

16             MR. MUDLONG:  No problem.  We can go

17   off the record for a second while that's getting

18   sent.

19                  (Discussion was had off the record.)

20             MR. MUDLONG:  I think we can go back

21   on the record so . . .

22   BY MR. MUDLONG:

23        Q.    So, Anna, who is Jesenia Ruiz?

24        A.    I think it should be the -- the one

Electronically signed by Deborah Janicek (101-112-275-6733)                    b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                          ANNA ROMANO

                                                               Page 27

 1    like a -- from the brokerage department of the

 2    shipper.

 3          Q.    Okay.  And do you generally deal with

 4    the brokers at Bukhara Trans?

 5          A.    I'm not sure.

 6          Q.    All right.  No problem.

 7                So I'm going to go ahead here and share

 8    my screen again and I'm just going to show you --

 9                MR. MUDLONG:  This is going to be

10    exhibit -- I think I'm on Exhibit 4 here.

11                    (The document was shared.)

12    BY MR. MUDLONG:

13          Q.    So do you see my screen?

14          A.    Yes.

15          Q.    So this is from the Sysco location in

16    Knoxville and it's essentially a temperature

17    assessment document of the load.

18                So here in Section 3 it states

19    Evaluate the load pattern.  In Subsection D, it

20    says is the time, temperature device located on

21    the last pallet facing the doors.  And it says if

22    not, where.  It says No TTR.

23                As you said earlier, is that because

24    you guys used a dry trailer to transport the goods

                CYNTHIA A. PAVESICH & ASSOCIATES
                        (312) 214-1992

Electronically signed by Deborah Janicek (101-112-275-6733)                    b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                              ANNA ROMANO

```
                                              Page 28
 1   at this time?

 2          A.    Yes.  Correct.

 3          Q.    Okay.  And then going down here to

 4   Evaluate the trailer condition, Section 4.  It says

 5   is the air chute free of damage and properly

 6   attached.

 7              So it's my understanding no -- the dry

 8   van trailers generally don't have an air chute?

 9          A.    Yes.

10          Q.    Okay.  And the dry vans, do they have a

11   reefer on those -- those trailers?

12          A.    No.  They don't.

13          Q.    Okay.  So it looks -- So at the bottom

14   here, this is signed by a Jim Lucas who is -- who

15   worked at the Sysco plant to do this temperature

16   assessment.

17              And then what is the date of this

18   report?

19          A.    October 12th, 2022.

20          Q.    And is that the date that you -- that

21   Bukhara Trans would have completed the delivery

22   for --

23          A.    Yes.

24          Q.    -- from Lineage to Sysco?
```

Electronically signed by Deborah Janicek (101-112-275-6733)                              b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

Page 29

1        A.     Yes.

2        Q.     Okay.  And then moving on here.  Let me

3    stop sharing again so I can pull up the other

4    document.

5              (The document was shared.)

6              MR. MUDLONG:  So this is probably

7    going to be the last exhibit so I believe this is

8    Exhibit 5 from Lineage Logistics, PFS.

9    BY MR. MUDLONG:

10       Q.     Do you recognize what this document is?

11       A.     Yes, it's a bill of lading.

12       Q.     Okay.  Perfect.

13              And down here in the Order message,

14   this is basically stating that a recorded -- they

15   recorded the temperature of the load.

16              And what was the temperature of the

17   load for each section of the trailer?

18       A.      So as I mentioned, it was a dry van

19   and we didn't like put any specific temperature

20   because we couldn't.

21       Q.     Okay.  Understood.

22              And so when you're transporting frozen

23   goods in a dry van, what generally happens to those

24   frozen goods?

Electronically signed by Deborah Janicek (101-112-275-6733)                    b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                          ANNA ROMANO

Page 30

1        A.    So when we're like transporting the

2    frozen goods -- also only with a specific truck,

3    which is a refrig truck -- trailer, sorry, and

4    when -- like transporting successfully, this

5    goods -- frozen goods -- but in this case we do

6    not -- didn't know about the -- that the load was

7    like frozen and the shipper was like at risk of --

8    like a ship -- just loaded the load like with the

9    frozen goods to our dry van trailer and our driver

10   did not notice that it was frozen goods because

11   the shipper loaded it, not our driver.

12           And because it's like a -- not refrig

13   trailer, we didn't like monitor.  It's like a

14   temperature because we -- we don't need it on the

15   dry van trailers.

16           So, yeah, it was just a

17   miscommunication I think, something like that,

18   with the broker.  So he -- he didn't mention about

19   the reefer load and our dispatcher like booked the

20   dry van load on.

21       Q.    Okay.  Understood.

22           So based on what you're telling me is

23   that the driver essentially didn't know that it was

24   going to be frozen goods when he went to go pick up

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                                    ANNA ROMANO

```
                                                   Page 31
 1   the load, is that right?

 2        A.    Right, yes.  Because the shipper

 3   actually like loaded the -- on his trailer the

 4   load and just -- The driver secured this load and

 5   just drive -- delivered it.

 6        Q.    Okay.  Understood.

 7              I'm going to share my screen again

 8   here.  I'm going to show you the Carrier load

 9   tender again.

10              (The document was shared.)

11   BY MR. MUDLONG:

12        Q.    So can you see my screen?

13        A.    Yes.

14        Q.    All right.  So here it says Driver is

15   responsible to verify load is blocked, braced and

16   secured as per DOT safety regulations.

17              Is that -- That's generally how Bukhara

18   Trans operates, is that fair?

19        A.    Yes.

20        Q.    Okay.  So in the instance of -- you

21   know, verifying that the load is secured, is the

22   driver -- is the driver able to verify what kind of

23   load he is transporting at that time?

24        A.    So the -- our dispatcher told him that
```

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                                    ANNA ROMANO

Page 32

1    it's a baking commodity and the shipper loaded

2    this baking commodity and he thought that it's

3    like a baking commodity and it's not frozen.

4              He secured -- Like they load it.

5    Shipper say they loaded the load and he just

6    secured it and just deliver it.

7              So we didn't know about -- just

8    this -- about the frozen goods.

9              And one more thing.  The broker didn't

10   mention about didn't like get update from us about

11   the temperature.

12             Actually broker's like getting the

13   update in every one hour like -- in certain about

14   the temperature of the load but the broker didn't

15   mention at all about the temperature.

16        Q.   Okay.  Let me go back to the bill of

17   lading here.

18                  (The document was shared.)

19   BY MR. MUDLONG:

20        Q.   So back here in the Order message -- So

21   generally speaking when would you -- when would a

22   driver receive a bill of lading?  If you know.

23        A.   On 11 October 2022.

24        Q.   Okay.  And do you see in the Order

Electronically signed by Deborah Janicek (101-112-275-6733)                    b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

Page 33

1    message where it says here Must be kept at zero

2    degrees.  Perishable product.  Maintain at proper

3    temperature?

4         A.    Yes.

5         Q.    So your driver would have received this

6    prior to departing on October 11, 2022?

7         A.    Yes.

8         Q.    Okay.  So if he received it and it

9    states that it must be kept at zero degrees, would

10   that be an issue for a dry van trailer?

11        A.    Yes, it will be.

12        Q.    Okay.  And generally speaking, what

13   happens to frozen products when you do not keep

14   them in a refrigerated environment?

15        A.    They'll melt.

16        Q.    All right.  So here what happens to the

17   product after the completion of the delivery?

18        A.    Sorry.  Could you just repeat this

19   question?

20        Q.    Sure.

21        A.    I'm sorry.

22        Q.    No, that's fine.

23              So what happened to the frozen product

24   after the delivery was completed?

Electronically signed by Deborah Janicek (101-112-275-6733)                    b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

```
                                              Page 34
 1        A.    It damaged it.  It was damage it
 2   because like a -- the temperature.
 3        Q.    Okay.  Stop sharing.  One more document
 4   to show you and then I'll turn it over to Ethan.
 5   So share one more time.
 6                (The document was shared.)
 7   BY MR. MUDLONG:
 8        Q.    So this is the last exhibit here.  So
 9   this is what we call a Reservations letter.
10             Do you see how this is addressed to
11   Mr. Avezov?
12        A.    Yes.
13        Q.    Do you have any knowledge of receiving
14   this Reservations of rights letter?
15        A.    Yes.
16        Q.    Okay.  So did you -- what kind of --
17   What level of knowledge do you have about this
18   Reservation of rights letter?
19        A.    So this is a claim information from
20   the Progressive, our insurance.
21        Q.    Okay.  And did Progressive -- Did you
22   read this Reservations of rights letter?
23        A.    Yes.
24        Q.    So -- So did Progressive send you this
```

Electronically signed by Deborah Janicek (101-112-275-6733)          b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

Page 35

1    letter or did you just so happen to have it in your

2    possession?

3         A.    So I just -- just check it because

4    it's my position.  It's my position.

5         Q.    Okay.  But generally who would

6    generally read these letters at Bukhara Trans?

7         A.    So as I told you, we have the claims

8    department and I'm just reviewing them and our

9    lawyer's working with us on this.

10        Q.    Okay.  Now can you just walk me through

11   that process?

12              So this letter comes in at Bukhara

13   Trans.  So who does it go to first?

14        A.    The -- I guess Fakhriddin Avezov.

15        Q.    Okay.  So after Mr. Avezov receives

16   this letter, does he then transfer it to claims or

17   does he hand it to you?

18              I'm just trying to figure out how

19   the -- where this letter goes after Bukhara

20   receives it.

21        A.    So I'm not sure who received this

22   letter but --

23        Q.    Okay.

24        A.    -- I reviewed it.

Electronically signed by Deborah Janicek (101-112-275-6733)                    b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                          ANNA ROMANO

Page 36

1            I'm not sure.

2       Q.    Okay.  So you did review this letter

3   just in light of today essentially.

4       A.    (Indicating.)

5       Q.    Scrolling down here.

6            So Progressive is essentially stating

7   that they wanted to look into the coverage of the

8   damaged goods for this matter specifically pursuant

9   to policy language regarding refrigeration

10  breakdown.

11           So do you see this section here

12  (indicating)?

13      A.    Um-hum.

14      Q.    I'm just going to -- I'm just going to

15  let you read that section briefly and then just let

16  me know when you're done.

17               (Pause.)

18           THE WITNESS:  I'm done

19           MR. MUDLONG:  Okay.  And then going

20  down to the last part that I want you to read is

21  this section that I've highlighted.  Just let me

22  know when you're done reading that highlighted

23  section.

24           I can take off the highlighting if

Electronically signed by Deborah Janicek (101-112-275-6733)          b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

Page 37

1    it's hard to read.  Just let me know.

2              THE WITNESS:  No that's fine.

3                   (Pause.)

4              THE WITNESS:  Okay.  I'm done.

5              MR. MUDLONG:  Okay.

6    BY MR. MUDLONG:

7         Q.   So as you know, the goods were damaged

8    here because they were frozen and transported in a

9    dry trailer, correct?

10        A.   Correct.

11        Q.   So in order for coverage to be asserted

12   here by Progressive, we have -- Progressive would

13   need to see that there was an accident regarding a

14   refrigeration unit on the trailer.

15             For the trailer in question, was

16   there -- was there a refrigeration unit attached to

17   the trailer?

18        A.   No.

19        Q.   Okay.  So at that time -- At the time

20   of transport, there was no refrigeration unit being

21   used to maintain the temperature of the trailer,

22   correct?

23        A.   Yes, we -- in this case, yes.

24        Q.   Okay.  And you stated that Bukhara has

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Deborah Janicek (101-112-275-6733)                    b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

                                                      Page 38

1    other trucks that have refrigeration capabilities?

2          A.    Correct, yes.

3          Q.    And you're not sure of how many trucks

4    they have available, correct?

5          A.    Yes.  Correct.

6          Q.    Okay.  Stop sharing.

7                MR. MUDLONG:  And from here, Ethan, I

8    think I'm going to turn it over to you.

9                MR. ZELIZER:  Okay.

10               THE WITNESS:  Thank you so much.

11               MR. ZELIZER:  Okay.  So, Ms. Romano,

12   I'm going to ask you a couple of questions.  Okay?

13               THE WITNESS:  Um-hum.

14                  CROSS EXAMINATION

15   BY MR. ZELIZER:

16         Q.    You were just shown a letter from

17   Progressive Insurance.

18         A.    Um-hum.

19         Q.    And counsel had asked you to read an

20   exclusion regarding refrigeration breakdown

21   maintenance and then another endorsement regarding

22   refrigeration general provisions.

23               Is it your opinion that those

24   exclusions applied to this situation?

Electronically signed by Deborah Janicek (101-112-275-6733)                    b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

Page 39

1          A.    I think no.

2          Q.    Why not?

3          A.    So --

4          Q.    Or let me strike that.  Let me ask

5     again.

6                Would refrigeration exclusions and

7     refrigeration endorsements be relevant to a dry

8     load that you book?

9          A.    Yes.

10               No?

11         Q.    I'm asking you.

12               If the load is dry, would you be

13    looking at refrigeration clauses in your

14    insurance -- insurance clauses?

15         A.    No.

16         Q.    Why not?

17         A.    Because it's a dry van.  They book a

18    dry van load, not a reefer load.  That's why we

19    didn't.

20         Q.    Okay.  And to your knowledge on

21    October 11th or October 12th, did anyone call

22    Bukhara and tell them that a refrigeration unit was

23    needed?

24         A.    No, nobody.

Electronically signed by Deborah Janicek (101-112-275-6733)                    b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

```
                                                  Page 40
   1              MR. ZELIZER:  No further questions.

   2              MR. MUDLONG:  Give me one second.  I

   3    just want to look at something.

   4                   (Pause.)

   5              MR. MUDLONG:  Okay.  So just a

   6    probably short redirect here.

   7              I'm going to share my screen again

   8    back to the Carrier agreement.

   9              (The document was shared.)

  10                 REDIRECT EXAMINATION

  11    BY MR. MUDLONG:

  12        Q.    So looking at Subsection 5 between --

  13    for this carrier agreement between Schmieding and

  14    Bukhara.  Carrier represents and warrants that all

  15    equipment used in transporting food shipments is in

  16    safe and sanitary condition appropriate for the

  17    performance of the services for food shipments

  18    including, but not limited to, equipment free from

  19    contamination, pest infestation, evidence of prior

  20    cargo that could render the food shipments unsafe.

  21              Carrier -- so the carrier here would

  22    be Bukhara -- represents and warrants that all

  23    equipment used in transporting food shipments is

  24    equipped with an operational air chute at least
```

Electronically signed by Deborah Janicek (101-112-275-6733)          b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

                                                        Page 41

1    43 feet in length and fully attached from the

2    beginning to the end of the refrigeration unit.

3              So based on this carrier agreement,

4    what is Bukhara required to have in their

5    trailers?

6              THE REPORTER:  I didn't hear that

7    answer.

8              MR. MUDLONG:  You need me to repeat

9    the question, Anna, to make it --

10             THE WITNESS:  Yes, please.

11   BY MR. MUDLONG:

12       Q.    Sure.  I'll make it easier for you.

13             If you can just read this section here,

14   Section 5, and just let me know when you're done

15   and then we can go from there to make it a little

16   easier on you.

17             (Pause.)

18   BY THE WITNESS:

19       A.    So regarding this question, I don't

20   know the specific, the -- of this document.

21   BY MR. MUDLONG:

22       Q.    Sure.

23             But based on the language that's in

24   front of you, is Bukhara required to have an

                CYNTHIA A. PAVESICH & ASSOCIATES
                       (312) 214-1992

ARTISAN v. BUKHARA                                    ANNA ROMANO

Page 42

1    operational air chute in their trailers?

2          A.    I'm not sure about this question but

3    if -- it will be only on the reefer loads --

4    trailers, not on the dry van.

5          Q.    Understood.

6                So when -- So would you agree that the

7    carrier agreement between Schmieding and Bukhara

8    would be in effect whenever Bukhara's transporting

9    on behalf of Schmieding?

10         A.    I don't know about this.  Sorry.

11         Q.    Sure.  Not a problem.

12               So reading this specific sentence here,

13   so carrier represents and warrants that all

14   equipment used in transporting food shipments is

15   equipped with refrigeration equipment that allows

16   data monitoring of temperatures.  So based on that

17   sentence that's in this agreement between Bukhara

18   and Schmieding, does your trailer need a

19   refrigeration unit?

20         A.    So as I mentioned, we had -- at that

21   time -- the dry van trailer, not the reefer

22   equipment and we thought that we loaded the dry

23   van load which is not requiring the specific

24   temperature.  And we -- On the dry van trailers,

Electronically signed by Deborah Janicek (101-112-275-6733)          b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

Page 43

1    we don't need the temperature control for this

2    kind of equipment.

3          Q.    Understood.

4                But when you're transporting for H.C.

5    Schmieding, as this carrier agreement -- which was

6    what this carrier agreement pertains to, the

7    tech -- would you agree that the agreement states

8    that refrigeration equipment is required for the

9    trailers and trucks that are transporting goods for

10   Schmieding?

11         A.    Yes.

12         Q.    Okay.

13               MR. MUDLONG:  Nothing further, Ethan.

14               MR. ZELIZER:  Okay.  We'll reserve

15   signature.

16               THE REPORTER:  Thank you.

17               THE WITNESS:  Thank you.

18               MR. MUDLONG:  No problem.  Thanks

19   for -- Thanks for your time.

20                    (AND FURTHER DEPONENT SAITH NOT.)

21

22

23

24

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                                      ANNA ROMANO

```
                                                    Page 44

 1            IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3
    ARTISAN AND TRUCKERS          )
 4  CASUALTY COMPANY,             )
                                  )
 5                   Plaintiff,   )
                                  )
 6       -vs-                     ) No. 23:CV-04439
                                  )
 7  BUKHARA TRANS, INC.,          )
                                  )
 8                   Defendant.   )

 9

10            I hereby certify that I have read the

11  foregoing transcript of my deposition given on

12  10-7-2024 at the time and place aforesaid and I do

13  again subscribe and make oath that the same is a

14  true, correct and complete transcript of my

15  deposition given as aforesaid, with corrections,

16  if any, appearing on the attached correction

17  sheet(s).

18

19            _____ correction sheets attached.

20            _____
                          ANNA ROMANO
21

22

23  SUBSCRIBED AND SWORN to
    before me this _____ day of
24  _____, A.D., 2024
```

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

ARTISAN v. BUKHARA                                    ANNA ROMANO

```
                                                    Page 45

  1   STATE OF ILLINOIS  )
                          )
  2   COUNTY OF C O O K  )

  3

  4              I, Deborah Janicek, Certified

  5   Shorthand Reporter and Notary Public in and for

  6   the County of Cook and State of Illinois, do

  7   hereby certify that ANNA ROMANO was first duly

  8   sworn by me to testify the truth, the whole truth,

  9   and nothing but the truth, and that the above

 10   deposition was recorded stenographically by me and

 11   was reduced to typewriting under my personal

 12   direction.

 13              I further certify that the foregoing

 14   transcript of the said deposition is a true,

 15   correct and complete record of the testimony given

 16   by the said witness at the time and place

 17   specified herein before.

 18              I further certify that I am not a

 19   relative, employee, attorney or counsel of any of

 20   the parties, nor a relative or employee of such

 21   attorney or counsel, or financially interested

 22   directly or indirectly in this action.

 23

 24
```

Electronically signed by Deborah Janicek (101-112-275-6733)                    b99fe623-ef54-47fa-bbbf-5300985cd0d5

ARTISAN v. BUKHARA                                    ANNA ROMANO

```
                                                    Page 46
   1             In witness whereof, I have hereunto

   2    set my hand and affixed my seal of office at

   3    Chicago, Illinois, this 10th day of October,

   4    A.D., 2024.

   5    _____
                        Deborah Janicek
   6                    Certified Shorthand Reporter
                        License No. 084-003352
   7

   8

   9

  10

  11

  12

  13

  14

  15

  16

  17

  18

  19

  20

  21

  22

  23

  24
```

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

# EXHIBIT 9

Order # 264146
08:55AM

**BILL OF LADING**

# Lineage Logistics PFS, LLC

2357 South Wood St Chicago, IL 60608 · PHONE: (773) 268-3400
FAX: (773) 268-3401  EMAIL: d3orders@lineagelogistics.com

Page 1

**FROM ACCOUNT OF:** SYSCOC
SYSCO MERCHANDISING SERVICES
1390 CORPORATION
Houston, TX
77077

**CONSIGNED TO:** Manual
BNCC SYSCO KNOXVILLE  LLC
900 TENNESSEE AVENUE
KNOXVILLE, TN
379212630

4-264146

Order Date    : 10.06.22
Cust. Ord. Num : WS0107
P.O. Number   : 06558960

Shipped Date : 10.11.22
Freight Term : COLLECT
Carrier : SCHMIEDING 10:00 10.11.22

LOT Code                    Description                        22 Unit Wgt.
(ITEM Code)  Units SKU              Pallets in  O  Pallets out ___  total spots

```
************** Order MESSAGE ***************
*                        *RECORD TEMPS*      *
*                                            *
*   NOSE _39_ MIDDLE _37_ TAIL _50_          *
*                                            *
*      **NUMBER OF PALLETS SHIPPED**         *
*                                            *
*   ___ # of CHEP        ___ # of WHITE      *
*                                            *
*  SEAL # __01581513__                       *
*                                            *
*  MUST BE KEPT AT 0 DEGREES                 *
*  PERISHABLE PRODUCT MAINTAIN AT PROPER     *
*  TEMPERATURE                               *
*                                            *
*  _____                               *
*                                            *
**********************************************
```

SHIPPER : 199000 - JASPER WYMAN & SONS
=====================================
D3247033      55 CS    2527653 IQF CRANBERRY WHOLE 2/5          12.00
                       02.11.24

(Item : 2527653)
00967398D3
                       1-I106A    0      1-STAGE   55 CS
-----------------------------------------------------------------
D3247033      35 CS    2527653 IQF CRANBERRY WHOLE 2/5          12.00
                       02.11.24

(Item : 2527653)
00967405D3
                       1-J060A    0      1-STAGE   35 CS



SYSCOC-264146

IMPORTANT THIS IS PERISHABLE PRODUCT MAINTAIN PROPER TEMPERATURE

**Lineage Logistics PFS, LLC**

REC'D BY:

SHIPPED BY:

# EXHIBIT 10

PROGRESSIVE CLAIMS
747 ALPHA DRIVE
HIGHLAND HEIGHTS, OH 44143

**PROGRESSIVE** ®

**Underwritten By:**
**Artisan and Truckers Casualty Company**

Claim Number:    22-8735713
Loss Date:          October 13, 2022
Loss State:         TN
Document Date:  October 31, 2022
Page 1 of 6

**claims.progressive.com**
    Track the status and details of your
    claim, e-mail your representative or
    report a new claim.

BUKHARA TRANS INC
320 BLAINE CT
AURORA, IL 60504

# Claim Information

Dear Mr. Avezov,

Please be advised, I am handling this claim on behalf of the above referenced underwriting company "the Company".  The purpose of this letter is to notify you, we are still investigating coverage for this claim.

The investigation to date alleges Bukhara Trans Inc was hired by Schmieding Produce to transport a load of frozen baking goods from IL to TN. A claim was filed on your policy as it is being alleged the cargo was delivered out of temperature, which resulted in loss of the product. It is further alleged that the cargo was transported using a dry van trailer without a refrigeration unit, which resulted in the temperature issues. To date, there has been no evidence provided to support there was a sudden and accidental breakdown of refrigeration or heating units, and you have stated there was none. Therefore, the Company hereby notifies you it is handling the claim with a full reservation of, and without prejudice to, any and all rights that the Company may have under the Policy.

We require your cooperation to continue our coverage investigation.  Please provide the following information so we may continue to assist with your claim:

-    Recorded statement from the driver involved in the transport

-    Driver logs / ELD for the transport dates

-    Cab card/registration card for the trailer used for the transport

Please note under the Policy and Cargo Endorsement Bukhara Trans Inc
has a duty to provide us with this information as available.

Please reference the policy insurance forms, Commercial Auto Policy 6912 (02/19), Motor Truck Cargo Legal Liability Coverage Form Z434IL (02/19), and Refrigeration Breakdown Coverage Endorsement Z440 (06/10) which state in part:

COMMERCIAL AUTO POLICY

DUTIES IN THE EVENT OF AN ACCIDENT OR LOSS

For coverage to apply under this policy, you or the person seeking coverage must promptly report each accident or loss even if you or the person seeking coverage is not at fault. Refer to your policy documents for the claims phone number.


Continued

You or the person seeking coverage must also obtain and provide us the names and addresses of all persons Involved in the accident or loss, the names and addresses of any witnesses, and the license plate numbers of the vehicles involved.

If you or the person seeking coverage cannot identify the owner or operator of a vehicle involved in the accident, or if theft or vandalism has occurred, you or the person seeking coverage must notify the police within 24 hours or as soon as practicable. However, for purposes of uninsured motorist coverage when the owner or operator of a vehicle involved in the accident cannot be identified, you or the person seeking coverage must notify the police no more than 30 days after the accident.

A person seeking coverage must:

1. cooperate with us in any matter concerning a claim or lawsuit;

MOTOR TRUCK CARGO LEGAL LIABILITY COVERAGE ENDORSEMENT

DUTIES IN CASE OF A LOSS

The following additional duties apply under this Motor Truck Cargo Legal Liability Coverage endorsement:

1.      You must take all reasonable steps to protect covered property and business equipment at the time of and after a loss to avoid further damage.

2.      You must allow us to have all property involved in an accident or loss inspected and appraised before its repair or disposal.

3.      You must give us a copy of the descriptions and schedules from all insurance policies applicable to the covered property or

business equipment, whichever the case may be, that was destroyed or damaged.

4.      You must send us a signed, sworn proof of loss containing all the information we request to settle the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

5.      You must, as often as we reasonably require, submit, and so far as is within your power, cause all other persons interested in the covered property or business equipment, whichever the case may be, and members of their households and employees to submit, to examination under oath by any person we name, and, in connection with any claim made, to produce for examination all books of accounts, uniform bills of lading, shipping receipts, invoices, drivers' log books, and any other documents, at such reasonable time and place as we may designate, and permit extracts and copies thereof to be made...

INSURING AGREEMENT--LOSS TO COVERED PROPERTY

Subject to the Limit of Liability, if you pay the premium for this Motor Truck Cargo Legal Liability Coverage, we will pay for the direct physical loss to covered property that you are legally liable to pay as a trucker under a written: bill of lading, tariff document, rate confirmation sheet, shipping receipt, or contract of carriage. For this coverage to apply, the covered property must, at the time of loss, be in your exclusive physical custody and control:

1.      while in due course of transit in, on, or attached to an insured auto; or


Continued

2.        during loading or unloading.

Coverage applies for loss to covered property only if the loss is caused by a covered peril. For covered property that is your property, our payment is not contingent upon your liability...

ADDITIONAL DEFINITIONS

The following additional definitions apply only to Motor Truck Cargo Legal Liability Coverage, as set forth in this endorsement, and any endorsements thereto that solely pertain to this coverage, whenever the defined term appears therein in boldface type, whether in the singular, plural, or possessive:

...2. "Covered peril" means any external risks of direct physical loss to covered property or business equipment, except for those listed in a. through m. below as Excluded Perils.

Excluded Perils: Please read the following list of excluded perils carefully. We will not pay for loss or damage caused by any of the excluded perils described below.

Loss or damage will be considered to have been caused by an excluded peril if the occurrence of that peril directly and solely results in loss or damage, or initiates a sequence of perils that results in loss or damage, regardless of the nature of any intermediate or final peril in that sequence...

...d. Inherent Vice

Deterioration; wear and tear; obsolescence; hidden or latent defect; gradual decay; fungus; mildew; mold; rot; rust; insects; vermin; change in flavor; or any quality, fault, or weakness in the covered property or business equipment that causes it to damage or destroy itself...

f. Consequential Loss

Loss of use, loss of market, loss of market value, or delay; or any other remote or consequential loss, other than direct physical loss, to covered property or business equipment.

...5 "In due course of transit" means being shipped from the time you assume exclusive physical custody and control of the covered property for the purpose of the actual movement of covered property from the point of shipment bound for a specific destination and ending when one of the following first occurs:

a.        the covered property is accepted by, or on behalf of, the consignee at the intended destination;

b.        the covered property is accepted by, or on behalf of, the consignee at any intermediate point short of reaching the original intended destination;

c.        72 hours after arrival at destination; or

d.        any other stop that exceeds 72 hours.

In due course of transit includes ordinary and necessary stops, interruptions, delays, or transfers incidental to the route and method of shipment...

6. "Insured auto" means:

a. Any auto specifically described on the declarations page that is not a trailer;

b. An additional auto that is not a trailer on the date you become the owner if:

(i) you acquire the auto during the policy period shown on the declarations page;



Continued

(ii) we insure all autos owned by you that are used in your business;

(iii) no other insurance policy provides coverage for that auto; and

(iv) you tell us within 30 days after you acquire it that you want us to cover it.

c. Any replacement auto that is not a trailer on the date you become the owner if:

(i) you acquire the auto during the policy period shown on the declarations page;

(ii) the auto that you acquire replaces one specifically described on the declarations page due to termination of your ownership of the replaced auto or due to mechanical breakdown of, deterioration of, or loss to the replaced auto that renders it permanently inoperable;

(iii) no other insurance policy provides coverage for that auto; and

(iv) you tell us within 30 days after you acquire it that you want us to cover it.

d. A trailer designed primarily for travel on public roads, only when the trailer is attached to a power unit that is an insured auto or while it is in due course of transit by a power unit that is an insured auto.

e. Any temporary substitute auto that is not a trailer.


Refrigeration Breakdown Coverage Endorsement


Duties In Case of a Loss


The following are added to the Duties in Case of a Loss section:


7. You must take all reasonable steps to protect covered property at the time of and after a loss to avoid further damage, including but not limited to storage of the cargo in a properly temperature controlled facility or alternate trailer;

8. You must allow us access to the refrigeration or heating equipment prior to its repair unless a delay in repair would imperil the cargo;

9. You must provide us access to all maintenance and repair records for the failed refrigeration or heating unit; and

10. You must allow us access to all records establishing the proper use of the equipment, including any and all electronic records or logs generated by the unit.


Insuring Agreement

The following is added to the Insuring Agreement:

Subject to the Limit of Liability, if you pay the premium for the Refrigeration Breakdown Coverage endorsement, we will pay for your legal liability for direct physical loss to covered property, caused by spoilage, or change in temperature, resulting directly from the sudden and accidental breakdown of refrigeration or heating units on an insured auto.


Additional Definitions

Under the definition of "covered peril", Excluded Peril "g." is deleted and replaced by:

g. Breakdown, Temperature, Humidity

(i) Humidity, dampness, dryness, or changes in or extremes of temperature, other than such loss caused by the sudden and accidental breakdown of refrigeration or heating units on the insured auto; or

(ii) Mechanical or electrical breakdown or failure, other than the sudden and accidental breakdown of refrigeration or heating units on the insured auto. However, this Excluded Peril does not apply to loss caused by a fire or explosion if such fire or explosion would be covered under this endorsement...


Continued

Exclusions

The following exclusions are added:

Coverage under this Refrigeration Breakdown Coverage endorsement will not apply for loss caused by, resulting from, or arising out of breakdown of the refrigeration or heating unit due to any of the following:

1. Failure to provide adequate fuel supply;

2. Failure to maintain crankcase oil or refrigerant level within the manufacturer's specifications;

3. Intentional destruction or damage to automatic temperature control units by an employee; or

4. Failure to maintain the calibration of the refrigeration or heating unit and/or failure to maintain the refrigeration or heating unit within the manufacturer's specifications.

General Provisions

The following is added to the General Provisions section:

I. Refrigeration/Heating Equipment Maintenance.

1. You, or your employee, must check the refrigeration and heating equipment every 12 hours while it is being operated; and

2. At least once a month, you must:

a. Have the refrigeration and heating equipment inspected by a manufacturer-authorized representative, or other trained refrigeration specialist, which may include you or your employee;

b. Promptly perform the proper maintenance according to manufacturer's specifications;

c. Make any appropriate or necessary repairs; and

d. Keep and update written records with respect to item 1. and items 2.a. through 2.c. above. You must allow us to inspect these records as often as we may reasonably require. If you fail to maintain these records, coverage will be void under this endorsement.

All other terms, limits, and provisions of the Motor Truck Cargo Legal Liability Coverage endorsement remain unchanged.

In summary, the investigation reveals to date, we have not received evidence that the loss occurred as the result of a sudden and accidental breakdown of refrigeration or heating units.  In addition, we have not received information that the loss occurred as a result of a covered peril as defined by the policy. Finally, based on the information we have been able to gather, this loss may also have been the result of multiple excluded perils as defined by the Cargo and Refrigeration Endorsements. Due to these issues, the Company may not be obligated to pay for the damages alleged in this loss.

This reservation of rights is based on our investigation to date. We reserve the right to amend this letter to assert any new or additional policy terms or conditions which may become pertinent to coverage as a result of our ongoing investigation. We will notify you in a timely manner of any new or additional basis for our reservation of rights under the policy as they arise in our ongoing investigation.


Continued

Sincerely,


ROY A MEYERS
Claims Department
1-440-910-2488
1-800-PROGRESSIVE (1-800-776-4737)
Fax: 1-833-905-1739

Form Z587 (01/08)

# EXHIBIT 11

PROGRESSIVE CLAIMS
747 ALPHA DRIVE
HIGHLAND HEIGHTS, OH 44143



**Underwritten By:**
**Artisan and Truckers Casualty Company**

Claim Number:      22-8735713
Loss Date:         October 13, 2022
Loss State:        TN
Document Date:     May 11, 2023
Page 1 of 1

**claims.progressive.com**
Track the status and details of your
claim, e-mail your representative or
report a new claim.

BUKHARA TRANS INC
1400 LIGHT RD.
APT 103
OSWEGO, IL 60543

# Claim Information

Dear Mr. Avezov,

This letter is to advise you that Artisan and Truckers Casualty Company has reviewed the lawsuit (Case 5:23-cv-05011-TLB) filed against you by H.C. Schmieding Produce Company, LLC on January 10, 2023. H.C. Schmieding Produce Company, LLC, the plaintiff, is seeking more than $113,277.64 in cargo damages and other fees and interests from Bukhara Trans Inc. A copy of the complaint is attached.

As you know, coverage was not afforded for this loss, and Artisan and Truckers Casualty Company maintains there is no coverage for this loss. I have attached a copy of the coverage disclaimer provided to you on November 17, 2022.

As there is no coverage for this claim, Artisan and Truckers Casualty Company will not be providing you with a defense in this matter. In the event you wish to retain an attorney, you must do so at your own expense.

If you have any questions or concerns, please contact me.

Sincerely,

ROY A MEYERS
Claims Department
1-440-910-2488
1-800-PROGRESSIVE (1-800-776-4737)
Fax: 1-833-905-1739

Form Z587 (01/08)